**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE NEW YORK TIMES COMPANY,

               Plaintiffs,

     v.

MICROSOFT CORPORATION, OPENAI, INC.,
OPENAI LP, OPENAI GP, LLC, OPENAI, LLC,
OPENAI OPCO LLC, OPENAI GLOBAL LLC,
OAI CORPORATION, LLC, and OPENAI
HOLDINGS, LLC,

               Defendants.

Case No. 1:23-cv-11195-SHS

**DEFENDANT MICROSOFT CORPORATION'S MEMORANDUM**
**IN SUPPORT OF PARTIAL MOTION TO DISMISS THE COMPLAINT**

March 4, 2024

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

ALLEGATIONS OF THE COMPLAINT........................................................................ 4

    A. Large Language Models Are A Profound Advance In Artificial Intelligence And A
    Powerful Tool For Human Flourishing................................................................. 4

    B. Microsoft Collaborates With OpenAI To Bring GPT-Based Tools To The Public. ........... 5

    C. The New York Times Sues Microsoft and OpenAI............................................ 6

    D. The Complaint Alleges No Real-World Instance of Output of The Times's Works or
    Impact to The Times's Rights. .............................................................................. 8

ARGUMENT ................................................................................................................... 9

I.   THE TIMES FAILS TO STATE A CLAIM FOR CONTRIBUTORY INFRINGEMENT
    BASED ON USER OUTPUTS. .............................................................................. 9

    A. The Complaint Fails To Allege An Actionable Instance Of End-User Copyright
    Infringement......................................................................................................... 10

    B. The Complaint Fails To Allege Microsoft's Knowledge Of Direct Infringement. ........... 11

II.  PLAINTIFF FAILS TO STATE A DMCA § 1202 CLAIM. .............................. 13

    A. The Complaint Does Not Plausibly Allege Microsoft's Intent To Induce, Enable,
    Facilitate, Or Conceal Infringement By Removal Of CMI............................... 14

    B. The Complaint Does Not Plausibly Allege "Removal" Of CMI From Copies Of Identical
    Works. ................................................................................................................. 17

III. PLAINTIFF'S MISAPPROPRIATION CLAIM IS PREEMPTED BY THE COPYRIGHT
    ACT....................................................................................................................... 20

    A. The Complaint Fails To Satisfy The Narrow "Hot News" Exception To Preemption. ...... 21

    B. The Recommendations-Based Claim Is Preempted........................................... 23

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A'Lor Int'l, Ltd. V. Tapper Fine Jewelry, Inc.*,
  No. 12-cv-02215, 2012 WL 12921035 (C.D. Cal. Aug. 8, 2012) ..........................................19

*Adina's Jewels, Inc. v. Shashi, Inc.*,
  442 F. Supp. 3d 766 (S.D.N.Y. 2020)....................................................................................25

*Andersen v. Stability AI Ltd.*,
  No. 23-cv-00201-WHO, 2023 WL 7132064 (N.D. Cal. Oct. 30, 2023) ................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................................9, 15

*Authors Guild, Inc. v. Google Inc.*,
  804 F.3d 202 (2d Cir. 2015)........................................................................................................2

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
  650 F.3d 876 (2d Cir. 2011)........................................................................................21, 23, 24

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  881 F.3d 293 (4th Cir. 2018) ...................................................................................................12

*DBW Partners, LLC v. Mkt. Sec.*,
  LLC, No. 22-cv-1333-BAH, 2023 WL 2610498 (D.D.C. Mar. 23, 2023) ........................23, 25

*Design Basics, LLC v. WK Olson Architects, Inc.*,
  No. 17-cv-7432, 2019 WL 527535 (N.D. Ill. Feb. 11, 2019) ..................................................18

*Doe 1 v. GitHub, Inc.*,
  No. 22-cv-6823-JST, 2024 WL 235217 (N.D. Cal. Jan. 22, 2024) ...................................14, 19

*Dolls Kill, Inc. v. Zoetop Bus. Co.*,
  No. 22-cv-1463, 2022 WL 16961477 (C.D. Cal. Aug. 25, 2022) ...........................................19

*Falkner v. Gen. Motors LLC*,
  393 F. Supp. 3d 927 (C.D. Cal. 2018) .....................................................................................18

*Fashion Nova, LLC v. Blush Mark, Inc.*,
  No. 22-cv-6127, 2023 WL 4307646 (C.D. Cal. June 30, 2023)...............................................15

*Faulkner Press, L.L.C. v. Class Notes, L.L.C.*,
  756 F. Supp. 2d 1352 (N.D. Fla. 2010)....................................................................................18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991)..................................................................................10

*Fin. Info., Inc. v. Moody's Invs. Serv., Inc.*,
   808 F.2d 204 (2d Cir. 1986).....................................................................22

*Fischer v. Forrest*,
   286 F. Supp. 3d 590 (S.D.N.Y. 2018).....................................................18

*Frost-Tsuji Architects v. Highway Inn, Inc.*,
   No. 13-cv-00496, 2015 WL 263556 (D. Haw. Jan. 21, 2015), *aff'd*, 700 F.
   App'x 674 (9th Cir. 2017) .......................................................................19

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir. 1971)........................................................10, 11, 12

*Gogo Apparel, Inc. v. True Destiny, LLC*,
   No. 19-cv-5693-GBD, 2020 WL 5578336 (S.D.N.Y. Sept. 17, 2020)...................24

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021)...............................................................................2

*Greer v. Fox News Media*,
   No. 22-1970, 2023 WL 2671796 (2d Cir. 2023) ....................................23

*Kelly v. Arriba Soft Corp.*,
   77 F. Supp. 2d 1116 (C.D. Cal. 1999) .....................................................18

*Ludvarts, LLC v. AT&T Mobility, LLC*,
   710 F.3d 1068 (9th Cir. 2013) .................................................................12

*Mango v. BuzzFeed, Inc.*,
   970 F.3d 167 (2d Cir. 2020).................................................................14, 16

*Matthew Bender & Co. v. West Publ'g Co.*,
   158 F.3d 693 (2d Cir. 1998)...........................................................10, 11, 12, 13

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)......................................................................10, 13

*ML Genius Holdings LLC v. Google LLC*,
   No. 20-3113, 2022 WL 710744 (2d Cir. 2022) ......................................23

*National Basketball Ass'n v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997)...........................................................21, 22, 23

*Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*,
   497 F. Supp. 2d 541 (S.D.N.Y. 2007)......................................................25

*Roberts v. BroadwayHD LLC*,
   518 F. Supp. 3d 719 (S.D.N.Y. 2021)........................................................................15

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ...............................1

*Stevens v. Corelogic, Inc.*,
   899 F.3d 666, 675 (9th Cir. 2018) ...........................................................................17

*Tremblay v. OpenAI, Inc.*,
   No. 23-cv-3223-AMO, 2024 WL 557720 (N.D. Cal. Feb. 12, 2024) ..................11, 14, 16, 17

*Viacom Int'l, Inc. v. Youtube, Inc.*,
   676 F.3d 19 (2d Cir. 2012)........................................................................................12

**Statutes**

15 U.S.C. § 1125(c) ..........................................................................................................7

Copyright Act, 17 U.S.C. §§ 101 *et seq.*

   § 101.............................................................................................................18

   § 102(b)........................................................................................................22

   § 106............................................................................................................10

   § 107..........................................................................................................7, 16

   § 301(a)........................................................................................................20

   § 512(c)........................................................................................................12

   § 1202 ..................................................................................................... *passim*

   § 1202(b)..............................................................................................3, 13, 17, 18

   § 1202(b)(1) ............................................................................................. *passim*

   § 1202(b)(3) ............................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6)....................................................................................................9

**Other Authorities**

Eduardo Porter, *Copyright Ruling Rings With Echo of Betamax*, The New York
   Times, Mar. 26, 2013, https://nytimes.com/2013/03/27/business/in-a-
   copyright-ruling-the-lingering-legacy-of-the-betamax.html ......................................1

*Home Recording of Copyrighted Works: Hearing on H.R.4783, H.R. 4794, H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705 Before the H. Comm. on the Judiciary*, 97th Cong. 8 (1982) ................................................................................1

Jennifer Langton, *Microsoft announces new supercomputer, lays out vision for future AI work*, news.microsoft.com/source/features/ai/openai-azure-supercomputer (May 19, 2020)................................................................................5

Michael M. Grynbaum and Ryan Mac, *The Times Sues OpenAI and Microsoft Over A.I. Use of Copyrighted Work*, https://www.nytimes.com/2023/12/27/business/media/new-york-times-open-ai-microsoft-lawsuit.html (Dec. 27, 2023)................................................................6

S. Rep. No. 105-190 (1998) ..............................................................................13

Webster's Third New International Dictionary 1921 (1993).............................18

## PRELIMINARY STATEMENT

"The VCR is to the American film producer and the American public as the Boston strangler is to the woman home alone," warned Jack Valenti, then head of the Motion Picture Association of America, in his 1982 testimony to the House of Representatives.[1]  The analogy was part of an all-out effort by television and movie producers to stop a groundbreaking new technology.  As Mr. Valenti spoke, the entertainment industry's claims of copyright infringement were headed to the Supreme Court after years of litigation.  The Court ultimately rejected the alarmism and voted for technological innovation and consumer choice, with its seminal decision in *Sony Corp. of America v. Universal City Studios, Inc.* freeing consumers from broadcast schedules and ushering in an on-demand world.  And that decision did not destroy Hollywood— quite the opposite, the entertainment industry flourished when the VCR opened new markets and revenue streams.  But at the time, empty warnings nearly won the day.  As one *New York Times* reporter recalled three decades later: "The Supreme Court almost bought" the argument.[2]

In this case, The New York Times uses its might and its megaphone to challenge the latest profound technological advance: the Large Language Model, or LLM.  LLMs are a breakthrough in artificial intelligence.  The LLMs at issue here are created by feeding large amounts of text through a machine learning algorithm called a "transformer," which breaks the text into constituent "tokens," then learns the statistical relationships among them.  This allows an LLM to generate brand new natural language content in response to user prompts.  LLMs can also be trained to perform countless tasks, from translation, to computer coding, to ad copy, to research.

---

[1] *Home Recording of Copyrighted Works: Hearing on H.R.4783, H.R. 4794, H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705 Before the H. Comm. on the Judiciary*, 97th Cong. 8 (1982).

[2] Eduardo Porter, *Copyright Ruling Rings With Echo of Betamax*, The New York Times, Mar. 26, 2013, https://nytimes.com/2013/03/27/business/in-a-copyright-ruling-the-lingering-legacy-of-the-betamax.html.

By harnessing humanity's collective wisdom and thinking, LLMs help us learn from each other, solve problems, organize our lives, and launch bold new ideas.  Because Microsoft firmly believes in LLMs' capacity to improve the way people live and work, it has collaborated with OpenAI to help bring their extraordinary power to the public, while leading the way in promoting safe and responsible AI development.

Despite The Times's contentions, copyright law is no more an obstacle to the LLM than it was to the VCR (or the player piano, copy machine, personal computer, internet, or search engine).  Content used to train LLMs does not supplant the market for the works, it teaches the models language.  It is the essence of what copyright law considers transformative—and fair— use:  A program called a "transformer" evaluates massive amounts of text, converts that text into trillions of constituent parts, discerns the relationships among all of them, and yields a natural language machine that can respond to human prompts.  The Times's suggestion that there is "nothing 'transformative'" about this, Compl. ¶ 8, ignores extensive authority holding otherwise, as Microsoft will show on summary judgment.  *See Authors Guild, Inc. v. Google Inc.*, 804 F.3d 202 (2d Cir. 2015); *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021).

This motion addresses those claims that are based not on building the GPT-based models, but on unsubstantiated suggestions that the public's use of GPT-based products harms The Times, and thus poses a mortal threat to "independent journalism" at "a cost to society [that] will be enormous."  Compl. ¶¶ 47-54.  None of this is based on how real-world people actually use the GPT-based tools at issue.  Rather, The Times crafted unrealistic prompts to try to *coax* the GPT-based tools to output snippets of text matching The Times's content—a technique The Times buries in lengthy exhibits to the Complaint.  Nowhere does The Times allege that anyone other than its legal team would actually do any of this, and certainly not on a scale that merits the

doomsday futurology it pushes before this Court and has boosted to its readers.

Three claims in particular should be dismissed. First, The Times alleges that Microsoft is contributorily liable for *end-user* copyright infringement through use of GPT-based tools. But it alleges no end-user infringement at all, and thus no knowledge on Microsoft's part that end-users are making infringing use of LLMs that have a universe of entirely lawful uses. The claim is therefore the exact one the Supreme Court rejected when it blessed the VCR. Part I, *infra*.

Second, The Times alleges that Microsoft violated the Digital Millennium Copyright Act's "copyright management information"—or CMI—provisions. *See* 17 U.S.C. § 1202(b). Those provisions are designed to prevent defendants from removing CMI from a copy of a work where doing so is likely to facilitate infringement or make it harder to detect. The Times never explains how this would happen in the real world. Its only examples are derived from its own prompts for particular Times content, which would require the user to already know the genesis of that content. And in any event, the outputs the Complaint cites are not *copies* of works at all, but mere snippets that are not cognizable under § 1202(b). Part II, *infra*.

Third, The Times repackages its copyright claims based on GPT-model outputs as state-law misappropriation torts, suggesting that the GPT-based tools appropriate "time-sensitive" news and Wirecutter reviews. Again, this is purely theoretical. But even if it were not, the claims are preempted by the Copyright Act, which does not permit plaintiffs to evade key limitations like fair use by dressing up copyright claims as state-law torts. Directly applicable Second Circuit law mandates this result. Part III, *infra*.

Once the claims challenged here are dismissed, Microsoft looks forward to litigating the issues in this case that are genuinely presented, and to vindicating the important values of progress, learning, and the sharing of knowledge.

## <u>ALLEGATIONS OF THE COMPLAINT</u>

**A.  Large Language Models Are A Profound Advance In Artificial Intelligence And A Powerful Tool For Human Flourishing.**

Over the past several years, researchers and engineers have made dramatic advances in the field of artificial intelligence.  Perhaps the most astounding is the "large language model," or LLM.  As relevant here, an LLM is a machine learning model that can process and produce natural language text.  Compl. ¶¶ 61, 64, 75.

At the heart of an LLM is a computer algorithm called a "transformer."  *See* Compl. ¶ 83.  To create a model, engineers engage in a step called "training," in which they feed large amounts of text through the transformer.  Compl. ¶¶ 75, 77.  As this happens, the LLM separates the text into "tokens"—words, punctuation, and so forth.  *See* Compl. ¶ 91.  Across the entire "training set" or "training corpus," the model then discerns semantic patterns among tokens, which it "encode[s] … as numbers called 'parameters.'"  Compl. ¶ 77.  A highly sophisticated model trained on a large corpus might have trillions of tokens and parameters.  *See, e.g.*, Compl. ¶ 91 (alleging that GPT-4 contains "13 trillion tokens" and "1.8 trillion parameters").  It is this extensive network of semantic connections that allows the model to emit natural-language text.  Compl. ¶¶ 75-77.

LLMs are sometimes referred to as "general purpose" or "foundational" AI models because their language capabilities have many applications.  For example, "[o]nce trained, LLMs may be provided with information specific to a use case or subject matter," Compl. ¶ 81, enabling them to assist a human user with that use case or subject.  That user directs the LLM's performance through user-selected "prompts" to which the model responds.  Compl. ¶¶ 61, 76.

As reflected in various sources incorporated by reference into the Complaint, Microsoft believes that LLMs "can so deeply absorb the nuances of language, grammar, knowledge,

concepts, and context that [they] can excel at multiple tasks," promising untold applications that will improve people's lives. Jennifer Langton, *Microsoft announces new supercomputer, lays out vision for future AI work*, news.microsoft.com/source/features/ai/openai-azure-supercomputer (May 19, 2020) (cited at Compl. ¶ 70 n.8). Microsoft has also urged the need for a responsible approach to such powerful technology, routinely stressing the importance of "responsible AI and AI safety" from the highest levels of the company. Compl. ¶¶ 71, 93.

### B. Microsoft Collaborates With OpenAI To Bring GPT-Based Tools To The Public.

OpenAI, "formed in December 2015 as a 'non-profit artificial intelligence research company,'" has led the way in recent advances in LLMs. Compl. ¶ 55. OpenAI has developed several versions of its foundational LLMs, built on its "Generative Pre-training Transformer" or GPT. Compl. ¶¶ 11, 58-59. "OpenAI became a household name upon the release of ChatGPT," a "text-generating chatbot" powered by an underlying GPT model, that "given user-generated prompts, can mimic human-like natural language responses." Compl. ¶ 61. The public was awed by what it could do—ChatGPT "gain[ed] over 100 million users within three months." Compl. ¶ 61.

Since 2019, Microsoft has collaborated with OpenAI to bring GPT-based products to the public. Compl. ¶ 66. Microsoft has provided technological infrastructure that OpenAI has used to train its LLMs. Microsoft built a supercomputing system to handle the immense workload of training an LLM. Compl. ¶ 70. It also provides OpenAI "cloud computing" services—e.g., data storage and hosting of models—through its Azure platform. Compl. ¶¶ 16, 68.

The Microsoft-OpenAI collaboration has been instrumental in bringing the immense promise of LLMs to the public. Compl. ¶ 72. Microsoft offers "Azure OpenAI Service," used by "18,000 organizations." Compl. ¶ 16. It also offers "Bing Chat, a generative AI chatbot

5

feature on its search engine powered by GPT-4."  Compl. ¶ 72.  And "Microsoft and OpenAI unveiled 'Browse with Bing,' a plugin to ChatGPT that enabled it to access the latest content on the internet through the Microsoft Bing search engine."  Compl.  ¶ 72.

        **C.**      **The New York Times Sues Microsoft and OpenAI.**

The Times is a "diversified multi-media company" with a host of "products"—including "news," "podcasts," "sports media," "recipes and other cooking-related content," "puzzles and games," and "shopping recommendations."  Compl. ¶¶ 14, 26.  Once primarily a print publication, The Times has "reinvented its business model to incorporate digital subscriptions." Compl. ¶ 40.  It has "10.1 million digital and print subscribers," and aims to have "15 million subscribers by year-end 2027."  Compl. ¶ 42.  It also provides "free access to a limited number of articles and other content."  Compl. ¶ 45.

The Times alleges that it "objected after it discovered that Defendants were using Times content without permission to develop their models and tools."  Compl. ¶ 7.  It alleges that "the Defendants likely used millions of Times-owned works" in training OpenAI's GPT models, such that pieces of these works are among the trillions of tokens and parameters from which predictive natural language responses are generated.  Compl. ¶ 91.  According to the Complaint, The Times "reached out to Microsoft and OpenAI in April 2023" seeking "an amicable resolution," then sued when "months" of negotiations yielded no resolution.  Compl. ¶¶ 7-9, 54. When the Times brought this lawsuit, it immediately publicized its filing and allegations in its own pages.  Michael M. Grynbaum and Ryan Mac, *The Times Sues OpenAI and Microsoft Over A.I. Use of Copyrighted Work*, https://www.nytimes.com/2023/12/27/business/media/new-york-times-open-ai-microsoft-lawsuit.html (Dec. 27, 2023).

The Complaint alleges seven causes of action against Microsoft based on multiple legal theories.  Compl. ¶¶ 158-204.  The first count of the Complaint alleges that Microsoft engaged in

direct copyright infringement based on theories involving "training" of OpenAI's models, Compl. ¶ 161; "storing, processing, and reproducing the GPT models … on Microsoft's supercomputing platform," Compl. ¶ 162; and "disseminating generative output" to users, Compl. ¶ 164.  The second two counts allege vicarious and contributory infringement against Microsoft for its role in the direct infringement by OpenAI alleged in Count I.  *See* Compl. ¶¶ 169-73 (vicarious infringement); Compl. ¶¶ 174-77 (contributory infringement).  These three claims are not at issue in this motion.  As the Complaint anticipates in its assertion that creating an LLM is not "transformative," Compl. ¶ 8, these claims will ultimately turn, among other things, on a fair-use defense under 17 U.S.C. § 107 not suited to the pleading stage.  The Complaint's seventh cause of action—a trademark tarnishment theory suggesting that "lower quality and inaccurate" output could "dilute[] the quality of The Times's trademarks"—is also not at issue in this motion.  Compl. ¶¶ 198-204; *see* 15 U.S.C. 1125(c).

At issue here are Counts IV, V, and VI.  The fourth count alleges an alternative theory of contributory infringement against Microsoft and OpenAI.  Compl. ¶¶ 178-80.  This claim anticipates another defense to one of the direct infringement claims—that it is the *user*, not Microsoft or OpenAI, who is the direct infringer if its "user-generated prompt[]," Compl. ¶ 61, results in an infringing output.  The Complaint alleges that "to the extent an end-user may be liable as a direct infringer based on output of the GPT-based products, Defendants materially contributed to and directly assisted with the direct infringement perpetrated by end-users." Compl. ¶ 179.  It claims that "Defendants knew or had reason to know" of infringement because they were "aware that … GPT-based products *are capable* of distributing unlicensed copies or derivatives of copyrighted Times works."  Compl. ¶ 180 (emphasis added).

The Complaint's fifth cause of action alleges violation of § 1202 of the DMCA, which

protects against the removal of "copyright management information," or CMI, from copies of works.  The Complaint alleges that Microsoft and OpenAI "removed The Times's copyright-management information" in "building the training datasets," "generating synthetic search results," and "generating outputs from the GPT models."  Compl. ¶¶ 184-87 (invoking 17 U.S.C. § 1202(b)(1)).  It also alleges that Defendants "distribut[ed]" works knowing that CMI was removed.  Compl. ¶ 189 (invoking 17 U.S.C. § 1202(b)(3)).

The Complaint's sixth cause of action alleges common law unfair competition by misappropriation.  The Times alleges that "[b]y offering content that is created by GenAI but is the same or similar to content published by The Times, Defendants' GPT models directly compete with Times content."  Compl. ¶ 194.  The Complaint alleges that Defendants misappropriate "time-sensitive breaking news" and consumer purchasing "recommendations" from the Wirecutter website.  Compl. ¶¶ 193-94.

### D. The Complaint Alleges No Real-World Instance of Output of The Times's Works or Impact to The Times's Rights.

The Complaint is filled with attempts to establish that GPT-based products "will output near-verbatim copies of significant portions of Times Works when prompted to do so."  Compl. ¶ 98; *see* Compl. ¶¶ 99-107.  And it warns that if The Times does not prevail in this case, the "cost to society will be enormous."  Compl. ¶ 48.  And yet its 68 pages and 204 paragraphs of allegations do not contain a single allegation concerning something that has actually *happened* in the real world as a result of the development, offering, or use of GPT-based products.

The Times is at pains to insinuate that with "minimal prompting" these products "will recite large portions" of The Times's works, Compl. ¶ 99, offering various examples that compare the text of an article to model output.  But The Times buries this "minimal prompting" in an exhibit, where it admits that its prompts each "comprise[] a short snippet from the

8

beginning of an article from The New York Times"—often verbatim snippets of *paragraphs* on end.  Compl. Ex. J at 1.  The Complaint does not explain why any real person, already in possession of a *New York Times* article, would ever want to feed part of that prompt into a GPT-based product to generate a part of the rest of the article.  It certainly does not allege that any real person has done so.  It has manufactured the story.

Similarly unsubstantiated are its various warnings of harm—from "threat[s] [to] high-quality journalism," Compl. at 14 (capitalization omitted), to hindering its "ability to continue to attract and grow its digital subscriber base," Compl. ¶ 52, to "decreases in traffic to Wirecutter," Compl. ¶ 128, to "endanger[ment] [of] Wirecutter's reputation by falsely attributing a product recommendation to Wirecutter that it did not make," Compl. ¶ 135.  All of this turns out to be mere speculation about what The Times apparently fears *might* happen.  Indeed, the Complaint does not allege a single real-world example of any occurrence that could even begin to cause such harm, let alone allege that any such harms have materialized.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  If a claim lacks a cognizable theory, lacks sufficient facts to plausibly support that theory, or advances a theory that is foreclosed as a matter of law, dismissal is appropriate.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient.  *Id.*

## I.    THE TIMES FAILS TO STATE A CLAIM FOR CONTRIBUTORY INFRINGEMENT BASED ON USER OUTPUTS.

The Times fails to state a claim that Microsoft has contributed to end-user copyright infringement.  *See* Compl. ¶¶ 178-80 (Count IV).  A contributory infringer is "one who, with

knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). The Complaint does not allege that Microsoft encouraged end-users to make infringing use of any GPT-based product, acted in a way that would promote such infringing use, or did anything to induce such infringing use. It advances only a "material contribut[ion]" theory. Compl. ¶ 179. The notion is that by offering end-users products that it allegedly knows "are capable of distributing unlicensed copies or derivative[] … works," Microsoft is a contributory infringer any time a user makes use of that capability. Compl. ¶ 180.

This theory fails for two reasons. First, The Times fails to allege any instance of direct infringement by a user, a necessary prerequisite to a claim for secondary liability. Part I.A, *infra*. Second, The Times cannot allege Microsoft's actual knowledge of (or willful blindness to) any act of direct infringement. Part I.B, *infra*. The Times's contributory infringement theory thus fails on the very same basis the challenge to the VCR failed four decades ago: It improperly seeks to impose liability based "solely [on] the design or distribution of a product capable of substantial lawful use." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 933 (2005). The claim should be dismissed.

### A.  The Complaint Fails To Allege An Actionable Instance Of End-User Copyright Infringement.

"Contributory infringement necessarily must follow a finding of direct or primary infringement." *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998). To allege direct infringement, a plaintiff must plead (1) its "ownership of a valid copyright," and (2) a primary infringer's "copying of constituent elements of the work that are original"—i.e., infringement of one of the rights protected under 17 U.S.C. § 106. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

In *Matthew Bender*, West Publishing Company, the publisher of the "National Reporter System," sued the publisher of electronic databases that collected judicial opinions.  158 F.3d at 697.  West alleged that a user of these databases could operate them to "view (and print) judicial opinions in the same order in which they are printed in a West volume," thus recreating West's reporters.  *Id.*  On this basis, it sought to hold the "database manufacturer … liable as a contributory infringer … for creating a product that assists a user to infringe a copyright directly."  *Id.* at 706.  The Second Circuit rejected the claim.  Though West "hypothesized that users … will retrieve and print cases in the order in which they appear in West's case reporters," it "failed to identify any primary infringer, other than [its own] counsel."  *Id.*

The Times has the same problem here.  The Complaint "hypothesize[s]" that someone *could* find a way to prompt the GPT-based products to yield output that is similar to one of The Times's works.  It contains examples of prompts that yield small amounts of similar text— prompts like multi-paragraph passages of an article, Compl. Ex. J, or cumbersome, direct requests for specific paragraphs of a specific piece.  Compl. ¶¶ 117-23.  But this is purely the work of individuals directed by The Times.  The Times does not allege that any actual user of a GPT-based product would prompt it this way, presumably because it lacks a good-faith basis for any such claim.  The bare theoretical possibility that someone somewhere might engage in the same acrobatics The Times did here is not enough to plausibly allege direct infringement.  This warrants dismissal of the claim.  *See Tremblay v. OpenAI, Inc.*, No. 23-cv-3223-AMO, 2024 WL 557720, at *2-3 (N.D. Cal. Feb. 12, 2024) (dismissing vicarious infringement claim based on ChatGPT outputs for failure to adequately allege direct infringement).

### B.  The Complaint Fails To Allege Microsoft's Knowledge Of Direct Infringement.

The Complaint also fails to allege the requisite "knowledge of the infringing activity." *Gershwin*, 443 F.2d at 1162.  To establish a contributory infringement claim, a plaintiff must

allege "actual knowledge of specific acts of infringement" or "[w]illful blindness of specific facts." *Ludvarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013) (internal quotation marks omitted).  And constructive knowledge or mere negligence will not support liability—it is not enough if a defendant merely "should have known of … infringing activity." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 310 (4th Cir. 2018). Although the Second Circuit has not expressly announced this standard, courts have observed that an actual knowledge requirement accords with "the Second Circuit's widely-cited *Gershwin* decision," which "expressly drew on" criminal aiding-and-abetting liability.  *Id.* at 309-10; *see also Matthew Bender*, 158 F.3d at 707 n.23 (finding no showing of knowledge where plaintiff merely hypothesized infringing capabilities); *cf. Viacom Int'l, Inc. v. Youtube, Inc.*, 676 F.3d 19, 32 (2d Cir. 2012) (knowledge standard under safe harbor provision of DMCA, 17 U.S.C. § 512(c), requires "awareness of facts or circumstances that indicate specific and identifiable instances of infringement").

The Complaint does not come close to meeting this high bar.  It alleges that "Defendants knew or had reason to know of the direct infringement by end-users because Defendants undertake extensive efforts in developing, testing, and troubleshooting their LLM models and GPT-based products."  Compl. ¶ 180.  And it claims that "Defendants are fully aware that their GPT-based products are capable of distributing unlicensed copies or derivatives of copyrighted" works.  Compl. ¶ 180.  These allegations do not even identify a "specific act[] of infringement," *Ludvarts*, 710 F.3d at 1072-73, let alone allege Microsoft's actual knowledge of one.  Indeed, the Complaint does not even assert that Microsoft has the ability to know that some user has engaged, is engaging, or will engage in an infringing use.

At most, The Times's allegations establish Microsoft's awareness that someone *could* use a GPT-based product to infringe.  Of course, the same was true of the VCR—as it is of word processors, hard drives, social media feeds, internet connections, and so forth.  Fortunately, the Supreme Court long ago rejected liability merely based on offering a multi-use product.  Since *Sony*, the law has barred liability based on "the equivocal conduct of selling an item with substantial lawful as well as unlawful uses," "limit[ing] liability to instances of more acute fault than the mere understanding that some of one's products will be misused."  *Grokster*, 545 U.S. at 932-33.  "[T]he 'substantial noninfringing use' test is as applicable here as it was in *Sony*," *Matthew Bender*, 158 F.3d at 707.  It bars The Times's contributory infringement claim.

## II.    PLAINTIFF FAILS TO STATE A DMCA § 1202 CLAIM.

The Times also fails to state a claim under either § 1202(b)(1) or (b)(3) of the DMCA.  *See* Compl. ¶¶ 181-91 (Count V).  Section 1202 is one of two adjoining provisions that aims to thwart digital piracy.  S. Rep. No. 105-190 at 11 n.18 (1998) (DMCA aimed to "discourage piracy").  It protects the "[i]ntegrity of copyright management information"—defined as "information conveyed in connection with copies … of a work"—on the rationale that removal or falsification of that information aids the spread of pirated copies.  *Id.* at 8, 34.  To state a claim under § 1202(b)(1), a plaintiff must allege that the defendant "intentionally remov[ed] or alter[ed]" CMI from a copy of a work.  17 U.S.C. § 1202(b)(1).  To state a claim under § 1202(b)(3), a plaintiff must plausibly allege that the defendant "distribute[d]" copies of works "knowing that [CMI] has been removed or altered without authority of the copyright owner[.]"  And for both claims, a plaintiff must further establish that the defendant removed or distributed CMI "knowing, or ... having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title."  17 U.S.C. § 1202(b).

Over the past 18 months, plaintiffs seeking to challenge generative AI tools have repeatedly tried and failed to adequately allege claims under § 1202.[3]  These decisions form an emerging judicial consensus that neither the highly technical process of training an LLM nor the generated outputs of that LLM implicate the sort of piracy concerns animating § 1202.  The Times fails for the same reasons others have.  First, it cannot allege Microsoft's culpable awareness that removal of CMI will "induce, enable, facilitate, or conceal an infringement" of The Times's works.  Part II.A, *infra*.  And second, it cannot allege the removal of CMI from identical copies of The Times's works, as required.  Part II.B, *infra*.

### A.  The Complaint Does Not Plausibly Allege Microsoft's Intent To Induce, Enable, Facilitate, Or Conceal Infringement By Removal Of CMI.

Section 1202 does not impose liability on a defendant whose removal of CMI has only the *incidental* effect of aiding or concealing copyright infringement.  It enacts this limitation through a stringent "double-scienter requirement."  *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 172 (2d Cir. 2020).  The first half of the requirement demands that the defendant's conduct—removal of CMI, alteration of CMI, and so forth—be intentional (for subsection (b)(1)) or knowing (for subsection (b)(3)).  *See id.*  The second half requires that the "defendant know or have reason to know" that its conduct "will induce, enable, facilitate, or conceal an infringement."  *Id.*  The Times fails to allege this, requiring dismissal of both its § 1202(b)(1) and (b)(3) claims.

The Complaint asserts that "[u]pon information and belief, Defendants removed The Times's copyright-management information in building the training datasets," Compl. ¶ 184; "[u]pon information and belief, Microsoft and OpenAI removed The Times's copyright-

---

[3] *See Tremblay*, 2024 WL 557720, at *4-5 (challenge to ChatGPT); *Doe 1 v. GitHub, Inc.*, No. 22-cv-6823-JST, 2024 WL 235217, at *8-9 (N.D. Cal. Jan. 22, 2024) (challenge to GPT-based "Codex" model); *Andersen v. Stability AI Ltd.*, No. 23-cv-00201-WHO, 2023 WL 7132064, at *10-11 (N.D. Cal. Oct. 30, 2023).

management information through generating synthetic search results" with Browse with Bing and Bing Chat, Compl. ¶ 185; *see* Compl. ¶ 72; and "Microsoft and OpenAI removed The Times's copyright-management information in generating outputs from the GPT models," Compl. ¶ 186.  These allegations, which go to the conduct element of a § 1202 claim, are addressed below (at 19-20).  The Complaint also asserts that "not preserv[ing] any copyright-management information" is "by design," Compl. ¶ 187, an allegation that goes to the first scienter requirement.

But when it comes to the second scienter requirement, the Complaint contains only the conclusory assertion that the Defendants' conduct "has been done knowingly and with the intent to induce, enable, facilitate, or conceal infringement."  Compl. ¶¶ 188-90.  That is just a "[t]hreadbare recital[] of" an "element of [the] cause of action," insufficient to state a claim. *Ashcroft*, 556 U.S. at 678.  Nor do allegations elsewhere in the Complaint suggest that Microsoft intended, by removing CMI, to further any of the infringement alleged in the Complaint.

***Alleged infringement during training and development.***  With respect to Microsoft's alleged conduct in training the GPT models, the Complaint alleges various acts involving "scraping," "storing," "processing," and "reproducing" works to "build [a] training dataset[]." Compl. ¶¶ 160-61.  It also alleges that "storing, processing, and reproducing the GPT models" themselves constitutes infringement of The Times's works.  Compl. ¶ 162.  But it makes no sense to base a CMI claim on alleged infringement during training.  The point of CMI, and thus § 1202's protections, is to "inform *the public* that something is copyrighted."  *Roberts v. BroadwayHD LLC*, 518 F. Supp. 3d 719, 737 (S.D.N.Y. 2021) (emphasis added); *Fashion Nova, LLC v. Blush Mark, Inc.*, No. 22-cv-6127, 2023 WL 4307646, at *5 (C.D. Cal. June 30, 2023) ("[T]he purpose of CMI is to provide *the public* with notice that a work is copyrighted.")

(emphasis added).  Training takes place out of public view, and training data itself is not
disseminated.  That is why the court in *Tremblay* rejected the theory that "knowing removal of
CMI from … books during the training process" could violate § 1202.  2024 WL 557720, at *4.

In any event, the Complaint concedes away any claim that Microsoft intends to facilitate
infringement during training by acknowledging Microsoft's strong belief that "thi[s] conduct is
protected as 'fair use.'"  Compl. ¶ 8.  As § 107 of the Copyright Act makes plain, "the fair use of
a copyrighted work … *is not an infringement* of copyright," (emphasis added).  And the
Complaint does not allege that Microsoft's belief in its fair use rights is ingenuine or objectively
unreasonable.  Microsoft's good-faith, objectively reasonable belief that it is engaging in fair
use—and therefore not infringing at all—thus negates any inference that it knew or should have
known it was facilitating or concealing infringement by allegedly removing CMI.  *Cf. Mango*,
970 F.3d at 173 (relying on defendant's acknowledgement that "he was required to get
permission" that removal of CMI would "wrongfully impl[y] … permission").

***Allegedly infringing output.***  The Complaint also fails to allege Microsoft's scienter with
respect to allegedly infringing output from a GPT-based product.  This is for much the same
reason The Times's theory of contributory infringement fails:  The Complaint does not plausibly
allege actual user conduct that yields infringing outputs in the first place, so it cannot possibly
raise the inference that Microsoft somehow intended, knew about, or should have known about
such behavior.  *See supra* 10-13.  Again, the allegedly infringing outputs contained in the
Complaint have been manufactured for purposes of the Complaint.  Nowhere does the Complaint
allege that any real-world user does or is likely to use any of the GPT-products in the manner The
Times has in drafting its Complaint.  And nowhere does the Complaint allege that if end-users

*did* make this sort of use, the alleged absence of CMI would in any way facilitate that infringement or make it harder to police it than it would be if CMI were preserved.

Indeed, any such claim would again be nonsensical.  The Times generated the examples in its Complaint by specifically *inputting* or *requesting* New York Times content.  If someone already has a *New York Times* article with which to prompt ChatGPT, or already has the title of the article to enter as a prompt, the presence or absence of CMI is irrelevant.  The user already knows where the article is from.  In such a situation, even if any mere removal of CMI is plausibly alleged, it would be immaterial to a claim under § 1202(b).

The Ninth Circuit's decision in *Stevens v. Corelogic, Inc.* is on point.  899 F.3d 666, 675 (9th Cir. 2018).  *Stevens* involved the defendant's removal of CMI metadata from photographs as part of technological "[d]ownsampling"—i.e., compression.  *Id.* at 671.  Plaintiff photographers suggested that this somehow would aid infringement.  But they "ha[d] not … averred that they ha[d] ever used CMI metadata to prevent or detect copyright infringement."  *Id.* at 675.  Nor could they establish that the defendant was aware of a third-party "pattern of conduct" or "established modus operandi" that might give rise to an inference that the defendant was "aware of the probable future impact of its actions" with respect to CMI.  *Id.* at 674.  The plaintiffs therefore could not establish that any removal of CMI was done with an awareness that it would facilitate infringement.  *Id.* at 675.  The Times's claim falls short for the same reason.  *See Tremblay*, 2024 WL 557720, at *4-5 (dismissing CMI claim for failure to allege requisite scienter).

## B.  The Complaint Does Not Plausibly Allege "Removal" Of CMI From Copies Of Identical Works.

The Times's CMI claims fail for the further reason that the Complaint does not allege the active "removal" of CMI from an identical copy of a work, as required under § 1202(b).  As

17

explained above (at 13-14), § 1202(b) is an anti-piracy statute—it protects the integrity of CMI not for its own sake, but to thwart the creation and trafficking of pirated copies of works. Several aspects of the text bear this out.  First, § 1202 explicitly defines CMI as "information conveyed in connection *with copies* … of a work," (emphasis added)—that is, in connection with the "material objects" in which the work is "fixed," 17 U.S.C. § 101—and not, more abstractly, with the underlying work itself.  And second, § 1202(b)(1) and (b)(3) use the term "remove," which connotes some active conduct.  To "remove" is "to move by lifting, pushing aside, or taking away or off" or "to get rid of."  Webster's Third New International Dictionary 1921 (1993).

Applying these statutory terms, courts have consistently rejected § 1202(b) claims where a defendant allegedly removed CMI from—or merely failed to transpose CMI to—an excerpt or modification of the original copy with which the CMI was included.  Courts have thus rejected claims based on mere "framing" of a photograph in a way that does not include CMI, *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938-39 (C.D. Cal. 2018); excerpting lecture notes and study questions from textbooks without reproducing CMI, *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1356, 1359 (N.D. Fla. 2010); copying "aspects" of architectural works but "omitting" the plaintiff's CMI, *Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17-cv-7432, 2019 WL 527535, at *5 (N.D. Ill. Feb. 11, 2019); or incorporating the underlying content from the original copy into some different form or distinct work without CMI, *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999) (thumbnail versions of images), *rev'd on other grounds*, 336 F.3d 811 (9th Cir. 2003).  In short, a CMI-removal claim lies only with respect to copies of works that are "substantially or entirely reproduced."  *Fischer v. Forrest*, 286 F. Supp. 3d 590, 609 (S.D.N.Y. 2018).

Similarly, courts have rejected § 1202(b) claims where a defendant "created [a] derivative work" without transposing CMI, because that cannot establish that the defendant "removed [CMI] from [the] original work." *Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-cv-00496, 2015 WL 263556, at *3 (D. Haw. Jan. 21, 2015), *aff'd*, 700 F. App'x 674 (9th Cir. 2017). And they have emphasized that § 1202 "does not prohibit merely omitting CMI from an infringing work." *Dolls Kill, Inc. v. Zoetop Bus. Co.*, No. 22-cv-1463, 2022 WL 16961477, at *3 (C.D. Cal. Aug. 25, 2022); *A'Lor Int'l, Ltd. V. Tapper Fine Jewelry, Inc.*, No. 12-cv-02215, 2012 WL 12921035, at *10 (C.D. Cal. Aug. 8, 2012) ("omissions" of CMI not actionable). The Complaint fails to identify identical copies from which CMI was removed.

**Synthetic search results.** With respect to alleged removal of CMI from "synthetic search results" returned by the GPT-based Bing tools, the Complaint vaguely refers to "copies" and "derivatives of Times Works," without explaining what precisely is at issue. Compl. ¶ 185. But elsewhere the Complaint admits what these synthetic search results really are: In "answer [to] user queries," the synthetic results "may include extensive paraphrases and direct quotes." Compl. ¶ 72. The mere non-inclusion of CMI with "paraphrases" or "quotes" does not constitute removal of CMI from a substantially identical copy of a work. *Doe 1*, 2024 WL 235217, at *8-9.

**End-user outputs.** Similarly deficient are the Complaint's allegations with respect to ChatGPT outputs—the ones returned in response to explicit requests for *New York Times* content. As the Complaint acknowledges, even these prompts generate only "verbatim *excerpts*" (which, of course, the prompter already knows are from the *New York Times*). *E.g.*, Compl. ¶¶ 105, 107, 113, 116, 119, 122; *see* Compl. ¶ 98 ("near-verbatim copies of *significant portions* of Times Works" (emphasis added)). Many of The Times's prompts specifically *request only excerpts*. Compl. ¶ 106 ("What were the opening paragraphs of his review?"; "what's the next sentence?").

19

Non-inclusion of CMI with an excerpt is not the same as removal of CMI from a copy—it is like photocopying a page from the middle of a book and *omitting* CMI, not like tearing out that book's copyright page. *See supra* 18-19 (collecting cases).

    ***Training materials.***  This leaves only The Times's conclusory allegation that "[u]pon information and belief, Defendants removed" CMI "in building the training datasets."  Compl. ¶ 184.  It is not clear what The Times is alleging here, because nothing in the Complaint describes the "scraping" or "building" The Times alleges.  This vague allegation fails to identify any actual copy from which CMI is allegedly removed.  And in any event, as explained above (at 15-16), the act of removal of CMI during the training process could never give rise to a claim because training takes place out of public view and training data is not disseminated.

    The Complaint's failure to allege removal of CMI from a substantially identical copy further merits dismissal of the § 1202(b)(1) and (b)(3) claims.

## III.   PLAINTIFF'S MISAPPROPRIATION CLAIM IS PREEMPTED BY THE COPYRIGHT ACT.

    The Times's state-law misappropriation claim should be dismissed as preempted by § 301 of the Copyright Act.  *See* Compl. ¶¶ 192-97 (Count VI).  Section 301 preempts "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright … and come within the subject matter of copyright."  17 U.S.C. § 301(a).  It thus operates to bar a claim that sounds in copyright, but that masquerades as a state law tort so as to avoid copyright law's limits—for example, the fair-use defense that safeguards a wide range of interests by inherently limiting the scope of the copyright monopoly.

    Though the Complaint is unclear, The Times appears to try on two disguises.  Both are familiar in the Second Circuit, and both fail under controlling precedent.  First, The Times insinuates (though never quite alleges) that Defendants misappropriate its "time-sensitive

breaking news." Compl. ¶ 193.  But the Complaint falls far short of the sort of "narrow 'hot-news' misappropriation claim [that] survives preemption" under *National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 852 (2d Cir. 1997).  Part III.A, *infra*.  Second, The Times claims misappropriation of its "Wirecutter recommendations."  Compl. ¶ 194.  But the Second Circuit found materially identical "recommendations" preempted in *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 902-07 (2d Cir. 2011).  Part III.B, *infra*.

### A. The Complaint Fails To Satisfy The Narrow "Hot News" Exception To Preemption.

In *NBA v. Motorola, Inc.*, the Court repeatedly "emphasize[d] the narrowness of state misappropriation claims that survive preemption," and described the law as only "begrudgingly" permitting certain "hot-news" misappropriation claims to survive preemption.  105 F.3d 841, 851-52 (2d Cir. 1997).  At times, the Complaint seems to be attempting to state such a claim.  As part of its misappropriation allegations, the Complaint alleges that "[t]he Times gathers information, which often takes the form of time-sensitive breaking news, for its content at a substantial cost to The Times."  Compl. ¶ 193.  And the Complaint's factual allegations allege that Bing Chat and Browse with Bing can be used for "unauthorized retrieval and dissemination of current news."  Compl. at 37 (capitalization omitted).  In the examples the Complaint provides, The Times specifically requested either Bing Chat or Browse with Bing to provide a particular New York Times article that "may not have been included in the model's training set."  Compl. ¶ 108.  The notion seems to be that by combining Bing's search engine functionality with a GPT-based model, the tool could theoretically retrieve information from news articles.

If this is indeed an attempt to plead a viable hot-news claim, it fails under the well-established framework for evaluating preemption as applied in *NBA*.  As in *NBA*, The Times's claim here implicates the "subject matter" of copyright—the first requirement of the preemption

analysis.  Although The Times's news content may include both "copyrightable" expression and "uncopyrightable events [and] facts," both of these come "within the ambit of copyright protection" for preemption purposes.  105 F.3d at 848-49.  (Were it otherwise, a plaintiff could use state law to evade § 102(b) of the Copyright Act's carefully drawn limits on protectable subject matter.)

As for the second inquiry—whether the claim "involves extra elements" and therefore asserts rights that are "not the equivalent of exclusive rights under a copyright"—*NBA* explained precisely what a plaintiff would need to allege in order to evade preemption:  "(i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, and (iii) the threat to the very existence of the product or service provided by the plaintiff."  105 F.3d at 850, 853.  The Complaint's attempt to make out these elements is woefully deficient.  While it references "time-sensitive" news, the Complaint neither defines that term nor alleges that Defendants' tools disseminate that time-sensitive news "precisely at the point where the profit is to be reaped," *id.* at 851 (internal quotation marks omitted).  The Complaint therefore alleges "neither the quantity of copying nor the immediacy of distribution necessary to sustain a 'hot' news claim."  *Fin. Info., Inc. v. Moody's Invs. Serv., Inc.*, 808 F.2d 204, 209 (2d Cir. 1986).

The story told by the Complaint of years of supercomputer development and training of models prior to release is inconsistent with the premise that the models are spitting out today's news, and casts considerable doubt on its plausibility.  But even if the premise were plausible, the Complaint's naked assertions that GPT-based tools "directly compete with Times content," Compl. ¶ 194, and will hamper "its current level of groundbreaking journalism," Compl. ¶ 157, are not.  Nothing in the Complaint remotely substantiates these dubious claims with real-world

facts.  It thus fails to allege the GPT-based tools "would so reduce the incentive to produce" its content "that its existence or quality would be substantially threatened."  *NBA*, 105 F.3d at 845.

Courts applying *NBA* have routinely found hot-news claims preempted at the pleading stage.  *E.g.*, *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *5-6 (2d Cir. 2022); *DBW Partners, LLC v. Mkt. Sec.*, LLC, No. 22-cv-1333-BAH, 2023 WL 2610498, at *5 (D.D.C. Mar. 23, 2023); *see also Greer v. Fox News Media*, No. 22-1970, 2023 WL 2671796, at *2 (2d Cir. 2023) (finding preemption as a matter of law).  This Court should do so here.

### B.  The Recommendations-Based Claim Is Preempted.

The Times's Wirecutter recommendation theory fails for similar reasons.  The Complaint asserts that "Wirecutter … compiles and produces time-sensitive recommendations for readers." Compl. ¶ 193.  (It ventures no explanation of how its product reviews are "time sensitive.")  It then offers examples where The Times itself prompted Bing Chat or Browse with Bing by asking it to return Wirecutter recommendations, in response to which the GPT-based tools summarized Wirecutter recommendations.  Compl. ¶¶ 127-35.  The Complaint alleges that on the Wirecutter website, the recommendations contain hyperlinks to purchase the recommended products, which can lead to commissions for Wirecutter.  Compl. ¶ 128.  Because the GPT-based tools do not include these links, the Complaint alleges, Wirecutter would not receive its commission if the user purchases one of the recommended products.  Compl. ¶¶ 128-29.  The Times dubs this "misappropriation of commercial referrals," Compl. at 48 (capitalization omitted), though, to be clear, there is no allegation that Defendants somehow receive Wirecutter's lost commission.

*Barclays Capital* forecloses this claim.  In that case, the defendant, Fly, was a news aggregator that collected and disseminated financial recommendations issued by major financial firms.  650 F.3d at 882-83.  The firms argued that Fly misappropriated "trading

23

'Recommendations'" developed by their analysts through application of "expertise, experience, and judgment." *Id.* at 881.  The firms complained "that clients are much more likely to place a trade with a Firm if they learn of the Recommendation directly from that Firm," and that the "commissions on those trades" are what allowed them to profit from the recommendations.  *Id.* at 882.  So they sued under a misappropriation theory.

Applying the copyright preemption analysis, the court found that "Recommendations satisfy the 'subject matter' requirement," and that it did not matter that the "facts of the Recommendations themselves are not copyrightable." *Id.* at 902.  It then found that the claims implicated the "general scope" of copyright because they challenged "acts of reproduction, performance, distribution or display." *Id.*  And finally, analogizing to hot-news claims, it found that the firms failed to establish extra elements that would separate a misappropriation claim from a copyright claim.  Fly was not "free-riding" because it was not "selling the Recommendation 'as its own'"—it was reporting that the firm had made the recommendation. *Id.* at 903.  Nor was Fly in "direct competition," because nothing indicated diversion of "a significant portion … of [the firms' lost] profits." *Id.* at 904.

The analysis applies fully here.  Wirecutter recommendations are no less the subject matter of copyright than the recommendations in *Barclays Capital*.  The Times explicitly alleges harm from "offering content … that is similar to content published by The Times," Compl. ¶ 194—conduct falling within copyright's general scope.  The Complaint nowhere alleges that Defendants attempt to sell Wirecutter reviews as their own—on the contrary, The Times's examples of misappropriated referrals all involve prompts asking for Wirecutter reviews.  *Supra* 23.  And despite the same conclusory claims of competition, the Complaint offers no real-world facts suggesting meaningful diversion of revenue from Wirecutter to Defendants.

Again, courts have not hesitated to find claims like this preempted at the pleading stage.

*E.g.*, *Gogo Apparel, Inc. v. True Destiny, LLC*, No. 19-cv-5693-GBD, 2020 WL 5578336, at *5

(S.D.N.Y. Sept. 17, 2020); *Adina's Jewels, Inc. v. Shashi, Inc.*, 442 F. Supp. 3d 766, 772

(S.D.N.Y. 2020); *Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 556

(S.D.N.Y. 2007); *see also DBW Partners, LLC v. Mkt. Sec., LLC*, No. 22-cv-1333-BAH, 2023

WL 2610498, at *5 (D.D.C. Mar. 23, 2023).  And again, this Court should do the same.

## <u>CONCLUSION</u>

The Court should grant the partial motion to dismiss in its entirety.

Dated:  New York, New York
       March 4, 2024

Orrick, Herrington & Sutcliffe LLP

By:   */s/ Annette L. Hurst*
       Annette L. Hurst (*Pro Hac Vice*)
       The Orrick Building
       405 Howard Street
       San Francisco, CA  94105-2669
       Telephone:  (415) 773-5700
       Facsimile: (415) 773-5759
       ahurst@orrick.com

       Christopher J. Cariello
       51 West 52nd Street
       New York, NY 10019
       Telephone: (212) 506-3778
       Facsimile: (212) 506-5151
       ccariello@orrick.com

       Attorneys for Defendant
       Microsoft Corporation