

November 18, 2024

*Sent via ECF*

**Orrick, Herrington & Sutcliffe LLP**
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

+1 415 773 5700
**orrick.com**


**Annette L. Hurst**

**E** ahurst@orrick.com
**D** +1 415 773 4585
**F** +1 415 773 5759

Hon. Ona T. Wang
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

RE:  *The New York Times Co. v. Microsoft Corp., et al*. No. 1:23-cv-11195
   *Daily News, LP, et al. v. Microsoft Corp., et al.*, No. 1:24-cv-3285
   *The Center for Investigative Reporting, Inc. v. Microsoft Corp.*, et al. No. 1:24-cv-04872

Dear Judge Wang:

Microsoft respectfully requests a pre-motion conference regarding The New York Times Company's ("The Times") refusal to produce highly relevant evidence regarding the valuation of and market or potential markets for the works-in-suit. Microsoft seeks judicial assistance in compelling The Times to produce the following: (1) information regarding subscription losses, including user surveys and other analyses of the reasons for subscription cancellation, which would directly refute The Times's claim that generative AI has caused subscription loss; (2) information regarding advertising revenue and analyses of effects on advertising revenue over time for the same purpose; (3) web traffic documentation to refute alleged effects on referral traffic; and (4) high level economic and financial reporting data regarding The Times's business performance from 2015 to 2024, in order to model economic performance prior to and independent of the pandemic.

The documents related to these topics are critical to assessing the fair use fourth factor: the effect of the use upon the potential market for or value of the copyrighted work. Nevertheless, The Times either refused to produce altogether or improperly narrowed the scope of the requests such that it would produce only that evidence it chooses rather than all relevant and responsive evidence. This is not how litigation works—Microsoft is entitled to discover evidence that refutes the claims, not just what The Times wants to disclose.

***Relevance to the Fair Use Fourth Factor.*** The law is clear: as a Defendant, Microsoft has the burden of presenting evidence on the fourth factor—one of the most important elements of fair use. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (burden on defendant to come forward with evidence); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015) ("the fourth factor is

1



of great importance in making a fair use assessment"). To meet that burden, Microsoft propounded various discovery requests seeking information about the economic performance of The Times to understand the manner in which it monetizes its copyrighted works and what effects there have been on its economic performance in pursuing its monetization strategies over time. This is basic information necessary to understand the market for the works in suit. And it is apparent from the First Amended Complaint that The Times obtains at least three types of revenue concerning the works in suit that are relevant to the claims at issue:  subscription revenue, advertising revenue, and product referral revenue from the reviews in *Wirecutter*. Thus, Microsoft's discovery requests were directed both specifically to these activities and more generally to understanding the economics of The Times's business operations.

***Subscription Cancellation Information.*** For Requests No. 75 (reasons for any cancellation of subscription to The Times), No. 77 (studies regarding the reasons for any cancellations of subscriptions to The Times), and No. 80 (decisions to include a question about AI in surveys regarding cancellation of subscription to The Times), The Times has simply refused to produce any documents. *See* Ex. A (The Times' Resps. & Objs. to Microsoft's Second Set of Requests for Production) at 6-9.  For Request No. 76 (surveys and responses regarding cancellation subscriptions) The Times has improperly narrowed what it will produce to only documents sufficient to show the specific surveys that include generative AI as one of the options for the reason a consumer cancelled their subscription, and declined to produce other surveys regarding reasons for cancellation. *See id.* at 7-8. In the parties' meet and confer, The Times feigned ignorance as to the relevance of these requests. Yet plainly evidence relating to ***all*** reasons why consumers have cancelled their subscriptions over the relevant time period is essential to rebut The Times's assertions of harm through subscription loss—whether that be cost, interest, bias, or something else entirely unrelated to Microsoft's generative AI products.

***Advertising Revenue Changes & Analyses.***  For Request No. 89, which seeks documents evidencing the reasons for changes in advertising revenue associated with nytimes.com page views, The Times has outright refused to produce any documentation with only cursory explanations as to why. Ex. A at 13-14. The Times has refused to collect any documents at all about advertising revenue analyses *from its Global Advertising Officer*, Joy Robins. The Times also complained in meet and confer that this Request would broadly sweep in all documentation reflecting any changes to advertising revenue, including purportedly insignificant references in daily emails. The fact that the email of Joy Robins, The Times's Global Advertising Officer, may discuss a wide variety of reasons for changes to advertising revenue *is exactly the point*. This is no basis for The Times to refuse these documents. The Times must undertake a reasonable collection of this material, including collection of Ms. Robins' email.

***Impacts on Website Traffic.*** The Times has also refused to produce any documentation responsive to Request No. 101, which seeks evidence of any effect on traffic to the nytimes.com domain resulting from non-party generative AI. Ex. A at 19-20. Because of the significance of Google's market position in search (including its use of generative AI tools as part of search), any understanding of effects on The Times must take into account what is happening with respect to Google. The Times refuses to accept Google's relevance to an assessment of the



market for website traffic and therefore refuses to produce the evidence.

***Analyses of the Market for the Works.*** Finally, Microsoft has served two catch-all requests seeking documents evidencing the market for the copyrighted works-in-suit (and derivatives thereof) including information that would show The Times's consumer base, gross revenues, overall market performance across all revenue streams (e.g., print, digital, advertising), and any market studies or research from 2015 to present. *See* Ex. B (The Times's Resps. & Objs. to Microsoft's First Set of Requests for Production) Request Nos. 8 & 9 at 7-9. The Times has refused to produce documents in response to these Requests, arguing that they are overbroad. But the reason these two Requests are formed in this manner is to ensure that regardless of the names used internally by The Times or the structure of the way its books and records are kept (which only The Times knows), Microsoft is able to discover sufficient evidence to understand The Times's current and anticipated markets for its copyrighted works and to assess the harm alleged to those markets. Microsoft's goal is to obtain periodic reports circulated in the ordinary course of business, budgets, strategic and other business plans, financial projections and metrics, as well as Board presentations reporting on the financial well-being of The Times across all revenue streams, and effects on such revenue streams over time. Clearly, The Times has this kind of business information and it should be produced. The fact that Microsoft does not know the names of its business reports should be no impediment to production. And it is needed for a long enough period of time to establish performance for several years prior to the global pandemic in order to properly examine causation over time.

The scope of the defense cannot limited by what The Times voluntarily decides to provide. Rather, *all* evidence regarding market benefits and harms must be assessed. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35-37 (2021). Here, the documents requested are all highly relevant to the fourth factor inquiry. For example, to weigh against fair use, "[t]here must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" *Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015) (quoting 17 U.S.C. § 107). In order to determine the existence of any such effect, Microsoft must first be able to understand the full scope of the market(s), potential market(s), and value of the works at issue. *See Harper & Row*, 471 U.S. at 568 ("This inquiry must take account not only of harm to the original but also of harm to the market for derivative works."). The Times's production of such information dating back to 2015 will enable understanding the impact, if any, of generative AI on the market for and valuation of the copyrighted works-at-issue.

If there has either been no effect on the market, or market effects are resultant from sources *other than* Microsoft's actions, the Requests directed to advertising revenue (RFP No. 89), click through rates and webpage views (RFP No. 101), and subscription cancellations (RFP Nos. 75, 76, 77, and 80) are designed to get to that very relevant question. Ex. A at 6-9, 13-14, 19-20. Thus, advertising revenue figures, web traffic documentation, subscription cancellation information and complaints (including surveys and all underlying data for such surveys)—all of which are readily available to The Times—should also be fairly provided to Microsoft.



Respectfully submitted,

*/s/ Annette L. Hurst*

Annette L. Hurst