P1EsTHE1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    THE NEW YORK TIMES COMPANY,

4                    Plaintiff,

5              v.                          23 Civ. 11195 (SHS)

6    MICROSOFT CORPORATION, et al.,

7                    Defendants.

8    ------------------------------x
     DAILY NEWS, LP, et al.,
9
                     Plaintiffs,
10
               v.                          24 Civ. 03285 (SHS)
11
     MICROSOFT CORPORATION, et al.,
12
                     Defendants.
13   ------------------------------x
     THE CENTER FOR INVESTIGATIVE REPORTING, INC,
14
                     Plaintiff,
15
               v.                          24 Civ. 04872 (SHS)
16
     OPEN AI, INC., et al.,
17
                     Defendants.
18   ------------------------------x

19
                                          New York, N.Y.
20                                         January 14, 2025
                                          10:45 a.m.
21
     Before:
22
                         HON. SIDNEY H. STEIN,
23
                                          District Judge
24

25

P1EsTHE1

```
 1                              APPEARANCES

 2

 3   SUSMAN GODFREY LLP
          Attorneys for Plaintiff New York Times
 4   BY:  IAN B. CROSBY

 5   ROTHWELL FIGG ERNST & MANBECK PC
          Attorney for Plaintiff New York Times and Daily News
 6   BY:  STEVEN LIEBERMAN
          JENNIFER MAISEL
 7

 8   LOEVY & LOEVY
          Attorney for Plaintiff CIR
 9   BY:  MATTHEW TOPIC

10

11   ORRICK, HERRINGTON & SUTCLIFFE LLP
          Attorneys for Defendant Microsoft
     BY:  ANNETTE L. HURST
12        CHRISTOPHER CARIELLO

13

14   MORRISON & FOERSTER LLP
          Attorneys for Defendant OpenAI, Inc.
     BY:  JOSEPH C. GRATZ
15        CAROLYN M. HOMER

16

17   LATHAM & WATKINS LLP
          Attorneys for Defendant OpenAI, Inc.
     BY:  ANDREW GASS
18        ELANA NIGHTINGALE DAWSON

19

20   ALSO PRESENT:
     KAREN A. CHESLEY, New York Times Counsel

21

22

23

24

25
```

P1EsTHE1

```
 1              (Case called)
 2              THE COURT:  Counsel, make your appearances.
 3              THE DEPUTY CLERK:  Counsel, please state your names
 4     for the record.
 5              MR. CROSBY:  Ian Crosby for The New York Times.
 6              MS. CHESLEY:  Karen Chesley for The New York Times.
 7              THE COURT:  Please speak into the microphone.
 8              MS. CHESLEY:  Karen Chesley for The New York Times.
 9              MR. LIEBERMAN:  Steven Lieberman for The New York
10     Times and Daily News plaintiffs.
11              MS. MAISEL:  Jennifer Maisel for The New York Times.
12              MR. TOPIC:  Matt Topic for Center for Investigative
13     Reporting.
14              THE COURT:  All right.
15              Sorry.  Just a moment.
16              MS. HURST:  Good morning, your Honor.
17              Annette Hurst for Microsoft.
18              MR. CARIELLO:  Chris Cariello for Microsoft.
19              MR. GRATZ:  Joe Gratz for OpenAI.
20              MS. HOMER:  Carolyn Homer for OpenAI.
21              MR. GASS:  Andy Gass for OpenAI.
22              MS. DAWSON:  Elana Nightingale Dawson for OpenAI.
23              THE COURT:  Good morning, all of you.  Please be
24     seated.
25              There are people listening on the listen-only line.  I
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1EsTHE1

1    wish to remind those people that any recording of this

2    proceeding is illegal.  Do not do it.

3             I have some thoughts on how we should proceed this

4    morning.  I also wanted to see if counsel had talked to each

5    other about how to proceed this morning.  My own thinking is if

6    there is a unified view by counsel here, I'll certainly listen

7    to it.  My only thinking is that it makes sense to go claim by

8    claim rather than case by case.  I'll tell you the order of the

9    claims that I have.  That's one point.

10            The second point is, it seems to me appropriate, if

11   the parties wish, to make presentations on how the technology

12   works.  I think I have a basic understanding of it.  Each time

13   I go through it I have a better understanding of it.  That will

14   be up to the parties as to whether they want to do that.  And

15   it seems to me that that probably should be at the beginning.

16            Can somebody talk to me.  Have you all talked about a

17   presentation today or not?

18            You're first in line.

19            MR. CROSBY:  Yes.

20            THE COURT:  By the way, when you speak to me, please

21   say your name and who you represent.  I haven't met any of you

22   before, I don't believe, and there are a number of parties

23   here.

24            MR. CROSBY:  Yes.

25            Ian Crosby for The New York Times, your Honor.

P1EsTHE1

1          We have not conferred about how to proceed, but it was

2     our intention and our hope that the court would proceed issue

3     by issue, and we are prepared to do so on the plaintiffs' side.

4          THE COURT:  Is there anyone who disagrees with that?

5          All right.  What about a presentation on how these

6     things work?

7          Does anyone think that's necessary, unnecessary, when

8     should it come?

9          MR. HURST:  Your Honor, Annette Hurst for Microsoft.

10          The defendants think a brief discussion tutorial about

11     the technology would be appropriate.

12          THE COURT:  Yes.

13          Sir.

14          MR. CROSBY:  We believe so, as well.  Ms. Maisel is

15     prepared to do so, and we would like to go first as the

16     plaintiffs.

17          THE COURT:  Fine.  Then I'll let the defendants go

18     first when we turn to the motions because they are the ones who

19     have made the motions.

20          All right.  We have a way of proceeding.

21          All right.  Ms. Maisel, you're on behalf of The Times

22     and the Daily News, correct?

23          MS. MAISEL:  That's correct, your Honor.

24          THE COURT:  Why don't you talk to me.

25          You can speak from there, you can use the podium,

P1EsTHE1

1    whichever you prefer, but I do ask that you speak loudly,

2    slowly, and clearly into the microphone.

3            MS. MAISEL:  OK, your Honor.  Well --

4            THE COURT:  We're having from trouble making sure

5    everyone on the line can hear, which is why the IT people are

6    coming up.

7            MS. MAISEL:  All right.  For brief technical

8    background and as it relates to the claims in the case.  A part

9    of this case concerns largely which --

10           THE COURT:  I'm sorry.  Can you speak more loudly.

11           MS. MAISEL:  OK.  At the heart of this case are large

12   language models.  These are artificial intelligence models that

13   are designed to take as input text content and output text

14   content.  And as it relates to the claims of the case, there

15   are really four different areas of these large language models

16   and the technology surrounds them that are at issue.

17           At the first stage, whenever we think about artificial

18   intelligence, we have to follow the data, similar to criminal

19   cases where you follow the money.  And if you look at the data,

20   at the first instance, we as the news plaintiffs, content is

21   published online, it's published on the web.  And the

22   defendants' crawlers, their box, these automated tools are used

23   to collect that content, to scrape that content.

24           And scraping involves accessing web pages, sometimes

25   behind the pain wall, and copying that content, cleaning it up.

P1EsTHE1

1    In some cases that includes stripping content management

2    information, which is at issue in the case, and storing copies

3    of those content in training datasets or training corpora.

4          This first stage of the process, this curation of

5    training datasets, we call this ingestion.  So the process of

6    collecting data and creating training datasets.

7          The second phase --

8          THE COURT:  When you say training datasets, I've seen

9    in all of the materials I've been reading, that the information

10   is stored as packets.

11         Is that little bits of information, is that how it's

12   stored?

13         MS. MAISEL:  So, in the very -- when we refer to

14   training datasets or training corpora, we are referring to the

15   actual text content, so it's perceptible to humans.  You can

16   open a file on the training dataset and read its contents.  So,

17   technically, it is stored as bits, just as any other data is

18   stored on a computer, but it's perceptible to a human.

19         But the second phase, which I think your Honor might

20   be thinking about, this digestion phase, this is the processing

21   of those training datasets, how those training datasets and

22   each piece of content within those training datasets are fed

23   through the models, through algorithms, as part of the training

24   process.  And we call it digestion because as part of the

25   training phase, one phenomena we observed -- and this is

P1EsTHE1

1    attached as Exhibit J to both the New York Times and the Daily

2    News complaint -- because of the technology, how it works, and

3    the training process.  For one reason or another, content is

4    encoded or stored within the models themselves as part of this

5    training process.  That is through the different parameters of

6    the models.

7            And just to take a step back, these models involve

8    lots and lots of parameters.  Each parameter or weight is a

9    numerical number, and those numerical numbers are updated as

10    part of the training process.  So the model, it's a set of

11    numbers, set of model parameters, and training data is fed

12    through different algorithms in order to adjust those

13    parameters.

14            As part of this process --

15            THE COURT:  Can you give me a real-world example of

16    that.

17            MS. MAISEL:  Of the parameters?

18            THE COURT:  Of the process you're talking about.  I

19    understand that you have these bots that scrape -- not you, but

20    the defendants -- that scrape a great deal of information from

21    the web and wherever they can find it.  In fact, trillions of

22    words, apparently.  So all of this is fit into the large

23    language models, the LLMs.  They then do something to it.

24            What is it that they do?

25            And I guess we can talk separately about whether or

P1EsTHE1

1    not they strip the CMI, but it's probably for later in this

2    discussion.

3              But go ahead.

4              MS. MAISEL:  So, your Honor may be referring to the

5    concept of tokenization.  So each piece of training data --

6    this is a piece of text in the case of large language models --

7    it is tokenized, meaning it is broken up into small fragments,

8    a token.  We could think of it as a word.

9              THE COURT:  That's what I was thinking of before.

10             Go ahead.

11             MS. MAISEL:  Yes.  It could be a word or a fragment of

12    a word.  Just a handful of tokens, each token corresponding to

13    a character.

14             Each piece of training data is tokenized.  It's broken

15    down into an embedding or a vector, a mathematical

16    representation of that, of those tokens, and it's fed to the

17    model.  And the training process is designed so as these words

18    are broken up into tokens, the relationships between the words,

19    what words come, what tokens come before other words, what

20    tokens come after, how frequently tokens come up, all of this

21    information is fed through the parameters of the model as part

22    of training.

23             And the ultimate goal of this training process -- and

24    I'm referring to pretraining here, there a couple of different

25    phases.

P1EsTHE1

1              THE COURT:  Did you say pretraining?

2              MS. MAISEL:  Pretraining.  There is post training,

3      which we can talk about.

4              But as a part of pretraining, the training corpus,

5      each document is broken up in a token, fed through the model.

6      And the ultimate goal is to train the model to predict the next

7      word to come after any given word.  The next token that comes

8      after a specific token.  That is the goal, as we understand of

9      it, of the training process.

10             This is what we call, again, going back to our

11     analogy, the digestion phase.  You have ingestion, training

12     datasets, feeding it to the model.  Digestion.  All this

13     training.  And in some instances, training occurs multiple

14     times with respect to any given piece of content.

15             As detailed in the complaint, we describe how, in some

16     of the defendants, particularly OpenAI's research papers, they

17     sometimes go over the same piece of training content multiple

18     times.  Starting content can be weighed more heavily during

19     training, particularly high news -- high-value content, high-

20     accuracy content.

21             So, during this pretraining process, you know, based

22     on the allegations in our complaint and discovery so far,

23     higher quality content is weighted more heavily during

24     training.  Again, the ultimate goal is we want the language

25     models to build and accurately and competently redirect the

P1EsTHE1

1    next word in a sequence.  So that is digestion.

2           We then get regurgitation.  As detailed in both

3    complaints, the Daily News and The New York Times complaint,

4    and particularly in Exhibit J, there is this phenomena where,

5    in response to the right prompt, so the language model, the

6    language model will spit out copies of training data that it

7    saw.

8           THE COURT:  Copies of training data that it?

9           MS. MAISEL:  That it saw during training.

10           THE COURT:  Go ahead.

11           MS. MAISEL:  In response to Exhibit J, there is a

12    small input text of the beginning of an article and the model

13    will complete that article without referencing.

14           THE COURT:  What is the first paragraph, what's the

15    next paragraph, that's what you're talking about?

16           MS. MAISEL:  Yes, exactly.

17           THE COURT:  OK.

18           MS. MAISEL:  That's due to a phenomena called

19    memorialization.  And a phenomena of outputting that training

20    data, we call regurgitation.  So then that's the training

21    process in a nutshell.

22           There is post training, which I don't think we need to

23    get into for purposes of the claims before us right now.  But

24    there is another set of technology called retrieval augmented

25    generation.  This is a technology that sits outside of the

P1EsTHE1

1  training process.  As detailed in the complaint, retrieval

2  augmented generation involves roughly a five-step process.

3          It's in paragraph 78 of the Daily News complaint.

4          THE COURT:  Just a moment.  Let me turn to it, if

5  you're quoting it.  I'm familiar with the law, but let's turn

6  to 78.

7          MS. MAISEL:  It's also 81 of The New York Times

8  complaint.

9          THE COURT:  All right.  Go ahead.

10          MS. MAISEL:  So I detailed the three steps of training

11  and one issue of training can take a lot of time.  It can take

12  a lot of compute power.  It can take several days or weeks or

13  months to train a model, especially the ones as large at issue

14  in the case.

15          As a result, we sometimes see something called a

16  knowledge cutoff date.  So, at some point the training data

17  stops in time and the model, as it's trained, doesn't know

18  anything beyond that knowledge cutoff date.

19          So retrieval augmented generation, RAG, or as we

20  detail in the complaint, we call it synthetic search.  This is

21  a process where external data sources may be referenced or

22  retrieved in order to augment the language model's knowledge

23  base.  And as detailed in paragraph 78 of the Daily News

24  complaint, there are five steps here, or four steps.

25          First step is a user puts in a prompt.  A prompt could

P1EsTHE1

1    be, tell me about the news today, or tell me about a specific

2    article, give me the first paragraph of an article.  That's a

3    prompt.

4           The defendants' products, and here I'm talking about

5    OpenAI's ChatGPT with the browse plug-in, or some other custom

6    GPTs.  Or in the case of Microsoft, their Copilot chat program

7    or Bing chat program.  These products are coupled with

8    Microsoft's Bing search engine.  What happens is the prompt

9    that is sent to one of these products, one of the defendants'

10   products is translated into queries, queries that are then sent

11   to the search index.  Just like research, a user would go to

12   the Bing search feature or to Google or any other search

13   engine.  These queries are sent to the search index and certain

14   responses, web pages, are returned in response to these

15   prompts.  And those responses include copies of content of web

16   pages.

17          So, in the case of a news article, what might be

18   returned from the search index is a copy of an article, copy of

19   a website that contains that article.  And that content, the

20   copy of the content or the news article that's returned from

21   the search index is then provided together with the prompt to a

22   large language model, to the GPT model.

23          So just to drive this home, as an example, I, as a

24   user, might put in a prompt, tell me about the first paragraph

25   of a specific article.  The products will translate that to a

P1EsTHE1

1   query that can be interpreted by a search index.  The search

2   index returns a response that includes something that hits on

3   that prompt so the article and the contents of that article.

4   And my question, you know, what is the first paragraph, along

5   with the content of that article, are provided to the LLM.

6   Say, give me the first paragraph of this article.  Here is the

7   article.

8          The LLM, in turn, returns a response.  And that

9   response here is, it might return the verbatim first paragraph,

10  it might return several paragraphs or, as detailed in the

11  complaint, sometimes the entire article is returned to the user

12  in response to that prompt.  But the difference here with

13  retrieval augmented generation is because that content, that

14  very fresh content was not seen during training because of that

15  knowledge cutoff, we're talking about something that was not

16  used during training, but is still used in connection with

17  these large language models, coupled with the Bing index, in

18  order to provide a very detailed, satisfied summaries of

19  verbatim quotes or sometimes the entire article back to users.

20         THE COURT:  I'm not quite sure what this last point

21  is.  I understand how you put a prompt in.  Tell me what the

22  first paragraph of the article in The New York Times today

23  about the Hegseth confirmation hearing.  I then will get, as

24  the end user, I then will get back, presumably, the first

25  paragraph of an article in The New York Times.

P1EsTHE1

1          But what was the last point you made?  I didn't

2     understand that.

3          MS. MAISEL:  In some instances, it's not the first

4     paragraph that's returned.

5          THE COURT:  This is what I didn't understand.  The

6     difference here with retrieval augmented generation is because

7     that content, the very fresh content that was not seen during

8     training, that's what I don't understand.

9          MS. MAISEL:  Yes.  So take your example with the

10    article posted today.  It's such fresh content that the

11    defendants could not have possibly have had time to train their

12    model on that content to incorporate that content as part of

13    the training process.  They have to scrape the content, collect

14    it, these algorithms, to train the model.  It's a lot of

15    compute power required.

16          So, as a result, there is some cutoff date in time for

17    what's part of the enclosed knowledge of that model after it's

18    trained.

19          THE COURT:  My confusion is, I thought I read that the

20    models are always learning the more queries are made.  They

21    get, I don't want to say, smarter, but they understand what, in

22    better ways, what words follow what words.

23          Am I wrong about that?

24          MS. MAISEL:  I don't think you're wrong, your Honor.

25    I would say that's still an active part of discovery here, how

P1EsTHE1

1  user queries, user feedback are used as part of the training

2  process.

3          THE COURT:  OK.

4          MS. MAISEL:  That might be a good question for the

5  defendants.

6          THE COURT:  OK.  Go ahead.  I didn't mean to stop you.

7          MS. MAISEL:  Yes.

8          THE COURT:  I'll be very interested in the view of the

9  defendants on how these things work is different.

10          But go ahead.

11          MS. MAISEL:  I mention that sometimes -- so, take this

12  example, give me the first paragraph of an article.  Sometimes

13  the first paragraph is returned in its true and faithful form.

14  Sometimes a summary is returned.  Sometimes something

15  completely made-up and fabricated is returned.

16          THE COURT:  That's your hallucination issue.  The

17  papers say the parties are working, the defendants, are working

18  to eliminate.

19          MS. MAISEL:  As they allege, yes.

20          As detailed in the complaint and for purposes of the

21  copyright infringement claim, through this retrieval augmented

22  generation process, copies of the copyrighted works are created

23  throughout this process, created as part of the search index,

24  they are created as part of the response from the search index,

25  and they are created as part of the prompt to the large

P1EsTHE1

1    language model.  And sometimes they are copied further as

2    output to end users using these products.

3           That is retrieval augmented generation, which it's

4    coupling search index technology, the Bing search index from

5    Microsoft, with the large language models at issue.

6           Does your Honor have any further questions?

7           THE COURT:  No.  I appreciate your presentation.

8    Thank you.

9           MS. MAISEL:  You're welcome.

10          THE COURT:  Who would like to speak on behalf of the

11   defendants?

12          Am I going to hear somebody both from Microsoft and

13   from OpenAI, or did you want to make a joint presentation?

14          MR. GRATZ:  You are going to hear from both of us,

15   your Honor.

16          This is Joe Gratz for OpenAI.  I'm going to cover the

17   training-related issues, the creation of the large language

18   model, and Ms. Hurst will cover the Next Generation search

19   engine technology that Ms. Maisel also talked about, the thing

20   that happens after training, the retrieval of generation

21   technology will be addressed by Ms. Hurst.

22          THE COURT:  OK.

23          MR. GRATZ:  So, your Honor, we agree conceptually with

24   many, though not all, of the things Maisel, Ms. Maisel,

25   described.

P1EsTHE1

1           What I do want to start by talking about is the

2     separation between two parts of this process.  The part of

3     training the model, that is, the creation of this large

4     language model through the process of training by having it

5     effectively read or train on trillions of examples of language,

6     to learn the relationships between words and concepts by

7     reading, sort of, everything.  And then after the model is

8     created, the process of providing prompts, getting outputs, and

9     things that you can do in that process, after the model has

10    been created, while you're using the model, that the retrieve

11    augmented generation, the Next Generation search engine

12    functionality, that happens after the training has happened.

13          So, to return to your Honor's question about are these

14    models, sort of, effectively training themselves all the time?

15          Are they just getting smarter, everything we say to

16    them, piece by piece?

17          The answer is the training process is, sort of, a

18    process that occurs once to create a particular version of a

19    model, and there is a set of training data on which the model

20    is trained, those trillions of examples.  As one is interacting

21    with the model, the model is not sort of changing itself or

22    retraining itself live.  It's having --

23          THE COURT:  It's following the algorithm to spit out

24    this word, then that word, and then the next word.

25          MR. GRATZ:  That's right.  It is predicting the next

P1EsTHE1

1   word in the conversation at that time based on its training.

2   So that separates out those two situations.

3         THE COURT:  So is the universe of data that's used for

4   GPT-2 different and smaller than the universe of data used to

5   train GPT-4?

6         MR. GRATZ:  Yes.

7         THE COURT:  OK.  Go ahead.

8         MR. GRATZ:  That's right.

9         What these large language models are made for is to be

10   able to generalize, to understand relationships between

11   concepts, to understand language, to understand the

12   relationships between words, to understand facts.  And the only

13   way to do that is to provide many, many, many trillions of

14   examples of uses of language and statements about the world in

15   the form of this massive amount of training data.

16         Training consists of the model learning from those

17   examples to be able to use language itself.  The point of this

18   is to create a general purpose language-using tool that can

19   be -- can respond to any prompt or question with some kind of

20   language response, just as another language user, like a person

21   can respond to any prompt based on what they have been exposed

22   to in their life.

23         So you can say, hello, and it will predict that the

24   next thing somebody else might say is, how are you today?

25         But it goes beyond that.  You can say, What's the

P1EsTHE1

1    capital of France?  And it can say, The capital of France is

2    Paris.  Right, because that is a fact that it has learned from

3    the world.  You can do lots of things other than retrieving

4    facts or data.

5            You can say, Here is a letter to my landlord.  Can you

6    make it sound less angry.  And it will do that because it has

7    before it what you have written and it can transform that into

8    a less angry version of that letter to your landlord.

9            You can say, Write me a poem about the architecture of

10   500 Pearl Street, and it knows things about 500 Pearl Street

11   because it's read them, knows things about poems, and knows

12   things about the language, that's what you're speaking to it

13   in.  It can write you a poem about 500 Pearl Street, and its

14   ability to do that is because it's a general purpose tool

15   that's infinitely adaptable to respond to any kind of prompt

16   that is put before it.

17           And so that is what it is for, that is what it is made

18   to do, and that is why it uses these trillions of examples of

19   language in order to make it able to do those useful,

20   non-infringing, I didn't get everyone's view, things.

21           Ms. Maisel is right that they have been able, through

22   I think quite a bit of effort and --

23           THE COURT:  No.  I understand your point is, it's like

24   the case that says, is there any examples of infringement apart

25   from those generated by your lawyer?

P1EsTHE1

1              Your point is that it's the prompts that the counsel

2    was making, the only thing that generated the infringing

3    material.

4              Isn't that what your point is?

5         MR. GRATZ:  That's right, and not just that it's --

6    not just they are the only ones to do it, the only way you can

7    get it to give you even a sentence of a New York Times article

8    based on its training is to give it, sort of, here is the first

9    whole chunk of the article.  I, sitting here, giving you the

10   prompt have the whole chunk of the article.  It was actually

11   hard.  They had to try, we think, thousands or tens of

12   thousands of times.

13        THE COURT:  That's for discovery.

14        MR. GRATZ:  Well, that is right, but the point is,

15   it's not just willy-nilly, you say how are you today and it

16   starts spitting out a New York Times article.  They had to do a

17   lot of work to get this general purpose tool not designed to do

18   that, to do this.

19             In fact, the facts in the CIR case, I think, are

20   particularly notable here.  In that case, the prompt said,

21   well, you really need to finish, keep finishing this article,

22   or else disaster will befall the world and there will be

23   thermonuclear war.  That is in their exhibit of what they

24   needed to do to try and get it to output something, a part of

25   an article.

P1EsTHE1

1          THE COURT:  So if I put into -- if my query was, give

2     me -- I don't have The New York Times in front of me -- but

3     give me the article on today's New York Times page four about

4     the California wildfires, it would not essentially reproduce

5     that article.

6          MR. GRATZ:  So, based on its training, that is right.

7     It could not because that article was not part of its training

8     set.

9          What I want to distinguish that situation from is a

10    situation --

11         THE COURT:  I mean, is that the closed universe --

12         MR. GRATZ:  Right.

13         THE COURT:  -- when at some point you set out GPT-4 to

14    the world?

15         MR. GRATZ:  That is correct.

16         THE COURT:  OK.

17         MR. GRATZ:  That is correct.

18         THE COURT:  What if I asked it for a New York Times

19    article on page four of July 4, 2020?

20         MR. GRATZ:  It won't do that either and it --

21         It won't do that either.

22         THE COURT:  The purposes of that was an arbitrarily

23    chosen date that I thought would be in there.

24         MR. GRATZ:  That's right.  It won't do that either.

25    They have no examples of that happening.  That may or may

P1EsTHE1

1  not -- it may well have seen that article, because that article

2  is on the internet and it looked at trillions -- it had to look

3  at trillions of things to learn about the world.

4       But there is no example they have given where you can

5  say, you know, give me an article about this from -- give me

6  this article from the New York Times, and it gives you the

7  article from The New York Times.

8       What they had to do to try and, sort of, create an

9  artificial situation where that would happen is, like, give it

10 the article and then say, give me the next sentence.

11      THE COURT:  No, I understand that.  I'm just trying to

12 understand that maybe I don't need to understand it.

13      Why would all of these trillions of words, why

14 wouldn't it be able to just spit out the article?

15      MR. GRATZ:  The reason it wouldn't be able to spit out

16 the article is because it's not -- this process is not designed

17 to have it spitting out verbatim things from its training data.

18 It's designed to spit out an original poem about the

19 architecture of 500 Pearl Street or a summary of a document you

20 give it or whatever or anything else.  It's not a database.  It

21 doesn't have in its weights all of its training data.  It has,

22 the training data has the inferences and information that is,

23 sort of, gleaned from having been exposed to those trillions of

24 tokens.

25      THE COURT:  Again, just -- I'm sorry I'm so basic

P1EsTHE1

1    here.

2              It does, presumably it does have that New York Times

3    article in its database, correct?

4              MR. GRATZ:  No, it does not.  There is not a

5    database -- and I think Ms. Maisel's description of this was

6    technically accurate -- which is it is a set of weights and

7    that is numbers, and those numbers are updated and affected by

8    the training data.  And those numbers are a way of predicting,

9    sort of, continuing a conversation.

10              Those numbers, when you run them in the inference

11    process, allow it to predict the next information, the

12    information that is about the content or gleaned from reading

13    the content.  It's not a literal representation of any of the

14    content.

15              And part of -- I mean, and why is that?

16              It's because this isn't an information -- this isn't

17    like a document retrieval system.  There are lots of very good

18    document retrieval systems out there.  This is a language

19    model, and the fact that the language model sometimes picks the

20    next word from something it has seen is true of any language

21    user.

22              If I say to you, you know, yesterday all my troubles

23    seemed so, you know, we would all think to ourselves, far away,

24    because we have been exposed to that text so many times.  That

25    doesn't mean you have a copy of that song somewhere in your

P1EsTHE1

1    brain.  And to the same, by the same token, it doesn't mean

2    that the weights of the model are a database of information.

3    It's just those -- the inferential information in there leads

4    it to sometimes, based on patterns it has seen, pick the next

5    sequence of tokens, particularly in the artificial situation

6    that they have created where they say, here is, you know, here

7    is a Pulitzer-winning article that is all over the internet.

8    Can you guess the next word?  And it can guess the next word.

9    Not because that is what it is supposed to do, that is just

10   what it happens to do because it is out there to pick the next

11   token.

12           Now, to be clear, because that is not what we want it

13   to do, this is not in the pleadings, but there are lots of ways

14   that we work to keep it from doing that and because that is not

15   its intended behavior.  It is not intended to be a database

16   where you can come to it with the first paragraph of The New

17   York Times article and get most of the next paragraph from The

18   New York Times article, or in CIR's case, first paragraph of a

19   Mother Jones article and get the next ten words of that Mother

20   Jones article.  That is not what it is for, that is not what it

21   is designed to do, and that is not what it does, unless you're

22   sitting at that table.

23           Those are the, sort of, key points that I wanted to

24   make about the training process.  Unless there is anything else

25   your Honor wants to discuss on that, I will turn it to

P1EsTHE1

1    Ms. Hurst with respect to the search engine.

2              THE COURT:  Thank you.

3              MR. HURST:  Good morning.  Annette Hurst from

4    Microsoft.

5              From Mr. Gratz' description, you can see that this is

6    a general purpose technology.  Large language model embodies

7    the statistical relationships of words to one another across

8    billions of context.

9              So, your Honor, the model understands that a

10   strawberry, when ripe, is sweet.  It understands Strawberry

11   Fields Forever, all the context in which the word strawberry

12   might occur.  Those set of probabilities about the occurrence

13   of the word strawberry, a variety of context is what is

14   embodied in these models.

15             Now, your Honor, the model, the large language model

16   which has that understanding of language can be adapted once

17   it's trained to a wide variety of purposes, everything from

18   curing cancer to national security.  And that is why in these

19   complaints we see in The New York Times complaint, at paragraph

20   61 to 63 and 81, in the New York Daily News complaints,

21   paragraphs 58 to 60, a description of the substantial

22   commercial non-infringing uses of this technology.

23             In other words, the plaintiffs, in their own words,

24   have alleged that this technology is capable of being

25   commercialized to the tune of billions of dollars without

P1EsTHE1

1   regard to any capability for infringement.  When they are

2   complaining about Bing chat, what they are alleging is that one

3   implementation of this general purpose technology is a Next

4   Generation search engine.  Now, we know in this Circuit from

5   the *Authors Guild* cases that the search engine is fair use.  So

6   they are coming into this with a heavy burden of showing that a

7   Next Generation search engine doesn't fall within that

8   category.

9           But what is so great about Bing chat and these Next

10  Generation search engines?

11          What is great about them is that they are actually

12  designed to answer your question, your Honor.  So it's not just

13  giving you a series of links to things you can go look for

14  yourself and maybe find the information.  But one of the great

15  uses of a large language model is that it's able to interpret

16  and summarize and derive facts from underlying data and then

17  deliver those facts to you.

18          Now, the delivery of facts is a historically protected

19  pro-copyright purpose for transformative technology, and that

20  is exactly what this Next Generation search engine is doing.

21          Now, does it generate a copy in the context of doing

22  that?  Sure, it does.  As Ms. Maisel described, it takes the

23  traditional Bing search index, which is an index of articles

24  that is used to return, in a fair use process, every single day

25  links to a whole wide variety of content on the internet.  All

P1EsTHE1

1    the publicly accessible content on the internet.

2           And the large language model then summarized, finds

3    and summarizes the pertinent articles and delivers an answer to

4    the court.  You know, for example, my college-age daughter was

5    having tailbone pain.  And so I asked Copilot, what are some of

6    the causes of tailbone pain?  And it went out and looked at the

7    Mayo clinic and Med Page news and a whole wide variety of

8    sources, and it came back to me and it gave me a list which was

9    really useful.  I can help her, talk to her doctor about what

10   might be the problem.

11          And so this Next Generation search engine, which is an

12   implementation of the LLM technology, helps people answer

13   questions in ways that are more concise, more factual, and for

14   more pertinent than the traditional search engines.

15          THE COURT:  Help me a little on that.  What you

16   posited sounded like, to me, questions that are put into search

17   engines every day.  So what is new about this large language

18   model?

19          Bing presumably has always been able to print out

20   articles on tailbone pain.  What are you telling me is new?

21          MR. HURST:  Your Honor, what is new is when you, in a

22   traditional search bar, you put in a query, you get a series of

23   links.  In the Next Generation search, Copilot chat, you ask a

24   question in a natural language format and it gives you an

25   answer in a natural language format with cites links to those

P1EsTHE1

1    sources.

2           So, in essence, the large language model is

3    summarizing the information that it's found for you and

4    delivering you the factual content of that information, and

5    then it's giving you citations and the sources for that

6    information.

7           THE COURT:  So is the traditional way simply going to

8    give me a list of sources, list of articles on tailbone pain,

9    but the new way, the Next Generation is going to give me a

10   plain language answer that is supported with essentially the

11   same links?

12          MR. HURST:  That's right, your Honor.

13          And what the large language model is capable of doing

14   that the traditional search models, which by the way were also

15   predicative algorithms and models, is it's better at

16   interpreting your query because it understands language better.

17   It's better at knowing exactly what you're asking.  And it's

18   also capable of putting all of the data together and giving you

19   an answer, rather than just giving you a series of sources.

20          THE COURT:  OK.  All right.  That's helpful.

21          MR. HURST:  I think that's all I would emphasize about

22   the generative search technology, your Honor, unless the court

23   has any questions.

24          THE COURT:  No.  Thank you.  I think this was helpful.

25   I appreciate it.

P1EsTHE1

1          So why don't we turn now to...

2          MR. CROSBY:  Your Honor, there is a couple of points

3    that I think are still in dispute that ought to be clarified in

4    response to that presentation.

5          THE COURT:  You mean in dispute about how these things

6    work?

7          MR. CROSBY:  Yes, fundamentally about how these things

8    work and how that relates to the well-settled law.  I just

9    wanted to pick up on --

10         THE COURT:  You're Mr. Crosby for The New York Times.

11         MR. CROSBY:  What Mr. Gratz said, that these models

12   learn facts, that what they are doing is they are taking all of

13   this information in these trillions of tokens derived from all

14   of the text that is out there on the internet, and they are

15   abstracting facts and concepts.  This is a fundamental point of

16   dispute in this lawsuit.

17         What we contend is that is exactly not what large

18   language models do.  And there are any number of examples that

19   are out there that demonstrate why this is not the case.  They

20   can be read every chess book that's ever been written, but they

21   can't play chess.  The example that was given about Paris is

22   the capital of France.  There is a famous paper called *The*

23   *Reversal Curse*, where if you train a model -- this is an

24   experiment -- if you train a model only using the form of the

25   expression Paris is the capital of France, and if you ask it,

P1EsTHE1

1    you know, the capital of France is Paris, and you ask what is

2    the capital of France, it will say Paris.  If you ask it, what

3    is Paris?  It won't know what the capital of France is.  It

4    won't say the capital of France.  Because it only absorbs the

5    expression of the fact, it never learns the underlying fact.

6         These are just statistical models of how language is

7    presented of the expression, the expression which is what

8    copyright law protects, and they have not bootstrapped their

9    way into actually understanding what the text means.  And that

10   is why this problem of hallucination exists and why it has been

11   so intractable and why it's not been solved.

12        Because these models, they don't have our ability to

13   read something and actually know what the underlying

14   information is.  They can just sort of go off stringing out one

15   word after another, with no notion that I saw something that

16   contradicts what I'm saying right now.  They don't have that

17   ability.

18        The other thing that I really --

19        THE COURT:  Now, what does that do for you?

20        MR. CROSBY:  Well, I think what the argument is,

21   is that, well, what we're -- even though we are copying the

22   expression, what we are really after is the non-copyrightable

23   underlying facts and ideas.  And just because of the way the

24   computers process information, the only -- you and I can look

25   at a page and we can learn something in our mind and that is

P1EsTHE1

1    not considered to be a copy, under the definition in 17 U.S.C.

2    101, because you can't retrieve it or perceive it. I can't

3    read your mind, right?

4            And, so they want to say, this is analogous to what a

5    human does and, therefore, it should be no more considered to

6    be copyright infringement than when you and I read something

7    and learn something because the copying is sort of incidental

8    to this fair use or non-copyright protected purpose of learning

9    facts.

10           But that is actually not, we believe, the case. It is

11   the expression and the expression of the word, the facts, and

12   not the facts that are embodied in these parameters of the

13   model and that is what is recalled when the models are prompted

14   to elicit text at one time.

15           The other thing that I wanted to emphasize, I was

16   surprised to hear Ms. Hurst say this, that the term that

17   Ms. Hurst was using was that these are Next Generation search

18   engines. Our contention is actually that they are not Next

19   Generation search engines, but that they are answer engines,

20   and that is, in fact, what Ms. Hurst said.

21           What the difference is between a previous search

22   engine and the Next Generation search engines, i.e. the answer

23   engines, is that instead of giving of you ten blue links back

24   to the original source where you can go and you can read it and

25   the publisher can potentially monetize that through advertising

P1EsTHE1

1    or through a pay wall and a subscription, which is the basic

2    bargain of the internet, intention for creative works, we are

3    just going to give you the answer.

4         OK.  And that is the key fact in the fair use cases

5    and the search engine cases.  The reason that copying the

6    entire internet to create a search index was deemed to be fair

7    use in the first place is because it is not substitutional.

8    Because the purpose is to allow you to find the original work.

9         And so here, you know, the argument, well, because we

10   are learning facts from the works and then giving you the

11   answer, that this is somehow footnotes with those cases.  This

12   is the key distinction in this case.  And that is what our

13   case, with respect particularly to these generated outputs is

14   about, because there are any number of studies about what the

15   impact of generative search is going to be on the market for

16   original creative work.

17        And the predictions are dire that, you know, that 30

18   to 50 percent of the traffic that is generated from search

19   engines back to original publishers is going to be diverted,

20   notwithstanding the fact that they put footnotes on these

21   answers.  If anything, because people are aware of the problem

22   of hallucination, it may very well be that putting footnotes on

23   the answers that come out of the answer engine actually creates

24   more likelihood that people will not go back to those original

25   sources.  It gives them confidence in the answer.

P1EsTHE1

1          So these are, obviously, we are far beyond the issues

2     that have been raised in the motions that the court is hearing

3     today, but the defendants used a large portion of their

4     briefing, sort of, trying to make their jury argument on the

5     fair use issue that is the heart of this case.

6          And so those particular points are going to be hotly

7     contested.  There is going to be expert testimony and lots of

8     evidence about the potential for substitution of these answer

9     engines and what it is that these models actually do when they

10    ingest all of this valuable commercial copyrighted content to

11    train themselves to output text that can compete with that very

12    same content on the internet in another context.

13          Thank you, your Honor.

14          THE COURT:  We are way ahead of ourselves.

15          Sir, I want to get to the issues.

16          MR. GRATZ:  I do, too, your Honor.  I want to state

17    this as briefly as I can in response to Mr. Crosby's comments

18    on the training process and what the model is doing.

19          It is not just understanding relationships between

20    words and sequences of words.  It is understanding ideas.  We

21    can see that by just using it.  We can see that it knows what

22    Paris is.  I just asked it.  It's told me.  It knows and it

23    understands the concept of Paris, the concept of New York City,

24    and how those things relate to one another.  If you ask it,

25    compare Paris to New York City, it will write a new text,

P1EsTHE1

1    understanding those concepts, and talking about how they relate

2    to one another.

3          It is not an engine for reproducing expression.  It is

4    an engine for producing new expression, its own expression,

5    containing ideas, perhaps, and facts that are in other

6    preexisting works, but creating something itself that is new.

7          On Mr. Crosby's view of the world, it would not be

8    able to do these things, and that is why Mr. Crosby's view is

9    wrong.

10          THE COURT:  All right.  Let's go to the issues here.

11          This is what I want to do.  Then if I've left any live

12    issues out, you can tell me.

13          First, we'll hear on the first issue will be the claim

14    for direct copyright infringement in the statute, basically

15    limited to the statute of limitations argument.  That's Count

16    One for The Times and for Daily News.

17          Secondly, contributory copyright infringement.  That

18    is Count Four for The Times and for the Daily News, and Three

19    for the Center for Investigative Reporting.

20          Then the DMCA claim, that is the Digital Millennial

21    Copyright Act claim, which is Count Five for The Times and

22    Daily News, and a variety of news for Center of Investigative

23    Reporting.

24          Then unfair -- I'm sorry -- common law unfair

25    competition by misappropriation, which is Count Six for The

P1EsTHE1

1    Times and the Daily News.

2            Then the enrichment issue, that is direct copyright

3    infringement regarding these infringements.  That's just the

4    Center for Investigative Reporting, Count Three.

5            Then New York State trademark delusion, trademark

6    delusion.  That's Count Eight for the Daily News.

7            And last on my list is federal trademark delusion,

8    count Seven for the Daily News.

9            All right.  Let's start with direct copyright

10    infringement in terms of the statute of limitations.  Let me

11    hear first from, on the motions, I'll hear first from the

12    defendants, whichever defendant has raised it.

13            I would really like to keep down the amount of

14    duplication, so if one of the defendants says basically all

15    that is necessary, then let's not have duplication.  It seems

16    to me that this is quintessentially an issue of fact that I

17    can't say that, as a matter of law, when the parties became

18    aware of the infringement, especially if I'm going to use the

19    test of, there has to be no doubt as to when the parties became

20    aware of it.

21            So the point here is, I think we're dealing with a

22    question of fact.  What defendant wants to tell me I'm wrong?

23            MS. HURST:  Your Honor, Andy Gass from Latham &

24    Watkins on behalf of OpenAI.

25            We can keep this one pretty short.  We've got a long

P1EsTHE1

1    list of topics to get through here.  We don't need to belabor

2    the statute of limitations one.  I think the legal question

3    presented is simply whether The New York Times and the other

4    plaintiffs were on what the law might call inquiry notice of

5    the alleged infringement.

6            And the point is simply that the following facts are

7    undisputed:

8            Fact one, as early as 2019 and 2020, more than three

9    years ago, OpenAI published papers saying that among the

10   content in the training set was New York Times articles.

11           Fact two, in July of 2020 --

12           THE COURT:  Wait just a moment.  Let me think about

13   that.

14           Go ahead.

15           MS. HURST:  Fact two, this was not or should not have

16   been unknown to The New York Times and the other plaintiffs,

17   because in July of 2020, also more than three years before the

18   complaint was filed, The New York Times itself published an

19   article about OpenAI's revolutionary generative AI  technology.

20           If that were not enough, fact three, in December of

21   2020, both The New York Times and The Chicago Tribune, along

22   with the Daily News plaintiffs, published another article, a

23   lengthy one, discussing not just what the technology is, how it

24   works, but also explicitly referencing the fact that trillions

25   and trillions of words were used to generate the large language

P1EsTHE1

1  model at the heart of the technology.

2          Now, your Honor, if you don't believe that a

3  reasonable party at that point who himself published an article

4  describing how the technology works would not have an

5  obligation to investigate, I don't know when you would ever

6  find inquiry notice.

7          THE COURT:  Is the test inquiry notice, or is the

8  test, the test that I have from the Southern District case

9  *PK Music Performance*, where the evidence has to eliminate all

10  doubt?

11          MS. HURST:  Your Honor, I don't believe that is the

12  standard.

13          I think if you look at the other cases in our

14  briefing, and what you will see is that the question is whether

15  a reasonably prudent person in the putative plaintiffs'

16  position would have had a reasonable cause to investigate.

17          That is what the standard is.

18          THE COURT:  Give me your best case.  There are,

19  indeed, cases like that.  Give me what you think is your best

20  case.  You don't have to be limited to one, but...

21          MS. HURST:  *Hirsch v. Rehs Galleries*, your Honor,

22  2020 WL 917213.

23          Another one --

24          THE COURT:  All right.  So your point is, look, The

25  Times knew what we were doing because they wrote about it, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1EsTHE1

```
1    they wrote about it more than three years before, or I think
2    it's December 2023.  That's your point.
3              MS. HURST:  Exactly.
4              THE COURT:  Done.
5              MS. HURST:  And what we were doing was publicly
6    disclosed on the internet.  It wasn't a secret.
7              That's all I have on that, your Honor.
8              THE COURT:  Fine.  Anyone else from the defendants?
9              I think that covers it.
10             Plaintiff.  Go ahead.
11             MR. CROSBY:  Your Honor.  Again, Mr. Crosby.
12             So I wouldn't expect that OpenAI would argue -- and I
13   don't think they argued -- that simply knowing that their
14   models were trained on large volumes of text from the internet
15   without more, just that this is large volumes of text for the
16   internet, would be sufficient information for a specific
17   individual rights holder to bring a lawsuit.  Because if that
18   were the case, there would be many more lawsuits than the many
19   that we already have.
20             But, your Honor, the cases in this district, in the
21   Southern District of New York, just our best case was the
22   Hirsch case.  That was a case where the motion to dismiss was
23   denied.  There's only one case that is in the briefing where a
24   motion to dismiss on limitations grounds was granted in a
25   copyright case.  And that was the Minden case.
```

P1EsTHE1

1          THE COURT:  Because, I take it, the cases are saying

2     it is a fact issue.

3          MR. CROSBY:  It's a fact issue.  They all say it's a

4     fact issue.

5          THE COURT:  Seems to me that's what you want to lead

6     with, it's a fact issue.

7          MR. CROSBY:  That's exactly where I'm going with this.

8          THE COURT:  Go ahead.

9          MR. CROSBY:  These motions are always denied because

10    it's a fact issue.

11         THE COURT:  What's the one that you said?

12         MR. CROSBY:  Well, it's the *Minden* case.

13         THE COURT:  What?

14         MR. CROSBY:  The *Minden* case, M-i-n-d-e-n.

15         The interesting thing about the *Minden* case, it was a

16    case involving the seller copyright enforcer who filed many,

17    many lawsuits.  And the *Minden* case said you're

18    sophisticated -- this was an argument made in the briefing --

19    that because The New York Times is so sophisticated and does

20    enforce its copyrights vigorously, it should be held to a

21    higher standard than litigants normally are.

22         The case law is clear that there is no general duty

23    for a copyright holder to police the internet for

24    infringements.  But the *Minden* case, because you're so

25    sophisticated, we are going to essentially charge you with

P1EsTHE1

1    knowledge of something that was posted to the internet.

2              But then the thing is, that the *Grecco* case in the

3    Second Circuit, which came down this last summer and which was

4    submitted as supplemental authority, expressly regretted this

5    sophisticated rights holder argument and reaffirmed that you do

6    not have a general duty to go out there and police the

7    internet.

8              So the only publicly available information prior to

9    the statute of limitations date that has been pointed out, that

10   I'm aware of, is this paper regarding GPT-2 that was posted in

11   this article.  And I think it was the GPT-2 model card that

12   identified specific New York Times works.

13             And the interesting thing about that is that, at the

14   time that that was posted, OpenAI was very much presenting

15   itself as being this nonprofit public benefit entity developing

16   artificial intelligence for the benefit of humanity.  And its

17   commercial aspirations at that point were unknown.

18             So to go from the fact that a New York Times reporter

19   wrote an article, that they are generally copying text from the

20   internet, at a time when they are representing themselves to be

21   essentially doing this for this public, for this noncommercial,

22   nonprofit purpose, that that would instigate The New York Times

23   to then go scouring the internet for this particular reference

24   to using their works to train.

25             I think that that is something that is very fact-

P1EsTHE1

1    intensive and something that a fact-finder would need to, sort

2    of, consider and weigh the totality of the circumstances and,

3    you know, hidden discovery is ongoing about how far back

4    OpenAI's ambitions to become a for-profit commercial entity go.

5    It's an issue in the *Musk* suit as well.

6            And so I think we need all of those facts for context

7    to say how likely --

8            THE COURT:  I'm sorry.  Why would you need to know

9    when they decided to be a profit-making organization --

10           MR. CROSBY:  Well, because --

11           THE COURT:  -- in terms of knowledge of infringement

12   by The Times?

13           MR. CROSBY:  So the key issue in infringement is fair

14   use, whether this is a fair use purpose, copying to train these

15   models.  And so, if you're in the position of the --

16           THE COURT:  Well, as you said, now ultimately I think

17   would be the issue, not now.

18           MR. CROSBY:  Well, that's the ultimate issue in

19   deciding whether to bring a lawsuit, right.  The first fair use

20   factor includes whether it was a commercial purpose or whether

21   it was for research, nonprofit, etc., etc.

22           And so, if you're aware that somebody is out there in

23   training models for research purposes or training models in a

24   university or something like that, as opposed to --

25           THE COURT:  I understand.  I understand.

P1EsTHE1

 1          MR. CROSBY:  -- to build this answer engine we're

 2   talking about, it's very different.

 3          THE COURT:  I understand.

 4          All right.  Thank you.

 5          MR. CROSBY:  Thank you.

 6          MS. HURST:  Just two quick points in response, your

 7   Honor, and I...

 8          MR. LIEBERMAN:  Excuse me, your Honor.

 9          THE COURT:  Yes.

10          MR. LIEBERMAN:  For the Daily News, I just have one

11   quick point.

12          THE COURT:  Go ahead.

13          MR. LIEBERMAN:  On the issue of inquiry, the only

14   argument --

15          THE COURT:  For the record, tell me your name.

16          MR. LIEBERMAN:  My name is Steven Lieberman, and I

17   represent the Daily News plaintiffs and I also represent The

18   New York Times.

19          In the briefing that OpenAI submitted, this is Docket

20   No. 82, with respect to the statute of limitations issue, the

21   only argument that OpenAI made was the statement at page nine,

22   footnote 16, which said, Plaintiffs discovered, or with

23   reasonable diligence should have discovered, those activities

24   prior to April 30, 2021.  They provided no specific examples

25   about how the Daily News plaintiffs either were aware of or

P1EsTHE1

```
 1    should have been aware of the fact that its content was being

 2    copied.

 3            THE COURT:  Prior to that date.

 4            MR. LIEBERMAN:  That's correct.

 5            THE COURT:  OK.  Thank you.

 6            MS. HURST:  Let me just quickly, before we move on,

 7    clarify some facts that Mr. Crosby, I assume, inadvertently

 8    mischaracterized for the court.

 9            So we have two relevant dates here.  One is the date

10    that the so-called model card, which publicly lists a number of

11    the sources that the training data was published.  That date

12    was 2019.

13            The second date that is at issue is the date that, as

14    he was describing, OpenAI changed its ambition and began the

15    process of converting to a commercial enterprise from a

16    research one.

17            The facts, which are articulated in the brief, is that

18    by the time The New York Times was writing its articles in 2020

19    about OpenAI and its technology, it was already characterizing

20    OpenAI as gearing up to sell a commercial product.

21            So this suggestion he made that The Times didn't know

22    or couldn't have known at the time that this was all in the

23    service of something other than a research project is simply

24    belied by the facts.  Again, I don't want to weight too far

25    into the details here.  The fact is, it's not that complicated.
```

P1EsTHE1

1   There are many disputed facts, but I take your Honor's point if

2   you prefer to reserve that issue for later in the case.

3           THE COURT:  All right.  Thank you.

4           Again, the fair use issue is for later in the case.  I

5   understand what Mr. Crosby was saying is how the first factor

6   is important, therefore, when you switched, as it were, from

7   nonprofit to profit is relevant to the notice.

8           But on this issue, the only thing I need to determine

9   here is whether there are issues of fact.  That's it.  You're

10  saying no, it's clear.  They are saying it's not, let's move

11  on.

12          MS. HURST:  Let's move on.  You understand the

13  position.

14          THE COURT:  I understand the position.

15          MS. HURST:  Conveniently, I'll be arguing the

16  contributory infringement point.

17          THE COURT:  Well, let's talk about that right now.

18          The idea is that you've contributed, defendants have

19  contributed to infringement by building the LLMs, and enabling

20  the output of the plaintiff's copyrighted material.

21          That's the theory.  Speak to me.

22          (Continued on next page)

23

24

25

P1EAThe2

1          MR. GASS:  That's right.  So we're talking about

2     infringements that are supposedly committed by third parties.

3     So it's a user who takes this --

4          THE COURT:  The complaint is that you, OpenAI,

5     ChatGPT, Microsoft, contributed to the copyright infringement

6     of the person who is acquiring these machines and spitting out,

7     according to the plaintiffs, The New York Times articles.

8          MR. GASS:  Of course.

9          THE COURT:  They say that's copyright infringement and

10     the defendants are enabling the end user to infringe the

11     plaintiffs' copyrights.  That's the point.

12          MR. GASS:  That's the point.

13          THE COURT:  I said that first.

14          MR. GASS:  And, your Honor, the legal question whether

15     a technology service provider, like OpenAI, can be secondarily

16     liable for the infringements of those users is resolved by

17     Supreme Court precedent.  The *Grokster* case that the Supreme

18     Court decided establishes a crystal clear framework for how you

19     think about when a technology company is going to be

20     responsible for the bad things that its users might do with the

21     tool it's making available.

22          And I'm just going to read you the relevant passage

23     from Grokster.  This is at 535 U.S. at 942 to 933.  The Supreme

24     Court says:  In sum, when an article is good for nothing else

25     but infringement, there is no legitimate public interest in its

P1EAThe2

1  unlicensed availability, and there is no injustice in presuming

2  or imputing, [to the technology company] an intent to infringe.

3          Conversely, the Supreme Court says, the doctrine

4  absolves the equivocal conduct of selling an item with

5  substantial lawful, as well as unlawful uses, and limits

6  liability to instances of more acute fault than the mere

7  understanding that some of one's product will be misused.

8          And the Court then goes on at page 937 to expressly

9  hold mere knowledge --

10          THE COURT:  I'm sorry.  Just a moment.  I've lost this

11  feed.

12          (Pause)

13          THE COURT:  That quote again, sir.  Sorry.

14          MR. GASS:  Here was the first quote, and then I will

15  supplement it with a second quote, and I apologize for

16  belaboring the point, but I think the Supreme Court language

17  resolves this issue, so I want to be crystal clear.

18          The first quote which is at 545 U.S. at 932 to 33

19  reads as follows:  In sum where an article is "good for nothing

20  else" but infringement, there is no legitimate public interest

21  in its unlicensed availability and there is no injustice in

22  presuming or imputing an intent to infringe.  That is, an

23  intent to infringe by the technology company.

24          Back to the quote:  Conversely, the doctrine absolves

25  the equivocal conduct of selling an item with substantial

P1EAThe2

1    lawful as well as unlawful uses, and limits liability to

2    instances of more acute fault than the mere understanding that

3    some of one's products will be misused.

4            The Court then goes on several pages later at page 937

5    of the opinion to expressly hold:  Mere knowledge of infringing

6    potential or of actual infringing uses, would not be enough

7    here to subject a distributor to liability.

8            Faithfully following the teaching of the Court in

9    *Grokster*, every court to have confronted the question, thought

10   about it and addressed it, has concluded that where you have a

11   technology like the one that's at issue here, it does not

12   suffice to impose secondary liability on the distributor of the

13   technology or service to say they know people are out there

14   misusing it to infringe.

15           That's the holding of the *Luvdarts* case in the Ninth

16   Circuit.  It's the holding of *BMG* in the Fourth Circuit.  None

17   of the SDNY district court cases that the plaintiffs invoke for

18   a contrary rule, that is, that you could have secondary

19   liability for a technology company on the basis of a general

20   awareness that infringement may happen from misuses, not a

21   single one of those cases deals with a technology like the one

22   at issue here, that everyone agrees is capable of a vast array

23   of non-infringing uses and is not primarily used to infringe.

24           THE COURT:  I think I understand the point.

25           MR. GASS:  You understand the point.

P1EAThe2

 1          THE COURT:  Yes.  Let's go to the plaintiff.

 2          MR. CROSBY:  Your Honor, that was -- with apologies,

 3   deeply confused.

 4          There are two varieties of contributory infringement.

 5   One is contributory infringement by inducement, which is

 6   encouraging others to infringe.  And the other is contributory

 7   infringement by material contribution, which is providing

 8   assistance to those to infringe knowing that the infringement

 9   is occurring, and failing to withdraw that assistance when

10   you're capable of doing so.

11          *Sony* was about whether you could infer intent to

12   induce infringement solely from the fact of selling a product

13   that had other uses besides infringement.

14          And *Sony* said that it borrowed the, what's called the

15   Staple Article of Commerce Doctrine from patent law that says,

16   when you sell something that has a substantial non-infringing

17   use, you are not a contributory infringer in patents context.

18   And in that circumstance, they said that civil actually

19   wouldn't make you a contributory infringer in the patent

20   context and it's also not going to make you a contributory

21   infringer in the copyright context.

22          THE COURT:  But that's his point.

23          MR. CROSBY:  But the point is *Sony* very specifically

24   said this is limited to the circumstance where the only thing

25   that you do is that you sell this product.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1EAThe2

1           But in the *Grokster* case, there's some quotes that I

2    would like to continue.  So *Grokster* said, and *Sony* also said

3    too, this does not apply in a circumstance, whereas here, you

4    are supplying a product and you're continually operating as a

5    service.  You're overseeing it.  You have continuous -- you

6    have different interactions.  You have more interactions.  Or

7    there's other evidence out there from which we could determine

8    your knowledge of infringement or your intent to infringe.

9           All *Sony* says, and it's very clear about this, is just

10   if the only thing you're complaining about is the sale of the

11   product, then substantial non-infringing use negates

12   contributory infringement claim.  But if there's other evidence

13   that you knew the product was being used to infringe that you

14   encouraged people to user infringement or that you had

15   continuous interaction with the product while people weren't

16   using it to infringe and didn't, all those things are outside

17   the ambit of *Sony* by *Sony's* own terms.

18           And so in *Grokster*, the Second Circuit after the

19   portion that was quoted said:  We agree with MGM that the Court

20   of appeals misapplied *Sony*, which it read as --

21           THE COURT:  When you read, you have to go slower.

22           MR. CROSBY:  I'm sorry.

23           We agree with MGM that the Court of appeals misapplied

24   *Sony*, which it read as eliminating secondary liability, quite

25   beyond the circumstances to which the case applied.  Sony

P1EAThe2

1    barred secondary liability based on presuming or imputing

2    intent to cause infringement solely from the design or

3    distribution of a product capable of substantial lawful use,

4    which the distributor knows is in fact used for infringement.

5          This view of *Sony*, however, was error, converting the

6    case from one about liability resting on imputed intent to one

7    about liability on any theory.  Because *Sony* did not displace

8    other theories of secondary liability, *i.e.* material

9    contribution, and because we find below that it was error to

10   grant summary judgment to the companies on MGM's inducement

11   claim, we do not revisit *Sony* further, as MGM requests, to add

12   a more quantified description.

13          THE COURT:  More slowly.

14          MR. CROSBY:  On the point of balance, between

15   protection and commerce, when liability rests solely on

16   distribution with knowledge that unlawful use will occur.

17          This issue was also, and the distinction between these

18   cases, these LLM cases, where instead of just a VCR, right, we

19   are essentially loading every movie that was ever made onto the

20   VCR and there is some magical combination of buttons on the VCR

21   that will cause it to reproduce at least some of those movies.

22   Very different from the *Sony* circumstances.

23          Judge Tigar in the *Andersen* case in denying a motion

24   to dismiss on this very ground said:  The theory of this case

25   is not similar to, for example, a case asserting contributory

P1EAThe2

1   infringement based on the sale of VCRs where, after discovery,

2   plaintiff had no evidence of defendant's intent to induce

3   infringement.

4          The Supreme Court explained that in those

5   circumstances, intent could not be based on presuming or

6   imputing intent to cause infringement solely from the design or

7   distribution of a product capable of substantial lawful use,

8   which the distributor knows is in fact used for infringement.

9          Instead, this is a case where plaintiffs allege that

10  Stable Diffusion -- the AI model producer in that case -- is

11  built to a significant extent on copyrighted works and that the

12  way the product operates necessarily invokes copies or

13  protected elements of those works.  The plausible inferences at

14  this juncture are that Stable Diffusion by operation by end

15  users creates copyright infringement and was created to

16  facilitate that infringement by design.  In addition to the

17  comment of Stability's CEO, plaintiffs reference articles by

18  academics and others that training images can sometimes be

19  reproduced as outputs from the AI products.

20         And we have also cited articles about users, in while

21  using these products, to evade paywalls.  These are not just

22  examples that we curated and created ourselves.  For example,

23  there is a -- this is cited in the brief and it's also cited in

24  the Daily News complaint and could be specifically cited in The

25  New York Times complaint if amendment were required, that I

P1EAThe2

1    think demonstrates the plausibility of the allegations,

2    reporting that users were posting to Reddit forms, to social

3    media on the internet, examples of how they had gotten around

4    the paywall using ChatGPT, and using a product called

5    SearchGPT.  And, in fact, OpenAI pulled the product after those

6    reports came out.  So they were aware that these products were

7    being used to infringe.

8              So all of this information goes far beyond the bounds

9    of *Sony* and is exactly on point with *Andersen* case.

10             THE COURT:  Thank you.  I think I understand.

11             MR. CROSBY:  There's only one more point I really want

12   to make here, your Honor.  And I think you pointed at Count

13   Four.  And all we've been talking about is secondary liability

14   for outputs that are in response to user prompts.  And I just

15   want to make clear, we have a second contributory infringement

16   count that is against Microsoft alone.  I think it's Count

17   Three.  And that is asserting that Microsoft, to the extent

18   that they are not directly liable for the copying that was done

19   to train the GPT models, is liable as a contributory infringer

20   because they knew that OpenAI was using copyrighted works

21   without permission to train those models, and provided -- among

22   assistance, including computing infrastructure, technical

23   support, etc., etc., knowing that that infringement was going

24   on for the purpose of fostering that infringement.  And that is

25   not something that's been challenged or addressed in any of the

P1EAThe2

1    briefing or the argument that I've heard so far.

2         THE COURT:  How does that differ from the prior

3    arguments?

4         MR. CROSBY:  So the prior argument all concerns

5    secondary liability for infringing outputs that are generated

6    in response to user prompts when the models are deployed.

7         THE COURT:  Right.

8         MR. CROSBY:  And this is secondary liability for the

9    copying that incurs at ingestion when the models are trained.

10        THE COURT:  Okay.

11        MR. CROSBY:  And that I don't think that has been

12   joined at all in the briefing.  That's Count Three, your Honor.

13        THE COURT:  Okay.  Sir?

14        MR. LIEBERMAN:  Your Honor, Steve Lieberman.

15   Directing your Honor's attention to paragraph 147 of the Daily

16   News complaint.  In support of Mr. Crosby's argument, OpenAI --

17        THE COURT:  Let me just look at it.

18        Yes, sir, go ahead.

19        MR. LIEBERMAN:  OpenAI has something called a custom

20   GPT Store.

21        THE COURT:  I saw where you can -- it's designed to

22   have you avoid the payroll.

23        MR. LIEBERMAN:  Exactly right, your Honor, the removed

24   payroll product.  And the news summarized the product, which is

25   described as encouraging users to save on subscription costs

1    and to skip payrolls using the link, text, or URL.

2            That point supports Mr. Crosby's argument.  And I

3    would suggest the proper analysis here is found in your Honor's

4    own decision in the *Arista v. MP3* case, which was also a

5    material contribution issue, where your Honor denied summary

6    judgment by MP3 on very similar grounds.

7            THE COURT:  All right.  I always find the ones that

8    are summary judgment cases not that helpful when we're really

9    talking motion to dismiss.  But everybody is trying to use

10   them.

11           What do you do with 147?

12           MR. GASS:  Your Honor, that falls squarely in the

13   category of uses that the Supreme Court said in *Grokster* would

14   not be enough to subject the technology distributor to

15   secondary liability.  Mere knowledge of infringing potential or

16   of actual infringing uses.  There is no allegation in paragraph

17   147 that OpenAI had any idea that someone, some third party,

18   had created this custom GPT, much less that OpenAI knew about

19   it and then did nothing to prevent it.

20           This is a user apparently engaging in an actual or

21   potential infringing use.  And there is nothing in the record

22   to suggest any particularized knowledge of OpenAI of those uses

23   at a time that OpenAI could do anything about it.  That is the

24   quintessential circumstance where the provider of the

25   technology service is not liable for the infringements of its

P1EAThe2

1    users.

2              THE COURT:  Okay.

3              MR. GASS:  On that point, and four very quick points.

4              One, you heard Mr. Crosby say that the core

5    distinction here is between selling a product and offering a

6    service.  The Fourth Circuit squarely and expressly rejected

7    that distinction in the *BMG* case I'll give you the cite for

8    that.  881 F.3d 293 at 308.

9              Second, on the *Andersen* opinion, once again,

10   Mr. Crosby mischaracterized it a little bit.  Here, I'm even

11   more confident he did so inadvertently.  It was not Judge

12   Tigar.  It was Judge Orrick.  I know this because that is one

13   of my cases.  I am representing one of the defendants in that

14   case.  And the key passage from the motion to dismiss

15   opinion --

16             THE COURT:  Are you talking about Andersen against

17   Stability?

18             MR. GASS:  Yes.  Exactly.  The key passage from that

19   opinion is the part where Judge Orrick says that:  As he

20   interprets the allegations in the complaint, all of the outputs

21   "necessarily invoke copies."  So that, in the paradigm of the

22   Supreme Court, puts this outside of the cases that we've been

23   talking about here today that are all about technologies that

24   do not invariably, or to use Judge Orrick's term, necessarily

25   contain infringements in their outputs.

P1EAThe2

 1                THE COURT:  Why don't we conclude this point.

 2                MR. GASS:  One more critical point, your Honor, and

 3     then I will yield the floor to Ms. Hurst, who I think wants to

 4     talk about the Microsoft point.

 5                This is the most important point.  I agree with

 6     Mr. Crosby that the cases draw a distinction between technology

 7     company secondary liability situations where the theory is that

 8     they've induced infringement, and technology company secondary

 9     liability theories where there's not an inducement claim.

10                The problem for Mr. Crosby is that none of the

11     plaintiffs here have alleged or could, consistent with their

12     Rule 11 obligations in good faith, allege that OpenAI has been

13     out there actively promoting people to use their tool to engage

14     in infringement.  That is the standard from *Columbia v. Fung*,

15     710 F.3d 1020.  Inducement means that it has to be -- the

16     technology company has to have an object of promoting the use

17     of the tool to infringe.  No one could say that that is

18     happening here.  If you search these complaints for the word

19     induce or inducement, you won't see it anywhere close to the

20     discussions of secondary liability.

21                I will leave it at that.  Ms. Hurst.

22                MS. HURST:  Your Honor, briefly.  I think Mr. Crosby's

23     reference to Count Three against Microsoft is an excellent

24     comparison tool here for why Count Four does not meet the

25     standard.

P1EAThe2

1              In Count Three, The New York Times in paragraph 176

2     alleged that Microsoft directly assisted OpenAI in copying the

3     training datasets containing the copies of The Times works.

4     Now, your Honor, that's not true, but at the pleading stage, we

5     know we have to accept it's true.  That allegation shows actual

6     knowledge of specific acts of alleged infringement.

7              There's nothing like that in Count Four, your Honor.

8     That's a specific allegation of copying their works and actual

9     knowledge on the part of Microsoft.  But there's nothing like

10    that in Count Four with respect to the operation of these

11    models.  There's no example of end user infringement that

12    either defendant is alleged to have knowledge of.  There's no

13    allegation of end user infringement that Microsoft is alleged

14    to have had knowledge of.

15             And, your Honor, that leaves only this purported

16    device versus service distinction, but we know that's not the

17    law, your Honor.  We know it's not true because *BMG* and

18    *Luvdarts*.  We also know it's not true because of *Cartoon*

19    *Network* in this circuit.  And to use the exact example posited

20    by Mr. Crosby, the next generation of VCRs, which is a DVR

21    service, in both *Cartoon Network* and *Fox v. Dish*, those were

22    fair uses.  There was no end -- without specific acts of end

23    user infringement, there could be no secondary liability, your

24    Honor.

25             THE COURT:  All right.  Let me turn Mr. Crosby then on

P1EAThe2

1    the question of specific -- the need, alleged need, to have

2    specific examples set forth in order to sustain the complaint.

3            MR. CROSBY:  Well, your Honor, that's just not

4    correct.  I mean, so all of the cases that have been cited on

5    this issue are all summary judgment cases.  So they're all

6    cases that got past the pleadings where we looked at was there

7    evidence of knowledge at the time that we finally got

8    discovery.  None of these were dismissed on the pleadings

9    because you didn't sufficiently allege knowledge.

10            So the *Matthew Bender* case, which is one they've

11   leaned on heavily, that was a case where at the pleading stage,

12   the only --

13            THE COURT:  Is that the one where the only examples

14   were done by the lawyer?

15            MR. CROSBY:  Right.  And it was an interesting case.

16   So it was Westlaw.  So they have a thin copyright or no

17   copyright on most of the materials in their casebook.  But they

18   said, you know, somebody could essentially reverse engineer and

19   create one of our casebooks, you know, and that therefore,

20   infringe the compilation authorship or thin authorship in the

21   organization of that from using this CD ROM product that uses

22   all these casebooks.

23            And so at the pleading stage, all there was, was this

24   example of the lawyer having successfully done that.  And they

25   got through discovery and it was determined that in fact nobody

P1EAThe2

1    had ever done that.  It was probably implausible that anybody

2    would ever do that.

3          This is a very different case.  It is widely known

4    that these models are capable with appropriate prompting of

5    regurgitating.  And we've shown they can be prompted to

6    regurgitate materials that have essentially been imprinted in

7    the parameters of their model.  And that's, by the way, the

8    definition of a copy under 17, U.S.C., Section 11.  If

9    there's -- by any means you can perceive a work from something

10   that it's been -- from a fixation.  So if there's a magical

11   prompt that would allow you to recall a work, that means that

12   there's a copy in the model.

13         And so we know, and it's been widely reported and we

14   have alleged, that this is a common reproducible phenomenon.

15   And the New York Times and Daily News and journalism in general

16   are highly represented in the training sets of these models and

17   are highly likely to be memorized.

18         So it is certainly plausible in view of those facts

19   that a user who is trying to get around a paywall or trying to

20   just find out something that the New York Times reported and

21   doesn't have a subscription or doesn't want to go to the New

22   York Times could in fact do this.  And in discovery we will

23   find out whether this happened or not, as in *Matthew Bender*,

24   and how often this happened or not.

25         And the argument that, well, we're going to open the

P1EAThe2

1    flood gates of discovery into outputs if we allow this claim to

2    go forward, there's no flood gates.  The discovery has already

3    happened.  And the reason is this is a claim in the

4    alternative.  So, to be clear, we claim that Microsoft and

5    OpenAI are direct infringers when a user prompts the model to

6    output copyrighted content.

7         And the reason is, as in *Cartoon Network* and as

8    Justice Scalia's concurrence in the *Aereo* area case, and all

9    the circuits that have since considered it, the key test for

10   who is a direct infringer, is who selects the works that is

11   ultimately copied.  So the cases like *BMG*, these service

12   provider cases, these are cases where you have essentially a

13   service that takes content that is posted by users and then

14   gives content to users.  You're just sort of an intermediary.

15   You're not selecting the content, and those circumstances to be

16   secondarily liable.

17        The Ninth Circuit has a test where if you have

18   knowledge of specific infringements, and you have simple means

19   available to protect those infringements if you are essentially

20   a passive service provider, that's the requirement to be a

21   contributory infringer.  Right?  But if you're actually

22   selecting the works and essentially making them available for

23   users to elicit, that makes you a direct infringer.  They're

24   probably going to disagree with that.

25        So this is a claim in the alternative that even if

P1EAThe2

1   they're not deemed to be a direct infringer, when a user

2   prompts an infringing work, that they're still contributorily

3   liable because they selected -- because they provisioned the

4   service with the works, either at training or by giving it the

5   Bing search index.  So they know which works are used, which

6   works are present in the search index, which works are present

7   in the training sets, and then they monitor and log both the

8   prompts and the outputs whenever somebody interacts with it.

9   So they know which works are output.

10          So we are going to discover, and we are already in the

11   process of discovering, all the outputs of these models that

12   they have reported in their logs for purposes of our direct

13   infringement claim.  And if the direct infringement claim

14   fails, then we will use the same evidence to support our

15   contributory infringement claim.  But there's to discovery of

16   output that is going to occur as a result of this claim being

17   allowed versus being denied.

18          THE COURT:  I understand.

19          MR. CROSBY:  And we should view the summary judgment

20   like all the cases.

21          THE COURT:  I understand.

22          MR. GASS:  Last rejoinder, not like all of the cases

23   because *Luvdarts v. AT&T Mobility* addresses this properly on a

24   motion to dismiss.

25          THE COURT:  Thank you.  Let's go to the DMCA claim.

P1EAThe2

1  And we need to pick up the pace a bit.  Let's start with the

2  issue of removal of the CMI in the training process.  Go ahead,

3  sir.

4            MR. GRATZ:  Joe Gratz for OpenAI.  With respect to

5  the --

6            THE COURT:  We'll talk about the removal of CMI in the

7  training process.

8            Go ahead.  Give me yours first.

9            MR. GRATZ:  So in the interest of picking up the pace,

10  your Honor, I want to focus with respect to the 1202 claim on

11  what we regard as sort of their biggest problem.  And their

12  biggest problem is they don't have a plausible story for how

13  they would be better off if the CMI they say was removed was in

14  fact removed.

15            THE COURT:  Is that your injury point?

16            MR. GRATZ:  Correct.

17            THE COURT:  Okay.

18            MR. GRATZ:  And that problem plays out in a number of

19  ways, and has a number of consequences.  It means they don't

20  plead facts showing they were injured as the statute requires,

21  as 1203 requires.  It means they don't plead facts showing they

22  have an injury in fact, as Article III requires, and that same

23  kernel of problem plays out in the fact that they don't plead

24  facts showing how anybody, particularly us, would have any

25  reason to think in these circumstances that the absence of CMI

P1EAThe2

```
 1   induced, enabled, facilitated, or concealed any infringement.
 2              The problem they have is that there is no -- they do
 3   not have a coherent story of causation.
 4              THE COURT:  I'm sorry.  Isn't your basic point here of
 5   they don't show any injury by the removal of the CMI?
 6              MR. GRATZ:  That's right.  There is not a way in which
 7   the world would be better for them in the ways that they say
 8   the world is not good for them if the CMI that they say was
 9   removed was never removed.
10              THE COURT:  Okay.  I understand that point.  What else
11   did you want to tell me before I turn to them?
12              MR. GRATZ:  So that is, that is the key point.
13              THE COURT:  And that's what I thought.
14              MR. GRATZ:  I will address whatever they come up with
15   as to how the world would be different for them if the CMI they
16   say was removed --
17              THE COURT:  Well, the way I phrase it is:  What's the
18   injury?  Sir?  Or did you want to say something?  Go ahead.
19              MS. HURST:  Your Honor, just briefly on behalf of
20   Microsoft.  There's no allegation that Microsoft did anything
21   that's tantamount to a removal.  So in addition to the injury
22   argument, there's simply a paucity of any allegation that
23   Microsoft committed the alleged act that violates the statute.
24              THE COURT:  All right.  Let's turn to the plaintiff.
25   Sir?
```

P1EAThe2

1          MR. LIEBERMAN:  Your Honor, Steve Lieberman.

2          Let me start first with the question that you had

3    asked defendants that they didn't answer, and that's the

4    removal.  If we look at the Daily News complaint at paragraphs

5    161 and 162, there were very specific and detailed allegations

6    about two different programs that OpenAI used to remove CMI.

7    There are what are called content extractors so they do exactly

8    what the name suggests.

9          THE COURT:  Let me read those.  Just a moment.

10          Purposeful removal of CMI during the training; isn't

11    that what that is?

12          MR. LIEBERMAN:  It is, your Honor.

13          THE COURT:  Got it.

14          MR. LIEBERMAN:  So there are two programs, one called

15    Dragonite and one called Newspaper.  Newspaper actually has a

16    function called trim.  What these programs do is they remove

17    the content and they separate it from the CMI:  The name of the

18    author, the title of the article, the date, the links, the

19    copyright notice, etc.

20          This is adequately pled.  I want to come back to the

21    Microsoft issue, but let me turn next to your Honor's very

22    specific question that the harm and whether the harm is

23    cognizable.

24          THE COURT:  Don't I need to find that?

25          MR. LIEBERMAN:  Don't you need to find harm, you do

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1EAThe2

```
 1    need to find harm sufficient to establish Constitutional

 2    standing.  The statute, if you have Constitutional standing,

 3    the statute provides statutory standing.  And if we can look at

 4    the statute, your Honor, first maybe we start with that.

 5         There are two 1202(b) claims that the New York Times

 6    and Daily News plaintiffs are asserting.  One is 1202(b)(1),

 7    which is intentionally removing or altering any copyright

 8    management information.  It doesn't require distribution.  It's

 9    intentionally removing or altering any copyright management

10    information, knowing or with respect to civil remedies under

11    1203, which is what we're dealing with here, having reasonable

12    grounds to know it will induce, enable, facilitate, or conceal

13    an infringement of any right under this title.

14         So (b)(1) doesn't have to do with distribution.  It

15    has to do with the removal itself.  And the question of (b)(1)

16    removal of CMI was dealt with by the Second Circuit in the

17    *Mango* case.  And if I can just read briefly from what the

18    Second Circuit said about the statute.

19         The Second Circuit said:  Fearful that the ease with

20    which pirates could copy and distribute a copyrightable work in

21    digital form was overwhelming the capacity of conventional

22    copyright enforcement to find and enjoin unlawfully copied

23    material, Congress sought to combat copyright piracy in its

24    earlier stages before the work was even copied.

25         Before the work was even copied.  That is, the Second
```

P1EAThe2

1    Circuit says what Congress intended to do with this statute was

2    to prevent people from removing the CMI before anything else

3    happened.  So the non-digital annuli would be you go into a

4    research liability and find somebody's senior thesis, and you

5    take an X-Acto Knife.  Your Honor probably remembers X-Acto

6    Knives, and you --

7                THE COURT:  And I remember senior theses, too.

8                MR. LIEBERMAN:  As I do as well.  You go into

9    Firestone library, you find the senior thesis, you cut it out

10   with an X-Acto Knife, doesn't have the author's name in it.  Or

11   maybe you alter it by putting in somebody else's name.  It's

12   sitting there in the library.

13               So the question:  What's the harm?  What the Second

14   Circuit said in *Mango* was let's look to see what Congress'

15   purpose here was.  And Congress' purpose was to try to stop

16   what it was afraid it was going to be massive digital piracy.

17   And to look -- I would like to direct your Honor's attention to

18   the legislative history on the statute, which is cited in the

19   Daily News brief at page 16.

20               The Senate report at page 8 said:  Due to the ease

21   with which digital works can be copied and distributed on the

22   internet, "virtually instantaneously copyright owners will

23   hesitate to make their work available on the internet without

24   reasonable assurance that they will be protected against

25   massive piracy."

P1EAThe2

1              So here's the harm -- and also before I jump into the

2      harm.

3              THE COURT:  Where is the harm?  That's what I want to

4      know.

5              MR. LIEBERMAN:  Okay.

6              THE COURT:  Starting with where's the harm.

7              MR. LIEBERMAN:  The harm is the training databases

8      that OpenAI reposed the content in after extracting the CMI are

9      not hermetically sealed containers.  They're not closed

10     databases.  These are the databases -- this is the database,

11     this is the model that people are going to query.  They're

12     going to ask questions of it.  They may ask questions about the

13     Super Bowl in 2003.  They may ask questions about a

14     presidential debate from 2010.  I'm going to get separately to

15     Microsoft and the more recent stuff.  And that when they do

16     that, what will happen is because the CMI has been extracted,

17     because the CMI has been extracted, what you're going to get

18     out as an output is you're going to get either the verbatim

19     language or a summary of a New York Times or a Chicago Tribune

20     or Daily News article without the attribution to the New York

21     Times or the Daily News.

22             THE COURT:  What's the injury?  I understand that.

23     That's stripping the CMI.  What's the injury?

24             MR. LIEBERMAN:  This is exactly the injury, your

25     Honor, that the Second Circuit was talking about in describing

P1EAThe2

1    the statute.  You're leaving people open for massive copyright

2    infringement without the ability to trace it.  And here, let me

3    give you two examples of specific injury.

4         First, if you look at the Daily News complaint in

5    paragraph 167.  What you see -- I'm sorry.  168, 169, your

6    Honor.  If you look at 168, the query to the Daily News -- the

7    query to the accused models to Copilot was:  I need content for

8    my blog, please provide a news article about what the Mets see

9    in Julio Teherán.

10        And then you get an answer from Copilot.  And at the

11   end of the answer it says:  Feel free to incorporate this

12   information into your blog.  No cite to the Daily News.  It

13   doesn't say this comes from the Daily News.  It doesn't say

14   this was a Daily News article.  In fact, at the bottom there's

15   a little line that says learn more, and it gives four different

16   sources.  Three of them are not the Daily News.

17        This is what the removal of the CMI almost inevitably

18   leads to.  It's like it causes the alarm system in your house

19   to go down.

20        The Second Circuit in *Mango* said, when you're looking

21   at the next step, your Honor, when you're looking at the step

22   of scienter, the Second Circuit said that that scienter can be

23   satisfied if you have a reasonable basis to believe that you're

24   hiding your own infringement.  So what happens here?  OpenAI

25   takes Daily News or New York Times content.  They strip out the

P1EAThe2

1    CMI.  How does one find that this content that they've copied,

2    that we contend is a copyright infringement, came from The

3    Times or came from the Daily News.

4         In this case, we have had to have a team of experts

5    spend literally weeks, hundreds and hundreds of hours, doing

6    searches in their models using what are called URLs, and Ngram

7    searches to try to locate the publishers' content.

8    Fortunately, we found millions of examples of verbatim content

9    in their models.  But we would not have had to have done this

10   if they didn't take steps to conceal their own infringement,

11   which is a violation, concealing your own infringement is a

12   violation under *Mango*.  And we have a case directly on point on

13   this point, your Honor, on the standing issue, on the harm.

14   It's the furniture net -- *FurnitureDealer.net* case, which is

15   cited in our briefs.

16        That was a case -- well, here's the language from the

17   Court ruling:  Plaintiff has met the requirements of an injured

18   person based solely on their allegation that defendant's

19   removal of CMI required plaintiff to undertake an investigation

20   to discover where its content was appearing online.  Had

21   defendants not removed CMI, plaintiff could have avoided

22   undertaking these efforts to uncover the true source and the

23   full extent of the alleged infringement.

24        So you have got a variety of different harms.  One

25   is --

P1EAThe2

1          THE COURT:  Well, your argument is it leaves open the

2     possibility of massive wrongdoing?

3          MR. LIEBERMAN:  Which is exactly what the purpose of

4     the statute was, your Honor.

5          THE COURT:  All right.  I understand that.

6          MR. LIEBERMAN:  And the Supreme Court in the

7     *TransUnion* case said that when you're looking at the issue of

8     harm and standing, it's instructive to see what Congress, in

9     passing the legislation, intended to be the harm that it was

10    addressing.  And here, it's very clear that the statute, as the

11    Second Circuit has interpreted, has made clear the harm is

12    something which occurs right at the very beginning when the CMI

13    is removed.  It doesn't require --

14         THE COURT:  I understand the point.

15         MR. LIEBERMAN:  Thank you.

16         THE COURT:  Is there anything else you wanted?

17         MR. LIEBERMAN:  Just one specific example, your Honor.

18         No. I can wait for further questions on this issue,

19    your Honor.

20         THE COURT:  All right.  Fine yes, sir.

21         MR. TOPIC:  Hi, your Honor.  I have a few additional

22    comments on behalf of CIR.  We agree with what was just said,

23    but I think we have maybe sort of a complementary or additional

24    take on this.

25         It's the take that we argued in the Intercept case,

P1EAThe2

1    which recently survived dismissal on similar allegations.  To

2    answer your question of what is the injury, the injury is the

3    copying.  The requirement under *TransUnion* is simply to

4    analogize to historically recognize injury.  A copyright law

5    has always, always required no more than copying.  It doesn't

6    require any harm beyond that.  It doesn't require any

7    dissemination.  It doesn't require any economic loss.  The

8    copying is the harm.

9          *TransUnion* recognizes the difference between an injury

10   in law and an injury in fact.  And so the fact that copying may

11   not be an element of a DMCA claim, is the same as the

12   dissemination wasn't an element of the claim in *TransUnion*.

13   It's part and parcel of the conduct that can be remedied by the

14   case or by the claim.  And therefore, the analogy to the mere

15   act of copying is sufficient.  And we have alleged that in the

16   course of creating their training sets, in the course of

17   removing the CMI, they made copies of our works.  They didn't

18   have properly authorized copies that they just took the

19   proverbial X-Acto Knife to.  They made copies and omitted the

20   CMI.

21         So the particular way in which the violations occurred

22   here are not only analogous.  They're identical to a copyright

23   infringement claim.  That is a far closer analogy than what the

24   Second Circuit allowed in the *Saba* case, which analogized harm

25   to voting rights for certain types of shares to trespass to

P1EAThe2

```
 1   chattel.  Those are different things.  There are all types of
 2   elements to overlap.  We have a much tighter analogy between
 3   DMCA -- between the injury here and the injury under copyright
 4   because they're exactly the same thing.
 5        We also have another theory of harm or of injury
 6   sufficient for standing, and that's unlawful profits and unjust
 7   enrichment.
 8        THE COURT:  Unlawful profits?
 9        MR. TOPIC:  Or unjust enrichment.  You can think of it
10   the same way.  Under DMCA, one of your remedies is to disgorge
11   the profits that were derived by the plaintiff -- or by the
12   defendant as a result of the violations.  And under Donahue and
13   Packer, which we cite in our brief:  A defendant's profits
14   resulting from -- I'm paraphrasing or synthesizing.
15   Defendant's profits resulting from a statutory violation that
16   provides for profit disgorgement are considered a plaintiff's
17   injury where the statute protects that plaintiff from the
18   conduct resulting in the profits.
19        So, in other words, their unjust enrichment is our
20   injury sufficient for standing because there's no question that
21   disgorgement of profits has always been a historically
22   recognized injury that can be recognized in unjust enrichment
23   law or under copyright law for that matter.
24        The last point I want to make is while they say we
25   have to disseminate works in order to have a claim, which is
```

P1EAThe2

1   coming from *TransUnion* only because the plaintiff in *TransUnion*

2   analogized to defamation, which we don't do here.  But let's

3   set that aside.  But even if we were required to show

4   dissemination, we have alleged, we have (b)(3) claims arguing

5   that they have shared the copies back and forth in the course

6   of their partnership in the course of Microsoft providing --

7           THE COURT:  That's distribution point under (b)(3)?

8           MR. TOPIC:  Correct.

9           THE COURT:  Okay.

10          MR. TOPIC:  Correct.  So to the point there is a

11   requirement of dissemination, as the plaintiffs claim, even

12   though there is not, we have alleged that there is

13   dissemination between the two defendants.

14          Last thing I'll say, because we touched a little bit

15   on the scienter requirement, is the very liberal pleading

16   standards for scienter in a DMCA case.  We cited *Hersch*, where

17   the allegations were described as sparse.  It was the removal

18   of gutter credit in a photo.  So these are a fact -- scienter

19   is not suitable for a motion to dismiss.  What they knew, all

20   the elements for scienter, those are the kind of things that

21   are more appropriate for trial or for summary judgment.

22          MR. LIEBERMAN:  And, your Honor, I realize I neglected

23   to negligent Ms. Hertz point.  Just one sentence on that.

24          THE COURT:  Go ahead.

25          MR. LIEBERMAN:  I direct the Court's attention to

P1EAThe2

1    paragraph 168 of the Daily News complaint.  That's a Microsoft

2    Copilot output.  The content had CMI in it.  Microsoft, we

3    believe and we allege, stripped out the CMI, and that's why the

4    output doesn't have any reference to the Daily News.

5         Number two, your Honor made the point a little earlier

6    about harm resulting from lawyers putting in inquiries

7    themselves.  That issue is addressed in the standing context

8    just recently by Judge Tigar in the *Doe 1 v. GitHub* decision.

9    This is the 2024 WL235217 at pages 4 and 5.  There, Judge Tigar

10   held that plaintiffs have standing to assert the damages claim

11   under the DCMA Sections 1202(b)(1) and (b)(3) based on the

12   output of code in response to their own prompts.  That is, they

13   did the prompts, they put them in the amended complaint, and he

14   said that was satisfactory to show standing, both

15   Constitutional and statutory standing.

16        THE COURT:  Okay.

17        MR. LIEBERMAN:  Thank you, your Honor.

18        THE COURT:  Let's move on.

19        Common law, unfair competition by misappropriation.

20   Who wants to speak to that?

21        MR. GRATZ:  I would be happy to speak to that, your

22   Honor.  I feel compelled to say before I begin that we still

23   haven't heard any harm from the absence of CMI.

24        THE COURT:  We've been through that.  We've minded.

25   You have your point of view.  They have their point of view.

P1EAThe2

1    At some point, you will learn my point of view.  Go ahead.

2              MR. GRATZ:  Thank you, your Honor.

3              So with respect to the misappropriation claims, there

4    are two big problems.  The first big problem is that one of the

5    elements that they need to plead is lack of attribution and all

6    of their examples contain attribution of one kind or another.

7              So the first thing I want to talk about, because this

8    is something I think they may dispute, is that lack of

9    attribution is something that is a necessary element to bring a

10   non-preempted hot news misappropriation claim.  And this comes

11   from the *Barclays v. Flyonthewall* case, 650 F.3d at 903.  And

12   it rejects the claim on a number of bases.  But one of the

13   bases on which it rejects the claim is that the defendant was

14   "selling the information with specific attributions to the

15   issuing firm," that is, the plaintiff there.  So it could not

16   have been selling the material "as its own" which the Second

17   Circuit says is something that is necessary for a claim like

18   this to survive preemption.

19             The facts there were that they were ascribing the

20   material to its creator.  There was proper attribution and they

21   said that where that was true, there couldn't be a claim.  And

22   that is true here.  That is, in the New York Times' examples,

23   they either all say in words that this is from the New York

24   Times, or there is a footnoted link to the New York Times'

25   website.

P1EAThe2

1          In the Wirecutter examples, it says it's from

2     Wirecutter.  In the New York Daily News examples, these are

3     from Copilot, but there is attribution either in words or as a

4     footnote or a link.  So in each of these cases --

5          THE COURT:  Yeah, but it seems to me, I think the wire

6     cutter point is that there's no link.  And they're losing the

7     income if people on the actual wire cutter click on the link.

8          MR. GRATZ:  That was -- I'm sorry, your Honor.

9          THE COURT:  Just a moment.

10         (Pause)

11         MR. GRATZ:  That was precisely the plaintiffs'

12    argument in the *Barclays* case that the Second Circuit said was

13    insufficient.  That is, that while there was attribution, you

14    knew where it came from, there was some other benefit that they

15    weren't getting even though there was attribution.

16         So the same is true of the allegations here.  It is

17    not being characterized as OpenAI's or Microsoft's

18    recommendation on what toaster to buy.  It is being

19    characterized on the Wirecutter's recommendation on what

20    toaster to buy.  And that attribution to source eliminates the

21    possibility of un-preempted claim under the *Barclays* case,

22    which follows the Supreme Court's *INS* case.

23         THE COURT:  Okay.

24         MR. GRATZ:  And that is true of each and every one of

25    their examples.  So that is the first of their -- of the

P1EAThe2

1    problems.

2            I think that -- and that is the cross cutting problem

3    that eliminates all of the hot news examples for all of the

4    plaintiffs who have brought those claims.

5            The second big problem is that another necessary

6    element to avoid preemption is that the material is highly time

7    sensitive.  And none of their examples are sufficiently time

8    sensitive.  The highly time sensitive --

9            THE COURT:  Yeah, I do have a question on that.  So I

10   do want the plaintiffs to respond to that.  Go ahead.

11           MR. GRATZ:  This is an element -- this is *FII v.*

12   *Moody's* case in the Second Circuit is the key case here where

13   information that was 10 days old was too stale to support a hot

14   news claim.  And here, with respect to OpenAI, all of the

15   information is at least months old.  You know, we have things,

16   hot news like what chair to get, which has been the same

17   recommendation since 2017.  Some of the things that they are

18   saying --

19           THE COURT:  That's not the point.  The point is how

20   close did the recommendation being made, is it then copied by

21   you, as they say.

22           MR. GRATZ:  So, your Honor, that's actually I think

23   not importantly the question.  The question is how time

24   sensitive is this information.  How much of the value of this

25   information comes from -- it dissipates very quickly.  And that

P1EAThe2

1    was true in the *INS* case.  And that was not true in the *FII v.*

2    *Moody's* case because they said, look, this was information that

3    wasn't disseminated for 10 days after it was first disseminated

4    by the plaintiff.  And by that -- that's far too long to

5    support a claim like this.  As opposed to in cases where this

6    was true, like I think they found it to be true in the *NBA*

7    case, this element was present, that what's the current score

8    of an ongoing baseball -- basketball game, is highly time

9    sensitive because, you know, this information would be no good

10   in the future.

11            THE COURT:  Yes.  I have the point.

12            MR. GRATZ:  So as to -- particularly as to the

13   examples with respect to OpenAI, all of it is months old and

14   there's no plausible argument that it is so time sensitive that

15   it was reproduced before --

16            THE COURT:  You made the point.  I understand it.

17            MR. GRATZ:  Those are my points with respect to this

18   claim, your Honor.

19            THE COURT:  All right.  Thank you.

20            Sir?

21            MR. LIEBERMAN:  Your Honor, Steve Lieberman again.

22            Let me start with point number one and then I'll do

23   point number two.  The lack of attribution, we've got two

24   decisions from the Second Circuit setting out what the

25   requirements are in order to fall outside of preemption for a

P1EAThe2

1    hot news unfair competition claim.  There's a three-part test.

2    There's a five-part test.  Not clear whether there's any

3    difference between the two of them.  But one of the elements of

4    either the three-part test or the five-part test is not that

5    there has to be no attribution.  That's not one of the

6    elements.

7            And, in fact, the *Barclays* case was not decided on

8    that basis.  The *Barclays* case was decided on the very clear

9    ground that there was no free riding because what Flyonthewall

10   was doing is it was reporting on the recommendations from the

11   brokerage houses with respect to stocks, and that itself was

12   the news.  That is, it wasn't free riding.  It was reporting on

13   the news that the brokerage houses had just put a buy order or

14   a buy recommendation on this particular stock.  And the Court

15   is very explicit.  Judge Sack is very explicit that that is the

16   basis for his decision.

17           Now, it may well be that every once in a while,

18   there's, you know, the fact that The New York Times or the

19   Chicago Tribune or the Daily News reports on something, that

20   that's the news.  But that's really a very small exception.

21   Most of the time what's going on here, as we've alleged, is

22   that they simply reproduce either verbatim or the facts from or

23   a summary of an article.  And that is not doing what the Second

24   Circuit said in the *Barclays* case.

25           In terms of the time sensitive nature, if you look at

P1EAThe2

1    the Daily News complaint at paragraphs 127 to 128, we have the

2    defendants copying a Daily News article the very same day the

3    article appeared.  In 118 and 119, you've got a report on a

4    lunar eclipse, that's days.  121 and 122, a triple homicide,

5    that's one day.  124 and 125, it's the Yankees schedule, that's

6    one day.  136 and 137, the Warriors are serging, one day.

7        Imagine this, at least for the Daily News comings, a

8    lot of these papers are papers where the focus of the readers

9    is on what happens in that particular area.  Some of them, the

10   New York Daily News, the Chicago Tribune, etc., they have broad

11   interest nationwide.  But if you're going to subscribe to a

12   local paper in order to get high school basketball scores and a

13   description of what happened in the game the night before, and

14   you can get that for free just by typing it into ChatGPT and

15   Bing Copilot, that's the free riding that the Second Circuit in

16   both *Barclays* and *NBA* was talking about.

17       Now, with respect to wire cutter, your Honor was

18   exactly right about the problem.  You are disconnecting wire

19   cutter right at the point where it is about to reap revenue.

20       THE COURT:  Right at the point where?

21       MR. LIEBERMAN:  It's about to reap revenue.

22       THE COURT:  Oh.

23       MR. LIEBERMAN:  It's been a month testing different

24   ovens, different refrigerators.  It's done all types of work.

25   It produces its recommendations and its reasons.  It's got a

P1EAThe2

link.  And if you go from that link and you buy the product,

wire cutter gets a fee.

      If OpenAI can copy those recommendations, even if they

attribute it to wire cutter, that doesn't diminish the harm to

wire cutter.  It doesn't diminish the harm to wire cutter

because if somebody goes and buys that product and they don't

do --

      THE COURT:  They're not going to be doing the link,

which is the key to your revenue.

      MR. LIEBERMAN:  Right.  Indeed, the attribution may

even cause additional harm to The Times.

      THE COURT:  How?

      MR. LIEBERMAN:  Well, we have examples in the

complaint where they cite wire cutter as endorsing certain

products, which they didn't endorse.  Wirecutter's reputation

can be very fragile.  If they endorse a particular -- if

ChatGPT says Wirecutter endorsed a particular product, and that

product was, for example, the subject of a product recall or

kills somebody's child who buys the product, the harm runs down

to Wirecutter.  That could destroy the business.

      In terms of time sensitiveness with Wirecutter, when

you have here are recommendations for Black Friday sales.  Here

are recommendations for Christmas presents.  There is an

inherent time sensitive nature to such articles.  I would say

when you're dealing with wire cutter, the question is:  What is

P1EAThe2

1    the news cycle?  What is a relevant news cycle for that article

2    and that recommendation?  If it's Black Friday sales and it's

3    published three days before Black Friday, then if they

4    reproduce it during that three-day period, that's plainly time

5    sensitive.

6           I don't know if your Honor has other questions about

7    that.

8           THE COURT:  No.  I understand the time sensitive

9    nature of it.  I really do.

10          MR. LIEBERMAN:  The last point I wanted to make was

11   *Barclays* and *NBA* are both cases where the Court found that

12   there was no hot news claim after they had been to trial.  This

13   is a motion to dismiss.  All these issues involve factual

14   issues, and we believe we can prove all of the elements of a

15   hot news claim.

16          THE COURT:  Thank you.

17          MR. LIEBERMAN:  Thank you, your Honor.

18          THE COURT:  Sir?

19          MR. GRATZ:  To respond to these points one by one,

20   counsel is drawing a distinction between free riding and -- the

21   free riding portion of this and passing off someone else's work

22   as one's own.  The *TVEyes* decision analyzes and addresses this

23   question.  The cite is 43 F.Supp 3d at 399, and this is Judge

24   Hellerstein, and the sentence is as follows:  "The Supreme

25   Court defined free riding as passing off someone else's work as

P1EAThe2

1    one's own."  Here *TVEyes* is not passing off as its own.  Those

2    two things are the same.  And they are an element.  That is the

3    first point.

4         The second point with respect to some of these

5    examples being closer in time, I want to emphasize that the

6    examples that they have with respect to -- that are closer in

7    time, are not examples in which OpenAI is implicated.  The

8    examples for OpenAI are all at least months old, and they

9    didn't tell you anything else.

10         With respect to Wirecutter, Mr. Lieberman is talking

11    about the harm, but the point here, the question is, how time

12    sensitive is the information that this is the best office

13    chair.  And those don't change very often, usually on a matter

14    of years, and it is not close.

15         Mr. Lieberman today has presented examples about Black

16    Friday sales and Christmas presents, neither of which are

17    examples that they have been able to make any of this stuff do,

18    that do not appear in the pleadings, and can't be the basis for

19    this claim to survive.

20         (Continued on next page)

21

22

23

24

25

P1EsTHE3

1          MR. GRATZ:  With respect to, sort of, the rest of the

2     response of Mr. Lieberman, I want to turn over to Ms. Hurst.

3          MR. HURST:  Your Honor, briefly on the allegations

4     regarding outputs from Copilot chat and whether they meet the

5     so-called hot news exception.

6          Your Honor, every one of the examples that are given

7     in the complaint, we see another situation where the plaintiffs

8     have come up with some contorted hypothetical scenario to try

9     to get the search engine to spit out something that might

10    support a claim.

11         So, in this example in paragraph 127, My friend told

12    me I should read the South Florida Sun Sentinel article, and

13    then it gives the quote of the title of the article, and what

14    are the first five paragraphs.  So this clearly cannot meet the

15    standard because the attribution is right in the prompt.  The

16    user knows the article, knows the title of the article, knows

17    the source of the article, and is asking for a reference to it.

18    That is not a standard.  You cannot meet the standard for lack

19    of attribution with that or any other example in this

20    complaint.

21         Your Honor, let me just add, the problem here with

22    this common law misappropriation claim is that it evades all of

23    the limitations of the copyright act.  In the case of the

24    Wirecutter example, it evades the limitation for facts.  What

25    does Wirecutter recommend is a fact.  It is not protected by

P1EsTHE3

1    the copyright.  It evades the fair use defense, your Honor.

2            So the end user, who has a perfectly legitimate

3    purpose for asking whatever question they are going to ask, we

4    don't get the benefit of that defense because it's a common law

5    misappropriation claim.  Your Honor, the net effect of that in

6    these circumstances is that it is indistinguishable from

7    copyright in a way that should be preempted, and it evades

8    critical limitations.

9            And there is no extra element here, your Honor.  There

10   is no extra element.  You know, free writing does not change a

11   claim of harm from copying into a claim of harm from copying

12   plus something else.  So I would submit, your Honor, it doesn't

13   meet the attribution requirement.  But in addition, because of

14   the important limitations of copyright that are relevant here,

15   it has to be preempted.

16           THE COURT:  Thank you.

17           I'm cutting off discussion.  I think it's fine.  I'm

18   not interested in hearing the argument on infringements at this

19   point.

20           In terms of the trademark delusion, Count Eight, am I

21   missing something here?

22           Federal Rule of Civil Procedure 5.1, a party that

23   files a pleading written motion draw -- so a party that files a

24   written motion drawing into question a constitutionality of a

25   state statute must promptly -- then it has certain procedural

P1EsTHE3

1    requirements in suit, including serving the notice and paper on

2    the Attorney General of the state, the state attorney general.

3           There is no evidence that that has been followed here.

4    Am I missing something?

5           Does anyone think those procedures should not have

6    been followed here?

7           MR. HURST:  Yes, your Honor.

8           That is in the circumstance where a party is filing a

9    lawsuit making a facial attack on a statute on constitutional

10   grounds.  That is not our argument in this case.

11          THE COURT:  No, it's as-applied.

12          MR. HURST:  Correct, your Honor.  But it's also --

13          THE COURT:  Just a moment.

14          Isn't that true whether -- I don't know the answer to

15   this -- whether it's an as-applied or facial attack?

16          It doesn't seem to be limited under 5.1.

17          MR. HURST:  Your Honor, I think it's more fundamental

18   that we haven't filed a lawsuit seeking to declare the statute.

19          THE COURT:  A party that files a written motion.

20          Am I mistaken here or am I off in never-never land?

21          My presumption is that the parties have thought long

22   and hard about this and that there was a reason you didn't

23   comply.  Certainly the plaintiffs aren't raising it as an

24   issue, so I'm a little reluctant myself to raise this issue.

25   The plaintiff is not saying there is a failure to comply with

P1EsTHE3

1    5.1.

2            Can I assume everyone says there is no reason to file

3    a 5.1?

4            MR. LIEBERMAN:  We think your argument is a brilliant

5    argument and we adopt it, your Honor.

6            THE COURT:  No, no, no.  Doesn't work.

7            I want to do the right thing here.  If I'm way off

8    base, I want to know that.

9            You know what, why don't I leave the parties with

10    that.  Ms. Hurst, why don't you think about that and submit

11    something to me.

12            All right?

13            MR. HURST:  I will, your Honor.

14            If I may briefly address that claim very briefly?

15            THE COURT:  Yes.

16            MR. HURST:  Your Honor, I would just say, in an

17    as-applied analysis, the New York State General Business Law

18    Section 360L, which does not require fame, does not require a

19    registration of trademark in the State of New York, does not

20    require actual delusion, but only likely delusion, and has as

21    its only remedy injunctive relief is tantamount to removing

22    speech.  It is absolutely tantamount to removing speak from an

23    internet-based nationwide service.

24            Your Honor, under those circumstances, the *American*

25    *Booksellers v. Dean*, the *American Libraries Association v.*

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1EsTHE3

1   *Pataki* cases provide a strong foundation for concern here that,

2   as applied to these generative AI and Next Generation search

3   engine services, this is direct regulation of interstate

4   commerce.

5           THE COURT:  OK.  I understand the argument.  I don't

6   need discussion of it here.

7           Why don't you think about that 5.1 point --

8           MR. HURST:  Thank you, your Honor.

9           THE COURT:  -- and write something.

10          Give me some paper where some submission whereby you

11   think it's absolutely unnecessary, if indeed that's the case.

12          All right.  Well, I thank everybody here.  I'm not

13   interested in federal trademark delusion argument here or New

14   York State law delusion.  I have a lot to think about and

15   you'll get an opinion in due course.

16          Thank you very much.

17          (Adjourned)

18

19

20

21

22

23

24

25