EXHIBIT C

# EXHIBIT 58

**In the Matter Of:**

*ELON MUSK vs*

*SAMUEL ALTMAN*

---

*TASHA MCCAULEY*

*September 30, 2025*

---



1

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

 5   IN RE MATTER OF:            )
                                 )
 6   ELON MUSK, et al.,          )
                                 )
 7           Plaintiffs,         )
                                 )
 8       vs.                     )   CASE NO.
                                 )   4:24-CV-04722-YGR
 9   SAMUEL ALTMAN, et al.,      )
                                 )
10           Defendants.         )
                                 )
11

12                ** CONFIDENTIAL **

13      VIDEOTAPED DEPOSITION OF TASHA McCAULEY

14              LOS ANGELES, CALIFORNIA

15           Tuesday, September 30, 2025

16

17

18

19

20

21   Stenographically Reported by:

22   HEATHER J. BAUTISTA, CSR, CRR, RPR, CLR
     Realtime Systems Administrator
23   California CSR License #11600
     Oregon CSR License #21-0005
24   Washington License #21009491
     Texas CSR License #10725
25
```

## Page 2

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5  IN RE MATTER OF:          )
                             )
 6  ELON MUSK, et al.,       )
                             )
 7        Plaintiffs,        )
                             )
 8     vs.                   )  CASE NO.
                             )  4:24-CV-04722-YGR
 9  SAMUEL ALTMAN, et al.,   )
                             )
10        Defendants.        )
                             )
11

12

13

14

15        VIDEOTAPED DEPOSITION of TASHA McCAULEY, taken

16  before Heather J. Bautista, CSR No. 11600, a Certified

17  Shorthand Reporter for the state of California, with

18  principal office in the county of Santa Clara,

19  commencing on Tuesday, September 30, 2025, 9:17 a.m., at

20  2121 Avenue of the Stars, Los Angeles, California 90067.

21

22

23

24

25
```

## Page 3

```
 1  APPEARANCES OF COUNSEL:

 2

 3      For Plaintiffs:
 4          MoloLamken
            BY:  WALTER HAWES, ESQ.
 5              ROBERT KRY, ESQ.
            600 New Hampshire Avenue, N.W.
 6          Washington, D.C. 20037
            Phone:  (202) 556-2013
 7          whawes@mololamken.com
            rkry@mololamken.com
 8

 9      For OpenAI Defendants:
10          Wachtell Lipton Rosen & Katz
            BY:  WILLIAM SAVITT, ESQ.
11              NATHANIEL CULLERTON, ESQ.
                ADAM TANNE, ESQ.
12          51 West 52nd Street
            New York, New York 10019
13          Phone:  (212) 403-1000
            wdsavitt@wlrk.com
14          ndcullerton@wlrk.com
            aptanne@wlrk.com
15

16      For Defendant Microsoft Corporation:
17          Dechert LLP
            BY:  NISHA PATEL, ESQ.
18          633 W. 5th Street, Suite 4900
            Los Angeles, California 90071
19          Phone:  (213) 808-5735
            nisha.patelgupta@dechert.com
20

21      For TASHA McCAULEY:
22          Ellis George LLP
            BY:  KATHERINE PETTI, ESQ.
23          2121 Avenue of the Stars, 30th Floor
            Los Angeles, California 90067
24          Phone:  (310) 274-7100
            kpetti@ellisgeorge.com
25
```

## Page 4

```
 1  APPEARANCES OF COUNSEL (CONTINUED):

 2          MARC TOBEROFF, ESQ.

    (Remote) JENNIFER SCHUBERT, ESQ. - MoloLamken

 3  (Remote) SARA TOFIGHBAKHSH, ESQ. - MoloLamken

    (Remote) ETHAN COHEN, ESQ. - Wachtell Lipton Rosen &

 4                   Katz

    (Remote) DANIEL CONTRERAS, ESQ. - Ellis George

 5  (Remote) CHRISTOPHER BERG, ESQ. - Ellis George

 6

 7  ALSO PRESENT:  Kevin Crowly, Videographer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 5

```
 1                 INDEX OF EXAMINATION

 2                                            PAGE

 3  TASHA McCAULEY

 4      EXAMINATION BY MR. HAWES              10

 5      EXAMINATION BY MR. SAVITT             143

 6      EXAMINATION BY MS. PATEL              278

 7      EXAMINATION BY MR. HAWES              286

 8      EXAMINATION BY MR. SAVITT             291

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

## Page 54

1   time away from -- from working on OpenAI, there was a
2   question of whether OpenAI shareholders should -- should
3   benefit from employee time being -- I believe, you know,
4   if I'm recalling the discussions correctly, it was
5   discussions of that nature.
6       Also corporate opportunity questions of
7   whether, sort of, products that -- or features that were
8   being offered to -- to startup fund participants,
9   startup fund companies, maybe before -- before general
10   releases that may have given them an advantage that --
11   I'm -- I apologize. I'm just trying to remember
12   accurately what some of the discussions were.
13       I think it was really just questions of whether
14   the fund was benefiting Sam, whether the fund was
15   sufficiently -- it was, you know, taking away from
16   potential returns for -- for OpenAI investors. That was
17   the primary gist of it.
18     Q.   (By Mr. Hawes) Okay.
19       And when you say "corporate opportunity
20   questions" as constituting a part of the concern, what
21   do you mean by that?
22     A.   Yeah. If -- if -- if companies in the fund
23   were getting access to, you know, certain features --
24   certain -- you know, certain parts of OpenAI's products
25   that weren't available to the general public, that was

## Page 55

1   giving them some -- some benefit that -- I think -- I
2   think the concern being expressed by Mr. D'Angelo is
3   that, you know, some amount of that benefit -- I want to
4   make sure I'm not mischaracterizing what the concern
5   that he was raising in this conversation was, so I'm
6   just making sure I'm articulating it properly.
7       I think I prefer not to kind of speculate on
8   what his specific concern was. This is approximately
9   what I remember.
10     Q.   Okay.
11       Just to make sure that I have your full
12   recollection of -- of that memory, was the concern that
13   OpenAI products would be directed or could be directed
14   by Mr. Altman to those companies in which the OpenAI
15   Startup Fund had invested?
16      MR. SAVITT: Objection. Calls for speculation.
17     Q.   (By Mr. Hawes) You can answer.
18     A.   I think that sounds -- I think that sounds
19   approximately right.
20     Q.   Did you share Mr. D'Angelo's concerns?
21     A.   I -- I would say I think his concerns made
22   sense to me, and I was equally interested in getting
23   clear answers on -- on the structure of the fund and
24   what the situation was.
25     Q.   To your knowledge -- to your knowledge, did the

## Page 56

1   OpenAI Startup Fund -- or strike that.
2       To your knowledge, did OpenAI provide products
3   to companies in which the OpenAI Startup Fund had
4   invested on a prioritized basis?
5     A.   I -- I remember discussion of that concern. I
6   do not recall specific -- specifically whether or not
7   that happened.
8     Q.   For all of these concerns that you've
9   referenced, who, besides Mr. D'Angelo, did you discuss
10   them with?
11      MR. SAVITT: Objection.
12      THE WITNESS: Some parts of this discussion,
13   again, would implicate the privilege, so I -- I won't
14   give you a complete list, but I would say there was a
15   discussion amongst other board members.
16     Q.   (By Mr. Hawes) Which other board members? And
17   with the understanding that I'm not asking for the
18   content of the attorney-client communications.
19     A.   Yeah.
20       Apologies. I may need to just ask a quick
21   question here. I apologize.
22     Q.   That's perfectly okay.
23      MS. PETTI: Yeah.
24      MR. HAWES: Let's go off the record.
25      THE WITNESS: We're off the record. The time

## Page 57

1   is 10:40 a.m.
2       (Recess taken from 10:40 a.m. to 11:01 a.m.)
3      THE VIDEOGRAPHER: We're back on the record.
4   The time is 11:01 a.m.
5     Q.   (By Mr. Hawes) All right.
6       Ms. McCauley, when we left, the question
7   pending was: Which other board members had you
8   discussed the concerns about Mr. Altman's investments
9   with? And you asked to clarify something with your
10   attorney regarding attorney-client privilege.
11     A.   Yes.
12     Q.   Can you answer that question to the best of
13   your knowledge --
14     A.   Yes.
15     Q.   -- again, with that understanding?
16     A.   Absolutely.
17       In particular about the OpenAI fund, I think
18   discussion included the full board. What I'm trying to
19   recall is, I don't remember exactly what month this --
20   like, these discussions were first taking place, so I'm
21   not 100 percent sure if Will -- Will was still on the
22   board, Will Hurd.
23       But in any case, it was the full board at the
24   time. So at the very least, I think Will would have
25   been there. So, you know, Sam, Greg, Ilya, Adam, Helen,

## Page 58

1   myself, and likely --

2       (Stenographer clarification.)

3       THE WITNESS:   -- likely enough Will, although I

4   don't specifically recall what -- what month this

5   discussion took place, so I can't be 100 percent sure.

6      Q.   (By Mr. Hawes)   Okay.

7       We've discussed concerns about Mr. Altman.   Did

8   you have similar concerns regarding Mr. Brockman?

9      A.   I did not.

10       When you say "similar concerns," concerns about

11   undisclosed activities or investments that might have --

12   could you clarify your question.   Sorry.

13      Q.   Did you have concerns regarding whether

14   Mr. Brockman had undisclosed interests in companies that

15   might affect his conduct on OpenAI's board?

16      A.   Not in particular.   I don't think that's -- I

17   don't recall having that concern.

18      Q.   Okay.

19       I'm going to show you what will be marked as

20   Exhibit 2.

21       (Exhibit 2 was marked for identification.)

22      Q.   (By Mr. Hawes)   And this, as it says on the

23   top, is a Unanimous Written Consent of the Board of

24   Directors of OpenAI dated November 16th, 2023, and it's

25   signed by you and the directors.

## Page 59

1       Do you see at the bottom of Page 1 where it

2   reads "Now, therefore, be it resolved" --

3      A.   Yes.

4      Q.   -- "that the board hereby, effective

5   immediately" --

6      A.   Yes.

7      Q.   -- "terminates Mr. Altman's employment with the

8   corporation and OpenAI GP, removes Mr. Altman from any

9   position in which he serves for the corporation or for

10   OpenAI GP."

11      A.   Yes.

12      Q.   Did the board, in fact, fire Mr. Altman from

13   his position as board member and CEO of OpenAI, Inc.,?

14   on November 16th, 2023?

15      A.   Yes.

16      Q.   Were you one of the board members who voted to

17   remove Mr. Altman?

18      A.   I was.

19      Q.   And the paragraph right above the paragraph

20   that I just read --

21      A.   Yes.

22      Q.   -- do you see where it states, "Whereas the

23   board has lost trust in Sam Altman's ability to be

24   candid and forthright in his communications with the

25   board" --

## Page 60

1      A.   Yes.

2      Q.   "and employees of the corporation and OpenAI

3   Global, LLC" --

4      A.   Um-hum.

5      Q.   -- "and is concerned about the resulting impact

6   of his actions on the corporation's mission and as a

7   result, the board desires to terminate Mr. Altman's

8   employment with the corporation and OpenAI GP."

9      A.   Yes.

10      Q.   Had you, in fact, lost trust in Sam Altman's

11   ability to be candid and forthright in his

12   communications with the board?

13      A.   We had.

14      Q.   In general terms, what caused you to lose

15   trust --

16       (Stenographer clarification.)

17      Q.   (By Mr. Hawes)   What caused you to lose trust

18   in Mr. Altman's ability to be candid and forthright?

19       MR. SAVITT:   Objection.   Form.

20      Q.   (By Mr. Hawes)   You can answer.

21      A.   We -- the board members had a number of

22   experiences where we felt that Sam, you know, wasn't

23   forthright and wasn't honest with the board and other,

24   you know, members of the company, senior leaders, and it

25   led to an erosion of trust, a loss of trust.

## Page 61

1      Q.   And were you, in fact, concerned about the

2   resulting impact of Mr. Altman's actions on OpenAI's

3   mission?

4      A.   Yes, absolutely.   Yeah.

5      Q.   How did Sam's conduct affect OpenAI's mission?

6      A.   Well, given that the mission of the company is

7   to ensure that, you know, artificial general

8   intelligence benefits all of humanity, we were -- we

9   needed to be careful that the public's interest, the

10   public good was -- was being considered in each of the

11   decisions; and that was the primary role of the

12   non-profit there, was to say, you know, in any given

13   moment, are the decisions we're making likely to present

14   some considerable risk to the public or not?

15       And the fact that I think a number of instances

16   made us feel that we could not trust that what we

17   were -- the information we were receiving from the

18   for-profit -- about the for-profit -- about the

19   for-profit's activities via Sam made us concerned

20   that -- you know, in particular, as the technology was

21   accelerating, as stakes were getting higher and higher

22   over time, that we would not be able to sufficiently

23   oversee and to -- to make the decisions we needed to

24   make.

25       MR. HAWES:   Okay.

Page 62

1    And for the record, Exhibit 2 is Bates stamped
2 OPENAI_MUSK27400.
3    Q.    (By Mr. Hawes)  Ms. McCauley, I'll now show you
4 another document.  This is going to be marked as Exhibit
5 3.
6    A.    Okay.
7          (Exhibit 3 was marked for identification.)
8          MR. HAWES:  And Exhibit 3 is Bates stamped
9 2024MUSK-11437.
10         This is a March 28th, 2025, "Wall Street
11 Journal" article titled "The Secrets and Misdirection
12 behind Sam Altman's firing from OpenAI."
13         THE WITNESS:  Um-hum.
14    Q.   (By Mr. Hawes)  Do you recognize this article?
15    A.    I -- I do remember seeing it when it came out.
16 I don't know that I read it in depth, but I do recognize
17 it, yeah.
18    Q.    If you turn to Page 3.
19    A.    Yes.
20    Q.    In the third paragraph down --
21    A.    Um-hum.
22    Q.    -- it starts, "This account is based on
23 interviews with dozens of people who lived through one
24 of the" --
25         (Stenographer clarification.)

Page 63

1    Q.    (By Mr. Hawes)  "One of the wildest business
2 stories of all time.  The sudden firing of the CEO of
3 the hottest tech company on the planet and his
4 reinstatement days later.
5          "At the center was a mercurial leader who kept
6 everyone around him inspired by his technological
7 vision, but also, at times, confused and unsettled by
8 his web of secrets and misdirections."
9          Do you see that?
10    A.    I do, yes.
11    Q.    Were you one of the dozens of people whom the
12 "Wall Street Journal" interviewed for this article?
13    A.    Yes, I believe so.
14    Q.    Do you know anyone else whom the "Wall Street
15 Journal" interviewed for the article?
16    A.    I don't.
17    Q.    On the same page, it continues:  "From the
18 start, OpenAI was set up to be a different kind of tech
19 company, one governed by a non-profit board with a duty
20 not to shareholders but to humanity."
21         Does that sentence, Ms. McCauley, accurately
22 reflect your understanding that the OpenAI board had a
23 duty to -- to humanity rather than to shareholders?
24    A.    Yes, that the non-profit board did, yes.  I --
25 I mean, to give a little more clarity there, the -- the

Page 64

1 non-profit board's duty was to humanity, and part of the
2 way that we exercised our -- our mandate was to, you
3 know, ensure -- ensure our ability to -- like I said
4 before, oversee the non-profit and also to, you know,
5 support the non-profit in carrying out the -- the
6 objectives it was trying to achieve in the cases that --
7 that they were supportive of the mission.
8          And so a side effect of that was that this
9 could be very good for investors, but our primary
10 objective wasn't to protect the interest of the
11 investors, so -- yeah.
12    Q.    Okay.
13         And the next paragraph, the one that's only one
14 sentence, it says, "Behind the scenes, the board was
15 finding, to its growing frustration, that Altman really
16 called the shots.  For the past year, the board had been
17 deadlocked over which AI safety expert to add to its
18 ranks.  The board interviewed Ajeya Cotra, an AI safety
19 expert, at the EA Charity Open Philanthropy" --
20    A.    Yes.
21    Q.    -- "but the process stalled largely due to
22 foot-dragging by Altman and his co-founder, Greg
23 Brockman, who was also on the board.  Altman countered
24 with his own suggestions."
25         Do you see that?

Page 65

1    A.    I do.
2    Q.    Is that description accurate, to the best of
3 your knowledge?
4    A.    Yes.  I -- I think that's -- I think I would
5 consider that accurate.  We interviewed a good number of
6 people.  Ajeya was one of -- one of -- one of a number
7 of board members -- potential board members that we
8 interviewed for that position, and we had been running
9 that process for quite a long time trying to expand the
10 board toward, you know, including an -- an AI -- like, a
11 safety-oriented board member and, in particular, trying
12 to expand the board towards what we considered a good
13 degree of independence.
14    Q.    Is it -- is it accurate -- you testified that
15 had been -- that process had been going on for quite a
16 long time.  Is it accurate that the board had been
17 deadlocked over which AI safety expert to add?
18    A.    Yes.  Yeah.
19    Q.    Which AI safety expert did you favor hiring?
20    A.    Well, I think I had, you know, positive views
21 on a couple of them and, you know, there were pros and
22 cons to each.  I believe I -- I was receptive to parts
23 of the -- you know -- sorry.
24         There was a lot to this discussion, and it went
25 for months, so I'm trying to simplify it as much as

## Page 66

1  possible.

2        I was on -- I was interested in bringing on a
3  board member that had, yes, you know, an eye to -- to AI
4  safety in particular.  I think the independent board
5  members and I were -- were particularly interested in
6  taking steps to increase independence on the board,
7  ideally with a board member who also had an eye to AI
8  safety, so we considered a fairly large number of -- of
9  candidates; and, you know, I think we had some good
10  options among those.

11       Q.  Did Mr. Altman oppose the board members that
12  you were in favor of that were focused on AI safety?

13       A.  Let me think about how to answer this most
14  correctly.

15       So I think one -- one thing that we found
16  challenging was that it was often difficult to tell --
17  and I think this is a challenge that I've learned
18  reflected from -- from other people in the company as
19  well.  It was a challenge to know what Sam actually
20  thought about things.  So even in times where he would
21  express, you know, a positive inclination towards
22  something, I wasn't sure if that was a true positive
23  inclination and then, you know, we would get, you know,
24  sort of negative response from maybe other members of
25  the board.  It was -- I think a concern for us was that

## Page 67

1  it was difficult to tell, you know, how each person
2  actually felt.

3        So I think there were some cases where --
4  maybe -- maybe Ajeya Cotra is a good example where I
5  think even Sam, at one point, was positively inclined
6  towards Ajeya.  I don't know if he actually had the
7  intention that he wanted her on the board, but was
8  expressing positive inclination there.

9        So I think what was challenging about the
10  situation was despite an immense amount of discussion
11  and months and months and months going by, we could
12  never actually get to a place where the board could
13  agree on bringing on an AI safety person.

14       And, by the way, I think this comes on the
15  heels of Sam had made a -- by the best of my
16  recollection, I remember an employee telling me that Sam
17  had made an announcement at an all-hands meeting of the
18  company that he wanted an AI safety-oriented board
19  member, and I remember getting positive feedback from
20  the employee I spoke to about that statement.

21       And there was clear understanding on the board
22  that that's something we wanted, so we -- as part of the
23  process that I was spearheading on the governance
24  committee, we ran a very comprehensive process to
25  consider new board members; and each of the

## Page 68

1  safety-oriented board members we brought, we were just
2  unable to make, you know, progress with.  I mean, it
3  was -- it was not seeming like we were going to, you
4  know, find one that was suitable.

5        Q.  Was it your understanding that notwithstanding
6  the statements he would make, Mr. Altman, in truth,
7  opposed the AI safety candidates?

8            MR. SAVITT:  Objection.

9            THE WITNESS:  You know, I -- I think -- I think
10  a concern that I had was that -- and I think a concern
11  that was spoken amongst, you know, the independent board
12  members at the time was that we were worried that Sam
13  didn't want to lose control of the board.

14       So I think -- I don't know about whether it was
15  specifically about an AI safety board member or not.  I
16  think it was more a question of whoever we brought on,
17  whether they were going to be favorable to, kind of,
18  Sam's wishes or -- or not.

19       Q.  (By Mr. Hawes)  Okay.

20       And so was it your understanding that
21  Mr. Altman was the reason the board was unable to make
22  progress?

23       A.  I think in -- I think, you know, he was a piece
24  of the reason, you know, each of these -- each of these
25  candidates was found not suitable.  I mean, he did go as

## Page 69

1  far as to make suggestions about different -- by the
2  best of my recollection again, about different
3  candidates, you know, that might be already employees of
4  OpenAI and that kind of thing.

5        For -- for the AI safety-oriented board member,
6  that wasn't suitable to us, because, again, part of our
7  objective was to increase the independence on the board.
8  We were concerned about the fact we had three employee
9  board members, you know, even though, technically, Sam
10  didn't have meaningful equity, but, I mean, you know, we
11  wanted -- and I think he was technically counted as an
12  independent member, but we were trying to increase the
13  true independence of the board.

14       Q.  Outside of the OpenAI employees, were there
15  other suggestions from Mr. Altman?

16       A.  Yes.  Yes.  I don't remember a comprehensive
17  list, but he definitely made numerous suggestions, and I
18  think the suggestions from -- from my perspective, and
19  I -- and according to the discussions I had with other
20  independent board members, our concern was that these
21  would tend to be people who would be favorable to him.

22       Q.  Was Mr. Altman's handling of this situation one
23  of the factors you considered in dismissing him?

24       A.  Yes.  I would say we were -- we were --
25  speaking for myself, I was concerned, very concerned,

ELON MUSK, et al. v. SAMUEL ALTMAN, et al. Case No. 4:24-cv-04722-YGR    Document 379-3    Filed 01/06/26    Page 10 of 23
SAMUEL ALTMAN    Confidential    Tasha McCauley
September 30, 2025

## Page 70

1   that the premise of the board, we -- that the design of
2   the structure and the way the board was intended to be
3   set up was that the board was -- had a majority of
4   disinterested members. I've -- I have no equity in
5   OpenAI. I've never been paid money by OpenAI. And I --
6   the decisions I was making as a board member there were,
7   you know, financially disinterested decisions.
8       I was -- there's also a question of just, you
9   know, Sam has a lot of power in, you know, the tech
10   world and the Valley; and a concern for us was any board
11   member we might be considering who had the, you know,
12   credibility and experience to join OpenAI's board would
13   likely be, you know, motivated and compelled by some
14   degree of wanting to, you know, be on Sam's good side,
15   so to speak, or, you know, just be -- be treated
16   favorably by Sam, I suppose, and so that made it
17   difficult.
18       You know, we had to sort of -- the filter we
19   were using here was trying to bring on people, in the
20   case of an AI safety board member, who were not
21   otherwise conflicted. If they had sufficient expertise,
22   it was likely enough they were from another lab or
23   something like that, so that made the pool restricted.
24       And then -- and then also people who we thought
25   would not be -- would be able to stand up to Sam in a

## Page 71

1   moment of need and the kinds of people Sam were
2   recommending, we didn't have a high degree of confidence
3   that that would be true.
4    Q.   On the next page --
5    A.   Yep.
6    Q.   -- if you flip, in the second full paragraph
7   under the picture of Sam, it says, "Concerns about
8   corporate governance and the board's ability to oversee
9   Altman became much more urgent for several board members
10   after they saw a demo of GPT-4, a more powerful AI that
11   could ace the AP biology test in the summer of 2022."
12       Is that description accurate, to the best of
13   your knowledge?
14    A.   You know, I don't recall that being a
15   particular moment or -- or I don't know that I would
16   have described it that way. I think I was -- I think,
17   from my perspective, over the whole time I was on the
18   board of OpenAI and, in an increasing way, as technology
19   accelerated, I was, you know, concerned about having
20   good corporate governance structures. It wasn't in
21   response to a particular demo.
22    Q.   Okay.
23    A.   Yeah.
24    Q.   In the last paragraph on that page, it says,
25   "Toner and McCauley had already begun to lose trust in

## Page 72

1   Altman. To review new products for risks before they
2   were released" --
3    A.   Um-hum.
4    Q.   -- "OpenAI had set up a joint safety board" --
5    A.   Yes.
6    Q.   "with Microsoft" --
7    A.   Yes.
8    Q.   -- "a key backer of OpenAI that had special
9   access to use of technology in its products."
10       "During one meeting in the winter of 2022, as
11   the board weighed how to release three somewhat
12   controversial enhancements to GPT-4, Altman claimed all
13   three had been approved by the joint safety board."
14    A.   Um-hum.
15    Q.   "Toner asked for proof and found that only one
16   had actually been approved."
17       Do you see that?
18    A.   I do.
19    Q.   Is that description accurate, to the best of
20   your knowledge?
21    A.   Yes.
22    Q.   Had you, in fact, begun to lose trust in Altman
23   at that point?
24    A.   Yes.
25    Q.   Why?

## Page 73

1    A.   Sorry. Are you asking were we losing trust in
2   him as a result of this particular incident or just more
3   generally? I think --
4    Q.   Let's start with this specific.
5    A.   Yes.
6    Q.   What about this incident contributed to you
7   losing trust in Altman?
8    A.   Well, because I think the joint safety board
9   was there to ensure that we could be assured that
10   products that might have, you know, potential negative
11   impacts that we -- you know, potential negative impacts
12   could go through a reliable process and that the result
13   of that process would be shared with the board and that
14   the board could have input on the -- the -- you know,
15   the way the process was run and the results of the
16   process; and when we were seeing that we were getting
17   assurance that certain -- you know, certain enhancements
18   to the -- to the model had been approved and hadn't, it
19   was very concerning to us.
20       I mean, not just -- I think that -- that
21   particular incident was, maybe, one small illustrative
22   example of -- of things like that that were occurring
23   that I think -- you know, put together, gave us -- gave
24   us a broader concern that we might not be able to trust
25   that the processes were working, the processes we put in

**Page 74**

1    place.
2        Q.   And I think you mentioned this incident
3    previously.
4        A.   Yes.
5        Q.   Were you there personally when those assurances
6    were made?
7        A.   Yes.
8        Q.   And then at some point, did you become aware
9    that only one of the three enhancements had actually
10   been --
11       A.   Yes.
12       Q.   -- approved?
13       A.   I believe -- yes -- yes, I did become aware.
14       Q.   Do you remember how you became aware?
15       A.   Yeah.  I was just trying to think.  I believe
16   there was, not too long after the board meeting, another
17   board member surfaced that concern via e-mail, if I
18   recall correctly.
19       Q.   Okay.
20            And you -- you touched on this, but as an
21   OpenAI board member, was it important to you that
22   enhancements to OpenAI's products be approved by the
23   joint safety board?
24       A.   Yes.
25       Q.   Why was that important?

**Page 75**

1        A.   As I said -- I mean, I think the -- in general,
2    this is because there are unintended consequences that
3    can come from very complex AI systems that, you know,
4    can have damaging effects on society, potentially, so
5    having a process in place to prevent those is -- is
6    critical.
7            I would say, in the case of these earlier
8    products, I don't think we were -- you know, I don't
9    think we thought that these particular products were
10   going to have specific negative effects; it was that we
11   needed assurance in these early days that the processes
12   we were putting in place were functional.
13           So the evidence we were getting that these
14   processes were not functional was very concerning to us.
15   And even if the processes themselves were running
16   properly, the fact that we weren't being informed about
17   the results of them, you know, made them -- made them
18   dysfunctional.  So -- yeah.
19       Q.   Was this situation one of the factors that you
20   considered in dismissing Altman?
21       A.   Yes.
22       Q.   If you flip to the next page.  In the first
23   paragraph, the article states, "Around the same time,
24   Microsoft launched a test of the still unreleased GPT-4
25   in India, the first instance of the revolutionary code

**Page 76**

1    being released in the wild."
2        A.   So sorry.  I'm actually -- tell me where you
3    are, which paragraph.
4        Q.   I think if you flip back one page.
5        A.   Oh.  I'm sorry.
6        Q.   The top part.
7        A.   Yeah.  Okay.
8        Q.   "Around the same time, Microsoft launched a
9    test of the still unreleased GPT-4 in India" --
10       A.   Um-hum.
11       Q.   -- "the first instance of the revolutionary
12   code being released in the wild" --
13       A.   Um-hum.
14       Q.   -- "without approval from the joint safety
15   board, and nobody had bothered to inform OpenAI's board
16   that the safety approval had been skipped."
17       A.   Yes.
18       Q.   "The Independent board members found out when
19   one of them was stopped by an OpenAI employee in the
20   hallway on the way out of a six-hour board meeting;
21   never once in that meeting had Altman or Brockman
22   mentioned the breach."
23            Is that description accurate, to the best of
24   your knowledge?
25       A.   Yes.

**Page 77**

1        Q.   Is that one of the incidents you described
2    previously in your testimony?
3        A.   Yes.
4        Q.   Around what time did that incident occur?
5        A.   What time of day?  I'm sorry.  What time --
6    sorry.
7        Q.   Around what date?
8        A.   Apologies.
9            This would have been in the -- in December --
10   early December of 2022 after this day-long board
11   meeting, yes.
12       Q.   And what -- strike that.
13           Were you the independent board member who was
14   stopped by an OpenAI employee in the hallway?
15       A.   Yes.
16       Q.   So is that how you found out that the code had
17   been released?
18       A.   That's how I found out, yeah, walking --
19   leaving the board meeting, I found out, you know, in
20   a -- you know, in what I consider a pretty happenstance
21   way; I ran into an employee in the hallway and had a
22   discussion, and it was mentioned.
23       Q.   Did they mention that it had specifically been
24   released without approval from the joint safety board?
25       A.   I -- that was at least the implication --

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  MS. PATEL: Objection. Form.

2  Sorry.

3  Objection. Form.

4  THE WITNESS: Apologies. Yeah.

5  I -- I'm trying to recall the specific, you

6  know, wording, whether it was just described as -- as

7  a -- I don't recall the specific wording, but that was

8  the, you know, understanding I had; that was certainly,

9  at the very least, the implication. I actually --

10  sorry. I don't want to speculate. I don't know.

11  Q. (By Mr. Hawes) That's fine.

12  At some point, did you find out that it had

13  been approved for release without the joint safety

14  board's approval?

15  A. Yes.

16  Q. What do you recall about how you found that

17  out?

18  MR. SAVITT: I'm sorry. Could you --

19  (Stenographer clarification.)

20  MR. SAVITT: I don't mean to interrupt your

21  question. I just want to make sure I knew what the "it"

22  was in your question you just asked.

23  THE WITNESS: Are you asking -- sorry.

24  MR. HAWES: I'll -- I'll rephrase.

25  THE WITNESS: Okay. Yes.

**Page 79**

1  MR. SAVITT: Thank you.

2  I apologize.

3  THE WITNESS: Sorry.

4  Q. (By Mr. Hawes) What do you recall about how

5  you found out that the still unreleased GPT-4 had been

6  released in India without joint safety board approval?

7  A. Yes. I recall that I did not know about this

8  breach, and when I exited a six-or-so-hour board

9  meeting, I ran into an employee on the way out of the

10  company, and that employee and I had a conversation.

11  The employee mentioned the breach.

12  I do believe -- I mean, the understanding that

13  I had was that it was without the -- you know, that it

14  was against --

15  (Stenographer clarification.)

16  THE WITNESS: That it was going against DSB

17  approval, because this particular employee I was

18  speaking to was on the deployment safety board and was

19  talking about this as a breach pertaining to that. So

20  that -- you know, that was my understanding.

21  Q. (By Mr. Hawes) All right.

22  And did Mr. Altman's failure to inform you of

23  that cause you concerns?

24  A. Yes.

25  Q. Okay.

**Page 80**

1  Would the release of unapproved models by

2  OpenAI present an AI safety risk?

3  A. Yes, it potentially could. You know, I think,

4  as I said before, we didn't know of any specific --

5  specific risks with these particular models, but

6  there's absolutely the risk that models can -- can

7  contain -- you know, that models can present risks; that

8  they can have unintended consequences, so for that

9  reason, having these processes in place was -- was very

10  crucial in the eyes of, you know, the board; at least

11  myself, I'll say.

12  Q. So was that one of the reasons that it caused

13  you concern?

14  A. Yes. Yes.

15  Q. Okay.

16  If you flip to the next page --

17  A. Yep.

18  Q. -- Page 6.

19  A. Um-hum.

20  Q. Was Mr. Altman's handling of the -- of the

21  release of GPT-4 in India without joint safety board

22  approval one of the factors you considered when you

23  decided to dismiss him?

24  A. Yes. Yes. It -- sorry. I -- it was one of

25  the factors we considered.

**Page 81**

1  Q. Okay.

2  Now, if you flip to the next page. This is

3  Page 6 of 9.

4  A. Okay.

5  Q. In the second full paragraph, do you see where

6  it reads, "To the independent board members, the

7  administrative oversight defied belief and cast previous

8  oversights as part of a possible pattern of deliberate

9  deception. For instance, they also hadn't been alerted

10  to the previous fall when OpenAI released ChatGPT, at

11  the time considered a research preview that used

12  existing technology that ended up taking the world by

13  storm."

14  Is that description accurate, to the best of

15  your knowledge?

16  A. Um-hum. Yes.

17  Q. Was Mr. Altman's handling of that situation

18  also one of the factors that you considered in

19  dismissing him?

20  A. Yes.

21  Q. Flip to the next page. Right under the

22  photograph, it says, "Toner had published a paper in

23  October that repeated criticisms of OpenAI's approach to

24  safety. Altman was livid. He told Sutskever and

25  McCauley" -- apologies.

## Page 82

1    "He said" -- "He told Sutskever that McCauley
2  had said Toner should obviously leave the board over the
3  article.  McCauley was taken aback when she heard this
4  account from Sutskever.  She knew she had said no such
5  thing."
6    A.   Um-hum.
7    Q.   Is that description accurate?
8    A.   Yes.
9    Q.   Do you recall the paper Ms. Toner published?
10   A.   Um-hum.  Yes.  Sorry.  I know I sometimes nod.
11   Q.   Thank you.
12   A.   Yes.
13   Q.   What concerns did that paper raise?
14   A.   I think it was quite an academic paper, and the
15 organization --
16        (Stenographer clarification.)
17        THE WITNESS:  -- the organization that Helen
18 works for sometimes puts out these -- these kind of
19 academic papers, and I think they were talking -- you
20 know, I don't recall the bulk of the paper of -- of what
21 it was talking about, but I believe it was, you know,
22 addressing some, you know, maybe, you know, safety
23 approaches by -- by various labs, and I think Sam was
24 unhappy with the way that the paper discussed something
25 about OpenAI's handling of safety.  And -- and I think

## Page 83

1  he was, you know, concerned that that just was not
2  appropriate for a board member; that it wasn't
3  supportive of -- of OpenAI.
4    Q.   (By Mr. Hawes)  When you refer to "Helen," are
5  you referring to Ms. Toner?
6    A.   Helen Toner --
7    Q.   -- who was referenced in the article?
8    A.   Yes.
9    Q.   And you say that Sam was unhappy with the way
10 the paper discussed something about OpenAI's handling of
11 the safety.  What discussions did you have with
12 Mr. Altman about that?
13   A.   Sam wanted to talk on the phone about it.  We
14 had a brief conversation about it.  And I think, by the
15 best of my recollection, what I said was something along
16 the lines of, you know, "You might want to -- to convey
17 your concerns to Helen."  I can say for certain it
18 involved no -- no indication of any kind that Helen
19 should leave the board or anything of that nature.  It
20 was -- it was, you know, nothing of that nature.
21   Q.   And at some point, did you learn that
22 Mr. Altman had attributed the statement to you that
23 Ms. Toner should obviously leave the board?
24   A.   Yes.
25   Q.   How did you find out?

## Page 84

1    A.   I was having a conversation with Ilya
2  Sutskever, and he said that in a conversation with Sam
3  about the -- after discovering the paper, that Sam had
4  spoken to me and that I had said -- I think the quote I
5  recall was "Helen's obviously got to go."
6         And I think also, in subsequent conversations,
7  he said that Sam indicated he had talked to me on
8  subsequent occasions and that I maintained that she
9  needed to leave the board.
10   Q.   How did you react upon hearing about that?
11   A.   I was very displeased.  This was absolutely not
12 reflective of something I said or thought in any way.  I
13 think Helen was a -- a good independent board member.  I
14 don't think -- I think Sam didn't -- well, I won't
15 speculate, but I was very displeased and very concerned.
16        I believe I called -- I called some other board
17 members.  I called Adam, I called Helen, and we
18 discussed the fact that there was an untrue thing being
19 said, it seemed with the intention of -- of pushing
20 Helen off the board.
21   Q.   And was Mr. Altman's handling of that situation
22 one of the factors you considered in dismissing him?
23   A.   Yes.
24   Q.   If you look one -- two paragraphs below the
25 photo on that page --

## Page 85

1    A.   Yes.
2    Q.   -- it states, "Sutskever and Murati had been
3  collecting evidence" --
4    A.   Yes.
5    Q.   -- "and now Sutskever was willing to share."
6    A.   Um-hum.
7    Q.   "He e-mailed Toner, McCauley, and D'Angelo two
8  lengthy PDF documents using gmail's self-destructing
9  e-mail function.  One was about Altman; the other about
10 Brockman."
11   A.   Yes.
12   Q.   Do you see that?
13   A.   I do.
14   Q.   Is that description accurate, to the best of
15 your knowledge?
16   A.   Yep.  Yes.
17   Q.   What did Mr. Sutskever's e-mail about
18 Mr. Altman contain?
19   A.   It contained a number of examples of what he
20 considered dishonest behavior or problematic behavior; I
21 would say some of the concerns we were considering.  So
22 there were -- maybe I'll just back out to say there was
23 a few buckets of concerns.
24        There was concern about sort of our ability to
25 oversee -- you know, properly oversee the company and

## Page 126

1    Q.   And were you contacted in connection with that
2    investigation?
3    A.   Um-hum.  I was.
4    Q.   What were you asked?
5    A.   What was I asked?
6    Q.   Um-hum.
7         THE WITNESS:  I have questions about --
8         MS. PETTI:  May we take a break?
9         MR. HAWES:  Strike it.
10        And, yes, we can take a break if you'd like.
11   Let's go off the record, please.
12        THE VIDEOGRAPHER:  We're off the record.  The
13   time is 1:12 p.m.
14        (Recess taken from 1:12 p.m. to 1:27 p.m.)
15        THE VIDEOGRAPHER:  We're back on the record.
16   The time is 1:27 p.m.
17   Q.   (By Ms. Hawes)  Ms. McCauley, we were just
18   discussing an investigation that Wilmer Hale did into
19   the circumstances surrounding Mr. Altman's --
20   A.   Yes.
21   Q.   -- dismissal.
22   A.   Right.
23   Q.   Did you ever review a summary of the
24   investigation conclusions?
25   A.   I did not.

## Page 127

1         Well, apologies.  If you're asking about a
2    written report or something generated by the
3    investigation, I did not.
4         If you're talking about the public very, very
5    brief summary that OpenAI provided, I did see that.  So
6    if that's what you mean by "summary," I saw -- I saw a
7    public statement about it or --
8    Q.   Okay.
9         Did you agree with the summary that you saw?
10   A.   I think, if I recall correctly, the summary was
11   that the board acted within its, you know, discretion in
12   making the decision to fire Sam -- I'm just trying to
13   recall the summary -- and -- but that it didn't -- that
14   the circumstances didn't mandate removal, if I'm
15   remembering approximately correctly.
16        I -- if that's -- if that memory is correct,
17   then -- I would say a question of whether the behavior
18   we saw mandates removal, is just maybe -- you know --
19   you know, subject to the -- to the viewer's opinion, but
20   I -- from our perspective, I think it -- it was fair
21   that it characterized it as us acting within our
22   discretion and being -- being justified in making the
23   decision we did.
24   Q.   I'm going to show you a document that's going
25   to be marked as Exhibit 9.

## Page 128

1         (Exhibit 9 was marked for identification.)
2         MR. HAWES:  This is a document with -- Bates
3    stamped MSFT_MUSK58581.
4         THE WITNESS:  Yes.
5         MR. HAWES:  It's a May 26, 2024 --
6         (Stenographer clarification.)
7         MR. HAWES:  -- article from "The Economist"
8    written by yourself and Ms. Toner --
9         THE WITNESS:  Yes.
10        MR. HAWES:  -- titled "AI firms mustn't govern
11   themselves say ex-members of OpenAI's board."
12        THE WITNESS:  That's right.
13   Q.   (By Mr. Hawes)  Did you co-author this article?
14   A.   Yes.
15   Q.   Are all the factual statements in this article
16   accurate, to the best of your knowledge?
17   A.   Yes.
18   Q.   Why did you decide to publish this?
19   A.   As I explained earlier, I think there were a
20   number of complicating factors right around the time of
21   Sam's firing that made it difficult for the board to
22   convey a summary of its reasoning apart from the very
23   high-level summary we provided in a couple of our
24   announcements around that time.
25        And I think we wanted to have something out

## Page 129

1    there in our words that explained a bit more about what
2    our reasoning was.
3    Q.   On Page 2 --
4    A.   Yes.
5    Q.   -- middle of the first paragraph, it says,
6    "When we were recruited to the board of OpenAI" --
7    A.   Yes.
8    Q.   -- "Tasha in 2018 and Helen in 2021" --
9    A.   Um-hum.
10   Q.   -- "we were cautiously optimistic that the
11   company's innovative approach to self-governance could
12   offer a blueprint for responsible AI development, but
13   based on our experience, we believe that self-governance
14   cannot reliably withstand the pressure of profit
15   incentives."
16   A.   That's right.
17   Q.   What experience led you to believe that
18   self-governance cannot reliably withstand the pressure
19   of profit incentives?
20   A.   The experience we had at OpenAI -- I think part
21   of the way I described it toward the beginning, which
22   is -- I think the reason we were optimistic is because
23   the company was oriented in a very public way around its
24   mission, and it had created a structure that would allow
25   the empowerment of that mission, even in the face of

## Page 130

1 extreme pressure from investors, for example.

2     But the piece that would make that work

3 correctly was really, you know, the leadership and the

4 leadership's willingness to allow the board the proper

5 oversight, allow the board to make decisions that were

6 informed. And because we didn't have that piece, we

7 were not able to really make that innovative structure

8 work at OpenAI.

9     That's not to say that it's impossible for a

10 self-governance structure to work. What we were saying

11 here is, it can't reliably -- this can't be the primary

12 mechanism by which AI governance happens.

13     (Stenographer clarification.)

14     THE WITNESS: Basically, that we need good

15 regulatory frameworks to support the responsible

16 development of AI, because if we're relying on private

17 companies to consider the interests of the public, they

18 can't be ultimately responsible for doing that because

19 of the potential for these internal misalignments that

20 come from -- the situation I've described, that come

21 from interests that are at odds with one another.

22     And it all comes down to kind of one CEO making

23 those decisions, and we have the public good at stake.

24 That's very sub-optimal, so -- so that's what this was

25 saying.

## Page 131

1     Q. (By Mr. Hawes) This mentioned profit

2 incentives. What profit incentives was OpenAI

3 experiencing?

4     A. Well --

5     (Stenographer requested to go off the record to

6 address an equipment issue.)

7     THE VIDEOGRAPHER: We're off the record. The

8 time is 1:34 p.m.

9     (Recess taken from 1:34 p.m. to 1:38 p.m.)

10     THE VIDEOGRAPHER: We're back on the record.

11 The time is 1:38 p.m.

12     Q. (By Mr. Hawes) Ms. McCauley, we were just

13 discussing the profit incentives that are mentioned in

14 this article, Exhibit 9.

15     A. Yes.

16     Q. In your time on the board, what profit

17 incentives did OpenAI experience?

18     A. Well, the company was developing -- you know,

19 was commercializing a number of products in the time

20 that I was there, so it stood to make money on those

21 products, and those are the profit incentives I'm

22 talking about.

23     I'm also talking about profit incentives for --

24 for investors who had invested in the company -- well,

25 let me just make sure I see the wording exactly.

## Page 132

1     Q. In the middle of that first paragraph, it

2 says --

3     A. Yeah.

4     Q. -- "Self-governance cannot reliably withstand

5 the pressure of profit incentives."

6     A. Yeah, exactly. So, you know, there were many

7 players who stood to get a return from the company, and

8 those -- those stakeholders would have -- you know,

9 there was potential for those -- those -- those

10 stakeholders to apply pressure.

11     Q. Was OpenAI able to withstand those profit

12 incentives effectively?

13     MR. SAVITT: Objection.

14     THE WITNESS: In my experience -- I mean, this

15 is at the heart of the issue we're talking about. In my

16 experience, we were concerned that, you know, decisions

17 were being made that we didn't see as prioritizing the

18 mission that the company was oriented around. And in

19 our experience, that seemed to have potentially been

20 motivated by profit interests.

21     Q. (By Mr. Hawes) Later on the page in the second

22 full paragraph --

23     A. Yes.

24     Q. -- it says, "If any company could have

25 successfully governed itself while safely and ethically

## Page 133

1 developing advanced AI systems, it would have been

2 OpenAI. The organization was originally established as

3 a non-profit with a laudable mission to assure that AGI,

4 or artificial general intelligence, AI systems that are

5 generally smarter than humans, would benefit all of

6 humanity. Later, a for-profit subsidiary was created to

7 raise the necessary capital, but the non-profit stayed

8 in charge. The stated purpose of this unusual structure

9 was to protect the company's ability to stick to its

10 original mission, and the board's mandate was to uphold

11 that mission."

12     A. Yes.

13     Q. "It was unprecedented, but it seemed worth

14 trying. Unfortunately, it didn't work."

15     What did not work about the for-profit

16 subsidiary structure?

17     A. I think what I described before about -- I do

18 think the -- the reason I say that we went in cautiously

19 optimistic about the structure itself -- I mean, the

20 structure was being conceived of when I joined the

21 company. As I said, I joined when it was still a

22 non-profit, so I was there -- came in kind of like right

23 before it -- it transitioned.

24     And I think, structurally, we were optimistic.

25 I was optimistic upon coming in and Helen, as she said

## Page 134

1 in this article as well, that that structure would lend
2 itself a good chance of self-governance if we were
3 achieving the necessary leadership buy-in.
4          And that's the piece that I think didn't work
5 about this.  I think the piece that didn't work was that
6 we did not have confidence that we could properly
7 oversee as -- as was mandated for us.  Our -- one of
8 our, you know, primary duties as board members was to
9 oversee the activities of the non-profit and ensure that
10 the activities were happening in accordance with the
11 non-profit's mission.  Since we determined that we
12 couldn't rely on information we were receiving, we
13 didn't think we could do that.
14    Q.   The article mentions that "the stated purpose
15 of the for-profit subsidiary was to protect the
16 company's ability to stick to its original mission."
17    A.   Um-hum.
18    Q.   Do you think that the for-profit subsidiary had
19 an alternative purpose that was different from that
20 stated purpose?
21    A.   Yeah.  Well, the stated purpose of the unusual
22 structure, the combination, this capped-profit structure
23 with the non-profit on top of it, was to protect the
24 company's ability to stick to its original mission.
25          Apologies.  Ask the last part of your question

## Page 135

1 again, please.
2    Q.   Do you think that the for-profit subsidiary had
3 an alternative purpose that was different from that
4 stated purpose?
5    A.   I mean, the reason this structure was put in
6 place is because it's assumed that a for-profit is going
7 to be -- you know, like most for-profits, are maximizing
8 for a, you know, return to their shareholders.
9          What we wanted to put in place was that the
10 for-profit can pursue that goal, can pursue a return for
11 its shareholders, but the non-profit, at any moment if
12 it perceives that the activities of the for-profit are
13 not acting in accordance with the non-profit mission,
14 the non-profit can make a decision that is not
15 prioritizing the interest of shareholders.
16          So the for-profit itself, you know, the
17 activities I understand, you know, they can -- they can
18 freely pursue a profit, pursue a return for
19 shareholders, but if it's acting out of accordance with
20 the mission, the -- the non-profit board can make a
21 decision to intervene.
22    Q.   And in your opinion, did OpenAI fail to stick
23 to its original mission?
24          MR. SAVITT:  Objection.
25          THE WITNESS:  I -- I think, in my opinion, I

## Page 136

1 saw a number of instances that I would characterize as
2 not prioritizing the mission.
3    Q.   (By Mr. Hawes)  And so when you say it didn't
4 work in the article --
5    A.   Yes.
6    Q.   -- are you saying that OpenAI failed to stick
7 to its mission?
8    A.   I think the structure that was put in place
9 wasn't sufficient to -- well, I would say the -- the
10 combination of the structure and the behavior of -- of
11 the company's CEO, Sam, resulted in a number of
12 instances that I think I would characterize, as I said
13 before, the mission was not being prioritized.
14          And we had concern that that would continue to
15 happen, and we had very great concern that as stakes got
16 a lot higher, that would be potentially against the
17 interest of -- of the public.
18    Q.   Okay.
19          If you go to the next page in the article.
20    A.   Yep.
21    Q.   At the top, it says, "Last November, in an
22 effort to salvage this self-regulatory structure" --
23    A.   Yes.
24    Q.   -- "the OpenAI board dismissed its CEO, Sam
25 Altman."

## Page 137

1    A.   Um-hum.
2    Q.   "The board's ability to uphold the company's
3 mission had become increasingly constrained due to
4 long-standing patterns of behaviors exhibited by
5 Mr. Altman" --
6    A.   Um-hum.
7    Q.   -- "which, among other things, we believe
8 undermines the board's oversight of key decisions in
9 internal safety protocols."
10    A.   Yes.
11    Q.   Outside of everything we've already discussed
12 today, was there any behavior of Mr. Altman that you are
13 referencing in that paragraph?
14    A.   Yes.  I mean, as I -- as I mentioned, I think
15 there were a number of instances in my own interactions
16 and a number of instances referred to by other members
17 of the company where people had shared concerns with the
18 board, board members -- apologies -- about Sam's -- you
19 know, Sam's pattern of dishonesty, and I think those all
20 contributed to our understanding of this long-standing
21 pattern.
22          I think it's a pattern that we all had become
23 aware of over time on the board or, you know, the -- the
24 ones of us making this decision had become aware of,
25 I'll speak for them, for myself and -- as part of that

ELON MUSK, et al. v. SAMUEL ALTMAN, et al.
Case 4:24-cv-04722-YGR   Document 379-3   Filed 01/06/26   Page 16 of 22
SAMUEL ALTMAN                        Confidential                   Jacob McCauley
                                                                September 30, 2025

## Page 138

1  group, had become aware of in our time on the board, and
2  those many experiences informed our decision.
3      Q.   So if you go in the next sentence, do you see
4  where it says, "Multiple senior leaders had privately
5  shared grave concerns with the board" --
6      A.   Yes.
7      Q.   -- "saying they believed that Mr. Altman
8  cultivated a toxic culture of lying" --
9      A.   Um-hum.
10     Q.   -- "and engaged in behavior that can be
11 characterized as psychological abuse."
12     A.   Yes.
13     Q.   Is that accurate, to the best of your
14 knowledge?
15     A.   Yes.
16     Q.   Which senior leaders are you referring to?
17     A.   Let's see.  So a toxic culture of lying was
18 something said to me by Mira Murati.  And she had
19 spoken -- had conveyed a -- a large number of concerns
20 to the board in the weeks prior to Sam's firing.
21 Just -- this was one of the things she cited in a -- in
22 a conversation that I had with her where she was listing
23 a number of things.
24          Oh.  And the next one here, sorry, behavior --
25 she -- she also commented on abuse from Sam, although I

## Page 139

1  think this particular quote is referencing another
2  conversation with a previous -- a previous conversation
3  that I had with another -- another senior leader who --
4  Dario Amodei -- some years prior, who had talked about
5  psychological abuse as well.
6      Q.   If you look down at the second full paragraph
7  of that page --
8      A.   Yes.
9      Q.   -- and in the last sentence of that
10 paragraph --
11     A.   Yes.
12     Q.   -- do you see where it says, "We also feel that
13 developments since he returned to the company" --
14     A.   Yeah.
15     Q.   -- "including his reinstatement to the board
16 and the departure of" --
17          (Stenographer clarification.)
18     Q.   (By Mr. Hawes)  -- "senior safety-focused
19 talent board bode ill for the OpenAI experiment in
20 self-governance."
21          Why did you feel Mr. Altman's return to the
22 board boded ill for the OpenAI experiments in
23 self-governance?
24     A.   A big piece of what we were struggling with, I
25 think, when we were on the board, was -- was Sam's --

## Page 140

1  we -- we didn't feel that we could get the board to, I
2  think, a place of sufficient independence from Sam's
3  wishes, and so part of our -- one requirement we had
4  when we were leaving the -- the company and deciding on
5  the new composition of the board was that Sam not be on
6  the board, at least in that iteration of the board.  We,
7  obviously, couldn't control what the board chose to do
8  later, but we didn't want his influence on -- at least
9  those -- you know, the initials phase of the composition
10 of that board.  We were very concerned that he would --
11 he would take action that would make it favorable to
12 him, as we did experience.
13     Q.   And when you mention the departure of senior
14 safety-focused talent --
15     A.   Yes.
16     Q.   -- who were you referring to?
17     A.   A number of -- I mean, in the spring following
18 the firing, a large number of people left in a very
19 short period of time -- well, a significant number of
20 people left in a -- in a short period of time.  I think
21 much of the super alignment team, some of the senior
22 people there, some policy people, so that was -- that
23 was very concerning to us, and I think -- I think there
24 were some statements to the effect of why they left that
25 were consistent with some of the concerns that we had

## Page 141

1  had.
2           And there were a number of things, actually,
3  even -- even in addition to that that were happening at
4  the time with concerns about the -- some
5  non-disparagement clause.  I mean -- I think there were
6  three or four instances in -- in maybe a two-week
7  period, where a whole bunch of things were going on that
8  were concerning about OpenAI's state, and I think that's
9  what we were referring to here.
10     Q.   And then at the bottom of this page in the very
11 last sentence, it reads, "but even with the best of
12 intentions" --
13     A.   Yes.
14     Q.   -- "without external oversight, this kind of
15 self-regulation will end up unenforceable, especially
16 under the pressure of immense profit incentives."
17     A.   Yes.
18     Q.   Do you see that?
19     A.   Yes, I do.
20     Q.   In your view, was OpenAI facing immense profit
21 incentives?
22     A.   Yes.  I think OpenAI had the potential to be
23 extremely profitable in the longer term.
24     Q.   And do you think those profit incentives risk
25 compromising OpenAI's ability to carry out its mission

## Page 142

1  of developing safe AI?
2      A.   I do --
3           MR. SAVITT:  Objection.  Form.  Knowledge.
4  Speculation.
5           THE WITNESS:  I think that -- I think that
6  those profit incentives make it necessary that there
7  is -- there are checks and balances on how the decisions
8  are being made.  If -- if, you know, the company is
9  going to talk about itself as a mission-oriented company
10 with an independent board over it, if it's presenting
11 itself that way, then -- then, absolutely, it needs to
12 be able to show that it can actually provide the
13 structure needed to -- to work against the profit
14 incentives.
15          You know, if it were a purely for-profit
16 company, you know, it's kind of a different question.
17 The mandate we had was this particular structure made it
18 so that we needed to be able to make informed decisions,
19 and we didn't feel we could.
20          MR. HAWES:  Okay.  Thank you very much.
21          We will reserve the remainder of our time and
22 pass the witness.
23          THE WITNESS:  Thanks.
24          MR. HAWES:  And if we all agree, should we take
25 a break and go off record for lunch?

## Page 143

1           THE VIDEOGRAPHER:  All right.
2           We're off the record.  The time is 1:53 p.m.
3           (Lunch recess from 1:53 p.m. to 2:46 p.m.)
4           THE VIDEOGRAPHER:  We're back on the record.
5  The time is 2:46 p.m.
6           MR. SAVITT:  Thank you.
7                     EXAMINATION
8  BY MR. SAVITT:
9      Q.   Good afternoon, Ms. McCauley.  My name is
10 William Savitt.  I represent the OpenAI defendants.
11 Appreciate you being available.
12     A.   Thank you.
13     Q.   Could you summarize for the record your
14 educational history since high school.
15     A.   Sure.  Since high school, I went to Bard
16 College for my undergraduate, and I got an MBA from USC
17 for graduate school.  Those are my degrees.
18     Q.   What was your major at Bard?
19     A.   I studied both Latin American political science
20 and sort of foreign languages, yeah.
21     Q.   And since -- did you go to USC for the MBA
22 immediately following completion --
23     A.   No, no.
24     Q.   -- of your degree at Bard?
25     A.   No.  Let's see.  I graduated from USC in 2014,

## Page 144

1  so about ten years later -- I finished ten years later.
2      Q.   Thank you.
3           So summarize for me as well, please, your work
4  history since -- since college.
5      A.   Sure.  I've had jobs in a number of different
6  areas.  Let's see.  I was working for a period of time
7  following college in alternative energy and specifically
8  around --
9           (Stenographer clarification.)
10          THE WITNESS:  I was working -- I was working
11 for an organization that worked on alternative energy,
12 and I had a period of time thereafter where I was
13 working in real estate.
14          I, in my mid 20s, became interested in
15 robotics.  I started focusing on -- on robotics and went
16 to a program focused kind of on robotics and AI and --
17 it wasn't a -- this was -- this was sort of, like, a
18 summer graduate program for the study of exponential
19 technologies, robotics and AI.  That kind of furthered
20 my interest in robotics.  I went and did some
21 post-baccalaureate coursework around that but didn't
22 pursue a degree in it.
23          Then started with some colleagues who I met
24 through that program -- well, I actually -- sorry.  I
25 was a student there and then came back.  This was at

## Page 145

1  Singularity University at NASA Ames, NASA Research Park,
2  in -- in Northern California, and I came back there as a
3  teaching fellow for a subsequent program and sort of ran
4  a lab there.
5           And through some of the people that I met
6  there, we started a small robotics company doing kind of
7  consumer robots, telepresence robots, and I -- I think,
8  in the interim, also had a position, like, a -- at kind
9  of an engineering company called Applied Minds, but I
10 was fairly short term.  It was just an internship.
11          Then I was with that robotics company for --
12 for a number of years.
13          And, let's see, I went back to do my MBA --
14 let's see.  So the robotics company was -- started in
15 2011, and then in -- I started my MBA in 2013, completed
16 that in 2014.
17          I took a period of time off after I had my
18 first baby -- I was leaving the robotics company at that
19 time, had a baby in 2015, and took a period of time off
20 after that.
21          And then I was -- then I was on the board of
22 another company called GeoSim that I had been an
23 investor in, and then I eventually became -- took a role
24 there and eventually became CEO of that company and did
25 that for a period of time.

## Page 254

1    Q.   (By Mr. Savitt)  And, ultimately, Altman did
2  come back.
3    A.   That's right.
4    Q.   And you and the other directors agreed that he
5  should come back.
6         MR. HAWES:  Objection to form.
7         THE WITNESS:  The other directors and I agreed
8  that of the options available to us at the moment -- at
9  the moment of decision, around that, that that was the
10  option that was most consistent with the mission,
11  because we thought if the alternative truly was that
12  OpenAI would disintegrate, that would not best serve the
13  mission.
14         We also, of course, you know, had our very, you
15  know, clear concerns around Mr. Altman; and a part of
16  the negotiation process was to -- was centered around
17  helping make -- helping make sure that he had the best
18  chance of being governed going forward.
19    Q.   (By Mr. Savitt)  Pair -- fair enough.
20         But I want to make sure I get this narrow a
21  point.
22    A.   Yeah.
23    Q.   You agree that Altman could not have been
24  reinstated without the approval of the board as it was
25  then constituted, which was you and three others;

## Page 255

1  correct?
2         MR. HAWES:  Objection to form.
3         THE WITNESS:  I -- I agree.
4    Q.   (By Mr. Savitt)  Thank you.
5         And you talked about trying to put a better
6  governance program in place looking ahead; you mentioned
7  that or words to that effect, fair, Ms. McCauley?
8    A.   Yes.
9    Q.   And was part of that getting some interim
10  directors in place that you had confidence in?
11    A.   Yes.  Yes, part of that was getting some
12  interim director -- you know, to answer that question is
13  not straight -- not entirely straightforward, because I
14  think the directors that we chose had some -- had some
15  evidence that they might be able to offer good
16  governance, and I had, you know, also points of concern.
17         So I think of the options that we had of the
18  composition that we were able to agree on, that seemed
19  like the most reasonable option.
20    Q.   You -- you and your fellow directors agreed
21  that Bret -- Bret Taylor and Larry Summers would become
22  directors; correct?
23    A.   Yes.
24         MR. HAWES:  Objection to form.
25    Q.   (By Mr. Savitt)  And you also agreed that

## Page 256

1  Mr. D'Angelo would stay on as a director.
2    A.   That's right.
3    Q.   And that those three would comprise the board
4  after Altman was reinstated.
5    A.   That's right.
6    Q.   You -- do you have any reason to doubt the
7  integrity or independence of Bret Taylor or Larry
8  Summers?
9         MR. HAWES:  Objection to form.
10         THE WITNESS:  I did have -- as I said, I had --
11  I think there were pros and cons in each case.  As we
12  weighed it out -- you know, part of what we really
13  wanted to have happen there was that Adam could -- you
14  know, one of the existing directors, which was Adam,
15  that Adam would be able to stay on the board, and that
16  meant that the other members being chosen had to be, you
17  know, pretty amenable to the folks negotiating on the
18  other side; and for that reason, we had to consider our
19  options and consider the pros and cons of each.
20         I did have, you know, I did have concerns.  I
21  knew -- I had more context on Bret Taylor than I did on
22  Larry, and I had concerns about his ability to be --
23  yeah, to make disinterested decisions in a way that
24  was --
25         (Stenographer clarification.)

## Page 257

1         THE WITNESS:  -- wasn't partial to Sam.  I
2  mean, you know, we had -- he had been proposed by Sam
3  for the board previously when we were there and when we
4  were going through the process of expanding the board.
5  And by the best of my recollection, you know, Sam had --
6  had made recommendations on a number of different
7  people.  He was favorable to Bret Taylor.
8         If I recall correctly, Adam had -- I think I
9  recall correctly that Adam had interviewed Bret in the
10  process of considering other candidates, and that one of
11  the -- prior to all of this -- sorry -- like, in the
12  process that we were running over this -- you know, in
13  the months prior, when we were trying to expand the
14  board; and at that time, that -- one of the take-aways
15  from that conversation was that -- I think -- I'm going
16  to try to recall this exactly as possible, but it was --
17  I think Bret may have expressed concern that -- concern
18  around the -- the conflicts.  I think that he had said
19  he had known Sam for a very long time and had a lot of
20  connections to Sam and whatnot.
21         So at the time, that was something in the
22  process of the board expansion that we were aware of;
23  and, you know, that -- that was what I would have
24  considered a con.  We -- we did not want board members
25  who were going to be overly partial to Sam.

## Page 258

1       Again, you know, from my perspective, we had
2 various trade-offs we had to weigh in this situation,
3 and I knew that we weren't going to -- or that we were
4 very unlikely to get a board composition that was
5 perfectly acceptable to us according to our preferences
6 for the board.
7       We had been trying for many, many, many months
8 to do so as directors, to even get an additional number
9 that we could all agree on, so --
10     Q.   (By Mr. Savitt)   So, ultimately, you approved
11 Mr. Taylor, notwithstanding those concerns.
12     A.   Yes.
13     Q.   And you also approved Mr. Summers.
14     A.   That's right.
15     Q.   And they became the board.
16     A.   And they became the board.
17     Q.   And the determination to reinstate Altman was
18 accompanied by an undertaking that would be an inquiry
19 into the circumstances leading to his firing; is that
20 correct?
21     A.   That's right.   Yes.
22     Q.   And the Wilmer Hale firm conducted that
23 inquiry.
24     A.   That's right.
25      MR. HAWES:   Objection.

## Page 259

1     Q.   (By Mr. Savitt)   Do you have any reason to
2 doubt the integrity or independence of the attorneys who
3 conducted that inquiry?
4      MR. HAWES:   Objection to form.
5      THE WITNESS:   I don't -- I don't have specific
6 reason to -- you know, let me say that the way they --
7 the interview process was conducted, did give me, you
8 know, concerns on -- it didn't happen in a way that I
9 think was consistent with what we were hoping for when
10 we agreed upon having an independent investigation.   It
11 was out of our control at that point, and OpenAI was the
12 one then commissioning --
13      (Stenographer clarification.)
14      THE WITNESS:   -- the -- it was like a special
15 committee of the board of OpenAI that was commissioning
16 that investigation.
17      What we were hopeful would happen with that
18 investigation was that a report would be produced and
19 that more information would be made public.   And from
20 what we learned about the process, the -- it doesn't
21 seem that a report was, you know, produced, and the --
22 the directors -- I have questions about --
23      MR. SAVITT:   I'll withdraw the question.
24      THE WITNESS:   Maybe we can -- yeah.   Is that
25 all right?   Sorry.

## Page 260

1     Q.   (By Mr. Savitt)   I just want to move on.   I
2 have a lot of things to ask you, and it's getting late.
3     A.   Yeah, that's okay.   That's okay.
4     Q.   So I think I have the gist of your answer.
5 Thank you.
6      You -- you met with the attorneys from Wilmer
7 Hale who conducted the investigation.
8     A.   I did.
9     Q.   I'm not asking about the substance of it, but
10 were you given the opportunity to tell them everything
11 that you knew or that you thought that you had seen?
12     A.   Yes.
13     Q.   You -- you mentioned that as part of the
14 board's lack of candor a statement by Altman regarding
15 the review of GPT-4 Turbo by the DSB.
16      Do you recall that?
17      MR. HAWES:   Objection.   Form.
18      THE WITNESS:   Sorry.   Could you -- could you
19 ask --
20     Q.   (By Mr. Savitt)   I'm asking about -- what's the
21 DSB?
22     A.   The deployment safety board, the joint board
23 between Microsoft and OpenAI.
24     Q.   Thank you.
25      And do you recall talking about the review of

## Page 261

1 GPT-4 Turbo by the DSB?
2     A.   Yes.   Well -- yes.
3     Q.   And you -- do you recall attributing a lack of
4 candor to a statement by Altman regarding the review of
5 the GPT-4 Turbo by the DSB?
6      MR. HAWES:   Objection to form.
7      THE WITNESS:   The issue with the GPT-4 Turbo
8 DSB review was that Sam had, you know, communicated
9 with -- with the CTO, indicating that this particular
10 product might not need to go through the DSB review.
11      So I'm just to clarify your question about lack
12 of candor.   This would have been -- I would have
13 described it as, you know, him communicating with a
14 couple of senior leaders in a way that seemed like he
15 wasn't being truthful with them, and then the board was
16 also unaware of that interaction and unaware that there
17 was potentially an attempt to slide this model past DSB
18 review.
19     Q.   (By Mr. Savitt)   And everything you know about
20 that you learned from Mr. Sutskever through a few
21 screenshots in his document; correct?
22     A.   Yes.
23      MR. HAWES:   Objection to form.
24      THE WITNESS:   Yes.
25     Q.   (By Mr. Savitt)   And in inquiring about this,

## Page 262

1  the board didn't talk with Kwon or Altman about what had
2  happened; right?
3           MR. HAWES: Objection to form.
4           THE WITNESS: Correct.
5       Q.   (By Mr. Savitt) And the GPT-4 Turbo was not an
6  entirely new model, was it? It was just an extension of
7  GPT-4; right?
8           MR. HAWES: Objection to form.
9       Q.   (By Mr. Savitt) Right?
10      A.   It was a -- yes, it was an extension of --
11      Q.   And GPT-4 --
12          MR. HAWES: Counsel, let her finish her answer.
13          THE WITNESS: Apologies.
14      Q.   (By Mr. Savitt) And GPT-4 did go through DSB
15  review, didn't it?
16      A.   You know, this was a different implementation
17  of GPT-4 and --
18      Q.   My question was whether GPT-4 had gone through
19  DSB review.
20      A.   GPT-4 did, although this GPT-4 Turbo was also
21  required to go through DSB review. And by this
22  conversation, I think Sam was trying to indicate that
23  maybe it didn't need to go through.
24      Q.   This conversation that was reported to you from
25  a few screenshots --

## Page 263

1      A.   That I saw screenshots --
2      Q.   -- from a document that Sutskever proposed to
3  you --
4          MR. HAWES: Objection.
5      Q.   (By Mr. Savitt) -- without any of the context
6  and leaving out other parts of the conversations.
7  That's what you relied on; right?
8          MR. HAWES: Objection to form.
9          THE WITNESS: I know the parts of the
10  conversation that I saw, and also I had conversations,
11  you know --
12      Q.   (By Mr. Savitt) But you didn't talk with a lot
13  of other people, did you? You just relied on a couple
14  of screenshots; that's what you did.
15          MS. PETTI: Objection. Objection.
16      Q.   (By Mr. Savitt) Did you know that GPT-4 Turbo
17  did go through the DSB review?
18          MR. HAWES: Objection to form.
19          THE WITNESS: It may have --
20      Q.   (By Mr. Savitt) Did you know it was ultimately
21  approved --
22          MR. HAWES: Counsel --
23          MS. PETTI: If you could let her finish.
24      Q.   (By Mr. Savitt) I'll withdraw the question and
25  ask you another one.

## Page 264

1       Do you know that GPT-4 Turbo was ultimately
2  approved by the DSB?
3      A.   That doesn't -- I'm sorry.
4          (Unreportable cross-talk.)
5          (Stenographer clarification.)
6      Q.   (By Mr. Savitt) Do you think the release of
7  GPT-4 Turbo was a mistake?
8      A.   That's not the issue at hand. It's not --
9      A.   That was my question.
10      A.   I think I don't consider the release of GPT-4
11  Turbo unsafe.
12      Q.   Thank you.
13      A.   And I would like to elaborate that that wasn't
14  the question at hand. The question that we were
15  considering in that was, was the process sufficient to
16  make sure that we could be ensured that models then and
17  going forward into the future would be handled and put
18  through a process of safety review in a way that was
19  sufficient and -- and acceptable to the board and that
20  indicated that --
21      Q.   I understand.
22      A.   Yes.
23      Q.   I understand.
24       Let me -- let's talk about another one, the
25  important aspects of your investigation. You mentioned

## Page 265

1  an issue regarding GPT-4 in India.
2       Do you recall that?
3      A.   I do.
4      Q.   That involved a limited test of a product.
5       Do you remember that?
6      A.   Um-hum.
7      Q.   And you know that it was not OpenAI who
8  released the product?
9          MR. HAWES: Objection to form.
10          (Unreportable cross-talk.)
11          (Stenographer clarification.)
12          MS. PETTI: Tasha, you can answer.
13          THE WITNESS: I do, and I think that was a
14  particular, you know, point of concern; that the, you
15  know, purely commercial partner was able to release a --
16  a limited version of the product to an unapproved
17  audience after the joint DSB, the joint deployment
18  safety board, had not determined that that was
19  appropriate to do, and we were not informed about it.
20       That was, yes, definitely concerning.
21      Q.   (By Mr. Savitt) And you didn't ask Mr. Altman
22  about it, did you?
23          MR. HAWES: Objection.
24          THE WITNESS: There was, you know, in the
25  course of that full-day board meeting that we were

## Page 286

1      A.   Could you ask the question one more time,
2   please.
3      Q.   Sure.
4           In the days following Mr. Altman's firing, was
5   it your understanding that OpenAI had the final say on
6   any decisions about who would be added to the OpenAI
7   board?
8      A.   Yes.
9      MS. PATEL:  Okay.  Thank you.
10      I think I will pass the witness.
11      THE WITNESS:  Thank you.
12      MR. HAWES:  Mind going off the record briefly?
13      THE VIDEOGRAPHER:  We're off the record.  The
14   time is 6:33 p.m.
15           (Recess taken from 6:33 p.m. to 6:44 p.m.)
16      THE VIDEOGRAPHER:  We're back on the record.
17   The time is 6:44 p.m.
18           EXAMINATION
19   BY MR. HAWES:
20      Q.   Ms. McCauley, what month and year did you join
21   OpenAI?
22      A.   November of 2018.
23      Q.   And at that point, OpenAI had already been in
24   existence for approximately three years; is that
25   correct?

## Page 287

1      A.   Yeah.  It was founded in 2015.  Yeah, that's my
2   recollection.
3      Q.   You don't have any personal knowledge about the
4   extent of Mr. Musk's involvement at OpenAI during those
5   three years, do you?
6      A.   Not -- not much.  I, you know, have bits of
7   information that I heard, but I wasn't there, so --
8      Q.   You just testified that Mr. Musk made financial
9   contributions to OpenAI before you joined; is that
10   correct?
11      A.   That was, yes, reported to me, yes.
12      Q.   Are you aware Mr. Musk continued to pay rent
13   for OpenAI at the Pioneer building even after he left
14   OpenAI in 2018?
15      MR. SAVITT:  Objection.
16      THE WITNESS:  I -- we shared an office space
17   with Neuralink, and I don't know if you're referring to
18   the fact that that company -- that company's rent was
19   being paid for.  Could you specify.  I'm sorry.  I'm
20   just --
21      Q.   (By Mr. Hawes)  Just trying to understand your
22   knowledge.
23           Are you aware of whether Mr. Musk continued to
24   pay rent for OpenAI even after he left in November of
25   2018?

## Page 288

1      A.   I'm -- I don't recall that.  I'm not aware of
2   that.
3      Q.   Do you know whether he continued to make those
4   payments through 2020?
5      A.   I -- I do not.  I do not know that.
6      Q.   You don't know?
7      A.   I don't know.
8      Q.   Okay.
9           You testified earlier about various
10   incidents --
11      A.   Yes.
12      Q.   -- reported in the "Wall Street Journal"
13   article that we reviewed that caused you to doubt
14   Mr. Altman's truthfulness and candor to the board.
15           Do you remember that?
16      A.   I do.
17      Q.   Was one of those incidents Mr. Altman's
18   foot-dragging over adding an AI safety expert to the
19   board?
20      A.   That -- that was -- you know, I think the fact
21   that that process was unable to result in adding
22   independent members and an AI safety member to the
23   board, it exacerbated our concerns, yes.
24      Q.   And was another one of those incidents that --
25   Mr. Altman's representation that the three enhancements

## Page 289

1   to GPT-4 had all been approved by the safety board?
2      A.   Yes, that was a factor.
3      Q.   Was another one of those incidents Mr. Altman's
4   failure to disclose that a GPT-4 test was released in
5   India without joint safety board review?
6      MR. SAVITT:  Objection.
7      (Stenographer clarification.)
8      Q.   (By Mr. Hawes)  I'm sorry.  Could you answer
9   whether that was another incident.
10      A.   Yes.
11      Q.   And was another incident whether -- excuse me.
12   Strike that.
13           Was another incident Mr. Altman's failure to
14   inform the board prior to ChatGPT's release?
15      MR. SAVITT:  Objection.
16      THE WITNESS:  Yes.
17      Q.   (By Mr. Hawes)  And was another incident
18   Mr. Altman's misrepresentation about you allegedly
19   saying Ms. Toner should obviously leave the board?
20      A.   Yes.
21      MR. SAVITT:  Objection.
22      Q.   (By Mr. Hawes)  And was another incident
23   Mr. Altman's misrepresentation that the legal department
24   told him GPT-4 Turbo did not need safety board review?
25      MR. SAVITT:  Objection.

Case 3:24-cv-04722-IST    Document 179-35    Filed 01/06/26    Page 22 of 23
El Segundo-1    v.    2025-09-30-TW Document 179-356-3    Filed 01/06/26    Page 22 of 23    Teresa McCauley
SAMUEL ALTMAN                                    Confidential                                    September 30, 2025

## Page 290

1    THE WITNESS:  Yes, that -- that we saw
2    screenshots to that effect.
3        Q.    (By Mr. Hawes)  And did those six incidents
4    cause you concern about Mr. Altman's commitment to AI
5    safety?
6        MR. SAVITT:  Objection.
7        THE WITNESS:  It caused me concern about our --
8    those and -- and I think a broader pattern that we were
9    observing, you know, through -- you know, this broad
10   pattern caused us concern that we would not
11   appropriately be able to oversee the -- the for-profit,
12   and that had, you know, implications for safety.
13       Q.    (By Mr. Hawes)  Okay.
14       A.    I can't speak to his personal commitment to
15   safety.  I don't know what he was thinking about that,
16   but it did -- it did definitely affect my -- my
17   impression of how capable we would be of upholding the
18   mission of the non-profit, yes.
19       Q.    Okay.
20            So did Mr. Altman's handling of those six
21   incidents impair the board's ability to manage AI safety
22   risks?
23       A.    I do believe it impaired our -- our ability to
24   do so with respect to -- to OpenAI and OpenAI's
25   activity.

## Page 291

1        Q.    And did those six incidents also cause you to
2    question whether Mr. Altman was prioritizing commercial
3    interests over AI's -- OpenAI's mission?  Excuse me.
4        MR. SAVITT:  Objection.
5        THE WITNESS:  It did -- they did cause me to
6    question -- to question that.
7        Q.    (By Mr. Hawes)  And did those six incidents
8    contribute to the view you expressed in your "Economist"
9    op-ed, that self-governance at OpenAI had not reliably
10   withstood the pressure of profit incentives?
11       A.    Those did, yes.
12       MR. HAWES:  Okay.
13       Thank you very much.
14       THE WITNESS:  Thank you.
15       MR. HAWES:  We pass the witness.
16       Do you want to go off the record?
17       MR. SAVITT:  No.  This will be super quick.
18       THE WITNESS:  Okay.
19            EXAMINATION
20   BY MR. SAVITT:
21       Q.    Notwithstanding those six incidents,
22   Ms. McCauley, you reached the conclusion that it was
23   better to reinstate Mr. Altman with the governance
24   revisions that your and your fellow directors
25   instituted, as compared to allowing OpenAI to

## Page 292

1    disintegrate; correct?
2        A.    Yes.
3        Q.    And you made the decision to reinstitute
4    Mr. Altman as CEO, believing it was in the best interest
5    of OpenAI and its mission; correct?
6        A.    I guess as compared to the alternative of the
7    company falling apart.
8        Q.    And that was the alternative that appeared to
9    be available; correct?
10       MR. HAWES:  Objection to form.
11       THE WITNESS:  That -- that it appeared
12   possible.
13       Q.    (By Mr. Savitt)  Okay.
14            Do you think Elon Musk would make a -- an
15   effective steward of an organization like OpenAI?
16       MR. HAWES:  Objection.  Beyond the scope.
17       THE WITNESS:  Can you clarify more what you
18   mean about what -- what his role might be.  Could you
19   clarify.
20       Q.    (By Mr. Savitt)  Do you think -- do you think
21   he's someone that one could rely upon to seek to bring
22   about artificial intelligence for the benefit of
23   humanity?
24       MR. HAWES:  Objection.  It's well beyond the
25   scope, as well as to form.

## Page 293

1    THE WITNESS:  Do I proceed to answer?
2    MS. PETTI:  Yeah.
3    THE WITNESS:  Okay.  Sorry.
4    I don't -- I don't have very much personal
5    knowledge of -- of Mr. Musk, so I -- that's a difficult
6    thing for me to say.  So much of that determination
7    would be based on me knowing -- well, I don't think I
8    have enough information to say.
9    MR. SAVITT:  Okay.
10   I have nothing more for this witness.
11   THE WITNESS:  Thank you.
12   MR. HAWES:  Nothing from us either.
13   MS. PATEL:  Nothing further from us either.
14   MR. KRY:  Just before we go off the record,
15   there was -- we're going to designate under the
16   protective order --
17        (Stenographer clarification.)
18   MR. KRY:  -- the testimony with respect to
19   Shivon Zilis that came up.
20   MS. PETTI:  What is the standard
21   confidentiality --
22   MR. SAVITT:  Highly confidential  --
23        (Unreportable cross-talk.)
24        (Stenographer clarification.)
25   MR. SAVITT:  We don't need this on the record.