

March 3, 2026

**Sent via ECF**

Hon. Ona T. Wang
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**Orrick, Herrington & Sutcliffe LLP**
222 Berkeley Street
Boston, MA 02116
+1 617 880 1800
**orrick.com**

**Laura B. Najemy**
**E** lnajemy@orrick.com
**D** +1 617 880 1889
**F** +1 617 880 1881

RE:     *In Re: OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-md-03143, This document relates to: *The New York Times Co. v. Microsoft Corp. et al.*, No. 1:23-cv-11195

Dear Judge Wang:

Pursuant to Section IV.b of Your Honor's Individual Practices and Local Civil Rule 37.2, Microsoft respectfully requests a conference concerning The New York Times's refusal to produce certain key categories of information: (1) core subscription data necessary to evaluate The Times's claim of harm from substitution; and (2) documentation relating to "brand tracker" surveys about substitution of GenAI products for The Times's content. In connection with this request, Microsoft also seeks a 3-hour 30(b)(6) deposition of The Times on each of these topics.

The Times alleges harm from substitution, specifically that: "Defendants' unlawful conduct threatens to divert readers, including current and potential subscribers, away from The Times, thereby reducing [] subscription … revenues[.]" NYT ECF No. 585 (Second Am. Compl.) ¶ 164. Its witnesses have also claimed diversion of subscribers in recent depositions, citing internal data from surveys conducted during this litigation. *See, e.g.*, Ex. I (Sulzberger Tr.) at 243:14-25 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Yet, as publicly reported, The Times's subscriptions (and associated revenue) have consistently ***gone up*** year-over-year following the release of Defendants' GenAI tools—even exceeding internal projections. *Compare* Ex. A at 3 (NYT Q4 2022 Earning Results, reporting 9.55M subscribers and $414.1M in subscription revenue); *with* Ex. B at 1, 4 (NYT Q4 2025 Earning Results, reporting 12.78M subscribers and $510.5M in subscription revenue). This leaves The Times claiming that it would have done even better, or that even if the harm has not occurred yet, it is likely to occur sometime in the future. *See, e.g.*, Ex. M (Sheridan Tr.) at 203:22-204:12; Ex. N (Yang 30(b)(1) Tr.) at 7:16-23.[1]

Either contention is one that Microsoft must be allowed to test through (1) an analysis of The Times's various subscription data metrics,[2] and (2) a comprehensive review of the reliability of

---

[1] Citations to Exhibits C, L, and N (the Yang and Bardeen rough deposition transcripts) correspond to the internal transcript page numbers, not the PDF page numbers.

[2] The Times tracks "audience" data related to digital readership and user behavior, including: the total numbers of users, the rates at which individuals convert to become registered or subscribed users, and overall cancellation rates. The Times classifies its readership into three categories of users: (1) anonymous, (2) registered, and (3) starts (*i.e.*, the number of Times subscriptions or subscribers). Ex. C (Yang 30(b)(6) Tr.) at 9:4-25, 17:3-16.

the internal surveys The Times now hangs its hat on. Without its audience and survey data, The Times cannot prove harm from subscriber substitution. As The Times plainly intends to rely upon this audience and survey data in support of its theory of subscriber harm, these documents should have been produced long ago in response to multiple outstanding requests for production.

Accordingly, Microsoft requests the Court compel The Times to produce the following documents:

(A) **Subscription Data Metrics:** An export of monthly data from 2015 to 2025 covering The Times's: (1) overall anonymous, registered, and subscribed users; (2) paywall conversion rates for anonymous and registered users; (3) weekly and monthly active users broken out by these three groups; (4) conversion and registration rates for anonymous and registered users; (5) overall churn and cancellation rates; and (6) conversion rates from Defendants' GenAI tools referral traffic.

(B) **Survey Support:** All documents relating to surveys The Times has run relating to its readers' usage of GenAI (including Defendants' products) and the extent to which such readers have indicated that GenAI could replace or substitute for Times content, including: (1) all survey instruments, and (2) documents sufficient to explain all aspects of the survey methodology.[3]

In addition to these productions, Microsoft seeks leave to conduct a 3-hour deposition on each of these topics with a properly prepared Rule 30(b)(6) witness.

### The Times Must Be Compelled To Produce All Relevant Subscription Data Metrics

Not until the very last day of fact discovery—during the deposition of Hannah Yang, The Times's Chief Growth and Customer Officer, and sole Rule 30(b)(6) deponent on overall subscription metrics—did it become clear that The Times has not produced the raw data necessary to make (in Ms. Yang's words) what The Times apparently views as an "███████████ ███████" of The Times's subscription conversion rates (*i.e.*, the rate at which anonymous or registered users convert to become subscribers) at different periods of time. Ex. C (Yang 30(b)(6) Tr.) at 134:21-135:24. Understanding whether that conversion rate has increased (as standalone Times Board documents show) or decreased (as The Times appears to be claiming) is essential to determine whether there is *any* support for The Times's theory of harm with respect to subscription rates over the past few years. Indeed, this is a threshold inquiry before one even gets to understanding whether any such harm was in fact *caused* by Defendants' GenAI tools or was the result of something entirely different. What Ms. Yang made clear, however, is that The Times *does* have the requisite data in order to make an "████████████" comparison, which is exactly what Microsoft seeks to understand.

Microsoft requested production of this missing subscription data at Ms. Yang's deposition, and sought to confer thereafter, but The Times would not make itself available to speak until Wednesday, March 4—after the deadline for motion practice. Microsoft will continue to work in good faith with The Times to resolve this dispute, but given that the parties are at functional impasse, Microsoft now seeks the Court's assistance to preserve its rights.

---

[3] By "methodology," Microsoft refers to the target population, sampling method(s), questionnaire design, method(s) for data collection and analysis, time and duration of survey, form or format of survey, and survey delivery method(s). Additionally, to the extent The Times intends to rely on any other surveys at summary judgment or trial, Microsoft requests production of these same materials for each such survey.

*This data is fundamental to the fair use analysis and essential to test The Times's theories of harm.* The Times has broadly alleged that "Microsoft's products … reduce the need for users to visit the websites that the Microsoft product relied on when providing its response" and consequently "users have a lower incentive to click on the underlying links[,]" which it claims impacts *some* of The Times's subscription metrics. Ex. D (NYT Supp. Resp. to MSFT ROG No. 15) at 5. The data Microsoft seeks would test whether there is any relevant diminution in subscriptions, or more likely establish a lack of any discernible effect on the market for The Times's copyrighted works resulting from Defendants' products (in support of Microsoft's fair use defense). *See* 17 U.S.C. § 107(4).

The data is responsive to at least the following Microsoft requests for production: number of monthly subscribers (RFP No. 59); increases, decreases, fluctuations, or changes in subscription rates to The Times (RFP No. 74); the rate at which Times readers who encounter a paywall convert to a trial, digital subscription, or otherwise become registered users (RFP No. 143); and documents to support The Times's contentions that it lost profits, including subscriber information and sales data (RFP No. 153).[4] Ex. E at 42; Ex. F at 6, Ex. G at 6-7, 13. While The Times has produced some Board presentations that reflect anonymous and registered users' conversion rates at different time periods—as Ms. Yang testified—these metrics are not necessarily standardized across time or by audience, and thus complicate an "████████" comparison. Ex. C (Yang 30(b)(6) Tr.) at 134:21-137:6. Given this testimony, The Times's underlying raw data is important to determining registered and anonymous user conversion rates in order to pressure test The Times's theory of harm to its subscriptions. In addition, Microsoft's motion covers all raw subscription data metrics to ensure that a proper, standardized analysis can be conducted of The Times's subscription metrics to fully test its various theories of harm. Microsoft is entitled to access to the same data The Times is using to support its claims and which it relies on in the regular course of business.

*Microsoft's requests are proportional to the needs of the case.* Microsoft's data requests are not unduly burdensome. *First*, Microsoft's request for raw subscriber metrics is sufficiently tailored to obtain the precise data underlying The Time's theories of harm relating to subscription metrics. Given that The Times has demonstrated how it tracks subscription data—and in other instances has readily exported similar raw data—The Times should have no difficulty providing the requested subscriber metrics. Indeed, Ms. Yang testified that she believes much (if not all) of this data is ████████████████. Ex. C (Yang 30(b)(6) Tr.) at 14:3-22; 15:8-21; 20:15-19. Pulling and producing data ██████████████████ should be straightforward. *Second*, specific to Microsoft's deposition request: requiring The Times to produce a Rule 30(b)(6) witness properly prepared to testify regarding subscriber data metrics is an efficient way to close out this outstanding discovery issue. *See, e.g.*, *Local 3621, EMS Officers Union v. City of N.Y.*, No. 18-cv-4476, ECF No. 246 at 1-2 (S.D.N.Y. Dec. 3, 2020) (ordering production of data and making "a Rule 30(b)(6) witness available to testify regarding the produced data[.]"). *Third*, "[t]he amount in controversy […] vastly exceeds the discovery cost at issue before the Court." *Patane v. Nestle Waters N. Am., Inc.*, No. 3:17-CV-1381, 2022 WL 603027, at *5 (D. Conn. Feb. 28, 2022); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003). The Times's mass-infringement allegations encompass millions of copyrighted works—potentially subjecting Defendants to extraordinary damages. Given the magnitude of its claims, The Times

---

[4] Microsoft also served a catch-all request for documents reflecting any harm or injury The Times claims to have suffered (RFP No. 56). Ex. E at 40-41.

cannot credibly argue that the costs of producing this raw data is disproportionate.

### *The Times Must Be Compelled To Produce All Information Regarding its GenAI Usage Surveys*

Despite months of conferrals regarding The Times's brand tracking surveys and other GenAI related surveys, the Times has still refused to provide the basic information about the surveys upon which it now relies. In the past few weeks all of its senior witnesses have testified that these internal "brand tracker" surveys conducted in 2024 and 2025—long after this litigation commenced—cause them to believe there is substitution by Defendants' products for their subscriptions.  The Times clearly intends to rely on these surveys to support its theory of subscriber harm.

The Times cannot be permitted to avoid the strictures of litigation surveys by reliance upon these "brand trackers" without production of the key information necessary to evaluate them. Without the survey instrument—the most basic information about what questions were asked—the method of administration, and the sample of respondents, it is not possible to evaluate these "brand trackers."  The Times cannot evade the requirements of FRE 702 and 703 by conducting new "internal" surveys while litigation is pending and then refusing to subject those surveys to any meaningful scrutiny.  The Times is attempting to pass off a survey that it cannot show meets the parameters of a properly conducted litigation survey as a run of the mill business record.  But the evidence is clear that The Times did not begin to run surveys testing its readers usage of GenAI (including Defendants' products) and their views of whether such tools could replace Times content until *after* this litigation began.  Accordingly, Microsoft requests that The Court compel The Times to produce the survey instruments and underlying methodology for the surveys it intends to rely on, or in the alternative, disclaim its reliance on these surveys.[5]

***Information regarding the survey instruments and methodology is essential.***  The Times has produced raw data and certain internal analyses for a series of surveys, including its Brand Tracker Surveys (including sub-brand trackers for Cooking, The Athletic, Wirecutter, and Games), and its AIG Qualitative GenAI Trust Diary Study and Qualitative ChatGPT Study.  It is apparent that The Times intends to rely on the results of these studies to show that consumers are using Defendants' tools in a substitutive way as a theory of harm, as evidenced by recent deposition testimony from Times witnesses.  *See, e.g.*, Ex. I (Sulzberger Tr.) at 243:14-25; 249:1-24 (███████████████████████ ████████████████████████████████████████████████████████████ ████████████); Ex. J (Yamada Tr.) at 21:11-24:8 (similar).  These surveys appear to include questions about respondents' usage of GenAI tools, including Defendants' products, and potential substitution of these tools for The Times's content.  Such surveys are directly relevant to several of Microsoft's requests for production, including requests that The Times agreed to produce responsive documents for without material limitation.  *See, e.g.,* Ex. E (Resps. to MSFT RFP Nos. 48 and 56) at 36, 40-41; Ex. H (Resp. to MSFT RFP No. 280) at 20-21.

While The Times has produced raw survey data and certain documents showing internal analyses of the survey results, it has not produced information regarding the methodology of these surveys or the survey instruments themselves (which would show the exact questions that were asked and any prepopulated responses).  Fundamental fairness dictates that The Times cannot rely on such surveys without allowing Microsoft to obtain the underlying data necessary to contest them.  These surveys were clearly conducted after The Times filed this litigation, and it cannot

---

[5] For all of these reasons, Microsoft requests the Court compel The Times to produce the same information (*i.e.*, all survey instruments and information regarding the survey methodology) for any survey that The Times intends to rely upon at summary judgment or trial.

shield itself from the requirements and strictures for a properly conducted litigation survey under the guise that these were run in the ordinary course of business.

The Times cannot rely on survey data if it does not provide the survey instruments so that Microsoft (and the Court) can "investigate the accuracy of the material." *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993), *aff'd*, 32 F.3d 690 (2d Cir. 1994); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 234 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) (noting that the wording of survey questions go to its overall trustworthiness); *Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*, 535 F. Supp. 2d 347, 367-68 (W.D.N.Y. 2008) (excluding survey where party failed to produce the underlying survey instrument).

*Additional testimony is necessary under the circumstances.*  The Times designated Sonia Yamada as a Rule 30(b)(6) witness to testify regarding, among other things, subscriber cancellation surveys and The Times's brand tracker reports which reflect public perception of The Times' brand based on consumer surveys.  Yet just last week, after Defendants deposed Ms. Yamada, The Times belatedly produced data that it claims demonstrates Times users view Defendants' products as a substitute for The Times's content and that Defendants' products negatively impact traffic to The Times, reduce subscribers, and negatively impact advertising.  *See* Ex. K (parties' email correspondence) at 2; *see also* Ex. L (Bardeen Tr.) at 145:5-146:9 (█████████); *id.*, at 188:22-189:17   (████████████████); Ex. I (Sulzberger Tr.) at 250:10-13 (███████████████).  Defendants are entitled to testimony about this belatedly produced data in addition to the survey instruments and documents explaining the survey methodologies, to test the veracity of what The Times claims the data purports to show.

*Microsoft's requests are not burdensome.*  The Times has not claimed that this information is irrelevant or would be burdensome to produce, resting instead on the unsupported conclusion that it has produced enough information.  *See* Ex. K (parties' email correspondence) at 3 ("Between the Brand Tracker Reports and the underlying survey data, you have the relevant information you need.").  More to the point, this is information that is uniquely in The Times's possession—Microsoft cannot reconstruct or replicate these surveys with the exact respondents who provided information to The Times in order to test their veracity or reliability.  And, as noted above, requiring The Times to provide an additional witness as to this data is reasonable and appropriate under the circumstances.

*       *       *

Microsoft respectfully requests that the Court compel The Times to (1) produce subscription metrics data (as identified above); (2) produce all documents related to the survey instruments and methodology for its Brand Tracker Surveys and its AIG GenAI Qualitative Study (and any other survey upon which The Times intends to rely at summary judgment or trial); and (3) order a 3-hour supplemental Rule 30(b)(6) deposition on each of these topics.

Respectfully submitted,
*/s/*
Laura B. Najemy
*Counsel for Defendant Microsoft Corporation*