# EXHIBIT 3
# (Redacted Version)

Case 1:23-cv-11195-SHS-OTW Document 1498 Filed 09/04/25 Page 1 of 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>THE NEW YORK TIMES COMPANY v. MICROSOFT CORPORATION, et al., No. 23-cv-11195 | 25-md-03143 (SHS) (OTW)<br><br>Hon. Ona T. Wang |

## DECLARATION OF MAXIME COHEN

I, Maxime Cohen, declare as follows:

1. I am the Scale AI Chair Professor and the Academic Director of the Bensadoun School of Retail Management at McGill University, where I have been a faculty since 2019. I have more than a decade of experience in academia and as a consultant and advisor in the private sector in data science and AI. I earned my Ph.D. from the Massachusetts Institute of Technology in 2015. I submit this declaration on behalf of OpenAI in support of its position statement regarding the hit count reports prepared pursuant to the court's August 19, 2025 order. I have personal knowledge of the facts set forth below and if called as a witness, could testify competently thereto. Should additional relevant documents or information be made available to me, I may adjust or supplement my opinions as appropriate. I also reserve the right to address any attempted rebuttal of my opinions.

### A. Background

2. I understand that this dispute relates to claims brought against OpenAI by plaintiffs in three cases: *New York Times Company v. Microsoft Corp., et al.*, *Daily News, LP v. Microsoft Corp., et al.*, and *Center for Investigative Reporting, Inc. v. OpenAI, Inc., et al.* (collectively, "News Plaintiffs" and, with OpenAI, the "Parties"). I understand that as part of this litigation, OpenAI plans to derive a sample of conversation data generated via OpenAI's ChatGPT Consumer service for analysis (the "**Merits Sample**"). I also understand that there is a dispute between the parties as to whether OpenAI's policy of retaining for no more than 30 days conversations generated by ChatGPT's "Temporary Chat" feature ("**Temporary Chats**") and conversations that ChatGPT users have manually deleted ("**Deleted Chats**") will bias the Merits Sample such that it contains fewer potentially pertinent conversations records.

3. I understand that pursuant to a court order, OpenAI began retaining all ChatGPT user logs generated on or after April 14, 2025, including all Temporary Chats and Deleted Chats, in segregated tables (the "**ChatGPT Consumer Preserved Data Table**"). I understand that the Court has directed OpenAI to draw four data samples from the ChatGPT Consumer Preserved Data Table, consisting of 5 million logs each, to search for an agreed-upon list of 142 terms in each sample, and to provide a report containing the number of logs in each sample where each term appears in the "prompt" or "output" fields. I also understand that the Court has directed OpenAI to report the number of logs in each sample that fall into four classification categories as determined by OpenAI's internal classification categories. I understand that those four samples are defined as follows:

i. The first sample is drawn from a population that includes all conversation records in the ChatGPT Consumer Preserved Data Table other than Temporary Chats and Deleted Chats.

Because this population corresponds to the population of data that OpenAI has historically retained, I will refer to this sample as the "**Retained Sample**."

ii. The second sample is drawn from a population that consists entirely of Temporary Chats. I refer to this sample as the "**Temporary Chat Sample**."

iii. The third sample is drawn from a population that consists entirely of Deleted Chats. I refer to this sample as the "**Deleted Chats Sample**."

iv. The fourth sample is drawn from a population that includes all conversation data in the ChatGPT Consumer Preserved Data Table, which includes both Temporary Chats and Deleted Chats in addition to all other chats. I refer to this sample as the "**All-In Sample**."

4. I have reviewed the hit counts OpenAI provided. For each sample, OpenAI provided a list of the 142 terms along with the number of logs in the sample in which each term appears in the "prompt" or the "output," as well as the number of logs in which each term appears in conjunction with the Compound News,[1] "paywall," or "pay wall" terms. OpenAI also provided a list of 12 privacy-related terms (the "**Privacy Terms**") and the number of logs in which each term appears in the "prompt" or the "output" of each sample. Per my assignment, my declaration does not include any analysis or conclusions on the samples with the Privacy Terms.

5. I have been asked to opine on whether those hit counts suggest that OpenAI's policy of retaining Temporary Chats and Deleted Chats for no more than 30 days is likely to result in a tangible economically significant "**Prejudicial Sampling Bias**." By Prejudicial Sampling Bias, I mean the kind of bias that will cause the Merits Sample to include fewer conversation records that may be potentially pertinent claims in this litigation, using the searches and classification

[1] The "Compound News" search term is "news_AND_(article*_OR_headline*_OR_breaking_OR_current_OR_summar*_OR_today_OR_yesterday_OR_week_OR_happen*_OR_occur*_OR_status_OR_update*)".

categories as a rough proxy for what may be potentially pertinent. By "tangible economically significant" I mean that the magnitude of the difference is substantial enough to lead to a meaningful Prejudicial Sampling Bias and this difference has a clear, consistent directionality.[2]

**B. <u>Analysis</u>**

*i. Differences Between Samples*

6. I have reviewed the March 31, 2025 letter from OpenAI's counsel (ECF No. 27-2) and, in particular, the table in that letter titled "Approximate Number of ChatGPT Free, Pro, and Plus Conversations." I understand that this table estimates the total number of ChatGPT conversations was roughly [redacted], and that roughly [redacted] of those conversations [redacted]) are Deleted Chats and roughly [redacted]% of those conversations [redacted]) are Temporary Chats. <u>Figure 1</u> below is a visualization of those numbers. In this figure, each blue dot represents roughly 11 million ChatGPT conversations. This figure is meant to be an illustration while reasonably preserving the different proportions reflected in the numbers reported above.[3]

---

[2] The hit counts on which I performed my analysis are not derived from the samples with the Privacy Terms.

[3] Figure 1 (as well as Figures 2 and 3) are visual representations of the data. Particularly, these graphics were produced by representing the total set of approximately [redacted] ChatGPT conversations as a collection of dots, with each dot representing roughly 11 million conversations. This approach resulted in approximately [redacted] dots being used to visualize the entirety of the dataset, with the allocation across categories as follows: [redacted] dots for Retained Chats, [redacted] for Deleted Chats, and [redacted] for Temporary Chats. For illustration of the attribute described in Figure 3, the red dots were distributed throughout the three samples as follows: [redacted] dots for Retained Chats, 1 for Deleted Chats, and 2 for Temporary Chats. These three numbers are hypothetical and aim to illustrate the point discussed below.

Figure 1: ChatGPT Conversation Scale




7. A good way to test whether OpenAI's policy of not retaining Temporary and Deleted Chats might cause Prejudicial Sampling Bias is to compare the Retained Sample and the All-In Sample. Because the **Retained Sample** is drawn from a population that includes all conversations *other than* Temporary and Deleted Chats, it represents the universe of data from which the parties will retrieve the Merits Sample. The Retained Sample represents the data population illustrated on the left of Figure 1 ("Retained Chats"). The **All-In Sample**, by contrast, is drawn from a population where Retained Chats, Temporary Chats, and Deleted Chats have all been combined into one pool, as illustrated below in Figure 2. This represents the universe of data that would be available for sampling "but for" the deletion of Temporary and Deleted Chats.

Figure 2: All-In Sample




8. If there is no statistical difference between those two samples, or if the keyword hit counts are statistically significantly higher in the Retained Chats compared to the All-in Sample, then there is no statistical reason to believe that the non-retention of Temporary and Deleted Chats will cause Prejudicial Sampling Bias. I understand that the News Plaintiffs have focused on the Temporary Chats Sample in their submission and News Plaintiff have advanced the argument that OpenAI's non-retention of Temporary and Deleted Chats is likely to result in Prejudicial Sampling Bias.

9. Focusing on this sample may not be the most appropriate way to evaluate the existence of Prejudicial Sampling Bias because (as illustrated in Figure 1, above), Temporary Chats represent less than half a percent of all ChatGPT conversations. Because Temporary Chats represent such a small proportion of total conversations, even statistically significant differences between the Temporary Chat Sample and the Retained Sample do not necessarily mean that there will be a tangible economically significant Prejudicial Sampling Bias. Attributes of Temporary Chats are

only probative of Prejudicial Sampling Bias if those differences are significant enough and economically tangible enough to affect the composition of the All-In Sample.

10. This concept is depicted in Figure 3 below, where red dots are used to represent some illustrative hypothetical attribute in the data, such as a hit count.

Figure 3: Hypothetical




11. The prevalence of that illustrative hypothetical attribute in the block labeled "Retained Chats" is roughly 1-in-300. The prevalence of that attribute in the block labeled "Temporary Chats" is roughly 2-in-30, i.e., which is far more frequent than the prevalence rate in Retained Chats. Nonetheless, because the number of Temporary Chats is very small in comparison to the data as a whole, the result of a sampling exercise is likely to be similar regardless of whether one **(a)** sampled entirely from "Retained Chats" or **(b)** sampled from an "All-In" population of Retained, Temporary, and Deleted Chats. In either circumstance, the prevalence rate would be

between 0.34%[4] and 0.35%.[5] This is not a statistically significant difference, even though (in this hypothetical example) the attribute is far more frequent in Temporary Chats.[6]

12. Only very significant data discrepancies in the Temporary Chats would yield statistically significant differences between **(a)** a sample drawn from the data available for sampling (*i.e.*, Retained Chats only); and **(b)** a sample drawn from the data that would have been available for sampling had OpenAI retained Temporary and Deleted Chats (corresponding to the "All-In Sample"). Evaluating the Temporary Chat sample in isolation would not reveal whether these differences are significant enough and economically tangible enough to cause Prejudicial Sampling Bias. To evaluate the existence of Prejudicial Sampling Bias, a good way is to directly compare the Retained Chat Sample to the All-In Sample, as I do below.

*ii. Statistical Significance Calculations*

13. As mentioned, to analyze whether the absence of Temporary Chats and Deleted Chats is likely to cause Prejudicial Sampling Bias, I compared the hit counts in the Retained Sample to the hit counts in the All-In Sample. First, I calculated the "delta" between each sample for each term, which consists of:

*Delta* = *# of prompts in* ***All-In Sample*** *that hit on each term* *minus* *# of prompts in* ***Retained Sample*** *that hit on each term*

[4] This prevalence rate is based on 18 samples with the attribute divided by [redacted] total samples illustrated in the Retained Chat block of the illustration above.

[5] This prevalence rate is based on 21 samples with the attribute divided by [redacted] total samples illustrated in the Retained, Deleted, and Temporary Chat blocks of the illustration above.

[6] Based on p-values from performing a Fisher's exact test and a two sample Z-test. Both tests are formally defined below.

14. The delta value exposes the degree to which a particular term (*e.g.*, "nytimes") appears more frequently in the 5 million logs from the All-In Sample than in the 5 million logs from the Retained Sample. If a Prejudicial Sampling Bias is present, one would expect *highly positive* delta values for many of the terms, indicating that the Merits Sample would (e.g.) contain more logs that mention "new york times" if it were drawn from a population that includes Temporary and Deleted Chats (represented by the All-In Sample) than if it were drawn from a population that excludes Temporary and Deleted Chats (represented by the Retained Sample).

15. After calculating the "delta" values for each term, I analyzed whether those delta values were statistically significant. The purpose of this exercise is to identify **(a)** which delta values are likely the product of chance and **(b)** which delta values are indicative of a real difference in the underlying data distribution. Delta values that are not statistically significant can be attributed to random chance, and even those that show statistical significance but with higher keyword counts in the Retained Chats compared to the All-In Sample do *not* support the existence of Prejudicial Sampling Bias.

16. To evaluate the statistical significance of each "delta" value, I used a method called the Fisher's exact test (also known as the Fisher-Irwin test), which is a standard choice in the field of statistics.[7] *See* Federal Judicial Center, Reference Manual on Scientific Evidence at 255 n.108 (3d ed., 2011) ("Well-known small-sample techniques include the sign test and Fisher's exact test."). The purpose of this test is to answer the question: "*Are the hit rates between these two groups different or is the difference observed just a result of random chance?*"

[7] Ian Campbell, "Chi-Squared and Fisher-Irwin Tests of Two-by-Two Tables with Small Sample Recommendations," Statistics in Medicine 26, no. 19 (August 30, 2007): 3661–75, https://doi.org/10.1002/sim.2832; K. M. Bower, "When to Use Fisher's Exact Test," *Six Sigma Forum Magazine* 2, no. 4 (Milwaukee, WI: American Society for Quality, 2003), 35–37.

17. The test results in a "p-value." For example, calculating the p-value for the delta between the hit counts in Group A and Group B requires four inputs: **(i)** the hit count rows for the term in Group A, **(ii)** the hit count rows for the term in Group B, **(iii)** the number of total rows in Group A, and **(iv)** the number of total rows in Group B.

18. High p-values (*i.e.*, p-values close to 1) indicate that the result is likely to be attributable to random chance. Low p-values (*i.e.*, p-values close to 0) indicate that the result is "statistically significant." For this analysis, I used a statistical significance threshold of 5%, which corresponds to a p-value of 0.05. *See* Federal Judicial Center, Reference Manual on Scientific Evidence at 251 (3d ed., 2011) ("[S]tatistical analysts typically use levels of 5% and 1%."). Under that assumption, a result is considered statistically significant only if the p-value is <u>lower</u> than 0.05.

19. I illustrate how this test works with two hypothetical examples:

- In the first hypothetical, assume the hit counts are <u>100 out of 5 million</u> in Group A and <u>102 out of 5 million</u> in Group B. Using Fisher's exact test, I calculate the p-value for this hypothetical to be 0.944. That is far higher than the threshold of 0.05, which indicates that this result is not statistically significant.
- In the second hypothetical, assume the hit counts are <u>100 out of 5 million</u> in Group A and <u>1002 out of 5 million</u> in Group B. Using Fisher's exact test, I calculate the p-value to be lower than 0.0000001. That is far lower than the threshold of 0.05, which indicates that this result is statistically significant.

20. To confirm my calculations and showcase the robustness of my findings, I also ran an alternative statistical test using another well-accepted methodology called a Z-test (again using a p-value threshold of 0.05).

21. I apply these two tests to all 288 delta values between the Retained and All-In Samples, including the "prompt" and "output" delta values for each of the 142 negotiated terms, and the delta values for each of the four conversation classifiers. I report my calculations in Exhibit B2. As shown in that appendix, out of the 288 delta values I evaluated, I found only six values that are statistically significant. More precisely, five of these values are statistically significant for both tests, whereas one of these values is significant only using the Z-test (assuming a p-value of 0.05). Those six values are indicated in red in Appendix A. As explained below, by conducting additional analysis, I conclude that none of these six values indicate a tangible economically significant Prejudicial Sampling Bias. The remaining 282 values were not statistically significant in either of the two tests.

iii. *Analysis of Statistically Significant Hit Counts*

22. I then analyzed each of the six delta values that I found to be statistically significant. I found that three of those delta values do not indicate Prejudicial Sampling Bias because the delta values are in the opposite direction. In other words, Prejudicial Sampling Bias would only exist if the exclusion of Temporary and Deleted Chats from the Merits Sample would cause that Merits Sample to include *fewer* potentially pertinent records. For the three delta values listed below, the statistically significant differences suggest that the exclusion of Temporary and Deleted Chats from the Merits Sample would cause that Merits Sample to include *more* potentially pertinent records.

23. **Compound News Term** (*see supra* note 1)**.** There is no statistically significant difference in the number of hits on this term in user *prompts* from the Retained Sample [redacted] out of 5 million) vs. the All-In Sample ([redacted] out of 5 million).[8] But there is a more pronounced difference

[8] See Exhibit B2.

in the number of hits on this term in *outputs* from the Retained Sample ([redacted]) vs. the All-In Sample ([redacted]).[9] That difference is negative and statistically significant (Fisher's exact test p-value = 0.0070). A similar conclusion was drawn by the Z-test.

24. However, this difference does not indicate Prejudicial Sampling Bias because it suggests that, if anything, a Merits Sample drawn from a population that excludes Temporary and Deleted Chats (represented by the Retained Sample) would include *more* outputs that hit on this Compound News term than a Merits Sample drawn from a population that includes Temporary and Deleted Chats (represented by the All-In Sample).

25. **"[redacted]" and "[redacted]" classifiers.** Of the 5 million logs in the Retained Sample, OpenAI classified [redacted] in the "[redacted]" category and [redacted] in the "[redacted]" category.[10] Of the 5 million logs in the All-In Sample, OpenAI classified [redacted] in the "[redacted]" category and [redacted] in the "[redacted]" category. Both of these are negative and statistically significant differences (Fisher's exact test p-values = 0.000000013 and ~0.000000010, respectively). A similar conclusion was drawn by the Z-test. But these differences do not indicate Prejudicial Sampling Bias because they suggest that, if anything, a Merits Sample drawn from a population that excludes Temporary and Deleted Chats (represented by the Retained Sample) would include *more* outputs in these categories than a Merits Sample drawn from a population that includes Temporary and Deleted Chats (represented by the All-In Sample).

26. I then analyzed the three remaining statistically significant datapoints. These are the only three datapoints (out of 288 total) that suggest that the exclusion of Temporary and Deleted Chats

[9] See Exhibit B2.

[10] See Exhibit B3.

from the Merits Sample may result in fewer potentially pertinent conversation logs in that Merits Sample. But while these datapoints support that conclusion *in isolation*, a more holistic view of the hit counts suggests that they do not indicate Prejudicial Sampling Bias.

27. First, I analyzed the hit counts for the term "**pay wall**." This term [redacted] the combined 10 million outputs from the Retained or All-In Samples. But this term [redacted] prompts out of the 5 million prompts in the Retained Sample, and in [redacted] prompts out of the 5 million prompts in the All-In Sample.[11] This difference is statistically significant (Fisher's exact test p-value = 0.0352), which suggests that a Merits Sample drawn from a population that *includes* Temporary and Deleted Chats (represented by the All-In Sample) would include more outputs that include the term "pay wall" than a Merits Sample drawn from a population that *excludes* Temporary and Deleted Chats (represented by the Retained Sample).

28. Notably, however, "pay wall" is an alternative variation of the term "paywall," which is also included in the hit count reports. In fact, the correct spelling of the word ("paywall") did not have a statistically significant difference, whereas the incorrect spelling ("pay wall") did. Since there is no semantic difference between "pay wall" and "paywall," I combined the number of hits on "pay wall" with the term "paywall" — in effect, treating these two terms as a single unified search term joined by an "OR" connector. I then proceeded to evaluate the statistical significance of the delta value between the hit counts for those combined terms as described in Paragraphs 20 and 21. That resulted in a p-value from Fisher's exact test of 0.4096, (i.e., much higher than 0.05) meaning that there is no statistically significant difference in the number of paywall-related prompts between the Retained and All-In Samples.[12] A similar conclusion was drawn from the Z-

---

[11] See Exhibit B2.

[12] See Table B4.

test. For that reason, the hit counts for the paywall-related terms do not indicate Prejudicial Sampling Bias.

29. Second, I analyzed the hit counts for the term "**daily news**." There is no statistically significant difference in the number of times in which this term appears in user *prompts* from the Retained Sample ([redacted] out of 5 million) vs. the All-In Sample ([redacted] out of 5 million). But there is a more pronounced difference in the number of times this term appears in *outputs* from the Retained Sample ([redacted] out of 5 million) vs. the All-In Sample ([redacted] out of 5 million). That difference is statistically significant (Fisher's exact test p-value = 0.0462), which tends to suggest that a Merits Sample drawn from a population that includes Temporary and Deleted Chats (represented by the All-In Sample) would include more outputs that include the term "daily news" than a Merits Sample drawn from a population that excludes Temporary and Deleted Chats (represented by the Retained Sample).

30. But the "daily news" term is notably different from other similar terms like "new_york_daily_news," "ny_daily_news," and "nydailynews.com," which specifically refer to the *New York Daily News*. Unlike these precise terms, "daily news" is a highly generic term that could potentially appear in all manner of model outputs that have little relevance with the plaintiff in this lawsuit (*e.g.*, "here's the daily news"). For that reason, the hit counts for this term seem more indicative of news-related outputs than specific references to the News Plaintiffs. The fact that there are *more* outputs containing the term "daily news" in the All-In Sample ([redacted] hits) than the Retained Sample ([redacted] hits) is a weak indicator that there are more *news-related outputs* in the All-In Sample than the Retained Sample. But that finding must be balanced against other data from the reports and, in particular, the fact that there are *fewer* outputs containing the Compound News term (which also serves as a proxy for news-related outputs) in the All-In Sample ([redacted]

Case 1:23-cv-11195-SHS-OTW Document 785 Filed 08/20/25 Page 15 of 16

than in the Retained Sample ([redacted] Because those two terms are proxies for the same pattern — *i.e.*, news-related text — and because they point in different directions, I conclude that the "daily news" output hit counts, while statistically significant, do not indicate Prejudicial Sampling Bias.

31. The last of the six terms addressed above is "new_york_daily_news." There is no difference in the number of times in which this term appears in user prompts from the Retained Sample ([redacted] out of 5 million) versus the All-In Sample ([redacted] out of 5 million). But there is a difference in the number of times this term appears in the Retained Sample ([redacted] out of 5 million) versus the All-In Sample ([redacted] out of 5 million). Only one of the two tests I performed suggests that this difference is statistically significant (assuming a 0.05 p-value threshold). Given the miniscule number of observations I consider this to be a non-issue in terms of potentially leading to a tangible economically significant Prejudicial Sampling Bias.

32. In conclusion, across the statistical tests I performed, the results indicate that the hit counts across the Retained and All-In Samples do not indicate a tangible economically significant Prejudicial Sampling Bias.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of September 2025 in Montreal, Quebec.

Dr. Maxime Cohen