**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OpenAI, INC.,<br><br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-11195-SHS-OTW<br>1:24-cv-03285-SHS-OTW<br>1:24-cv-04872-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:25-cv-04315-SHS-OTW | 25-md-3143 (SHS) (OTW) |

**NEWS PLAINTIFFS' RESPONSE TO THE STATEMENT OF INTEREST OF THE UNITED STATES**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

ARGUMENT .......... 2

I. DOJ'S STATEMENT IS NOT AN INFORMED ASSESSMENT OF THE FACTS IN THIS CASE, LACKS SPECIFIC SUBJECT-MATTER EXPERTISE, AND IS INCONSISTENT WITH PRIOR VIEWS .......... 2

II. THIS COURT MUST INDEPENDENTLY EVALUATE THE FAIR USE DEFENSE .......... 6

III. THE AI INDUSTRY WOULD NOT BE BURDENED BY THE NEED TO PAY FOR THE WORKS IT COPIED .......... 10

IV. THE DOJ'S FAIR USE ANALYSIS CONFLICTS WITH THE CONSIDERED VIEWS OF THE COPYRIGHT OFFICE .......... 14

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Cases**

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .................................................. 14

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) .................................................. 14

*Aziz v. Trump*,
234 F. Supp. 3d 725 (E.D. Va. 2017) .................................................. 6

*Cable News Network, Inc. et al. v. Trump et al.*,
26-cv-03287 (D.D.C. Sept. 24, 2026) .................................................. 1

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) .................................................. 6

Kadrey v. Meta Platforms, Inc.,
788 F. Supp. 3d 1026 N.D. Cal. 2025) .................................................. 4, 6, 12

*N.Y. Rest. Ass'n v. N.Y. City Bd. of Health*,
556 F.3d 114 (2d Cir. 2009) .................................................. 1

*Rep. of Arg., v. NML Capital, Ltd.*,
573 U.S. 134 (2014) .................................................. 3

*Time, Inc. v. Hill*,
385 U.S. 374 (1967) .................................................. 13

**Statutes**

17 U.S.C. § 107 .................................................. 1

17 U.S.C. § 701(b) .................................................. 3

**Other Authorities**

Comments of the Federal Trade Commission, *Artificial Intelligence and Copyright,* U.S. Copyright Office (Oct. 30, 2023) .................................................. 5

COPYRIGHT AND ARTIFICIAL INTELLIGENCE: PART 3, GENERATIVE AI TRAINING (May 2025) .................. 3

OUR ARTIFICIAL FUTURE: WHAT GENERATIVE AI MEANS FOR LAW AND SOCIETY (2026) ...................... 12

The White House, A NATIONAL POLICY FRAMEWORK FOR ARTIFICIAL INTELLIGENCE (March 2026) ...... 4

News Plaintiffs respectfully submit this response to the Statement of Interest ("Statement" or "Stmt.") filed by the Department of Justice ("DOJ") on September 1, 2026. ECF 1682. The DOJ asks this Court to find that the Defendants' use of News Plaintiffs' copyrighted material to train Large Language Models ("LLMs") is fair use under the Copyright Act. 17 U.S.C. § 107. Specifically, the DOJ says that it would be "problematic—and legally incorrect—to impose broad copyright liability that would generally render training of AI models impermissible without licensing." Stmt. at 19.

The Statement asks this Court to disregard the opinion of the Government agency with the statutory authority and expertise to address these issues (the Copyright Office), and to bless what Defendants themselves acknowledge to be the largest theft of labor in human history. It does so without the benefit of seeing the parties' evidence or briefing, so its purported analysis is divorced from the actual facts of this case, despite the fact-specific nature of the fair use inquiry. Instead, it favors the AI industry at the expense of news publishers and other content creators. Such a preference is necessary, the DOJ says, due to supposed national security concerns—a justification that courts have repeatedly rejected in any number of contexts in recent years. *See, e.g.*, *Cable News Network, Inc. et al. v. Trump et al.*, 26-cv-03287, ECF 24 at 6 (D.D.C. Sept. 24, 2026) (finding the government "offer[ed] little to back up their asserted national security interest"). And it does all this while ignoring completely the feasibility of licensing to accomplish the Department's claimed objectives, despite the White House's previous guidance that such licensing markets should be encouraged.

In the Second Circuit, "The weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *N.Y. Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 130 (2d Cir. 2009) (addressing

FDA amicus brief). Taking these factors into account, the Court should give the DOJ's statement no weight at all.

## ARGUMENT

### I. DOJ'S STATEMENT IS NOT AN INFORMED ASSESSMENT OF THE FACTS IN THIS CASE, LACKS SPECIFIC SUBJECT-MATTER EXPERTISE, AND IS INCONSISTENT WITH PRIOR VIEWS

Although the DOJ acknowledges that a proper fair use analysis "hinges on the specific facts and uses at issue in each case," Stmt. at 19, it did not even attempt to consider the "specific facts and uses at issue" here. The DOJ submitted the Statement just a few days before the parties filed their motions for summary judgment, and before large portions of those briefs were unsealed. As a consequence, the DOJ did not have access to critical evidence, including Microsoft and OpenAI's internal documents and testimony reflecting their senior executives' views that their products are "substitutive, period" and "destroy their supply chain" (that is, journalism outlets like News Plaintiffs). It did not consider that a Microsoft executive called the AI industry's use of copyrighted content to train AI models one of the "greatest property thefts in human history," and explained that a finding of fair use in these circumstances—as urged by the DOJ—would arguably "make a complete mockery of the idea of 'fair use.'" Refusing to apply those laws to AI training, as a Microsoft executive explained, would create a "doom loop" in which publishers can no longer afford to produce the news content that AI products copy to answer users' questions.[1]

The later-filed summary judgment record includes hundreds of documents gleaned from two years of fact discovery, the deposition transcripts of more than 70 fact witnesses, and dozens of expert reports. The DOJ did not consider any of it, even though it could easily have filed its Statement after the

[1] These quotations and others are addressed in News Plaintiffs' Combined Summary Judgment Brief, ECF 1709, especially at pp. 1-3.

parties moved for summary judgment in order to get some understanding of the facts necessary for the fair use analysis. The DOJ instead premised its position on the Administration's adoption of a policy that strongly favors the unimpeded development of AI in the United States. Stmt. at 2. While the Executive Branch is free to advocate for the policies of its choosing, courts need not (and should not) weigh these considerations to the detriment of clear legal principles. *Rep. of Arg., v. NML Capital, Ltd.*, 573 U.S. 134, 146 (2014) (rejecting U.S. Government concerns about the "worrisome international-relations consequences of siding with the lower court" and upholding lower courts' application of the relevant statute according to its terms).

The DOJ's legal analysis is also ill-informed. To start, it does not grapple with the dramatically opposed views of the U.S. Copyright Office, the agency tasked by statute with interpreting the Copyright Act. *See* 17 U.S.C. § 701(b) (setting forth the Copyright Office's central role in developing U.S. policies on copyright matters). The Copyright Office has issued a 108-page report, *Copyright and Artificial Intelligence: Part 3, Generative AI Training* (May 2025) ("Copyright Report")[2] that explains in detail how fair use principles should apply to AI training. The Office's comprehensive report canvasses the applicable copyright statutes and case law, addresses thousands of public comments and submissions (including those submitted by Defendants in this case, as well as other AI companies), and reaches legal conclusions without regard to political concerns.

Typically, a Statement of Interest filed by the United States results from a process of consultation with the government agency or agencies with expertise in the matter, and takes into account the views of those agencies. Here, the DOJ reportedly did not contact *any* relevant agency.[3] And the DOJ not only

---

[2] The Copyright Report is available at https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf.

[3] *See* Sara Fischer & Kerry Flynn, *Scoop: DOJ's copyright filing took key agencies by surprise*, Axios (Sept. 24, 2026), https://www.axios.com/2026/09/19/justice-department-openai-new-york-times.

failed to consider the Copyright Office's position—it attempts to undermine the Office's position by accusing the Office of "threadbare reasoning" and noting the Administration's efforts to remove the Register of Copyrights. Stmt. at 16 n.17.

Not only is the Copyright Office's report hardly "threadbare," its nuanced analysis lands firmly on the conclusion that "the copying of expressive works from pirate sources in order to generate unrestricted content that competes in the marketplace, when licensing is reasonably available, is unlikely to qualify as fair use."[4] Relying on this analysis, Judge Chhabria in *Kadrey v. Meta Platforms, Inc.*, acknowledged that in "most cases" the fair use doctrine will not apply because it "typically doesn't apply to copying that will significantly diminish the ability of copyright holders to make money from their works (thus significantly diminishing the incentive to create in the future)." 788 F. Supp. 3d 1026, 1034 (N.D. Cal. 2025).

Moreover, the Statement is also inconsistent with the Government's prior positions. In March 2026, the White House released its AI Framework, which encouraged Congress to find ways to foster collective licensing agreements so that creators could be fairly compensated when their work is used for AI.[5] The DOJ acknowledges the President's previous efforts to "encourage[] Congress to consider enabling licensing frameworks or collective rights systems for rights holders," Stmt. at 2-3, but does not

---

[4] Copyright Report at 74.

[5] "Congress should consider enabling licensing frameworks or collective rights systems for rights holders to collectively negotiate compensation from AI providers, without incurring antitrust liability. Any such legislation, however, should not address when or whether such licensing is required." The White House, *A National Policy Framework for Artificial Intelligence* (Mar. 3, 2026) at III, available at https://www.whitehouse.gov/wp-content/uploads/2026/03/03.20.26-National-Policy-Framework-for-Artificial-Intelligence-Legislative-Recommendations.pdf.

Although the AI Framework noted that "the Administration believes that training of AI models on copyrighted material does not violate copyright laws," it acknowledged "arguments to the contrary exist" and expressly left resolution of these issues to the judiciary. *Id.*

explain how the licensing regime would be sustained if courts determined that AI companies can take everyone's work for free.

The Federal Trade Commission, in comments submitted (during a prior Administration) to the Copyright Office, has also raised concerns about the use of copyrighted content to train AI models under competition laws:

> As the courts apply the doctrine of fair use to the training and use of AI, the evolution of the doctrine could influence the competitive dynamics of the markets for AI tools and for products with which the outputs of those tools may compete. Conduct that may violate the copyright laws—***such as training an AI tool on protected expression without the creator's consent*** or selling output generated from such an AI tool, including by mimicking the creator's writing style, vocal or instrumental performance, or likeness—may also constitute an unfair method of competition or an unfair or deceptive practice, especially when the copyright violation deceives consumers[.][6]

That the DOJ fails to acknowledge any possible contrary views, and dismisses the Copyright Office's comprehensive study in a footnote, suggests that the DOJ may have been influenced by extraneous considerations—up to and including the Administration's political and financial interests. AI companies and their executives (including executives of Defendants in this case) have been among this Administration's largest donors.[7] The Administration is reportedly considering OpenAI's offer of a 5% stake in the company "to ease Washington pressure."[8] At the same time, the Administration has promised to remove any barrier to the unfettered and rapid development of AI technology, as reflected in the DOJ's Statement. Although one could argue that political factors will always influence

---

6 Comments of the Federal Trade Commission, *Artificial Intelligence and Copyright*, U.S. Copyright Office, Dkt. No. 2023-6 (Oct. 30, 2023) (emphasis added), https://www.ftc.gov/system/files/ftc_gov/pdf/p241200_ftc_comment_to_copyright_office.pdf.

7 *See* Stephen Council, *OpenAI exec becomes top Trump donor with $25 million gift*, Yahoo Finance (Jan. 2, 2026), https://finance.yahoo.com/news/openai-exec-becomes-top-trump-230342268.html.

8 *See* Anniek Bao, *OpenAI proposes 5% stake to Trump administration to ease Washington pressure: Report*, CNBC (July 2, 2026), https://www.cnbc.com/2026/07/02/openai-proposes-us-government-own-5percent-stake-to-address-political-blowback.html.

Government litigation positions to some extent, the nature, extent, and transparency of the AI industry's efforts to influence this Administration should not be lightly dismissed.

## II. THIS COURT MUST INDEPENDENTLY EVALUATE THE FAIR USE DEFENSE

The DOJ's arguments echo the Administration's political views that the unfettered development of AI is of utmost importance to national security. *See* Stmt. at 2 ("Rules of law that make it significantly more difficult to develop a robust AI industry in the United States […] threaten national security and give a competitive advantage to foreign adversaries who are not so encumbered."). While there is reason to doubt that racing ahead with the development of AI best protects U.S. interests, even if it did, that would not change the result in this case. Enforcement of the copyright laws does not pose a serious risk to the development of AI. As the court noted in *Kadrey*:

> "Meta seems to imply that such a ruling [against fair use] would stop the development of LLMs and other generative AI technologies in its tracks. This is nonsense. As mentioned earlier, a ruling that certain copying isn't fair use doesn't necessarily mean the copier has to stop their copying—it means that they have to get permission for it."

788 F. Supp. 3d at 1058-59.

The DOJ's policy pronouncements cannot override the court's duty to apply statutory fair use factors as Congress enacted them. The Supreme Court has long recognized that courts do not abdicate their judicial function merely because the Executive invokes national security. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004); *Aziz v. Trump*, 234 F. Supp. 3d 725, 734 (E.D. Va. 2017) (recognizing courts may "look behind [the agency's] proffered national security rationale"). The DOJ's position that the public interest may be served by removing *any* regulation of AI[9], including application of the copyright laws, does not relieve this Court of its obligation to evaluate independently the legal

[9] Indeed, this position may have changed since even the filing of the Statement. *See* Raquel Coronell Uribe, *Trump says he's creating an AI force and appointing a czar amid concerns over the rapidly developing tech*, NBC News (Sept. 19, 2026), https://www.nbcnews.com/politics/white-house/artificial-intelligence-task-force-czar-technology-trump-rcna598688.

merits of the fair use defense. As the DOJ's own Statement acknowledges, fair use is "an equitable rule of reason" requiring "case-by-case analysis," and the statutory factors must be "explored, and the results weighed together, in light of the purposes of copyright." Stmt. at 8. This Court should do precisely that, and apply the statute and case law, rather than subordinate its analysis of the Copyright Act to a particular policy. The Government's apparent desire at this moment to promote the American AI industry cannot substitute for the legal showing that § 107 demands.

Moreover, even if national security arguments were relevant to the copyright issues in this case, the only link that the DOJ attempts to make between the threat to national security and the need to pay for copyrighted content is to suggest that content costs might impose a hypothetical burden on hypothetical entrants into the AI industry. Stmt. at 4. The DOJ does not provide any factual support for its position, for example, by showing that the need to pay for content would impose a material burden on any existing AI company or a significant barrier to entry for any hypothetical industry start-up. New entrants into the AI industry will already need capital for a host of other "raw materials"—expensive computer chips and massive amounts of electricity to name just two. The DOJ does not explain why the need to obtain copyrighted content represents a more significant hurdle, or a bigger threat to national security, than these.

Finally, if the Court entertains the DOJ's invitation to consider potential benefits to be had from untethered AI development, it should consider the potential dangers as well. These include a series of disturbing incidents that demonstrate the industry's inability to control its own products. Taking OpenAI as an example, one incident involved a "swarm" or "collective" of AI agents backed by some of OpenAI's most powerful models that coordinated through "[u]nauthorized, persistent message boards" to attack Hugging Face, an online AI development platform. According to OpenAI's own website: "In July 2026, during internal cybersecurity evaluations, OpenAI models *circumvented controls* designed to

isolate them from the internet and compromised parts of OpenAI's internal research infrastructure and Hugging Face's systems," without any human instruction or support.[10] According to OpenAI's report of the incident, the agents "performed computer network exploitation of OpenAI's internal research infrastructure and Hugging Face systems."[11] OpenAI found that its models "exploited a separate, *previously unknown vulnerability* . . . to move beyond their sandbox environment and compromise the Hugging Face environment."[12] In the same announcement, OpenAI acknowledged that, following the Hugging Face incident, there was another incident where AI agents attacked *OpenAI's* infrastructure, which "culminated in the agents using a series of creative exploits to gain full administrator access to a research cluster that supported [OpenAI's] virtual machine environments."[13] According to OpenAI's technical report, on July 19, 2026, the "[a]gents [took] over active evaluation infrastructure"[14]—i.e., the agents took over the tools used to monitor and evaluate them. These were not isolated incidents. OpenAI recently reported on six other "instances of model misalignment," that involved AI-generated instruction, concealment of mistakes, unsanctioned communications, and improper file-sharing.[15] Other AI companies have reported similar incidents.[16]

---

[10] *See* "The Hugging Face Incident and the road ahead," OpenAI (Aug. 26, 2026), https://openai.com/index/hugging-face-incident-and-the-road-ahead/.

[11] *See* "OpenAI-Hugging Face Incident, Technical Report," https://cdn.openai.com/pdf/67869394-cb91-4c12-888c-5cbd85c7814c/OpenAI-Hugging-Face%20Incident-Technical-Report.pdf at 4 (last visited Sept. 27, 2026).

[12] *Id.* at 8 (emphasis added).

[13] *See* "The Hugging Face Incident and the road ahead," OpenAI (Aug. 26, 2026), https://openai.com/index/hugging-face-incident-and-the-road-ahead/.

[14] *See* "OpenAI-Hugging Face Incident, Technical Report," https://cdn.openai.com/pdf/67869394-cb91-4c12-888c-5cbd85c7814c/OpenAI-Hugging-Face%20Incident-Technical-Report.pdf at p. 37.

[15] *See* "Our framework for reporting model misalignment," OpenAI (Sept. 16, 2026), https://openai.com/index/model-misalignment-reporting-framework/.

[16] *See* "Investigating three real-world incidents in our cybersecurity evaluations," Anthropic (July 30, 2026), https://www.anthropic.com/news/investigating-incidents-cybersecurity-evals:

Warnings about the AI risks are not new. A letter drafted in March 2023 with signatures from over 33,000 AI experts and others calls for a moratorium on AI development. The crux of their concern (emphasis in original): "*Advanced AI could represent a profound change in the history of life on Earth, and should be planned for and managed with commensurate care and resources*."[17] In recent weeks, researchers at the largest AI companies, including OpenAI, have raised the same concerns publicly. Jacob Coxon, a former OpenAI researcher, resigned from his most recent position with Anthropic, and warned that AI companies are "gambling with our lives."[18] Another Anthropic scientist agreed, seeing a 10% chance that AI would destroy humanity by the end of the decade.[19] A researcher at Google's Deep Mind resigned because she "earnestly believe[s] that AI has the potential to kill us all, and that we might be running out of time to avoid this outcome."[20]

The Administration is entitled to its views on the importance of AI and on this country's AI policies. The events discussed above, and many more, highlight the important and intricate issues that those policies raise. But these intricacies are not issues for this Court to unravel, and they further support

---

*In a review of our [Anthropic's] cybersecurity evaluation transcripts, we found three incidents in which a Claude model reached the internet from within or while interacting with a third-party evaluation environment, and then gained unauthorized access to the real systems of three different organizations.*

(Italics in original, bold deleted.); *See also* Erin Woo & Robert McMillian, *Gemini Hacked Three Companies in First Known Breakout by Google's AI*, The Wall Street Journal (Sept. 18, 2026), https://www.wsj.com/tech/ai/gemini-hacked-three-companies-in-first-known-breakout-by-googles-ai-5c0baba2.

17 *See* "Pause Giant AI Experiments: An Open Letter," Future of Life Institute (Mar. 22, 2023), https://futureoflife.org/open-letter/pause-giant-ai-experiments/ (emphasis in original).

18 *See* Kaitlyn Huamani, *Anthropic researcher resigns with warning about the dangers of AI development*, AP (Sept. 9, 2026), https://apnews.com/article/anthropic-ai-safety-jacob-coxon-2ed549e07f2f941600a135070487d83d.

19 *See* Reuters, *Ex-Google DeepMind researcher adds to warnings that AI could 'kill all humans'* (Sept. 15, 2026), ttps://www.reuters.com/technology/ex-google-deepmind-researcher-adds-warnings-that-ai-could-kill-all-humans-2026-09-15/.

20 *Id.*

the view that this Court should apply the statute and relevant precedent without regard to extraneous policy arguments.

## III. THE AI INDUSTRY WOULD NOT BE BURDENED BY THE NEED TO PAY FOR THE WORKS IT COPIED

The Court does not have to reject the DOJ's policy position to find its Statement without merit. According to the DOJ, "It is not in the public's interest for the largest technology companies to have an oligopoly on LLM training due to licensing entry barriers that function primarily as large subsidies for old mainstream media companies." Stmt. at 4. This statement, and the policy concerns it reflects, are wrong on a number of levels.

For starters, licensing fees are not barriers to entry into the AI industry in any meaningful sense. In any industry, there is payment for "raw materials." Using OpenAI as an example, early in the development of its LLMs, OpenAI entered into a partnership with Microsoft in which Microsoft provided OpenAI with access to the computing power and other resources OpenAI needed. According to sworn testimony from a Microsoft executive during Elon Musk's lawsuit against OpenAI, Microsoft has spent more than $100 billion on OpenAI's development.[21] The need to access resources valued at $100 billion was certainly a tremendous barrier to OpenAI's entry into the AI industry, so by DOJ's logic, Microsoft should have been required to provide its resources to OpenAI for free.[22] In any event, the fact that OpenAI needed $100 billion from one source merely to begin development of its AI models shows that, on the list of barriers to entry into the AI world, licensing fees for copyrighted content are barely a footnote.

---

[21] *See* Rachel Metz, Brody Ford, & Madlin Mekelburg, *Microsoft Spent $100 billion on OpenAI Partnership*, Bloomberg (May 13, 2026), https://www.bloomberg.com/news/articles/2026-05-13/microsoft-spent-over-100-billion-on-openai-partnership-to-date.

[22] Reports are that Microsoft received a 27% stake in OpenAI. *Id.* As noted below, OpenAI is on track to issue an IPO valuing the company at approximately $1 trillion.

Moreover, current AI model developers include some of the largest companies in the world, including Microsoft, Alphabet/Google, Meta/Facebook, Apple, and Amazon. Microsoft alone projects that its capital expenditure during 2026 will be $175 billion, and an analysis of the companies' financial disclosures reveals that between 2023 and June 2026, combined capital spending by Google, Amazon, Microsoft, and Meta was $1.1 trillion.[23] Other AI model developers like OpenAI and Anthropic have access to enormous fonts of capital. Each of those companies is expected to go public with stock offerings that would value each company at about $1 trillion.[24]

The funds to pay copyright owners for their content are readily available to all of these companies, and the DOJ admits that "both mainstream and independent publishers could enter (and have entered) into licensing agreements to provide developers with specialized access to real-time, pay-walled, proprietary, and other content and information." Stmt. at 4, n.13. Current licensees include News Corp., Reuters, and Hearst. To take just one important example, public reports value News Corp.'s license to OpenAI at $250 million over five years.[25] Although News Corp. is one of the largest media companies in the world, the annual license fee it charged OpenAI is little more than a rounding error in a major AI company's accounts (*e.g.*, Microsoft, Google, Amazon), and well within the reach of the "smaller" companies like OpenAI. The bottom line, *contra* the DOJ, is that the AI industry has

---

[23] *See* Ryan McMorrow, Rafe Rosner-Unnin, & Hannah Murphy, *Big Tech AI spending spree tops $1tn*, Financial Times (July 30, 2026), https://www.ft.com/content/dcf3873e-7b32-4a24-a90d-3bccf1d2c996?syn-25a6b1a6=1.

[24] *See* Parmy Olson, *Anthropic's $2 Trillion IPO Is Still On. And So Is the AI Race*, Bloomberg (Sept. 15, 2026), https://www.bloomberg.com/opinion/articles/2026-09-15/anthropic-s-2-trillion-ipo-is-still-on-and-so-is-the-ai-race; Kate Clark, *OpenAI Considers Pre-IPO Funding Round at More Than $1.2 Trillion Valuation*, Wall Street Journal (Sept. 15, 2026), https://www.wsj.com/tech/ai/openai-considers-pre-ipo-funding-round-at-more-than-1-2-trillion-valuation-54555295.

[25] *See* Alexandra Bruell, Sam Schechner, & Deepa Seetharaman, *OpenAI, WSJ Owner News Corp Strike Content Deal Valued at Over $250 Million*, Wall Street Journal (May 22, 2024), https://www.wsj.com/business/media/openai-news-corp-strike-deal-23f186ba.

recognized the need to license content, and it has the resources to do so.

To the extent that the DOJ credits OpenAI's and Microsoft's argument that paying for copyrighted content to train their LLMs is too hard or too cumbersome, here is what a recent work published by the Cambridge University Press had to say:

> Also, what are we supposed to make of companies that simultaneously claim their technology could cure cancer and solve global warming, yet are utterly incapable of creating a functioning content licensing regime? The tech industry has demonstrated unparalleled capacity for innovation and problem-solving. It is incumbent upon these companies to invest the necessary resources in developing a fair and equitable licensing framework, or at least make a good-faith attempt before making conclusory statements about impossibility. Such a framework can then be adapted for smaller entities, ensuring a level playing field.[26]

Finally, DOJ also does not account for a phenomenon that some AI-industry insiders have called the "doom loop."[27] They recognize that, in order to provide answers to users' questions on current events, AI models need ready access to up-to-date journalistic content, including local, national, and international news. Many news outlets that provide raw material for the AI models will not survive, or at least will have to curtail their ability to provide news coverage, if readers can get their information directly from AI.

Recent evidence shows that this is already happening. A "publication" called *Prism News* has offered a service that uses AI to scan over 10,000 news sources to provide "ultra-concise updates" to subscribers to its services.[28] According to *Prism News*, "Our AI-powered system processes thousands of

---

[26] *See* David Atkinson, *Our Artificial Future: What Generative AI Means for Law and Society* 145 (2026). The author then cited Judge Chhabria's decision in *Kadrey*, discussed above, calling the argument that adverse copyright rulings would stop this technology "ridiculous."

[27] *See* News Plaintiffs' Combined Summary Judgment Brief (ECF 1709) at 2.

[28] Prism's description of its services, and terms of service, are available at https://www.prismnews.ai/ (last visited Sept. 27, 2026).

sources, delivering the most important updates in seconds."[29] As another example, Brown Brothers Media reportedly "buys online publications that have established themselves as offering a distinctive type of journalism" and then "floods their websites with dizzying torrents of AI-generated content . . . in a bid to soak up as many readers as possible via Google and other platforms."[30] It "fired a stunning proportion of its own writers as it embraced generative AI." *Id.*

The policy choice the Government is pushing will not just hurt AI companies, it will decimate newsrooms. And what happens then? What happens when all the trained journalists are out of jobs? Who gets to report on the news? Where do citizens get their information? Are we going to trust generative AI companies to hire their own internal news corps, and consolidate control over information even further? In the end, what would happen to the journalism industry that "assures the maintenance of our political system and an open society"? *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).

The DOJ does not address these questions. Instead, it argues that license fees to copyright owners would entrench an AI-industry "oligopoly" and subsidize "old mainstream media companies." Stmt. at 4. The DOJ offers no facts to support its position, it ignores readily available information showing that its concerns are misplaced, and in the end, it fails to consider the many countervailing factors that favor a finding of no fair use in this case.[31]

---

29 *Id.* Recent reports suggest that *Prism News* has folded, but the website remains active.

30 *See* Maggie Harrison Dupré & Jon Christian, *How Three Brothers Built an AI Slop Empire by Buying Legitimate News Sites and Turning Them Into Zombie Content Farms That They Say Get 50 Million Page Views Per Month*, Futurism (Sept. 17, 2026), https://futurism.com/artificial-intelligence/brown-brothers-media-ai-slop-empire.

31 Of course, the voluminous confidential evidence in this case provides even more information on these issues.

## IV. THE DOJ'S FAIR USE ANALYSIS CONFLICTS WITH THE CONSIDERED VIEWS OF THE COPYRIGHT OFFICE

DOJ's incomplete fair use analysis relies primarily on two points: (1) that the application of fair use principles must be applied on a "use-by-use" basis—in this case, the use of copyrighted material to train AI models (Stmt. at 9-11); and (2) that "the use of copies to train [AI models] is extraordinarily transformative" and "the radically transformative nature of the AI technology at issue supports a fair-use finding." Stmt. at 12, 17. Examining the facts, the Copyright Office's report reached the opposite conclusion on each of these points.

On the issue of the relevant "use" of the copied material, the Office canvassed the applicable case law and public comments, including comments to the effect that copying at different stages in the development and operation of AI models should be considered separately.[32] The Office relied on two Second Circuit decisions, and concluded:

> The Office agrees that different uses during AI development and deployment require separate consideration. But while it is important to identify the specific act of copying during development, *compiling a dataset or training alone is rarely the ultimate purpose. Fair use must also be evaluated in the context of the overall use*.[33]

As to "transformativeness," the Office again canvassed the case law and considered public comments. The Office concluded that "whether copying a work to compile a training dataset is transformative depends on whether the dataset will be used for a transformative purpose."[34] With respect to the use at issue here—that is, the training of an AI model to provide substantive responses to user queries—the Office concluded that the use is not transformative:

> On the other end of the spectrum is training a model to generate outputs that are substantially similar to copyrighted works in the dataset. For example, a foundation

---

32 *See* Copyright Office Report, op cit., at 36-37.

33 *Id.* (emphasis added), citing *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015), and *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014).

34 *Id.* at 45.

> image model might be further trained on images from a popular animated series and deployed to generate images of characters from that series. Unlike cases where copying computer programs to access their functional elements was necessary to create new, interoperable works, using images or sound recordings to train a model that generates similar expressive outputs does not merely remove a technical barrier to productive competition. In such cases, unless the original work itself is being targeted for comment or parody, it is hard to see the use as transformative.[35]

In an important addendum, the Office addressed and rejected an argument, similar to DOJ's (Stmt. at 14), that "the use of copyrighted works to train AI models is inherently transformative because it is not for expressive purposes. We view this argument as mistaken."[36]

The intra-Government dispute between DOJ and the agency with the specific expertise on copyright matters is yet another reason why this Court should rest its decision entirely on the Copyright Act itself, the case law, and the record in this case, rather than on the policy issues DOJ raises in its Statement.

## CONCLUSION

For these reasons, as well as those discussed in previous sections, the Court should give the DOJ's views little weight.

Dated: September 28, 2026

*/s/ Steven Lieberman*

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Robert Parker (admitted pro hac vice)
Jenny L. Colgate (admitted pro hac vice)
Alexandra Hughes (admitted pro hac vice)
Mark Rawls (admitted pro hac vice)
Michael H. Jones (admitted pro hac vice)
Kristen J. Logan (admitted pro hac vice)
Bryan B. Thompson (6004147)
Mary L. Mullins (pending pro hac vice)
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001

35 *Id.* at 46.

36 *Id.* at 47.

Telephone: (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
rparker@rothwellfigg.com
jcolgate@rothwellfigg.com
ahughes@rothwellfigg.com
mrawls@rothwellfigg.com
mjones@rothwellfigg.com
klogan@rothwellfigg.com
bthompson@rothwellfigg.com
mmullins@rothwellfigg.com

*Attorneys for Daily News Plaintiffs*

*/s/ Ian Crosby*

Ian Crosby (pro hac vice)
Katherine M. Peaslee (pro hac vice)
Susman Godfrey L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com
kpeaslee@susmangodfrey.com

Davida Brook (pro hac vice)
Emily K. Cronin (pro hac vice)
Adnan Muttalib (pro hac vice)
Susman Godfrey L.L.P.
1900 Ave of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com
ecronin@susmangodfrey.com
amuttalib@susmangodfrey.com

Elisha Barron (5036850)
Zachary B. Savage (ZS2668)
Alexander Frawley (5564539)
Eudokia Spanos (5021381)
Susman Godfrey L.L.P.
One Manhattan West
New York, NY 10001

Telephone: (212) 336-8330
Facsimile: (212) 336-8340
ebarron@susmangodfrey.com
zsavage@susmangodfrey.com
afrawley@susmangodfrey.com
espanos@susmangodfrey.com

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Kristen J. Logan (pro hac vice)
Rothwell, Figg, Ernst & Manbeck, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
klogan@rothwellfigg.com

*Attorneys for Plaintiff*
*The New York Times Company*

*/s/ Matthew Topic*

Jon Loevy *(pro hac vice)*
Michael Kanovitz *(pro hac vice)*
Matthew Topic *(pro hac vice)*
Thomas Kayes *(pro hac vice)*
Steven Art *(pro hac vice)*
Kyle Wallenberg *(pro hac vice)*
Shelley Geiszler *(pro hac vice)*
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900 (p)
312-243-5902 (f)
jon@loevy.com
mike@loevy.com
matt@loevy.com
kayes@loevy.com
steve@loevy.com
wallenberg@loevy.com
geiszler@loevy.com

Stephen Stich Match (No. 5567854)
Lauren Sonnenberg *(pro hac vice)*

LOEVY & LOEVY
222 Sutter Street, Suite 600A
San Francisco, CA 94108
(312) 243-5900
match@loevy.com
sonnenberg@loevy.com

*Attorneys for Plaintiff The Center for Investigative Reporting, Inc. and The Intercept Media, Inc.*

/s/ Lacy H. Koonce, III

Lacy H. ("Lance") Koonce, III
Matthew A. Leish
Brendan Kehoe
Lucy Hoffman
Maya Katalan
Klaris Law PLLC
161 Water Street
New York, NY 10038
Telephone: (646) 779-4882
lance.koonce@klaris.com
matthew.leish@klarislaw.com
brendan.kehoe@klarislaw.com
lucy.hoffman@klarislaw.com
maya.katalan@klarislaw.com

Guy Ruttenberg (pro hac vice)
Ruttenberg IP Law, A Professional Corporation
1801 Century Park East
Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
ZD-AICopyright@ruttenbergiplaw.com

John R. Cuti
Cuti Frisch PLLC
233 Broadway, Suite 1720
New York, NY 10279

*Attorneys for Plaintiffs Ziff Davis, Inc., Ziff Davis, LLC, IGN Entertainment, Inc., Everyday Health Media, LLC, Mashable, Inc., and CNET Media, Inc.*