**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: OpenAI, Inc. Copyright Infringement Litigation<br><br>This Document Relates To:<br><br>No. 1:23-cv-11195<br>No. 1:24-cv-03285<br>No. 1:24-cv-04872 | Case No. 1:25-md-3143 (SHS) (OTW)<br><br>CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL UNDER THE STIPULATED PROTECTIVE ORDER |

**NEWS PLAINTIFFS' RESPONSE TO DEFENDANT MICROSOFT CORPORATION'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT IN NEWS PLAINTIFFS' CONSOLIDATED CASES**

**REDACTED**

**TABLE OF CITATION CONVENTIONS**

| Citation | Document | ECF No. |
|---|---|---|
| MSFT-Mot. | Microsoft's Memorandum of Law in Support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases | 1699 |
| MSFT-SOF | Microsoft's Rule 56.1 Statement in Support of Motion for Summary Judgment on News Plaintiffs' Claims | 1702 |
| NP-CSOF | News Plaintiffs' Counterstatement of Facts In Opposition to Defendants' Motions for Summary Judgment | Filed Concurrently |
| NP-Mot. | News Plaintiffs' Memorandum of Law in Support of News Plaintiffs' Motion for Summary Judgment | 1728 |
| NP-SOF | News Plaintiffs' Corrected Rule 56.1 Statement of Material Undisputed Facts in Support of News Plaintiffs' Motion for Summary Judgment | 1985 |
| NP. Ex. | News Plaintiffs' Exhibits, which were attached to the September 4, September 17, and October 23 Declarations of Davida Brook and Ian Crosby | 1777, 1785, 1786, 1790, 1792, 1799, 1803, 1807, 1809, 1812, 1823, 1829, 1830, 1833, 1834, 1837, 1839, 1841, 1842, 1843, 1844, 1846, 1847, 1849, 1851, 1852, 1854, 1856, 1857, 1861, 1863, 1869, 1871, 1874, 1876, 1877, 1878, 1880, 1882, 1885, 1887, 1888, 1891, 1893, 1896, 1897, 1899, 1902, 1903, 1905, 1909, |

| | | |
|---|---|---|
| | | 1911, 1914, 1917, 1918, 1919, 1920, 1921, 1922, 1923, 1989, 1990, 1991, 1994, 1995-1999, 2001, 2003, 2004, 2009, 2013-15, 2017, 2019, 2020, 2022 |
| OAI-Mot. | OpenAI's Memorandum of Law in Support of Motion for Summary Judgment on News Plaintiffs' Claims | 1749 |
| OAI-SOF | OpenAI's Rule 56.1 Statement | 1735 |
| Alter Decl. | Declaration of Adam Alter ISO News Plaintiffs' Motion for Summary Judgment | 1784 |
| Alter Rebuttal Rep. | Declaration of Adam Alter ISO News Plaintiffs' Motion for Summary Judgment (Ex. A) | 1784 |
| Bauerlein Decl. | Declaration of Monika Bauerlein | 1788 |
| Bell Decl. | Declaration of Emily Bell ISO News Plaintiffs' Motion for Summary Judgment | 1794 |
| Bell Opening Rep. | Declaration of Emily Bell ISO News Plaintiffs' Motion for Summary Judgment (Exhibit A) | 1794 |
| Bell Rebuttal Rep. | Declaration of Emily Bell ISO News Plaintiffs' Motion for Summary Judgment (Exhibit B) | 1794 |
| Bell Reply Rep. | Declaration of Emily Bell ISO News Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment | Filed Concurrently |

| | | |
|---|---|---|
| Cross Rebuttal Rep. | Declaration of Sue Cross (Exhibit A) | 1821-1 |
| Etzioni Decl. | Declaration of Oren Etzioni ISO News Plaintiffs' Motion for Summary Judgment | 1806 |
| Etzioni Opening Rep. | Declaration of Oren Etzioni ISO News Plaintiffs' Motion for Summary Judgment (Exhibit A) | 1806 |
| Etzioni Rebuttal Rep. | Declaration of Oren Etzioni ISO News Plaintiffs' Motion for Summary Judgment (Exhibit B) | 1806 |
| Etzioni Reply Rep. | Declaration of Oren Etzioni ISO News Plaintiffs' Motion for Summary Judgment (Exhibit C) | 1806 |
| Goldstein Decl. | Declaration of Tom Goldstein ISO News Plaintiffs' Motion for Summary Judgment | 1819 |
| Goldstein Opening Rep. | Declaration of Tom Goldstein ISO News Plaintiffs' Motion for Summary Judgment (Exhibit A) | 1819 |
| Goldstein Rebuttal Rep. | Declaration of Tom Goldstein ISO News Plaintiffs' Motion for Summary Judgment (Exhibit B) | 1819 |
| Goldstein Reply Rep. | Declaration of Tom Goldstein ISO News Plaintiffs' Motion for Summary Judgment (Exhibit C) | 1819 |
| Goldstein Supplemental Rep. | Declaration of Tom Goldstein ISO News Plaintiffs' Motion for Summary Judgment (Exhibit D) | 1819 |
| Gratz Decl. | Declaration of Joseph C. Gratz Motions for Summary Judgment, Vols. 1–4 | 1740, 1741, 1747, 1752 |

| | | |
|---|---|---|
| Hurst Decl. | Declaration of Annette L. Hurst ISO Microsoft's Motions for Summary Judgment | 1816 |
| Macala Decl. | Declaration of Miroslav Macala | 1836 |
| Maisel Decl. | Declaration of Jennifer B. Maisel ISO News Plaintiffs' Motion for Summary Judgment | 1815 |
| Maisel MSJ-Opposition Decl. | Declaration of Jennifer B. Maisel ISO News Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment | Filed Concurrently |
| Malackowski Decl. | Declaration of Jim Malackowski ISO News Plaintiffs' Motion for Summary Judgment | 1800 |
| Malackowski NYT/DNP Opening Rep. | Declaration of Jim Malackowski ISO News Plaintiffs' Motion for Summary Judgment (Exhibit A) | 1800 |
| Malackowski NYT/DNP Rebuttal Rep. | Declaration of Jim Malackowski ISO News Plaintiffs' Motion for Summary Judgment (Exhibit B) | 1800 |
| Malackowski NYT/DNP Reply Rep. | Declaration of Jim Malackowski ISO News Plaintiffs' Motion for Summary Judgment (Exhibit C) | 1800 |
| Malackowski NYT/DNP Supplemental Rep. | Declaration of Jim Malackowski ISO News Plaintiffs' Motion for Summary Judgment (Exhibit D) | 1800 |
| McDonald Rebuttal Rep. | Declaration of Michael McDonald (Exhibit A) | 1875-1 |
| Mitchell Decl. | Declaration of Melanie Mitchell ISO News Plaintiffs' Omnibus Memorandum of Law in Opposition to | Filed Concurrently |

| | | |
|---|---|---|
| | Defendants' Motions for Summary Judgment | |
| Mitchell Opening Rep. | Declaration of Melanie Mitchell ISO News Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Exhibit A) | Filed Concurrently |
| Mitchell Rebuttal Rep. | Declaration of Melanie Mitchell ISO News Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Exhibit B) | Filed Concurrently |
| Mitchell Reply Rep. | Declaration of Melanie Mitchell ISO News Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Exhibit C) | Filed Concurrently |
| Morris Decl. | Declaration of Robyn Morris ISO News Plaintiffs' Motion for Summary Judgment | 1776 |
| Owen Decl. | Declaration of Taylor Owen ISO News Plaintiffs' Motion for Summary Judgment | 1811 |
| Owen Opening Rep. | Declaration of Taylor Owen ISO News Plaintiffs' Motion for Summary Judgment (Exhibit A) | 1811 |
| Owen Rebuttal Rep. | Declaration of Taylor Owen ISO News Plaintiffs' Motion for Summary Judgment (Exhibit B) | 1811 |
| Second Bauerlein Decl. | Second Declaration of Monika Bauerlein | Filed Concurrently |
| Sherrard Decl. | Declaration of Michael Sherrard | Filed Concurrently |

| | | |
|---|---|---|
| Stricchiola Decl. | Declaration of Jessie Stricchiola ISO News Plaintiffs' Motion for Summary Judgment | 1798 |
| Stricchiola NYT/DNP Opening Rep. | Declaration of Jessie Stricchiola ISO News Plaintiffs' Motion for Summary Judgment (Exhibit A) | 1798 |
| Stricchiola Rebuttal Rep. | Declaration of Jessie Stricchiola ISO News Plaintiffs' Motion for Summary Judgment (Exhibit C) | 1798 |
| Stricchiola Reply Rep. | Declaration of Jessie Stricchiola ISO News Plaintiffs' Motion for Summary Judgment (Exhibit D) | 1798 |
| Supplemental Goldstein Decl. | Supplemental Declaration Tom Goldstein ISO News Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment | Filed Concurrently |
| Tease Opening Rep. | Declaration of Antoinette Tease (Exhibit A) | Filed Concurrently |
| Wenger Opening Rep. | Declaration of Emily Wenger (Exhibit A) | 1858-1 |
| Wenger Rebuttal Rep. | Declaration of Emily Wenger (Exhibit D) | 1858-4 |
| Wenger Reply Rep. | Declaration of Emily Wenger (Exhibit F) | 1858-6 |
| Wenger Supplemental Rep. | Declaration of Emily Wenger (Exhibit H) | 1858-8 |
| Wu Rebuttal Rep. | Declaration of Timothy Wu ISO News Plaintiffs' Motion for Summary Judgment (Exhibit A) | 1808-1 |

Pursuant to Local Civil Rule 56.1, Plaintiffs The New York Times ("The Times"), Daily News Plaintiffs[1] ("DNP"), and the Center for Investigative Reporting, Inc. ("CIR"), (each a "News Plaintiff" and collectively, "News Plaintiffs"), respectfully submit this response to Defendant Microsoft Corporation's ("Microsoft") statement of material facts as to which Microsoft contends there are no genuine issues to be tried.

**COUNT I: COPYRIGHT INFRINGEMENT (17. U.S.C. § 501)**

**COUNT I: COPYRIGHT INFRINGEMENT (17. U.S.C. § 501) – TRAINING CLAIM**

**A. Fair Use (17 U.S.C. § 107)**

***1. Purpose and Character of the Use (Factor 1)***

**Microsoft Paragraph 1:** A large language model ("LLM") is a machine learning deep neural network trained on vast quantities of text with the objective of predicting the next token in a sequence in order to generate natural language.

Lafferty Decl. ¶¶ 16, 33, 77-78; *see also* Hurst Decl. **Ex. 75** (Melton Dep. Tr.) 29:6-30:19, 9:20-10:16, 11:16-17:7; **Ex. 112** (Song Dep. Tr.) 32:13-33:25, 9:8-10:21; **Ex. 54** (Huynh Dep. Tr.) 95:23-96:4, 7:11-8:18, 15:3-7, 15:25-16:25; **Ex. 81** (Nadella Dep. Tr.) 274:24-276:4, 277:3-23, 17:19-18:7, 25:16-22, 29:10-30:3; **Ex. 115** (Suleyman Dep. Tr.) 35:9-36:8; **Ex. 99** (Ribas Dep. Tr.) 22:2-25, 10:23-11:6, 11:23-12:3, 14:2-23, 17:9-18:10, 18:3-19:19.

**News Plaintiffs' Response to Microsoft Paragraph 1**:

**Undisputed** that a large language model ("LLM") is a machine learning deep neural

[1] "*Daily News* Plaintiffs" or "DNP" includes Daily News, LP ("New York Daily News"); Chicago Tribune Company, LLC ("Chicago Tribune"); Orlando Sentinel Communications Company, LLC ("Orlando Sentinel"); Sun-Sentinel Company, LLC ("Sun-Sentinel"); San Jose Mercury-News, LLC ("San Jose Mercury News"); DP Media Network, LLC ("Denver Post"); ORB Publishing, LLC ("Orange County Register"); and Northwest Publications, LLC ("Pioneer Press").

network trained on text with the objective of predicting the next token. **Denied** in part because there is no requirement that an LLM be trained on "vast quantities" of text. The "Large" in "Large Language Model" refers to the large number of parameters (weights), not the size of the training data. Goldstein Opening Rep. ¶ 306. Also **denied** that all machine learning necessarily requires large amounts of data to train. Admissible evidence contradicts this statement. News Plaintiffs' expert Dr. Oren Etzioni opines on academic studies that demonstrate how certain smaller large language models trained on smaller amounts of curated data can outperform larger models trained on larger amounts of lower quality data. *See* Etzioni Opening Rep. ¶¶ 78-85.

Further **denied** to the extent Microsoft contends that the object of next-token prediction is to generate novel natural language rather than to approximate the text on which the model was trained. OpenAI's former Chief Technology Officer Mira Murati rejected that framing as well, testifying that she did [redacted] of generating text that appears human-generated. NP Ex. 506 (Murati Depo Tr.) at 105:2-13.

**<u>Microsoft Paragraph 2</u>:** Machine learning requires large amounts of data, and the more complex and varied the domain, the greater the volume and diversity of data needed for a model to learn patterns that generalize reliably to new inputs. Natural language is among the most complex of such domains.

Lafferty Decl. ¶¶ 16, 41, 45, 52, 66, 70, 77, 81, 90, 97, 99-100.

**<u>News Plaintiffs' Response to Microsoft Paragraph 2</u>**:

**Denied** to the extent Microsoft states that natural language is "among the most complex of such domains." Microsoft does not define the "domains" of which natural language is supposedly the most "complex," nor does Microsoft define "complex." As such, the statement is vague and

undefined.

**Denied** that all machine learning necessarily requires large amounts of data to train. Admissible evidence contradicts this statement. News Plaintiffs' expert Dr. Oren Etzioni opines on academic studies that demonstrate how certain smaller large language models trained on smaller amounts of curated data can outperform larger models trained on larger amounts of lower quality data. *See* Etzioni Opening Rep. ¶¶ 78-85.

Also **denied** because the training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75.

**Microsoft Paragraph 3:** LLMs are a general-purpose technology capable of a wide variety of natural language processing tasks, such as summarization, translation, reasoning, content generation, and question answering.

Lafferty Decl. ¶¶ 16, 33, 36, 45, 77-78; *see also* Hurst Decl. **Ex. 112** (Song Dep. Tr.) 32:13-33:25; **Ex. 54** (Huynh Dep. Tr.) 95:23-96:4, 7:11-8:18, 15:3-7, 15:25-16:25, 17:14-22; **Ex. 81** (Nadella Dep. Tr.) 274:24-276:4, 277:3-23; **Ex. 115** (Suleyman Dep. Tr.) 35:9-36:8; **Ex. 99** (Ribas Dep. Tr.) 18:3-19:19, 22:2-25; **Ex. 119** (Templeton 30(b)(6) Dep. Tr. (Vol. 2, dated Jan. 21, 2026)) 407:24-408:9; **Ex. 118** (Templeton 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 20, 2026)) 13:14-16, 14:14-20, 15:2-12, 16:18-19:10, 22:1-14, 22:25-23:15, 24:2-25:25, 26:14-27:16, 221:6-222:20.

**News Plaintiffs' Response to Microsoft Paragraph 3**:

**Undisputed** that LLMs are capable of natural language processing tasks, such as summarization, translation, content generation, and question answering. **Denied** that LLMs are

capable of reasoning.

Admissible evidence contradicts Microsoft's statement that LLMs are capable of reasoning. LLMs are statistical prediction machines that merely mimic human reasoning. Wenger Rebuttal Rep. at 17 ("LLMs are machines designed to predict what a human would likely say in a given context and nondeterministically mimic that expression"); Mitchell Opening Rep. ¶ 26 ("the LLM is trained to develop a statistical model of language—a representation of how collections of words tend to be associated with other collections of words").

**Denied** to the extent Microsoft invokes the phrase "general-purpose technology" in a misleading way, as an undisputed economic definition rather than a description of technology. McDonald Rebuttal Rep. at 47 (describing the General Purpose Technology Framework is drawn from the economics of growth and innovation literature and is used to explain patterns of aggregate productivity growth but is not meant to be used as an analytical framework for evaluating effects on markets or industries).

**Denied** also to the extent that Microsoft intends to imply that Defendants' LLMs were not trained for specific purposes. Admissible evidence contradicts this. *See, e.g.*, Etzioni Opening Rep. ¶ 155 (opining based on OpenAI testimony that OpenAI focused its mid-training on training on "fresh" data in order to improve the LLM's ability to output fresh news content); NP Ex. 639 [Koch 30(b)(6) Depo. Tr.] at 33:22-34:23 (testifying that OpenAI's mid-training team had a goal to use news data during mid-training to improve freshness).

**Microsoft Paragraph 4:** The process of training an LLM involves:

a) Acquiring a large volume of text to assemble a training corpus—typically by crawling and scraping publicly accessible data on the internet in a manner that has existed before LLMs

were invented;

Lafferty Decl. ¶¶ 69, 79, 89-91, 100; Tucker Decl. ¶ 13(d), 167-173; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 32:5-33:14, 48:20-24, 66:23-67:10, 95:10-23); **Ex. 130** (Yuan Dep. Tr.) 12:11-14:13, 28:6-12, 8:6-25, 10:9-23.

**News Plaintiffs' Response to Microsoft Paragraph 4(a)**:

The umbrella clause is **denied** to the extent that "training" refers to anything other than pretraining a large language model. The umbrella clause is also **denied** to the extent it suggests the ensuing sub-paragraphs contain a complete description of the entire model training process. For example, training a model often involves other techniques, such as reinforcement learning with human feedback. Wenger Opening Rep. at 23. In addition, pretraining involves other steps not referenced in this statement. For example, after scraping but before tokenization, various steps are performed, such as deduplication, filtering, and text extraction. NP Ex. 748 [OpenAI's Responses to Daily News Plaintiffs' Fifth Set of Interrogatories], No. 17 (describing use of HTML-to-text extractors, "newspaper" and "dragnet" extractors, use of OpenAI-developed text extractor called "gutentag"); NP Ex. 752 [OpenAI's Supplemental Response to Ziff Davis Interrogatory No. 20 (Feb. 27, 2026)] at 14 (same & describing the first step in OpenAI's processing pipeline as text extraction); NP. Ex. 756 [OpenAI's Supplemental Response to Intercept Interrogatory No. 3 (Dec. 31, 2025)] at 6 (same & describing the first step in OpenAI's processing pipeline as text extraction); NP Ex. 748 [OpenAI's Responses to Daily News Plaintiffs' Fifth Set of Interrogatories], No. 17 (OpenAI filtered Common Crawl data to remove material); NP Ex. 752 [OpenAI's Supplemental Response to Ziff Davis Interrogatory No. 20 (Feb. 27, 2026)] at 15 (same); NP. Ex. 756 [OpenAI's Supplemental Response to Intercept Interrogatory No. 3 (Dec. 31,

2025)] at 6 (same).

Subparagraph (a) is **denied** to the extent it states that Defendants crawled and scraped News Plaintiffs' and other owners' content from the internet for training in a manner consistent with preexisting practice. Admissible evidence contradicts Microsoft's statement. There was no preexisting practice that permitted the scraping and crawling of content that would then be used to compete against the creators or owners of that content, or in violation of a website's terms of use. Wenger Rebuttal Rep.at 19-21. Moreover, much of News Plaintiffs' content is not "publicly accessible" because it is protected by a paywall or registration wall; to the extent Defendants were able to access it, they did so using improper means. *See, e.g.*, NP Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 168:17-20 (testifying that The Times launched the paywall on its website in March 2011); NP Ex. 411 [NYT_01014327] at 28, 31 (indicating that The Times's metered paywall was at 5 free articles in July 2020); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 237:12-19, 239:5-19 (describing *Daily News* Plaintiffs' paywall meters).

Further **denied** because the training corpus for an LLM can and does include sources other than web data obtained from crawling; for example, one can license content from humans or hire humans to write the content needed for pretraining data. *See* Wenger Rebuttal Rep. at 14-15.

Further **denied** because LLMs can be trained without using vast quantities of text. *See* Etzioni Opening Rep. ¶¶ 78-85.

b) Processing the textual data into a numerical format that can be used by a neural network—*i.e.*, tokenization, whereby readable text is broken into unique "tokens" comprised of short words, segments of longer words, or groupings of characters, and then integers are assigned

to each token;

Lafferty Decl. ¶¶ 105-114; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 19:12-20:18, 176:22-177:23; **Ex. 117** (Sutskever Dep. Tr.) 141:8-142:2, 19:15-19, 21:12-22:7, 26:17-29:8; **Ex. 117.A** (Sutskever Dep. Ex. 12 - Language Models Are Few-Shot Learners GPT-3 Research Paper) 8-11.

**News Plaintiffs' Response to Microsoft Paragraph 4(b):**

**Undisputed** that **Defendants** convert language data into tokens. **Disputed** to the extent Microsoft contends that tokenization transforms the underlying expression into something other than the text itself. In his deposition, OpenAI's CEO Sam Altman stated that [redacted] NP Ex. 607 (Altman 30(b)(1) Depo Tr.) at 116:11-13.

c) Embedding the tokens in high-dimensional, mathematical space, where tokens are represented by numerical vectors that point toward and away from each other based on relationships among the tokens gleaned from numerous contexts across the entirety of the training corpus;

Lafferty Decl. ¶¶ 33, 115-123; *see also* Hurst Decl. **Ex. 117** (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 53:3-17, 67:9-15, 141:8-142:2; **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 50:10-19.

**News Plaintiffs' Response to Microsoft Paragraph 4(c):**

**Undisputed** that tokens are represented by numerical vectors reflecting relationships among tokens. **Disputed** to the extent Microsoft contends that those relationships are properties of the training corpus in the aggregate rather than of the individual works within it, for the reasons

set forth in response to Microsoft's Paragraph 11.

d) Processing those vectors through transformer layers and repeatedly making small adjustments to the model "parameters," a set of numerical model weights that the model uses to predict the next token in a sequence of text, shape the model's weights.

Lafferty Decl.¶¶ 137-147; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 18:16-19:4, 176:24-177:23; **Ex. 101** (Rossett Dep. Tr.) 67:25-68:9, 8:1-9, 8:24-9:9, 17:6-18:4, 18:22-23:2; **Ex. 117** (Sutskever Dep. Tr.) 141:8-142:2; **Ex. 117.A** (Sutskever Dep. Ex. 12 - Language Models Are Few-Shot Learners GPT-3 Research Paper) 2-8.

**News Plaintiffs' Response to Microsoft Paragraph 4(d):**

**Undisputed** that the models at issue in this case encode numerical values in a network of parameters or weights. **Disputed** to the extent Microsoft suggests that "[p]rocessing those vectors through transformer layers" transforms the underlying expression into something other than the text itself, for the reasons set forth in response to Microsoft's Paragraph No. 4(b).

(e) Periodically during training, the model will be presented with data it has not seen during training in order to measure the model's generalization ability. Training continues as long as the model's performance on the unseen data continues to improve. Once the model begins to perform well on training data but begins to lose accuracy on testing data, the

training stops.

Lafferty Decl. ¶ 71.

**<u>News Plaintiffs' Response to Microsoft Paragraph 4(e):</u>**

**Denied** insofar as the statement asserts that the objective of LLM training is generalization. Admissible evidence contradicts that assertion. The training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75; Mitchell Reply Rep. ¶ 21; NP Ex. 621 [Ryder 30(b)(6) Depo. Tr.] at 175:06-176:10 (OpenAI 30(b)(6) witness on LLM training topics: "[redacted]"). Generalization can be a hoped-for outcome of model training, but it is not the training objective. Mitchell Reply Rep. ¶ 21.

**Denied** also as to the third sentence in the statement. Admissible evidence contradicts that sentence. The training does not "stop[]", as Microsoft contends above; there are additional phases of LLM training including mid-training and post-training. Mitchell Opening Rep. ¶¶ 90-99. For example, mid-training takes a base model and trains it further on domain-specific data, including news articles. *Id.* OpenAI specifically targeted "current events / news articles (NYT data, etc.)" as priority for mid-training, meaning OpenAI used mid-training to improve its LLMs' ability to produce news content. NP Ex. 759 [OPCO_MDL_004740422] at -422; *see also* NP Ex. 761 [OPCO_MDL_000481870] (members of OpenAI's mid-training team stating a goal was to "crush

freshness in the domain of real-world news" with "[redacted] accuracy on current events").

**<u>Microsoft Paragraph 5</u>:** Training an LLM requires an enormous volume of text. Publicly disclosed training-set sizes for frontier models rose from approximately 2 trillion tokens in 2023 to approximately 18 trillion tokens by late 2024.

Lafferty Decl. ¶¶ 91-92; Hurst Decl. **Ex. 215** (OPCO_MDL_004424223) at -226; **Ex. 197** (MSFT_AI_MDL_000221039) at -042.

**<u>News Plaintiffs' Response to Microsoft Paragraph 5</u>**:

**Denied.** Admissible evidence contradicts the statement. For example, smaller LLMs typically do not require trillions of tokens. NP Ex. 1345 [S. Biderman et al., Pythia: A Suite for Analyzing Large Language Models Across Training and Scaling, *Proceedings of the 40th International Conference on Machine Learning*, 2023] (describing Pythia-12B, an LLM that was trained on 300 billion tokens).

**<u>Microsoft Paragraph 6</u>:** The GPT models at issue were pre-trained on corpora of this scale: GPT 3 on approximately 300 billion tokens; GPT-4 and GPT-3.5 Turbo on approximately [redacted] tokens (epoch weighted); and GPT-4o on approximately [redacted] tokens (epoch weighted).

Lafferty Decl. ¶¶ 91-92, 94-97; Hurst Decl. **Ex. 196** (MSFT_AI_MDL_000205724); **Ex. 215** (OPCO_MDL_004424223) at -226; **Ex. 197** (MSFT_AI_MDL_000221039) at -042; **Ex. 96** (Radford Dep. Tr.) 20:25-23:3; **Ex. 227** (Paino Decl.).

**<u>News Plaintiffs' Response to Microsoft Paragraph 6</u>**:

**Undisputed** that it is reported that the GPT models at issue were pre-trained on corpora

of this scale. **Disputed** to the extent Defendants contend that those tokens represent 300 billion distinct tokens of data. In the paper titled "Language Models are Few-Shot Learners," OpenAI explained that "[redacted]." NP Ex. 1359 [Radford Dep. Ex. 32] at 8.

**<u>Microsoft Paragraph 7</u>:** Training an LLM also requires a wide diversity of text. Model developers draw training data from a broad range of sources, including web data, software code, books, encyclopedic and scientific sources, forum posts, and transcripts.

> Lafferty Decl. ¶¶ 34, 89-91, 93-97; Hurst Decl. **Ex. 117** (Sutskever Dep. Tr.) 26:16-21, 27:4-15, 28:5-29:15, 33:17-34:9, 67:9-15, 255:12-18; **Ex. 196** (MSFT_AI_MDL_000205724); **Ex. 215** (OPCO_MDL_004424223) -226; **Ex. 197** (MSFT_AI_MDL_000221039) -042; **Ex. 198** (MSFT_AI_MDL_000221643); **Ex. 213** (OPCO_MDL_001938121).

**<u>News Plaintiffs' Response to Microsoft Paragraph 7</u>**:

**Denied** that training all LLMs requires a wide diversity of text in all circumstances. Admissible evidence contradicts this statement. News Plaintiffs' expert Dr. Oren Etzioni opines on academic studies that demonstrate how certain smaller large language models trained on smaller amounts of curated data can outperform larger models trained on larger amounts of lower quality

data. *See* Etzioni Opening Rep. ¶¶ 78-85.

**<u>Microsoft Paragraph 8</u>:** The internet is the only practicable source of text at a scale sufficiently voluminous and varied to train a general-purpose LLM.

Lafferty Decl. ¶¶ 45, 90-91; Usdan Decl. ¶ 10; *see also* Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) 80:3-81:23; **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 48:20-24, 67:2-6; **Ex. 117** (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 33:17-34:9, 67:9-15, 255:12-18; **Ex. 130** (Yuan Dep. Tr.) 28:6-25, 12:11-14:13.

**<u>News Plaintiffs' Response to Microsoft Paragraph 8</u>**:

**Denied.**

Admissible evidence contradicts Microsoft's statement. Microsoft's statement wrongly presupposes a strict dichotomy between the internet and other non-internet sources. In reality, model developers can use both internet and non-internet sources and thus reduce reliance on the internet. For instance, they can hire humans to write training data or acquire large volumes of books through licensing deals. They can also use any books that are in the public domain. In addition, Microsoft's statement elides relevant distinctions among internet sources. For example, model developers can rely on internet sources in the public domain or those they have licensed from consenting parties. Wenger Rebuttal Rep. at 12-14; Etzioni Rebuttal Rep. ¶ 259 ("[C]apable models can be built on alternative data sources (e.g., licensed content, public-domain content, and content obtained with consent) combined with careful curation.").

**<u>Microsoft Paragraph 9</u>:** LLM training requires an enormous volume and a wide diversity of textual data because the fundamental objective of training is generalization—producing a model

capable of responding to new, previously unseen inputs across an effectively unlimited range of contexts and tasks.

Lafferty Decl. ¶¶ 16, 17, 34, 90-91, 98, 154-156.

<u>**News Plaintiffs' Response to Microsoft Paragraph 9**</u>:

**Denied.**

Admissible evidence contradicts Microsoft's statement. The training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75; Mitchell Reply Rep. ¶ 21; NP Ex. 621 [Ryder 30(b)(6) Depo. Tr.] at 175:06-176:10 (OpenAI 30(b)(6) witness on LLM training topics: "[redacted]"). Generalization can be a hoped-for outcome of model training, but it is not the training objective. Mitchell Reply Rep. ¶ 21. Moreover, admissible evidence proves that Defendants trained the at-issue LLMs not for an "unlimited range of contexts and tasks", but rather to become capable of producing news-like outputs and providing news content to users. NP Ex. 1021 [OPCO_MDL_001837980] at slide 31 (In a presentation dated October 2020, Anthropic's Dario Amodei – who was then a top researcher at OpenAI – listed "News Generation" as one of GPT-3's "Skills"); NP Ex. 745 [OPCO_MDL_000220773] at -783-784 (OpenAI's President Greg Brockman stating: "we are excellent at news btw. every time i do any generative stuff on NYT it seems to predict the next sentence pretty well. so i kinda have a mental model of davinci as very good at any news task."); NP Ex. 855 [MSFT_AI_MDL_000047584] at -588 (Microsoft's Chief Technology Officer Kevin Scott writing in August 2022: "[redacted]).

Further denied because LLMs can be trained without using enormous quantities of text.

*See* Etzioni Opening Rep. ¶¶ 78-85.

**<u>Microsoft Paragraph 10</u>:** The capacity to generalize is an emergent property of learning across the complete distribution of the training data. No individual work is responsible for conferring that capability.

Lafferty Decl. ¶¶ 16, 33-34, 45, 66, 80-81, 99, 145-146; *see also* Hurst Decl. **Ex. 81** (Nadella Dep. Tr.) 90:9-23, 274:12-275:12.

**<u>News Plaintiffs' Response to Microsoft Paragraph 10</u>**:

**Denied** insofar as the statement asserts that generalization is the objective of model training. Admissible evidence contradicts that statement. The training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75; Mitchell Reply Rep. ¶ 21; NP Ex. 621 [Ryder 30(b)(6) Depo. Tr.] at 175:06-176:10 (OpenAI 30(b)(6) witness on LLM training topics: "[redacted]"). Generalization can be a hoped-for outcome of model training, but it is not the training objective. Mitchell Reply Rep. ¶ 21. Undisputed that no individual work in the training corpus is

responsible for achieving next-token prediction.

**Microsoft Paragraph 11:** Because the statistical patterns a model learns are distributed redundantly across millions of sources spanning trillions of tokens, the removal of any single work or collection of works from the training corpus would not materially alter the statistical structure the model learns.

Lafferty Decl. ¶ 33-34, 99, 322.

**News Plaintiffs' Response to Microsoft Paragraph 11**:

**Denied** to the extent Microsoft states that removing a category of works from the training corpus would not materially alter the statistical structures the model encodes with respect to that category.

Admissible evidence contradicts Microsoft's statement. Including news content in a model increases the model's ability to produce news-style outputs. Thus, removing the category of "news content" will materially reduce the model's ability to produce news-style outputs. Wenger Rebuttal Rep. at 16-17 ("[A] pretrained model lacking substantial news content in its training corpus would be less capable of producing that type of output"); Etzioni Opening Rep. ¶ 99 ("if you want to provide news-like answers to users, news-like content is required during training"); Etzioni Rebuttal Rep. ¶ 70 ("The capability to produce news-like outputs comes from training on the expressive features of journalism."); Etzioni Rebuttal Rep. ¶ 67 (a model trained on News Plaintiffs' works learns the form of journalism, not merely the underlying facts); Mitchell Opening Rep. ¶¶ 110-112; NP Ex. 130 [Brockman Depo. Tr.] at 300:15-18 ("[W]hen you train these models on data for – they're relevant to specific areas, broad areas, like coding, they get better at that area."); NP Ex. 749 [OPCO_MDL_004738943] at -43 (OpenAI internal document stating that

"[w]hen thinking about whether or not to include a new dataset in our pre-training runs, there should be only two considerations," including whether "the capability that it advances [is] something we want").

**<u>Microsoft Paragraph 12</u>:** A properly trained LLM is a set of billions or even trillions of numerical parameters (mathematical weights) that encode generalized statistical relationships of language such that the model can simulate conversation and reasoning.

Lafferty Decl. ¶¶ 16, 33-35, 45, 52, 71-72, 74-76, 90-91, 94-100, 139-40, 154-55, 157-58, 164; *see also* Hurst Decl. **Ex. 81** (Nadella Dep. Tr.) 90:9-23, 275:4-276:13; **Ex. 103** (Russinovich Dep. Tr.) 106:4-107:15, 9:3-14, 9:18-23, 12:24-13:15, 14:18-15:17, 16:5-10; **Ex. 16** (Brockman Dep. Tr.) 319:20-320:12, 23:19-23, 24:3-8, 26:22-27:9, 37:9-38:8; **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 50:10-51:23, 181:25-182:4; **Ex. 117** (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 33:17-34:9, 67:9-15, 255:12-18; **Ex. 96** (Radford Dep. Tr.) 20:25-23:3.

**<u>News Plaintiffs' Response to Microsoft Paragraph 12</u>**:

**Denied** insofar as the statement implies there is only one way to "properly train" an LLM. Undisputed that an LLM can be a set of billions or even trillions of numerical parameters (mathematical weights) that encode generalized statistical relationships of language. Further **denied** as to "conversation" and "reasoning," for the reasons set forth in response to Microsoft's

Paragraph No. 3. What the models produce is an imitation of conversation and/or reasoning.

**Microsoft Paragraph 13:** When generalization is strong, an LLM generates coherent and contextually appropriate text about unfamiliar subjects because its parameters represent the deeper structure of language rather than the surface content of the training set; the resulting output is novel text distinct from the source material used for training.

Lafferty Decl. ¶¶ 76-77, 81, 98, 141, 145, 155-56; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 48:20-50:19, 104:4-17, 180:21-182:4, 184:18-185:18; **Ex. 16** (Brockman Dep. Tr.) 265:19-266:5.

**News Plaintiffs' Response to Microsoft Paragraph 13**:

**Denied** to the extent Microsoft suggests when an LLM's generalization is "strong" its output will be novel and will not reproduce or regurgitate the data on which it was trained. To the contrary, optimal generalization depends on the LLM memorizing its training data. *See* Goldstein Rebuttal Rep. ¶ 71 ("To accurately predict and generate text within the long tail, a deep learning model has no choice but to memorize subpopulation-specific, unique expressions."); Goldstein Rebuttal Rep. ¶ 62 ("Sometimes optimal generalization requires the verbatim memorization of unique, subpopulation-specific expressions."); Mitchell Rebuttal Rep. ¶ 25 ("machine learning researchers have shown that, in large deep neural networks such as LLMs, memorization and generalization abilities can and do co-exist."); Mitchell Rebuttal Rep. ¶ 36 ("pitting memorization against generalization is a false dichotomy; it has been demonstrated in many studies that in neural networks with large numbers of parameters (e.g., LLMs), the tendency to memorize training data can co-exist with generalization abilities. In fact, these behaviors are hard to separate"); Etzioni Rebuttal Rep. ¶ 42 ("it is well known that LLMs both generalize and memorize, and they do these

together along a spectrum that depends on training data frequency, sequence rarity, and model capacity.").

It is also disputed that an LLM's "resulting output is novel text distinct from the source material used for training," for the reasons set forth in greater detail in response to Microsoft's Statement of Fact No. 14.

**<u>Microsoft Paragraph 14</u>:** Models can at times generate text that was part of their training corpus, a known phenomenon called regurgitation. However, instances of regurgitation in a properly trained model are extremely rare. A model that has a tendency to regurgitate its training data reflects an unintended side-effect of the training process rather than the intended operation of the model.

Lafferty Decl. ¶ 35; *see also* Usdan Decl. ¶¶ 19-20.

**<u>News Plaintiffs' Response to Microsoft Paragraph 14</u>**:

The first sentence is **undisputed.** The remainder is **denied.**

Admissible evidence contradicts Microsoft's statement that regurgitations in a properly trained model are "extremely rare." (For purposes of this response, News Plaintiffs assume that OpenAI's GPT models are "properly trained model[s].") Wenger Opening Rep. at 69-70 (OpenAI had "reason to know that its models could and would regurgitate training data" and noting OpenAI's witnesses testified models can memorize and regurgitate); Wenger Reply Rep. at 93 ("[T]he likely inefficacy of these techniques is supported by both my and Dr. Berg-Kirkpatrick's analysis of OpenAI's models, which report thousands of regurgitations of copyrighted content, including from news sources."); Goldstein Opening Rep. ¶¶ 293-376 (explaining propensity of models at issue to memorize and regurgitate and providing results). Microsoft's own expert Dr. Lafferty also identified at least 35,806 Copilot outputs in the 8.2 million Copilot conversations that

contained a minimum of six non-overlapping 16-grams (96 words) with an Asserted Work. NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 120. *See e.g.* Maisel Decl., Ex. E (Microsoft Copilot Infringement Rule 1006 Summaries) (Microsoft copied at least 58 of The Times's Asserted Works in 60 Copilot conversations, 68 of DNP's Asserted Works in 69 Copilot conversations); Wenger Opening Rep. at 105-08 (finding Copilot copied 35 Mother Jones Registered Asserted Works across 77 hits in 51 conversations); NP Ex. 816 [MSFT_AI_MDL_002881582] (Copilot output logs); Bauerlein Decl. Ex. D. NP Ex. 1170 [CIR Copilot ConvoID Table] (Asserted Works matched to Copilot logs); Wenger Rebuttal Rep. at 38 (describing 20 million ChatGPT conversation sample underrepresents the number of Plaintiff-related conversations and therefore the extrapolation likely underestimates the true amount of Plaintiff-related regurgitations by ChatGPT); *see also* MSFT News MSJ Br. at 22 (Microsoft acknowledging at least 59,545 instances of regurgitation of News Plaintiffs' content in Copilot logs).

Admissible evidence also contradicts Microsoft's statement that regurgitation is an unintended side effect of the training process. Generalization requires memorization of training data, and memorized data is prone to regurgitation. Wenger Rebuttal Rep. at 7-12, 75-76. Further, the cited evidence does not support the proposition that regurgitation is an unintended side effect of the training process. Jordan Usdan's Declaration references a specific agreement between HarperCollins and Microsoft and represents his perspective on why anti-regurgitation terms were added to an agreement, but does not serve as evidence that regurgitation is an unintended side effect of LLM models generally. Usdan Decl. ¶¶ 19-20 ("[redacted]

[redacted]”).

**<u>Microsoft Paragraph 15</u>:** At OpenAI’s request, Microsoft provided OpenAI with portions of the Bing Index, the web index that powers Microsoft’s Bing search engine.

Hurst Decl. **Ex. 118** (Templeton 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 20, 2026)) 304:9-16; **Ex. 119** (Templeton 30(b)(6) Dep. Tr. (Vol. 2, dated Jan. 21, 2026)) 390:22-391:1; **Ex. 38** (Gaggara 30(b)(6) Dep. (dated Aug. 20, 2025)) 44:13-15; **Ex. 37** (Gaffney 30(b)(6) Dep. Tr.) 131:20-133:2, 9:2-5, 9:15-10:5, 10:19-25; **Ex. 37.A** (Gaffney Dep. Ex. 16) at 2-3.

**<u>News Plaintiffs’ Response to Microsoft Paragraph 15</u>**:

**Undisputed** that Microsoft provided OpenAI with the Bing Index as part of what OpenAI’s Chief Research Officer Bob McGrew described as a “trade.” NP Ex. 616 [OPCO_MDL_001936752] at -752 (“the idea here [was] that we’re giving data to them and they are giving data to us”). **Disputed** to the extent Microsoft characterizes what it transferred as mere “portions” of the Bing Index. Microsoft provided OpenAI with the full offline version of the Bing Index. NP Ex. 615 [Gaggara Aug. 20, 2025 30(b)(6) Depo. Tr.] at 145:25-146:7.

**<u>Microsoft Paragraph 16</u>:** The provision of portions of the Bing Index to OpenAI was a step in the process for the purpose of training LLMs.

Hurst Decl. **Ex. 107** (Shan Dep. Tr.) 318:11-319:9; **Ex. 37** (Gaffney 30(b)(6) Dep. Tr.) 131:20-133:2; **Ex. 37.A** (Gaffney Ex. 16); **Ex. 16** (Brockman Dep. Tr.) 323:11-16.

**<u>News Plaintiffs’ Response to Microsoft Paragraph 16</u>**:

**Denied** that the provision of Bing Index to OpenAI was solely a step in the process for the purpose of training LLMs. NP Ex. 621 [Ryder 30(b)(6) Depo. Tr.] at 66:5-68:25, 158:14-159:7;

NP Ex. 414 [Sohl Dec. 9, 2025 30(b)(6) Depo. Tr.] at 345:5-13 (OpenAI used the Bing Index data provided by Microsoft to develop, test, and evaluate its large language models); NP Ex. 617 [Canel 30(b)(6) Depo. Tr.] at 153:13-155:21 (Microsoft and OpenAI both used the Bing Index for retrieval augmented generation); NP Ex. 409 [Perelman 30(b)(6) Depo. Tr.] at 131:17-22 (When ChatGPT first began using retrieval augmented generation to respond to user queries, the first source that ChatGPT used for retrieval augmented generation was the Bing Index); NP Ex. 813 [OPCO_MDL_001895987] at slide 4 (Microsoft's Bing Index "powers ChatGPT browsing" and ChatGPT Browsing used the Bing API). Further disputed to the extent Microsoft characterizes what it transferred as mere "portions" of the Bing Index. Microsoft provided OpenAI with the full offline version of the Bing Index. NP Ex. 615 [Gaggara Aug. 20, 2025 30(b)(6) Depo. Tr.] at 145:25-146:7.

**Microsoft Paragraph 17:** To create the Deucalion model, Microsoft participated in post-training on GPT 3.5 Turbo using a synthetic dataset derived from Bing Chat user conversations, of which at most .02% included New York Times content.

Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. Vol. 2 (dated July 31, 2026)) 525:3–15; Lafferty Decl. ¶¶ 25, 336, 338-39.

**News Plaintiffs' Response to Microsoft Paragraph 17**:

**Undisputed** that Microsoft post-trained the Deucalion model using The Times's content.

**<u>Microsoft Paragraph 18</u>:** The purpose of creating the Deucalion model was to improve the performance of GPT 3.5 Turbo in following instructions and accurately answering user questions as part of the Copilot product.

Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 204:5-22, 206:13-207:22, 15:18-21, 16:1-5, 18:7-12, 22:25-23:8, 23:21-25:6, 26:12-27:4; **Ex. 199** (MSFT_AI_MDL_002644093); **Ex. 113** (Song 30(b)(6) Dep. Tr.) 46:5–47:13, 53:8–19; Lafferty Decl. ¶¶ 339-40.

**<u>News Plaintiffs' Response to Microsoft Paragraph 18</u>**:

**Undisputed.**

**<u>Microsoft Paragraph 19</u>:** The New York Times's experts performed no causal analysis demonstrating that the use of at most .02% of New York Times content to construct the synthetic Deucalion post-training dataset contributed in any measurable way to the performance of the Deucalion model.

Lafferty Decl. ¶¶ 337-39.

**<u>News Plaintiffs' Response to Microsoft Paragraph 19</u>**:

**Undisputed** that Microsoft post-trained the Deucalion model using The Times's content. Disputed to the extent this statement suggests Dr. Goldstein did not explain how Microsoft used The Times's content to improve the performance of the Deucalion model.

Dr. Goldstein explained that Microsoft used the Deucalion fine-tuning data, which included The Times's content, "to improve instruction following and overall response quality," and this use led to model responses that were "more information rich" than the responses generated by GPT-

3.5. *See* Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶ 181.

**<u>Microsoft Paragraph 20</u>:** News Plaintiffs' expert Dr. Goldstein states he also found The Denver Post's content in the Deucalion model post-training dataset, but he did not quantify that content or ascribe any value to it in the performance of the model.

Hurst Decl. Ex. **231** (Goldstein Opening Report) ¶ 181.

**<u>News Plaintiffs' Response to Microsoft Paragraph 20</u>**:

**Undisputed** that Microsoft post-trained the Deucalion model using The Denver Post's content. Disputed to the extent this statement suggests that Dr. Goldstein did not explain how Microsoft used The Denver Post's content to improve the performance of the Deucalion model.

Dr. Goldstein explained that Microsoft used the Deucalion fine-tuning data, which included The Denver Post's content, "to improve instruction following and overall response quality," and this use led to model responses that were "more information rich" than the responses generated by GPT-3.5. *See* Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶ 181.

**<u>Microsoft Paragraph 21</u>:** News Plaintiffs publish the Asserted Works (which they define as consisting of individual articles) to be read by people for information, edification, and entertainment.

Hurst Decl. **Ex. 59** (Julien 30(b)(6) Dep. Tr.) 23:1-25:3; **Ex. 42** (Gordon Dep. Tr.) 20:12-21:6; **Ex. 13** (Bauerlein Dep. Tr. (dated January 27, 2026)) 46:20-25; **Ex. 31** (Dolnick Dep. Tr.) 21:4-15; **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-14; **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 185:3-8; **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 311:1-15; Tucker Decl. ¶¶ 11(b), 95-97, 102.

**News Plaintiffs' Response to Microsoft Paragraph 21:**

**Undisputed** that the Asserted Works consist of individual articles. **Denied** that News Plaintiffs publish the Asserted Works solely or exclusively "to be read by people for information, edification, and entertainment." Admissible evidence contradicts this.

News Plaintiffs publish the Asserted Works for many reasons, not limited to the reasons identified. *See, e.g.*, NP Ex. 18 [Burbach 30(b)(1) Depo. Tr.] at 14:18-22 ("to deliver news that is of distinct value to our communities and attract readers and subscribers, deliver news that will persuade people to look at us, to look at us again, and to pay us"); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 104:6-8 ("public service, government accountability"); NP Ex. 3 [Sulzberger 30(b)(1) Depo. Tr.] at 129:4-130:9 (testifying about The Times's "accountability reporting" and reporting on "subjects that really matter to the health of society").

News Plaintiffs object because the cited evidence does not support Microsoft's asserted fact. *See* Hurst **Ex. 59** (Julien 30(b)(6) Dep. Tr.) 23:1-25:3 (testifying that the New York Daily News provides online news, information, and stories); Hurst **Ex. 42** (Gordon Dep. Tr.) 20:12-21:6 (testifying that "audience" refers to users or people who are reading their journalism); Hurst **Ex. 13** (Bauerlein Dep. Tr. (dated January 27, 2026)) 46:20-25 (testifying that reporters write and produce stories or audio-visual productions); Hurst **Ex. 31** (Dolnick Dep. Tr.) 21:4-15 (testifying about how The Times's journalism is produced by human reporters and editors for readers); Hurst **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-14 (a question about the different types of plaintiffs' subscription revenue streams); Hurst **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 185:3-8 (a Q&A about licensing revenue); Hurst **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 311:1-15 (testimony about how the CIR decides which entities to license its content to); Tucker Decl. ¶¶ 11(b) (opining that the Asserted Works consist of curated, original

journalism that consumers read to stay informed about current events and related topics), ¶¶ 95-97 (opining that newspapers provide timely, relevant, and authoritative stories), ¶ 102 (opining about the purported differences between journalism and Generative AI).

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

### 2. *Nature of the Work (Factor 2) and Amount and Substantiality Used (Factor 3)*

**Microsoft Paragraph 22:** The LLM training process deconstructs works into tokens, then analyzes the patterns among various pieces of tokenized content in order to translate those patterns into model weights–all to gain access to underlying facts, ideas, linguistic patterns, and statistical relationships.

Lafferty Decl. ¶¶ 77, 80-81, 105-114, 137-39, 141, 144-47, 283; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 18:12-19:4, 19:12-20:18, 48:25-49:24, 50:10-19, 104:15-17, 176:22-177:23; **Ex. 101** (Rossett Dep. Tr.) 18:22-23:2, 67:25-68:9.

**News Plaintiffs' Response to Microsoft Paragraph 22**:

**Undisputed** that the LLM training process deconstructs works into tokens, analyzes patterns among tokens, and analyzes the patterns among tokenized content. Otherwise **denied.**

Admissible evidence contradicts the rest of Microsoft's statement. The purpose of the training process is not to "gain access to underlying facts, ideas, linguistic patterns, and statistical relationships." Rather, the goal is to adjust the parameters of the LLM so that its outputs match the

training data as closely as possible. Etzioni Opening Rep. ¶ 31; Goldstein Opening Rep. ¶ 127. Moreover, the purpose of training includes tuning the LLM's parameters to encode the specific structure of different types of text. Mitchell Opening Rep. ¶ 71. Specific structures encoded in the LLM include the precise expression used in those different texts (e.g., emails, news articles, encyclopedia entries, film scripts, etc.), the expressive styles of different writers and publications, and other features of text, as well as general world knowledge (e.g., "apples are a kind of fruit" or "winter, spring, summer and fall are the four seasons"). *Id.* Further, the LLM training process results in verbatim memorization. Mitchell Opening Rep. ¶¶ 113-24.

News Plaintiffs object to Microsoft's reliance on Hurst Exhibits 101 and 104 to support this assertion. The assertion is not limited to the specific LLMs which are at issue in the case, and these exhibits consist of deposition testimony from employees of Defendants who have not been disclosed under Rule 26(a)(2)(C) as non-retained experts.

**Microsoft Paragraph 23:** The patterns extracted through training—including grammar, syntax, semantic relationships, facts, ideas, and concepts—are properties discernable only from the totality of the training data rather than from any individual work.

Lafferty Decl. ¶¶ 16, 33-34, 45, 66, 80-81, 99, 145-146, 283; *see also* SUMF ¶10.

**News Plaintiffs' Response to Microsoft Paragraph 23**:

**Denied.** Admissible evidence contradicts Microsoft's statement.

As explained by News Plaintiffs' expert Melanie Mitchell, LLMs memorize individual works from their training data. Mitchell Opening Rep. ¶ 113. Memorization of training data in an LLM means that the LLM has learned, during its pre-training, to strongly associate the tokens making up a block of training text with one another as well as with references to that text. Mitchell

Opening Rep. ¶ 114; *see also* Etzioni Rebuttal Rep. ¶ 53 (News Plaintiffs' expert Oren Etzioni describing how "memorization" refers to instances where the model retains specific text from its training data in its parameters as a state of the trained model). Defendants knew their LLMs memorized specific text from the training corpus. *See* NP Ex. 684 [OPCO_MDL_004672513] at 3 ("The model will readily produce excerpts from works under copyright."); NP Ex. 716 [OPCO_MDL_000479579] at -83; NP Ex. 720 [OPCO_MDL_001939120] at -124-26; NP Ex. 728 [OPCO_MDL_001639231] at -231; NP Ex. 722 [MSFT_AI_MDL_002836983] at -983; NP Ex. 724 [MSFT_AI_MDL_000665166]; NP Ex. 1268 [MSFT_AI_MDL_000665167] at -167, -169; NP Ex. 730 [OPCO_MDL_001461776] at -776 (OpenAI employees stating that GPT-4 "will have memorized a ton of data and therefore will be insanely good at regurgitation"); NP Ex. 718 [OPCO_MDL_001644364] at 365 (OpenAI's VP of Research, Jerry Tworek: "We train our networks to memorize the training data — that's their objective.").

Also **denied** because style is a pattern that LLMs can learn through training. NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 71 (Microsoft expert admitting that "the ability to generate news-like style or content is what one would expect from a model that has learned recurring statistical patterns of a genre"); NP Ex. 519 [Brundage Depo. Tr.] 108:25-109:10 (former OpenAI employee confirming at deposition that, when a GPT model is presented with the first sentence or two of a news article, the model could "generate something in a style that is similar to what it perceives to be the intended style or the kind of ongoing style of text, which might be news-style coverage"); NP Ex. 684 [OPCO_MDL_004672513] at 3-4 (June 2023 OpenAI presentation noting "the model will readily produce excerpts from works under copyright" and that "it sometimes emulates the style"). Etzioni Opening Rep. ¶ 123 ("From a technical standpoint, a fundamental characteristic of LLMs is that they learn to produce text that mirrors the structural and stylistic properties of their

training data.").

**Microsoft Paragraph 24:** News articles published by News Plaintiffs consist predominantly of factual news reporting.

***The New York Times*:** Hurst Decl. **Ex. 207** (NYT_01077210) (I.3 nyt-2021-2022 – Asserted Works Overview); Procas 30(b)(6) 65:12-66:2. ***New York Daily News:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 131:1-21; **Ex. 79.B** (Morris Dep. Ex. 52 – Asserted Works Overview). ***Chicago Tribune:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 122:2-125:8; **Ex. 79.A** (Morris Dep. Ex. 49 – Asserted Works Overview). ***Orlando Sentinel:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 144:19-145:16; **Ex. 79.D** (Morris Dep. Ex. 56 – Asserted Works Overview). ***Sun Sentinel:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 148:20-149:13; **Ex. 79.E** (Morris Dep. Ex. 58 – Asserted Works Overview). ***Mercury News:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 138:20-139:21**; Ex. 79.C** (Morris Dep. Ex. 54 – Asserted Works Overview). ***The Denver Post:*** Hurst Decl. Ex. 180 (DNP-00636807 - DP Authors_part2). ***The Orange County Register:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 162:18-163:4; **Ex. 79.G** (Morris Dep. Ex. 62 – Asserted Works Overview). ***Pioneer Press:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 154:6-155:22; **Ex. 79.F** (Morris Dep. Ex. 60 – Asserted Works Overview). ***CIR*:** ECF No. 582 (No. 1:24-cv-04872) (Joint Stipulation and [Proposed] Order Regarding Asserted Works); (Ex. 2 to CIR's First Amended Compl. (1:24-cv-04872-

SHS-OTW, ECF 88)); **Ex. 138** (Exhibit A to CIR's First Set of Interrogs. to Defendants).

**<u>News Plaintiffs' Response to Microsoft Paragraph 24</u>**:

**Denied.** Admissible evidence contradicts this.

News Plaintiffs' Asserted Works consist of expressive content about a wide range of topics in various formats, including opinion and analysis. Any purported "factual news reporting" is conveyed through expression and is only a portion of what News Plaintiffs publish. *See, e.g.,* NP Ex. 3 [Sulzberger 30(b)(1) Depo. Tr.] at 128:2-8 (describing The Times's journalism as being systematically verified and then put in a distinctive, compelling story-telling package); Bell Rebuttal Rep. ¶ 202 (opining about how one cannot limit journalism or the works of The Times to the collection and relaying of bare facts, as The Times "commissions guest essays, opinion articles, assembles datasets, and creates visualizations – all of which go much farther than a relaying of facts, and into the creative process of presenting, contextualizing, rationalizing, and critiquing those facts"); NP Ex. 1364 [NYTimes.com Homepage, https://www.nytimes.com/] (demonstrating that The Times publishes a wide range of journalistic works that cover categories including but not limited to breaking news reporting, investigative reporting, beat reporting, reviews and analysis of arts and culture, technology, commentary and opinion, Cooking, and The Athletic); Owen Rebuttal Report ¶ 33 (content includes wide range of topics including investigative reporting; local government, court and community coverage; features; opinions and editorials; reviews; sports; business and finance; arts and entertainment; food, health, and travel; science and technology reporting; weather; obituaries; practical service journalism to help readers navigate daily life); NP Ex. 26 (Chicago Tribune has won 29 Pulitzer Prizes including, *inter alia*, for commentary capturing the culture of Chicago; editorial writing on reforming the death penalty; and editorial writing on the Illinois child welfare system); NP Exs. 28–29 (Orlando Sentinel has

won Pulitzer Prizes for editorial writing regarding lax growth management; and for editorial writing regarding predatory lending practices in Florida). NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 104:2-6 ("Sometimes there's a column that's particularly well written. That might get an award because of the nature of the expression and the actual craft that goes into journalism."); Malackowski DNP/NYT Rebuttal Rep at 6-7 ("News Plaintiffs' copyrighted works are economically valuable, expressive information goods that Defendants specifically sought out for their quality, creativity, uniqueness, and the information value that comes from such expression, which in large part is driven by the fixed investment required to develop such expression. In other words, from an economic perspective, the nature of News Plaintiffs' works is highly distinguishable from 'joe schmo's' blog."); Cross Rebuttal Rep. at 9, 12 (describing news as based on "much more than the presentation of raw facts.") As *Daily News Plaintiffs*' expert, Taylor Owen, explained: "A news article is not only the facts it contains. It is also the reporting that produced those facts: the work of finding the story, developing the sources, gathering documents, verifying what is true, telling the story (e.g., structural writing choices, original phrasing), and exercising editorial judgment about what to publish. The facts and the reporting are not the same thing, and the Defendants' framing tends to treat them as if they were." Owen

Opening Rep. ¶ 52.

News Plaintiffs object to the phrase "factual news reporting" as vague and ambiguous. Plaintiffs further object because the cited evidence does not support the purported fact. *See* Hurst Ex. 207 (NYT_01077210) (I.3 nyt-2021-2022 – Asserted Works Overview) (listing The Times's Asserted Works but not categorizing the works by topic or subject area); Hurst Ex. 93 (Procas 30(b)(6) Depo. Tr.) at 65:12-66:2 (testifying that the summary spreadsheets produced by The Times constitute the list of Asserted Works The Times is asserting in this case). The cited exhibits relating to the *Daily News* Plaintiffs consist of deposition testimony of Ms. Robyn Morris identifying that the asserted articles are identified in a series of spreadsheets, and providing copies of those spreadsheets. The cited evidence says nothing about the amount of facts versus expression contained in the asserted articles. The cited exhibits relating to CIR consist of Mother Jones's Asserted Works and a document narrowing the scope of works at issue. The cited evidence says nothing about the amount of facts versus expression contained in the asserted articles.

**Microsoft Paragraph 25:** The New York Times's *Wirecutter* articles consist predominantly of factual descriptions and comparisons of the attributes and/or performance of various consumer products.

ECF No. 1-69 (No. 1:23-cv-11195) (Exhibit K to NYT Complaint).

**News Plaintiffs' Response to Microsoft Paragraph 25**:

**Denied.** Admissible evidence contradicts this.

Wirecutter's articles consist not only of factual descriptions and comparisons of various consumer products, but also "tremendous and empathetic reporting and research and testing." NP Ex. 87 [Frumin 30(b)(1) Depo. Tr.] at 95:22-96:5 (Wirecutter's Editor-in-Chief Ben Frumin

testifying that Wirecutter's "most proprietary IP advantage… is not the picks on their own, it is when they are paired with an explanation or demonstration of the tremendous and empathetic reporting and research and testing that we've done to settle upon those picks and those recommendations.").

News Plaintiffs object because Microsoft fails to support its assertion with admissible evidence. Indeed, the only evidence Microsoft cites is a list of 17 of The Times's registered, copyrighted Wirecutter works that were attached to the original Times Complaint. *See* ECF No. 1-69 (No. 1:23-cv-11195) (Exhibit K to NYT Complaint).

**Microsoft Paragraph 26**: The New York Times's *NYT Cooking* recipes consist predominantly of one or more lists of ingredients and the steps necessary to transform those ingredients into the specified dish.

Hurst Decl. **Ex. 207** (NYT_01077210) (I.3 nyt-2021-2022 – Asserted Works Overview); Procas 30(b)(6) 65:12-66:2; **Ex. 124** (Velasquez Dep. Tr.) 99:13-17; **Ex. 30** (Diggs Dep. Tr.) 198:7-23.

**News Plaintiffs' Response to Microsoft Paragraph 26:**

**Denied** to the extent that Microsoft is suggesting that the articles and content published by NYT Cooking (as opposed to portions of that content that contains only "recipes") consist predominantly of lists of ingredients and the steps necessary to transform those ingredients into the specified dish.

Admissible evidence contradicts Microsoft's assertion. NP Ex. 1355 [Velasquez 30(b)(1) Depo. Tr.] at 64:18-65:13 (The Times's Camilla Velasquez testifying about how The Times and NYT Cooking publish recipes as well as other content including food articles, collections, and

roundups, including for example compilations of "25 Healthy Ideas for Thanksgiving" or "50 Best Recipes of the Year"), 95:21-96:7 (describing NYT Cooking's "What to Cook Today" guides).

### *3. Impact Upon the Market (Factor 4)*

***The New York Times Company (The New York Times)***

**Microsoft Paragraph 27:** From 2019 to 2024, the vast majority of The New York Times's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots (*e.g.*, syndication)).

Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); **Ex. 10** (Bardeen 30(b)(6) Dep. Tr.) 17:22-18:21, 18:22-19:3; 46:19-47:6; **Ex. 129** (Yang 30(b)(6) Dep. Tr.) 78:24-79:16; **Ex. 76** (Miller 30(b)(6) Dep. Tr.) 130:20-24; **Ex. 45** (Grossman-Cohen 30(b)(6) Dep. Tr.) 24:22-29:19, 101:18-102:16; **Ex. 77** (Miller Dep. Tr.) 10:3-11, 14:2-20; Tucker Decl. ¶¶ 30-31, Figure 2.

**News Plaintiffs' Response to Microsoft Paragraph 27**:

**Undisputed** that the majority of The Times's revenue from exploitation of its Asserted Works was earned through subscriptions and advertising. The third largest category of Times revenue comes from "other" revenue sources, which includes both licensing revenue and affiliate referrals (among other sources). *See* NP Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 77 (reporting that in 2024, 69.2% of The Times's total revenue was from subscriptions, 19.6% was from advertising, and 11.2% was from "other," including affiliate referrals, licensing, commercial printing, leasing, live events, retail commerce, books, television and film, and The

Times's student sponsorship program, and reporting a similar breakdown from 2023).

**<u>Microsoft Paragraph 28</u>:** The New York Times's revenues have increased since the use of its Asserted Works to train the LLMs at issue.

**<u>News Plaintiffs' Response to Microsoft Paragraph 28</u> (Intro)**:

**Denied.** News Plaintiffs incorporate by reference their responses to Paragraph 28 subparts (a) through (e) below.

In addition, admissible evidence contradicts Microsoft's assertion. NP Ex. 130 [Brockman 30(b)(1) Depo. Tr.] at 58:8-10 (testifying that GPT-2 was trained "towards the end of 2018, perhaps early 2019"); NP Ex. 128 [Stamm Rebuttal Rep.] ¶ 379 (OpenAI's economics expert assuming for purposes of her analysis that the date of first infringement for GPT-3 was October 2019); Hurst Ex. 264 [The New York Times SEC Form 10-K Dec. 27, 2020] at 34 (reporting a decrease in The Times's total revenue between 2019 and 2020); NP Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 34 (reporting that The Times's advertising revenue decreased from 2022 to 2023 by 3.5%).

a) The New York Times's total revenue has steadily increased since 2020.

Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); Tucker Decl. ¶¶ 11(a), 30-31, Figure 2.

**<u>News Plaintiffs' Response to Microsoft Paragraph 28</u>(a)**:

**Undisputed** that The Times's revenue has increased year-over-year since 2020. Denied

that The Times's revenue has increased "steadily" over that timeframe, if by "steadily" Microsoft means that The Times's revenue has increased at the same rate each year since 2020. **Denied** to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot.

Admissible evidence contradicts that The Times's revenue has increased since 2020 at the same or a similar rate each year; in fact, after the release of Defendants' products in late 2022 and 2023, The Times's revenue increases have been smaller than during the 2020-2022 timeframe. *See* Hurst Ex. 265 [The New York Times SEC Form 10-K Dec. 26, 2021] at 33 (reporting revenue increase from 2020 to 2021 of $1.78 billion to $2.07 billion, or ~16%); Hurst Ex. 63.A [The New York Times SEC Form 10-K Dec. 31, 2022] at 32 (reporting revenue increase from 2021 to 2022 of $2.07 billion to $2.31 billion, or ~11%); Hurst Ex. 63.B [The New York Times SEC Form 10-K Dec. 31, 2024] at 34 (reporting revenue in 2023 of $2.42 billion, which is an increase from 2022 of ~5%, and showing revenue in 2024 of $2.58 billion, which is an increase from 2023 of ~6.6%); NP Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 35 (reporting revenue increase from 2024 to 2025 of $2.58 billion to $2.82 billion, which is an increase of ~9.2%).

Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way."). Admissible evidence also indicates that The Times's acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. *See* Malackowski Opening Rep. at 84.

News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly

remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

b) The New York Times's subscription revenue has continued to trend upward since 2020.

Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); **Ex. 129** (Yang 30(b)(6) Dep. Tr.) 76:22-77:7; **Ex. 10** (Bardeen 30(b)(6) Dep. Tr.) 95:4-96:4; **Ex. 63** (Levien Dep. Tr.) 21:1-25:10, 36:15-39:6, 42:2-15; **Ex. 63.A** (Levien Dep. Ex. 1) at 36; **Ex. 63.B** (Levien Dep. Ex. 3) 36; Tucker Decl. ¶¶ 11(a), 30-31, Figure 2.

**<u>News Plaintiffs' Response to Microsoft Paragraph 28(b)</u>**:

**Undisputed** to the extent that "trend upward" means increased.

**Denied** to the extent that "trend upward" means that such increases were uniform year to year. Admissible evidence contradicts this. *See* Hurst Ex. 265 [The New York Times SEC Form 10-K Dec. 26, 2021] at 33 (reporting that subscription revenues increased 13.9% from 2020 to 2021); Hurst Ex. 63.A [Levien Dep. Ex. 1 - The New York Times SEC Form 10-K Dec. 31, 2022] at 33 (reporting that subscription revenues increased 14% from 2021 to 2022 in part because The Times acquired The Athletic); Hurst Ex. 266 [Levien Dep. Ex. 2 - The New York Times SEC Form 10-K Dec. 31, 2023] at 34 (reporting that subscription revenues increased 6.7% from 2022 to 2023); Hurst Ex. 63.B [Levien Dep. Ex. 3 - The New York Times SEC Form 10-K Dec. 31, 2024] at 33 (reporting that subscription revenues increased 8% from 2023 to 2024).

**Denied** to the extent Microsoft suggests this means there has been no harm from ChatGPT

or Copilot. Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way."). Admissible evidence also indicates that The Times's acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. Malackowski Opening Rep. at 84.

News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

c) The New York Times's advertising revenue has continued to trend upward since 2021.

Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); **Ex. 63** (Levien Dep. Tr.) 21:1-23:4, 25:11-19, 36:15-39:6, 42:16-18, 21:1-23:4, 36:15-39:6; **Ex. 63.A** (Levien Dep. Ex. 1) at 36; **Ex. 63.B** (Levien Dep. Ex. 3) at 36; **Ex. 100** (Robins Dep. Tr.) 205:17-206:3; Tucker Decl. ¶¶ 11(a), 30-31, Figure 2.

**News Plaintiffs' Response to Microsoft Paragraph 28(c)**:

**Denied** to the extent that "trend upward" means increased. **Denied** to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot.

Admissible evidence contradicts Microsoft's assertion that The Times's advertising

revenue has always continued to increase since 2021. NP Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 34 (reporting that The Times's advertising revenue decreased from 2022 to 2023 by 3.5%). Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"). Admissible evidence also indicates that The Times's acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. Malackowski Opening Rep. at 84.

News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

d) The New York Times's "other" sources of revenue, which includes licensing revenue, has continued to trend upward since 2020.

Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); **Ex. 63** (Levien Dep. Tr.) 25:20-26:14, 36:15-39:6, 43:3-13; **Ex. 63.A** (Levien Dep. Ex. 1)

at 45; **Ex. 63.B** (Levien Dep. Ex. 3) at 43; Tucker Decl. ¶¶ 11(a), 30-31, Figure 2.

**News Plaintiffs' Response to Microsoft Paragraph 28(d)**:

**Undisputed** that The Times's "other" sources of revenue has increased since 2020.

**Denied** to the extent that Microsoft suggests that any such revenue increase has been uniform year-to-year. Admissible evidence contradicts this. *See* Hurst Ex. 265 [The New York Times SEC Form 10-K Dec. 26, 2021] at 33 (reporting that "other" revenue increased 9.9% from 2020 to 2021); Hurst Ex. 63.A [Levien Dep. Ex. 1 - The New York Times SEC Form 10-K Dec. 31, 2022] at 33 (reporting that "other" revenue increased 8.1% from 2021 to 2022]; Hurst Ex. 266 [Levien Dep. Ex. 2 - The New York Times SEC Form 10-K Dec. 31, 2023] at 35 (reporting that "other" revenue increased 13.8% from 2022 to 2023); Hurst Ex. 63.B [The New York Times SEC Form 10-K Dec. 31, 2024] at 33 (reporting that "other" revenue increased 10% from 2023 to 2024).

**Denied** to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot. Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"). Admissible evidence also indicates that The Times's acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. Malackowski Opening Rep. at 84.

News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that

affect those trends to determine causation).

e) The total number of subscribers to The New York Times has increased since the introduction of Copilot and ChatGPT.

Tucker Decl. ¶¶ 11(a), 32-33, Figure 3, Figure 4; *see also* Hurst Decl. **Ex. 129** (Yang 30(b)(6) Dep. Tr.) 76:22-77:7; **Ex. 10** (Bardeen 30(b)(6) Dep. Tr.) 95:4-96:4; **Ex. 63** (Levien Dep. Tr.) 21:1-23:25:10, 36:15-39:6, 42:2-15; **Ex. 63.A** (Levien Dep. Ex. 1) at 40; **Ex. 63.B** (Levien Ex. 3) at 10.

**News Plaintiffs' Response to Microsoft Paragraph 28(e)**:

**Undisputed** that The Times's total number of subscribers has increased since November 2022, when ChatGPT was publicly released, which was the same year that The Times acquired The Athletic, which previously had its own subscribers. Denied to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot.

Admissible evidence contradicts that any such subscription number increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"). Admissible evidence also indicates that there has been a decrease in news-only subscribers to The Times since 2022. *See, e.g.*, NP Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 35-36 (reporting that news-only subscribers decreased from 2022 to 2023); NP Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 34-35 (reporting that news-only subscribers decreased from 2023 to 2024); NP Ex. 1 [The New York Times SEC Form 10-K Dec.

31, 2025] at 36-37 (reporting that news-only subscribers decreased from 2024 to 2025).

News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 29</u>:** To the extent The New York Times asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following: News Plaintiffs' expert Dr. Goldstein analyzed logs of 8.2 million real-world conversations with Microsoft's consumer version of Copilot produced by Microsoft. The 8.2 million conversations were selected from a population of approximately 1,134,799,717 total conversations between users and Microsoft's consumer Copilot occurring between July 2023 to September 2024 based on matches with certain keyword terms in any text-containing field. The keyword terms used were primarily the names of News Plaintiffs' publications and URLs including the domain names of their publications (*e.g.*, nytimes.com), as supplied by News Plaintiffs.

Hurst Decl. ¶¶ 2-3; Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶¶ 382-84.

**<u>News Plaintiffs' Response to Microsoft Paragraph 29</u>**:

**Undisputed** that Plaintiffs' expert Dr. Goldstein analyzed logs of 8.2 million real-world conversations with Microsoft's consumer version of Copilot produced by Microsoft, and that the 8.2 million conversations were selected from a population of approximately 1,134,799,717 conversations between users and Microsoft's consumer Copilot occurring between July 2023 to September 2024, and that the 8.2 million conversations were selected based on matches with

certain keyword terms, including the names of News Plaintiffs' publications and URLs.

**Denied** to the extent Microsoft asserts all of the approximately 1,134,799,717 conversations contained searchable text fields. About 25% of the universe of available Copilot logs had key text fields removed from them due to a privacy stripping program. Goldstein Opening Report ¶ 378.

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Report, ¶ 398), looking at News Plaintiffs' domains (Goldstein Opening Rep., ¶¶ 394-397; Goldstein Rebuttal Rep., ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep., ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep., ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep., ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. See Goldstein

Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

**<u>Microsoft Paragraph 30</u>:** The conversation logs contained [redacted] fields for outputs displayed to a user, as well as [redacted] fields containing web grounding data retrieved by the Copilot system.

Lafferty Decl. ¶¶ 201; Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37.

**<u>News Plaintiffs' Response to Microsoft Paragraph 30</u>**:

**Undisputed.**

**<u>Microsoft Paragraph 31</u>:** Any logs that hit on a keyword in any of those fields were produced.

Hurst Decl. ¶3; Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶ 382-84; Lafferty Decl. ¶ 342.

**<u>News Plaintiffs' Response to Microsoft Paragraph 31</u>**

**Denied.** Admissible evidence contradicts Microsoft's statement.

Microsoft applied redactions to the logs before producing the logs, which means the logs were only partially produced. Goldstein Opening Rep. ¶ 382. The scale of the redactions is enormous. In the set of 8.2 million output logs that Microsoft produced, there are 622,460,385 total redactions (or about 76 redactions per output log). Goldstein Opening Rep. ¶ 386. For example, in one conversation, the following words and phrases are redacted from a published article by the Sun Sentinel: "a lot," "Business Leader of the Year in Broward County," "businessman," "people," "company owner," "mentor," "fundraiser," "board member," "diner patron," and "friend." In other examples, Microsoft has similarly redacted generic and non-

identifying terms appearing in public articles. Goldstein Opening Rep. ¶ 386.

**<u>Microsoft Paragraph 32</u>:** Goldstein performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works.

Hurst Decl. Ex. 231 (Goldstein Opening Report) ¶ 297; Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 21.

a) Subject to certain exclusions for user-supplied data or lack of originality (which he assessed using an LLM), Dr. Goldstein ultimately found a regurgitation when either (1) there was a 16 gram match between text of an article in an Asserted Work and either [redacted] or [redacted] fields in a chat log, or (2) using a 4-gram continuity score there was a 16-gram sequence comprised of 4-gram matches, allowing for a single word gap between each 4-gram match (again, in either [redacted] or other [redacted] fields) (this was designed to address privacy redactions). A gram is approximately equivalent to a word.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶¶ 22–25, 27–28.

b) Goldstein found that of The New York Times's 4,519,337 Asserted Works, 2,601 articles matched in the Copilot [redacted] fields (the grounding data) using the 4x4 gram continuity score and 2,462 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

c) Goldstein also found that of The New York Times's 4,519,337 Asserted Works, 183 New York Times articles matched in the Copilot [redacted] fields (the outputs displayed to the user)

using the continuity score and 104 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).

d) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**News Plaintiffs' Response to Microsoft Paragraph 32**:

**Undisputed** that Dr. Goldstein analyzed the 8.2 million output logs and that one purpose of his analysis was to assess whether any of the Copilot outputs contained matches to Times or Daily News Plaintiffs' works and portions thereof.

**Undisputed** that Dr. Goldstein reported results based on different metrics, including a 16-gram overlap score as well as 4-gram continuity score in which there was a 16-gram sequence comprised of 4-gram matches, allowing for a single word gap between each 4-gram match.

**Denied** because the description of Dr. Goldstein's "exclusions" for his methodology is incomplete. Dr. Goldstein also during scoring removed from consideration any text from the Asserted Works enclosed in quotation marks. Goldstein Supp'l Rep. ¶ 28.

Also **denied** insofar as the Fact asserts that the only purpose of Dr. Goldstein's analysis of the 8.2 million logs was to assess regurgitation. Dr. Goldstein also analyzed these logs to, among other things, assess whether any of the logs relied on a news website or pink-slime website for retrieval augmented generation, *e.g.*, Goldstein Supp'l Rep. ¶¶ 66-67, as well as to assess whether Copilot cited and/or summarized Times or Daily News content in responses to user prompts, *e.g.*, Goldstein Opening Rep. ¶ 400.

Also **denied** because Dr. Goldstein's methodology referenced in Undisputed Fact ¶ 32(a)

is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Report, ¶ 398), looking at News Plaintiffs' domains (Goldstein Opening Rep., ¶¶ 394-397; Goldstein Rebuttal Rep., ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Report, ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Report, ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Report, ¶¶ 415-418).

Also **denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Also **denied** because Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. Goldstein Opening Report ¶¶ 419-420; Goldstein Rebuttal Report ¶¶ 109-120, 129-158.

Also **denied** because The Times does not have 4,519,337 Asserted Works. There are 5,840,526 Times Asserted Works (Maisel MSJ-Opposition Decl. ¶ 6) and the total number of works on which The Times is moving for summary judgment is 964,888. NP-SUF 296.

***Daily News, LP (Daily News)***

**Microsoft Paragraph 33:** From fiscal year 2019 to 2024, the vast majority of the Daily News's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

Hurst Decl. **Ex. 141** (Daily News Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6)

Dep. Tr.) 26:13-24; Ex. 66 (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 140** (Daily News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 36, Figure 6B.

**News Plaintiffs' Response to Microsoft Paragraph 33**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Daily News's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of Daily News's revenue was earned equally from subscriptions, advertising, and licensing.

Most of Daily News's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11] at –437.

**Microsoft Paragraph 34:** [redacted]

a) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 36, Figure 6B.

b) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 36, Figure 5A, Figure 6B.

c) [redacted]

[redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**News Plaintiffs' Response to Microsoft Paragraph 34**:

**Denied** because it suggests that the Daily News's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.

Daily News's revenues have been declining, and no evidence in this case isolates the impact of ChatGPT and Copilot on the Daily News's revenues, including total revenues, subscription revenues, and advertising revenues, from other factors. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 35:** To the extent the Daily News asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of the Daily News's 525,341 Asserted Works, 356 articles matched in the Copilot

[redacted] fields using the 4x4 gram continuity score and 333 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b) Of The Daily News's 525,341 Asserted Works, 15 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 6 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).

c) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**<u>News Plaintiffs' Response to Microsoft Paragraph 35</u>**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this. Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep.¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶

415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

***Chicago Tribune Company, LLC (Chicago Tribune)***

**Microsoft Paragraph 36:** From fiscal year 2019 to 2024, the vast majority of the Chicago Tribune's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

Hurst Decl. **Ex. 134** (Chicago Tribune Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 133** (Chicago Tribune 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34-35, Figure 6A.

**News Plaintiffs' Response to Microsoft Paragraph 36**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Chicago Tribune's revenue from exploitation of its Asserted Works. **Denied** to the extent it suggests that the vast majority of Chicago Tribune's revenue was earned equally from subscriptions, advertising, and licensing.

Most of Chicago Tribune's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-

00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437.

**<u>Microsoft Paragraph 37</u>:** [redacted]

a) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 35, Figure 5A, Figure 6A.

b) [redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**<u>News Plaintiffs' Response to Microsoft Paragraph 37</u>**:

**Denied** because it suggests that the Chicago Tribune's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this. Chicago Tribune's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Chicago Tribune's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she

did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 38</u>:** To the extent the Chicago Tribune asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of the Chicago Tribune's 1,205,350 Asserted Works, 1,200 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 1,159 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 3; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b) Of the Chicago Tribune's 1,205,350 Asserted Works, 82 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 45 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).

c) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**<u>News Plaintiffs' Response to Microsoft Paragraph 38</u>**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only

analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

***Sun-Sentinel Company, LLC (Sun Sentinel)***

**Microsoft Paragraph 39:** From fiscal year 2019 to 2024, the vast majority of the Sun Sentinel's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

Hurst Decl. **Ex. 167** (Sun Sentinel Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; Tucker Decl. ¶¶ 34, 37, Figure 6C.

**News Plaintiffs' Response to Microsoft Paragraph 39**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Sun Sentinel's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of Sun Sentinel's revenue

was earned equally from subscriptions, advertising, and licensing.

Most of Sun Sentinel's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437.

**<u>Microsoft Paragraph 40</u>:** [redacted].

a) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 37, Figure 5A, Figure 6C.

b) [redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**<u>News Plaintiffs' Response to Microsoft Paragraph 40</u>:**

**Denied** because it suggests that the Sun Sentinel's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this. Sun Sentinel's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Sun Sentinel's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting

measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 41:** To the extent the Sun Sentinel asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of the Sun Sentinel's 134,518 Asserted Works, 121 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 117 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b) Of the Sun Sentinel's 134,518 Asserted Works, 9 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 5 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).

c) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**News Plaintiffs' Response to Microsoft Paragraph 41**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is

limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

***<u>Orlando Sentinel Communications Company, LLC (Orlando Sentinel)</u>***

**Microsoft Paragraph 42:** From fiscal year 2019 to 2024, the vast majority of the Orlando Sentinel's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

Hurst Decl. **Ex. 160** (Orlando Sentinel Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 156** (Orlando Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex.**

**68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 38, Figure 6D.

**News Plaintiffs' Response to Microsoft Paragraph 42**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Orlando Sentinel's revenue from exploitation of its Asserted Works. **Denied** to the extent it suggests that the vast majority of Orlando Sentinel's revenue was earned equally from subscriptions, advertising, and licensing.

Most of Orlando Sentinel's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437.

**Microsoft Paragraph 43:** [redacted]

a) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 38, Figure 6D.

b) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 38, Figure 5A, Figure 6D.

c) [redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**News Plaintiffs' Response to Microsoft Paragraph 43**:

**Denied** because it suggests that the Orlando Sentinel's revenues have not been impacted

by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.

Orlando Sentinel's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Orlando Sentinel's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 44:** To the extent the Orlando Sentinel asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of the Orlando Sentinel's 424,822 Asserted Works, 289 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 276 using the 16-gram score. Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b) Of the Orlando Sentinel's 424,822 Asserted Works, 17 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 9 using the 16-gram

score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶¶ 26–28, 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.

c) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**News Plaintiffs' Response to Microsoft Paragraph 44**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein

Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

***<u>San Jose Mercury-News, LLC (The Mercury News)</u>***

**<u>Microsoft Paragraph 45</u>:** From fiscal year 2019 to 2024, the vast majority of The Mercury News's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

> Hurst Decl. **Ex. 149** (Mercury News Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 148** (Mercury News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 39, Figure 6E.

**<u>News Plaintiffs' Response to Microsoft Paragraph 45</u>**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Mercury News's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of Mercury News's revenue was earned equally from subscriptions, advertising, and licensing.

Most of Mercury News's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437.

**<u>Microsoft Paragraph 46</u>:** [redacted]

[redacted]

a) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 39, Figure 6E.

b) [redacted]

Tucker Decl. Ex. ¶¶ 11(a), 34, 39, Figure 5B, Figure 6E.

c) [redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**News Plaintiffs' Response to Microsoft Paragraph 46**:

**Denied** because it suggests that The Mercury News's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.

The Mercury News's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on The Mercury News's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not

undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 47:** To the extent The Mercury News asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of The Mercury News's 130,331 Asserted Works, 931 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 877 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b) Of The Mercury News's 130,331 Asserted Works, 94 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 57 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.

c) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**<u>News Plaintiffs' Response to Microsoft Paragraph 47</u>**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only

analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

***DP Media Network, LLC (The Denver Post)***

**Microsoft Paragraph 48:** From fiscal year 2019 to 2024, the vast majority of The Denver Post's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

Hurst Decl. **Ex. 145** (Denver Post Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 140** (Denver Post 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 40, Figure 6F.

**News Plaintiffs' Response to Microsoft Paragraph 48**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues

collectively comprised the vast majority of the Denver Post's revenue from exploitation of its Asserted Works. **Denied** to the extent it suggests that the vast majority of Denver Post's revenue was earned equally from subscriptions, advertising, and licensing.

Most of Denver Post's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437.

**Microsoft Paragraph 49**: [redacted]

a) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 40, Figure 6F.

b) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 40, Figure 5B, Figure 6F.

c) [redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**News Plaintiffs' Response to Microsoft Paragraph 49**:

**Denied** because it suggests that The Denver Post's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.

The Denver Post's revenues have been declining and no evidence in this case isolates the

impact of ChatGPT and Copilot on The Denver Post's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 50:** To the extent The Denver Post asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of The Denver Post's 89,269 Asserted Works, 1,005 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 969 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b) Of The Denver Post's 89,269 Asserted Works, 123 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 78 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty

Decl. ¶ 409, Table 2.

c) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**News Plaintiffs' Response to Microsoft Paragraph 50**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep, ¶¶ 109-120, 129-158.

***<u>ORB Publishing, LLC (The Orange County Register)</u>***

**<u>Microsoft Paragraph 51</u>:** From fiscal year 2019 to 2024, the vast majority of The Orange County Register's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

Hurst Decl. **Ex. 157** (Orange County Register Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 156** (OC Register 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 41, Figure 6G.

**<u>News Plaintiffs' Response to Microsoft Paragraph 51</u>**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Orange County Register's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of The Orange County Register's revenue was earned equally from subscriptions, advertising, and licensing. Most of The Orange County Register's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437.

**<u>Microsoft Paragraph 52</u>:** [redacted]

a) [redacted]

[redacted]

Tucker Decl. ¶¶ 11(a), 34, 41, Figure 6G.

b) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 41, Figure 5B, Figure 6G.

c) [redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**News Plaintiffs' Response to Microsoft Paragraph 52**:

**Denied** because it suggests that The Orange County Register's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.

The Orange County Register's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on The Orange County Register's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken

because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 53:** To the extent The Orange County Register asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of The Orange County Register's 35,603 Asserted Works, 36 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 32 using the 16-gram score.

   Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b) Of the Orange County Register's 35,603 Asserted Works, 1 article matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 1 using the 16-gram score.

   Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.

c) Goldstein did not report a match to any entire article.

   *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**<u>News Plaintiffs' Response to Microsoft Paragraph 53</u>**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is

limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

***Northwest Publications, LLC (Pioneer Press)***

**Microsoft Paragraph 54:** From fiscal year 2019 to 2024, the vast majority of the Pioneer Press's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (e.g., syndication)).

Hurst Decl. **Ex. 164** (Pioneer Press Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 163** (Pioneer Press 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl.

¶¶ 34, 42, Figure 6H.

**<u>News Plaintiffs' Response to Microsoft Paragraph 54</u>**:

**Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Pioneer Press's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of the Pioneer Press's revenue was earned equally from subscriptions, advertising, and licensing.

Most of the Pioneer Press's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437.

**Microsoft Paragraph 55:** [redacted]

a) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 42, Figure 6H; Hurst Decl. **Ex. 20** (Burbach Deposition) 22:7-23:1.

b) [redacted]

Tucker Decl. ¶¶ 11(a), 34, 42, Figure 5B, Figure 6H.

c) [redacted]

Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18.

**<u>News Plaintiffs' Response to Microsoft Paragraph 55</u>**:

**Denied** because it suggests that the Pioneer Press's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.

The Pioneer Press's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Pioneer Press's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 56</u>:** To the extent the Pioneer Press asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:

a) Of the Pioneer Press's 47,527 Asserted Works, 326 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 300 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty

Decl. ¶ 408, Table 1 (Sur-reply).

b) Of the Pioneer Press's 47,527 Asserted Works, 21 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 12 using the 16-gram score.

Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.

c) Goldstein did not report a match to any entire article.

*See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

**<u>News Plaintiffs' Response to Microsoft Paragraph 56</u>**:

**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.

Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).

Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond

regurgitation by looking at how frequently Copilot is used for news purposes. See Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158.

***<u>The Center for Investigative Reporting (CIR)</u>***

**Microsoft Paragraph 57:** From 2019 to 2024, the vast majority of CIR's revenue from exploitation of its Asserted Works was earned through subscriptions, donations, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).

Hurst Decl. **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. Vol. 2 (dated Dec. 19, 2025)) 311:1-15, 405:25-408:22; **Ex. 17** (Buckingham 30(b)(6) Dep. Tr. (Vol. 1, dated Dec. 18, 2025)) 194:5-7; **Ex. 17A** (Buckingham Dep. Ex. 30 – Building the investigative newsroom of the future); **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 2, dated Jan. 27, 2026)) 378:19-379:3, 385:9-24; **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 293:25-294:22, 297:22-25, 299:13-21; Ex. 13 (Bauerlein Dep. Tr. dated Jan. 27, 2026) 58:16-64:18; **Ex. 12.A** (Bauerlein Dep. Ex. 47); Tucker Decl. ¶ 44.

**<u>News Plaintiffs' Response to Microsoft Paragraph 57</u>**:

**Undisputed** to the extent CIR raises money through the non-exhaustive list of donations, subscriptions and licensing. CIR also raises money through grants and advertising. NP Ex. 1277 [Bauerlein 30(b)(6) 1/27/26 Depo. Tr.] at 319:23-320:5, 322:20-24 (describing grant making programs from foundations or institutional donors); NP Ex. 1277 [Bauerlein 30(b)(6) 1/27/26

Depo. Tr.] at 413:1-4 (describing stronger advertising sales on digital channels).

**Microsoft Paragraph 58:** [redacted]

a) [redacted]

Tucker Decl. ¶¶ 11(a), 44, 48, Figure 8; *see also* Hurst Decl. **Ex. 17** (Buckingham 30(b)(6) Dep. Tr. (Vol. 1, dated Dec. 18, 2025)) 194:5-7; **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 2, dated Jan. 27, 2026)) 385:9-24.

b) [redacted]

Tucker Decl. ¶¶ 11(a), 44-47, Figure 7; *see also* Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 299:13-21.

**News Plaintiffs' Response to Microsoft Paragraph 58**:

Subparagraph (a) is **denied** to the extent Microsoft means Mother Jones magazine subscription revenue increased due to the introduction of Copilot and ChatGPT. Evidence cited does not support that contention. **Undisputed** to the extent Microsoft's statement means Madeleine Buckingham, Chief Financial Officer at CIR, testified that overall, "subscription revenue has increased" from 2018-2024. She also testified that "if I look at the trend line, it looks like it's remained relatively flat with a slight bump-up in the last year." NP Ex. 284 [Buckingham 30(b)(6) Depo. Tr. (Vol. 1, dated Dec. 18, 2025)] at 195:14-16. Also **undisputed** that Ms. Bauerlein testified "[t]here has not been a downward trend, but it has become more difficult and more expensive to acquire those subscribers." NP Ex. 1277 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 2, dated

Jan. 27, 2026)] at 385:9-24. *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

Subparagraph (b) is denied to the extent Microsoft treats the absence of direct attribution data as establishing Copilot and ChatGPT were not associated with a decrease in donation revenue. Admissible evidence contradicts Microsoft's statement. Ms. Bauerlein testified that "we don't have data that directly connect these products with individuals who haven't made a donation," not that Copilot and ChatGPT are not associated with a decrease in donation revenue. Hurst Decl. Ex. 11; NP Ex. 1276 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 1, dated Jan. 26, 2026)] at 299:13-21. Further denied to the extent Microsoft treats donation revenue as the only measure of value important to Mother Jones. Cross Rebuttal Rep. at 21 (cultivation of eventual donors begins at the moment a user first discovers an organization exists); Cross Rebuttal Rep. at 6 (nonprofit news organizations build financial support over multiple years); Cross Rebuttal Rep. at 24 (ChatGPT and Copilot interrupt the discovery of news organization, which shrinks the pool of potential donors and undermines the entire business model of nonprofit news organizations). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 59:** To the extent CIR asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: CIR's expert Dr. Wenger analyzed the same logs of approximately 8.2 million Copilot conversations described in Undisputed Facts ¶¶ 29-32(a).

Hurst Decl. **Ex. 246** (Wenger Opening Report) at 104-05; **Ex. 247** (Wenger Reply Report)

at 113 & n.162; Lafferty Decl. ¶¶27, 28, Table 1 (Rebuttal), 360.

**<u>News Plaintiffs' Response to Microsoft Paragraph 59</u>**:

**Denied** to the extent Microsoft asserts Dr. Wenger's Copilot log analysis is only relevant to harm from regurgitation and suggests that Plaintiffs' evidence of harm from LLM training is limited to Dr. Wenger's Copilot log analysis. Admissible evidence contradicts this.

Dr. Wenger's Copilot regurgitation analysis is not the only analysis Dr. Wenger performed. Among other things, Dr. Wenger quantified the amount of CIR's content appearing in Microsoft's and OpenAI's output logs and the frequency with which CIR's web domains and keywords appeared in those logs. Wenger Opening Rep. at 87-110. Dr. Wenger's analyses concerned harms to CIR beyond regurgitation. For instance, she examined the extent to which training on CIR's and other Plaintiffs' news content furthered OpenAI's models' and downstream products' ability to mimic news-style content and to serve news-related use cases. Wenger Reply Rep. at 80-81 ("OpenAI's models would uniquely benefit from news content in the sense that including news content in the training data would improve the models' ability to produce news-style outputs.").

**<u>Microsoft Paragraph 60</u>:** Wenger analyzed the Copilot [redacted] and [redacted] fields using a filter built from 16-grams of CIR's Asserted Works.

Hurst Decl. **Ex. 246** (Wenger Opening Report) at 104-05; **Ex. 247** (Wenger Reply Report) at 113 & n.162; Lafferty Decl. ¶¶ 28, Table 1 (Rebuttal), 360.

a) Dr. Wenger treated as a "putative regurgitation" any Copilot [redacted] that contained at least five 16-gram matches to an individual *Mother Jones* Asserted Work.

Hurst Decl. **Ex. 246** (Wenger Opening Report) at 74–75, 105–06; Lafferty Decl. ¶

360.

b) Dr. Wenger found 51 articles over the five 16-gram match threshold in the Copilot [redacted] fields, after exclusion of public-domain text (e.g., the Constitution or the Bible).

Hurst Decl. **Ex. 246** (Wenger Opening Report) at 38, 40, 105–07; Lafferty Decl. ¶¶ 360–61.

c) In her analysis of the Copilot logs, Wenger did not report a match to any entire article.

Hurst Decl. **Ex. 246** (Wenger Opening Report) at 106–07; Lafferty Decl. ¶ 360.

**News Plaintiffs' Response to Microsoft Paragraph 60**:

The umbrella sentence is **undisputed.**

Subparagraph (a) is **denied** as unsupported by the cited evidence. The phrase "putative regurgitation" is drawn from Dr. Wenger's inspection of OpenAI's base models, not her analysis of Copilot Text fields.

For subparagraph (b), **undisputed** that Dr. Wenger reported finding 77 hits associated with copies of Mother Jones Registered Works in 51 different conversations. Denied to the extent Microsoft suggests that these results were meant to be comprehensive as to all CIR's Asserted Works. This aspect of Dr. Wenger's analysis did not include a direct search for any of CIR's unregistered works, which comprise the majority of CIR's Asserted Works. *See id.*; *see* Bauerlein Decl. A. at "Registered Works," "Mother Jones," and "Reveal" Tabs.

Subparagraph (c) is **undisputed.**

***As to all News Plaintiffs***

**Microsoft Paragraph 61:** Microsoft's expert Dr. Lafferty calculated a regurgitation rate in the user-facing output ([redacted]) for all The New York Times and Daily News Plaintiffs' Asserted Works of 0.004% of all logged Copilot conversations, and for all CIR's Asserted Works of 0.00008% of all logged Copilot conversations.

Lafferty Decl. ¶¶ 28, Table 1 (Rebuttal), 374-77, Table 4 (Rebuttal) (New York Times and Daily News Plaintiffs); *id.* ¶¶ 361–64, 344 Table 2 (Rebuttal) (CIR).

**News Plaintiffs' Response to Microsoft Paragraph 61**:

**Undisputed** that Microsoft's expert Dr. Lafferty calculated regurgitation rates where messages contained at least six 16-grams of News Plaintiffs Asserted Works, and that Microsoft's statement accurately reports his proffered rates. In particular, Dr. Lafferty calculated how many messages contained at least six 16-grams of News Plaintiffs Asserted Works over the 8.2 million sample, and obtained his 0.004% rate by dividing that amount over the entire population of 1 billion conversations (assuming that there would not be any matches in the 991,800,000 conversations he did not analyze). Lafferty Decl. ¶ 377, Table 4.

**Denied** to the extent Microsoft contends that Dr. Lafferty used an appropriate and reliable method for calculating regurgitation rates. Admissible evidence contradicts that contention. For example, News Plaintiffs' expert Dr. Goldstein applied a superior method for identifying instances in which Copilot regurgitated News Plaintiffs' content in the produced Copilot logs. Goldstein Supp'l Rep. ¶¶ 21-41. Dr. Goldstein found 263,348 conversations containing a URL in the user output corresponding to an Asserted Work for all The New York Times and Daily News Plaintiffs' (compared to Lafferty's 35,806). Goldstein Supp'l Rep. ¶ 46, Table 3. These results do not take into account the 25% of conversations that had their key text fields stripped by a privacy program, the truncations and redactions within the output logs Microsoft produced, or conversations outside

of the 8.2 million sample (which Microsoft did not produce). Goldstein Rebuttal Rep. ¶¶ 79, 85; Goldstein Reply Rep. ¶ 288. Dr. Goldstein also performed other measures (including counting domain hits, analyzing Microsoft's impressions data, and computing 16-gram and continuity scores), which resulted in more hits than what Dr. Lafferty reported. Goldstein Supp'l Rep. ¶¶ 16-52.

In addition, Dr. Wenger showed that Dr. Lafferty under-represented the regurgitation rate as to CIR, including because he incorrectly assumed that all regurgitations would include a reference to the plaintiff-related search terms used to construct the sample (which is wrong because OpenAI's removal of CMI prevented those terms from being included in Copilot regurgitations of the training data). The true regurgitation rate for CIR is thus approximately 0.0006% for the Mother Jones Registered Works, 0.0058% for all Mother Jones Asserted Works, and 0.0001% for the Reveal Asserted Works. These rates are confirmed by (because they closely approximate) the regurgitation rate for The Intercept's Asserted Works, which is an appropriate control group because Intercept-related terms were not used to construct the 8.2 million sample. *See* Wenger Opening Rep. at 105-10; Wenger Reply Rep. at 113-17.

**<u>Microsoft Paragraph 62</u>:** Between 2019 and 2024, News Plaintiffs did not enter into any agreement to license or sell their Asserted Works for the purpose of use as training data for general purpose LLMs.

***<u>New York Times</u>:*** Hurst Decl. **Ex. 46** (Grossman-Cohen 30(b)(6) Dep. Tr.) 24:22-29:19, 101:18-102:16; **Ex. 77** (Miller Dep. Tr.) 10:3-11, 14:2-20. ***<u>Daily News</u>:*** Hurst Decl. **Ex. 140** (Daily News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***<u>Chicago Tribune</u>:*** Hurst Decl. **Ex.**

**133** (Chicago Tribune 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Orlando Sentinel:*** Hurst Decl. **Ex. 159** (Orlando Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Sun Sentinel:*** Hurst Decl. **Ex. 166** (Sun Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Mercury News:*** Hurst Decl. Ex. 148 (Mercury News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Denver Post:*** Hurst Decl. **Ex. 144** (Denver Post 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Orange County Register:*** Hurst Decl. **Ex. 156** (OC Register 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Pioneer Press:*** Hurst Decl. **Ex. 163** (Pioneer Press 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***CIR:*** Hurst Decl. **Ex. 12** (Bauerlein Dep. Tr. dated Jan. 27, 2026) 58:16-64:18; **Ex. 12.A** (Bauerlein Dep. Ex. 47 – Bauerlein email with Bloomberg reporter (dated July 25, 2024)); **Ex. 18**

(Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 405:25-408:22.

**News Plaintiffs' Response to Microsoft Paragraph 62**:

**The Times**: **Undisputed**, but **denied** to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal.

Admissible evidence contradicts this. *See* NP Ex. 229 [Felix Depo. Ex. 137] [NYT_00468323]; NP Ex. 230 [Felix Depo. Tr.] at 312:17-314:21; NP Ex. 231 [Lightcap 30(b)(1) Depo. Ex. 17]; NP Ex. 232 [Lightcap 30(b)(1) Depo. Ex. 18] [OPCO_MDL_004419803] ([redacted]); NP Ex. 234 [Russell 30(b)(6) Depo. Tr.] at 221:19-228:20 ([redacted]); NP Ex. 1289 [Felix Depo. Ex. 130 – NYT_00941750] at -750-751 (The Times and Amazon engaged in licensing negotiations in 2024 for the GenAI licensing deal that closed in 2025); *see also* NP Ex. 228 [NYT_00890201].

**Daily News Plaintiffs**:

**Undisputed**, but **denied** to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal. Admissible evidence contradicts this.

For example, outreaches to *Daily News* Plaintiffs regarding licenses for LLM training

started around 2023, 2024, and *Daily News* Plaintiffs approached them with a curiosity about what this new category of business could look like, but also sensitive to risks that could come with licensing (such as the potential for cannibalization and the potential negative impacts to the business versus whatever money is being offered). NP Ex. 1300 [Lown 30(b)(1) 1/9/26 Depo Tr.] at 18:23-19:4; NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 161:10-167:4; 206:8-209:6.

**CIR**:

**Undisputed**, but **denied** to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal. The cited evidence also does not support the purported fact.

Admissible evidence contradicts this. NP Ex. 1276 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 1, dated Jan. 26, 2026)] at 196:11-16 (CIR was not approached by Microsoft regarding licensing its content); NP Ex. 1276 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 1, dated Jan. 26, 2026)] at 196:3-10 (testifying "if [CIR] had been asked [to license its content], we certainly would have considered it.").

**Microsoft Paragraph 63:** There are substantial impediments to the formation of a market for licensing a training corpus sufficient to train the type of general purpose LLMs at issue in this case.

**News Plaintiffs' Response to Microsoft Paragraph 63 (Introduction):**

**Denied.**

News Plaintiffs incorporate by reference their responses to Microsoft Paragraph 63 subparts (a) through (f) below.

In addition, admissible evidence contradicts Microsoft's assertion. Malackowski Rebuttal

Rep. at 36 (opining that the "key building blocks of a market" for Generative AI data licensing already exist: "willing buyers with demand, willing sellers with supply, pricing mechanisms (albeit depressed, at this point), intermediaries and license facilitators, and executed transactions"), 37-40; NP Ex. 128 [Stamm Rebuttal Rep.] at Appendix C, Ex. 1 (summarizing [redacted] between OpenAI [redacted] for use of their data or content in generative AI); NP Ex. 129 [Stamm ZD Rebuttal Rep.] ¶¶ 177-178, Appendix C, Ex. 1; NP Ex. 127 [Rao Rebuttal Report] at Tabs 3-4 (summarizing [redacted] Microsoft, and Amazon's [redacted]); NP Ex. 82 [Tucker Opening Rep.] ¶ 135 (Microsoft's expert Dr. Tucker admitting that "licensing collectives and marketplaces for data for training or grounding LLMs" are "developing" in the United States); NP Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 322; NP Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 17e; Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of OpenAI's licensing agreements with media publishers that provide for OpenAI's "training use" and "display use," where display use typically includes access to current information through an API and/or crawlers for grounding purposes); Malackowski ZD Opening Rep. at p. 59-62, Appendix D, Exhibit 2.2.1 (same); Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1 (chart summarizing Microsoft's data access and content access agreements with at least [redacted] granting Microsoft certain rights to content including non-fiction books, [redacted]

[redacted]).

**Microsoft Paragraph 63(a):**

For example:

a) A very large volume and a large variety of textual data is necessary for the training corpus to develop general purpose LLMs like those at issue; as such, no individual work has value by itself as training material nor is it currently technologically possible to isolate the contribution of any particular piece of data to an LLM's output generation.

Lafferty Decl. ¶¶ 16, 34, 94-97, 99, 168, 283, 290, 322, 433; Usdan Decl. ¶¶ 10-11; Hurst Decl. **Ex. 53** (Hoeschele Dep. Tr. (Vol. 1, dated Apr. 2, 2025)) 16:17-22, 17:1-23, 19:12-20:1, 23:24-24:25 25:15-23, 26:6-22, 35:18-36:11; **Ex. 117** (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 67:9-15, 255:12-256:2.

**News Plaintiffs' Response to Microsoft Paragraph 63(a):**

**Denied.** Admissible evidence contradicts Microsoft's assertion.

News content is especially valuable for training general purpose LLMs. Etzioni Opening Rep. ¶¶ 72-75, 78-85, 87-93, 95-122 (opining based on academic studies and Defendants' documents that high-quality content, and in particular news content, is especially valuable for training Defendants' accused LLMs, that a relatively small amount of high-quality data can have an outsized impact on model performance, and citing studies that successfully isolated certain high-quality data as an independent variable and found observable performance gains); *id.* ¶ 53 (opining that "[i]f one wants to generate 'news-like' outputs from LLMs, they need news content for training."); NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 71 (Defendants' expert admitting that "the ability to generate news-like style or content is what one would expect from a model that has

learned recurring statistical patterns of a genre"); Wenger Rebuttal Rep. at 16. In addition, Microsoft executive Jaron Lanier has stated that [redacted]. NP Ex. 1313 [MSFT_AI_MDL_002218935] at -42 (Lanier proposing in March 2023 that Microsoft "[redacted]).

**<u>Microsoft Paragraph 63(b)</u>:**

b) The Asserted Works were a minuscule share of the training corpus used to train the GPT models.

Lafferty Decl. ¶¶ 94-97, 105-109; Tucker Decl. ¶¶ 13(a), 134, 137-138.

**<u>News Plaintiffs' Response to Microsoft Paragraph 63(b)</u>:**

**Undisputed** that there were a large volume of other works in the training corpus. **Denied** that the Asserted works were a "miniscule share of the training corpus."

Admissible evidence indicates that the Asserted Works were a particularly important share of the training corpus. For example, during mid-training OpenAI prioritized using news content, including News Plaintiffs' content, to improve the models' ability to consume and produce news content. See NP Ex. 759 [OPCO_MDL_004740422] at -422 (during "mid-training" OpenAI wanted to improve on "current events / news articles (NYT data, etc.))"; NP Ex. 761 [OPCO_MDL_000481870] at -870; (Members of OpenAI's mid-training team had the goal to "crush freshness in the domain of real-world news first" with "~95% accuracy on current events"); NP Ex. 757 [OPCO_MDL_000155738] at 6 (OpenAI identified news datasets, including CC-

News, as "natural sources of freshness" and "high quality (and fresh) data relevant for our users"). OpenAI likewise prioritized obtaining news content, including News Plaintiffs' content, for use in pre-training its LLMs. NP Ex. 688 [OPCO_MDL_000113921] at -25 (explaining how OpenAI's president Greg Brockman "scraped" websites including "[redacted]"); NP Ex. 551 [OPCO_MDL_000481178] at -78 (February 2022 conversation noting that "greg [Brockman] has prepped some high quality, small datasets" including [redacted]).

News Plaintiffs object to the term "miniscule share" as vague and ambiguous.

**Microsoft Paragraph 63(c):**

c) For a traditional copyright license, rightsholders monetize the inherent value of specific creative expression contained within their individual works. By contrast, when licensing data for LLM training, value is not attributable to any discrete piece of interchangeable data, but rather emerges from statistical distributions observable only across large-scale datasets. There is no settled or workable means for pricing any given piece of training data.

Tucker Decl. ¶¶ 13(b), 149-153.

**News Plaintiffs' Response to Microsoft Paragraph 63(c):**

**Denied.** Admissible evidence contradicts Microsoft's assertion.

News content is especially valuable for training general purpose LLMs. Etzioni NYT-DN Opening Rep. ¶¶ 72-75, 78-85, 87-93, 95-122 (opining based on academic studies and Defendants' documents that high-quality content, and in particular news content, is especially valuable for training Defendants' accused LLMs, that a relatively small amount of high-quality data can have

an outsized impact on model performance, and citing studies that successfully isolated certain high-quality data as an independent variable and found observable performance gains); *id.* ¶ 53 (opining that "[i]f one wants to generate 'news-like' outputs from LLMs, they need news content for training."); NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 71 (Defendants' expert admitting that "the ability to generate news-like style or content is what one would expect from a model that has learned recurring statistical patterns of a genre"); Wenger Rebuttal Rep. at 16; Malackowski Rebuttal Rep. at 36 (opining that the "key building blocks of a market" for Generative AI data licensing already exist: "willing buyers with demand, willing sellers with supply, pricing mechanisms (albeit depressed, at this point), intermediaries and license facilitators, and executed transactions"), 37-42 (opining that the business economic indicia of genuine Generative AI data licensing market emergence are present, including that "[c]ontractual and pricing structures across independent transactions are beginning to converge on recognizable conventions including per-token, per-query, per-scrape, percentage of revenue, and lump sum bundled rights formulations"); NP Ex. 128 [Stamm Rebuttal Rep.] at ¶¶ 366-368 (summarizing OpenAI documents and deposition testimony regarding the internal "benchmarks" for pricing existing and prospective Generative AI licenses on a per-word basis), Appendix C, Ex. 1. (summarizing [redacted] between OpenAI [redacted] for use of their data or content in generative AI); NP Ex. 129 [Stamm ZD Rebuttal Rep.] ¶¶ 177-178, Appendix C, Ex. 1; NP Ex. 127 [Rao Rebuttal Report] at Tabs 3-4 (summarizing [redacted] Microsoft, and Amazon's [redacted]); NP Ex. 82 [Tucker Opening Rep.] ¶ 135 (Microsoft's expert Dr. Tucker admitting that "licensing collectives and marketplaces for data for training or grounding LLMs" are "developing" in the United States); NP Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 322; NP Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 17e; Malackowski NYT-

DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of OpenAI's licensing agreements with media publishers that provide for OpenAI's "training use" and "display use," where display use typically includes access to current information through an API and/or crawlers for grounding purposes); Malackowski ZD Opening Rep. at p. 59-62, Appendix D, Exhibit 2.2.1 (same); Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1 (chart summarizing Microsoft's data access and content access agreements with at least [redacted] granting Microsoft certain rights to content including non-fiction books, [redacted]); NP Ex. 375 [OPCO_MDL_004589228] (reference document prepared by OpenAI pricing existing and in-progress Generative AI licensing deals in terms of dollar amounts per article and/or word); NP Ex. 1312 [MSFT_AI_MDL_001618003] at -8089 (internal Microsoft presentation [redacted]).

Furthermore, rightsholders license their works for a variety of reasons—including those beyond the creative expression contained within their individual works. *See, e.g.*, NP Ex. 1316 [NYT_00759576 at – 77] (Text and Data Mining License Agreement) (NYT licensing its works to Stanford University "to copy and use [The Times's] Licensed Material solely for Text and Data Mining").

**<u>Microsoft Paragraph 63(d)-(f)</u>:**

d) A developer seeking to license a training corpus would need to obtain rights from millions

of dispersed authors and content creators.

Tucker Decl. ¶¶ 13(a)-(b), 130-133, 139-144; Usdan Decl. ¶¶ 10-11, 22, 24.

e) Rightsholders for individual works can be difficult and costly to identify and locate, increasing the transaction costs of negotiating any proposed training data licenses.

Tucker Decl. ¶¶ 13(b), 139-144; Usdan Decl. ¶ 24

f) Negotiations for the aggregation of the necessary volume and variety of data are susceptible to holdout problems.

Tucker Decl. ¶¶ 13(b), 145-148.

**<u>News Plaintiffs' Response to Microsoft Paragraph 63(d)-(f):</u>**

**Denied.** Admissible evidence contradicts Microsoft's assertions. The purported difficulties are not especially hard to surmount.

For example, intermediaries exist to facilitate licensing of content for Generative AI, and licenses for GenAI training, grounding and display have already been entered into. *See, e.g.*, Malackowski NYT-DN Rebuttal Rep. at 77-78 (opining about Microsoft's "Publisher Content Marketplace" designed to "empower publishers with a transparent economic framework for licensing premium content into AI products"), 80-82 (opining on the dozens of intermediaries, technological solutions, and collective licensing solutions that have entered the market to facilitate licensing in the Generative AI data licensing market, including by facilitating content licenses between content providers and AI companies); NP Ex. 128 [Stamm Rebuttal Rep.] at ¶¶ 366-368 (summarizing OpenAI documents and deposition testimony regarding the internal "benchmarks" for pricing existing and prospective Generative AI licenses on a per-word basis), Appendix C, Ex. 1 (summarizing [redacted] between OpenAI [redacted] for use of their data or content in generative AI); NP Ex. 129 [Stamm ZD Rebuttal

Rep.] ¶¶ 177-178, Appendix C, Ex. 1; NP Ex. 127 [Rao Rebuttal Report] at Tabs 3-4 (summarizing [redacted] Microsoft, and Amazon's [redacted]); NP Ex. 82 [Tucker Opening Rep.] ¶ 135 (Microsoft's expert Dr. Tucker admitting that "licensing collectives and marketplaces for data for training or grounding LLMs" are "developing" in the United States); NP Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 322; NP Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 17e; Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of OpenAI's licensing agreements with media publishers that provide for OpenAI's "training use" and "display use," where display use typically includes access to current information through an API and/or crawlers for grounding purposes); Malackowski ZD Opening Rep. at p. 59-62, Appendix D, Exhibit 2.2.1 (same); Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1 (chart summarizing Microsoft's data access and content access agreements with at least [redacted] granting Microsoft certain rights to content including non-fiction books, [redacted]); NP Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 216:20-217:2 (testifying regarding The Times's over ten million copyrighted written works from 1924-2024), 32:13-19 (testifying that "The Times has copyright registrations for all the works it's asserting in this case"); Maisel Decl. Ex. A (Rule 1006 summaries identifying the 964,888 copyrighted works asserted by The Times in its summary judgment motion); NP Ex. 136 [Shetty 30(b)(6) Depo. Tr.] at 14:24-15:23 (OpenAI's Varun Shetty testifying about how OpenAI enters agreements with media publishers to use that media company's content); Malackowski NYT-DN Reply Rep. at 32-35 (opining about the existing market for Generative AI data licensing deals and the evidence of infrastructure designed to reduce transaction costs and the hundreds of millions of

dollars in existing licenses).

**<u>Microsoft Paragraph 64</u>:** After the release of the LLMs at issue in this case, News Plaintiffs have continued to write and publish newspapers and magazines.

Hurst Decl. **Ex. 116** (Sulzberger Dep. Tr.) 177:24-178:6; 246:5-17; **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr.) (Vol. 2, dated Jan. 27, 2026) 423:6-16; **Ex. 59** (Julien Dep. Tr.) 33:12-17; Tucker Decl. ¶¶ 14, 30-48, 237-238.

**<u>News Plaintiffs' Response to Microsoft Paragraph 64</u>**:

**Undisputed.**

**<u>Microsoft Paragraph 65</u>:** To the extent that News Plaintiffs claim that using the Asserted Works to train the LLMs at issue resulted in loss of conversions or traffic, *see infra* ¶¶ 86-91, 93-97, 99 103, 105-109, 111-115, 117-121, 123-127, 129-133, 135-139, 141-146 which are hereby incorporated by reference.

**<u>News Plaintiffs' Response to Microsoft Paragraph 65</u>**: **Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft Paragraphs 86-91, 93-97, 99-103, 105-109, 111-115, 117-121, 123-127, 129-133, 135-139, 141-146.

## COUNT I: COPYRIGHT INFRINGEMENT (17. U.S.C. § 501) – GROUNDING AND OUTPUT CLAIMS RELATED TO WEB GROUNDING

### Fair Use (17 U.S.C. § 107)

#### 1. *Purpose and Character of the Use (Factor 1)*

**Microsoft Paragraph 66:** An LLM is inherently limited by the data included in the training corpus used to create its statistical parameters; accordingly, a standalone, LLM-based chatbot cannot reliably—or usefully—respond to those queries that require information omitted from or first discovered after the data of the training corpus.

Abib Decl. ¶¶ 9-10; Lafferty Decl. ¶¶ 18, 178, 189-91; Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) 155:25-156:20.

**News Plaintiffs' Response to Microsoft Paragraph 66**:

**Undisputed,** with the understanding that a "standalone, LLM-based chatbot" means a chatbot that does not have access to any information outside its own parameters.

**Microsoft Paragraph 67:** Microsoft added a functionality called "web grounding" to its LLM based chatbot, Copilot. Web grounding enables Copilot to retrieve content that was obtained from the public internet, and to use such content in responding to user queries.

Abib Decl.¶¶ 8-22; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9, **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 71** (Manivannan 30(b)(6) Dep. Tr.) 50:15-51:6, 9:6-9, 11:20-22, 12:5-16, 13:6-9; **Ex. 85** (Parakhin Dep. Tr.) 216:9-217:17.

**News Plaintiffs' Response to Microsoft Paragraph 67**:

**Undisputed** that the process Microsoft refers to as "web grounding" enables Copilot to retrieve content that was obtained from the internet and use such content in responding to user queries. Cited evidence does not support the proposition that the content retrieved was from the

"public internet." Abib Decl.¶ 8 ([redacted]).

**Denied** that web grounding enabled Copilot to retrieve content obtained from the "public internet" to the extent "public" means not behind a paywall or requiring a log-in. Admissible evidence contradicts the purported fact. NP Ex. 410 [Feamster Opening Rep.] ¶¶ 206, 213 (During the RAG process, Defendants' products access webpage content using the Bing API); NP Ex. 513 [Ribas Depo. Tr.] at 160:19-161:7 (The Bing API is an application programming interface that enables one to access and query the Bing Index); NP Ex. 807 [OPCO_MDL_001700392] at -97 (On April 14, 2023, during the public beta of Browse with Bing, an OpenAI employee reported that she "was able to use ChatGPT Browsing to get past a NYT paywall."); NP Ex. 809 [OPCO_MDL_004771719] at -720-21 (On June 27, 2023, OpenAI performed a "paywall test" for GPT-4 with browsing and confirmed that it could bypass paywalls); NP Ex. 1145 [MSFT_AI_MDL_000455566] (On June 27, 2023, a Microsoft employee [redacted]

[redacted]").

**<u>Microsoft Paragraph 68</u>:** By providing Copilot with an ever-evolving source of information, web grounding greatly expands the usefulness of Copilot for users because Copilot can accurately and more completely respond to a significantly broader range of user queries than a standalone LLM based chatbot limited by its training data.

Abib Decl. ¶ 10; Lafferty Decl. ¶ 178; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 71** (Manivannan 30(b)(6) Dep. Tr.) 50:15-51:6.

**<u>News Plaintiffs' Response to Microsoft Paragraph 68</u>**:

**Undisputed** that a standalone LLM-based chatbot is limited by its training data, otherwise denied. The extent to which web grounding on "an ever-evolving source of information" can "greatly expand the usefulness of Copilot" because Copilot can "accurately and more completely respond to a significantly broader range of user queries" depends on the sources it relies on for information. The terms "greatly expands," "usefulness," and "more completely" are vague and undefined.

Admissible evidence contradicts Microsoft's statement. Some web sources can increase the likelihood of Copilot outputting "hallucinations," including for example pink-slime news sites, which are low-quality news sites. Bell Opening Rep. ¶ 128; Cross Rebuttal Rep. at 32. Log records produced in this case confirm that Copilot relies on pink-slime news sites for grounding. Goldstein

Rebuttal Rep. ¶ 113.

**Microsoft Paragraph 69:** Copilot web grounding also improves LLM performance by reducing the likelihood of so-called "hallucinations"—seemingly plausible but inaccurate outputs—because the chatbot relies on not just next token prediction but also retrieved content in order to provide more reliable responses supported by material synthesized from publicly accessible web sources.

Abib Decl. ¶ 10; Bird Decl. ¶¶ 30, 39; *see also* Hurst Decl.; **Ex. 26** (Cook Dep. Tr.) 111:19-112:9, 116:1-11, 117:1-118:4, 10:12-20, 11:1-6, 16:14-17:12, 20:24-21:1, 22:1-24:18; **Ex. 71** (Manivannan 30(b)(6) Dep. Tr.) 50:18-22; Lafferty Decl. ¶¶ 178, 312.

**News Plaintiffs' Response to Microsoft Paragraph 69**:

**Denied** to the extent that "publicly accessible web sources" means uncopyrighted, free-to-download or use content. Denied to the extent the statement suggests that Copilot does not hallucinate with web grounding.

Admissible evidence contradicts Microsoft's statement. *See* Bell Opening Rep. ¶ 160 ("In Tow Center studies, chatbots often misattributed the sources of quotes. In the Tow Center's 2025 study, ChatGPT correctly linked the original article in eight out of 200 outputs. It linked the incorrect article in 79 instances, only linked to the homepage instead of the specific article 37 times, did not include any links 42 times, did not identify the article at all on 38 instances, and linked a URL that led to an error page a handful of times. Meanwhile, Microsoft's Copilot hardly ever identified the correct article link, linked the wrong article on 72 instances, and did not identify the article at all 46 times."); NP Ex. 1207 [Klaudia Jaźwińska & Aisvarya Chandrasekar, AI Search Has a Citation Problem, COLUM. JOURNALISM REV. (Mar. 6, 2025), https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-

news.php.] (The Tow Center for Digital Journalism conducted a series of experiments from late 2024 and early 2025 and found that major GenAI tools including ChatGPT and Copilot were routinely bad at declining to answer questions about sources of excerpts of news articles that they could not answer accurately, and were instead "confidently wrong"); NP Ex. 956 [MSFT_AI_MDL_000447446] at -450 (Microsoft knew in February 2023 that [redacted]); NP Ex. 719 [Bilenko Depo. Tr.] at 164:22–165:7 (As of March 30, 2023, Mr. Bilenko noted that [redacted]); NP Ex. 1211 [Adam Tauman Kalai et al., Why Language Models Hallucinate, arXiv (Sept. 4, 2025), https://arxiv.org/abs/2509.04664] (In a study led by three researchers from OpenAI, and one from Georgia Tech, found that "language models hallucinate because the training and evaluation procedures reward guessing over acknowledging uncertainty," further arguing that "guessing when uncertain improves test performance."); NP Ex. 1212 [DNP-00569563] at -564-565 (Computerworld's interpretation of the study was that "large language models will always produce plausible but false outputs, even with perfect data, due to fundamental statistical and computation limits," and that OpenAI's advanced reasoning models actually hallucinated more frequently than simpler models.). Also **denied** because some web sources can increase the likelihood of Copilot outputting "hallucinations", including for example pink-slime news sites,

which are low-quality news sites. Bell Opening Rep. ¶ 128; Cross Rebuttal Rep. at 32.

**Microsoft Paragraph 70:** Web grounding enhances a user's experience; for example, by accessing information from Microsoft's Bing search infrastructure, Copilot with web grounding improves knowledge discovery, synthesis, and location by enabling direct and informed responses to user queries in the context of a conversational chatbot.

Abib Decl. ¶¶ 5-7, 23-26; Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 212:17-217:17; **Ex. 85.A** (Parakhin Dep. Ex. 25 - The new Bing: Our approach to Responsible AI documentation); **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9, **Ex. 1.A** (Abib 30(b)(6) Ex. 3).

**News Plaintiffs' Response to Microsoft Paragraph 70**:

**Undisputed** to the extent the cited evidence describes retrieval, synthesis, and conversational responses. Denied to the extent the cited evidence establishes the user experience is "enhanced" as an objective or measurable fact. Also denied because some web sources used for grounding can increase the likelihood of Copilot outputting misinformation or "hallucinations", including for example pink-slime news sites, which are low-quality news sites. Bell Opening Rep. ¶ 128; Cross Rebuttal Rep. at 32.

**Microsoft Paragraph 71:** Copilot's web grounding works by connecting the LLM with Microsoft Bing via Retrieval Augmented Generation, or RAG. When the Copilot system recognizes that responding to a user query may benefit from web grounding, the query proceeds down a "grounding pipeline" as follows:

a) First, the user's query is tokenized in order to be interpreted and acted upon by the LLM;

Cook Decl. ¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A**

(Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.

b) Second, Copilot sends a search-optimized query to the Bing Index, obtaining the top results: six potentially responsive webpages;

Cook Decl. ¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.

c) Third, each webpage—or a truncated portion thereof—is tokenized;

Cook Decl.¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.

d) Fourth, all of the tokenized grounding content is placed alongside the tokenized user query into a temporary "context window" and passed along to Copilot's LLM;

Cook Decl. ¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.

e) Fifth, the LLM analyzes this "context window" in order to generate a response using its underlying statistical parameters.

Cook Decl. ¶ 5; Hurst Decl. **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.

**News Plaintiffs' Response to Microsoft Paragraph 71**:

**Denied** to the extent that Microsoft anthropomorphizes Copilot by stating that the system "recognizes" when a query may benefit from grounding. **Undisputed** to the extent the cited

evidence describes an automated retrieval trigger and pipeline.

**Microsoft Paragraph 72:** Copilot's web-grounded responses are influenced by all tokens in the model's context window; the grounded content tokens alter the LLM's probability distribution (its statistical prediction of the next sequence of tokens), which influences the token sequence generated in response to the user query. Copilot is thereby able to synthesize different pieces of grounding data and the user prompt in generating a response, while also drawing upon the background understanding, insight, and reasoning capacity encoded into its underlying LLM parameters.

Cook Decl. ¶ 6; Lafferty Decl. ¶¶ 189-91; Hurst Decl. **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.

**News Plaintiffs' Response to Microsoft Paragraph 72**:

**Denied** to the extent that Microsoft anthropomorphizes Copilot by stating that the system has "understanding, insight, and reasoning capacity."

**Denied** to the extent Microsoft means "drawing upon the background" does not include leakage in the outputs. Goldstein Rebuttal Report ¶ 82 (Even with the truncation, over 10% of the 45K sample (4,651 conversations out of 45,000 total conversations) contain a 16-gram in the output that leaked through from the internal RAG fields); *id.* (Even with the truncation, approximately 20% of the 8.2M Microsoft output logs (1.66M conversations) contain a 16-gram in the output that leaked through from the internal RAG fields; NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 53 (Microsoft's expert admits that, for Microsoft output logs with RAG fields, "[t]he presence of these fields (and the URLs/domains in these fields) establishes that some content is

retrieved and processed by the model in forming its response.")

**Microsoft Paragraph 73:** Copilot provides attribution and links to every webpage used as grounding content, helping users navigate directly to those webpages to verify information or learn more.

Abib Decl. ¶¶ 6, 10; Hurst Decl. **Ex. 26** (Cook Dep. Tr.) 111:14-112:17, 147:20-148:1; **Ex. 99** (Ribas Dep. Tr.) 65:7-12.

**News Plaintiffs' Response to Microsoft Paragraph 73**:

**Denied** to the extent that Microsoft asserts Copilot provides attribution and links to every webpage used as grounding content *or* that doing so necessarily helps users navigate to webpages or learn more. Admissible evidence contradicts Microsoft's statement. *See* Bell Opening Rep. ¶ 160 ("In Tow Center studies, chatbots often misattributed the sources of quotes. In the Tow Center's 2025 study, ChatGPT correctly linked the original article in eight out of 200 outputs. It linked the incorrect article in 79 instances, only linked to the homepage instead of the specific article 37 times, did not include any links 42 times, did not identify the article at all on 38 instances, and linked a URL that led to an error page a handful of times. Meanwhile, Microsoft's Copilot hardly ever identified the correct article link, linked the wrong article on 72 instances, and did not identify the article at all 46 times."); NP Ex. 1207 [Klaudia Jaźwińska & Aisvarya Chandrasekar, AI Search Has a Citation Problem, COLUM. JOURNALISM REV. (Mar. 6, 2025), https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php] (discussing Copilot and ChatGPT citation accuracy). Microsoft's assertion also lacks a

time basis and mischaracterizes product descriptions as proof.

**<u>Microsoft Paragraph 74</u>:** Microsoft deployed a multi-layered mitigation system to prevent Copilot from outputting copyrighted content in response to a user query. Microsoft's mitigations include, for example: metaprompt and system prompt instructions; user input classifiers and filters; and an output detection system.

Bird Decl. ¶¶ 34-43; *see also* Hurst Decl. **Ex. 26** (Cook Dep. Tr.) 37:5-10, 52:17-53:20, 61:16-62:25, 65:18-66:3, 67:2-24, 69:5-11, 77:22-78:3, 107:3-6, 137:22-138:14, 144:7-145:13; **Ex. 85** (Parakhin Dep. Tr.) 217:18-218:20; **Ex. 99** (Ribas Dep. Tr.) 132:8-135:12.

**<u>News Plaintiffs' Response to Microsoft Paragraph 74</u>**:

**Denied** to the extent that "prevent" implies Microsoft's mitigation system eliminates Copilot outputs containing copyrighted content.

The cited sources do not support the statement. Microsoft mischaracterizes Mr. Parakhin's, Mr. Ribas's and Ms. Cook's deposition testimony. The citations to Mr. Ribas's testimony, Mr. Parakhin's testimony, and most citations to Ms. Cook's testimony concern NOARCHIVE and NOCACHE metatags, not copyright mitigations. In her discussion of classifiers, Ms. Cook does not mention any copyright-specific classifier. To the extent Microsoft relies on Ms. Cook's reference to Snippy,

To the extent Microsoft relies [redacted] (Bird Decl. ¶¶ 41-42), the record forecloses the argument. [redacted]. *Id.* [redacted]

Microsoft's corporate designee on these issues, Elbio Abib, testified [redacted]

[redacted] NP Ex. 657 [Elbio Abib 30(b)(6) Dep. Tr.] at 99:9-18, 107:16-108:6. Dr. Bird's declaration confirms [redacted] (Bird Decl. ¶¶ 41-42): Microsoft considered [redacted] (NP Ex. 1310 [MSFT_AI_MDL_001178782] at 9) — [redacted]. Bird Decl. ¶ 42.

*See also* evidence cited in response to Paragraphs 69, 72 & 73.

### 2. *Nature of the Work (Factor 2)*

**Microsoft Paragraph 75:** Microsoft incorporates Undisputed Facts ¶¶ 22-26 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 75**: **Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 22-26 as though fully restated herein.

### *3 Amount and Substantiality Used (Factor 3)*

**Microsoft Paragraph 76:** Copilot web grounding is not designed to display grounding content to a user as part of the LLM's grounded response; that is, the system has no deterministic functionality for passing grounding content through to a user.

Cook Decl. ¶ 7.

**News Plaintiffs' Response to Microsoft Paragraph 76**:

**Denied** to the extent that Microsoft asserts grounding content cannot be reflected in user-facing outputs. Admissible evidence contradicts Microsoft's statement. Microsoft grounded

Copilot on at least 1,820 words of a single News Plaintiff article, and an identified Copilot output included retrieved and paraphrased article text with verbatim sequences. Goldstein Rebuttal Rep. ¶ 107, Table 4; NP Ex. 806 [MSFT_AI_MDL_002882532] at -2889899-902. Dr. Goldstein further found that over 10% of the 45,000 sample conversations, and approximately 20% of the 8.2 million sample conversations had "leaked" at least one 16-gram (i.e., 16 consecutive words) from the grounding content into the response to a user. Goldstein Rebuttal Rep. ¶¶ 77-85 (noting that "[t]his analysis likely significantly undercounts the number of true 16-gram regurgitations because of the number of truncations and redactions in the data.").

Microsoft mischaracterizes the system's design objective as proof that grounding content cannot appear in a user-facing response.

**<u>Microsoft Paragraph 77</u>:** As described in Undisputed Fact ¶ 72, Copilot uses grounding data within the LLM's context window to provide a newly generated string of tokens through next token prediction.

Cook Decl. ¶ 7; Lafferty Decl. ¶¶ 189-91; *see also* Hurst Decl. **Ex. 26** (Cook Dep. Tr.) 73:22-11.

**<u>News Plaintiffs' Response to Microsoft Paragraph 77</u>**:

**Denied t**hat Copilot provides a "newly generated string of tokens" that does not include copyrighted content in the outputs. Admissible evidence contradicts Microsoft's purported fact.

*See* evidence cited in response to Paragraph 72.

**<u>Microsoft Paragraph 78</u>:** Because an LLM's next-token prediction is non-deterministic, an LLM can incidentally predict token strings that match grounding data. It is also possible that the LLM, to satisfy a particular user prompt, could attempt to provide a portion of tokens from grounding data. These behaviors are intermediated by Copilot's multi-layered mitigation system, described at Undisputed Fact ¶ 74, to prevent Copilot responses from containing significant output matching copyrighted content.

Cook Decl. ¶ 8; Lafferty ¶¶ 187, 191, 398.

**<u>News Plaintiffs' Response to Microsoft Paragraph 78</u>**:

**Denied** to the extent that Microsoft characterizes matching copyrighted output as "incidental" or as reflective of a user's desires. Admissible evidence contradicts Microsoft's statement. Goldstein and Wenger identified matching text in Copilot conversations, including user-facing outputs and grounded material. Goldstein Rebuttal Rep. ¶ 107; NP Ex. 800 [Lafferty Rebuttal Rep.] ¶¶ 120, 360-64.

Outputs that substantially overlap with copyrighted text are not merely incidental; these outputs reflect regurgitation of either the model's training data or data retrieved during RAG. *See* Mitchell Rebuttal Rep. ¶¶ 33-34. Contrary to Microsoft's statement, "shared text in the grounding and user output fields is expected as part of the normal output grounding process." NP Ex. 1148 [Lafferty Reply Rep.] ¶ 6. *See also* NP Ex. 1148 [Lafferty Reply Rep.] ¶ 20 (overlap between retrieved text and output is an "[redacted]"); NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 103 [redacted]); NP Ex. 461 [Berg-Kirkpatrick

Opening Rep.] ¶ 196 (using a 25-word threshold for identifying regurgitations because this threshold is "[redacted]").

**<u>Microsoft Paragraph 79</u>:** News Plaintiffs' experts Goldstein and Wenger identified certain outputs containing matching text in the pool of 8.2 million conversations that hit on keywords associated with News Plaintiffs. Goldstein's analysis finds 59,545 of these conversations contain matching text. Wenger's analysis searched for conversations with at least 5 16-gram matches; she found 51 total out of the 8.2 million conversation sample.

*See* Lafferty Decl. ¶¶ 360-61; 396-401.

**<u>News Plaintiffs' Response to Microsoft Paragraph 79</u>**:

**Undisputed** that Dr. Goldstein found approximately 20% of the 8.2 million sample conversations had "leaked" at least one 16-gram (i.e., 16 consecutive words) from the grounding content into the response to a user, and that included 59,545 conversations Dr. Goldstein could link to a News Plaintiff domain. Disputed to the extent Microsoft is suggesting this analysis fully captures all such leaks. Dr. Goldstein explained that "the ability to identify and link leaked content to individual web domains is extremely limited because the web search blocks in Microsoft logs that include the web grounding data provided to the model are severely shortened [i.e., truncated]." Goldstein Rebuttal Rep. ¶ 82. Dr. Goldstein also explained that "[t]his analysis [i.e., the leak analysis] likely significantly undercounts the number of true 16-gram regurgitations because of the number of truncations and redactions in the data." Goldstein Rebuttal Rep. ¶ 85.

Denied as misleading as to Dr. Wenger's findings. Within the 74,745 references to CIR-

related keywords and 95,882 references to CIR-associated web domains, Dr. Wenger found 51 hits in 77 conversations pertaining to CIR's Mother Jones Registered Works following keyword exclusion. Wenger Opening Rep. at 104-06. This aspect of Dr. Wenger's analysis did not include a direct search for any of CIR's unregistered works, which comprise the majority of CIR's Asserted Works. *See id.*; *see* Bauerlein Decl. A. at "Registered Works," "Mother Jones," and "Reveal" Tabs. Using her true hit rate calculated for the Mother Jones Registered Works, Dr. Wenger extrapolated hit rates for all CIR's works and concluded that Copilot likely regurgitates CIR's Asserted Works over 160,000 times per year. Wenger Opening Rep. at 108-110; Wenger Reply Rep. at 113-117.

**Microsoft Paragraph 80:** Meta tag controls are machine readable code on a webpage that operate at the individual HTML page level and communicate to a web crawling robot, such as Microsoft's Bingbot, how to process that webpage. When a website permits crawling by Bingbot, Bingbot retrieves the content found on a particular webpage and stores this content in Microsoft's Bing Index.

Canel Decl. ¶¶ 11-12; Gaggara Decl. ¶ 15; *see also* Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 226:23–227:24; **Ex. 99** (Ribas Dep. Tr.) 178:9–17; **Ex. 64** (Liang Dep. Tr.) 169:7-170:10.

**News Plaintiffs' Response to Microsoft Paragraph 80**:

**Disputed** to the extent the statement characterizes meta tags as controls that determine how Bingbot processes a webpage. News Plaintiffs object to this statement as unsupported by the cited evidence. For example, Microsoft Exhibit 99 (Ribas Depo. Tr. at 178:9–17) does not address meta tags, and Mr. Ribas testified that [redacted] NP Ex. 513 [Ribas Depo Tr.] at 177:24–178:21. Mr. Parakhin, who acknowledged he was [redacted] testified only generally about, for example, [redacted]

NP Ex. 647 [Parakhin Depo. Tr.] at 226:23–227:24. Denied to the extent the statement implies that Microsoft honored publishers' meta tag instructions. Bing Chat and Copilot continued to ground on and display NOARCHIVE-tagged content. NP Ex. 453 [MSFT_AI_MDL_000391970] at -970 ([redacted]); NP Ex. 454 [Abib 30(b)(1) Tr.] at 61:8-62:10 (Microsoft employee testifying [redacted]); NP Ex. 455 [MSFT_AI_MDL_000642967] at –967.

**Undisputed** that Microsoft uses Bingbot to crawl webpages, including News Plaintiffs' webpages, and stores the content in the Bing Index. NP Ex. 610 [Sept. 25, 2025 Discovery Hearing Tr.] at 69:20-21 (The Bing Index "supports the Bing search engine by crawling, storing, and organizing the internet."); NP Ex. 613 [Gaggara Jan. 27, 2026 30(b)(6) Depo. Tr.] at 21:17-22:6; NP Ex. 615 [Gaggara Aug. 20, 2025 30(b)(6) Depo. Tr.] at 63:12-64:2 (Microsoft uses a bot ("Bingbot") to crawl the internet and index and collect content from webpages, including News Plaintiffs' webpages, and Microsoft then stores that content in the "Bing Index.").

**Microsoft Paragraph 81:** After the release of Bing Chat, Microsoft implemented a change to its system whereby the existing NOARCHIVE and NOCACHE meta tags were designed to be used by publishers to signify the degree, if any, to which their content should be excluded from web grounding.

Fabrice Decl. ¶¶ 23-29.

**News Plaintiffs' Response to Microsoft Paragraph 81**:

**Denied** to the extent it suggests the meta tags would result in content being excluded from

web grounding once tagged. Admissible evidence contradicts this.

In practice, content tagged NOARCHIVE often continues to be grounded on because Microsoft does not (re)index the content after it is marked with the meta-tag, and thus, Publishers' attempts to control use are ignored. *See* NP Ex. 1351 [Stricchiola Depo Tr.] at 165:12-166:24 (suggesting that older content is often not reindexed after metatags are applied).

**Microsoft Paragraph 82:** On September 22, 2023, Microsoft announced—via a post published on Microsoft Bing Blogs—that it had repurposed the NOARCHIVE and NOCACHE meta tags for publishers to use as AI-related controls. The blog post stated that content tagged with the repurposed NOARCHIVE meta tag "will not be included in Bing Chat answers, not be linked to in the answers." A webmaster's inclusion of the NOARCHIVE meta tag in the HTML on a webpage stored in the Bing Index signals to the Copilot system that it is supposed to exclude that webpage entirely from the data provided to Copilot for web grounding.

> Canel Decl. ¶ 27; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex. 21.A** (Canel Dep. Ex. 35 – Microsoft Bing Blog Announcing Meta Tags); **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 179:2-181:8, 182:17-183:9; **Ex. 64** (Liang Dep. Tr.) 181:8–182:21; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:10-105:12.

**News Plaintiffs' Response to Microsoft Paragraph 82**:

**Denied** to the extent it suggests the meta tags would result in content actually being excluded from web grounding once tagged. Admissible evidence contradicts this.

In practice, content tagged NOARCHIVE often continues to be grounded on because Microsoft does not (re)index the content after it is marked with the meta-tag, and thus, Publishers'

attempts to control use are ignored. *See* NP Ex. 1351 [Stricchiola Depo Tr.] at 165:12-166:24 ([redacted]); NP Ex. 453 [MSFT_AI_MDL_000391970] at -970 ([redacted]); NP Ex. 454 [Abib 30(b)(1) Tr.] at 61:8-62:10 (Microsoft employee testifying [redacted]); NP Ex. 455 [MSFT_AI_MDL_000642967] at -967

**<u>Microsoft Paragraph 83</u>:** The blog post also stated that portions of content from a web page tagged with the repurposed NOCACHE meta tag "may be included in Bing Chat answers." A webmaster's inclusion of the NOCACHE meta tag in the HTML on a webpage stored in the Bing Index signals to the Copilot system that it is supposed to exclude from grounding data everything on the page other than the page title, URL and a snippet.

Canel Decl. ¶ 27; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex. 21.A** (Canel Dep. Ex. 35 – Microsoft Bing Blog Announcing Meta Tags); **Ex. 85** (Parakhin Dep. Tr.) 217:18–218:20, 226:23–227:24; **Ex. 99** (Ribas Dep. Tr.) 132:8–135:12; **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 179:2-181:8; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:10-105:12.

**<u>News Plaintiffs' Response to Microsoft Paragraph 83</u>**:

**Denied** to the extent that Microsoft suggests the use of the NOCACHE meta tag always excludes from grounding data everything on the web page other than the title, URL, and a snippet. Admissible evidence contradicts this.

In practice, content tagged NOCACHE would be treated the same as content not tagged

NOCACHE unless Microsoft has reindexed the content after it is marked with the meta-tag. *See* NP Ex. 1351 [Stricchiola Depo Tr. 165-168] (suggesting that older content is often not reindexed after metatags are applied).

**<u>Microsoft Paragraph 84:</u>** The blog post also explained that if a webmaster uses neither meta tag, then the content "may be included in Bing Chat answers." Without a tag, when stored in the Bing Index the web page is used as grounding data by the Copilot system if it is selected as one of the relevant sources of data.

Canel Decl. ¶ 27; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex. 21.A** (Canel Dep. Ex. 35); **Ex. 85** (Parakhin Dep. Tr.) 15:18-21, 16:1-5, 18:7-12, 22:25-23:8, 23:21-25:6, 26:12-27:4, 217:18–218:20; **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 179:4-181:8, 182:17-183:9; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:9-105:12.

**<u>News Plaintiffs' Response to Microsoft Paragraph 84</u>**:

**Denied** to the extent it suggests the use of the NOCACHE or NOARCHIVE meta tags will fully prevent the use of publishers' content by Copilot. Admissible evidence contradicts this.

In practice, content tagged NOCACHE or NOARCHIVE would be treated the same as content not tagged with those metatags, unless Microsoft has reindexed the content after it is marked with the meta-tag. *See* NP Ex. 1351 [Stricchiola Depo Tr. 165-168] (suggesting that older

content is often not reindexed after metatags are applied).

***4) Impact Upon the Market (Factor 4)***

***The New York Times Company (The New York Times)***

**Microsoft Paragraph 85:** Microsoft incorporates Undisputed Facts ¶¶ 27-32, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 85**:

**Denied.** This is not an appropriate undisputed fact. To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 27-32 and 61 as though fully restated herein.

**Microsoft Paragraph 86:** Although The New York Times was capable of tracking and in fact collected at least some conversion data (*i.e.,* data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 129** (Yang 30(b)(6) Dep. Tr.) 20:5-22:23, 64:4-65:15, 66:21-67:16; **Ex. 114** (Stricchiola Dep. Tr.) 97:22-98:4, 98:14-99:2, 99:22-24; **Ex. 281** (Bell Dep. Tr.) 144:16-145:3.

**News Plaintiffs' Response to Microsoft Paragraph 86**:

**Denied.**

Admissible evidence contradicts this assertion. The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates (CTR) from Bing search and Bing Chat and found that the [redacted]. *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389-90. Reduced traffic to The Times's website results in fewer

conversions to subscribers. *See* NP Ex. 8 [Bardeen 30(b)(6) Depo. Tr.] at 198:2-11 ("[T]he less traffic we get, the less subscribers we have, the less advertising we can sell, and, therefore, the less advertising revenue. And so, for the exact same reasons that I've described … having fewer subscribers than our expectations would lead to less subscriber revenue, the same dynamic would lead to less advertising revenue than we would otherwise have."); NP Ex. 1106 [The New York Times Company's Supplemental Response to Microsoft Interrogatory No. 15] at 10 ("[R]educed traffic to The Times's websites—including the Athletic and Wirecutter—reduce subscriptions, advertising revenue, and affiliate revenue."); NP Ex. 1234 [NYT_00832517]; NP Ex. 1254 [Yang Depo. Ex. 13] at 6 (a Times Oct. 2025 board presentation entitled [redacted]; NP Ex. 1254 [Yang Depo. Ex. 13] at 37 [redacted]).

**Denied** that The Times collected data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content. The cited evidence does not support this assertion.

Admissible evidence contradicts Microsoft's assertion that The Times collected data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content. *See* Hurst Ex. 129 [Yang 30(b)(6) Depo. Tr.] at 21:18-22:23 (The Times's Chief Growth and Customer Officer, Hannah Yang, testifying that she does not believe The Times typically calculates conversion rates on a daily basis but could calculate it from the raw data on the number of anonymous or registered users and subscribers on a given day), 66:21-67:16 (Ms. Yang testifying that although The Times can pull records of conversion rates,

she is not sure if it is kept consistently in a place that can be pulled over the entire relevant period); NP Ex. 1306 [Melikadze 30(b)(6) Depo. Tr.] at 77:19-80:10 (The Times's VP of Data and Insight Enterprise Analytics testifying that The Times's conversion data does not indicate the specific sources or rates of conversions).

**<u>Microsoft Paragraph 87</u>:** The conversion rate for The New York Times core product (defined internally as its "news" content) increased from November 2022 to November 2025.

Tucker Decl. ¶¶ 11(a), 49-53, Figure 9; Hurst Decl. **Ex. 91** (Poferl 30(b)(6) Dep. Tr.) 15:2-15.

**<u>News Plaintiffs' Response to Microsoft Paragraph 87</u>**:

**Undisputed** that the conversion rate for The Times's core news product was higher in November 2025 than it was in November 2022, shortly after The Times acquired The Athletic and during a period of heightened news awareness due to the change in presidential administrations. Insofar as Microsoft intends to mean that the conversion rate has always increased during the entire period from November 2022 to November 2025, that is disputed.

Admissible evidence contradicts that the paywall conversion rate for The Times's news product increased during the entire period from November 2022 to November 2025. *See* NP Ex. 1317 [NYT_01036107] ([redacted]); NP Ex. 1352 [Tucker Rebuttal Rep.] at 50, Figure 6 (analyzing The Times's paywall conversion rates for its news product and demonstrating sharp declines at certain periods between

2022 and 2025).

**<u>Microsoft Paragraph 88</u>:** Although The New York Times collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026) 109:9-110:5.

**<u>News Plaintiffs' Response to Microsoft Paragraph 88</u>**:

**Denied.**

Admissible evidence contradicts that The Times's experts did not analyze traffic data. The Times's expert Jim Malackowski analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites. For example, Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").

Further, Mr. Malackowski testified that although he did analyze the traffic data that was produced, ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to

quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski testified: "I believe there's quantitative evidence in the record, whether it be the survey evidence [i.e., Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

Finally, The Times's expert Jessie Stricchiola analyzed Microsoft's produced [redacted] for The Times's domains and concluded that the clickthrough rate for [redacted] for The Times's domains. *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389-90 ("Based on my analysis of Microsoft's produced [redacted] covering the period December 2, 2023 through September 30, 2024, [redacted]

[redacted]. . . . The overall percentage reduction in CTR for Bing Chat was approximately [redacted] for The Times's domains and [redacted] for *Daily News* Plaintiffs' domains when compared with Bing Web search."); Stricchiola NYT/DN Opening Rep. ¶ 393 ("Based on my analysis of Microsoft's produced [redacted] covering June 2023 and December 2, 2023 to September 30, 2024, it is my opinion that user clickthrough-rate (CTR) (measures as click/impression) is [redacted]").

**<u>Microsoft Paragraph 89</u>:** [redacted].

Tucker Decl. ¶¶ 11(a), 63-64, Figure 12.

**<u>News Plaintiffs' Response to Microsoft Paragraph 89</u>: Denied.**

The cited evidence contradicts Microsoft's assertion. *See* Tucker Decl. ¶ 64, Figure 12 (a chart prepared by Microsoft's expert showing [redacted]). Microsoft's expert Dr. Tucker's conversion rate analysis also fails because it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

Admissible evidence also contradicts Microsoft's assertion to the extent that Microsoft seeks to suggest that Copilot and ChatGPT do not cause a decrease in pageviews to The Times's websites compared to non-GenAI search. The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates from Bing search and Bing chat and found that the [redacted]. *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389–90. Defendants' experts also admitted [redacted]

[redacted]. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.] at ¶ 60 ([redacted]).

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 90**: [redacted]

Tucker Decl. ¶¶ 11(a), 65-66, Figure 13A, Figure 13B, Figure 14A, Figure 14B.

**News Plaintiffs' Response to Microsoft Paragraph 90**:

**Denied.**

The cited evidence contradicts Microsoft's assertion. *See* Tucker Decl. ¶ 65, Figure 13A (a chart prepared by Microsoft's expert showing [redacted]), Figure 13B (a chart prepared by Microsoft's expert showing [redacted]), ¶ 66, Figure 14A (a chart prepared by Microsoft's expert showing [redacted]), Figure 14B (a chart prepared by Microsoft's expert showing [redacted]). Microsoft's expert Dr. Tucker's conversion rate analysis also fails because it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants'

products) specifically on the rate. *See* ECF 2067 at 13-16.

Admissible evidence also contradicts Microsoft's assertion to the extent that Microsoft seeks to suggest that Copilot and ChatGPT do not cause a decrease in user visits to The Times's websites compared to non-GenAI search. The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates from Bing search and Bing chat and found that the [redacted]. *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389-390. Defendants' experts also admitted that [redacted]. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.] at ¶ 60 ([redacted]).

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 91**: [redacted]

Tucker Decl. ¶¶ 12(b), 112-113, Figure 23.

**News Plaintiffs' Response to Microsoft Paragraph 91**:

**Denied.** The cited evidence contradicts this asserted fact. *See* Tucker Decl. ¶ 113, Figure 23 (a chart prepared by Microsoft's expert showing [redacted]

[redacted]). Microsoft's expert Dr. Tucker's conversion rate analysis also fails because it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

To the extent that Microsoft seeks to suggest that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT, admissible evidence contradicts this assertion. For example, The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates from Bing search and Bing chat and found that the [redacted] ¶¶ 389-90. [redacted] *See, e.g.,* NP Ex. 556 [Amir Opening Rep.] at ¶ 60 ([redacted]). Moreover, the release of Defendants' accused products sparked other companies like Google to fast-track their own generative AI products, including but not limited to Google AI Overviews, which provides AI-generated summaries in the same way as Defendants' products. *See* NP Ex. 1111 [TONER_000000154] at -183; NP Ex. 1112 ["Ways to Search (AI Overviews)," Google, https://search.google/ways-to-search/ai-overviews/]; NP Ex. 128 [Stamm Rebuttal Rep.] ¶ 148; NP Ex. 1113 ["Find information in faster & easier ways with AI Overviews in Google Search," Google Search Help, https://support.google.com/websearch/answer/14901683]; NP Ex. 495 ["Introducing ChatGPT search," OpenAI (Oct. 31, 2024), https://openai.com/index/introducing-chatgpt-search/]. Defendants' own experts agree that Google AI Overviews negatively impacted The Times's traffic. *See* NP Ex. 467 [Goldfarb Opening Rep.] ¶ 169; NP Ex. 128 [Stamm Rebuttal Rep.] ¶¶ 139-147.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***Daily News, LP (Daily News)***

**Microsoft Paragraph 92:** Microsoft incorporates Undisputed Facts ¶¶ 33-35, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 92**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 33-35 and 61 as though fully restated herein.

**Microsoft Paragraph 93:** Although the Daily News was capable of tracking and in fact collected at least some conversion data (*i.e.,* data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

**News Plaintiffs' Response to Microsoft Paragraph 93**:

**Denied.** Admissible evidence contradicts this.

The *Daily News* Plaintiffs' experts did analyze conversion data. For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing

search and Bing chat and found that the [redacted] For the domain nydailynews.com the CTR for [redacted] *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

**Microsoft Paragraph 94**: [redacted].

Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.

**News Plaintiffs' Response to Microsoft Paragraph 94**:

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Daily News website compared to non-GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain nydailynews.com the [redacted] *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified,

"We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 95</u>:** Although the Daily News collects data regarding the sources of its traffic, its experts did not analyze whether Copilot affected actual traffic volumes to its website.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**<u>News Plaintiffs' Response to Microsoft Paragraph 95</u>**:

**Denied.** Admissible evidence contradicts this.

*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to

plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence

simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**Microsoft Paragraph 96**: [redacted].

Tucker Decl. ¶¶ 11(a), 67-69, 71, 77-78, 80, Figure 15, Figure 16.

**News Plaintiffs' Response to Microsoft Paragraph 96**:

Denied to the extent it suggests Copilot and ChatGPT do not cause a decrease in pageviews and users to the Daily News website compared to non-GenAI search. Admissible evidence contradicts this.

Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains, the difference was [redacted], and for nydailynews.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep, ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] would have a negative effect on

pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 97</u>:** [redacted]

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**<u>News Plaintiffs' Response to Microsoft Paragraph 97</u>**:

Denied to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

Daily News Plaintiffs' experts analyzed numerous sources of data supporting the proposition that [redacted]. For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for nydailynews.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to

referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***Chicago Tribune Company, LLC (Chicago Tribune)***

**Microsoft Paragraph 98:** Microsoft incorporates Undisputed Facts ¶¶ 36-38, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 98**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference

their responses to Microsoft's Undisputed Facts ¶¶ 36-38 and 61 as though fully restated herein.

**<u>Microsoft Paragraph 99</u>:** Although the Chicago Tribune was capable of tracking and in fact collected at least some conversion data (*i.e.,* data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

**<u>News Plaintiffs' Response to Microsoft Paragraph 99</u>**:

**Denied.** Admissible evidence contradicts this.

The *Daily News* Plaintiff experts did analyze conversion data. For example, expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and [redacted]. For the domain chicagotribune.com the CTR for [redacted]. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers,

paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

**<u>Microsoft Paragraph 100</u>:** [redacted].

Tucker Decl. ¶¶ 11(a) 49-51, 54-55, Figure 10.

**<u>News Plaintiffs' Response to Microsoft Paragraph 100</u>**:

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Chicago Tribune website compared to non-GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain chicagotribune.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389.

Admissible evidence in the case further demonstrates that when the plaintiffs have less

traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not

undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 101</u>:** Although the Chicago Tribune collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**<u>News Plaintiffs' Response to Microsoft Paragraph 101</u>**:

**Denied.** Admissible evidence contradicts this.

*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to

quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**<u>Microsoft Paragraph 102</u>:** [redacted].

Tucker Decl. ¶¶ 11(a), 67-70, 77-79, Figure 15, Figure 16.

**<u>News Plaintiffs' Response to Microsoft Paragraph 102</u>**:

**Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated

with a decrease in pageviews and users, including to the Chicago Tribune website, compared to non-GenAI search.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted] and for chicagotribune.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs']

copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] (tab "Metrics"); Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 103</u>:** [redacted].

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**<u>News Plaintiffs' Response to Microsoft Paragraph 103</u>**:

**Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that th[redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for

chicagotribune.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026

30(b)(6) Depo. Tr.] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***Sun-Sentinel Company, LLC (Sun Sentinel)***

**Microsoft Paragraph 104:** Microsoft incorporates Undisputed Facts ¶¶ 39-41, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 104**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 39-41 and 61 as though fully restated herein.

**Microsoft Paragraph 105:** Although the Sun Sentinel was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

**News Plaintiffs' Response to Microsoft Paragraph 105**:

**Denied.** Admissible evidence contradicts this.

The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]

[redacted]. For the domain sun-sentinel.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine 2/4/26 30(b)(6) Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

**<u>Microsoft Paragraph 106</u>:** [redacted].

Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.

**<u>News Plaintiffs' Response to Microsoft Paragraph 106</u>:**

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Sun Sentinel website compared to non-GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain sun-sentinel.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified,

"We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 107</u>:** Although the Sun Sentinel collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**<u>News Plaintiffs' Response to Microsoft Paragraph 107</u>**:

**Denied.** Admissible evidence contradicts this.

*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to

plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence

simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**Microsoft Paragraph 108**: [redacted].

Tucker Decl. ¶¶ 11(a), 67-69, 72, 77-78, 81, Figure 15, Figure 16.

**News Plaintiffs' Response to Microsoft Paragraph 108**:

**Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in pageviews and users, including to the Sun Sentinel website, compared to non-GenAI search.

For example, Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for sun-sentinel.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a

negative effect on pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not

undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 109**: [redacted]

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**News Plaintiffs' Response to Microsoft Paragraph 109**:

**Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

Daily News Plaintiffs' experts analyzed numerous sources of data [redacted] For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for sun-sentinel.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and

ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***Orlando Sentinel Communications Company, LLC (Orlando Sentinel)***

**Microsoft Paragraph 110:** Microsoft incorporates Undisputed Facts ¶¶ 42-44, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 110**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 42-44 and 61 as though fully restated herein.

**Microsoft Paragraph 111:** Although the Orlando Sentinel was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

**News Plaintiffs' Response to Microsoft Paragraph 111**:

**Denied.** Admissible evidence contradicts this.

The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain orlandosentinel.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer

subscribers for our company.”). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants’ products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, “We’re not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we’re asking them, as well as the type of content they’re looking at, whether or not there was major news happening, right. So you’re going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly.” NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker’s conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants’ products) specifically on the rate. *See* ECF 2067 at 13-16.

**<u>Microsoft Paragraph 112</u>:** [redacted].

Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.

**<u>News Plaintiffs’ Response to Microsoft Paragraph 112</u>**:

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Orlando Sentinel website compared to non-

GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain orlandosentinel.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates

generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 113:** Although the Orlando Sentinel collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**News Plaintiffs' Response to Microsoft Paragraph 113**:

**Denied.** Admissible evidence contradicts this.

*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you

just referenced.”).

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants’ products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because “[t]here are many countervailing facts within the marketplace that mask the ability to parse that out”); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 (“One thing that I and Ms. Stamm [OpenAI’s expert] and Dr. Rao [Microsoft’s expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.”).

When asked if there is “any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants’ products,” Mr. Malackowski responded: “I believe there’s quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola’s click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you’re asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can’t draw a definitive economic – econometric conclusion of the relative impact of the defendants’ action that wasn’t offset in ways by mitigation or other market conditions.” NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**<u>Microsoft Paragraph 114</u>:** [redacted].

Tucker Decl. ¶¶ 11(a), 67-69, 73, 77-78, 82, Figure 15, Figure 16.

**<u>News Plaintiffs' Response to Microsoft Paragraph 114</u>**:

**Denied.** Admissible evidence contradicts this.

Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat [redacted] For the *Daily News* Plaintiff domains the difference was 83-91%, and for orlandosentinel.com specifically the difference in click-through-rate was 86.10%. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo.

Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 115</u>:** [redacted]

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**<u>News Plaintiffs' Response to Microsoft Paragraph 115</u>**:

**Denied** to the extent it suggests that declines in search-referred visits after the introduction

of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for orlandosentinel.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]. An 83-91% lower CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs']

copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***San Jose Mercury-News, LLC (The Mercury News)***

**Microsoft Paragraph 116:** Microsoft incorporates Undisputed Facts ¶¶ 45-47, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 116**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 45-47 and 61 as though fully restated herein.

**Microsoft Paragraph 117:** Although The Mercury News was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

**<u>News Plaintiffs' Response to Microsoft Paragraph 117</u>**:

**Denied.** The admissible evidence contradicts this.

The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain mercurynews.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates

generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

**<u>Microsoft Paragraph 118</u>:** [redacted]

Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.

**<u>News Plaintiffs' Response to Microsoft Paragraph 118</u>**:

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on The Mercury News website compared to non-GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and [redacted] For the domain mercurynews.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products)

from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 119:** Although The Mercury News collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**News Plaintiffs' Response to Microsoft Paragraph 119**:

**Denied.** Admissible evidence contradicts this.

*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that

show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record,

whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**Microsoft Paragraph 120**: [redacted].

Tucker Decl. ¶¶ 11(a), 67-69, 73, 77-78, 82, Figure 15, Figure 16.

**News Plaintiffs' Response to Microsoft Paragraph 120**:

**Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in pageviews and users, including to the Mercury News website, compared to non-GenAI search.

For example, Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was 83-91%, and for mercurynews.com specifically the difference in click-through-rate was 82.82%. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]

[redacted]). An [redacted] CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's

opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 121</u>:** [redacted]

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**<u>News Plaintiffs' Response to Microsoft Paragraph 121</u>**:

**Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for mercurynews.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's

VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***DP Media Network, LLC (The Denver Post)***

**Microsoft Paragraph 122:** Microsoft incorporates Undisputed Facts ¶¶ 48-50, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 122:**

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 48-50 and 61 as though fully restated herein.

**Microsoft Paragraph 123:** Although The Denver Post was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

**News Plaintiffs' Response to Microsoft Paragraph 123:**

**Denied.** Admissible evidence contradicts this.

The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain denverpost.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer

subscribers for our company.”). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants’ products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, “We’re not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we’re asking them, as well as the type of content they’re looking at, whether or not there was major news happening, right. So you’re going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly.” NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker’s conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants’ products) specifically on the rate. *See* ECF 2067 at 13-16.

**Microsoft Paragraph 124**: [redacted].

Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.

**News Plaintiffs’ Response to Microsoft Paragraph 124**:

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on The Denver Post website compared to non-

GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain denverpost.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates

generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 125</u>:** Although The Denver Post collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**<u>News Plaintiffs' Response to Microsoft Paragraph 125</u>**:

**Denied.** Admissible evidence contradicts this.

*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you

just referenced.").

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**<u>Microsoft Paragraph 126</u>:** [redacted].

Tucker Decl. ¶¶ 11(a), 67-69, 74, 77-78, 83, Figure 15, Figure 16.

**<u>News Plaintiffs' Response to Microsoft Paragraph 126</u>:**

**Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in pageviews and users, including to the Denver Post website, compared to non-GenAI search.

Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for denverpost.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]. An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo.

Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 127</u>:** [redacted]

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**<u>News Plaintiffs' Response to Microsoft Paragraph 127</u>**:

**Denied** to the extent it suggests that declines in search-referred visits after the introduction

of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for denverpost.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An 83-91% lower CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search 37.2 percent of the time would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs']

copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs 30(b)(6) 2/12/26 Dep Tr] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***ORB Publishing, LLC (The Orange County Register)***

**Microsoft Paragraph 128:** Microsoft incorporates Undisputed Facts ¶¶ 51-53, 61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 128**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 51-53 and 61 as though fully restated herein.

**Microsoft Paragraph 129:** Although The Orange County Register was capable of tracking and in fact collected at least some conversion data (*i.e.,* data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

<u>**News Plaintiffs' Response to Microsoft Paragraph 129**</u>:

**Denied.** The admissible evidence contradicts this.

The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain ocregister.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates

generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

**Microsoft Paragraph 130**: [redacted].

Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.

**News Plaintiffs' Response to Microsoft Paragraph 130**:

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on The Orange County Register website compared to non-GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain ocregister.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers,

paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 131:** Although The Orange County Register collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**News Plaintiffs' Response to Microsoft Paragraph 131**:

**Denied.** *Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to

plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence

simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**Microsoft Paragraph 132**: [redacted].

Tucker Decl. ¶¶ 11(a), 67-69, 75, 77-78, 84, Figure 15, Figure 16.

**News Plaintiffs' Response to Microsoft Paragraph 132**:

**Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in pageviews and users, including to the Orange County Register website, compared to non-GenAI search.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for ocregister.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on

pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not

undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 133**: [redacted].

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**News Plaintiffs' Response to Microsoft Paragraph 133**:

**Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for ocregister.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to

referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

***<u>Northwest Publications, LLC (Pioneer Press)</u>***

**<u>Microsoft Paragraph 134</u>:** Microsoft incorporates Undisputed Facts 54-56, 61 as though fully restated herein.

**<u>News Plaintiffs' Response to Microsoft Paragraph 134</u>**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference

their responses to Microsoft's Undisputed Facts ¶¶ 54-56 and 61 as though fully restated herein.

**<u>Microsoft Paragraph 135</u>:** Although the Pioneer Press was capable of tracking and in fact collected at least some conversion data (*i.e.,* data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14.

**<u>News Plaintiffs' Response to Microsoft Paragraph 135</u>**:

**Denied.** Admissible evidence contradicts this.

The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain twincities.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers,

paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

**<u>Microsoft Paragraph 136</u>:** [redacted]

Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.

**<u>News Plaintiffs' Response to Microsoft Paragraph 136</u>**:

**Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Pioneer Press website compared to non-GenAI search.

For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the domain twincities.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they

convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.

The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not

undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 137:** Although the Pioneer Press collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.

Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6.

**News Plaintiffs' Response to Microsoft Paragraph 137**:

**Denied.** Admissible evidence contradicts this.

*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.

Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was [redacted]. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").

Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to

quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").

When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9.

**Microsoft Paragraph 138**: [redacted]

Tucker Decl. ¶¶ 11(a), 67-69, 76, 77-78, 85, Figure 15, Figure 16.

**News Plaintiffs' Response to Microsoft Paragraph 138**:

**Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated

with a decrease in pageviews and users, including to the Pioneer Press website, compared to non-GenAI search.

For example, Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for twincities.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]) combined with GenAI search substituting for non-GenAI search 37.2 percent of the time would have a negative effect on pageviews and users.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs']

copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**<u>Microsoft Paragraph 139</u>:** [redacted]

Tucker Decl. ¶¶ 12(b), 112-113, Figure 24.

**<u>News Plaintiffs' Response to Microsoft Paragraph 139</u>**:

Denied to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for twincities.com

specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.,* NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.

Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.

Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.

CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026

30(b)(6) Depo. Tr.] at 23:6-22.

News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 140:** Microsoft incorporates Undisputed Facts ¶¶ 57-61 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 140**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 57-61 as though fully restated herein.

**Microsoft Paragraph 141:** CIR has no paywall on its *Mother Jones* website.

Hurst Decl. **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec 19, 2025)) 295:9-24.

**News Plaintiffs' Response to Microsoft Paragraph 141**:

**Undisputed.**

**Microsoft Paragraph 142:** CIR uses a window of approximately two months between publication of its *Mother Jones* magazine and inclusion of that content on the *Mother Jones* website.

Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan 26, 2026)) 144:21-

145:11.

**<u>News Plaintiffs' Response to Microsoft Paragraph 142</u>**:

**Undisputed.**

**<u>Microsoft Paragraph 143</u>:** CIR's expert did not identify any causal relationship between the introduction of Copilot and the traffic to the *Mother Jones* website.

Hurst Decl. **Ex. 27** (Cross Dep. Tr.) 142:15-21; **Ex. 74** (McDonald Dep. Tr.) 92:24-100:5.

**<u>News Plaintiffs' Response to Microsoft Paragraph 143</u>**:

**Denied** to the extent Microsoft characterizes the absence of an identified causal relationship in the cited evidence as proof no relationship exists.

The cited evidence does not support Microsoft's purported fact, as it pertains to AI and not to Copilot specifically. Hurst Decl. Ex. 74 (McDonald Depo. Tr.) at 93:5-11 ("The report does not attempt to ascribe specific driving causal factors for any harm, in general . . . related to this AI. It does not attempt to quantify the magnitude of the harm that stems from AI."). Dr. McDonald described "it's likely that there's multiple causal factors related to this harm, AI being one of those causal factors, perhaps the principal causal factor" and "you have multiple factors that occur in the same time period, and you don't have an effective proxy variable or effective data to capture this." Hurst Decl. Ex. 74 (McDonald Depo. Tr.) at 93:18-94:24.

Microsoft mischaracterizes the cited deposition excerpts by taking a lack of an isolated

causal finding and converting it into proof that no causal relationship could exist.

**<u>Microsoft Paragraph 144</u>:** [redacted].

Tucker Decl. ¶¶ 11(a), 86-89, Figure 17, Figure 18, Figure 19.

**<u>News Plaintiffs' Response to Microsoft Paragraph 144</u>**:

**Denied.**

The cited evidence does not support the proposition. Dr. Tucker does not provide evidence that demonstrates users and visits were declining before the introduction of Copilot and ChatGPT.

Admissible evidence also contradicts the purported fact. Before the release of ChatGPT and Copilot, the monthly visitor count to CIR's *Mother Jones* website was positive. McDonald Rebuttal Rep. at pp. 20-21 ("Controlling for article output and time trends, Mother Jones lost approximately 43,105 unique visitors per month in the post-ChatGPT period."). Average monthly readership fell from 8.545 million in the 52 months before ChatGPT's release to 3.297 million in the 32 months after, a decline of approximately 5.25 million readers per month. *See id*. Dr. McDonald concluded that Mother Jones experienced "a large, statistically robust, and editorially-independent decline in audience reach" whose timing and magnitude "align with the deployment

of AI tools that reduce the need for users to visit original news sources." *See id.*

***As to All News Plaintiffs***

**Microsoft Paragraph 145:** Using both a survey and an analysis of Copilot conversation logs, Microsoft's experts found that consumers rarely use Copilot to obtain information about current events.

Bail Decl. ¶¶ 97, 124-25; Amir Decl. ¶¶ 9(c), 42, 55, 57, 59-60.

**News Plaintiffs' Response to Microsoft Paragraph 145**:

**Undisputed** that Microsoft's experts did those analyses; **denied** that their conclusion was that consumers "rarely" use Copilot to obtain information about current events. Denied that consumers "rarely use Copilot to obtain information about current events." Admissible evidence contradicts Microsoft Paragraph 145.

Microsoft expert Dr. Amir did a survey and concluded that [redacted]" and Professor Bail's team did an analysis of Copilot conversation logs and concluded that [redacted] however both of these studies were flawed and unreliable for numerous reasons as set forth in Plaintiffs' experts reports. Indeed, Dr. Bail at deposition conceded that "[redacted]" NP Ex. 1367 [Bail Depo Tr.] at 56:22-57:15. *See also, e.g.,* Malackowski NYT-DNP Rebuttal at 55-59 ([redacted]); Owen Rebuttal at para 34-36 (Bail assumes [redacted]

[redacted]; Goldstein Rebuttal Rpt. at 109-120 and 129-158 and 213-216; Goldstein Supplemental Rpt. at 50-52; McDonald Rebuttal Rep. at 63-64 (Dr. Bail's "[redacted] the most temporally constrained slice of news-related usage and understates the relevance of AI substitution for Plaintiffs' investigative and policy journalism, which has a longer shelf life than breaking news). In any event, Dr. Amir's results actually indicate that at least [redacted] of respondents use Copilot to obtain news or product recommendations. NP Ex. 1275 [Amir Depo Tr.] at 98:3-102:9.

Using a list of news sites provided by Drs. Bell and Owen (News Plaintiffs' journalism experts), Dr. Goldstein found that Copilot retrieved a news domain for grounding its output in [redacted] of RAG conversations in Dr. Lafferty's 45,000 Copilot sample ([redacted] total RAG conversations), and [redacted] of RAG conversations in the 8.2M sample ([redacted] total RAG conversations). Goldstein Rebuttal Rpt. at 109-120 and 129-158; Goldstein Supplemental Rpt. at 50-52. He also concluded that "[t]he categories chosen by Dr. Bail are not strongly predictive of where news data is used for RAG[.]" Goldstein Rebuttal Rpt. at 116.

Furthermore, the 1.2% and 1.3% percentages – even if correct – do not indicate that consumers' use of generative AI chats to obtain information about current events is "rare." As of December 2024, ChatGPT processed more than 1 billion total queries per day. As of July 2025, ChatGPT processed approximately 2.5 billion queries per day. Even if a minority of outputs or low proportion of users use OpenAI's LLMs to obtain information similar to that of News Plaintiffs, when such use is put into context, it is substantial. For example, 1.2% of 2.5 billion queries per day is 30 million queries per day to obtain information about current events.

Malackowski Rebuttal at 57 (citing NP Ex. 1278 ["Believe it or not, ChatGPT gets over 1 billion messages every single day," PCWorld, December 5, 2024, https://www.pcworld.com/article/2546712/believe-it-or-not-chatgpt-gets-over-1-billion-messages-everysingle-day.html]; NP Ex. 1228 [Aaron Chatterji, et. al., "How People Use ChatGPT," OpenAI, et. al., September 15, 2025, https://cdn.openai.com/pdf/a253471f-8260-40c6-a2cc-aa93fe9f142e/economic-research-chatgptusagepaper.pdf, p. 36]).

**Microsoft Paragraph 146:** News Plaintiffs' experts produced no analysis quantifying any loss of traffic, subscriptions, or revenue as a result of readers choosing to read a Copilot output with "regurgitated" content (as measured by Goldstein) as a substitute for reading any of their Asserted Works.

***New York Times:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 281** (Bell Dep. Tr.) 99:16-22, 144:16-145:3, 168:20-169:15; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Daily News:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Chicago Tribune:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-

110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Orlando Sentinel:*** Hurst Decl. Ex. 41 (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Sun Sentinel:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr.) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***The Mercury News:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***The Denver Post:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); Ex. 82 (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24.

***The Orange County Register:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Pioneer Press:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 10 9:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***CIR:*** Hurst Decl. **Ex. 125** (Wenger Dep. Tr.) 249:1–13; **Ex. 74** (McDonald Dep. Tr.) 70:6-15, 92:24-100:5, 228:2-10; **Ex. 27** (Cross Dep. Tr.) 142:15-21.

**News Plaintiffs' Response to Microsoft Paragraph 146**:

**Denied** to the extent it suggests there are no opinions about loss of traffic, subscriptions, and revenues as a result of Defendants' infringing conduct. Admissible evidence contradicts this.

For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing Search and Bing Chat [redacted] For The Times domains the difference was [redacted], for DNP domains the difference was [redacted] and for Ziff Davis's domains the difference was [redacted]. *See* Stricchiola NYT/DNP Rebuttal Rpt. ¶ 29; Stricchiola NYT/DNP Opening Rpt. ¶ 389; Stricchiola ZD Opening Rpt. ¶ 264.

As another example, James Malackowski analyzed the produced metrics of all eight *Daily News* Plaintiffs and concluded that they all saw declines in organic search referrals between 2022

and 2024 – Denver Post had a [redacted] decrease; Mercury News had a [redacted] decrease; Orange County Register had a [redacted] decrease; Pioneer Press had a [redacted] decrease; Chicago Tribune had a [redacted] decrease; Sun-Sentinel had a [redacted] decrease; Daily News had a [redacted] decrease; and Orlando Sentinel had a [redacted] decrease. *See* Malackowski NYT-DNP Opening Rep. at 70, n. 500 and Appendix B, Exhibit 13.1; NP Ex. 1243 [DNP-00366826] tab "Metrics."

Jim Malackowski also testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced."). *See also* Malackowski NYT-DNP Opening Rep. at 29-67 (identifying scores of qualitative and quantitative evidence to support that defendants have reduced traffic to plaintiffs' websites in the form of third party reports, testimony and documents from Defendants' executives, click-through-rate data (in connection with Microsoft's estimate that if LLMs caused a [redacted]); NP Ex. 854 [MSFT_NEWS_000944196-200] at 197.

Michael McDonald likewise quantified traffic loss for CIR, finding a statistically significant secular decline of approximately 43,100-69,900 unique visitors per month that cannot be attributed to article output or email subscriber acquisition. McDonald Rebuttal Rep. at p 54 (describing his findings).

That there is no quantification of the aforementioned losses by News Plaintiffs' experts

based on the produced empirical data does not mean there is no harm or loss; rather, it reflects the numerous factors at play and the difficulty in isolating the various causes. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).

**Microsoft Paragraph 147:** Between 2019 and 2024, News Plaintiffs did not enter into any agreement to license their Asserted Works for the purpose of use as grounding data for LLM-based general purpose chatbots.

***New York Times:*** Hurst Decl. **Ex. 46** (Grossman-Cohen 30(b)(6) Dep. Tr.) 24:22-29:18, 101:18-102:16; **Ex. 77 (**Miller Dep. Tr.) 10:3-11, 14:2-20. ***Daily News:*** Hurst Decl. **Ex. 140** (Daily News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Chicago Tribune:*** Hurst Decl. **Ex. 133** (Chicago Tribune 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Orlando Sentinel:*** Hurst Decl. **Ex. 159** (Orlando Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6)

Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Sun Sentinel:*** Hurst Decl. **Ex. 166** (Sun Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Mercury News:*** Hurst Decl. **Ex. 148** (Mercury News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Denver Post:*** Hurst Decl. **Ex. 144** (Denver Post 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Orange County Register:*** Hurst Decl. **Ex. 156** (OC Register 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Pioneer Press:*** Hurst Decl. **Ex. 163** (Pioneer Press 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***CIR:*** Hurst Decl. **Ex. 12** (Bauerlein Dep. Tr. Dated Jan. 27, 2026) 58:16-64:18; **Ex. 12.A** (Bauerlein Dep. Ex. 47); **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 405:25-408:22.

**News Plaintiffs' Response to Microsoft Paragraph 147**:

**The Times**: **Undisputed** that the parties had not executed a final agreement to "license their Asserted Works for the purpose of use as grounding data for LLM-based general purpose chatbots," but **denied** to the extent it is intended to suggest that News Plaintiffs were not in negotiations during that period to license their Asserted Works for that purpose, and would not

have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal.

Admissible evidence contradicts this. *See* NP Ex. 229 [Felix Depo. Ex. 137] [NYT_00468323]; NP Ex. 230 [Felix Depo. Tr.] at 312:17-314:21; NP Ex. 231 [Lightcap 30(b)(1) Depo. Ex. 17]; NP Ex. 232 [Lightcap 30(b)(1) Depo. Ex. 18] [OPCO_MDL_004419803] ([redacted]); NP Ex. 234 [Russell 30(b)(6) Depo. Tr.] at 221:19-228:20 ([redacted]); NP Ex. 1289 [Felix Depo. Ex. 130 – NYT_00941750] at -750-751 (The Times and Amazon engaged in licensing negotiations in 2024 for the GenAI licensing deal that closed in 2025).

**Daily News Plaintiffs**:

**Undisputed**, but **denied** to the extent it suggests that *Daily News* Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal. Admissible evidence contradicts this.

While *Daily News* Plaintiffs did not enter into such an agreement between 2019 and 2024, outreaches to *Daily News* Plaintiffs regarding licenses for LLM training started around 2023, 2024, and *Daily News* Plaintiffs approached them with a curiosity about what this new category of business could look like, but also sensitive to risks that could come with licensing (such as the potential for cannibalization and the potential negative impacts to the business versus whatever

money is being offered). NP Ex. 1300 [Lown 30(b)(1) 1/9/26 Depo Tr.] at 18:23-19:4; NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 161:10-167:4; 206:8-209:6.

**CIR**: Undisputed, but denied to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal.

Admissible evidence contradicts this. NP Ex. 1276 [Bauerlein 30(b)(6) 1/26/26 Depo. Tr.] at 196:11–16 (CIR was not approached by Microsoft regarding licensing its content); NP Ex. 1276 [Bauerlein 30(b)(6) 1/26/26 Depo. Tr.] at 196:3–9 (testifying "if [CIR] had been asked [to license its content], we certainly would have considered it.").

**<u>Microsoft Paragraph 148</u>:** There are substantial impediments to the formation of a market for licensing data for web grounding LLMs. For example:

a) Because developers cannot predict in advance which specific content and sources will be relevant to any given prompt, a large volume and a large variety of textual data is necessary for grounding general purpose LLMs like those at issue.

Decl. ¶¶ 13(c), 154-156.

b) No singular piece of data is needed to ground an LLM; any one piece of data used to ground a response can be easily substituted for another.

Tucker Decl. ¶¶ 13(c), 155-157.

c) LLMs generate outputs probabilistically in response to user prompts (including during web grounding); it is difficult to isolate the marginal contribution of an individual piece of

data in an LLM's output generation.

Lafferty Decl. ¶¶ 16, 99, 140, 175, 180, 189, 191, 284, 435; Hurst Decl. **Ex. 80** (Murati Dep. Tr.) 108:12-18, 11:13-16, 13:24-14:4, 18:3-14, 114:11-115:6; Tucker Decl. ¶¶ 13(a), 13(c), 155-156, 160-161.

d) Rightsholders for individual works can be difficult and costly to identify and locate, increasing the transaction costs of negotiating any proposed web grounding data licenses.

Tucker Decl. ¶¶ 13(c), 161-165.

e) Negotiations for the necessary volume of data needed for web grounding an LLM are susceptible to holdout problems.

Tucker Decl. ¶¶ 13(c), 161-165.

**News Plaintiffs' Response to Microsoft Paragraph 148**:

**Denied.** Admissible evidence contradicts each of these points.

For example, while Dr. Tucker argues that large quantities of data would need to be licensed because "[redacted]" this is contradicted by her claims that data is interchangeable (point b). If data were interchangeable, there would be no need to keep getting more of it. Malackowski DNP/NYT Rebuttal Rpt. at 83.

On the point that it is difficult to isolate the marginal contribution of individual data in the LLM output, this is technically incomplete because the LLM training pipeline has three stages – pre-training, mid-training, and post-training, and news content plays a distinct role in each. *See* Malackowski DNP/NYT Reply Rpt. at 13. In addition, Microsoft executive Jaron Lanier has stated that [redacted]. NP Ex. 1313 [MSFT_AI_MDL_002218935] at -42 (Lanier proposing in March 2023 that

Microsoft "[redacted]" in order to "[redacted]).

On the point that rightsholders for individual works can be difficult and costly to identify and locate, increasing the transaction costs of negotiating any proposed web grounding data licenses, there is evidence in the record (through Mr. Malackowski) that these types of transaction costs and fragmented ownership "are precisely the kinds of challenges all IP licensing markets face" and they "do not preclude a market; they call for solutions." Malackowski DNP/NYT Reply Rpt. at 33 (providing example that photocopying spurred the formation of the Copyright Clearance Center in the late 1970s and digital music rights were formalized through iTunes after Napster). Mr. Malackowski also identifies at least 29 intermediaries (e.g., Calliope Networks, Tollbit, ProRata.ai, ScalePost) that facilitate licensing at scale. Malackowski DNP/NYT Rebuttal Rpt., Appx. 5.2.

Finally, Dr. Tucker's argument that [redacted] is contradicted by Mr. Malackowski's testimony that the fair use doctrine "expressly rejects that circular logic" and that the relevant inquiry is not whether every piece of web content can be licensed, but whether a market exists for "the plaintiffs' type of work."

*See* Malackowski DNP/NYT Reply Rpt. at 33 and 36-37.

**Microsoft Paragraph 149:** News Plaintiffs' incentives to create new works have not been reduced following the use of the Asserted Works for web grounding, as demonstrated by their continued publication.

Tucker Decl. ¶¶ 14, 30-48, 237-238; Hurst Decl. **Ex. 116** (Sulzberger Dep. Tr.) 177:24-178:6; **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr.) (Vol. 2, dated Jan. 27, 2026) 423:6-16; **Ex. 59** (Julien Dep. Tr.) 33:12-17.

**News Plaintiffs' Response to Microsoft Paragraph 149**:

**Denied.**

Admissible evidence contradicts Microsoft's assertion. *See* Bell Rebuttal Rep. ¶¶ 161, 163, 200 (opining that The Times's incentive to create new works is driven in part by its ability to create new works, which in turn is driven by its ability to fund the creation of its journalism via subscriptions, advertising, licensing, and affiliate revenue, so any harm to The Times from Defendants' or other third parties' unauthorized uses of their Asserted Works necessarily impacts The Times's incentives and ability to create new works); NP Ex. 5 [Meredith Levien Depo. Ex. 7] at 13; NP Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 41 (detailing The Times's increased journalism costs of $48.7 million, which were "largely due to higher compensation and benefits, which was driven by growth in the number of employees who work in [The Times's] newsrooms as well as higher salaries, benefits costs and incentive compensation"); NP Ex. 3 [Sulzberger Depo. Tr.] at 191:16-192:10 (describing The Times's track record of "reinvesting deeply into [its] journalistic mission"), 302:8-23 (describing The Times's investment into its journalism, including having "bureaus all over the world" and giving journalists "sometimes

years" "to do the most important work"); NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 36:1-37:6 (explaining that as a result of generative AI causing reductions in traffic and revenues, that "will also result in significant reductions of employees, specifically our newsrooms and our advertising departments will no longer be able to continue to fund the same amount of staff and produce the same amount of copyrighted, quality, accurate, and trusted content"); NP Ex. 20 [J. Anderson Depo Tr.] at 138:13-20 ("I don't think people understand what we put into investigations. And it just can't be taken, because if it is, we can't do it anymore because there's so much – so many resources put into it. And if it's just taken and put out there for free, and we can't, you know, monetize it and do it for the community, then there's really no point."); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 251:1-6 ("I think it has been well documented that generative AI poses a serious, immediate, and existential threat to the economy and the industry for local news, essentially to my business, and I think that has been acknowledged by both Microsoft and OpenAI"); NP Ex. 1277 [Bauerlein 1/27/26 Depo. Tr.] at 423:6-16 (testifying that while CIR maintains its mission-driven desire to create new works, generative AI products "affect the return on [CIR's] efforts" and CIR's "ability to have the impact that [it] seek[s]" and thereby "could impact the incentives by making it more difficult to have the impact."); Cross Rebuttal Rep. at 14 (opining that copyright gives news organizations like CIR the incentive to invest in coverage, helping "newsrooms cover costs and continue their creative work").

News Plaintiffs object to the phrase "incentives to create new works" as vague and ambiguous. It is unclear what an "incentive" is – a personal desire, the actual creation of new work, business strategy for creating new works, etc. News Plaintiffs further object that cited testimony of Andrew Julien (Ex. 59) does not support the proposition – it says only that New York

Daily News (one of the eight DNPs) has never missed an issue of publication.

**Implied License**

**Microsoft Paragraph 150:** Microsoft incorporates Undisputed Facts ¶¶ 80-84 as though fully restated herein.

**News Plaintiffs' Response to Microsoft Paragraph 150**:

**Denied.** This is not an appropriate undisputed fact. To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 80-84 as though fully restated herein.

**Microsoft Paragraph 151:** Microsoft's blog post announcing the repurposed NOARCHIVE and NOCACHE meta tags further stated that "content with the NOCACHE tag or NOARCHIVE tag will still appear in our search results." Publishers can remain in the Bing Index for use in traditional Bing search, while excluding their content from web grounding.

Canel Decl. ¶¶ 27-28; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex. 21.A** (Canel Dep. Ex. 35 – Microsoft Bing Blog Announcing Meta Tags); **Ex. 85** (Parakhin Dep. Tr.) 226:23–227:24; **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 179:2-181:8, 182:17-183:9; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:9-105:12; **Ex. 34** (Felix Dep. Tr.) 121:23–122:22; **Ex. 64** (Liang Dep. Tr.) 187:10–23; **Ex. 11** (Bauerlein 30(b)(6) Dep. (Vol. 1, dated Jan. 26, 2026)) 171:5–13, 176:25–177:19.

**News Plaintiffs' Response to Microsoft Paragraph 151**: Disputed.

**Denied.** Admissible evidence contradicts Microsoft's assertion that "[p]ublishers can remain in the Bing Index for use in traditional Bing search, while excluding their content from

web grounding." *See* NP Ex. 453 [MSFT_AI_MDL_000391970] at -970 [redacted] which demonstrates that Bing Chat continued displaying and grounding on content tagged NOARCHIVE, including paywalled content, after Microsoft's September 22, 2023 blog post); NP Ex. 454 [Abib 30(b)(1) Tr.] at 61:8-62:10 (Microsoft employee testifying [redacted]; NP Ex. 455 [MSFT_AI_MDL_000642967] at -967; Stricchiola NYT/DN Opening Rep. at ¶¶ 280-297 (Microsoft's own published data in a tool called Bing Webmaster Tools showing that [redacted]).

News Plaintiffs object that the evidence cited does not support Microsoft's assertions. The quoted language from the cited blog post does not appear in the attached blog post. *See* Hurst Ex. 21.A.

**Microsoft Paragraph 152:** Each News Plaintiff employs a webmaster, or equivalent personnel, who holds a Bing Webmaster Tools Account for managing content control for digital publications. Canel Decl. ¶ 15.

**News Plaintiffs' Response to Microsoft Paragraph 152**:

**Denied** to the extent it suggests the person who holds the Bing Webmaster Tools Account can manage content control for digital publications, and that Microsoft abides by those controls. Admissible evidence contradicts this.

Microsoft does not abide by a NOARCHIVE tag unless content is crawled for the Bing Index *after* the NOARCHIVE tag is added, and in the case of News Plaintiffs' content, this often

did not happen even a year following the tagging of content with NOARCHIVE. *See* NP Ex. 1351 [Stricchiola Depo. Tr.] at 165:12-168:9; Stricchiola NYT / DN Opening Rpt. at 103-109.

News Plaintiffs object that the cited evidence does not support Microsoft's assertion. *See* Canel Decl. ¶ 15 (stating only that "each News Plaintiff holds a Bing Webmaster Tools account").

**Microsoft Paragraph 153:** Microsoft's announcement via blog post of its repurposing of the NOARCHIVE meta tag for use as an AI-related control was communicated to News Plaintiffs, via for example:

a) Microsoft transmitted a mass notification to all Bing Webmaster Tools account holders when Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was published.

Canel Decl. ¶ 30.

b) Microsoft publicized how it had repurposed the NOARCHIVE meta tag via its post on Microsoft Bing Blogs as well as through industry outreach.

Canel Decl. ¶ 30; *see also* Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 279:1-22.

c) Microsoft publicized its blog post featuring the repurposed NOARCHIVE meta tag at webmaster and search engine optimization conferences.

Canel Decl. ¶ 30; *see also* Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) 130:1–131:24; Ex. 85 (Parakhin Dep. Tr.) 279:1-22.

d) Microsoft created a chart summarizing the repurposed meta tags, which was presented

directly to The New York Times and to other publishers at an event in Mexico.

Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) 130:1–131:24.

**News Plaintiffs' Response to Microsoft Paragraph 153**:

**Denied.** Admissible evidence contradicts this.

For example, the expert report and deposition of Ms. Stricchiola make clear that Microsoft's message was *not effectively communicated*. Indeed, News Plaintiffs had marked their content with the NOARCHIVE meta tag and yet Microsoft's own published data in Bing Webmaster Tools reflected that Copilot was still repeatedly accessing and using the content. In Ms. Stricchiola's deposition, [redacted] This is a loophole in Microsoft's meta tag instructions. *See* NP Ex. 1351 [Stricchiola Depo. Tr.] at 165:12-168:9; Stricchiola NYT / DN Opening Rpt. at 103-109.

News Plaintiffs object that Microsoft's cited evidence does not support that News Plaintiffs received Microsoft's purported "transmi[ssion] [of] a mass notification to all Bing Webmaster Tools account holders when Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was published," through "industry outreach," through "webmaster and search engine optimization conferences," *see* Canel Decl. ¶ 30, or through a "chart summarizing the repurposed meta tags, which was presented directly to The New York Times and to other publishers at an

event in Mexico," *see* Hurst Ex. 99 (Ribas Dep. Tr.) 130:1–131:24.

**Microsoft Paragraph 154:** After publication of the September 22, 2023 blog post, News Plaintiffs knew about Microsoft's repurposed NOARCHIVE meta tag control, and how to use it on their webpages to signal exclusion from web grounding on News Plaintiffs' content in the Bing Index.

***The New York Times:*** Hurst Decl. **Ex. 34** (Felix Dep. Tr.) 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; **Ex. 34.A** (Times Ex. 105); **Ex. 64** (Liang Dep. Tr.) 172:25–173:12, 176:2–177:16, 181:8–182:21; **Ex. 93** (Procas, 30(b)(6) Dep. Tr.) 179:2–181:8; Canel Decl. ¶ 30. ***Daily News:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Chicago Tribune:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Orlando Sentinel:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Sun Sentinel:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***The Mercury News:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***The Denver Post:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***The Orange County Register:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Pioneer Press:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel

Decl. ¶ 30. ***CIR:*** Canel Decl. ¶ 30.

**News Plaintiffs' Response to Microsoft Paragraph 154**:

**Denied.** The cited evidence does not support the assertion, and admissible evidence shows that News Plaintiffs did not know how to use it on their webpages to signal exclusion from web grounding on News Plaintiffs' content in the Bing Index. The expert report and deposition of Ms. Stricchiola makes clear that Microsoft's message of how to signal exclusion of content from web grounding was misleading. News Plaintiffs *had* marked their content with the NOARCHIVE meta tag and yet Microsoft's own published data in Bing Webmaster Tools reflected that Copilot was [redacted]. NYT / DN Stricchiola Opening Rpt. at 103-109.

**Microsoft Paragraph 155:** With knowledge of Microsoft's repurposed NOARCHIVE meta tag, The New York Times did not uniformly apply Microsoft's repurposed NOARCHIVE meta tag on a sitewide basis, despite internal recommendations to do so.

Hurst Decl. **Ex. 64** (Liang Dep. Tr.) 175:23–177:16, 183:3–17, 190:15–195:18; **Ex. 64.A** (Liang Dep. Ex. 14); **Ex. 64.B** (Liang Dep. Ex. 16).

**News Plaintiffs' Response to Microsoft Paragraph 155**:

**Denied.** News Plaintiffs object to the term "uniformly apply" as vague and ambiguous. News Plaintiffs also object to the suggestion that there was any obligation for publishers to opt out of having their content used for training or web grounding or that NOARCHIVE was effective to prevent such use of publisher content.

Admissible evidence shows that, in 2024, The Times reviewed Microsoft's recommendation that the NOARCHIVE tag was "a way to ... opt out of Bing chat and other GenAI products under Microsoft's umbrella," as an alternative to blocking Bingbot entirely from crawling

The Times's site, which would have hurt The Times in search. NP Ex. 415 [Liang Tr.] at 192:4-20. The Times maintained the NOARCHIVE tagging it already had in place, which was on all news stories. NP Ex. 415 [Liang Tr.] at 195:6-13.

**Microsoft Paragraph 156:** Until early 2026, The New York Times selectively implemented the NOARCHIVE meta tag control, blocking some webpages but not others (for example the home page, as well as Wirecutter articles).

> Hurst Decl. **Ex. 64** (Liang Dep. Tr.) 174:6–175:22; **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 181:20–182:16.

**News Plaintiffs' Response to Microsoft Paragraph 156**:

**Undisputed** that before 2026, The Times did not implement the NOARCHIVE metatag on its homepage or on all Wirecutter articles. **Denied** as to the rest of this statement. News Plaintiffs object to the term "selectively implemented" as vague and ambiguous. News Plaintiffs also object to the suggestion that there was any obligation for publishers to opt out of having their content used for training LLMs or that NOARCHIVE was effective to prevent use of publisher content for training.

Admissible evidence shows that, in 2024, The Times maintained the NOARCHIVE tagging it already had in place, which was on all news stories. Hurst **Ex. 64** (Liang Tr.) at 174:18–23 ("Q: And you said that the tag already existed on the website before you arrived. What pages does The Times use the NOARCHIVE meta tag on? A: The NOARCHIVE tag is present on all article pages."); 188:7–10, 195:6-13 ("Q: And so – and I believe you said that you used the NOARCHIVE tags on – on at least all of the News article pages for The Times, correct? A: Correct. . . . Q: [T]he NOARCHIVE tags remained on the news stories [as of April 18, 2024]. Correct? A:

Correct.”).

***All Daily News Plaintiffs***

**<u>Microsoft Paragraph 157</u>:** With knowledge of Microsoft’s repurposed NOARCHIVE meta tag, the Daily News Plaintiffs did not uniformly apply that meta tag to their news articles until March 7, 2025.

> ***<u>Daily News</u>*:** Hurst Decl. **Ex. 139** (Daily News 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***<u>Chicago Tribune</u>***: Hurst Decl. **Ex. 132** (Chicago Tribune 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex**. **57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***<u>Orlando Sentinel</u>***: Hurst Decl. **Ex. 158** (Orlando Sentinel 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***<u>Sun Sentinel</u>***: Hurst Decl. **Ex. 165** (Sun Sentinel 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; Ex. **57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***<u>The Mercury News</u>***: Hurst Decl. **Ex. 147** (Mercury News 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–

140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***The Denver Post***: Hurst Decl. **Ex. 143** (Denver Post 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***The Orange County Register***: Hurst Decl. **Ex. 155** (OC Register 2d Suppl. Resp. to OAI Interrog. No. 6); Ex. **57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; Ex. 57.B (Jacobs Dep. Ex. 31); Ex. **57.B** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***Pioneer Press***: Hurst Decl. **Ex. 162** (Pioneer Press 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18.

**News Plaintiffs' Response to Microsoft Paragraph 157**:

**Denied** to the extent it suggests that Daily News Plaintiffs did not indicate that their content should not be grounded on before March 7, 2025, and to the extent it suggests Daily News Plaintiffs could have "uniformly implemented" metatags on all content immediately upon Microsoft's issuance of a blog post. Admissible evidence contradicts this.

After the September 2023 blog post, Daily News Plaintiffs investigated and tested the NOARCHIVE meta-tag, including how it worked (or rather, how they believed it worked). NP Ex. 72 [Jacobs 2/12/26 Depo. Tr.] at 94:23-97:2 (explaining that the "sands keep shifting" on what needs to be done to protect content; they are "difficult to find out about" and "difficult to figure out how to implement and use"; notwithstanding, Daily News Plaintiffs researched the

NOARCHIVE meta tag upon seeing the Microsoft blog post and added the tags). In April 2024, *Daily News* Plaintiffs sued Microsoft, thereby providing notice that Microsoft was not permitted to use Daily News Plaintiffs' content for, *inter alia*, grounding. *See* ECF 1 (No. 1:24-cv-3285). Notwithstanding being sued, Microsoft continued to use *Daily News* Plaintiffs' content for grounding. Stricchiola NYT/DN Opening Rpt. at 103-109. In March 2025, Daily News Plaintiffs added the NOARCHIVE metatag to their content, and thereafter, Microsoft still continued to use *Daily News* Plaintiffs' content for grounding. *See* Stricchiola NYT / DN Opening Rpt. at 103-109.

Further, as explained in the responses to, for example, Paragraph No. 153 above, Microsoft has not effectively communicated how its NOARCHIVE meta tag works, including that addition of the NOARCHIVE has no effect unless Microsoft re-indexes the content. *See* NP Ex. 1351 [Stricchiola Depo. Tr.] at 165:12-168:9; Stricchiola NYT / DN Opening Rpt. at 103-109.

News Plaintiffs object to the terms "uniformly" and "their news articles" as vague and ambiguous.

***The Center for Investigative Reporting (CIR)***

**Microsoft Paragraph 158:** With knowledge of Microsoft's repurposed NOARCHIVE meta tag, CIR decided not to implement that meta tag at all on any of CIR's webpages.

Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 176:9–11, 176:14–16.

**News Plaintiffs' Response to Microsoft Paragraph 158**:

**Denied.** The cited evidence does not support the purported fact. Ms. Bauerlein was asked if she has "any idea what the noarchive meta tag is?" to which she responded "I have heard of it, but I don't really know what it is." Hurst Decl. Ex. 11 (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated

Jan. 26, 2026)) 176:5-8. She then was asked "Do you know whether CIR applies the noarchive meta tag to any of its websites" to which she responded "I don't believe so." Hurst Decl. Ex. 11 (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 176:9-11. Ms. Bauerlein's full testimony, offered as evidence of this fact, does not represent CIR "decided not to implement that meta tag at all on any of CIR's webpages."

Further, there is admissible evidence that contradicts Microsoft's purported fact. CIR had no pre-suit knowledge of any Microsoft webmaster control meta-tags that relate to permissions for generative AI training. NP Ex. 1285 [CIR's Supplemental Response to Microsoft Corporation's Interrogatories (Nos. 5, 6, 21)] No. 21 ("Plaintiff states that it had no pre-suit knowledge of any Microsoft webmaster control meta-tags that relate to permissions for generative AI training. Accordingly, there was no decision whether or not to use Microsoft's webmaster control meta-tags to control usage of Plaintiff's content in Microsoft's Generative AI Products and Services."); Second Bauerlein Decl. ¶ 5.

**COUNT II: VICARIOUS COPYRIGHT INFRINGEMENT**

**COUNT II: VICARIOUS COPYRIGHT INFRINGEMENT**

**Microsoft Paragraph 159:** Microsoft incorporates Undisputed Facts ¶¶ 1-65 as though fully restated herein. Because training an LLM is fair use, there is no direct infringement. Without a direct infringer, there is no vicarious liability.

**News Plaintiffs' Response to Microsoft Paragraph 159**:

**Denied.** This is not an appropriate undisputed fact.

To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 1-65 as though fully restated herein.

News Plaintiffs object to Microsoft's assertion that "[b]ecause training an LLM is fair use, there is no direct infringement. Without a direct infringer, there is no vicarious liability" as improper use of the 56.1 Statement to make legal arguments. *See Chinese Am. Citizens Alliance Greater New York v. New York City Dep't of Edu.*, 802 F. Supp. 3d 483, 502 (S.D.N.Y. 2025) ("Plaintiffs also improperly use their 56.1 Statement to make legal arguments."); *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022) (disregarding portions of a 56.1 Statement that contained legal arguments); *Wysocki v. Nassau County*, 2026 WL 1965726, at *2 (E.D.N.Y. July 7, 2026) ("[L]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded.") (internal citations omitted).

**COUNTS I-II**

**ALL COUNTS: COMPILATIONS CONSTITUTE ONE WORK FOR PURPOSES OF STATUTORY DAMAGES**

**Microsoft Paragraph 160:** News Plaintiffs have long registered their newspapers and magazines, including the Asserted Works, as compilations by issue and not as individual articles.

***The New York Times:*** Hurst Decl. **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 32:13-33:10, 38:21-39:10, 45:2-17; **Ex. 277** (NYT_00146884). ***Daily News:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 273** (DNP-00001769). ***Chicago Tribune:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 271** (DNP-00000945). ***Orlando Sentinel:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 276** (DNP-00348298). ***Sun Sentinel:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 272** (DNP-00001523). ***The Mercury News:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 270** (DNP-00000615). ***The Denver Post:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 269** (DNP-00000279). ***The Orange County Register:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 275** (DNP-00036164). ***Pioneer Press:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 274** (DNP-00002088). ***CIR:*** Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 7o:23-

71:14, 73:9-18; **Ex. 279** (Buckingham 30(b)(6) Dep. Tr. (Vol. 3, dated Feb. 27, 2026)) 23:2-25:5; **Ex. 267** (CIR0002550).

**News Plaintiffs' Response to Microsoft Paragraph 160**:

**Denied.** Admissible evidence contradicts this.

News Plaintiffs' copyright registrations for the Asserted Works cover both the individual articles as well as the compilations/issues. *See, e.g.,* Maisel Declaration Exhibit A [The Times's SJ Rule 1006 Summaries of its Asserted Works] (the "Times Rule 1006 Summaries") and Exhibit B [DNP SJ Rule 1006 Summaries of its Asserted Works]; NP Ex. 312 [NYT_00000001 – NYT_00020143; NYT_00146890 – NYT_00147431; NYT_00186429 – NYT_00191175; NYT_00218808 – NYT_00264891; NYT_00420950 – NYT_00420951] (NYT registration certificates); NP Ex. 324 [DNP-00160885-952, DNP-00001672-2002; DNP-00000944 – 1338; DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671; DNP-00263471-DNP-00263604, DNP-00001343-1603, DNP-00000187-430, DNP-00035985 - DNP-00036038,DNP-00263465-70, DNP-00348303, DNP-00002003-2209, DNP-00036105 - DNP-00036241, DNP-00000451-942, DNP-00036039 - DNP-00036104, DNP-00640861-64, DNP-00640879-964] (DNP registration certificates); Bauerlein Decl. (ECF 1788) ¶ 17; Bauerlein Decl. Ex. A at "Registered Works"; Bauerlein Decl. Ex. B.

News Plaintiffs object to the statement because it is vague and ambiguous as to whether it is referring to the process News Plaintiffs undertook for registration, or the content that was registered as a result. News Plaintiffs further object that this purported fact is immaterial to the

issue of whether statutory damages should be issued per article or per issue.

Dated: October 23, 2026

/s/ Ian Crosby

Ian Crosby *(pro hac vice)*
Katherine M. Peaslee *(pro hac vice)*
Susman Godfrey L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
icrosby@susmangodfrey.com
kpeaslee@susmangodfrey.com

Davida Brook *(pro hac vice)*
Emily K. Cronin (*pro hac vice*)
Adnan Muttalib *(pro hac vice)*
Susman Godfrey L.L.P.
1900 Ave of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
dbrook@susmangodfrey.com
ecronin@susmangodfrey.com
amuttalib@susmangodfrey.com

Elisha Barron (5036850)
Zachary B. Savage (ZS2668)
Alexander Frawley (5564539)
Eudokia Spanos (5021381)
Susman Godfrey L.L.P.
One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
ebarron@susmangodfrey.com
zsavage@susmangodfrey.com
afrawley@susmangodrey.com
espanos@susmangodfrey.com

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Kristen J. Logan *(pro hac vice)*
Rothwell, Figg, Ernst & Manbeck, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone: (202) 783-6040
Facsimile: (202) 783 6031

slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
klogan@rothwellfigg.com

*Attorneys for Plaintiff*
*The New York Times Company*

*/s/ Steven Lieberman*

Steven Lieberman (SL8687)
Jennifer B. Maisel (5096995)
Robert Parker *(admitted pro hac vice)*
Jenny L. Colgate *(admitted pro hac vice)*
Alexandra Hughes *(admitted pro hac vice)*
Mark Rawls *(admitted pro hac vice)*
Michael H. Jones *(admitted pro hac vice)*
Kristen J. Logan *(admitted pro hac vice)*
Bryan B. Thompson (6004147)
Mary L. Mullins *(pending pro hac vice)*
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
901 New York Avenue, N.W., Suite 900 East
Washington, DC 20001
Telephone: (202) 783-6040
Facsimile: (202) 783-6031
slieberman@rothwellfigg.com
jmaisel@rothwellfigg.com
rparker@rothwellfigg.com
jcolgate@rothwellfigg.com
ahughes@rothwellfigg.com
mrawls@rothwellfigg.com
mjones@rothwellfigg.com
klogan@rothwellfigg.com
bthompson@rothwellfigg.com
mmullins@rothwellfigg.com

*Attorneys for Daily News Plaintiffs*

<u>*/s/ Matthew Topic*</u>

Jon Loevy (*pro hac vice*)
Michael Kanovitz (*pro hac vice*)
Matthew Topic (*pro hac vice*)
Thomas Kayes (*pro hac vice*)
Steven Art (*pro hac vice*)
Kyle Wallenberg (*pro hac vice*)
Shelley Geiszler *(pro hac vice*)
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312-243-5900 (p)
312-243-5902 (f)
jon@loevy.com
mike@loevy.com
matt@loevy.com
kayes@loevy.com
steve@loevy.com
wallenberg@loevy.com
geiszler@loevy.com

Stephen Stich Match (No. 5567854)
Lauren Sonnenberg *(pro hac vice)*
LOEVY & LOEVY
222 Sutter Street, Suite 600A
San Francisco, CA 94108
(312) 243-5900
match@loevy.com
sonnenberg@loevy.com

*Attorneys for Plaintiffs The Center for Investigative Reporting, Inc.*