**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re: OpenAI, Inc. Copyright Infringement Litigation

This Document Relates To:

Case No. 1:23-cv-11195
Case No. 1:24-cv-03285
Case No. 1:24-cv-04872

Case No. 1:25-md-3143-SHS-OTW

**REDACTED – PUBLIC VERSION**

**Defendant Microsoft Corporation's Opposition To News Plaintiffs' Motion For Partial Summary Judgment**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii
TABLE OF CITATION CONVENTIONS ........ vi
INTRODUCTION ........ 1
STATEMENT OF FACTS ........ 4
Microsoft has long focused on fostering responsible deployment of AI technology. ........ 4
Microsoft's purpose in designing Copilot was to give users a powerful general-purpose technology that respects website owners' interests. ........ 5
ARGUMENT ........ 7
I. Training An LLM Is Fair Use As A Matter Of Law. ........ 7
A. LLM training is highly transformative (Factor one). ........ 8
B. News Plaintiffs' works are predominantly factual and reasonably necessary to LLM training (Factors two and three). ........ 11
C. Training an LLM causes no substantial market harm in any cognizable market (Factor four). ........ 12
II. Copilot Web Grounding Is Fair Use As A Matter Of Law. ........ 13
A. Use of web content for Copilot web grounding is transformative (Factor one). ........ 14
B. Web grounding uses factual elements of predominantly factual works as intermediate copies (Factors two and three). ........ 17
C. Web grounding causes no legally cognizable market harm (Factor four). ........ 20
1. Copilot does not harm the traditional market for News Plaintiffs' works by providing substitute copies. ........ 20
2. News Plaintiffs have no protectible interest in news, facts, answers, or attention. ........ 22
3. News Plaintiffs have no right to historical click-through rates. ........ 24
4. There is no cognizable market for grounding content. ........ 25
III. News Plaintiffs Are Not Entitled To Summary Judgment On Their Exemplary Direct Infringement Claims. ........ 26
A. Whether Microsoft was the volitional actor is disputed. ........ 27
B. Whether outputs contain substantially similar non-de-minimis expression is disputed. ........ 29

IV. News Plaintiffs Are Not Entitled To Summary Judgment On Ownership, Number Of Statutory Damages Awards, Or Microsoft Defenses. ........................ 31

CONCLUSION ........................................................................................................ 33

CERTIFICATE OF WORD COUNT COMPLIANCE ....................................................... 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACT, Inc. v. Worldwide Interactive Network, Inc.*,
46 F.4th 489 (6th Cir. 2022) .......... 17

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith* (*Warhol I*),
11 F.4th 26 (2d Cir. 2021) .......... 22, 24

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 10, 14

*Apple Inc. v. Corellium, Inc.*,
2023 WL 3295671 (11th Cir. May 8, 2023) .......... 15

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013) .......... 19

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) .......... 12, 25

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .......... 10, 11, 15, 16, 19, 20, 21, 23

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......... 8

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) .......... 25

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001) .......... 29

*Bryant v. Media Right Prods., Inc.*,
603 F.3d 135 (2d Cir. 2010) .......... 31

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014) .......... 26

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 8, 20

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) .......... 27, 29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 32

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
724 F.2d 1044 (2d Cir. 1983) .......... 24

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) .......... 31

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .......... 16

*Giannullo v. City of New York*,
322 F.3d 139 (2d Cir. 2003) .......... 26

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) .......... 15, 22

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .......... 15, 20, 22, 23

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 17

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... 8, 20, 23

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
875 F.3d 107 (2d Cir. 2017) .......... 32

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999) .......... 11, 13, 16, 19, 29, 31

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004) .......... 13

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025) .......... 19

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) .......... 15

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .......... 3

*Sparaco v. Lawler, Matusky, Skelly, Eng'rs LLP*,
303 F.3d 460 (2d Cir. 2002) .......... 17

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014) ....................14

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intelligence Inc.*,
2026 WL 2932557 (3d Cir. Sept. 29, 2026) .................... 15, 16

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) .................... 19

*VHT, Inc. v. Zillow Grp., Inc.*,
918 F.3d 723 (9th Cir. 2019).................... 27, 29

**Statutes**

17 U.S.C. § 101....................31

17 U.S.C. § 107 .................... 22

17 U.S.C. § 504(c)(1) ....................31

**Other Authorities**

Farhad Manjoo, *A Creator (Me) Made a Masterpiece With A.I.*, N.Y. Times (Aug. 25, 2023), https://tinyurl.com/3j73nnum.................... 2

A.G. Sulzberger, *Five Generations, One Newspaper*, N.Y. Times (Sept. 30, 2026), https://tinyurl.com/mrpmc3jc ....................1

**TABLE OF CITATION CONVENTIONS**

This brief uses the following abbreviations and citation conventions for briefs, Rule 56.1 statements, and record materials filed in connection with the parties' cross-motions for summary judgment in the News Plaintiffs' and Books Plaintiffs' cases.

| Citation | Document |
|---|---|
| Abib ¶ | Declaration of Elbio Abib in Support of Microsoft's News Motion for Summary Judgment |
| Bail ¶ | Declaration of Christopher A. Bail, Ph.D. in Support of Microsoft's Motions for Summary Judgment |
| Bird ¶ | Declaration of Sarah Bird in Support of Microsoft's News Motion for Summary Judgment |
| Canel ¶ | Declaration of Fabrice Canel in Support of Microsoft's News Motion for Summary Judgment |
| Defs' News Counter-SUMF ¶ | Defendants' Response to News Plaintiffs' Rule 56.1 Statement |
| Lafferty ¶ | Declaration of John D. Lafferty, Ph.D. in Support of Microsoft's Motions for Summary Judgment |
| Msft Books MSJ | Defendant Microsoft Corporation's Memorandum of Law in Support Of Motion For Summary Judgment In Books' Plaintiffs' Consolidated Cases |
| Msft Books Opp. | Defendant Microsoft Corporation's Opposition To Books Plaintiffs' Motion For Partial Summary Judgment |
| Msft News MSJ | Defendant Microsoft Corporation's Memorandum of Law in Support Of Motion For Summary Judgment In News' Plaintiffs' Consolidated Cases |
| Msft News SUMF ¶ | Rule 56.1 Statement of Undisputed Material Facts in Support of Microsoft's News Motion for Summary Judgment (Vols. 1-4) |
| NP MSJ | News Plaintiffs' Combined Summary Judgment Brief |
| NP SUMF ¶ | News Plaintiffs' Corrected Combined Rule 56.1 Statement of Undisputed Material Facts |

| | |
|---|---|
| OAI News Opp. | OpenAI's Opposition to News Plaintiffs' Motion for Summary Judgment |
| OAI SUMF ¶ | OpenAI's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment |
| Simpson Ex. | Declaration of Lisa T. Simpson in Support of Defendant Microsoft's Oppositions to the Books and News Plaintiffs' Motions for Partial Summary Judgment |
| Tucker ¶ | Declaration of Catherine Tucker, Ph.D. in Support of Defendant Microsoft Corporation's Motion for Summary Judgment in News Plaintiffs' Consolidated Cases |
| Tucker Opp. ¶ | Declaration of Catherine Tucker, Ph.D. in Support of Defendant Microsoft Corporation's Opposition to Plaintiffs' Motion For Summary Judgment In News Plaintiffs' Consolidated Cases |
| Usdan ¶ | Declaration of Jordan Usdan in Support of Microsoft Corporation's Motions for Summary Judgment |

All statutory cites are to Title 17 unless otherwise indicated. All ECF cites are to MDL No. 1:25-md-3143-SHS-OTW unless otherwise indicated.

## INTRODUCTION

News Plaintiffs justified this litigation on dire warnings that LLMs and products like Microsoft Copilot are distributing news articles to the public and destroying journalism. But reality is stubborn. News Plaintiffs could find no evidence that people are using Copilot to get *New York Times*, *Daily News*, or *Mother Jones* articles. They also cannot dispute that if they prefer that Copilot *not* look at or link to their websites when responding to user queries, they can easily exclude their content. And as for the journalism industry, the prophesied LLM-engendered apocalypse has not come. The evidence decisively shows that the launch of LLMs has not hurt News Plaintiffs at all. Meanwhile publications like the "thriving" *New York Times* are adopting generative AI "in ambitious ways, from helping … reporters comb through large data sets to creating an audio version of every story."[1] Progress.

Without proof that LLMs or Copilot hurt them, News Plaintiffs turn to context-be-damned quotes from a Microsoft employee, Dr. Brent Hecht, who holds the academic (not legal) opinion that humans who create inputs for developing AI systems should be compensated for their labor. News Plaintiffs call Hecht an "executive"; in reality, Hecht is a researcher and self-styled provocateur. Microsoft is proud to give thinkers like Hecht the latitude to pursue their research. And though Hecht does not set Microsoft's priorities or make its AI policy, Microsoft values his input, even when divergent. Surely venerated institutions like News Plaintiffs similarly welcome different perspectives, like the view of The Times's long-time columnist on whether artists should "be compensated for their contributions, and if so, how?": "To me, the answer is no …. I don't mind if

[1] Simpson Ex. 343, 3, 12 (A.G. Sulzberger, *Five Generations, One Newspaper*, N.Y. Times (Sept. 30, 2026), https://tinyurl.com/mrpmc3jc).

human readers are informed or inspired by reading my work—that's why I do it!—so why should I fret that computers will be?"[2]

Every viewpoint of every employee of every party in this case is not an "admission," as News Plaintiffs insinuate. Hecht himself says he does not speak for Microsoft. In any event, the quotes News Plaintiffs repeat do not help resolve any question before the Court. Hecht is not a labor historian qualified to opine on historical "theft of labor" or a lawyer who can speak to fair use doctrine. News Plaintiffs also quote Microsoft CEO Satya Nadella, who of course *does* speak for Microsoft on AI issues. But Nadella's statements that Microsoft disfavors piracy and respects website owners' use of content controls, while true, have no bearing on the fair use questions in this case in the way News Plaintiffs suggest.

Back to the law and record. Supreme Court and Second Circuit authorities recognize that highly transformative uses of copyrighted content are generally fair because they use content in new and different ways, without giving people substitute copies of an author's expression. Permitting such uses is an important way copyright law promotes the spread of knowledge and learning. Undisputed evidence establishes that Copilot, aided by web grounding, is a general-purpose technology useful for an immense range of knowledge-based tasks. And while News Plaintiffs make a show of exceptionally rare instances in which Copilot outputs include short, incidental snippets of text that overlap with a news article, the record hardly supports the implausible notion that users view these rarities as substitutes for news subscriptions. Subscription trends have been unaffected; The Times's have even grown.

---

[2] Simpson Ex. 344, 3 (Farhad Manjoo, *A Creator (Me) Made a Masterpiece With A.I.*, N.Y. Times (Aug. 25, 2023), https://tinyurl.com/3j73nnum).

Despite themselves adopting transformative LLM-based tools, News Plaintiffs seemingly fear that if others do the same, their businesses will suffer. Throughout their brief, they say that if Copilot helps people learn or write about facts, events, ideas, and occurrences, that weighs *against* fair use. This is a radical reorientation of fair use law, one that would recognize for the first time harms that have nothing to do with protected expression. News Plaintiffs do not own the news, and certainly they have no exclusive right to answer factual questions. Nor can they claim an entrenched interest in perpetuating click-through rates through traditional search engines. New tools that give people information about the world (and much more) while challenging Google's search monopoly are *good* things, even if News Plaintiffs prefer the comfort of the status quo.

This Court should reject News Plaintiffs' attempt to rewrite copyright law. Microsoft shares News Plaintiffs' desire to safeguard the future of journalism, and it designed Copilot accordingly. Any publisher that wishes to opt out of web grounding may do so with a few keystrokes on its website. If generative AI tools nevertheless alter the landscape for news publishers, even as they create new opportunities for the spread of valuable ideas and information, that is no basis for on-the-fly policymaking designed to "sustain the continued production" of journalism, least of all by making a mockery of the fair use doctrine. NP MSJ 73. Only Congress can "fashion[] the new rules that new technology ma[kes] necessary." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984). This Court should apply existing law to the undisputed record, deny News Plaintiffs' motion, and find that both LLM training and Microsoft's web grounding technology are fair use as a matter of law.

## STATEMENT OF FACTS

As in the Books case, Microsoft responds to each of News Plaintiffs' 1,800 contentions in Defendants' joint counter-statement, but addresses below only pertinent topics.

***Microsoft has long focused on fostering responsible deployment of AI technology.***

As explained elsewhere, a trained LLM is a general-purpose technology, like a microprocessor or GPS, that can be adapted to various applications by either the LLM developer (like with OpenAI's ChatGPT) or others who use it as a component in their products. *See* Msft Books Opp. 4-6. With respect to Microsoft, this case concerns only (1) the development, with OpenAI, of OpenAI's foundational GPT models; and (2) Microsoft's web-grounded Copilot chatbot. And what is material to these issues are the technical details, guardrails, and real-world effects of these technologies.

News Plaintiffs would rather scour Microsoft's internal communications, plucking out quotes to cast Microsoft in a race-to-the-bottom competition with other AI developers. NP MSJ 1-2, 73-74. This account ignores the work of hundreds of people at Microsoft who have spent a decade promoting responsible AI development. Microsoft established a committee to research the ethical implications of AI in 2017, adopting Responsible AI Principles the following year. Bird ¶ 12. It founded an "Office of Responsible AI," translating Microsoft's principles into "formal company-wide policies." *Id.* By the time Microsoft partnered with OpenAI, it had spent years preparing to deploy AI technology in a manner "aligned with human values." *Id.* ¶¶ 11-12.

To be sure, opinions differ on these topics within Microsoft just as they do outside of it. Microsoft invites this, Usdan ¶¶ 38-39, including by employing researchers

like Hecht in "academic position[s] within [the] company where [they] have" tenure-like freedom to "speak [their] mind[s]." Simpson Ex. 305, 85:20-86:1. Hecht's "provocation[s]," as he describes them, Simpson Ex. 304, 83:7-24, are welcome even though his hypotheses differ from those at Microsoft who develop products and lead AI policy.

News Plaintiffs have chosen to make Hecht the centerpiece of their case. NP MSJ 1, 2, 11, 13, 53, 54, 69, 72, 73, 74. Microsoft's Books Opposition (at 7-8) already addresses this distraction. Where News Plaintiffs cross a line is in falsely suggesting that *Hecht's* views reflect some secret, inner views of Microsoft itself. *See, e.g.*, NP MSJ 2, 11, 73. Hecht himself disagrees: "[E]verything I said about what I think is … not speaking for the company, not speaking legally." Simpson Ex. 304, 402:1-8. So do Hecht's colleagues. *See* Usdan ¶ 39. Microsoft's CEO did not even know who he was. *See* Simpson Ex. 306, 137:13-24.

This case should be decided based on evidence, not "provocation[s]," Simpson Ex. 304, 83:7-24, or "asymmetric, futuristic point[s] of view[]," Simpson Ex. 305, 80:5-15.

***Microsoft's purpose in designing Copilot was to give users a powerful general-purpose technology that respects website owners' interests.***

That evidence is clear: Microsoft's implementation of LLM-based technology carefully balanced competing interests, developing an innovative web-grounded chatbot that website owners can easily opt out of. Microsoft understood that to make an LLM-based chatbot genuinely useful, the chatbot's responses needed to be grounded in current, real-world information. *See* Msft News MSJ 4-5; Msft News SUMF ¶ 66. So Microsoft paired Copilot with Bing search. This web grounding technique significantly

broadened the range of tasks and queries Copilot can reliably address, making it easier than ever before for end-users to access, understand, and use information. Msft News SUMF ¶¶ 66-68.

Microsoft also designed Copilot to protect the interests of content creators. It created meta tags that enable any website owner to exclude its content from web grounding, even while remaining visible in traditional Bing search. Msft News SUMF ¶¶ 81-84, 151; Simpson Ex. 330, 184:8-24. Plaintiffs know how to use these tags: The Daily News and New York Times Plaintiffs have done so selectively, Msft News SUMF ¶¶ 156-57, while CIR prefers that its [redacted], Simpson Ex. 331, 171:5-13. News Plaintiffs cite scattered instances of "leakage"—the term Microsoft's quality-control systems use when content slips through despite use of a NOARCHIVE meta tag. *See* NP MSJ 14; NP SUMF ¶¶ 517, 520; Simpson Ex. 332, 55:12-23. Occasional "bug[s]" are inevitable, but Microsoft remediates anomalies "as soon as possible." Simpson Ex. 332, 55:16-23. In fact, Plaintiffs' own expert's data show NOARCHIVE meta tag compliance at over 99% for The Times. *See* Simpson Ex. 346, ¶¶ 294-96.

Microsoft also deployed a multilayered mitigation system to prevent Copilot from outputting copyrighted content. *See* Msft News MSJ 7-9. Plaintiffs' own expert's analysis shows that over 99% of Copilot conversations do not contain even a *sentence* of grounding content. Msft News SUMF ¶ 32(a). If News Plaintiffs had contrary evidence, they would say so on page one of their brief. Instead, they provide fewer than *200* conversations—out of 8.2 million examined—that they claim contain enough matching text to establish a copyright claim. NP MSJ 44-49. Even these examples are nothing close to copies of full news articles, and News Plaintiffs do not suggest that these

scattered instances cause meaningful market harm. Undisputed evidence shows that they do not. Msft News MSJ 23-27; Tucker ¶¶ 11(a), 16-95, 106-116; Msft News SUMF ¶¶ 85-146.

In short, Microsoft's commitment to responsible AI has worked, resulting in an innovative new product that does not hurt content owners.

## ARGUMENT

### I. Training An LLM Is Fair Use As A Matter Of Law.

News Plaintiffs move for summary judgment on Microsoft's fair use defense as to three LLM-training-related uses: data acquisition; training; and transfers of training data between OpenAI and Microsoft (what they call "horse trading"). NP MSJ 51, 74-75. These transformative uses are fair as a matter of law. *See* Msft Books MSJ 9-33; Msft News MSJ 10-13; Msft Books Opp. 9-23.

At the outset, we note that News Plaintiffs lump together their analyses of LLM training and web grounding. *See* NP MSJ 51-75. The factual record establishes that these are two technologies made in two different ways, by distinct parties, for distinct purposes. LLM training, performed largely by OpenAI, entailed data acquisition, dataset creation, and training itself. Its purpose is to create a finished model that can predict the next token in a string of text. Msft Books MSJ 5-8, 12-13. This coherent set of steps and endpoint are what the courts evaluated in *Bartz* and *Kadrey*. Web grounding, by contrast, uses an entirely different technological process called Retrieval Augmented Generation (RAG), and its purpose is to augment an LLM-based chatbot with data external to the LLM. Msft News MSJ 5-7. This separate feature, as developed by Microsoft in Copilot, requires separate analysis.

This section of the brief addresses LLM training, which embraces what News Plaintiffs call "Acquisition," "Training," and "Horse Trading" (i.e., transfers between Defendants), and maps onto Books Plaintiffs' motion. Msft Books Opp. 9-35. "Grounding" and "Output" are web-grounding-related uses addressed further below (at 14-26) and not at issue in the Books case.

### A. LLM training is highly transformative (Factor one).

**1.** Like Books Plaintiffs, News Plaintiffs ignore the technical details of LLM training, avoiding the transformativeness question that lies at the "heart" of fair use. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). But there is no avoiding what may be "the most transformative [technology] many of us will see in our lifetimes." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025).

News Plaintiffs nevertheless claim that the "purpose and character" of LLM training is to "exploit the[ir] works for their intrinsic value and offer commercial products that supplant those works." NP MSJ 51. The argument fails for the same reason Books Plaintiffs' similar argument does, *see* Msft Books Opp. 17-21, and because of additional problems detailed below.

To start, copyright does not protect the "intrinsic value" of works. It protects creative expression. News Plaintiffs claim that training an LLM is what enables downstream products to "emulat[e]" the "style" of their news articles. NP MSJ 66. But a high school student on the school newspaper can emulate the voice of The Times. "[S]tyle is not copyrightable—only expression is." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1045 (N.D. Cal. 2025). Training aims to extract only unprotected elements from News Plaintiffs' works. Msft Books MSJ 15.

News Plaintiffs' next misconception is that the "*purpose*" of training an LLM on news articles is to create a commercial product that competes with News Plaintiffs. The evidence says otherwise. The purpose of training an LLM on news articles is to endow the model with the ability to generalize, so that people can put the tool to myriad tasks. Msft News SUMF ¶¶ 3, 9. News content is useful for that because it is coherent, factually dense, and grammatically sound, while covering a broad range of subject areas. *See* Lafferty ¶¶ 315-17; *see* Msft Books Opp. 17-18. Defendants trained LLMs to create a general-purpose tool, not accomplish any particular downstream use. Msft Books Opp. 4-6, 17-19.

Nor is there evidence that Defendants' LLMs "supplant" News Plaintiffs' works. NP MSJ 51. If Plaintiffs are suggesting that training results in regurgitation of their *expression*, the record shows otherwise: even their own expert's adversarial testing (prompting with Plaintiffs' own article text) produced a 16-word match less than 0.1% of the time. *See* OAI SUMF ¶¶ 219-24, 229-32. Nor do News Plaintiffs point to any meaningful number of outputs from LLM-based tools (like Copilot) that result from the use of news articles to train an LLM (versus web grounding). If, instead, News Plaintiffs are suggesting that people can use LLM-based tools to create *non-infringing* news content—just as News Plaintiffs themselves now do, OAI SUMF ¶¶ 289-330—that does not diminish the transformativeness of LLMs. Just the opposite, the law treats increased competition flowing from new and different uses of copyrighted works as a transformative good. Msft Books Opp. 17-20.

Last, News Plaintiffs wrongly suggest that Defendants' commercial purpose in training LLMs creates a "presumption" against fair use. NP MSJ 55. The Second Circuit has "repeatedly rejected the contention that commercial motivation should outweigh a

convincing transformative purpose and absence of significant substitutive competition." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 219 (2d Cir. 2015); *see* Msft Books MSJ 16.

**2.** News Plaintiffs advance their version of Books Plaintiffs' "shadow library" argument, claiming that the "transgressive and deceptive nature of Defendants' efforts to acquire Plaintiffs' content" weighs against fair use. NP MSJ 56. In News Plaintiffs' version, if OpenAI obtained news articles that were behind a paywall on News Plaintiffs' websites—even if OpenAI obtained them from some *other* source (i.e., not from behind the paywall)—this weighs against fair use. This cannot be reconciled with cases like *Authors Guild*, where the defendant made 20 million unauthorized copies of books, all found to be fair use. 804 F.3d at 208. What mattered in *Authors Guild*, and what matters here, is that all of the challenged copies were made for a profoundly transformative purpose. Msft Books Opp. 13-16.

News Plaintiffs emphasize Microsoft's preference, expressed by its CEO, that LLMs not be trained on content scraped from behind a paywall. NP MSJ 56. That is indeed Microsoft's preference, and Microsoft allows website owners to use meta tags to exclude their content from *training* just as it does for RAG-enabled web grounding in Copilot. *See* Simpson Ex. 345. But that preference is immaterial to the fair use analysis here, which focuses on the "objective" purpose and character of OpenAI's use for training. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 545 (2023).

**3.** Finally, News Plaintiffs suggest that transfers of training data between Defendants—so-called "horse-trading" in transfers like "Project Mango" or "Project Taxi"—were less transformative than other uses. NP MSJ 31-32. They seemingly suggest that these transfers were separate, purposeless exchanges of "currency" or bare

data sales. *Id.* But undisputed evidence, detailed in Microsoft's Books Opposition (at 21-23), establishes that each transfer was part and parcel of the development and deployment of the GPT models at issue. *See also* Defs' News Counter-SUMF ¶¶ 695, 700-02, 712-13, 728-29, 748, 827. Some (like Project Mango) involved sourcing data used for training; others (like Project Taxi or temporary access to GPT-3 data) were for model evaluation and experimentation. Defs' News Counter-SUMF ¶¶ 695, 708, 712-13, 728-29, 748. All were related to LLM development, however, and all were therefore new and different ways of using news articles.

### B. News Plaintiffs' works are predominantly factual and reasonably necessary to LLM training (Factors two and three).

News Plaintiffs briefly claim factor two favors them because their works contain original expression. NP MSJ 57. They are wrong. News Plaintiffs' asserted works are "predominantly factual news articles" whose "expressive elements … are not dominant features." *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72-73 (2d Cir. 1999); *see* Msft News SUMF ¶¶ 24-26.

News Plaintiffs also claim that factor three favors them, arguing that use of their news articles is not "necessary to" LLM training. NP MSJ 57-58. (Books Plaintiffs make a similarly flawed argument, but claim it applies to factor one. Msft Books Opp. 20-21.) *Authors Guild* forecloses the argument. The proper question is whether the amount and substantiality of a work used was "reasonably necessary" (or "reasonably appropriate") to achieve a transformative purpose. 804 F.3d at 221. Undisputed evidence shows that LLM training requires immense amounts of highly varied data, and that news articles are useful to training's transformative purpose. Msft News SUMF ¶ 5; OAI SUMF ¶ 9.

Use of full news articles is therefore reasonably appropriate even if no single work is the but-for cause of generative AI technology.

### C. Training an LLM causes no substantial market harm in any cognizable market (Factor four).

Factor four is concerned with "only one type of economic injury": the "harm that results because the secondary use serves as a substitute for the original work." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014). As detailed in Microsoft's motion (at 23-27), undisputed evidence shows that the introduction of the GPT models and Copilot has had no effect on News Plaintiffs' traditional markets. News Plaintiffs do not attempt to argue that LLM training *itself*—as opposed to their training-plus-web-grounding mashup—harms them. That should end the inquiry.

Unlike Books Plaintiffs, News Plaintiffs do not assert there was a functional market for LLM training data at the time of training, instead claiming a market for "generative AI" data more broadly. NP MSJ 71-72. However the market is defined, the argument fails. As Microsoft has explained at length elsewhere, courts have repeatedly rejected plaintiffs' arguments that they lost a sale for the very transformative use they challenge. Msft News MSJ 28-29; Msft Books MSJ 27-28; Msft Books Opp. 33-34.

News Plaintiffs also claim to be suffering from "market dilution," not from training specifically, but from Defendants' models and products as a whole. The claim is that people could use LLM-based tools to write non-infringing news articles that compete with News Plaintiffs' reporting. NP MSJ 62-64. This theory fails as a matter of law for the same reasons discussed in Microsoft's Books Opposition (at 28-31). Copyright owners have no right to be free from creative competition engendered by transformative use of their works. *See* Msft Books MSJ 27-30. And News Plaintiffs'

argument is particularly troubling because it is well settled that the public has "every right to republish the facts contained in [news] articles." *Nihon*, 166 F.3d at 70. No one owns the news or has the exclusive right to communicate facts to the public.

Anyway, News Plaintiffs offer no evidence of market dilution. They point to the existence of "pink slime"—unreliable, low-quality content that is "often either plagiarized or remixed from legitimate news sources." NP MSJ 69; *see* Msft News MSJ 12. But their experts acknowledge that pink slime "content farms" existed long before the current generative AI revolution. NP MSJ 69; Simpson Ex. 333, ¶ 129. While News Plaintiffs speculate that LLM technology will make it "easier" for pink slime publishers to further "proliferate," NP MSJ 69-70, they make no effort to quantify the harm that it will actually cause to them—let alone show that the use of *their works* to train an LLM causes that harm. *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004); Msft Books Opp. 32-33.

***

The analysis overwhelmingly supports a finding that training is fair use as a matter of law. The transformativeness of the use and lack of market harm tilt the two most important factors (one and four) heavily in Defendants' favor. Factor two also favors fair use because News Plaintiffs' works are predominantly factual. And because the use of full, tokenized works is reasonably necessary for training, factor three favors Defendants as well. This Court should deny News Plaintiffs' motion and grant Defendants'.

## II. Copilot Web Grounding Is Fair Use As A Matter Of Law.

News Plaintiffs' motion also fails as to Microsoft's fair use defense for web-grounding-related uses, labeled "Grounding" and "Output." NP MSJ 51, 74-75. As

Microsoft's summary judgment motion established (at 13-31), (1) use of News Plaintiffs' articles for intermediate web grounding and (2) any short, incidental outputs with overlapping text resulting from that process are fair use as a matter of law.

### A. Use of web content for Copilot web grounding is transformative (Factor one).

**1.** As with LLM training, News Plaintiffs' argument on web grounding cedes the "central question" under factor one: whether web grounding "adds something new, with a further purpose or different character" from News Plaintiffs' works. *Warhol*, 598 U.S. at 528 (citation omitted). Plaintiffs ignore undisputed evidence establishing how web grounding uses content and what purposes it serves for end-users. News Plaintiffs evidently recognize that to voice these details is to describe a use that is nothing like the competing news distribution platform they make Copilot out to be.

Web grounding broadens the range of tasks and queries that an LLM-based chatbot like Copilot can address by providing it with an up-to-date source of information. Msft News MSJ 14-18. By integrating the functionality in a chatbot, web grounding deepens a user's ability to engage with synthesized responses drawn from material across the web and then navigate to that material via citations to those sources in the response itself. Msft News SUMF ¶¶ 67-68, 70. It thus behaves like a personalized, "multifaceted research service" that can handle complex tasks and engage with the user to better locate, understand, and use information. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014); *see* Msft News MSJ 14-17. For example, for a user making a vacation itinerary, Copilot can draw specific factual details from numerous sources—Wikipedia, restaurant websites, news on goings-on,

and so forth—providing results, links, synthesis, and follow-up. Msft News SUMF ¶¶ 72-73; Bail ¶¶ 59, 91; Abib ¶¶ 6, 10(b).

News Plaintiffs cannot dispute that this is the sort of "highly creative and innovative tool" courts have regularly recognized as transformative. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30 (2021); *e.g.*, *Authors Guild*, 804 F.3d at 209; *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 606-07 (9th Cir. 2000); *Apple Inc. v. Corellium, Inc.*, 2023 WL 3295671, at *6-7 (11th Cir. May 8, 2023).

Instead, News Plaintiffs focus on inapposite cases about non-transformative uses. They first rely on cases involving so-called "*consumptive* use[s]," *see* NP MSJ 52, 55 (emphasis added), where the defendant's copying merely "reduc[es] the costs of accessing [works] already created" rather than "allow[ing] for the creation of [something] new," 4 Nimmer on Copyright § 13F.05. News Plaintiffs' lead case is *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) (cited by NP MSJ at 51, 57, 58, 59, 60, 62, 64, 65, 71), where the defendant made "digital copies" of books available "online, in full, for free," *Hachette*, 115 F.4th at 174. That is nothing like web grounding. Web grounding uses tokenized, intermediate copies of web content to enable an LLM to generate a new, direct response to a user query based on its parameters and the grounding content in the LLM's context window. Msft News SUMF ¶¶ 71-72. And it is undisputed that over 99% of Copilot outputs do not contain even a *single sentence* of overlap with grounding content, let alone News Plaintiffs' works as a whole. *See* NP MSJ 16; Msft News MSJ 21-23.

Perhaps recognizing as much, News Plaintiffs claim that they need not show that web grounding results in "similar outputs" at all. NP MSJ 54. For this, they rely on *Thomson Reuters Enterprise Center GmbH v. Ross Intelligence Inc.*, 2026 WL 2932557

(3d Cir. Sept. 29, 2026). Microsoft's Books Opposition (at 11-12) explains why *Ross* is inapposite: It concerned a "minimally transformative" use of the plaintiff's copyrighted works made for the same purpose as the plaintiff's use that just spit out quotations from legal opinions. 2026 WL 2932557, at *6-7. *Ross* explicitly contrasted that use with "generative AI" that "generate[s] original expression." *Id.* at *6 n.7. Transformativeness, as always, makes all the difference.

**2.** News Plaintiffs' remaining arguments that web grounding is substitutive all fail for the same reason: None of them claim substitution for *their protected expression*, which is the only substitution that matters. *See* Msft Books Opp. 17-18.

News Plaintiffs say web grounding "substitute[s] for news." NP MSJ 52. But "news .... may not be copyrighted." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991). Indeed, News Plaintiffs *themselves* republish news first reported by others all the time, OAI SUMF ¶¶ 214-16; Simpson Ex. 334, 93:25-96:16, apparently without accusing each other of unlawful substitution. So even if it were true that Copilot is "'good at news,'" or "substitutes for demand for news," NP MSJ 52, 54, 65, 67, that is irrelevant because copyright "protects only the author's manner of expression," *Authors Guild*, 804 F.3d at 224.

Next, News Plaintiffs claim Copilot provides "substitutive answers" to questions that someone could get from within a news article instead. NP MSJ 65; *see id.* at 54. Settled case law establishes that everyone, including Microsoft, is "entitled ... to answer" queries with "unprotected fact[s]" and "information." *Authors Guild*, 804 F.3d at 224; *Nihon*, 166 F.3d at 72-73; *Feist*, 499 U.S. at 348. A new technology capable of providing direct factual answers in a conversational format is precisely the sort of transformative

use that furthers copyright's interest in the "free flow of information." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

And last, News Plaintiffs repeatedly claim that Copilot "substitute[s] for the 'labor of the people'" who write news articles. NP MSJ 69. But "there is no labor theory of copyright." *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 500 (6th Cir. 2022). The notion that "an author's labor in discovering facts justifie[s] giving the author protection against the copying of those facts" was long ago "repudiate[d]." *Sparaco v. Lawler, Matusky, Skelly, Eng'rs LLP*, 303 F.3d 460, 466 (2d Cir. 2002).

Because web grounding yields highly transformative *new* expression, rather than substituting for News Plaintiffs' expression, factor one heavily favors Microsoft.

### B. Web grounding uses factual elements of predominantly factual works as intermediate copies (Factors two and three).

News Plaintiffs cannot dispute that their works are predominantly factual, so the second factor weighs in favor of fair use. *Supra* 11. And they say little about factor three, which evaluates how and how much of this predominantly factual content is used. As explained in Microsoft's News MSJ (at 22-23), the third factor favors fair use because web grounding (1) makes *intermediate* use of grounding content, (2) provides an opt-out for the website owner, and (3) virtually never displays meaningful amounts of News Plaintiffs' protected expression to end-users.

As already explained, and as News Plaintiffs concede, web grounding is an intermediate use that enables an LLM to "generate[] [the] output" that responds to a user query. NP MSJ 13; *see* Msft News MSJ 7, 17, 19. News Plaintiffs make a show of depicting word-for-word portions of their news articles that appear in the *web grounding pipeline*, but there is no dispute that these are just internal search results—

back-end copies never displayed to the public. *See, e.g.*, NP MSJ 45. Intermediate uses like these are routinely found to be fair, as cases like *Authors Guild*, *Connectix*, and *Sega* establish. Msft News MSJ 20.

News Plaintiffs also do not dispute Copilot's feature that allows website publishers to exclude their content from even this intermediate use. NP SUMF ¶ 516; *see* Msft News MSJ 19-20. They vaguely assert that Microsoft has "continued to access and scrape [tagged] websites for grounding." NP MSJ 14. To be clear: There is no evidence that Microsoft has *a practice* of disregarding, dismissing, or neglecting meta tags. Defs' News Counter-SUMF ¶¶ 517, 520, 1560, 1773-74. As with any new, large-scale technical effort, there have been bugs that Microsoft must identify and fix. *Supra* 6; Canel ¶ 31. At other times, there is a lag in the system's processing of a meta tag (though Microsoft built a feature to eliminate even that, Canel ¶ 19). This is nit-picking. Undisputed evidence shows that meta tags virtually always work as intended, giving website owners control over whether and how much of their copyrighted content may be used. Abib ¶¶ 18(a), 19; Canel ¶¶ 26-31; Simpson Ex. 346, ¶ 294 (99.85% of Copilot citations to Times URLs were "not in violation").

Last, the evidence confirms that Copilot outputs containing non-de-minimis overlap with grounding content are vanishingly rare. News Plaintiffs identify 0.4% out of 8.2 million Copilot conversations with at least one output that contains "96 words"—really, six non-contiguous 16-word strings of text—matching one of their works. NP MSJ 16; Defs' News Counter-SUMF ¶ 1246. This paragraph is exactly 96 words. So if the paragraph's contents were scattered across an output in 16-word strings, News Plaintiffs would count it and *still* get to only 0.4% of Copilot *conversations*, which often have multiple prompt-and-output pairs within them.

News Plaintiffs' own analysis thus flatly belies their suggestion that web grounding "enables the public to read substantial parts of the copied works." NP MSJ 65 (quoting *Romanova v. Amilus Inc.*, 138 F.4th 104, 117 n.9 (2d Cir. 2025) (citation modified)). Web grounding exposes *nothing* over 99% of the time, and in a fraction of the 1% incidentally generates an amount of text that is de minimis as a matter of law. *Nihon*, 166 F.3d at 71 (first paragraph of a six-paragraph article is de minimis).

News Plaintiffs' argument gets more infinitesimal when they tout fewer than 200 out of 8.2 million conversations that they claim are clear infringement. NP MSJ 44, 49. These are the outliers' outliers. As explained below (at 26-29), these outputs are generally the result of some unusual user misuse of Copilot, and many *do not* contain non-de-minimis overlap once unprotected factual elements are filtered out (as the law requires). Defs' News Counter-SUMF ¶¶ 1239-40, 1250-51, 1255-56.

But in all events, even these outputs do not meaningfully detract from—and remain protected by—the fair-use defense for web grounding generally. First, they are all part of larger chatbot conversations that effectuate web grounding's transformative purpose. *See Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552 (S.D.N.Y. 2013) (giving little weight to "incidental consequence[s]" of an otherwise fair use). Second, their rarity demonstrates the effectiveness of the "variety of limitations" Microsoft employs to ensure that web grounding remains an intermediate use. *Authors Guild*, 804 F.3d at 222; *see A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 645 (4th Cir. 2009) (focusing on "how the [challenged] system generally operates"). And third, the outputs are far too rare to support News Plaintiffs' characterization of Copilot as a platform for distributing news articles—which is why there is no evidence people use it that way.

### C. Web grounding causes no legally cognizable market harm (Factor four).

Speaking of no evidence, News Plaintiffs strenuously insist they need not provide any showing that Copilot has harmed their traditional markets. NP MSJ 60. In their view, "actual effects" and "empirical data" are unnecessary; the Court should accept a "common sense" instinct that web grounding must hurt somehow. NP MSJ 60, 68. That is wrong. Courts have sometimes presumed harm where the use results in mere duplication of the copyrighted works. *E.g.*, *Hachette*, 115 F.4th at 193-94. But where, as here, the use goes "beyond mere duplication," News Plaintiffs cannot rely on "inference[s] of market harm." *Campbell*, 510 U.S. at 591; *see Hachette*, 115 F.4th at 195 (limiting its reasoning to cases where the use is "not transformative"). And "where a defendant introduces evidence of a lack of market harm," a plaintiff must respond in kind with "empirical evidence." *Kadrey*, 788 F. Supp. 3d at 1056 (quoting Patry on Fair Use § 6:13).

News Plaintiffs' revenues, subscriptions, donations, web traffic, and conversion rates have [redacted] in the period both before and after the launch of Copilot (and ChatGPT). Msft News SUMF ¶¶ 27-58, 85-144. Plaintiffs' failure to adduce countervailing empirical evidence that Copilot hurts them cinches the fair use defense in Microsoft's favor. Defs' News Counter-SUMF ¶¶ 1460-63, 1532, 1566, 1604. News Plaintiffs' workarounds fail.

#### 1. Copilot does not harm the traditional market for News Plaintiffs' works by providing substitute copies.

As *Authors Guild* explains, the fourth factor "focuses on whether *the copy* brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential

purchasers may opt to acquire *the copy* in preference to the original." 804 F.3d at 223 (emphasis added). News Plaintiffs quote this standard and try to satisfy it with a scant paragraph asserting that "Defendants' models and products can and do produce outputs that contain verbatim copies … as well as paraphrased copies." NP MSJ 65.

Microsoft Copilot virtually never does this. *Supra* 6. As just explained, exceptionally infrequently, a user may receive a chatbot response with incidental sentences of overlapping text. If someone peddled such outputs claiming them as "verbatim copies" that substitute for *New York Times* articles, they would be slammed for fraud. The same goes for News Plaintiffs' roughly 200 examples. *Supra* 6-7. But even assuming that all of these are lost sales—highly dubious when one reviews the outputs, *infra* 26-31—"*some* loss of sales" falls well short of the "meaningful or significant effect" on the market required to "tilt the weighty fourth factor in favor of" News Plaintiffs. *Authors Guild*, 804 F.3d at 224.

Beyond rare outputs, News Plaintiffs make the same "pink slime" claim dispatched above (at 13). NP MSJ 69-70. But they provide no evidence of meaningful numbers of pink slime purveyors using *Copilot* to plagiarize their articles. Defs' News Counter-SUMF ¶¶ 1683-1712. The same problem befalls their drive-by citations to surveys about how people use ChatGPT, NP MSJ 68, 70, a different product with different design features, Defs' News Counter-SUMF ¶¶ 1481-87, 1521-22, 1581. And in any event, economic evidence shows no impact from the launch of the GPT models either. *Supra* 20.

Simply put: News Plaintiffs have not suffered harm from substitution of their expressive works, the only harm the law has ever recognized as cognizable. So they try to dislodge the law from its moorings.

### 2. News Plaintiffs have no protectible interest in news, facts, answers, or attention.

News Plaintiffs urge this Court to recognize a new type of factor-four harm: "harm to the market for *the same type of content* as the Asserted Works," which means not only "the publisher's own body of works" but also "the *broader category*" of "news articles" in general. NP MSJ 62 (emphasis added). Into this new bucket, they drop a host of theories. They are harmed if a user creates *non*-infringing news articles, a call-back to *Kadrey*'s market dilution theory. *But see supra* 12-13. They are harmed if Copilot "output[s] news content"—even, apparently, bare facts or events in direct response to a user query. NP MSJ 65. So too if web grounding helps deliver users "fast, timely answers," *id.* at 69, or even competes with News Plaintiffs for "attention," *id.* at 71.

Again, no case has ever held anything like this. Plaintiffs claim support from the text of § 107, which refers to the effect upon "the potential market for or value of" a work, NP MSJ 62, suggesting that *any* impact on a work's value is cognizable. As explained in Microsoft's Books Opposition (at 28-31), *Oracle*, *Authors Guild*, and *NXIVM* flatly foreclose this argument, explaining that a transformative use might even "kil[l] demand for the original"—that is, destroy its value completely—but "not [be] cognizable." *Oracle*, 593 U.S. at 35 (cleaned up).

News Plaintiffs' citations to *Warhol* and *Hachette* do not support the theory. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith* (*Warhol I*) just recognized that a plaintiff's market in an image extends to a "derivative image," 11 F.4th 26, 50 (2d Cir. 2021), not (in Plaintiffs' words) the "broader category" of all images. And though *Hachette* did refer to possible societal harms, it did so only after finding that the

free digital lending library at issue caused classic substitution for books; *Hachette* authorized no expansion of or replacement for that traditional approach. 115 F.4th at 196.

And that leaves nothing but a block quote to *Kadrey*'s market dilution theory. NP MSJ 63. As already explained elsewhere, *Kadrey*'s basic premise is legally incorrect and foreclosed by binding law. *Supra* 12-13; Msft Books Opp. 28-31. If a transformative use has the knock-on effect of allowing others to create new, non-infringing works that people value, that weighs *in favor* of fair use, not against it. So *Kadrey*'s musing that LLM-based products "might be expected to greatly harm the print news market" by providing users with "accurate information," 788 F. Supp. 3d at 1053, has it upside down. In any event, both *Kadrey* and News Plaintiffs point to the same amount of evidence showing market dilution: None. News Plaintiffs do not even attempt to make the showing *Kadrey* itself demands—which articles? Which outputs? How significant is the impact? Would it persist if instead of News Plaintiffs' articles, web grounding sourced "accurate information" from elsewhere?

This Court should reject the invitation to invent new types of legal harms that, if they occur at all, "occur in relation to interests that are not protected by the copyright" for their works. *Authors Guild*, 804 F.3d at 224. News Plaintiffs have no right to prevent Microsoft or anyone else from giving answers to questions, providing factual information, or telling the public the news. And indeed, a transformative technology that accomplishes these ends without bringing substitutive copies to the market is a quintessential fair use.

### 3. News Plaintiffs have no right to historical click-through rates.

News Plaintiffs next claim harm from a "drop[] in click-through rates" from Copilot as compared to Bing search. NP MSJ 2. Under this indirect harm theory, Plaintiffs say that web-grounded Copilot serves as a "replacement [for] search," but "driv[es] … less traffic" to News Plaintiffs' websites than a traditional search engine. NP MSJ 67-68. News Plaintiffs even posit that people might like Copilot's transformative technology so much as an information location tool that it could unseat Google from its previously impenetrable status as "gatekeeper" of the internet, *see* Simpson Ex. 333, ¶ 55; Simpson Ex. 319, ¶ 141, and disrupt its monopoly, NP MSJ 68 (noting finding in Google antitrust case "of emerging competition from GenAI"). And this is supposed to be a *bad* thing?

Even if users were switching to Copilot in droves, it would not weigh against fair use. Again, factor four asks "not whether [a use] would *damage* the market for the [original] … but whether it *usurps* the market … by offering a competing substitute." *Warhol I*, 11 F.4th at 48. That Copilot may outcompete search tools in a *different market* and thereby cause an "indirect negative effect[]" on News Plaintiffs is not the sort of harm "[t]he Copyright Act was … designed to prevent." *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1050 (2d Cir. 1983).

In any event, News Plaintiffs again fail to actually prove their own newly invented theory. As explained in Microsoft's motion (at 30-31), News Plaintiffs' expert conceded that she failed to even *analyze*, let alone demonstrate, the critical premise that people are using Copilot where they would otherwise be using traditional search. Simpson Ex. 336, 96:15-97:9. The only empirical analysis is from Microsoft's expert, who

demonstrated no change in traffic trends following launch of Copilot. *See* Msft News MSJ 26-27; Msft News SUMF ¶¶ 85-144; Tucker ¶¶ 11(a), 16-93, 106-116; Tucker Opp. ¶ 13.

News Plaintiffs' final tactic is to speculate that even if Copilot web grounding has not harmed them, "[w]idespread and unrestricted" use of web grounding might cause them market harm. NP MSJ 72. There is no reason to think this is true. Microsoft built Copilot with a host of design features, mitigations, and opt-outs designed to respect website owners' interests. Msft News SUMF ¶¶ 73-78, 80-84. That product is not harming News Plaintiffs. If that responsible approach is ruled fair and then widely replicated, it will clear the way for new and useful tools while allowing website owners, if they wish, to opt out and avoid any harms they fear.

**4. There is no cognizable market for grounding content.**

Last, News Plaintiffs claim "harm to licensing markets," NP MSJ 61-62, announcing that a "market for licensing data for [generative AI] … exists." NP MSJ 71. But they neglect well-established case law holding that the market for a "transformative use" itself is not cognizable. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006); *see HathiTrust*, 755 F.3d at 99-100. Undisputed evidence shows that a market for grounding data did not exist and was not likely to develop absent Microsoft's (and others') developing that transformative technology. Msft News SUMF ¶¶ 147-48.

Regardless, News Plaintiffs point to a variety of experimental "GenAI license agreements" that range widely in terms of the rights granted, content used, and prices demanded, and to a list of intermediaries that purportedly "connect publishers with GenAI companies." NP MSJ 71-72. That does not suffice to show the existence of a

"reasonably efficient, reasonably priced, [and] convenient [to] access" licensing market for web grounding. *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1279 (11th Cir. 2014); Tucker Opp. ¶¶ 18-24.

***

As with LLM training, uses related to web grounding are highly transformative and do not usurp demand for News Plaintiffs' articles. The Court should deny News Plaintiffs' motion, grant Microsoft's motion, and find fair use as a matter of law.

## III. News Plaintiffs Are Not Entitled To Summary Judgment On Their Exemplary Direct Infringement Claims.

News Plaintiffs move on prima facie claims of direct infringement as to an "exemplary set of Asserted Works" allegedly infringed by Copilot outputs. *See* NP MSJ 44. Deficiencies in News Plaintiffs' Rule 56.1 statement preclude summary judgment. That statement contains no factual assertions going to two key elements: (1) whether an output is the result of Microsoft's, versus the user's, volitional conduct; and (2) whether the outputs contain substantially similar, non-de-minimis expression. Plaintiffs just dump the sets of accused Copilot conversations and the underlying works into exhibits, expecting the Court and Microsoft to evaluate them—sometimes with no guidance for even *finding* the accused snippet within pages upon pages of text. *E.g.*, Simpson Ex. 339, -619-49. A "non-movant" is "not required to rebut [this] insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003). Even putting aside this threshold deficiency, fact disputes preclude summary judgment on News Plaintiffs' "exemplary" outputs.

### A. Whether Microsoft was the volitional actor is disputed.

Volitional conduct is an "important element of direct liability." *Cartoon Network LP, LLLP v. CSC Holdings, Inc.* ("*Cablevision*"), 536 F.3d 121, 131 (2d Cir. 2008). The requirement "takes on greater importance in cases involving automated systems," *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019), because it allows a court to determine "*who* made" the copy—the defendant who operates the system, or the system's end-users, *Cablevision*, 536 F.3d at 130-31. The inquiry is inherently fact-bound, requiring assessment of how a system works and how the user operated it. For example, if a Copilot user engages in deliberate prompting to elicit copyrighted content—contrary to Copilot's permitted uses, and in a way that overcomes Copilot's layers of mitigation—it is that user's *misuse* that is the volitional act, and Microsoft can at most be secondarily liable.

A review of News Plaintiffs' examples reveals that many result from this sort of user conduct. *See, e.g.*, Simpson Exs. 337-338. For example, this user prompted Copilot with the URL of a copyrighted article, much as someone might copy a link into a browser:

**User Query**

https://www.nytimes.com/2024/01/28/world/middleeast/israel-hamas-weapons-rockets.html

Simpson Ex. 337, Example 39. The output provided some text and quotations relaying factual information that overlapped with the article.

In other cases, users made a direct request to "summarize" or extract the "key points" of an article:

**User Query**

summarize the new york times article macfarquhar, n. [REDACTED], [REDACTED]. russia pulled out of a nuclear test ban treaty. here's what that means. the new york times. https://www.nytimes.com/2023/11/02/world/europe/russia-nuclear-test-ban-treaty.html

Simpson Ex. 337, Example 55. And some of Plaintiffs' examples look suspiciously like someone trying to trick Copilot into generating text from an article they already have. Below, the user prompted Copilot with the paragraph that follows the bolded word **"Text":**

**Message 1**

**Timestamp:** 2024-04-13 17:15:49+00:00
**Author:** user
**Message Type:** chat

**Text**

and the number of competitive swing states in 2024 is projected to be smaller than ever, comprising just six major battlegrounds (arizona, georgia, michigan, nevada, pennsylvania, and wisconsin) with 15 percent of the country's population. that leaves 85 percent of [REDACTED] with little incentive to vote for the nation's highest office, which affects down-ballot races as well.#n##n#an illustration that nods to the story of the garden of eden, a green serpent coils itself around the constitution.#n#nicolás ortega#n#because representation in the senate helps determine the number of electoral votes, smaller states also have more power than large ones to determine the [REDACTED]. the vote of a wyoming [REDACTED], for instance, counts 3.7 times more than that of a [REDACTED] in a presidential election.#n##n#sign up for our free newsletter#n#subscribe to the mother jones daily to have our top stories delivered directly to your inbox.#n##n#email#n#email#n#by signing up, you agree to our privacy policy and terms of use, and to receive messages from mother jones and our [REDACTED].#n##n#like dry rot on a decaying house, the imbalances built into the electoral system keep getting worse. things that once seemed to be an aberration, like a -[REDACTED] losing the popular vote but winning the electoral college, are [REDACTED] routine. before the 2000 election, only three times in us history had the [REDACTED] of the popular vote won the electoral college. but that's happened twice [REDACTED] since then. it almost occurred a third time in 2020, when [REDACTED] won the popular vote by 7 million votes but [REDACTED] lost the three closest states in the electoral college by just 44,000 total votes. [REDACTED] never could have attempted to overturn the results—and there would have been no -insurrection-—if the united states had a system in which every vote mattered equally in presidential elections.

Simpson Ex. 348.A, 1. The prompt is from the middle of the very article News Plaintiffs assert, which the user must have already had:

> And the number of competitive swing states in 2024 is projected to be smaller than ever, comprising just six major battlegrounds (Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin) with 15 percent of the country's population. That leaves 85 percent of Americans with little incentive to vote for the nation's highest office, which affects down-ballot races as well.

*See* Simpson Ex. 348.B, 1 (row 23); Simpson Ex. 348.C, -313.

For these examples and many more, a jury could easily find that the user "supplies the necessary element of volition," *Cablevision*, 536 F.3d at 131, for example by "select[ing] the copyrighted content," *VHT*, 918 F.3d at 732. This fact-bound issue is inappropriate for summary judgment.

### B. Whether outputs contain substantially similar non-de-minimis expression is disputed.

News Plaintiffs also must show that outputs bear "'substantial similarity' to protected expression in the copyrighted work." *Nihon,* 166 F.3d at 70. The standard asks "whether an average lay observer would overlook any dissimilarities between the works and would conclude that one was copied from the other." *Id.* And for news articles, a "more discerning" test applies. *Id.* "[U]nprotectible elements" like facts must be "exclud[ed]," and a "higher quantity of copying is required to support a finding of substantial similarity." *Id.* at 70-71.

News Plaintiffs offer no "side-by-side comparison" of each of the Copilot conversations and allegedly infringed articles. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 273 (2d Cir. 2001). This lies in contrast to News Plaintiffs' *training* claims. For those, Plaintiffs offer a "coverage score" comparing certain of their works with material in OpenAI's training data; they concede that for works on which they offer no score, "any questions of substantial similarity" are for the jury. *See* NP MSJ 36. When it comes to their *outputs*, they include no score—and indeed no analysis at all. Defs' News Counter-SUMF ¶¶ 1250-51, 1253-56; NP MSJ 43-50. Plaintiffs do nothing but assert that Microsoft copied "substantial, verbatim portions" of their works. NP MSJ 44. That is nowhere near enough. *Nihon*, 166 F.3d at 71 ("simple word count" is insufficient).

One of Plaintiffs' examples shows why. A user put the following query into Copilot:

**User Query**

what did the massive ice cap above chicago make when it melkted

Simpson Ex. 338, Example 23. Here is Copilot's response, with the red text marking the overlap with one of News Plaintiffs' articles:

**Model Output**

**twenty thousand years ago**, chicago was encased in ice roughly **3,000 feet thick**—twice the height of willis tower. all that's left of the colossal ice sheet that sprawled over much of north america and formed the great lakes is a kernel of ice in the canadian arctic—and it's dwindling fast[^1^]. this massive ice sheet, known as the **laurentide ice sheet**, had a profound impact on shaping the landscape and environment we know [REDACTED].
here are some remarkable consequences of the melting laurentide ice sheet:
1. **great lakes formation**: as the ice sheet melted, it carved out the basins of the **great lakes**, leaving behind the planet's largest system of freshwater. these lakes—superior, michigan, huron, erie, and ontario—[REDACTED] play a crucial role in regional ecosystems, transportation, and recreation.
2. **fertile soil creation**: the ice sheet tilled what would become some of the most **fertile soils** in the world for [REDACTED]. the rich glacial deposits provided essential nutrients for agriculture across the midwest.
3. **mississippi river alteration**: the melting ice sheet altered the course of the **mississippi river**, the country's largest river. the river's flow shaped contemporary state lines from wisconsin to louisiana.
4. **legacy landscape**: glacial deposits continue to influence our lives [REDACTED]. they provide a significant portion of the water we drink, impacting everything from agriculture to urban infrastructure[^1^].
while the barnes ice cap—the last remnant of the laurentide ice sheet—is hardly a global concern by itself, its disappearance could serve as a **warning** for other massive ice sheets in greenland and antarctica. as these ice sheets melt, they contribute to **sea level rise** and may disrupt ocean currents, affecting global climate patterns[^1^] [^2^]. the legacy of ancient ice continues to shape our world, even as it gradually disappears.

**Sources cited:**

- https://phys.org/news/2019-03-massive-glacier-great-lakes-greenhouse.html
- https://www.chicagotribune.com/2019/02/28/the-massive-glacier-that-formed-the-great-lakes-is-disappearing-and-greenhouse-gases-are-to-blame-for-its-untimely-demise/
- https://www.sciencedaily.com/releases/2007/12/071210094332.htm

*Id.* The first fifty or so words appear to overlap with two sentences of Plaintiffs' article, but that is de minimis in the news context. *See Nihon*, 166 F.3d at 71 (one paragraph is de minimis). The rest consists almost entirely of unprotected facts "in a different arrangement, with a different sentence structure and different phrasing." *Id.*

A jury could readily reject substantial similarity for this and other outputs News Plaintiffs point to. *See, e.g.*, Simpson Ex. 337, Examples 44, 50, 52, 59. Summary judgment should be denied.

## IV. News Plaintiffs Are Not Entitled To Summary Judgment On Ownership, Number Of Statutory Damages Awards, Or Microsoft Defenses.

Summary judgment should be denied as to remaining issues.

***Compilations.*** For purposes of statutory damages, "all the parts of a compilation"—such as a newspaper or magazine, *see* § 101—"constitute one work," § 504(c)(1), and thus News Plaintiffs may receive only one award "for each" compilation, *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140-42 (2d Cir. 2010). As Microsoft has explained, News Plaintiffs' uniform practice of registering issues, not articles, confirms that the articles were issued "together as a unit." *Id.* at 141; Msft News MSJ 34-35; Msft News SUMF ¶ 160. News Plaintiffs invoke *EMI Christian Music Group, Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016), to argue that they are entitled to per-article statutory damages because each article was "available for consumption as [a] single work[] separate and apart from any issue." NP MSJ 79. That is wrong on both the law and facts.

*EMI Christian* allowed "separate statutory damages awards for songs … issued as singles" only because the plaintiffs proved at trial that "each individual sound recording at issue … was *available for purchase* as a single" work. 844 F.3d at 101 (emphasis

added). By contrast, News Plaintiffs register works collectively as issues, and identify no articles that were issued for sale as distinct commercial works. *See* Msft News MSJ 35. Rather, readers purchase an issue or a subscription to access articles. *See, e.g.*, NP SUMF ¶¶ 412, 452, 462, 476. Making articles available online to "[c]onsum[e]," "download[]," "read[]," or "access," NP MSJ 79, is not equivalent to separate issuance as a distinct saleable work, and News Plaintiffs cite no authority holding otherwise.

***Ownership.*** Microsoft joins OpenAI's brief explaining why News Plaintiffs have not advanced sufficient evidence entitling them to summary judgment on ownership of works. *See* OAI News Opp. 20-22.

***Affirmative Defenses.*** News Plaintiffs' bare assertion that Microsoft has "not provided evidence" for affirmative defenses fails. NP MSJ 80 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). A "conclusory assertion" that the nonmovant "has no evidence" does not suffice to carry the movant's burden on summary judgment. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 116-17 (2d Cir. 2017) (quoting *Celotex*, 477 U.S. at 328 (White, J., concurring)). Microsoft briefly addresses its license defenses below, and retains all others for trial.

As Microsoft's motion explained, undisputed evidence establishes an implied license, as a matter of law, for any of News Plaintiffs' claims based on webpages lacking a NOARCHIVE meta tag after Microsoft first introduced it in September 2023. Msft News MSJ 31-34; *see* Msft News SUMF ¶¶ 150-58. As to express license, the record shows that The Times and Daily News Plaintiffs each granted Microsoft a license to "[r]eproduce" and "publicly display" a subset of their asserted works in connection with Copilot. *See* Simpson Ex. 340, ¶¶ 1.12, 3.3(a); Simpson Ex. 341, ¶ 5.3.

## CONCLUSION

News Plaintiffs' motion should be denied.

Dated: October 23, 2026

Respectfully submitted,

*/s/ Annette L. Hurst*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Robert Scott Shwarts
Catherine Lui (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkeley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

FAEGRE DRINKER BIDDLE & REATH LLP
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
Facsimile: (202) 842-8465
lora.brzezynski@faegredrinker.com

brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
Andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the foregoing Opposition complies with the Court's order of August 7, 2026 (ECF 1664), as it contains 8749 words, according to the word processing program used to prepare it.

*/s/ Annette L. Hurst*
Annette L. Hurst
*Attorney for Defendant*
*Microsoft Corporation*