**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In Re: OpenAI, Inc. Copyright Infringement Litigation

This Document Relates To:

Case No. 1:23-cv-11195
Case No. 1:24-cv-03285
Case No. 1:24-cv-04872

Case No. 1:25-md-3143-SHS-OTW

**REDACTED – PUBLIC VERSION**

# Defendant Microsoft Corporation's Reply Memorandum of Law In Support Of Motion For Summary Judgment In News Plaintiffs' Consolidated Cases

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

TABLE OF CITATION CONVENTIONS .......... iv

INTRODUCTION .......... 1

I. LLM Training Is Fair Use. .......... 3

II. Copilot Web Grounding Is Fair Use. .......... 4

- A. Web grounding is highly transformative (Factor one). .......... 4
- B. Web grounding makes intermediate use of predominantly factual works without displaying copies to users, while affording an opt-out (Factors two and three). .......... 5
- C. Copilot web grounding causes News Plaintiffs no cognizable harm (Factor four). .......... 9

III. News Plaintiffs' Knowing Decision To Forgo Meta Tags Gives Rise To An Implied License. .......... 12

IV. News Plaintiffs Are Entitled To No More Than One Statutory Damages Award Per Issue. .......... 15

CONCLUSION .......... 16

CERTIFICATE OF WORD COUNT COMPLIANCE .......... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309 (2d Cir. 2022) ....................12

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .................... 5

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013) .................... 10, 11

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .................... 4

*Bryant v. Media Right Prods., Inc.*,
603 F.3d 135 (2d Cir. 2010).................... 15, 16

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016)....................15

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .................... 10

*Field v. Google Inc.*,
412 F. Supp. 2d 1106 (D. Nev. 2006).................... 13, 15

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021).................... 5

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .................... 3

*Hanagami v. Epic Games, Inc.*,
85 F.4th 931 (9th Cir. 2023).................... 7

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .................... 3

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999) .................... 8

*Parker v. Yahoo!, Inc.*,
No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) .................... 14

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025) .......... 6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 .......... 5

**Statutes**

17 U.S.C. § 101 .......... 15

17 U.S.C. § 504(c)(1) .......... 15

**Other Authorities**

Monika Isia Jasiewicz, Comment, *Copyright Protection in an Opt-Out World: Implied License Doctrine and News Aggregators*, 122 Yale L.J. 837 (2012) .......... 12

## TABLE OF CITATION CONVENTIONS

This brief uses the following abbreviations and citation conventions for briefs, Rule 56.1 statements, and record materials filed in connection with the parties' cross-motions for summary judgment in the News Plaintiffs' and Books Plaintiffs' cases.

| Citation | Document | ECF No. |
|---|---|---|
| Abib ¶ | Declaration of Elbio Abib in Support of Microsoft's News Motion for Summary Judgment | 1713 |
| Bail ¶ | Declaration of Christopher A. Bail, Ph.D. in Support of Microsoft's Motions for Summary Judgment | 1719 |
| Bird ¶ | Declaration of Sarah Bird in Support of Microsoft's News Motion for Summary Judgment | 1710 |
| Brook Ex. | Corrected Declaration of Davida Brook in Support News Plaintiffs' Motion for Summary Judgment | 1984-1 |
| Canel ¶ | Declaration of Fabrice Canel in Support of Microsoft's News Motion for Summary Judgment | 1711 |
| Defs' News Counter-SUMF ¶ | Defendants' Response to News Plaintiffs' Rule 56.1 Statement | 2253 |
| Gaggara ¶ | Declaration of Padma Priya Gaggara in Support of Microsoft Corporation's Motions for Summary Judgment | 1705 |
| Hurst Ex. | Declaration of Annette L. Hurst in Support of Defendant Microsoft's Replies in Support of Microsoft's Motions for Summary Judgment | |
| Lafferty ¶ | Declaration of John D. Lafferty, Ph.D. in Support of Microsoft's Motions for Summary Judgment | 1723 |
| Msft Books MSJ | Defendant Microsoft Corporation's Memorandum of Law in Support Of Motion For Summary Judgment In Books Plaintiffs' Consolidated Cases | 1692 |
| Msft Books Opp. | Defendant Microsoft Corporation's Opposition To Books Plaintiffs' Motion For Partial Summary Judgment | 2179 |

| | | |
|---|---|---|
| Msft News MSJ | Defendant Microsoft Corporation's Memorandum of Law in Support Of Motion For Summary Judgment In News Plaintiffs' Consolidated Cases | 1699 |
| Msft News Opp. | Defendant Microsoft Corporation's Opposition to News Plaintiffs' Motion for Partial Summary Judgment | 2225 |
| Msft News Reply SUMF ¶ | Microsoft's Reply to News Plaintiffs' Response to Defendant Microsoft Corporation's Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases | |
| Msft News SUMF ¶ | Defendant Microsoft Corporation's Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases | 1702 |
| NP MSJ | News Plaintiffs' Combined Summary Judgment Brief | 1728 |
| NP Opp. | News Plaintiffs' Opposition to Defendants' Motions for Summary Judgment | 2119 |
| NP Resp-Msft SUMF ¶ | News Plaintiffs' Response to Microsoft's Rule 56.1 Statement of Undisputed Material Facts in Support of Microsoft's Motion for Summary Judgment | 2122 |
| NP SUMF ¶ | News Plaintiffs' Corrected Combined Rule 56.1 Statement of Undisputed Material Facts | 1985-1 |
| OAI News Opp. | OpenAI's Opposition to News Plaintiffs' Motion for Summary Judgment | 2216 |
| OAI SUMF ¶ | OpenAI's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment | 1735 |
| Tucker ¶ | Declaration of Catherine Tucker, Ph.D. in Support of Defendant Microsoft Corporation's Motion for Summary Judgment in News Plaintiffs' Consolidated Cases | 1733 |
| Tucker Opp. ¶ | Declaration of Catherine Tucker, Ph.D. in Support of Defendant Microsoft Corporation's Opposition to Plaintiffs' Motion For Summary Judgment In News Plaintiffs' Consolidated Cases | 2227 |

| | | |
|---|---|---|
| Usdan ¶ | Declaration of Jordan Usdan in Support of Microsoft Corporation's Motions for Summary Judgment | 1707 |

All statutory cites are to Title 17 unless otherwise indicated. All ECF cites are to MDL No. 1:25-md-3143-SHS-OTW unless otherwise indicated.

## INTRODUCTION

News Plaintiffs' opposition to Microsoft's summary judgment motion makes clear that their assault on Microsoft Copilot is not about misuse of creative expression—it is about ad sales. Plaintiffs fear that by helping users efficiently get answers to questions, even by providing only unprotected facts and ideas, tools like Copilot might reduce visits to Plaintiffs' websites. Less time-wasting for consumers could mean fewer eyeballs on the banner ads, pop-ups, and digital billboards Plaintiffs intersperse with their content. But copyright law does not protect prevailing business models, nor grant Plaintiffs a monopoly over answering questions or conveying news and information. It protects only their exclusive right to sell their own creative works. Copilot does not interfere with that right in purpose or effect. And if Plaintiffs nevertheless think Copilot will cause them *any* harm, they can exclude their content with a few easy keystrokes.

The record makes abundantly clear that Copilot is not a platform for distributing news articles. It is an interactive tool for locating and using information that operates in a different market from news distributors. Copilot's web grounding feature furthers that end by extracting and synthesizing unprotected factual material and ideas from multiple sources to respond directly to user queries. News Plaintiffs do not dispute that this is a novel and creative use of web content that enriches public knowledge, the core aim of copyright law.

News Plaintiffs also have no explanation for how Copilot exploits them if they can simply exclude their content, easily and for free, any time they like. Microsoft designed Copilot on the conviction that the best way to deploy revolutionary LLM technology is to create products that improve users' lives while also giving content owners flexibility. With Copilot, Microsoft was among the first to use machine-readable content controls

for AI, ensuring that any website owner can dictate use (or not) of their content—just as they have for decades with search engines. In fact, several Plaintiffs do use Copilot meta tags, even as they pretend in this litigation that new AI products are being forced upon them. What could be more fair than a transformative product that users love and content owners can readily avoid?

But perhaps the biggest problem with News Plaintiffs' story of how Copilot will hurt their business model is that it just has not happened. Copilot has been available to the public for several years. If web grounding caused genuine harm to Plaintiffs, it would have shown up by now in economic metrics. It has not, precisely as one would expect from a non-substitutive tool that helps people access and understand information as never before. Plaintiffs offer little more than a list of dubious theories of harm, plus the refrain that any day now these harms might materialize.

This Court should reject News Plaintiffs' attempt to thwart a new product bringing powerful LLM technology to the public responsibly and fairly. In addition to finding that LLM training is fair use as a matter of law, the Court should hold that Microsoft's approach to Copilot web grounding is fair, too. Such a ruling will encourage future innovators to likewise develop new and productive tools while protecting content owner interests. Rights owners will adapt, as they always have, and the technological Progress envisioned by our country's forebears will roll on. The motion should be granted.

## ARGUMENT

### I. LLM Training Is Fair Use.

Across multiple briefs, Microsoft has detailed why the undisputed facts establish that training is fair use as a matter of law. *See* Msft News MSJ 10-13; Msft Books MSJ 9-32; Msft News Opp. 8-13; Msft Books Opp. 9-35; Msft Books Reply 2-15. Microsoft addresses two News-Plaintiff-specific points related to the fourth fair use factor.

Microsoft has repeatedly pointed to economic evidence demonstrating that OpenAI's LLM training has had no effect on News Plaintiffs' financial metrics. Msft News MSJ 11; Msft News SUMF ¶¶ 27, 33, 36, 39, 42, 45, 48, 51, 54, 57. Plaintiffs have identified no economic evidence to refute Microsoft's showing. Plaintiffs say Microsoft is "attempt[ing] to shift the burden" "in arguing that Plaintiffs have not shown harm to traffic or financial performance." NP Opp. 2, 20. But Microsoft *carried* its burden, which is why Plaintiffs must respond with evidence of significant harm to create a fact issue, not mere "logical inferences." *Contra* NP Opp. 2-3, 20-22; *see Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1055-56 (N.D. Cal. 2025); Msft News Opp. 20. Anyway, such "inferences" are available only from "self-evident[ly]" substitutive uses, not profoundly transformative ones like LLM training. *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 193 (2d Cir. 2024); Msft News Opp. 20; Msft Books Reply 23.

News Plaintiffs erroneously claim that Microsoft has "concede[d]" that the "models … distribute verbatim copies to users." NP Opp. 8-9. Their support for this purported concession, however, is Microsoft's discussion of rare text overlap resulting from *web grounding*—not *training*. Msft News MSJ 20-23. Nor does Plaintiffs' expert's elaborate adversarial prompting show that LLMs "output copies of Plaintiffs'

articles" to *real-world users* as a result of OpenAI's use of those articles for training. NP Opp. 27; *see* Defs' News Counter-SUMF ¶ 968. The theoretical possibility that the GPT models could emit snippets of training data hardly means that *actual users are getting substitute news articles* from LLMs "in preference to" the originals—let alone so frequently as to cause Plaintiffs "significant harm." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223-24 (2d Cir. 2015). There is no cognizable harm from LLM training. It is fair use.

## II. Copilot Web Grounding Is Fair Use.

Microsoft has also established that Copilot's web grounding feature is fair use, including both (1) intermediate copies in Copilot's context window that influence the LLM's generated response, and (2) rare outputs matching some grounding content. Msft News MSJ 13-31; Msft News Opp. 13-26. Web grounding is a new and different way to use content without providing substitute copies of protected expression, and Copilot allows any website owner to opt out.

### A. Web grounding is highly transformative (Factor one).

Web grounding serves two transformative purposes: It enables general purpose LLM-based chatbots like Copilot to answer queries that require knowledge of the present-tense world, while simultaneously deepening a user's ability to engage with vast expanses of the internet by enhancing the experience of web search. Msft News MSJ 4-5, 14-18; Msft News Opp. 14-15.

News Plaintiffs do not dispute either purpose. They concede that absent web grounding, a "standalone LLM-based chatbot [would be] limited by its training data." NP Resp-Msft SUMF ¶ 68; *see* Msft News MSJ 4-5, 14-16; Msft News Opp. 14-15. And Plaintiffs' whole argument is premised on the fear that web grounding will so radically

enhance web search that they may have to adapt the business model they built around traditional search. NP Opp. 6-7. Plaintiffs say it does not matter if Copilot is a "novel," "useful," "creative," and "innovat[ive]" "new product," NP Opp. 32-33, but the Supreme Court disagrees: Using works to enable "highly creative and innovative tool[s]" that serve a different function than the original is a well-established transformative purpose. *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30-31 (2021); *see* Msft Books Reply 10-12.

Nor are Plaintiffs correct that Copilot's transformative purposes do not further copyright's "goal" of "provid[ing] an economic incentive to create original works." NP Opp. 33 (quoting *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 535 (2023)). According to Plaintiffs, because "RAG outputs" are not *themselves* "copyrightable," web grounding cannot be transformative. *Id.*; *see id.* at 14-15. But this view of copyright is too narrow. Copyright's incentive structure exists to serve a more fundamental "constitutional objective": "'Progress'" itself. *Oracle*, 593 U.S. at 30 (quoting U.S. Const. art. I, § 8, cl. 8). Fair uses are sacred not because they immediately yield copyrightable works, but because they "promote the progress of science and the arts, *without diminishing* the incentive to create." *Warhol*, 598 U.S. at 531 (emphasis added). Copilot does that, so factor one favors fair use.

**B. Web grounding makes intermediate use of predominantly factual works without displaying copies to users, while affording an opt-out (Factors two and three).**

When Copilot uses news articles for grounding, it makes intermediate copies of predominantly factual works and virtually never shares protected expression with users. *See* Msft News MSJ 18-20 (scope of fair use greater for factual works even if they include original expression); Msft News Opp. 11. Undisputed evidence establishes that *over 99%* of the time Copilot grounds on News Plaintiffs' works, the output contains not

a single sentence of text overlapping with the article. Msft News MSJ 20-23; Msft News Opp. 18-19; Msft News Reply SUMF ¶ 79; Lafferty ¶ 399. Instead of passing along copies of articles, Copilot uses tokenized grounding content to inform the next-token prediction of its LLM—newly generating strings of tokens every time, which Plaintiffs fail to dispute. Msft News Reply SUMF ¶¶ 72, 77. Moreover, through its meta tags, Copilot uses only as much content as a website owner allows, so Plaintiffs can exclude their content if they wish. Msft News MSJ 19-20.

News Plaintiffs concede that "courts have blessed certain non-substitutive uses that 'provided [a benefit] without allowing public access to the copy.'" NP Opp. 9 (quoting *Romanova v. Amilus Inc.*, 138 F.4th 104, 115 (2d Cir. 2025)). That perfectly describes web grounding. News Plaintiffs try to create fact disputes on two side issues to avoid summary judgment: (1) the frequency of incidental *outputs* with text overlapping with grounding content; and (2) the effectiveness of Copilot's meta tags. Both attempts fail.

***Rare outputs with overlap do not undermine fair use.*** News Plaintiffs insist that "the extent to which [web grounding] causes substantially similar outputs is … hotly disputed." NP Opp. 34. With all the evidence in, it is worth taking a step back to consider the nature of these purported disputes. Plaintiffs brought this case alleging that Copilot *reproduces their articles to users.* Now they are reduced to quibbles over 16-gram snippets of text here and splotchy color-coded passages of mostly factual material there. Whatever methodological disputes may teem in the weeds, the upshot is indisputable: Overlapping text in Copilot outputs is a rare, incidental, and typically de minimis byproduct of web grounding. *See* Msft News MSJ 20; Msft News Opp. 19.

News Plaintiffs lead with the demonstrably false assertion that "verbatim text *from the Plaintiffs' works* appears in up to 20% of the conversations produced in this case." NP Opp. 5 (emphasis added) (citing NP SUMF ¶¶ 1032-33). Follow the factual citation and their "up to 20%" figure is not about "Plaintiffs' works" but rather about overlap with *any grounding content* from *any* source—could be a weather forecast, famous quote, or list of nucleotides in DNA. *See* NP SUMF ¶¶ 1032-33; Lafferty ¶ 399; Goldstein Decl., Ex. B ¶¶ 82, 107 & tbl. 7. Filtering for one-sentence overlaps with *Plaintiffs'* works, Plaintiffs' expert found matches in just 0.73% of Copilot conversations. *See* Msft News SUMF ¶ 79. That 0.73% rate is the *maximum* the record supports, and Plaintiffs nowhere dispute or undermine that figure. NP Resp-Msft SUMF ¶ 79.

Plaintiffs' next trick is to call this 0.73% figure an "infringement rate" that "yields millions of infringements when extrapolated across over 1 billion output logs." NP Opp. 40. That is doubly misleading. To start, the figure does not come from a random sample, but from the 8.2 million conversations with keywords implicating *Plaintiffs' URLs*—that census (not sample) cannot be "extrapolated" across all Copilot outputs. *See* Msft News MSJ 21-22; ECF 2055 at 22 (Rule 702 motion). The figure is also not an "infringement rate" because the criterion for inclusion is a mere *one sentence* of overlap with Plaintiffs' works. "[O]ne sentence" is "ordinarily" a de minimis amount of copying, and thus *not* infringement. Msft News MSJ 21 (quoting *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 946 (9th Cir. 2023)).

When Plaintiffs' expert increased the amount of overlap necessary to count as a match—non-consecutive strings amounting to the length of a paragraph—the rate of matches dropped by almost half, to 0.4%. Msft News Opp. 18; Defs' News Counter-SUMF ¶ 1246. That *still* does not reach the threshold for infringement under Second

Circuit law, which holds that copying the entire "first paragraph of a six-paragraph" news article is de minimis. *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71 (2d Cir. 1999).

News Plaintiffs shift to arguing that a "simple word count" does not prove non-infringement—claiming that Copilot outputs "detailed summaries" of their works. NP Opp. 36, 40. But Plaintiffs provide no evidence regarding the frequency of Copilot summaries or whether such summaries are substantially similar enough to the originals to count as derivative works. Msft News Opp. 29-31.

Given the foregoing, News Plaintiffs' emphasis on an "illustrative set" of conversations that purportedly show more than de minimis overlap—but still nothing approaching an actual article—is effectively beside the point. NP Opp. 42. For all the pains Plaintiffs have taken to highlight overlapping snippets of text in outputs with the greatest degree of overlap they could find, the bottom line remains unaltered: Web grounding effectuates its transformative purpose while virtually never making Plaintiffs' protected expression publicly available.

***Meta tags are highly effective.*** News Plaintiffs take a similar tack with meta tags, magnifying rare glitches to distract from the overwhelming effectiveness of these content controls. NP Opp. 33-34. Plaintiffs do not dispute that sophisticated website publishers have long used meta tags to dictate how online content can be used. Canel ¶¶ 8-13, 29; Gaggara ¶¶ 15-16; Msft News Reply SUMF ¶ 156; Msft News MSJ 32. The Times, for example, has used NOARCHIVE as a grounding control for Copilot on most of its webpages since September 2023. Msft News Reply SUMF ¶¶ 155-56. This worked. Fully 99.85% of the time Copilot grounded on the Times' content, it was on pages the

Times chose *not* to meta tag, proving the tags reliably exclude tagged pages. Hurst Ex. 383 ¶ 294.

News Plaintiffs' contention that Copilot "repeatedly ignore[d]" meta tags for other Plaintiffs mischaracterizes the record. NP Opp. 5. Their cited evidence involves either (a) technical kinks Microsoft quickly resolved following the rollout of the tags and a webmaster tracking tool, respectively, Canel ¶ 31; ECF 2056 (F. Canel Decl.) ¶¶ 7-13, or (b) a lag in updates to the Bing Index—a temporary issue that occurs when website owners add tags to older webpages already contained in the Bing Index, Gaggara ¶¶ 24-26; *see* Defs' News Counter-SUMF ¶¶ 517, 1560. Microsoft routinely recrawls to capture newly added tags, and also provides an "IndexNow" tool that news publishers regularly use to refresh their content. *See* Canel ¶ 19; Gaggara ¶¶ 24-27. These cooperative solutions make meta tags extraordinarily effective overall—as the 99.85% figure for the Times bears out. So not only does web grounding make intermediate use of content while virtually never revealing protected expression to users, website owners can opt out.

### C. Copilot web grounding causes News Plaintiffs no cognizable harm (Factor four).

News Plaintiffs also fail to overcome economic evidence showing that web grounding has not harmed them.

***Copilot causes no harm in traditional markets.*** In response to empirical evidence showing no impact on "revenues, subscriptions, donations, web traffic, and conversion rates" since "the launch of Copilot (and ChatGPT)," Msft News MSJ 23-27; Msft News Opp. 20, News Plaintiffs claim that "traffic and subscriptions" to their websites are "[d]eclining," NP Opp. 7. Their cited evidence supports no such thing. It

shows only an ongoing decline in "organic referrals" from *traditional search engines* (caused, for example, by changes to Google's search algorithm), plus a continued downward trend in the Daily News Plaintiffs' revenues, neither of which was affected by the launch of Copilot or ChatGPT. *See* Defs' News Counter-SUMF ¶¶ 1609-24; Tucker ¶¶ 34-43, 113 (including Figs. 5(A)-(B), 6(A)-(H), 24); *see, e.g.*, Msft News Reply SUMF ¶¶ 91, 97.

News Plaintiffs expect "harm … on the horizon." NP Opp. 7. But there is nothing to fear because they can easily implement Copilot's content controls—as the Times and Daily News Plaintiffs have. Msft News Reply SUMF ¶¶ 156-57; Msft News Opp. 6; Msft News MSJ 33. Plaintiffs cannot claim future harm from a use they can avoid.

***News Plaintiffs' theories of indirect harm fail.*** Plaintiffs fail to establish that purported harms from *non-infringing* Copilot outputs—*i.e.*, market dilution—are legally cognizable. Msft News MSJ 18, 27-28, 30; Msft News Opp. 16-17, 22-25. Most notably, they do not contest that everyone has "every right" to satisfy demand for information, including by "republish[ing] the facts" contained in Plaintiffs' articles. Msft News MSJ 18 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991)). Plaintiffs themselves republish scoops, stats, scientific breakthroughs, and news sourced by others constantly. *Id.* at 19.

News Plaintiffs also cannot support their claim that copyright law entitles them to a historical click-through rate that "generat[es] audiences." NP Opp. 7; Msft News MSJ 29-31; Msft News Opp. 24-25. Plaintiffs suggest that *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013), supports "infer[ring] present harm" from click-through rate declines. NP Opp. 44. But *Meltwater* did not discuss such declines, let alone under factor four. The defendant

there, a paid news monitoring service, attempted to defend its non-transformative republication of articles by likening itself to a search engine—seeking cover under cases holding that search engines are transformative. 931 F. Supp. 2d at 552-53, 555-56. The court rejected this defense, finding that Meltwater's "small click-through rate[s]" were not "equivalent to" the search engines "to which it compare[d] itself." *Id.* at 554. The factor-four harm flowed from Meltwater distributing verbatim excerpts of AP articles without a license, the same use other monitoring services paid to license. *Id.* at 560-61. *That* is market substitution.

Regardless, News Plaintiffs fail to patch the gap in their proof Microsoft identified: Their expert neglected to analyze whether Copilot has replaced the traditional search engines from which Plaintiffs claim higher click-through rates or actually reduced traffic to their websites. *See* Msft News MSJ 30-31. Plaintiffs do not dispute that this is a critical premise of their click-through argument, yet fail to support it.

***News Plaintiffs cannot establish a cognizable web grounding licensing market.*** Plaintiffs cannot claim harm from lost licensing revenues without evidence that web grounding was a "potential market" before Microsoft (and others) invented that transformative use. Msft News MSJ 28-29; Msft News Opp. 25. Plaintiffs' assertion that the market now exists—*after* Microsoft invented web grounding—is no refutation of Microsoft's point, even assuming Plaintiffs could support that view with their scattershot data deals. NP Opp. 44; *but see* Msft News MSJ 29.

### III. News Plaintiffs' Knowing Decision To Forgo Meta Tags Gives Rise To An Implied License.

For any infringement claim based on a webpage lacking a NOARCHIVE tag following Microsoft's September 2023 meta tags announcement, summary judgment is also warranted based on an implied license. Msft News MSJ 31-34. News Plaintiffs knew how to exclude their pages from grounding but chose not to—conduct that courts have long treated as giving rise to an implied license.

***Content controls are a long-standing mechanism for implied consent online.*** News Plaintiffs start by likening Microsoft to a "burglar[]," while claiming that "[l]icensing is not an 'opt-out' regime." NP Opp. 45, 49. Undisputed evidence says otherwise. Online content controls like robots.txt and meta tags are a foundational framework in which website owners are "well versed." Canel ¶ 29; *see* Msft News SUMF ¶¶ 80-81 & NP Resp-Msft SUMF ¶¶ 80-81 (disputing only efficacy). Given the internet's scale, machine-readable signals are the only practical way permissions *could* work, and the internet has long run on the presumption that it is "open" unless owners "affirmative[ly] … block access." Monika Isia Jasiewicz, Comment, *Copyright Protection in an Opt-Out World: Implied License Doctrine and News Aggregators*, 122 Yale L.J. 837, 843-44 (2012); Canel ¶¶ 9, 12. Website owners like Plaintiffs have used meta tags for decades, and the industry frequently extends existing content control standards to new search features like web grounding. Canel ¶¶ 8-13; *see* Msft News SUMF ¶ 80.

***News Plaintiffs knew how Microsoft's meta tags worked and could easily implement them.*** All agree that the ultimate question is whether there was a "meeting of the minds between the parties to permit the particular usage at issue."

*ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022) (citation omitted); Msft News MSJ 31; NP Opp. 45-46. There is no dispute that Microsoft publicized the use of the NOARCHIVE tag for web grounding in September 2023. Msft News SUMF ¶ 82; Canel ¶¶ 27-30. Plaintiffs' witnesses confirmed they understood this, yet did not use tags, communicating their implied consent. *See* Hurst Ex. 386, 117:10-118:23; Hurst Ex. 387, 106:2-107:3.

News Plaintiffs say they did not know what web grounding was. *See* NP Opp. 46-47. But they do not dispute that they knew about the NOARCHIVE meta tag announced in September 2023. Hurst Ex. 385, 176:2-177:16; Hurst Ex. 387, 95:13-18. That announcement was not phrased in jargon. It told webmasters: "[n]o action is needed to remain in Bing Chat" (now Copilot); untagged content "may be included in Bing Chat answers"; and "[c]ontent tagged NOARCHIVE will not be included in Bing Chat answers." Hurst Ex. 410 at 2; *see* Canel ¶¶ 15, 20-21, 30; Msft News Reply SUMF ¶¶ 82-84. So this is not a case involving "the unilateral expectations of one party." NP Opp. 46 (citation omitted). However Plaintiffs understood the technicalities of "grounding," they do not dispute that they knew how the tags worked. *See* Msft News Reply SUMF ¶ 154 & NP Resp-Msft SUMF ¶ 154 (disputing only the tag's efficacy, not knowledge); Hurst Ex. 386, 117:23-118:23.

News Plaintiffs also suggest that meta tags impose "great effort and expense" on website owners. NP Opp. 5. This is meritless. Each Plaintiff has a Bing Webmaster Tools account through which Microsoft notified account holders that NOARCHIVE would exclude content from grounding. Msft News SUMF ¶¶ 152-53; Canel ¶¶ 15, 30. As *Field v. Google Inc.* explained, a "web site owner can add the 'no-archive' meta tag to a Web page in a matter of seconds." 412 F. Supp. 2d 1106, 1112 n.4 (D. Nev. 2006).

***News Plaintiffs did not withdraw implied consent to ground on untagged pages.*** Plaintiffs maintain that they "told Defendants they could not use their copyrighted content for Generative AI products through their terms of service, paywalls, letters, and these lawsuits." NP Opp. 47-49. As sophisticated website publishers, however, Plaintiffs know that crawlers follow meta tags and robots.txt—not boilerplate Terms of Service that a crawler cannot read. Canel ¶ 12; Defs' News Counter-SUMF ¶¶ 523-25. And such boilerplate terms are "insufficient to overcome the implied license." *Parker v. Yahoo!, Inc.*, No. 07-2757, 2008 WL 4410095, at *5 n.10 (E.D. Pa. Sept. 25, 2008). Otherwise Plaintiffs point to *pre*-September 2023 inquiries that, as Plaintiffs describe them, focused on *training*, not grounding. NP Opp. 48.

In any event, News Plaintiffs never explain why their specific, daily acts of implied consent, consistent with the internet's long-accepted permissions framework, should not control. Plaintiffs knew precisely how Microsoft's web crawler would interpret non-use of meta tags and decided to allow that interpretation anyway.

***News Plaintiffs' remaining arguments are empty.*** Plaintiffs again point to purported glitches in meta tag compliance on pages they *did* decide to tag. NP Opp. 50. That is irrelevant to implied license. Microsoft's summary judgment motion seeks only a ruling that any claim predicated on webpages left *untagged* after September 2023 is licensed. Msft News MSJ 31. (In any event, meta tags are highly effective. *Supra* pp. 11-12.)

That leaves only News Plaintiffs' observation that "other companies read" the NOARCHIVE tag "as barring access to cached versions of content" such that applying it "to block Copilot grounding simultaneously bars *other* companies from accessing cached content." NP Opp. 51. Plaintiffs cite no testimony suggesting they would have wanted to

allow other companies to access cached versions. *See* Msft News Reply SUMF ¶ 156. And anyway, Microsoft's public documentation explains how a website owner can limit the meta tag to Bing's robot crawler. *See* Hurst Ex. 413 at -619.

News Plaintiffs "made a conscious decision to permit" grounding on some pages, while tagging others NOARCHIVE. *Field*, 412 F. Supp. 2d at 1116. That conduct is "reasonably interpreted as the grant of a license … for that use." *Id.*

## IV. News Plaintiffs Are Entitled To No More Than One Statutory Damages Award Per Issue.

Though News Plaintiffs convolute the analysis, NP Opp. 59-62, the Second Circuit's approach to § 504(c)(1)'s one-award-per-compilation rule is clear. Whether works form a compilation "subject to Section 504(c)(1)'s one-award restriction" turns on "whether the … copyright holder … issued its works separately, or together as a unit." *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 141 (2d Cir. 2010). If issued as part of a unit, a per-part award is available only if that part was made available for purchase separately. *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016).

News Plaintiffs concede that their [redacted] Hurst Ex. 417, 10:21-11:10, and that their registrations are for issues as "collective work[s]," Hurst Ex. 390, 38:21-39:10, *see* Brook Ex. 312; Hurst Exs. 391-398; Msft News SUMF ¶ 160, which are compilations by definition under § 101. Plaintiffs suggest that "registration form" is irrelevant, NP Opp. 61-62, but it is of course relevant where the registrations prove beyond dispute that all Asserted Works are parts of a compilation.

News Plaintiffs fail to identify evidence that any article was sold separately. Plaintiffs note only that each article is "available separately online" on its own webpage.

NP Opp. 60. But that is nothing like the songs sold as "singles" in *EMI Christian,* 844 F.3d at 101, and, in any event, *Bryant* refused to disregard § 504(c)(1)'s "statutory language" "simply because" digitization makes it "easier" to access a compilation's parts "separately," 603 F.3d at 141-42.

## CONCLUSION

This Court should grant Microsoft's motion on all issues.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Annette L. Hurst*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Robert Scott Shwarts
Catherine Lui (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkeley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

FAEGRE DRINKER BIDDLE & REATH LLP
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
Facsimile: (202) 842-8465
lora.brzezynski@faegredrinker.com
brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*

**CERTIFICATE OF WORD COUNT COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the foregoing Reply complies with the Court's order of August 7, 2026 (ECF 1664), as it contains 4,375 words, according to the word processing program used to prepare it.

*/s/ Annette L. Hurst*
Annette L. Hurst
*Attorney for Defendant*
*Microsoft Corporation*