**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: OpenAI, Inc. Copyright Infringement Litigation<br><br>This Document Relates To:<br><br>No. 1:23-cv-11195<br>No. 1:24-cv-03285<br>No. 1:24-cv-04872 | Case No. 1:25-md-3143 (SHS) (OTW)<br><br>**REDACTED - PUBLIC VERSION** |

# DEFENDANT MICROSOFT CORPORATION'S REPLY TO NEWS PLAINTIFFS' RESPONSE TO MICROSOFT'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MICROSOFT'S MOTION FOR SUMMARY JUDGMENT IN NEWS PLAINTIFFS' CONSOLIDATED CASES

Pursuant to Local Civil Rule 56.1, Defendant Microsoft respectfully submits this Reply to News Plaintiffs' Response to Rule 56.1 Statement of Undisputed Material Facts in Support of Microsoft's Motion for Summary Judgment. ECF No. 2122 (the "Statement").

Pursuant to this Court's Order dated October 7, 2026 (ECF No. 2092), Defendant Microsoft provided its response in column format and has attempted to streamline its response for the benefit of the Court. For the Court's convenience and to avoid further lengthening this response, Microsoft does not repeat any supporting authority for the issues below in every response. Instead, Microsoft states these objections plainly and incorporates the below authority into each of those responses.

**Immaterial.** Facts designated "Immaterial" are facts that, even if true, do not help resolve any question currently before the Court on summary judgment, i.e., they do not "affect the outcome of the suit under the governing law." *I.M. v. United States*, 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019). Rule 56.1 statements are "immaterial" if they "do not provide any basis to rule in favor of either party for summary judgment even if they are disputed." *See Parks v. Lebhar-Friedman, Inc.*, No. 04-cv-7133-DCP-KNF, 2008 WL 3833802, at *4 (S.D.N.Y. Aug. 11, 2008). Facts designated as "Immaterial" below thus reflect facts that are not legally significant because it does not impact an element of any claim or defense at issue in Microsoft's summary judgment motion. Microsoft's designation of certain facts as "immaterial" does not concede that any fact not designated as such is material for purposes of adjudicating Microsoft's Motion, or for any other purpose.

**Not Supported by Cited Evidence.** Facts designated as "Not Supported by Cited Evidence" are facts with incorrect citations or where the cited evidence does not support the stated fact. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) (A "Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. Where ... the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

**Not Supported by Admissible Evidence.** Facts designated as "Not Supported by Admissible Evidence" are facts that are not supported by admissible evidence as required by Local Rule 56.1, and therefore are not properly before the Court. S.D.N.Y. Local Rule 56.1 (d) ("Each statement by the movant ... must be followed by citation to evidence that would be admissible[.]"); *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (statements in a Rule 56.1 statement "are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, ... or do not cite to supporting evidence").

**Improper Legal Argument.** Facts designated as an "Improper Legal Argument" are facts where the assertion therein constitutes improper attorney argument and/or is conclusory. These facts require no response. *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) (statements in a Rule 56.1 statement "are inappropriate if they are conclusory or argumentative[.]"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 369 (S.D.N.Y. 2025) (quoting *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022)) (the Court sets aside "[t]he portions of [a responding party's] 56.1 Statement that contain legal argument bereft of factual matter[.]").

**Incomplete.** Facts designated as "Incomplete" are facts where Plaintiffs have "introduce[d] all or part of a statement" and Microsoft introduces "any other part—or any other statement—that in fairness ought to be considered at the same time" pursuant to Federal Rule of Evidence 106.

This reply also uses the following abbreviations and citations for briefs, Rule 56.1 statements, and record materials filed in connection with the parties' cross-motions for summary judgment in the News Plaintiffs' case.

| Citation | Document |
|---|---|
| Blanco Opp. Decl. | Declaration of Allison Blanco in Support of Defendants' Joint Response to News Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts in Support of News Plaintiffs' Motion for Partial Summary Judgment |
| C. Tucker Corr. Decl. | Correction to Declaration of Catherine Tucker, Ph.D. In Support of Defendant Microsoft Corporation's Motion for Summary Judgment In News Plaintiffs' Consolidated Cases (*filed herewith*) |
| ECF 2050 | Defendants' Notice of Motion and Rule 702 Motion to Exclude Expert Testimony |
| ECF 2055 | Memorandum of Law in Support of Defendants' Rule 702 Motion to Exclude Expert Testimony |
| ECF 2067 | Plaintiffs' Memorandum of Law in Support of Joint *Daubert* Motion and Motion to Strike |
| ECF 2357 | Defendants' Memorandum of Law in Opposition to Plaintiffs' Joint *Daubert* Motion and Motion to Strike |
| Hurst Decl. | Declaration of Annette L. Hurst in Support of Defendant Microsoft's Motions for Summary Judgment<br><br>Declaration of Annette L. Hurst in Support of Defendant Microsoft's Reply in Support of Microsoft's Motions for Summary Judgment (*filed herewith*) |
| MSFT News MSJ Br. | Defendant Microsoft Corporation's Memorandum of Law in Support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases (ECF 1699) |

| Citation | Document |
|---|---|
| Malhotra Decl. | Declaration of Paven Malhotra in Support of Defendants' Opposition to Plaintiffs' Joint *Daubert* Motion and Motion to Strike |
| MSFT News SUMF ¶ | Defendant Microsoft Corporation's Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment in News Plaintiffs' Consolidated Cases (ECF 1702) |
| News Ex. | Exhibit filed with the Declaration of Davida Brook in Support of News Plaintiffs' Motion for Partial Summary Judgment<br><br>Exhibit filed with the Declaration of Davida Brook in Support of News Plaintiffs' Opposition to Defendants Microsoft's and OpenAI's Motions for Summary Judgment |
| NP Counter-SUMF ¶ | News Plaintiffs' Counterstatement of Material Facts in Opposition to Microsoft's Motion for Summary Judgment in News Plaintiffs' Consolidated Cases (ECF 2126) |
| Simpson Decl. | Declaration of Lisa T. Simpson in Support of Defendant Microsoft's Oppositions to the Books and News Plaintiffs' Motions for Partial Summary Judgment |

## COUNT I: COPYRIGHT INFRINGEMENT (17. U.S.C. § 501)

## I. COUNT I: COPYRIGHT INFRINGEMENT (17. U.S.C. § 501) – Training Claim

### A. Fair Use (17 U.S.C. § 107)

#### 1. *Purpose and Character of the Use (Factor 1)*

**Paragraph 1**

| |
|---|
| 1. **A large language model ("LLM") is a machine learning deep neural network trained on vast quantities of text with the objective of predicting the next token in a sequence in order to generate natural language.** Lafferty Decl. ¶¶ 16, 33, 77-78; *see also* Hurst Decl. **Ex. 75** (Melton Dep. Tr.) 29:6-30:19, 9:20-10:16, 11:16-17:7; **Ex. 112** (Song Dep. Tr.) 32:13-33:25, 9:8-10:21; **Ex. 54** (Huynh Dep. Tr.) 95:23-96:4, 7:11-8:18, 15:3-7, 15:25-16:25; **Ex. 81** (Nadella Dep. Tr.) 274:24-276:4, 277:3-23, 17:19-18:7, 25:16-22, 29:10-30:3; **Ex. 115** (Suleyman Dep. Tr.) 35:9-36:8; **Ex. 99** (Ribas Dep. Tr.) 22:2-25, 10:23-11:6, 11:23-12:3, 14:2-23, 17:9-18:10, 18:3-19:19. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 1**: **Undisputed** that a large language model ("LLM") is a machine learning deep neural network trained on text with the objective of predicting the next token. **Denied** in part because there is no requirement that an LLM be trained on "vast quantities" of text. The "Large" in "Large Language Model" refers to the large number of parameters (weights), not the size of the training data. Goldstein Opening Rep. ¶ 306. Also **denied** that all machine learning necessarily requires large amounts of data to train. Admissible evidence contradicts this statement. News Plaintiffs' expert Dr. Oren Etzioni opines on academic studies that demonstrate how certain smaller large language models trained on smaller amounts of curated data can outperform larger models trained on larger amounts of lower quality data. *See* Etzioni Opening Rep. ¶¶ 78-85. | **Microsoft's Reply:** Paragraph 1 is not genuinely disputed. News Plaintiffs do not dispute that "a large language model ('LLM') is a machine learning deep neural network trained on text with the objective of predicting the next token in a sequence." However, they seek to create a dispute of fact that (1) LLMs need not be trained on "vast" quantities of text, (2) not all machine learning necessarily requires large amounts of data, and (3) generating novel natural language is not an objective of next-token prediction. None of these purported disputes creates a genuine issue of material fact, because (1) the evidence cited by News Plaintiffs does not controvert the fact as stated, and (2) the response answers different propositions than stated in the fact.<br><br>*First*, Paragraph 1 describes how LLMs are trained; it does not set a minimum corpus size. Plaintiffs' own experts agree with the proposition stated in Paragraph 1, describing the |

| | |
|---|---|
| Further **denied** to the extent Microsoft contends that the object of next-token prediction is to generate novel natural language rather than to approximate the text on which the model was trained. OpenAI's former Chief Technology Officer Mira Murati rejected that framing as well, testifying that she did "not believe that these models were trained with th[e] specific goal" of generating text that appears human-generated. NP Ex. 506 (Murati Depo Tr.) at 105:2-13. | use of "enormous" and "vast" collections of text for pretraining. ECF 1819 (Goldstein Decl.) Ex. A (Goldstein Opening Rep.) ¶ 127; Hurst Decl. Ex. 400 (M. Mitchell Tr.) at 148:18-150:20 ("vast amounts of data enables LLMs to become experts at generating human-like language."): ECF 1858 (Wenger Decl.) Ex. A (Wenger Opening Rep.) at 10 ("A key feature of LLMs is that they are trained on vast amounts of language data, which researchers have found enables more efficient training for a variety of language tasks.").<br><br>Instead of controverting the stated fact, Plaintiffs instead seek to add an additional fact to create a dispute: that smaller models need less data than the GPT models at issue. A response that addresses a different proposition does not controvert the one stated. First, the papers Dr. Etzioni discusses are consistent with the stated fact: they discuss smaller models (many of which are designed to perform a specific task), and even those models used large amounts of pretraining data (e.g., 2.6 and 15-trilloin token data sets). ECF 1806(Etzioni Decl.) Ex. A. ¶¶ 82-83. Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions contained in the cited paragraphs of Dr. Etzioni's Opening Report. ECF 2055 at 25-28. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2).<br><br>*Second*, News Plaintiffs' dispute "to the extent Microsoft contends that the object of next-token prediction is to generate novel natural language" also answers a proposition Microsoft did not state. The word "novel" does not appear in Paragraph 1. Ms. Murati's testimony concerns whether the models were trained with the "specific goal" of producing text that appears human-generated. That is a |

| | |
|---|---|
| | different proposition, and it does not controvert the statement that LLMs predict the next token in order to generate natural language. Ms. Murati further testified [redacted]" Hurst Decl. Ex. 80 (M Murati Tr.) at 108:4-10. When asked [redacted][,]" she responded, [redacted]" *Id.* at 108:12-18. Microsoft's LLM expert agrees that "LLMs are deep learning systems designed to process and generate human language," LLMs are trained on "vast quantities of text, with the objective of predicting the next token in a sequence," and that "[t]hrough the pre-training process, the parameters of the neural network represent a vast amount of generalized information about the semantic structure, grammar, style, and other types of word co-occurrence patterns underlying the entirety of data it was trained on." ECF 1723 (Lafferty Decl.) ¶¶ 77-78. "[N]ext-token prediction provides a self-supervised learning signal that allows the model to learn grammar, syntax, factual associations, style, and other statistical regularities across the corpus." *Id.* ¶272. There is no dispute that training aims to predict the next token in a sequence, and natural-language generation is the result of that training. |

**Paragraph 2**

| 2. **Machine learning requires large amounts of data, and the more complex and varied the domain, the greater the volume and diversity of data needed for a model to learn patterns that generalize reliably to new inputs. Natural language is among the most complex of such domains.** Lafferty Decl. ¶¶ 16, 41, 45, 52, 66, 70, 77, 81, 90, 97, 99-100. | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 2</u>**: **Denied** to the extent Microsoft states that natural language is "among the most complex of such domains." Microsoft does not define the "domains" of which natural language is supposedly the most "complex," nor does Microsoft define "complex." As such, the statement is vague and undefined.<br><br>**Denied** that all machine learning necessarily requires large amounts of data to train. Admissible evidence contradicts this statement. News Plaintiffs' expert Dr. Oren Etzioni opines on academic studies that demonstrate how certain smaller large language models trained on smaller amounts of curated data can outperform larger models trained on larger amounts of lower quality data. *See* Etzioni Opening Rep. ¶¶ 78-85.<br><br>Also **denied** because the training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75. | **<u>Microsoft's Reply:</u>** **Undisputed** that the more varied a domain, the greater the volume and diversity of data a model needs; their response challenges only the role of "complexity." News Plaintiffs also do not dispute that "generalization occurs." To the extent News Plaintiffs purport to dispute Paragraph 2, such dispute is not genuine because the cited evidence does not specifically controvert the fact as stated.<br><br>*First*, News Plaintiffs in their response purport to dispute that natural language is "among the most complex of such domains" and that "the complexity of a domain" does not affect "the volume or diversity of data required to train a model." They cite no evidence to support either contention. Instead, News Plaintiffs rest solely on the objection that the fact is vague. News Plaintiffs' vagueness objection is improper legal argument; they identify no ambiguity that prevents a response.<br><br>*Second*, News Plaintiffs again argue that not "all machine learning necessarily requires large amounts of data." This argument fails to create a genuine issue of material fact for the same reasons as stated in reply to the same argument in Microsoft's Reply to News Plaintiffs' response to Paragraph 1, including that Defendants' pending Rule 702 motion seeks to exclude the opinions contained in the cited paragraphs of Dr. Etzioni's Opening Report regarding these |

| | |
|---|---|
| | smaller models. ECF 2055 at 25-28. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2).<br><br>*Third*, Plaintiffs' last argument that training means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible does not contradict the fact as stated: that models learn patterns from the training data that allows them to generalize to new inputs. News Plaintiffs' expert agrees: "In machine learning (including in LLMs), a model learns from training instances (for LLMs, sequences of text in the training data) to perform a particular task, such as to predict the next token in an input text sequence. In this context, generalization refers to the ability to perform well on *this same task* with *similar inputs* that were not in the training data (for LLMs, predicting the next token in new text sequences)." ECF 2161 (Mitchell Decl.) Ex. 2 (Mitchell Rebuttal Rep.) ¶ 21. She agrees with both OpenAI's VP of Research Nick Ryder and Dr. Callison-Burch on this point, who she quotes as stating that the goal of pretraining is to generalize such that the model can apply learned patterns to new, unseen inputs. *Id.* ¶¶ 21-22 (citing N. Ryder 30(b)(6) Dep. Tr. 51:8-13 & Callison-Burch Opening Report, ¶ 270). As such, there is not a genuine dispute of fact. |

**Paragraph 3**

| |
|---|
| **3. LLMs are a general-purpose technology capable of a wide variety of natural language processing tasks, such as summarization, translation, reasoning, content generation, and question answering.** Lafferty Decl. ¶¶ 16, 33, 36, 45, 77-78; *see also* Hurst Decl. **Ex. 112** (Song Dep. Tr.) 32:13-33:25; **Ex. 54** (Huynh Dep. Tr.) 95:23-96:4, 7:11-8:18, 15:3-7, 15:25-16:25, 17:14-22; **Ex. 81** (Nadella Dep. Tr.) 274:24-276:4, 277:3-23; **Ex. 115** (Suleyman Dep. Tr.) 35:9-36:8; **Ex. 99** (Ribas Dep. Tr.) 18:3-19:19, 22:2-25; **Ex. 119** (Templeton 30(b)(6) Dep. Tr. |

(Vol. 2, dated Jan. 21, 2026)) 407:24-408:9; **Ex. 118** (Templeton 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 20, 2026)) 13:14-16, 14:14-20, 15:2-12, 16:18-19:10, 22:1-14, 22:25-23:15, 24:2-25:25, 26:14-27:16, 221:6-222:20.

| News Plaintiffs' Response | Microsoft's Reply |
| --- | --- |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 3</u>: Undisputed** that LLMs are capable of natural language processing tasks, such as summarization, translation, content generation, and question answering. **Denied** that LLMs are capable of reasoning.<br><br>Admissible evidence contradicts Microsoft's statement that LLMs are capable of reasoning. LLMs are statistical prediction machines that merely mimic human reasoning. Wenger Rebuttal Rep. at 17 ("LLMs are machines designed to predict what a human would likely say in a given context and nondeterministically mimic that expression"); Mitchell Opening Rep. ¶ 26 ("the LLM is trained to develop a statistical model of language—a representation of how collections of words tend to be associated with other collections of words").<br><br>**Denied** to the extent Microsoft invokes the phrase "general-purpose technology" in a misleading way, as an undisputed economic definition rather than a description of technology. McDonald Rebuttal Rep. at 47 (describing the General Purpose Technology Framework is drawn from the economics of growth and innovation literature and is used to explain patterns of aggregate productivity growth but is not meant to be used as an analytical framework for evaluating effects on markets or industries).<br><br>**Denied** also to the extent that Microsoft intends to imply that Defendants' LLMs were not trained for specific purposes. Admissible evidence contradicts this. *See, e.g.*, Etzioni Opening Rep. ¶ 155 (opining based on OpenAI | **<u>Microsoft's Reply:</u> Undisputed** "that LLMs are capable of natural language processing tasks, such as summarization, translation, content generation, and question answering," and News Plaintiffs concede in their response that "LLMs are machines designed to predict what a human would likely say in a given context and nondeterministically mimic that expression" and that LLMs are "trained to develop a statistical model of language—a representation of how collections of words tend to be associated with other collections of words."<br><br>However, Plaintiffs seek to create a dispute of fact that LLMs are not capable of *human* "reasoning." Paragraph 3 does not say "human" reasoning nor does it anthropomorphize the general-purpose nature of the LLM technology or imply human psychology. Reasoning in this sense is simply an objective empirical description of a natural language processing function that LLMs can perform by engaging in multiple steps in a chain of inferences to obtain a result. As such, News Plaintiffs do not specifically controvert the fact as stated.<br><br>Plaintiffs also dispute Microsoft's use of the phrase "general-purpose technology" to the extent the phrase is used to mean "an undisputed economic definition rather than a description of technology." Paragraph 3 uses the phrase descriptively, as the rest of the sentence makes clear: LLMs are "capable of a wide variety of natural language processing tasks." In order to manufacture a dispute, Plaintiffs cite the McDonald Rebuttal Report which uses "general-purpose technology" in relation to an economic |

| | |
|---|---|
| testimony that OpenAI focused its mid-training on training on "fresh" data in order to improve the LLM's ability to output fresh news content); NP Ex. 639 [Koch 30(b)(6) Depo. Tr.] at 33:22-34:23 (testifying that OpenAI's mid-training team had a goal to use news data during mid-training to improve freshness). | framework used "to explain patterns of aggregate productivity growth." McDonald Rebuttal Rep. at 47. This does not dispute that LLMs can perform a wide variety of tasks and therefore does not specifically controvert the fact as stated. Microsoft uses the phrase in the technical sense to describe a technology that can be used for a wide variety of tasks. *See* ECF 1723 (Lafferty Decl.) ¶ 16. As such, News Plaintiffs do not specifically controvert the fact as stated.<br><br>Plaintiffs also dispute this paragraph to the extent that Microsoft intends to imply that Defendants' LLMs were not trained for specific purposes. The fact says nothing about training models for specific purposes or mid-training. As such, Plaintiffs do not specifically controvert the fact as stated.<br><br>Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions contained in the cited paragraph of the McDonald Rebuttal Report. ECF 2055 at 41-42. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2). |

**Paragraph 4**

| |
|---|
| **4. The process of training an LLM involves:** |
| **a. Acquiring a large volume of text to assemble a training corpus—typically by crawling and scraping publicly accessible data on the internet in a manner that has existed before LLMs were invented;** Lafferty Decl. ¶¶ 69, 79, 89-91, 100; Tucker Decl. ¶ 13(d), 167-173; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 32:5-33:14, 48:20-24, 66:23-67:10, 95:10-23); **Ex. 130** (Yuan Dep. Tr.) 12:11-14:13, 28:6-12, 8:6-25, 10:9-23. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 4(a)**: The umbrella clause is **denied** to the extent that "training" refers to anything other than pretraining a large language model. The umbrella clause is also **denied** to the extent it suggests the ensuing sub-paragraphs contain a complete description of the entire model training process. For example, training a model often involves other techniques, such as reinforcement learning with human feedback. Wenger Opening Rep. at 23. In addition, pretraining involves other steps not referenced in this statement. For example, after scraping but before tokenization, various steps are performed, such as deduplication, filtering, and text extraction. NP Ex. 748 [OpenAI's Responses to Daily News Plaintiffs' Fifth Set of Interrogatories], No. 17 (describing use of HTML-to-text extractors, "newspaper" and "dragnet" extractors, use of OpenAI-developed text extractor called "gutentag"); NP Ex. 752 [OpenAI's Supplemental Response to Ziff Davis Interrogatory No. 20 (Feb. 27, 2026)] at 14 (same & describing the first step in OpenAI's processing pipeline as text extraction); NP. Ex. 756 [OpenAI's Supplemental Response to Intercept Interrogatory No. 3 (Dec. 31, 2025)] at 6 (same & describing the first step in OpenAI's processing pipeline as text extraction); NP Ex. 748 [OpenAI's Responses to Daily News Plaintiffs' Fifth Set of Interrogatories], No. 17 (OpenAI filtered Common Crawl data to remove material); NP Ex. 752 [OpenAI's Supplemental Response to Ziff Davis Interrogatory No. 20 (Feb. 27, 2026)] at 15 (same); NP. Ex. 756 [OpenAI's Supplemental Response to Intercept Interrogatory No. 3 (Dec. 31, 2025)] at 6 (same).<br><br>Subparagraph (a) is **denied** to the extent it states that Defendants crawled and scraped News Plaintiffs' and other | **Microsoft's Reply:** **Undisputed** that the process of training an LLM involves the steps set out in Paragraphs 4(a)–(e) and that training an LLM involves "[a]cquiring a large volume of text to assemble a training corpus.<br><br>News Plaintiffs' response goes beyond the scope of Paragraph 4, which states only that the training process "involves" the listed steps. Paragraph 4 does not purport to "contain a complete description of the entire model training process." That Paragraph 4 does not detail every step of every stage of what could be considered "training" does not create a genuine issue of material fact. As such, News Plaintiffs do not specifically controvert the fact as stated.<br><br>Plaintiffs instead improperly seek to include a litany of additional immaterial facts about text extraction that do not controvert the fact as stated.<br><br>Further, the portion of the response regarding whether there was a "preexisting practice that permitted scraping and crawling of content that would then be used to compete against the creators or owners of that content, or in violation of a website's terms of use" is improper legal argument about authorization, not a factual dispute about how training corpora are assembled. None of the cited evidence controverts Paragraph 4(a) as stated. News Plaintiffs instead seek to add additional facts about paywalls to create a dispute. That does not make this fact disputed.<br><br>News Plaintiffs' argument that LLMs can be trained without using "vast quantities of text" fails to create a genuine issue of material fact for the same reasons as stated in Microsoft's Reply to the same argument in News Plaintiffs' response to Paragraph 1, including that Defendants' pending Rule 702 |

| | |
|---|---|
| owners' content from the internet for training in a manner consistent with preexisting practice. Admissible evidence contradicts Microsoft's statement. There was no preexisting practice that permitted the scraping and crawling of content that would then be used to compete against the creators or owners of that content, or in violation of a website's terms of use. Wenger Rebuttal Rep.at 19-21. Moreover, much of News Plaintiffs' content is not "publicly accessible" because it is protected by a paywall or registration wall; to the extent Defendants were able to access it, they did so using improper means. *See, e.g.*, NP Ex. 371 [Yang 30(b)(6) Depo. Tr.] at 168:17-20 (testifying that The Times launched the paywall on its website in March 2011); NP Ex. 411 [NYT_01014327] at 28, 31 (indicating that The Times's metered paywall was at 5 free articles in July 2020); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 237:12-19, 239:5-19 (describing *Daily News* Plaintiffs' paywall meters).<br><br>Further **denied** because the training corpus for an LLM can and does include sources other than web data obtained from crawling; for example, one can license content from humans or hire humans to write the content needed for pretraining data. *See* Wenger Rebuttal Rep. at 14-15.<br><br>Further **denied** because LLMs can be trained without using vast quantities of text. *See* Etzioni Opening Rep. ¶¶ 78-85. | motion seeks to exclude the opinions contained in the cited paragraphs of Dr. Etzioni's Opening Report. ECF 2055 at 25-28. To the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2). Further, none of the cited evidence contradicts the fact that crawling is a typical means of acquiring training data. |
| **b. Processing the textual data into a numerical format that can be used by a neural network—*i.e.*, tokenization, whereby readable text is broken into unique "tokens" comprised of short words, segments of longer words, or groupings of characters, and then integers are assigned to each token;** Lafferty Decl. ¶¶ 105-114; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 19:12-20:18, 176:22-177:23; **Ex. 117** (Sutskever Dep. Tr.) 141:8-142:2, 19:15-19, 21:12- | |

| | |
|---|---|
| 22:7, 26:17-29:8; **Ex. 117.A** (Sutskever Dep. Ex. 12 - Language Models Are Few-Shot Learners GPT-3 Research Paper) 8-11. | |
| **News Plaintiffs' Response to Microsoft Paragraph 4(b): Undisputed** that **Defendants** convert language data into tokens. **Disputed** to the extent Microsoft contends that tokenization transforms the underlying expression into something other than the text itself. In his deposition, OpenAI's CEO Sam Altman stated that "the standard byte pair encoding tokenization methods we have used … are reversible." NP Ex. 607 (Altman 30(b)(1) Depo Tr.) at 116:11-13. | **Microsoft's Reply: Undisputed** except to the extent News Plaintiffs' response implies that Microsoft and not OpenAI tokenize training GPT training data.<br><br>To the extent News Plaintiffs purport to dispute Paragraph 4(b), their response relies on improper legal argument and fails to specifically controvert the fact as stated. Whether tokenization "transforms the underlying expression into something other than the text" is improper legal argument directed to the conclusion of the first factor transformative use inquiry, and does not dispute the technical process of tokenization that Paragraph 4(b) describes as a necessary step of translating human language into machine readable data.<br><br>News Plaintiffs' quotation of Mr. Altman also does not controvert the stated fact because reversibility of a token-to-integer mapping is consistent with Paragraph 4(b), which states that integers are assigned to each token. |
| c. **Embedding the tokens in high-dimensional, mathematical space, where tokens are represented by numerical vectors that point toward and away from each other based on relationships among the tokens gleaned from numerous contexts across the entirety of the training corpus**; Lafferty Decl. ¶¶ 33, 115-123; *see also* Hurst Decl. **Ex. 117** (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 53:3-17, 67:9-15, 141:8-142:2; **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 50:10-19. | |
| **News Plaintiffs' Response to Microsoft Paragraph 4(c): Undisputed** that tokens are represented by numerical vectors reflecting relationships among tokens. **Disputed** to the extent Microsoft contends that those | **Microsoft's Reply:** Paragraph 4(c) is not genuinely disputed. **Undisputed** that tokens are embedded in high-dimensional, mathematical space, where they are represented by numerical vectors that point toward and |

| | |
|---|---|
| relationships are properties of the training corpus in the aggregate rather than of the individual works within it, for the reasons set forth in response to Microsoft's Paragraph 11. | away from each other based on relationships among the tokens.<br><br>News Plaintiffs assert that those relationships are due to properties of individual works instead of the training corpus in the aggregate. This assertion does not create a genuine factual dispute because it responds to a different proposition than the one stated in the fact and because it is unsupported by the cited cross-reference. Specifically, News Plaintiffs reference their response to Microsoft's Paragraph 11, in which they dispute that removing a category of works from the training corpus would not materially alter the statistical structures the model encodes with respect to that category. That argument, and the cited argument does not controvert the fact stated in Paragraph 4(c). Further, News Plaintiffs' expert Melanie Mitchell agrees that during embedding, the model "captures useful semantic distances between tokens . . . . learned by the LLM from its training data." and that "[t]hese embeddings placing tokens in an ultra-high-dimensional semantic space, can capture many nuances of meaning of the tokens in the LLM's vocabulary." ECF 2161 (Mitchell Decl.) Ex. 1 (Mitchell Opening Rep.) ¶¶ 44-45. Additionally, Ms. Mitchell explained that the "'meanings' captured by embeddings are based on complex statistics, gleaned from the LLM's training data, of how words tend to occur in the context of other words." *Id.* ¶ 46. This describes corpus-level statistics, not features of individual works. |
| **d. Processing those vectors through transformer layers and repeatedly making small adjustments to the model "parameters," a set of numerical model weights that the model uses to predict the next token in a sequence of text, shape the model's weights.** Lafferty Decl.¶¶ 137-147; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 18:16-19:4, 176:24-177:23; **Ex. 101** (Rossett Dep. Tr.) 67:25-68:9, 8:1-9, 8:24-9:9, 17:6-18:4, 18:22-23:2; | |

| | |
|---|---|
| **Ex. 117** (Sutskever Dep. Tr.) 141:8-142:2; **Ex. 117.A** (Sutskever Dep. Ex. 12 - Language Models Are Few-Shot Learners GPT-3 Research Paper) 2-8. | |
| **News Plaintiffs' Response to Microsoft Paragraph 4(d): Undisputed** that the models at issue in this case encode numerical values in a network of parameters or weights. **Disputed** to the extent Microsoft suggests that "[p]rocessing those vectors through transformer layers" transforms the underlying expression into something other than the text itself, for the reasons set forth in response to Microsoft's Paragraph No. 4(b). | **Microsoft's Reply:** Paragraph 4(d) is not genuinely disputed. **Undisputed** that the models at issue in this case encode numerical values in a network of parameters or weights the model uses to predict the next token in a sequence of text or that the processing of vectors through transformer layers repeatedly causes small adjustments to the model's parameters.<br><br>To the extent Plaintiffs purport to dispute Paragraph 4(d), their response relies on improper legal argument, fails to specifically controvert the fact as stated, and is not supported by admissible evidence.<br><br>First, whether "'[p]rocessing those vectors through transformer layers' transforms the underlying expression into something other than the text itself," which News Plaintiffs state in their response, is improper legal argument directed to the conclusion of the first factor transformative use inquiry, and does not dispute the technical process of vectorization that Paragraph 4(d) describes.<br><br>Second, News Plaintiffs' experts admit that processing vectors / embedded tokens through transformer layers "modif[ies] the embeddings of the input tokens so that the tokens' placement in semantic space reflects the meaning of the entire sequence of input text." ECF 2161 (Mitchell Decl.) Ex. 1 (Mitchell Opening Rep.) ¶ 48. ."Those modified embeddings are then input to the feedforward layer, whose output consists of embeddings that have been further modified." *Id.* ¶ 49. "The final output layer transforms the final set of modified embeddings into a set of probabilities |

| | |
|---|---|
| | over all tokens in the LLM's vocabulary. These probabilities represent the likelihood of each possible token being the next token in the sequence." *Id.* ¶ 56.<br><br>Further, this paragraph is not genuinely disputed because the only evidence cited by News Plaintiffs does not controvert the fact. News Plaintiffs refer back to their response to Microsoft's Paragraph No. 4(b), which in turn cites one piece of evidence stating that tokenized text can be de-tokenized back to its original form. That statement does not controvert the fact as stated as it says nothing about the ability to detokenize text back to its original form once it has been embedded in the model's parameters and weights. While it may be possible to take a piece of text, run it through a tokenization program to create a tokenized version of the text, and then run the tokenized version back through the tokenization program in reverse to reconstruct the original text, once the tokenized text is fed to the LLM it passes through many transformer layers that deconstruct, disaggregate, and transmute the tokenized text such that the original piece of text no longer exists in its original form, and is no longer recoverable. *See generally* ECF 1723 (Lafferty Decl.) ¶¶ 106-108.<br><br>Microsoft further incorporates its Reply to News Plaintiffs' Response to Paragraph 4(c). |

e. **Periodically during training, the model will be presented with data it has not seen during training in order to measure the model's generalization ability. Training continues as long as the model's performance on the unseen data continues to improve**. Once the model begins to perform well on training data but begins to lose accuracy on testing data, the training stops. Lafferty Decl. ¶ 71.

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 4(e): Denied** insofar as the statement asserts that the objective of LLM training is generalization. Admissible evidence contradicts that assertion. The training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75; Mitchell Reply Rep. ¶ 21; NP Ex. 621 [Ryder 30(b)(6) Depo. Tr.] at 175:06-176:10 (OpenAI 30(b)(6) witness on LLM training topics: "For all of the models we are talking about, they were trained with next-token prediction loss."). Generalization can be a hoped-for outcome of model training, but it is not the training objective. Mitchell Reply Rep. ¶ 21.<br><br>**Denied** also as to the third sentence in the statement. Admissible evidence contradicts that sentence. The training does not "stop[]", as Microsoft contends above; there are additional phases of LLM training including mid-training and post-training. Mitchell Opening Rep. ¶¶ 90-99. For example, mid-training takes a base model and trains it further on domain-specific data, including news articles. *Id.* OpenAI specifically targeted "current events / news articles (NYT data, etc.)" as priority for mid-training, meaning OpenAI used mid-training to improve its LLMs' ability to produce news content. NP Ex. 759 [OPCO_MDL_004740422] at -422; *see also* NP Ex. 761 [OPCO_MDL_000481870] (members of OpenAI's mid-training team stating a goal was to "crush freshness in the domain of real-world news" with "~95% accuracy on current events"). | **Microsoft's Reply:** Paragraph 4(e) is not genuinely disputed. **Undisputed** that, during training, the model will be presented with data it has not seen during training in order to measure the model's generalization ability.<br><br>News Plaintiffs' response instead seeks to add additional facts and make legal arguments to negate this general proposition regarding LLM training. That does not make this fact disputed as stated. Plaintiffs' characterization of generalization as a "hoped-for outcome" is improper argument.<br><br>*Further*, News Plaintiffs' cited evidence does not controvert the fact as stated. The 30(b)(6) testimony News Plaintiffs cite explains that [redacted]" News Ex. 621 (N. Ryder 30(b)(6) Tr.) at 175:18-21. The testimony that the models "were trained with next-token prediction loss," *id.* at 175:22-176:1, is consistent with Paragraph 4(e).<br><br>News Plaintiffs' dispute regarding when training stops, and the cited exhibits regarding mid-training do not create a dispute of material fact as they describe later adjustments to an already-pretrained base model. |

**Paragraph 5**

| |
|---|
| **5. Training an LLM requires an enormous volume of text. Publicly disclosed training-set sizes for frontier models rose from approximately 2 trillion tokens in 2023 to approximately 18 trillion tokens by late 2024.** Lafferty Decl. ¶¶ 91-92; Hurst Decl. **Ex. 215** (OPCO_MDL_004424223) at -226; **Ex. 197** (MSFT_AI_MDL_000221039) at -042. |

| | |
|---|---|
| <u>**News Plaintiffs' Response to Microsoft Paragraph 5**</u>: **Denied.** Admissible evidence contradicts the statement. For example, smaller LLMs typically do not require trillions of tokens. NP Ex. 1345 [S. Biderman et al., Pythia: A Suite for Analyzing Large Language Models Across Training and Scaling, *Proceedings of the 40th International Conference on Machine Learning*, 2023] (describing Pythia-12B, an LLM that was trained on 300 billion tokens). | <u>**Microsoft's Reply:**</u> Paragraph 5 is not genuinely disputed. **Undisputed** that "[p]ublicly disclosed training-set sizes for frontier models rose from approximately 2 trillion tokens in 2023 to approximately 18 trillion tokens by late 2024."<br><br>Plaintiffs attempt to create a dispute that training a smaller LLM does not require "an enormous volume of text." For the reasons stated in Reply to News Plaintiffs' Response to Paragraph 1, there is no genuine dispute that frontier LLMs, like those at issue in this case, require an "enormous" volume of training data. Adding an additional fact about irrelevant "[s]maller LLMs" that are not the frontier models Paragraph 5 addresses does not make this fact disputed.<br><br>Neither do News Plaintiffs cite admissible contradictory evidence. News Plaintiffs' single piece of cited evidence is inadmissible. Specifically, News Exhibit 1345 is hearsay and lacks foundation because it is a non-party publication offered for the truth of its contents, unaccompanied by any authenticating testimony or sponsoring expert to establish its reliability, and therefore may not be considered in support of summary judgment. Because the response rests entirely on inadmissible evidence, it does not comply with Local Civil Rule 56.1(d) and should be disregarded. Even if News Exhibit 1345 were admissible, it is irrelevant to the stated fact because it does not discuss frontier models. |

| | |
|---|---|
| | Instead, it concerns small models ranging from 70M to 12B parameters, in contrast to the GPT models at issue, such as the 175B-parameter GPT-3 model. Evidence about smaller research-grade models does not contradict the stated fact about frontier-model training-set sizes and, therefore, has no bearing. |

**Paragraph 6**

| | |
|---|---|
| 6. **The GPT models at issue were pre-trained on corpora of this scale: GPT 3 on approximately 300 billion tokens; GPT-4 and GPT-3.5 Turbo on approximately** [redacted] **tokens (epoch weighted); and GPT-4o on approximately** [redacted] **tokens (epoch weighted).** Lafferty Decl. ¶¶ 91-92, 94-97; Hurst Decl. **Ex. 196** (MSFT_AI_MDL_000205724); **Ex. 215** (OPCO_MDL_004424223) at -226; **Ex. 197** (MSFT_AI_MDL_000221039) at -042; **Ex. 96** (Radford Dep. Tr.) 20:25-23:3; **Ex. 227** (Paino Decl.). | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 6</u>**: **Undisputed** that it is reported that the GPT models at issue were pre-trained on corpora of this scale. **Disputed** to the extent Defendants contend that those tokens represent 300 billion distinct tokens of data. In the paper titled "Language Models are Few-Shot Learners," OpenAI explained that "during training, datasets are not sampled in proportion to their size, but rather datasets we view as higher-quality are sampled more frequently." NP Ex. 1359 [Radford Dep. Ex. 32] at 8. | **<u>Microsoft's Reply:</u>** Paragraph 6 is not genuinely disputed. **Undisputed** "that the GPT models at issue were pre-trained on corpora of this scale" or that the number of tokens (epoch weighted) cited were in the pre-training datasets for each of the named models.<br><br>However, News Plaintiffs seek to create a dispute of fact that the figures in Paragraph 6 do not "represent distinct tokens of data." But Paragraph 6 does not assert that the figures represent distinct tokens; for GPT-4, GPT-3.5 Turbo, and GPT-4o, it expressly states that the figures are "epoch weighted." Plaintiffs' evidence confirms that GPT-3 was trained "for 300 billion tokens," with some datasets seen more than once, News Ex. 1359.1 (Radford Dep. Ex. 32) at 8, which is consistent with Paragraph 6. |

**Paragraph 7**

| |
|---|
| 7. **Training an LLM also requires a wide diversity of text. Model developers draw training data from a broad range of sources, including web data, software code, books, encyclopedic and scientific sources, forum posts, and transcripts.** Lafferty Decl. ¶¶ 34, 89-91, 93-97; Hurst Decl. **Ex. 117** (Sutskever Dep. Tr.) 26:16-21, 27:4-15, 28:5-29:15, 33:17-34:9, 67:9-15, 255:12-18; **Ex. 196** (MSFT_AI_MDL_000205724); **Ex. 215** (OPCO_MDL_004424223) -226; **Ex. 197** (MSFT_AI_MDL_000221039) -042; **Ex. 198** (MSFT_AI_MDL_000221643); **Ex. 213** (OPCO_MDL_001938121). |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 7**: **Denied** that training all LLMs requires a wide diversity of text in all circumstances. Admissible evidence contradicts this statement. News Plaintiffs' expert Dr. Oren Etzioni opines on academic studies that demonstrate how certain smaller large language models trained on smaller amounts of curated data can outperform larger models trained on larger amounts of lower quality data. *See* Etzioni Opening Rep. ¶¶ 78-85. | **Microsoft's Reply:** Paragraph 7 is not genuinely disputed. **Undisputed** "that [t]raining an LLM also requires a wide diversity of text" or that "[m]odel developers draw training data from a broad range of sources, including web data, software code, books, encyclopedic and scientific sources, forum posts, and transcripts."<br><br>However, Plaintiffs seek to create a dispute of fact that training an LLM does not require "a wide diversity of text" "in all circumstances." That purported dispute does not create a genuine issue of material fact because it fails to specifically controvert the fact as stated. Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions contained in the cited paragraphs of Dr. Etzioni's Opening Report cited by Plaintiffs regarding smaller models. ECF 2055 at 25-28. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2). |

**Paragraph 8**

| |
|---|
| 8. **The internet is the only practicable source of text at a scale sufficiently voluminous and varied to train a general-purpose LLM.** Lafferty Decl. ¶¶ 45, 90-91; Usdan Decl. ¶ 10; *see also* Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) |

80:3-81:23; **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 48:20-24, 67:2-6; **Ex. 117** (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 33:17-34:9, 67:9-15, 255:12-18; **Ex. 130** (Yuan Dep. Tr.) 28:6-25, 12:11-14:13.

| News Plaintiffs' Response | Microsoft's Reply |
| --- | --- |
| **News Plaintiffs' Response to Microsoft Paragraph 8: Denied.**<br><br>Admissible evidence contradicts Microsoft's statement. Microsoft's statement wrongly presupposes a strict dichotomy between the internet and other non-internet sources. In reality, model developers can use both internet and non-internet sources and thus reduce reliance on the internet. For instance, they can hire humans to write training data or acquire large volumes of books through licensing deals. They can also use any books that are in the public domain. In addition, Microsoft's statement elides relevant distinctions among internet sources. For example, model developers can rely on internet sources in the public domain or those they have licensed from consenting parties. Wenger Rebuttal Rep. at 12-14; Etzioni Rebuttal Rep. ¶ 259 ("[C]apable models can be built on alternative data sources (e.g., licensed content, public-domain content, and content obtained with consent) combined with careful curation."). | **Microsoft's Reply:** Paragraph 8 is not genuinely disputed. **Undisputed** that model developers must use internet sources to train LLMs; their response asserts only that developers "can use both internet and non-internet sources and thus reduce reliance on the internet."<br><br>News Plaintiffs seek to create a dispute of fact that non-internet sources are a practicable alternative to the internet for text at the scale and variety needed to train a general-purpose LLM, but News Plaintiffs fail to cite any evidence of a general-purpose LLM trained without internet data. Further, News Plaintiffs' experts Dr. Wenger's and Dr. Etzioni's statements regarding the use of public domain works or licensed content that News Plaintiffs cite in their response does not refute that a training corpus of the necessary scale can practicably be assembled without the internet. |

**Paragraph 9**

9. **LLM training requires an enormous volume and a wide diversity of textual data because the fundamental objective of training is generalization—producing a model capable of responding to new, previously unseen inputs across an effectively unlimited range of contexts and tasks.** Lafferty Decl. ¶¶ 16, 17, 34, 90-91, 98, 154-156.

| News Plaintiffs' Response | Microsoft's Reply |
| --- | --- |
| **News Plaintiffs' Response to Microsoft Paragraph 9: Denied.** | **Microsoft's Reply:** Paragraph 9 is not genuinely disputed. **Undisputed** that LLMs require a wide diversity |

| | |
|---|---|
| Admissible evidence contradicts Microsoft's statement. The training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75; Mitchell Reply Rep. ¶ 21; NP Ex. 621 [Ryder 30(b)(6) Depo. Tr.] at 175:06-176:10 (OpenAI 30(b)(6) witness on LLM training topics: "For all of the models we are talking about, they were trained with next-token prediction loss."). Generalization can be a hoped-for outcome of model training, but it is not the training objective. Mitchell Reply Rep. ¶ 21. Moreover, admissible evidence proves that Defendants trained the at-issue LLMs not for an "unlimited range of contexts and tasks", but rather to become capable of producing news-like outputs and providing news content to users. NP Ex. 1021 [OPCO_MDL_001837980] at slide 31 (In a presentation dated October 2020, Anthropic's Dario Amodei – who was then a top researcher at OpenAI – listed "News Generation" as one of GPT-3's "Skills"); NP Ex. 745 [OPCO_MDL_000220773] at -783-784 (OpenAI's President Greg Brockman stating: "we are excellent at news btw. every time i do any generative stuff on NYT it seems to predict the next sentence pretty well. so i kinda have a mental model of davinci as very good at any news task."); NP Ex. 855 [MSFT_AI_MDL_000047584] at -588 (Microsoft's Chief Technology Officer Kevin Scott writing in August 2022: [redacted]).<br><br>Further denied because LLMs can be trained without using enormous quantities of text. *See* Etzioni Opening Rep. ¶¶ 78-85. | of textual data or that LLMs are capable of responding to new, previously unseen inputs across an effectively unlimited range of contexts or tasks.<br><br>What's left of News Plaintiffs' response adds additional facts that do not controvert the stated fact. For example, News Plaintiffs' discussion of next-token prediction does not specifically controvert the fact as stated. While next-token prediction is a loss function used in training, that technical "objective" does not compete with the "fundamental objective" of generalization and is in fact the technical mechanism through which model parameters are updated and statistical relationships between tokens are embedded in the model, which allow the model to respond to new, previously unseen inputs. Dr. Lafferty opines that "next-token prediction provides a self-supervised learning signal that allows the model to learn grammar, syntax, factual associations, style, and other statistical regularities across the corpus. The purpose of training an LLM is to learn patterns that generalize beyond the text examples shown during training. Through training on large and diverse collections of text, an LLM learns statistical relationships that can be applied to new prompts and contexts." ECF 1723 (Lafferty Decl.) ¶ 272. And "[l]ikewise, in language modeling, the goal is not to always perfectly predict the next word or token in the training data, but to accurately model the probability of the next word in new, previously unseen contexts." *Id.* ¶ 276. Dr. Mitchell agrees that there are two meanings to "objective of training," one being "what the LLM designers hope will result from training[,]" *i.e.*, generalization, and the other being "[i]n the technical sense, . . . to minimize the loss function, namely, to achieve high accuracy at next-token prediction." ECF 2161 (Mitchell Decl.) Ex. 2 (Mitchell Rebuttal Rep.) ¶ 36. |

| | |
|---|---|
| | Likewise, News Plaintiffs' assertions that "to the extent LLMs generalize at all they do so by encoding the expression contained in their training data" and that generalization is merely "hoped-for" are improper legal argument.<br><br>News Plaintiffs again attempt to create a dispute that LLM training does not require an enormous volume of text. For the reasons stated in Reply to News Plaintiffs' response to Paragraph 1, there is no genuine dispute that LLMs of the scale of those at issue in this case, require a "large," "enormous," or "vast" quantity of varied training data. Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions contained in the cited paragraphs of Dr. Etzioni's Opening Report. ECF 2055 at 25-28. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2). |

**Paragraph 10**

| | |
|---|---|
| **10. The capacity to generalize is an emergent property of learning across the complete distribution of the training data. No individual work is responsible for conferring that capability.** Lafferty Decl. ¶¶ 16, 33-34, 45, 66, 80-81, 99, 145-146; *see also* Hurst Decl. **Ex. 81** (Nadella Dep. Tr.) 90:9-23, 274:12-275:12. | |
| **News Plaintiffs' Response to Microsoft Paragraph 10**: **Denied** insofar as the statement asserts that generalization is the objective of model training. Admissible evidence contradicts that statement. The training objective for LLMs is next-token prediction, which means adjusting the parameters of the LLM so that its outputs match the training data as closely as possible. Mitchell Opening Rep. ¶ 75; Mitchell Reply Rep. ¶ 21; NP Ex. 621 [Ryder 30(b)(6) | **Microsoft's Reply: Undisputed** "that no single work, standing alone, is responsible for a model's capacity to generate text."<br><br>Plaintiffs again seek to create a dispute as to whether the goal of model training is generalization. For the reasons stated in Microsoft's Reply to News Plaintiffs' response to Paragraph 9, Plaintiffs fail to create a genuine factual |

| | |
|---|---|
| Depo. Tr.] at 175:06-176:10 (OpenAI 30(b)(6) witness on LLM training topics: "For all of the models we are talking about, they were trained with next-token prediction loss."). Generalization can be a hoped-for outcome of model training, but it is not the training objective. Mitchell Reply Rep. ¶ 21. Undisputed that no individual work in the training corpus is responsible for achieving next-token prediction. | dispute. Further, the 30(b)(6) testimony News Plaintiffs cite explains that [redacted]" News Ex. 621 (N. Ryder 30(b)(6) Tr.) at 175:18-21. The testimony that the models "were trained with next-token prediction loss," *id.* at 175:22-176:1, is consistent with Paragraph 10.<br><br>*Second*, Plaintiffs' characterization of generalization as a "hoped-for outcome" is improper argument. rather than evidence. |

**Paragraph 11**

| | |
|---|---|
| 11. **Because the statistical patterns a model learns are distributed redundantly across millions of sources spanning trillions of tokens, the removal of any single work or collection of works from the training corpus would not materially alter the statistical structure the model learns.** Lafferty Decl. ¶ 33-34, 99, 322. | |
| **News Plaintiffs' Response to Microsoft Paragraph 11: Denied** to the extent Microsoft states that removing a category of works from the training corpus would not materially alter the statistical structures the model encodes with respect to that category.<br><br>Admissible evidence contradicts Microsoft's statement. Including news content in a model increases the model's ability to produce news-style outputs. Thus, removing the category of "news content" will materially reduce the model's ability to produce news-style outputs. Wenger Rebuttal Rep. at 16-17 ("[A] pretrained model lacking | **Microsoft's Reply: Undisputed** that the statistical patterns a model learns are distributed redundantly across millions of sources spanning trillions of tokens. Nor do News Plaintiffs dispute that the removal of any single work from the training corpus would not materially alter the statistical structures the model learns; they limit their dispute to the removal of "a category of works" and its hypothetical effect "with respect to that category."<br><br>Plaintiffs do not contradict the fact as stated. The fact states that the removal of any single work or ***collection of works*** (in the copyright law sense of "a work … in which a |

| | |
|---|---|
| substantial news content in its training corpus would be less capable of producing that type of output"); Etzioni Opening Rep. ¶ 99 ("if you want to provide news-like answers to users, news-like content is required during training"); Etzioni Rebuttal Rep. ¶ 70 ("The capability to produce news-like outputs comes from training on the expressive features of journalism."); Etzioni Rebuttal Rep. ¶ 67 (a model trained on News Plaintiffs' works learns the form of journalism, not merely the underlying facts); Mitchell Opening Rep. ¶¶ 110-112; NP Ex. 130 [Brockman Depo. Tr.] at 300:15-18 ("[W]hen you train these models on data for – they're relevant to specific areas, broad areas, like coding, they get better at that area."); NP Ex. 749 [OPCO_MDL_004738943] at -43 (OpenAI internal document stating that "[w]hen thinking about whether or not to include a new dataset in our pre-training runs, there should be only two considerations," including whether "the capability that it advances [is] something we want"). | number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole," 17 U.S.C. § 101) would not materially alter the statistical structure the model learns. It says nothing about the removal of an entire ***category*** of works, such as all news.<br><br>News Plaintiffs assert that removing the category of news materially alters the model, which does not create a genuine factual dispute because it does not address the fact as stated and because it is unsupported by the cited evidence. For instance, Mr. Brockman's testimony that training on data relevant to "broad areas, like coding" improves performance in "that area." News Ex. 130 (G. Brockman Tr.) at 300:15-18, concerns adding data from a broad domain, not removing any work or collection of works. Further, his testimony supports the idea that including a category of training data—like computer code—in the training corpus improves the model's ability to perform in that area (coding). It does not support that removal of a collection of computer code—say, code from one programmer—from the training corpus would materially alter the statistical structure of the model.<br><br>Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions contained in the cited paragraphs of Dr. Etzioni's Opening Report. ECF 2055 at 25-28. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2). |

**Paragraph 12**

<table>
<tr><td colspan="2">12. A properly trained LLM is a set of billions or even trillions of numerical parameters (mathematical weights) that encode generalized statistical relationships of language such that the model can simulate conversation and reasoning. Lafferty Decl. ¶¶ 16, 33-35, 45, 52, 71-72, 74-76, 90-91, 94-100, 139-40, 154-55, 157-58, 164; see also Hurst Decl. Ex. 81 (Nadella Dep. Tr.) 90:9-23, 275:4-276:13; Ex. 103 (Russinovich Dep. Tr.) 106:4-107:15, 9:3-14, 9:18-23, 12:24-13:15, 14:18-15:17, 16:5-10; Ex. 16 (Brockman Dep. Tr.) 319:20-320:12, 23:19-23, 24:3-8, 26:22-27:9, 37:9-38:8; Ex. 104 (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 50:10-51:23, 181:25-182:4; Ex. 117 (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 33:17-34:9, 67:9-15, 255:12-18; Ex. 96 (Radford Dep. Tr.) 20:25-23:3.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 12</u>: Denied insofar as the statement implies there is only one way to "properly train" an LLM. Undisputed that an LLM can be a set of billions or even trillions of numerical parameters (mathematical weights) that encode generalized statistical relationships of language. Further denied as to "conversation" and "reasoning," for the reasons set forth in response to Microsoft's Paragraph No. 3. What the models produce is an imitation of conversation and/or reasoning.</td><td><u>Microsoft's Reply:</u> Paragraph 12 is not genuinely disputed. Undisputed "that an LLM can be 'a set of billions or even trillions of numerical parameters (mathematical weights) that encode generalized statistical relationships of language such that the model can simulate conversation[.]'"<br><br>News Plaintiffs again attempt to create a dispute of material fact over the use of "reasoning," but as Microsoft explained in its Reply to News Plaintiffs' response to Paragraph 3, Microsoft identifies reasoning in the empirical sense of describing a natural language processing task LLMs can perform; it makes no claim about whether LLMs "reason" in accordance with human psychology. Indeed, News Plaintiffs' own characterization, that the models produce "an imitation of reasoning," is consistent with, not contrary to, Paragraph 12's statement that a model can "simulate" reasoning. There is no material dispute.<br><br>There is also no material factual dispute regarding whether there is "only one way to 'properly train' an LLM." Paragraph 12 does not state that there is only one way to train an LLM.</td></tr>
</table>

**Paragraph 13**

<table>
<tr><td colspan="2">13. When generalization is strong, an LLM generates coherent and contextually appropriate text about unfamiliar subjects because its parameters represent the deeper structure of language rather than the surface content of the training set; the resulting output is novel text distinct from the source material used for training. Lafferty Decl. ¶¶ 76-77, 81, 98, 141, 145, 155-56; see also Hurst Decl. Ex. 104 (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 48:20-50:19, 104:4-17, 180:21-182:4, 184:18-185:18; Ex. 16 (Brockman Dep. Tr.) 265:19-266:5.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 13</u>: Denied to the extent Microsoft suggests when an LLM's generalization is "strong" its output will be novel and will not reproduce or regurgitate the data on which it was trained. To the contrary, optimal generalization depends on the LLM memorizing its training data. See Goldstein Rebuttal Rep. ¶ 71 ("To accurately predict and generate text within the long tail, a deep learning model has no choice but to memorize subpopulation-specific, unique expressions."); Goldstein Rebuttal Rep. ¶ 62 ("Sometimes optimal generalization requires the verbatim memorization of unique, subpopulation-specific expressions."); Mitchell Rebuttal Rep. ¶ 25 ("machine learning researchers have shown that, in large deep neural networks such as LLMs, memorization and generalization abilities can and do co-exist."); Mitchell Rebuttal Rep. ¶ 36 ("pitting memorization against generalization is a false dichotomy; it has been demonstrated in many studies that in neural networks with large numbers of parameters (e.g., LLMs), the tendency to memorize training data can co-exist with generalization abilities. In fact, these behaviors are hard to separate"); Etzioni Rebuttal Rep. ¶ 42 ("it is well known that LLMs both generalize and memorize, and they do these together along a spectrum that depends on</td><td><u>Microsoft's Reply:</u> Paragraph 13 is not genuinely disputed. Undisputed that LLMs generalize. Undisputed that models exhibit some degree of memorization. Drs. Lafferty and Callison-Burch agree learning and retaining facts and commonly occurring sequences of text like common phrases and idioms can be beneficial to model performance and reflect generalization rather than improper memorization. See ECF 1723 (Lafferty Decl.) ¶ 165, 283, 300-04; News Ex. 675 (C. Callison-Burch Reply Rep.) ¶¶ 48, 51–52.<br><br>News Plaintiffs' expert addresses whether memorization occurs, not whether outputs are novel when generalization is strong. Indeed, Dr. Goldstein opines that "[s]ometimes optimal generalization requires the verbatim memorization of unique, subpopulation-specific expressions" and that "[a] large language model can be, and in the case of OpenAI's models is, highly generalized globally while remaining deeply memorized locally." ECF 1819 (Goldstein Decl.) Ex. B (Goldstein Rebuttal Rep.) ¶¶ 62-63. This characterization recognizes the difference between beneficial memorization of facts, common phrases, and idioms -- and undesirable memorization of the surface content of the training data. None of News Plaintiffs' cited evidence refutes that a model with "strong generalization" will generate "novel output."</td></tr>
</table>

| | |
|---|---|
| training data frequency, sequence rarity, and model capacity.”).<br><br>It is also disputed that an LLM’s “resulting output is novel text distinct from the source material used for training,” for the reasons set forth in greater detail in response to Microsoft’s Statement of Fact No. 14. | |

**Paragraph 14**

| | |
|---|---|
| 14. **Models can at times generate text that was part of their training corpus, a known phenomenon called regurgitation. However, instances of regurgitation in a properly trained model are extremely rare. A model that has a tendency to regurgitate its training data reflects an unintended side-effect of the training process rather than the intended operation of the model.** Lafferty Decl. ¶ 35; *see also* Usdan Decl. ¶¶ 19-20. | |
| **<u>News Plaintiffs’ Response to Microsoft Paragraph 14</u>**: The first sentence is **undisputed.** The remainder is **denied.**<br><br>Admissible evidence contradicts Microsoft’s statement that regurgitations in a properly trained model are “extremely rare.” (For purposes of this response, News Plaintiffs assume that OpenAI’s GPT models are “properly trained model[s].”) Wenger Opening Rep. at 69-70 (OpenAI had “reason to know that its models could and would regurgitate training data” and noting OpenAI’s witnesses testified models can memorize and regurgitate); Wenger Reply Rep. at 93 (“[T]he likely inefficacy of these techniques is supported by both my and Dr. Berg-Kirkpatrick’s analysis of OpenAI’s models, which report thousands of regurgitations of copyrighted content, including from news sources.”); Goldstein Opening Rep. ¶¶ 293-376 (explaining | **<u>Microsoft’s Reply:</u>** Paragraph 14 is not genuinely disputed. **Undisputed** that models “can at times generate text that was part of their training corpus, a known phenomenon called regurgitation.” News Plaintiffs do not genuinely dispute that “instances of regurgitation in a properly trained model are extremely rare” as an empirical matter. News Plaintiffs’ cited evidence does not controvert the fact as stated, is not admissible, and/or is contradicted by their own expert’s testing.<br><br>News Plaintiffs’ own evidence confirms that the rate of “regurgitation” is so low as to be nearly nonexistent. *See, e.g.* ECF 1815 (Maisel Decl.) Ex. E (Microsoft Copilot Infringement Rule 1006 Summaries) (Out of 8.2 million conversation logs, Microsoft allegedly copied at least 58 of The Times’s Asserted Works in 60 Copilot conversations, 68 of DNP’s Asserted Works in 69 Copilot conversations). |

| | |
|---|---|
| propensity of models at issue to memorize and regurgitate and providing results). Microsoft's own expert Dr. Lafferty also identified at least 35,806 Copilot outputs in the 8.2 million Copilot conversations that contained a minimum of six non-overlapping 16-grams (96 words) with an Asserted Work. NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 120. *See e.g.* Maisel Decl., Ex. E (Microsoft Copilot Infringement Rule 1006 Summaries) (Microsoft copied at least 58 of The Times's Asserted Works in 60 Copilot conversations, 68 of DNP's Asserted Works in 69 Copilot conversations); Wenger Opening Rep. at 105-08 (finding Copilot copied 35 Mother Jones Registered Asserted Works across 77 hits in 51 conversations); NP Ex. 816 [MSFT_AI_MDL_002881582] (Copilot output logs); Bauerlein Decl. Ex. D. NP Ex. 1170 [CIR Copilot ConvoID Table] (Asserted Works matched to Copilot logs); Wenger Rebuttal Rep. at 38 (describing 20 million ChatGPT conversation sample underrepresents the number of Plaintiff-related conversations and therefore the extrapolation likely underestimates the true amount of Plaintiff-related regurgitations by ChatGPT); *see also* MSFT News MSJ Br. at 22 (Microsoft acknowledging at least 59,545 instances of regurgitation of News Plaintiffs' content in Copilot logs).<br><br>Admissible evidence also contradicts Microsoft's statement that regurgitation is an unintended side effect of the training process. Generalization requires memorization of training data, and memorized data is prone to regurgitation. Wenger Rebuttal Rep. at 7-12, 75-76. Further, the cited evidence does not support the proposition that regurgitation is an unintended side effect of the training process. [redacted] | Microsoft also incorporates its Replies to News Plaintiffs' responses to Paragraphs 32, 35, 38, 41, 44, 47, 50, 53, 56, 60 (News Plaintiffs' experts found low rates of regurgitation for each News Plaintiff).<br><br>Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions contained in the cited paragraphs of Dr. Goldstein's and Dr. Wenger's Opening Reports. ECF 2055 at 8-20, 22. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Further, Microsoft incorporates its Reply to News Plaintiffs' response to Paragraph 9 that generalization is the overall goal of training an LLM, even if the technical mechanism of achieving that goal is training for next-token prediction.<br><br>Finally, that developers built guardrails to prevent regurgitation confirms that regurgitation is an unintended side effect of the training process, not the intended operation of the model. *See* ECF 2161 (Mitchell Decl.) Ex. 1 (Mitchell Opening Rep.) ¶ 119, n.62 (quoting N. Ryder 30(b)(6) Tr. at 183:24–184:12).<br><br>News Plaintiffs' evidence establishes, at most, that some memorization occurs during training as a byproduct of next-token prediction. It does not controvert that a "tendency to regurgitate" reflects "an unintended side-effect of the training process rather than the intended operation of the model." This portion of Paragraph 14 is not genuinely disputed. |

| | |
|---|---|
| [redacted] Usdan Decl. ¶¶ 19-20 ("[redacted]"). | |

**Paragraph 15**

15. **At OpenAI's request, Microsoft provided OpenAI with portions of the Bing Index, the web index that powers Microsoft's Bing search engine.** Hurst Decl. **Ex. 118** (Templeton 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 20, 2026)) 304:9-16; **Ex. 119** (Templeton 30(b)(6) Dep. Tr. (Vol. 2, dated Jan. 21, 2026)) 390:22-391:1; **Ex. 38** (Gaggara 30(b)(6) Dep. (dated Aug. 20, 2025)) 44:13-15; **Ex. 37** (Gaffney 30(b)(6) Dep. Tr.) 131:20-133:2, 9:2-5, 9:15-10:5, 10:19-25; **Ex. 37.A** (Gaffney Dep. Ex. 16) at 2-3.

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 15**: **Undisputed** that Microsoft provided OpenAI with the Bing Index as part of what OpenAI's Chief Research Officer Bob McGrew described as a "trade." NP Ex. 616 [OPCO_MDL_001936752] at -752 ("the idea here [was] that we're giving data to them and they are giving data to us"). **Disputed** to the extent Microsoft characterizes what it transferred as mere "portions" of the Bing Index. Microsoft provided OpenAI with the full offline version of the Bing Index. NP Ex. 615 [Gaggara Aug. 20, 2025 30(b)(6) Depo. Tr.] at 145:25-146:7. | **Microsoft's Reply:** Paragraph 15 is not genuinely disputed. **Undisputed** that "Microsoft provided OpenAI with ... Bing Index" data and that the Bing Index is "the web index that powers Microsoft's Bing search engine."<br><br>News Plaintiffs fail to create a genuine dispute that Microsoft provided OpenAI "the full offline version of the Bing Index," rather than "portions" of it because the cited evidence does not address and therefore does not specifically controvert the fact as stated. The deposition testimony cited as News Ex. 615 does not discuss Microsoft's provision of the Bing Index to OpenAI (let alone |

| | |
|---|---|
| | that Microsoft provided the "full" Index) or any amount of content Microsoft provided to OpenAI; instead, it relates to the web crawling services Microsoft provided to OpenAI and the costs associated with providing those services. With respect to Microsoft's provision of portions of the Bing Index to OpenAI, the evidence cited in Paragraph 15 reflects that Ms. Gaggara actually testified that Microsoft shared the Bing Index with OpenAI "*[a]fter filtering it out*." Hurst Decl. Ex. 38 (P. Gaggara 30(b)(6) Tr. (Aug. 20, 2025)) at 44:13-15 (emphasis added). In other words, the version of the Bing Index that Microsoft provided to OpenAI excluded webpages applying the NOARCHIVE and/or NOCACHE meta tag directives, and Microsoft removed content subject to DMCA takedown protocols from the Bing Index data it shared with OpenAI. Blanco Opp. Decl. Ex. 202 (P. Gaggara 30(b)(6) Tr. (Jan. 27, 2026)) at 230:22-231:8 ("We removed anything which was 'noarchive/nocache' from them. We removed anything which was DMCA removed from them."); *see also id.* at 237:4-13, 232:8-233:23; Blanco Opp. Decl. Ex. 251 (M. Parakhin Tr.) at 91:5-94:21, 101:19-102:16. News Plaintiffs' response includes an additional assertion that does not address or specifically controvert the stated fact. It therefore does not create a genuine dispute of the fact stated in Paragraph 15 and is irrelevant to the determination of the merits of Microsoft's motion for summary judgment. |

**Paragraph 16**

| |
|---|
| 16. **The provision of portions of the Bing Index to OpenAI was a step in the process for the purpose of training LLMs.** Hurst Decl. **Ex. 107** (Shan Dep. Tr.) 318:11-319:9; **Ex. 37** (Gaffney 30(b)(6) Dep. Tr.) 131:20-133:2; **Ex. 37.A** (Gaffney Ex. 16); **Ex. 16** (Brockman Dep. Tr.) 323:11-16. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 16: Denied** that the provision of Bing Index to OpenAI was solely a step in the process for the purpose of training LLMs. NP Ex. 621 [Ryder 30(b)(6) Depo. Tr.] at 66:5-68:25, 158:14-159:7; NP Ex. 414 [Sohl Dec. 9, 2025 30(b)(6) Depo. Tr.] at 345:5-13 (OpenAI used the Bing Index data provided by Microsoft to develop, test, and evaluate its large language models); NP Ex. 617 [Canel 30(b)(6) Depo. Tr.] at 153:13-155:21 (Microsoft and OpenAI both used the Bing Index for retrieval augmented generation); NP Ex. 409 [Perelman 30(b)(6) Depo. Tr.] at 131:17-22 (When ChatGPT first began using retrieval augmented generation to respond to user queries, the first source that ChatGPT used for retrieval augmented generation was the Bing Index); NP Ex. 813 [OPCO_MDL_001895987] at slide 4 (Microsoft's Bing Index "powers ChatGPT browsing" and ChatGPT Browsing used the Bing API). Further disputed to the extent Microsoft characterizes what it transferred as mere "portions" of the Bing Index. Microsoft provided OpenAI with the full offline version of the Bing Index. NP Ex. 615 [Gaggara Aug. 20, 2025 30(b)(6) Depo. Tr.] at 145:25-146:7. | **Microsoft's Reply: Undisputed** that Microsoft's provision of Bing Index data to OpenAI "was a step in the process for the purpose of training LLMs."<br><br>News Plaintiffs fail to create a genuine dispute that Microsoft provided OpenAI the "full version" of the Bing Index as opposed to "portions" of it, for the reasons set forth in Microsoft's Reply to Paragraph 15.<br><br>News Plaintiffs' assertion that "the provision of the Bing Index to OpenAI" was not "*solely* a step in the process for the purpose of training LLMs" does not controvert the stated fact and is not supported by Plaintiffs' cited evidence. The evidence cited as News Exs. 621 and 414 supports that Microsoft's provision of portions of the Bing Index was a step in the process for the purpose of training. *See* News Ex. 621 (N. Ryder 30(b)(6) Tr.) at 68:10-25 ("[redacted]); News Ex. 414 (I. Sohl 30(b)(6) Tr.) at 345:10-13 (the Bing Index data "was used to train several internal-only research models for evaluation purposes"). That deposition testimony does not controvert the evidence cited in Paragraph 17. *See* Hurst Decl. Ex. 107 (Shan Tr.) at 319:1-9 ("[redacted].<br><br>The remaining cited evidence (News Exs. 617, 409, and 813) conflates the Bing Index with the Bing API that ChatGPT used for web grounding. The evidence cited as News Exs. 617, 409, and 813 exclusively relate to OpenAI's use of the |

| | |
|---|---|
| | Bing API to retrieve ordinary Bing search results for grounding ChatGPT answers, and no party contends that the retrieval of web content for grounding is in any way related to the use of content for model training, whether for experimental purposes or developing production LLMs. This evidence bears no relation to Microsoft's provision of portions of the Bing Index to OpenAI for experimentation with training LLMs, which is the subject of the stated fact. News Plaintiffs have not asserted claims against Microsoft for OpenAI's use of the Bing API for web grounding, nor did they argue or even mention OpenAI's use of the Bing API anywhere in their brief in opposition to Microsoft's motion for summary judgment. These additional facts therefore are irrelevant to the determination of the issues before the Court and do not address or specifically controvert the fact stated.<br><br>Further, News Plaintiffs' characterization that OpenAI's use of the Bing API for web grounding constitutes "provision of the Bing Index to OpenAI" is inaccurate. ChatGPT used the Bing API to retrieve a limited number of Bing search results (including only the title, link, and snippet) most relevant to a user's query to generate web grounded responses; the Bing API is not an access-point to the full contents of webpages contained in the Bing Index. Blanco Opp. Decl. Ex. 161 (E. Abib 30(b)(6) Tr.) at 76:1–25; Blanco Opp. Decl. Ex. 203 (P. Gaggara 30(b)(6) Tr. (Jan. 28, 2026)) at 435:18–437:3; Hurst Decl. Ex. 416 (J. Ribas Tr.) at 235:15-236:6. Microsoft's witness Jordi Ribas testified that Microsoft did not "make a copy of the Bing Index for OpenAI's use in querying [the Bing API]" and explained, "[B]asically, there is the index. Then there is the ranker. And then the Bing API is on top of the ranker and the index, and when you send a query to the Bing API, it provides the same |

| | |
|---|---|
| | results in theory as if you were going to Bing.com." Hurst Decl. Ex. 416 (J. Ribas Tr.) at 236:9-237:24. This claim is also not supported by the cited evidence. *See* News Ex. 617 (F. Canel 30(b)(6) Tr. (Jan. 22, 2026)) at 155:3-21 ("leveraging Bing"); News Ex. 813 at slide 4 ([redacted]. While the deposition testimony cited as News Ex. 409 reflects that Mr. Perelman agreed with counsel's characterization that ChatGPT used "the Bing Index" for retrieval augmented generation, pursuant to Fed. R. Evid. 106, Mr. Perelman independently testified that [redacted] News Ex. 409 (A. Perelman 30(b)(6) Tr.) at 30:1-3. Microsoft's corporate designee on topics related to the Bing API services provided to OpenAI testified that characterizing the Bing API as returning content directly from the Bing Index is an inaccurate characterization and explained their respective differences. *See* Blanco Opp. Decl. Ex. 161 (E. Abib 30(b)(6) Tr.) at 68:24-71:21. |

**Paragraph 17**

| | |
|---|---|
| 17. **To create the Deucalion model, Microsoft participated in post-training on GPT 3.5 Turbo using a synthetic dataset derived from Bing Chat user conversations, of which at most .02% included New York Times content.** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. Vol. 2 (dated July 31, 2026)) 525:3–15; Lafferty Decl. ¶¶ 25, 336, 338-39. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 17</u>**: **Undisputed** that Microsoft post-trained the Deucalion model using The Times's content. | **<u>Microsoft's Reply:</u> Undisputed** as to the fact as stated, and News Plaintiffs' additional assertion does not specifically controvert that fact. Accordingly, the fact as stated in Paragraph 17 remains undisputed. |

**Paragraph 18**

| | |
|---|---|
| **18. The purpose of creating the Deucalion model was to improve the performance of GPT 3.5 Turbo in following instructions and accurately answering user questions as part of the Copilot product.** Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 204:5-22, 206:13-207:22, 15:18-21, 16:1-5, 18:7-12, 22:25-23:8, 23:21-25:6, 26:12-27:4; **Ex. 199** (MSFT_AI_MDL_002644093); **Ex. 113** (Song 30(b)(6) Dep. Tr.) 46:5–47:13, 53:8–19; Lafferty Decl. ¶¶ 339-40. | |
| **News Plaintiffs' Response to Microsoft Paragraph 18: Undisputed.** | **Microsoft's Reply: Undisputed.** |

**Paragraph 19**

| | |
|---|---|
| **19. The New York Times's experts performed no causal analysis demonstrating that the use of at most .02% of New York Times content to construct the synthetic Deucalion post-training dataset contributed in any measurable way to the performance of the Deucalion model.** Lafferty Decl. ¶¶ 337-39. | |
| **News Plaintiffs' Response to Microsoft Paragraph 19: Undisputed** that Microsoft post-trained the Deucalion model using The Times's content. Disputed to the extent this statement suggests Dr. Goldstein did not explain how Microsoft used The Times's content to improve the performance of the Deucalion model.<br><br>Dr. Goldstein explained that Microsoft used the Deucalion fine-tuning data, which included The Times's content, "to improve instruction following and overall response quality," and this use led to model responses that were "more information rich" than the responses generated by GPT-3.5. *See* Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶ 181. | **Microsoft's Reply: Undisputed** that New York Times content made up at most .02% of the Deucalion training data and that The New York Times's experts performed no causal analysis showing that content contributed in any measurable way to the performance of the Deucalion model.<br><br>News Plaintiffs do not create a dispute by describing the overall process and effects of fine-tuning the Deucalion model, "to improve instruction following and overall response quality," which says nothing about whether Times content in particular contributed in any measurable or meaningful way to that improvement — particularly given its negligible share of the dataset. Dr. Goldstein found 45 occurrences of nytimes.com and Wirecutter domains across all the Deucalion fine-tuning data. Hurst Decl. Ex. 231 (Goldstein Opening Rep.) ¶ 181. The Deucalion fine-tuning |

| | |
|---|---|
| | data consisted of 228,679 messages, meaning The New York Times content was at most 0.02% of the training data. ECF 1723 (Lafferty Decl.) ¶¶ 337-39. News Plaintiffs do not challenge these numbers or claim that 0.02% of the data measurably affected the model's performance. |

**Paragraph 20**

| | |
|---|---|
| **20. News Plaintiffs' expert Dr. Goldstein states he also found The Denver Post's content in the Deucalion model post-training dataset, but he did not quantify that content or ascribe any value to it in the performance of the model.** Hurst Decl. Ex. **231** (Goldstein Opening Report) ¶ 181. | |
| **News Plaintiffs' Response to Microsoft Paragraph 20**: **Undisputed** that Microsoft post-trained the Deucalion model using The Denver Post's content. Disputed to the extent this statement suggests that Dr. Goldstein did not explain how Microsoft used The Denver Post's content to improve the performance of the Deucalion model.<br><br>Dr. Goldstein explained that Microsoft used the Deucalion fine-tuning data, which included The Denver Post's content, "to improve instruction following and overall response quality," and this use led to model responses that were "more information rich" than the responses generated by GPT-3.5. *See* Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶ 181. | **Microsoft's Reply:** News Plaintiffs fail to meaningfully dispute Paragraph 20 for the same reasons as described in Microsoft's Reply to News Plaintiffs' response to Paragraph 19. The only difference is that Dr. Goldstein failed to even identify the number of instances of The Denver Post's content he found in the Deucalion model post-training dataset, let alone determine any causal connection between those instances and the performance of the model. |

**Paragraph 21**

<table>
<tr><td colspan="2">21. News Plaintiffs publish the Asserted Works (which they define as consisting of individual articles) to be read by people for information, edification, and entertainment. Hurst Decl. Ex. 59 (Julien 30(b)(6) Dep. Tr.) 23:1-25:3; Ex. 42 (Gordon Dep. Tr.) 20:12-21:6; Ex. 13 (Bauerlein Dep. Tr. (dated January 27, 2026)) 46:20-25; Ex. 31 (Dolnick Dep. Tr.) 21:4-15; Ex. 56 (Ibrahim 30(b)(6) Dep. Tr.) 26:13-14; Ex. 88 (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 185:3-8; Ex. 18 (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 311:1-15; Tucker Decl. ¶¶ 11(b), 95-97, 102.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 21:</u> Undisputed that the Asserted Works consist of individual articles. Denied that News Plaintiffs publish the Asserted Works solely or exclusively "to be read by people for information, edification, and entertainment." Admissible evidence contradicts this.<br><br>News Plaintiffs publish the Asserted Works for many reasons, not limited to the reasons identified. See, e.g., NP Ex. 18 [Burbach 30(b)(1) Depo. Tr.] at 14:18-22 ("to deliver news that is of distinct value to our communities and attract readers and subscribers, deliver news that will persuade people to look at us, to look at us again, and to pay us"); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 104:6-8 ("public service, government accountability"); NP Ex. 3 [Sulzberger 30(b)(1) Depo. Tr.] at 129:4-130:9 (testifying about The Times's "accountability reporting" and reporting on "subjects that really matter to the health of society").<br><br>News Plaintiffs object because the cited evidence does not support Microsoft's asserted fact. See Hurst Ex. 59 (Julien 30(b)(6) Dep. Tr.) 23:1-25:3 (testifying that the New York Daily News provides online news, information, and stories); Hurst Ex. 42 (Gordon Dep. Tr.) 20:12-21:6</td><td><u>Microsoft's Reply:</u> Paragraph 21 is not genuinely disputed. News Plaintiffs do not dispute that the Asserted Works are published "to be read by people for information, edification, and entertainment," but argue that this is not an exclusive list of purposes. That additional information does not make this fact disputed. Moreover, the evidence cited by News Plaintiffs does not specifically controvert the fact as stated. The testimony News Plaintiffs cite demonstrates reasons for publishing the Asserted Works that could fall into the categories of information, edification, and entertainment. This testimony therefore does not create a genuine dispute that the Asserted Works are published "to be read by people for information, edification, and entertainment."<br><br>News Plaintiffs' criticism of the evidence cited by Microsoft also does not create a genuine dispute of fact. The testimony Microsoft cites demonstrates that News Plaintiffs intend for their works to be read by people for information, edification, and entertainment.</td></tr>
</table>

| | |
|---|---|
| (testifying that "audience" refers to users or people who are reading their journalism); Hurst **Ex. 13** (Bauerlein Dep. Tr. (dated January 27, 2026)) 46:20-25 (testifying that reporters write and produce stories or audio-visual productions); Hurst **Ex. 31** (Dolnick Dep. Tr.) 21:4-15 (testifying about how The Times's journalism is produced by human reporters and editors for readers); Hurst **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-14 (a question about the different types of plaintiffs' subscription revenue streams); Hurst **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 185:3-8 (a Q&A about licensing revenue); Hurst **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 311:1-15 (testimony about how the CIR decides which entities to license its content to); Tucker Decl. ¶¶ 11(b) (opining that the Asserted Works consist of curated, original journalism that consumers read to stay informed about current events and related topics), ¶¶ 95-97 (opining that newspapers provide timely, relevant, and authoritative stories), ¶ 102 (opining about the purported differences between journalism and Generative AI).<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

### 2. *Nature of the Work (Factor 2) and Amount and Substantiality Used (Factor 3)*

**Paragraph 22**

| | |
|---|---|
| **22. The LLM training process deconstructs works into tokens, then analyzes the patterns among various pieces of tokenized content in order to translate those patterns into model weights–all to gain access to underlying facts, ideas, linguistic patterns, and statistical relationships.** Lafferty Decl. ¶¶ 77, 80-81, 105-114, 137-39, 141, 144-47, 283; *see also* Hurst Decl. **Ex. 104** (Ryder 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 29, 2026)) 17:2-18:7, 18:12-19:4, 19:12-20:18, 48:25-49:24, 50:10-19, 104:15-17, 176:22-177:23; **Ex. 101** (Rossett Dep. Tr.) 18:22-23:2, 67:25-68:9. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 22</u>: Undisputed** that the LLM training process deconstructs works into tokens, analyzes patterns among tokens, and analyzes the patterns among tokenized content. Otherwise **denied.**<br><br>Admissible evidence contradicts the rest of Microsoft's statement. The purpose of the training process is not to "gain access to underlying facts, ideas, linguistic patterns, and statistical relationships." Rather, the goal is to adjust the parameters of the LLM so that its outputs match the training data as closely as possible. Etzioni Opening Rep. ¶ 31; Goldstein Opening Rep. ¶ 127. Moreover, the purpose of training includes tuning the LLM's parameters to encode the specific structure of different types of text. Mitchell Opening Rep. ¶ 71. Specific structures encoded in the LLM include the precise expression used in those different texts (e.g., emails, news articles, encyclopedia entries, film scripts, etc.), the expressive styles of different writers and publications, and other features of text, as well as general world knowledge (e.g., "apples are a kind of fruit" or "winter, spring, summer and fall are the four seasons"). *Id.* | **<u>Microsoft's Reply:</u> Undisputed** that "language data is converted into 'tokens' and that LLM models encode numerical values in a network of 'parameters' or weights."<br><br>News Plaintiffs do not genuinely dispute that the "LLM training process" has the technical objective of "gain[ing] access to underlying facts, ideas, linguistic patterns, and statistical relationships." For example, Plaintiffs do not dispute that training involves "tuning the LLM's parameters to encode the specific structure of different types of text." Plaintiffs instead insert improper legal argument and additional facts that do not controvert the stated fact about the "purpose of the training process," which is a legal conclusion in the fair-use analysis.<br><br>News Plaintiffs' objection to Microsoft's reliance on Hurst Exhibits 101 and 104 is ill taken. Plaintiffs elicited technical testimony from employee engineers while taking their 30(b)(1) depositions, had every opportunity to cross-examine that testimony, and to later rebut it with their own experts. It is not undisclosed expert opinion from non-retained experts, it was fact testimony from employees about their areas of work expertise. |

| | |
|---|---|
| Further, the LLM training process results in verbatim memorization. Mitchell Opening Rep. ¶¶ 113-24.<br><br>News Plaintiffs object to Microsoft's reliance on Hurst Exhibits 101 and 104 to support this assertion. The assertion is not limited to the specific LLMs which are at issue in the case, and these exhibits consist of deposition testimony from employees of Defendants who have not been disclosed under Rule 26(a)(2)(C) as non-retained experts. | |

**Paragraph 23**

| | |
|---|---|
| **23. The patterns extracted through training—including grammar, syntax, semantic relationships, facts, ideas, and concepts—are properties discernable only from the totality of the training data rather than from any individual work.** Lafferty Decl. ¶¶ 16, 33-34, 45, 66, 80-81, 99, 145-146, 283; *see also* SUMF ¶10. | |
| **News Plaintiffs' Response to Microsoft Paragraph 23: Denied.** Admissible evidence contradicts Microsoft's statement.<br><br>As explained by News Plaintiffs' expert Melanie Mitchell, LLMs memorize individual works from their training data. Mitchell Opening Rep. ¶ 113. Memorization of training data in an LLM means that the LLM has learned, during its pre-training, to strongly associate the tokens making up a block of training text with one another as well as with references to that text. Mitchell Opening Rep. ¶ 114; *see also* Etzioni Rebuttal Rep. ¶ 53 (News Plaintiffs' expert Oren Etzioni describing how "memorization" refers to instances where the model retains specific text from its training data in its parameters as a state of the trained model). Defendants knew their LLMs memorized specific text from the training corpus. *See* NP Ex. 684 [OPCO_MDL_004672513] at 3 | **Microsoft's Reply: Undisputed** that LLMs learn patterns through training, and that those patterns include grammar, syntax, semantic relationships, facts, ideas, and concepts.<br><br>Plaintiffs fail to genuinely dispute that "the patterns extracted through training … are properties of the aggregate training distribution rather than of any individual work." Indeed, Plaintiffs' expert Melanie Mitchell agrees that during embedding the model "captures useful semantic distances between tokens…learned by the LLM from its training data, [that] placing tokens in an ultra-high-dimensional semantic space, can capture many nuances of meaning of the tokens in the LLM's vocabulary, [and that] [t]he 'meanings' captured by embeddings are based on complex statistics, gleaned from the LLM's training data, of how words tend to occur in the context of other words." ECF |

| | |
|---|---|
| ("The model will readily produce excerpts from works under copyright."); NP Ex. 716 [OPCO_MDL_000479579] at -83; NP Ex. 720 [OPCO_MDL_001939120] at -124-26; NP Ex. 728 [OPCO_MDL_001639231] at -231; NP Ex. 722 [MSFT_AI_MDL_002836983] at -983; NP Ex. 724 [MSFT_AI_MDL_000665166]; NP Ex. 1268 [MSFT_AI_MDL_000665167] at -167, -169; NP Ex. 730 [OPCO_MDL_001461776] at -776 (OpenAI employees stating that GPT-4 "will have memorized a ton of data and therefore will be insanely good at regurgitation"); NP Ex. 718 [OPCO_MDL_001644364] at 365 (OpenAI's VP of Research, Jerry Tworek: "We train our networks to memorize the training data — that's their objective.").<br><br>Also **denied** because style is a pattern that LLMs can learn through training. NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 71 (Microsoft expert admitting that "the ability to generate news-like style or content is what one would expect from a model that has learned recurring statistical patterns of a genre"); NP Ex. 519 [Brundage Depo. Tr.] 108:25-109:10 (former OpenAI employee confirming at deposition that, when a GPT model is presented with the first sentence or two of a news article, the model could "generate something in a style that is similar to what it perceives to be the intended style or the kind of ongoing style of text, which might be news-style coverage"); NP Ex. 684 [OPCO_MDL_004672513] at 3-4 (June 2023 OpenAI presentation noting "the model will readily produce excerpts from works under copyright" and that "it sometimes emulates the style"). Etzioni Opening Rep. ¶ 123 ("From a technical standpoint, a fundamental characteristic of LLMs is that they learn to produce text that mirrors the structural and stylistic properties of their training data."). | 2161 (Mitchell Decl.) Ex. 1 (Mitchell Opening Rep.) ¶¶ 44–46. This describes corpus-level statistics, not features of individual works.<br><br>Plaintiffs' cited evidence does not controvert the fact as stated; it consists instead of additional facts concerning whether LLM training involves memorization of individual works and the extent to which an LLM is capable of regurgitation. As detailed in Microsoft's Reply to Paragraph 13, "memorization" is distinct from "regurgitation," and the "memorization" of individual works during LLM training is not inconsistent with patterns being derived from "the aggregate training distribution rather than of any individual work." Plaintiffs' evidence concerning "regurgitation" and what Defendant "knew" about regurgitation is flawed for the reasons stated in Microsoft's Reply to Paragraph 14, and does not show that patterns of grammar, syntax, semantic relationships, facts, ideas, or concepts are properties of any individual work.<br><br>Finally, Plaintiffs' assertion that "style is a pattern that LLMs can learn through training" does not controvert the stated fact and is improper legal argument that should be disregarded |

**Paragraph 24**

| |
|---|
| **24. News articles published by News Plaintiffs consist predominantly of factual news reporting. *The New York Times*:** Hurst Decl. **Ex. 207** (NYT_01077210) (I.3 nyt-2021-2022 – Asserted Works Overview); Procas 30(b)(6) 65:12-66:2. ***New York Daily News:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 131:1-21; **Ex. 79.B** (Morris Dep. Ex. 52 – Asserted Works Overview). ***Chicago Tribune:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 122:2-125:8; **Ex. 79.A** (Morris Dep. Ex. 49 – Asserted Works Overview). ***Orlando Sentinel:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 144:19-145:16; **Ex. 79.D** (Morris Dep. Ex. 56 – Asserted Works Overview). ***Sun Sentinel:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 148:20-149:13; **Ex. 79.E** (Morris Dep. Ex. 58 – Asserted Works Overview). ***Mercury News:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 138:20-139:21**;** **Ex. 79.C** (Morris Dep. Ex. 54 – Asserted Works Overview). ***The Denver Post:*** Hurst Decl. Ex. 180 (DNP-00636807 - DP Authors_part2). ***The Orange County Register:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 162:18-163:4; **Ex. 79.G** (Morris Dep. Ex. 62 – Asserted Works Overview). ***Pioneer Press:*** Hurst Decl. **Ex. 79** (Morris 30(b)(6) Dep. (dated Mar. 25, 2026)) 154:6-155:22; **Ex. 79.F** (Morris Dep. Ex. 60 – Asserted Works Overview). ***CIR*:** ECF No. 582 (No. 1:24-cv-04872) (Joint Stipulation and [Proposed] Order Regarding Asserted Works); (Ex. 2 to CIR's First Amended Compl. (1:24-cv-04872-SHS-OTW, ECF 88)); **Ex. 138** (Exhibit A to CIR's First Set of Interrogs. to Defendants). |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 24: Denied.** Admissible evidence contradicts this.<br><br>News Plaintiffs' Asserted Works consist of expressive content about a wide range of topics in various formats, including opinion and analysis. Any purported "factual news reporting" is conveyed through expression and is only a portion of what News Plaintiffs publish. *See, e.g.,* NP Ex. 3 [Sulzberger 30(b)(1) Depo. Tr.] at 128:2-8 (describing The Times's journalism as being systematically verified and then put in a distinctive, compelling story-telling package); Bell Rebuttal Rep. ¶ 202 (opining about how one cannot limit journalism or the works of The Times to the collection and relaying of bare facts, as The Times "commissions guest essays, opinion articles, assembles datasets, and creates visualizations – all of which go much farther than a relaying | **Microsoft's Reply:** Paragraph 24 is not genuinely disputed because News Plaintiffs have not "specifically controverted" the fact that the news articles they publish consist predominantly of factual news reporting. Local Civ. R. 56.1(c).<br><br>Paragraph 24 cites to an illustrative list of the works that News Plaintiffs are asserting. News Plaintiffs do not deny that their articles contain factual news reporting. Their response concedes that "factual news reporting" is part of what they publish and argues only that it "is conveyed through expression and is only a portion" of their output. That some Asserted Works are opinion, analysis, or commentary does not controvert the fact that factual reporting predominates. |

| | |
|---|---|
| of facts, and into the creative process of presenting, contextualizing, rationalizing, and critiquing those facts"); NP Ex. 1364 [NYTimes.com Homepage, https://www.nytimes.com/] (demonstrating that The Times publishes a wide range of journalistic works that cover categories including but not limited to breaking news reporting, investigative reporting, beat reporting, reviews and analysis of arts and culture, technology, commentary and opinion, Cooking, and The Athletic); Owen Rebuttal Report ¶ 33 (content includes wide range of topics including investigative reporting; local government, court and community coverage; features; opinions and editorials; reviews; sports; business and finance; arts and entertainment; food, health, and travel; science and technology reporting; weather; obituaries; practical service journalism to help readers navigate daily life); NP Ex. 26 (Chicago Tribune has won 29 Pulitzer Prizes including, *inter alia*, for commentary capturing the culture of Chicago; editorial writing on reforming the death penalty; and editorial writing on the Illinois child welfare system); NP Exs. 28–29 (Orlando Sentinel has won Pulitzer Prizes for editorial writing regarding lax growth management; and for editorial writing regarding predatory lending practices in Florida). NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 104:2-6 ("Sometimes there's a column that's particularly well written. That might get an award because of the nature of the expression and the actual craft that goes into journalism."); Malackowski DNP/NYT Rebuttal Rep at 6-7 ("News Plaintiffs' copyrighted works are economically valuable, expressive information goods that Defendants specifically sought out for their quality, creativity, uniqueness, and the information value that comes from such expression, which in large part is driven by the fixed investment required to develop such expression. In other | Finally, News Plaintiffs' objections are unavailing. The phrase "factual news reporting" is neither vague nor ambiguous. News Plaintiffs use the same vocabulary in their own response, describing their output as including "breaking news reporting, investigative reporting, [and] beat reporting" Additionally, Microsoft's cited exhibits identify the Asserted Works themselves, which are the best evidence of their own content. News Plaintiffs, who authored them, identify no Asserted Work, and no category of Asserted Works, that is not predominantly factual reporting. Having offered nothing to contradict the fact, News Plaintiffs have not met their burden under Local Civil Rule 56.1(d). |

| | |
|---|---|
| words, from an economic perspective, the nature of News Plaintiffs' works is highly distinguishable from 'joe schmo's' blog."); Cross Rebuttal Rep. at 9, 12 (describing news as based on "much more than the presentation of raw facts.") As *Daily News Plaintiffs*' expert, Taylor Owen, explained: "A news article is not only the facts it contains. It is also the reporting that produced those facts: the work of finding the story, developing the sources, gathering documents, verifying what is true, telling the story (e.g., structural writing choices, original phrasing), and exercising editorial judgment about what to publish. The facts and the reporting are not the same thing, and the Defendants' framing tends to treat them as if they were." Owen Opening Rep. ¶ 52.<br><br>News Plaintiffs object to the phrase "factual news reporting" as vague and ambiguous.<br><br>Plaintiffs further object because the cited evidence does not support the purported fact. *See* Hurst Ex. 207 (NYT_01077210) (I.3 nyt-2021-2022 – Asserted Works Overview) (listing The Times's Asserted Works but not categorizing the works by topic or subject area); Hurst Ex. 93 (Procas 30(b)(6) Depo. Tr.) at 65:12-66:2 (testifying that the summary spreadsheets produced by The Times constitute the list of Asserted Works The Times is asserting in this case). The cited exhibits relating to the *Daily News* Plaintiffs consist of deposition testimony of Ms. Robyn Morris identifying that the asserted articles are identified in a series of spreadsheets, and providing copies of those spreadsheets. The cited evidence says nothing about the amount of facts versus expression contained in the asserted articles. The cited exhibits relating to CIR consist of Mother Jones's Asserted Works and a document narrowing the | |

| | |
|---|---|
| scope of works at issue. The cited evidence says nothing about the amount of facts versus expression contained in the asserted articles. | |

**Paragraph 25**

| | |
|---|---|
| **25. The New York Times's *Wirecutter* articles consist predominantly of factual descriptions and comparisons of the attributes and/or performance of various consumer products.** ECF No. 1-69 (No. 1:23-cv-11195) (Exhibit K to NYT Complaint). | |
| **News Plaintiffs' Response to Microsoft Paragraph 25: Denied.** Admissible evidence contradicts this.<br><br>Wirecutter's articles consist not only of factual descriptions and comparisons of various consumer products, but also "tremendous and empathetic reporting and research and testing." NP Ex. 87 [Frumin 30(b)(1) Depo. Tr.] at 95:22-96:5 (Wirecutter's Editor-in-Chief Ben Frumin testifying that Wirecutter's "most proprietary IP advantage... is not the picks on their own, it is when they are paired with an explanation or demonstration of the tremendous and empathetic reporting and research and testing that we've done to settle upon those picks and those recommendations.").<br><br>News Plaintiffs object because Microsoft fails to support its assertion with admissible evidence. Indeed, the only evidence Microsoft cites is a list of 17 of The Times's registered, copyrighted Wirecutter works that were attached to the original Times Complaint. *See* ECF No. 1-69 (No. 1:23-cv-11195) (Exhibit K to NYT Complaint). | **Microsoft's Reply:** Paragraph 25 is not genuinely disputed. Plaintiffs do not dispute that *Wirecutter* articles consist of "factual descriptions and comparisons of various consumer products," but argue that this is not an exclusive list of components. That does not make this fact disputed. Moreover, the evidence cited by Plaintiffs does not specifically controvert the fact as stated. The testimony Plaintiffs cite confirms that *Wirecutter* articles include descriptions and comparisons of products and provides more context on the process of pulling these articles together. This testimony therefore does not create a genuine dispute as to whether "*Wirecutter* articles consist predominantly of factual descriptions and comparisons of the attributes and/or performance of various consumer products."<br><br>Furthermore, News Plaintiffs do not specify the grounds for which they deem Ex. K to The Times's Complaint as inadmissible. Ex. K is nevertheless admissible under Fed. R. Evid. 801(d)(2). *See, e.g., Belabbas v. Inova Software Inc.*, No. 1:16-CV-07379-LGS, 2019 WL 13258046, at *2 (S.D.N.Y. Oct. 1, 2019) ("It is well established that a |

| | |
|---|---|
| | complaint filed in a proceeding is admissible as evidence in that same proceeding under Rule 801(d)(2).”). |

**Paragraph 26**

| | |
|---|---|
| **26. The New York Times’s *NYT Cooking* recipes consist predominantly of one or more lists of ingredients and the steps necessary to transform those ingredients into the specified dish.** Hurst Decl. **Ex. 207** (NYT_01077210) (I.3 nyt-2021-2022 – Asserted Works Overview); Procas 30(b)(6) 65:12-66:2; **Ex. 124** (Velasquez Dep. Tr.) 99:13-17; **Ex. 30** (Diggs Dep. Tr.) 198:7-23. | |
| **<u>News Plaintiffs’ Response to Microsoft Paragraph 26:</u> Denied** to the extent that Microsoft is suggesting that the articles and content published by NYT Cooking (as opposed to portions of that content that contains only “recipes”) consist predominantly of lists of ingredients and the steps necessary to transform those ingredients into the specified dish.<br><br>Admissible evidence contradicts Microsoft’s assertion. NP Ex. 1355 [Velasquez 30(b)(1) Depo. Tr.] at 64:18-65:13 (The Times’s Camilla Velasquez testifying about how The Times and NYT Cooking publish recipes as well as other content including food articles, collections, and roundups, including for example compilations of “25 Healthy Ideas for Thanksgiving” or “50 Best Recipes of the Year”), 95:21-96:7 (describing NYT Cooking’s “What to Cook Today” guides). | **<u>Microsoft’s Reply:</u>** Paragraph 26 is not genuinely disputed. Plaintiffs do not dispute that “*NYT Cooking* recipes consist predominantly of one or more lists of ingredients and the steps necessary to transform those ingredients into the specified dish,” but argue that not all content published by *NYT Cooking* consists predominantly of these components. That does not make the fact as stated by Microsoft disputed.<br><br>Moreover, the evidence cited by Plaintiffs does not specifically controvert the fact as stated. The testimony Plaintiffs cite confirms that *NYT Cooking* publishes recipes. This testimony therefore does not create a genuine dispute as to whether “*NYT Cooking* recipes consist predominantly of one or more lists of ingredients and the steps necessary to transform those ingredients into the specified dish.” Plaintiffs’ additional facts further do not create a dispute of fact because The Times does not appear to have asserted any articles published by *NYT Cooking*. *See generally* NYT Rule 1006 Asserted Works Summaries. |

### 3. *Impact Upon the Market (Factor 4)*

***The New York Times Company (The New York Times)***

**Paragraph 27**

| |
|---|
| 27. **From 2019 to 2024, the vast majority of The New York Times's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots (*e.g.*, syndication)).** Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); **Ex. 10** (Bardeen 30(b)(6) Dep. Tr.) 17:22-18:21, 18:22-19:3; 46:19-47:6; **Ex. 129** (Yang 30(b)(6) Dep. Tr.) 78:24-79:16; **Ex. 76** (Miller 30(b)(6) Dep. Tr.) 130:20-24; **Ex. 45** (Grossman-Cohen 30(b)(6) Dep. Tr.) 24:22-29:19, 101:18-102:16; **Ex. 77** (Miller Dep. Tr.) 10:3-11, 14:2-20; Tucker Decl. ¶¶ 30-31, Figure 2. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 27**: **Undisputed** that the majority of The Times's revenue from exploitation of its Asserted Works was earned through subscriptions and advertising. The third largest category of Times revenue comes from "other" revenue sources, which includes both licensing revenue and affiliate referrals (among other sources). *See* NP Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 77 (reporting that in 2024, 69.2% of The Times's total revenue was from subscriptions, 19.6% was from advertising, and 11.2% was from "other," including affiliate referrals, licensing, commercial printing, leasing, live events, retail commerce, books, television and film, and The Times's student sponsorship program, and reporting a similar breakdown from 2023). | **Microsoft's Reply:** Paragraph 27 is **Undisputed.**<br><br>Microsoft also incorporates C. Tucker Corr. Decl. (Updated Figure 2). |

**Paragraph 28**

| **28. The New York Times's revenues have increased since the use of its Asserted Works to train the LLMs at issue.** | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 28</u> (Intro)**: **Denied.** News Plaintiffs incorporate by reference their responses to Paragraph 28 subparts (a) through (e) below.<br><br>In addition, admissible evidence contradicts Microsoft's assertion. NP Ex. 130 [Brockman 30(b)(1) Depo. Tr.] at 58:8-10 (testifying that GPT-2 was trained "towards the end of 2018, perhaps early 2019"); NP Ex. 128 [Stamm Rebuttal Rep.] ¶ 379 (OpenAI's economics expert assuming for purposes of her analysis that the date of first infringement for GPT-3 was October 2019); Hurst Ex. 264 [The New York Times SEC Form 10-K Dec. 27, 2020] at 34 (reporting a decrease in The Times's total revenue between 2019 and 2020); NP Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 34 (reporting that The Times's advertising revenue decreased from 2022 to 2023 by 3.5%). | **<u>Microsoft's Reply:</u>** Paragraph 28 is not genuinely disputed. For the same reasons described in reply to Paragraph 28(a)-(e), Plaintiffs' responses do not make this fact disputed. Furthermore, the evidence News Plaintiffs cite demonstrates a few isolated decreases since 2019. A couple of dips does not create a dispute that overall, "The New York Times's revenues have increased since the use of its Asserted Works to train the LLMs at issue."<br><br>Furthermore, News Ex. 130 does not pertain to claims asserted against Microsoft because Mr. Brockman is testifying about GPT-2, which is not a model at issue against Microsoft. *See* ECF 707; ECF 60. This evidence can therefore not contradict Paragraph 28.<br><br>Microsoft also incorporates C. Tucker Corr. Decl. (Updated Figure 2). |
| **a. The New York Times's total revenue has steadily increased since 2020.** Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); Tucker Decl. ¶¶ 11(a), 30-31, Figure 2. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 28</u>(a)**: **Undisputed** that The Times's revenue has increased year-over-year since 2020. Denied that The Times's revenue has increased "steadily" over that timeframe, if by "steadily" Microsoft means that The Times's revenue has increased at the same rate each year | **<u>Microsoft's Reply:</u>** Paragraph 28(a) is not genuinely disputed. **Undisputed** that The Times's revenue "has increased year-over-year since 2020."<br><br>Plaintiffs' issue with the word "steadily" does not create a dispute because "steadily" does not mean "increased at the |

| | |
|---|---|
| since 2020. **Denied** to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot.<br><br>Admissible evidence contradicts that The Times's revenue has increased since 2020 at the same or a similar rate each year; in fact, after the release of Defendants' products in late 2022 and 2023, The Times's revenue increases have been smaller than during the 2020-2022 timeframe. *See* Hurst Ex. 265 [The New York Times SEC Form 10-K Dec. 26, 2021] at 33 (reporting revenue increase from 2020 to 2021 of $1.78 billion to $2.07 billion, or ~16%); Hurst Ex. 63.A [The New York Times SEC Form 10-K Dec. 31, 2022] at 32 (reporting revenue increase from 2021 to 2022 of $2.07 billion to $2.31 billion, or ~11%); Hurst Ex. 63.B [The New York Times SEC Form 10-K Dec. 31, 2024] at 34 (reporting revenue in 2023 of $2.42 billion, which is an increase from 2022 of ~5%, and showing revenue in 2024 of $2.58 billion, which is an increase from 2023 of ~6.6%); NP Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 35 (reporting revenue increase from 2024 to 2025 of $2.58 billion to $2.82 billion, which is an increase of ~9.2%).<br><br>Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way."). Admissible evidence also indicates that The Times's acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. *See* Malackowski Opening Rep. at 84. | same rate each year," as shown by the evidence Microsoft cited. Paragraph 28(a) is therefore **Undisputed**.<br><br>Microsoft also incorporates C. Tucker Corr. Decl. (Updated Figure 2). |

<table>
<tr><td>News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion. See ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).</td><td></td></tr>
<tr><td colspan="2">b. The New York Times's subscription revenue has continued to trend upward since 2020. Hurst Decl. Ex. 263 (NYT 2019 10-K); Ex. 264 (NYT 2020 10-K); Ex. 265 (NYT 2021 10K); Ex. 63.A (Levien Dep. Ex. 1 - NYT 2022 10K); Ex. 266 (Levien Dep. Ex. 2 - NYT 2023 10K); Ex. 63.B (Levien Dep. Ex. 3 - NYT 2024 10K); Ex. 129 (Yang 30(b)(6) Dep. Tr.) 76:22-77:7; Ex. 10 (Bardeen 30(b)(6) Dep. Tr.) 95:4-96:4; Ex. 63 (Levien Dep. Tr.) 21:1-25:10, 36:15-39:6, 42:2-15; Ex. 63.A (Levien Dep. Ex. 1) at 36; Ex. 63.B (Levien Dep. Ex. 3) 36; Tucker Decl. ¶¶ 11(a), 30-31, Figure 2.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 28(b)</u>: Undisputed to the extent that "trend upward" means increased.<br><br>Denied to the extent that "trend upward" means that such increases were uniform year to year. Admissible evidence contradicts this. See Hurst Ex. 265 [The New York Times SEC Form 10-K Dec. 26, 2021] at 33 (reporting that subscription revenues increased 13.9% from 2020 to 2021); Hurst Ex. 63.A [Levien Dep. Ex. 1 - The New York Times SEC Form 10-K Dec. 31, 2022] at 33 (reporting that subscription revenues increased 14% from 2021 to 2022 in part because The Times acquired The Athletic); Hurst Ex. 266 [Levien Dep. Ex. 2 - The New York Times SEC Form 10-K Dec. 31, 2023] at 34 (reporting that subscription revenues increased 6.7% from 2022 to 2023); Hurst Ex. 63.B [Levien Dep. Ex. 3 - The New York Times SEC Form 10-K Dec. 31, 2024] at 33 (reporting that subscription revenues increased 8% from 2023 to 2024).</td><td><u>Microsoft's Reply:</u> Paragraph 28(a) is not genuinely disputed. Undisputed that The Times's subscription revenue "has continued to trend upward since 2020."<br><br>Plaintiffs' issue with the term "trend upward" does not create a dispute because "trend upward" does not mean increases that are "uniform year to year," as shown by the evidence Microsoft cited. Paragraph 28(b) is therefore Undisputed.<br><br>Microsoft also incorporates C. Tucker Corr. Decl. (Updated Figure 2).</td></tr>
</table>

<table>
<tr><td>Denied to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot. Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. See NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 (“One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.”). Admissible evidence also indicates that The Times’s acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. Malackowski Opening Rep. at 84.<br><br>News Plaintiffs object to the citation to Dr. Tucker’s analysis pursuant to Plaintiffs’ pending Daubert motion. See ECF 2067 at 13-16 (Dr. Tucker’s opinions on “trends” purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).</td><td></td></tr>
<tr><td colspan="2">c. The New York Times’s advertising revenue has continued to trend upward since 2021. Hurst Decl. Ex. 263 (NYT 2019 10-K); Ex. 264 (NYT 2020 10-K); Ex. 265 (NYT 2021 10K); Ex. 63.A (Levien Dep. Ex. 1 - NYT 2022 10K); Ex. 266 (Levien Dep. Ex. 2 - NYT 2023 10K); Ex. 63.B (Levien Dep. Ex. 3 - NYT 2024 10K); Ex. 63 (Levien Dep. Tr.) 21:1-23:4, 25:11-19, 36:15-39:6, 42:16-18, 21:1-23:4, 36:15-39:6; Ex. 63.A (Levien Dep. Ex. 1) at 36; Ex. 63.B (Levien Dep. Ex. 3) at 36; Ex. 100 (Robins Dep. Tr.) 205:17-206:3; Tucker Decl. ¶¶ 11(a), 30-31, Figure 2.</td></tr>
<tr><td><u>News Plaintiffs’ Response to Microsoft Paragraph 28(c)</u>: Denied to the extent that “trend upward” means increased. Denied to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot.</td><td><u>Microsoft’s Reply:</u> Paragraph 28(c) is not genuinely disputed. The fact states that The Times’s advertising revenue “has continued to trend upward since 2021,” not that it “has always continued to increase since 2021.” The evidence cited by Plaintiffs does not contradict the fact as</td></tr>
</table>

| | |
|---|---|
| Admissible evidence contradicts Microsoft's assertion that The Times's advertising revenue has always continued to increase since 2021. NP Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 34 (reporting that The Times's advertising revenue decreased from 2022 to 2023 by 3.5%). Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"). Admissible evidence also indicates that The Times's acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. Malackowski Opening Rep. at 84.<br><br>News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | stated. A single decrease from 2022-2023 does not mean that revenue has not continued to trend upward since 2021. Paragraph 28(c) is therefore **Undisputed**.<br><br>Microsoft also incorporates C. Tucker Corr. Decl. (Updated Figure 2). |

d. **The New York Times's "other" sources of revenue, which includes licensing revenue, has continued to trend upward since 2020.** Hurst Decl. **Ex. 263** (NYT 2019 10-K); **Ex. 264** (NYT 2020 10-K); **Ex. 265** (NYT 2021 10K); **Ex. 63.A** (Levien Dep. Ex. 1 - NYT 2022 10K); **Ex. 266** (Levien Dep. Ex. 2 - NYT 2023 10K); **Ex. 63.B** (Levien Dep. Ex. 3 - NYT 2024 10K); **Ex. 63** (Levien Dep. Tr.) 25:20-26:14, 36:15-39:6, 43:3-13; **Ex. 63.A** (Levien Dep. Ex. 1) at 45; **Ex. 63.B** (Levien Dep. Ex. 3) at 43; Tucker Decl. ¶¶ 11(a), 30-31, Figure 2.

| News Plaintiffs' Response to Microsoft Paragraph 28(d) | Microsoft's Reply |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 28</u>(d)**: **Undisputed** that The Times's "other" sources of revenue has increased since 2020.<br><br>**Denied** to the extent that Microsoft suggests that any such revenue increase has been uniform year-to-year. Admissible evidence contradicts this. *See* Hurst Ex. 265 [The New York Times SEC Form 10-K Dec. 26, 2021] at 33 (reporting that "other" revenue increased 9.9% from 2020 to 2021); Hurst Ex. 63.A [Levien Dep. Ex. 1 - The New York Times SEC Form 10-K Dec. 31, 2022] at 33 (reporting that "other" revenue increased 8.1% from 2021 to 2022]; Hurst Ex. 266 [Levien Dep. Ex. 2 - The New York Times SEC Form 10-K Dec. 31, 2023] at 35 (reporting that "other" revenue increased 13.8% from 2022 to 2023); Hurst Ex. 63.B [The New York Times SEC Form 10-K Dec. 31, 2024] at 33 (reporting that "other" revenue increased 10% from 2023 to 2024).<br><br>**Denied** to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot. Admissible evidence contradicts that any such revenue increase means there has been no harm from ChatGPT or Copilot. *See* NP Ex. 1302 [Malackowski July 15, 2026 Depo Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"). Admissible evidence also indicates that The Times's acquisition of The Athletic in 2022 (and the resulting increase in subscriptions and advertising revenue) mitigated broader headwinds. Malackowski Opening Rep. at 84. | **<u>Microsoft's Reply:</u>** Paragraph 28(d) is not genuinely disputed. **Undisputed** that The Times's "other" sources of revenue has increased since 2020.<br><br>Microsoft does not say that increases were "uniform year-to-year" but that their "other" revenue "has continued to trend upward since 2020," as shown by the evidence Microsoft cited. Paragraph 28(d) is therefore **Undisputed**.<br><br>Microsoft also incorporates C. Tucker Corr. Decl. (Updated Figure 2). |

<table>
<tr><td>News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion. See ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation).</td><td></td></tr>
<tr><td colspan="2">e. The total number of subscribers to The New York Times has increased since the introduction of Copilot and ChatGPT. Tucker Decl. ¶¶ 11(a), 32-33, Figure 3, Figure 4; see also Hurst Decl. Ex. 129 (Yang 30(b)(6) Dep. Tr.) 76:22-77:7; Ex. 10 (Bardeen 30(b)(6) Dep. Tr.) 95:4-96:4; Ex. 63 (Levien Dep. Tr.) 21:1-23:25:10, 36:15-39:6, 42:2-15; Ex. 63.A (Levien Dep. Ex. 1) at 40; Ex. 63.B (Levien Ex. 3) at 10.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 28(e)</u>: Undisputed that The Times's total number of subscribers has increased since November 2022, when ChatGPT was publicly released, which was the same year that The Times acquired The Athletic, which previously had its own subscribers. Denied to the extent Microsoft suggests this means there has been no harm from ChatGPT or Copilot.<br><br>Admissible evidence contradicts that any such subscription number increase means there has been no harm from ChatGPT or Copilot. See NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"). Admissible evidence also indicates that there has been a decrease in news-only subscribers to The Times since 2022. See, e.g., NP Ex. 98 [The New York Times SEC Form 10-K Dec. 31, 2023] at 35-36 (reporting that news-only subscribers decreased from 2022 to 2023); NP Ex. 103 [The New York Times SEC Form 10-K Dec. 31, 2024] at 34-35 (reporting that news-only</td><td><u>Microsoft's Reply:</u> Paragraph 28(e) is not genuinely disputed. Undisputed that The Times's "total number of subscribers has increased since November 2022." Paragraph 28(e) is therefore Undisputed.</td></tr>
</table>

| | |
|---|---|
| subscribers decreased from 2023 to 2024); NP Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 36-37 (reporting that news-only subscribers decreased from 2024 to 2025).<br><br>News Plaintiffs object to the citation to Dr. Tucker's analysis pursuant to Plaintiffs' pending Daubert motion. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 29**

| | |
|---|---|
| **29. To the extent The New York Times asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following: News Plaintiffs' expert Dr. Goldstein analyzed logs of 8.2 million real-world conversations with Microsoft's consumer version of Copilot produced by Microsoft. The 8.2 million conversations were selected from a population of approximately 1,134,799,717 total conversations between users and Microsoft's consumer Copilot occurring between July 2023 to September 2024 based on matches with certain keyword terms in any text-containing field. The keyword terms used were primarily the names of News Plaintiffs' publications and URLs including the domain names of their publications (*e.g.*, nytimes.com), as supplied by News Plaintiffs.** Hurst Decl. ¶¶ 2-3; Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶¶ 382-84. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 29</u>**: **Undisputed** that Plaintiffs' expert Dr. Goldstein analyzed logs of 8.2 million real-world conversations with Microsoft's consumer version of Copilot produced by Microsoft, and that the 8.2 million conversations were selected from a population of approximately 1,134,799,717 conversations between users and Microsoft's consumer Copilot occurring between July 2023 to September 2024, and that the 8.2 million conversations were selected based | **<u>Microsoft's Reply:</u>** **Undisputed** that Plaintiffs' expert Dr. Goldstein analyzed logs of 8.2 million real-world conversations with Microsoft's consumer version of Copilot produced by Microsoft, occurring between July 2023 to September 2024, that were selected based on matches with certain keyword terms, including the names of News Plaintiffs' publications and URLs. |

| | |
|---|---|
| on matches with certain keyword terms, including the names of News Plaintiffs' publications and URLs.<br><br>**Denied** to the extent Microsoft asserts all of the approximately 1,134,799,717 conversations contained searchable text fields. About 25% of the universe of available Copilot logs had key text fields removed from them due to a privacy stripping program. Goldstein Opening Report ¶ 378.<br><br>**Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Report, ¶ 398), looking at News Plaintiffs' domains (Goldstein Opening Rep., ¶¶ 394-397; Goldstein Rebuttal Rep., ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep., ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep., ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep., ¶¶ 415-418).<br><br>Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how | Plaintiffs attempt to create a dispute of fact by denying Paragraph 29 "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's regurgitation analyses from his opening report.<br><br>Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions derived from Dr. Goldstein's flawed methodology described in Microsoft News SUMFs ¶¶ 29-32(a), including:<br><br>(1) Dr. Goldstein's 4-gram matching analysis (Hurst Decl. Ex. 231 (Goldstein Opening Rep.) ¶ 398);<br><br>(2) his News Plaintiff domain analysis (Hurst Decl. Ex. 231 (Goldstein Opening Rep.) ¶¶ 394-397; Goldstein Rebuttal Rep., ¶¶ 106-107);<br><br>(3) his URL analysis (Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶¶ 46-49);<br><br>(4) his RAG "leaks" analysis (ECF 1819 (Goldstein Decl.) Ex. B (Goldstein Rebuttal Rep.) ¶ ¶¶ 77-79, 82-85),<br><br>(5) his analysis of Microsoft's impressions data (Hurst Decl. Ex. 231 (Goldstein Opening Rep.) ¶¶ 415-418); and<br><br>(6) his opinions regarding the rate Copilot is used for news purposes (ECF 1819 (Goldstein Decl.) Ex. B |

| | |
|---|---|
| frequently Copilot is used for news purposes. See Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | (Goldstein Rebuttal Rep.) ¶¶ 109-120, 129-158.); ECF 2055 at II. A. 1. & 3.<br><br>As described in the Motion, none of these analyses are valid or reliable because his calculations were based on statistical methods using valid random samples, but there was no random sample. Instead, there was a highly biased census which was an effort to include all conversations involving News Plaintiffs' content, and therefore any rates derived from examining that pool of data are by definition not reflective of the entire population. ECF 2050; ECF 2055 at 9-10, 13-18. Additionally, the fact that there may have been other logs in that keyword population had they not been removed by an ordinary course privacy program designed to comply with the EU General Data Protection Regulation (GDPR) and other foreign data privacy laws does not resuscitate Goldstein's methodology. If those hypothetical logs were added to the census, it still would not be a valid random sample or produce a reliable method of deriving any rates of so-called regurgitation. The GDPR program therefore does not dispute the fact as stated.<br><br>To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. See Fed. R. Civ. P. 56(c)(2). |

**Paragraph 30**

| | |
|---|---|
| **30. The conversation logs contained [redacted] fields for outputs displayed to a user, as well as [redacted] fields containing web grounding data retrieved by the Copilot system.** Lafferty Decl. ¶¶ 201; Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37. | |
| **News Plaintiffs' Response to Microsoft Paragraph 30: Undisputed.** | **Microsoft's Reply:** Paragraph 30 is **Undisputed**. |

**Paragraph 31**

| | |
|---|---|
| **31. Any logs that hit on a keyword in any of those fields were produced.** Hurst Decl. ¶3; Hurst Decl. **Ex. 231** (Goldstein Opening Report) ¶ 382-84; Lafferty Decl. ¶ 342. | |
| **News Plaintiffs' Response to Microsoft Paragraph 31: Denied.** Admissible evidence contradicts Microsoft's statement.<br><br>Microsoft applied redactions to the logs before producing the logs, which means the logs were only partially produced. Goldstein Opening Rep. ¶ 382. The scale of the redactions is enormous. In the set of 8.2 million output logs that Microsoft produced, there are 622,460,385 total redactions (or about 76 redactions per output log). Goldstein Opening Rep. ¶ 386. For example, in one conversation, the following words and phrases are redacted from a published article by the Sun Sentinel: "a lot," "Business Leader of the Year in Broward County," "businessman," "people," "company owner," "mentor," "fundraiser," "board member," "diner patron," and "friend." In other examples, Microsoft has similarly redacted generic and non-identifying terms appearing in public articles. Goldstein Opening Rep. ¶ 386. | **Microsoft's Reply: Undisputed** that logs that hit on a keyword in the relevant fields were produced. News Plaintiffs do not create a dispute of fact because Microsoft applied redactions to the logs before production (as agreed by the parties) in order to protect users' personal identifiable information. If Plaintiffs were dissatisfied with the PII redaction protocol, they had every opportunity to (1) bring that to Judge Wang's attention, and (2) adjust their expert methodology to address it – which they in fact did. The fact as stated is not controverted. |

**Paragraph 32**

<table>
<tr><td colspan="2">

**32. Goldstein performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works.** Hurst Decl. Ex. 231 (Goldstein Opening Report) ¶ 297; Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 21.

a. **Subject to certain exclusions for user-supplied data or lack of originality (which he assessed using an LLM), Dr. Goldstein ultimately found a regurgitation when either (1) there was a 16 gram match between text of an article in an Asserted Work and either [redacted] or [redacted] fields in a chat log, or (2) using a 4-gram continuity score there was a 16-gram sequence comprised of 4-gram matches, allowing for a single word gap between each 4-gram match (again, in either [redacted] or other [redacted] fields) (this was designed to address privacy redactions). A gram is approximately equivalent to a word.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶¶ 22–25, 27–28.

b. **Goldstein found that of The New York Times's 4,519,337 Asserted Works, 2,601 articles matched in the Copilot [redacted] fields (the grounding data) using the 4x4 gram continuity score and 2,462 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

c. **Goldstein also found that of The New York Times's 4,519,337 Asserted Works, 183 New York Times articles matched in the Copilot [redacted] fields (the outputs displayed to the user) using the continuity score and 104 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).

d. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

</td></tr>
<tr><td>

**<u>News Plaintiffs' Response to Microsoft Paragraph 32</u>: Undisputed** that Dr. Goldstein analyzed the 8.2 million output logs and that one purpose of his analysis was to assess whether any of the Copilot outputs contained

</td><td>

**<u>Microsoft's Reply:</u> Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing

</td></tr>
</table>

| | |
|---|---|
| matches to Times or Daily News Plaintiffs' works and portions thereof.<br><br>**Undisputed** that Dr. Goldstein reported results based on different metrics, including a 16-gram overlap score as well as 4-gram continuity score in which there was a 16-gram sequence comprised of 4-gram matches, allowing for a single word gap between each 4-gram match.<br><br>**Denied** because the description of Dr. Goldstein's "exclusions" for his **methodology** is incomplete. Dr. Goldstein also during scoring removed from consideration any text from the Asserted Works enclosed in quotation marks. Goldstein Supp'l Rep. ¶ 28.<br><br>Also **denied** insofar as the Fact asserts that the only purpose of Dr. Goldstein's analysis of the 8.2 million logs was to assess regurgitation. Dr. Goldstein also analyzed these logs to, among other things, assess whether any of the logs relied on a news website or pink-slime website for retrieval augmented generation, *e.g.*, Goldstein Supp'l Rep. ¶¶ 66-67, as well as to assess whether Copilot cited and/or summarized Times or Daily News content in responses to user prompts, *e.g.*, Goldstein Opening Rep. ¶ 400.<br><br>Also **denied** because Dr. Goldstein's methodology referenced in Undisputed Fact ¶ 32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Report, ¶ 398), looking at News Plaintiffs' domains (Goldstein Opening Rep., ¶¶ 394-397; Goldstein Rebuttal Rep., ¶¶ 106-107), looking at News | other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Paragraph 32(a) is **Undisputed.** News Plaintiffs seek to create a dispute by stating that the description of Goldstein's "exclusion" methodology is incomplete as Paragraph 32(a) does not explicitly state that Dr. Goldstein also removed from consideration text from the Asserted Works enclosed in quotation marks in his supplemental analyses. That does not make this fact disputed. Indeed, Paragraph 32(a) cites the same evidence as News Plaintiffs for Goldstein's "exclusions"—namely, Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 28.<br><br>Paragraphs 32(b) and 32(c) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5. But The Times seeks to create a dispute by stating they now assert a different number of works and have chosen to move on only a subsection of those Asserted Works. That does not contradict the fact as stated, which merely states the findings of The Times' expert, who has not supplied any further supplemental analyses based on The Times' fluctuating number of asserted works.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which |

| | |
|---|---|
| Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Report, ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Report, ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Report, ¶¶ 415-418).<br><br>Also **denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Also **denied** because Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. Goldstein Opening Report ¶¶ 419-420; Goldstein Rebuttal Report ¶¶ 109-120, 129-158.<br><br>Also **denied** because The Times does not have 4,519,337 Asserted Works. There are 5,840,526 Times Asserted Works (Maisel MSJ-Opposition Decl. ¶ 6) and the total number of works on which The Times is moving for summary judgment is 964,888. NP-SUF 296. | merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraph 32(d) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***Daily News, LP (Daily News)***

**Paragraph 33**

| |
|---|
| **33. From fiscal year 2019 to 2024, the vast majority of the Daily News's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).** Hurst Decl. **Ex. 141** (Daily News Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; Ex. 66 (Loretto |

| |
|---|
| 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 140** (Daily News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 36, Figure 6B. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 33**: **Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Daily News's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of Daily News's revenue was earned equally from subscriptions, advertising, and licensing.<br><br>Most of Daily News's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11] at –437. | **Microsoft's Reply: Undisputed** that the Daily News earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots).<br><br>The fact does not state that each of these revenue streams make up equal percentages of the Daily News's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 33. |

**Paragraph 34**

| |
|---|
| **34.** [redacted]<br><br>**a.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 36, Figure 6B.<br><br>**b.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 36, Figure 5A, Figure 6B. |

| | |
|---|---|
| **c.** | [redacted] Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 34**: **Denied** because it suggests that the Daily News's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.<br><br>Daily News's revenues have been declining, and no evidence in this case isolates the impact of ChatGPT and Copilot on the Daily News's revenues, including total revenues, subscription revenues, and advertising revenues, from other factors. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | **Microsoft's Reply:** Paragraph 34 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the trends in the Daily News's total revenue, subscription revenue, and advertising revenue.<br><br>News Plaintiffs' denial that these facts "suggest[] the Daily News's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 34 is therefore **Undisputed**. |

**Paragraph 35**

| |
|---|
| **35. To the extent the Daily News asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:** |

| | |
|---|---|
| a. **Of the Daily News's 525,341 Asserted Works, 356 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 333 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).<br><br>b. **Of The Daily News's 525,341 Asserted Works, 15 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 6 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).<br><br>c. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above). | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 35</u>**: **Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this. Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep.¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418). | **<u>Microsoft's Reply:</u>** **Undisputed** that Dr. Goldstein performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 35(a) and 35(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. |

| | |
|---|---|
| Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 35(c) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***<u>Chicago Tribune Company, LLC (Chicago Tribune)</u>***

**Paragraph 36**

| | |
|---|---|
| **36. From fiscal year 2019 to 2024, the vast majority of the Chicago Tribune's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).** Hurst Decl. **Ex. 134** (Chicago Tribune Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 133** (Chicago Tribune 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34-35, Figure 6A. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 36</u>: Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Chicago Tribune's revenue from exploitation of its Asserted Works. **Denied** to the extent it suggests that the vast majority of Chicago Tribune's revenue was earned equally from subscriptions, advertising, and licensing.<br><br>Most of Chicago Tribune's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP- | **<u>Microsoft's Reply:</u> Undisputed** that the Chicago Tribune earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots).<br><br>The fact does not state that each of these revenue streams make up equal percentages of the Chicago Tribune's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 36. |

| | |
|---|---|
| 00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437. | |

**Paragraph 37**

| |
|---|
| **37.** [redacted] <br><br> **a.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 35, Figure 5A, Figure 6A. <br><br> **b.** [redacted] Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. |

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 37</u>: Denied** because it suggests that the Chicago Tribune's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this. Chicago Tribune's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Chicago Tribune's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken | **<u>Microsoft's Reply:</u>** Paragraph 37 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the Chicago Tribune's total revenue, subscription revenue, and advertising revenue. <br><br> News Plaintiffs' denial that these facts "suggest[] the Chicago Tribune's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 37 is therefore **Undisputed**. |

| | |
|---|---|
| because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 38**

**38. To the extent the Chicago Tribune asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:**

a. **Of the Chicago Tribune's 1,205,350 Asserted Works, 1,200 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 1,159 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 3; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b. **Of the Chicago Tribune's 1,205,350 Asserted Works, 82 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 45 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).

c. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

| | |
|---|---|
| <u>**News Plaintiffs' Response to Microsoft Paragraph 38**</u>: **Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses | <u>**Microsoft's Reply:**</u> **Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by |

| | |
|---|---|
| that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).<br><br>Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 38(a) and 38(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 35(c) is **Undisputed.** Plaintiffs cite no contradictory evidence |

***<u>Sun-Sentinel Company, LLC (Sun Sentinel)</u>***

**Paragraph 39**

| | |
|---|---|
| **39. From fiscal year 2019 to 2024, the vast majority of the Sun Sentinel's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).** Hurst Decl. **Ex. 167** (Sun Sentinel Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; Tucker Decl. ¶¶ 34, 37, Figure 6C. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 39</u>**: **Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Sun Sentinel's revenue from exploitation of its Asserted Works. | **<u>Microsoft's Reply:</u> Undisputed** that the Sun Sentinel earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). |

| | |
|---|---|
| Denied to the extent it suggests that the vast majority of Sun Sentinel's revenue was earned equally from subscriptions, advertising, and licensing.<br><br>Most of Sun Sentinel's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437. | The fact does not state that each of these revenue streams make up equal percentages of the Sun Sentinel's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 39. |

**Paragraph 40**

| | |
|---|---|
| **40.** [redacted].<br><br>**a.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 37, Figure 5A, Figure 6C.<br><br>**b.** [redacted] Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 40</u>: Denied** because it suggests that the Sun Sentinel's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this. Sun Sentinel's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Sun Sentinel's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. | **<u>Microsoft's Reply:</u>** Paragraph 40 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the Sun Sentinel's total revenue, subscription revenue, and advertising revenue.<br><br>News Plaintiffs' denial that these facts "suggest[] the Sun Sentinel's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 40 is therefore **Undisputed**. |

| | |
|---|---|
| Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 41**

**41. To the extent the Sun Sentinel asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:**

a. **Of the Sun Sentinel's 134,518 Asserted Works, 121 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 117 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b. **Of the Sun Sentinel's 134,518 Asserted Works, 9 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 5 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2 (Sur-reply).

c. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 41**: **Denied** to the extent Microsoft asserts that Dr. | **Microsoft's Reply:** **Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to |

| | |
|---|---|
| Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).<br><br>Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 41(a) and 41(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 41(c) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***<u>Orlando Sentinel Communications Company, LLC (Orlando Sentinel)</u>***

**Paragraph 42**

**42. From fiscal year 2019 to 2024, the vast majority of the Orlando Sentinel's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*,**

| |
|---|
| **syndication)).** Hurst Decl. **Ex. 160** (Orlando Sentinel Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 156** (Orlando Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 38, Figure 6D. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 42**: **Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Orlando Sentinel's revenue from exploitation of its Asserted Works. **Denied** to the extent it suggests that the vast majority of Orlando Sentinel's revenue was earned equally from subscriptions, advertising, and licensing.<br><br>Most of Orlando Sentinel's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437. | **Microsoft's Reply:** **Undisputed** that the Orlando Sentinel earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots).<br><br>The fact does not state that each of these revenue streams make up equal percentages of the Orlando Sentinel's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 42. |

**Paragraph 43**

| |
|---|
| **43.** [redacted]<br><br>**a.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 38, Figure 6D.<br><br>**b.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 38, Figure 5A, Figure 6D. |

| | |
|---|---|
| c. [redacted] urst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. | |
| **News Plaintiffs' Response to Microsoft Paragraph 43**: **Denied** because it suggests that the Orlando Sentinel's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.<br><br>Orlando Sentinel's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Orlando Sentinel's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | **Microsoft's Reply:** Paragraph 43 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the trends in the Orlando Sentinel's total revenue, subscription revenue, and advertising revenue.<br><br>News Plaintiffs' denial that these facts "suggest[] the Orlando Sentinel's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 43 is therefore **Undisputed**. |

**Paragraph 44**

| |
|---|
| **44. To the extent the Orlando Sentinel asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:** |

a. **Of the Orlando Sentinel's 424,822 Asserted Works, 289 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 276 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b. **Of the Orlando Sentinel's 424,822 Asserted Works, 17 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 9 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶¶ 26–28, 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.

c. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

| | |
|---|---|
| <u>**News Plaintiffs' Response to Microsoft Paragraph 44**</u>: **Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at | <u>**Microsoft's Reply:**</u> **Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 44(a) and 44(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. |

| | |
|---|---|
| Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).<br><br>Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 44(c) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***<u>San Jose Mercury-News, LLC (The Mercury News)</u>***

**Paragraph 45**

| | |
|---|---|
| 45. **From fiscal year 2019 to 2024, the vast majority of The Mercury News's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).** Hurst Decl. **Ex. 149** (Mercury News Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 148** (Mercury News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 39, Figure 6E. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 45</u>**: **Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Mercury News's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of Mercury News's revenue was earned equally from subscriptions, advertising, and licensing.<br><br>Most of Mercury News's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for | **<u>Microsoft's Reply:</u> Undisputed** that The Mercury News earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots).<br><br>The fact does not state that each of these revenue streams make up equal percentages of The Mercury News's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 45. |

| | |
|---|---|
| purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437. | |

**Paragraph 46**

| | |
|---|---|
| **46.** [redacted]<br>**a.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 39, Figure 6E.<br>**b.** [redacted] Tucker Decl. Ex. ¶¶ 11(a), 34, 39, Figure 5B, Figure 6E.<br>**c.** [redacted] Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 46</u>**: **Denied** because it suggests that The Mercury News's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.<br><br>The Mercury News's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on The Mercury News's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a | **<u>Microsoft's Reply:</u>** Paragraph 46 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the trends in The Mercury News's total revenue, subscription revenue, and advertising revenue.<br><br>News Plaintiffs' denial that these facts "suggest[] The Mercury News's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 46 is therefore **Undisputed**. |

| | |
|---|---|
| quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 47**

| |
|---|
| **47. To the extent The Mercury News asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:**<br><br>**a. Of The Mercury News's 130,331 Asserted Works, 931 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 877 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).<br><br>**b. Of The Mercury News's 130,331 Asserted Works, 94 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 57 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.<br><br>**c. Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above). |

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 47</u>: Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm | **<u>Microsoft's Reply:</u> Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing |

| | |
|---|---|
| from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).<br><br>Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 47(a) and 47(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 47(c) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***<u>DP Media Network, LLC (The Denver Post)</u>***

**Paragraph 48**

| |
|---|
| **48. From fiscal year 2019 to 2024, the vast majority of The Denver Post's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).** Hurst Decl. **Ex. 145** (Denver Post Resp. to MSFT ROG No. 24); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** |

| | |
|---|---|
| (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 140** (Denver Post 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 40, Figure 6F. | |
| **News Plaintiffs' Response to Microsoft Paragraph 48**: **Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Denver Post's revenue from exploitation of its Asserted Works. **Denied** to the extent it suggests that the vast majority of Denver Post's revenue was earned equally from subscriptions, advertising, and licensing.<br><br>Most of Denver Post's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437. | **Microsoft's Reply: Undisputed** that The Denver Post earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots).<br><br>The fact does not state that each of these revenue streams make up equal percentages of The Denver Post's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 48. |

**Paragraph 49**

**49.** [redacted]

**a.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 40, Figure 6F.

**b.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 40, Figure 5B, Figure 6F.

| | |
|---|---|
| **c.** [redacted] Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 49</u>: Denied** because it suggests that The Denver Post's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.<br><br>The Denver Post's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on The Denver Post's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | **<u>Microsoft's Reply:</u>** Paragraph 49 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the trends in The Denver Post's total revenue, subscription revenue, and advertising revenue.<br><br>News Plaintiffs' denial that these facts "suggest[] The Denver Post's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 49 is therefore **Undisputed**. |

**Paragraph 50**

| |
|---|
| **50. To the extent The Denver Post asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:** |

| | |
|---|---|
| a. **Of The Denver Post's 89,269 Asserted Works, 1,005 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 969 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).<br><br>b. **Of The Denver Post's 89,269 Asserted Works, 123 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 78 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.<br><br>c. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above). | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 50</u>**: **Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418). | **<u>Microsoft's Reply:</u>** **Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 50(a) and 50(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. Goldstein's Supplemental Expert Report. Hurst Decl. Ex. |

| | |
|---|---|
| Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep, ¶¶ 109-120, 129-158. | 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 50(c) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***<u>ORB Publishing, LLC (The Orange County Register)</u>***

**Paragraph 51**

| | |
|---|---|
| 51. **From fiscal year 2019 to 2024, the vast majority of The Orange County Register's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).** Hurst Decl. **Ex. 157** (Orange County Register Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 156** (OC Register 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 41, Figure 6G. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 51</u>**: **Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Orange County Register's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of The Orange County Register's revenue was earned equally from subscriptions, advertising, and licensing. Most of The Orange County Register's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. | **<u>Microsoft's Reply:</u>** **Undisputed** that The Orange County Register earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots).<br><br>The fact does not state that each of these revenue streams make up equal percentages of The Orange County Register's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 51. |

| | |
|---|---|
| 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437. | |

**Paragraph 52**

| | |
|---|---|
| **52.** [redacted]<br><br>**a.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 41, Figure 6G.<br><br>**b.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 41, Figure 5B, Figure 6G.<br><br>**c.** [redacted] Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. | |
| **News Plaintiffs' Response to Microsoft Paragraph 52**: **Denied** because it suggests that The Orange County Register's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.<br><br>The Orange County Register's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on The Orange County Register's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that | **Microsoft's Reply:** Paragraph 52 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the trends in The Orange County Register's total revenue, subscription revenue, and advertising revenue.<br><br>News Plaintiffs' denial that these facts "suggest[] The Orange County Register's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 52 is therefore **Undisputed**. |

| | |
|---|---|
| have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 53**

**53. To the extent The Orange County Register asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:**

a. **Of The Orange County Register's 35,603 Asserted Works, 36 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 32 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b. **Of the Orange County Register's 35,603 Asserted Works, 1 article matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 1 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.

c. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 53**: **Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this. | **Microsoft's Reply:** **Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing other analyses Dr. Goldstein performed, including as to |

| | |
|---|---|
| Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).<br><br>Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. *See* Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 53(a) and 53(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in these paragraphs. These figures are drawn directly from Dr. Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 53(c) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***<u>Northwest Publications, LLC (Pioneer Press)</u>***

**Paragraph 54**

| |
|---|
| **54. From fiscal year 2019 to 2024, the vast majority of the Pioneer Press's revenue from exploitation of its Asserted Works was earned through subscriptions, advertising, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (e.g., syndication)).** Hurst Decl. **Ex. 164** (Pioneer Press Resp. to MSFT ROG No. 23); **Ex. 56** (Ibrahim 30(b)(6) Dep. Tr.) 26:13-24; **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 14:10-20; **Ex. 163** (Pioneer Press 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** |

| | |
|---|---|
| (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5; Tucker Decl. ¶¶ 34, 42, Figure 6H. | |
| **News Plaintiffs' Response to Microsoft Paragraph 54**: **Undisputed** to the extent it suggests that subscriptions, advertising, and licensing revenues collectively comprised the vast majority of the Pioneer Press's revenue from exploitation of its Asserted Works. Denied to the extent it suggests that the vast majority of the Pioneer Press's revenue was earned equally from subscriptions, advertising, and licensing.<br><br>Most of the Pioneer Press's revenue in recent years is from circulation/subscriptions, a lesser amount is from advertising, and a lesser amount still is from licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots). NP Ex. 95 [DNP-00533731]; NP Ex. 91 [DNP-00396431/D. Anderson Dep. Ex. 11) at –437. | **Microsoft's Reply: Undisputed** that the Pioneer Press earned the vast majority of its revenue from exploitation of the Asserted Works via subscriptions, advertising, and licensing (for purposes other than LLM training or grounding LLM-based general purpose chatbots).<br><br>The fact does not state that each of these revenue streams make up equal percentages of the Pioneer Press's overall revenue, so News Plaintiffs' "denial" does not genuinely dispute Paragraph 54. |

**Paragraph 55**

**55.** [redacted]

**a.** [redacted] ucker Decl. ¶¶ 11(a), 34, 42, Figure 6H; Hurst Decl. **Ex. 20** (Burbach Deposition) 22:7-23:1.

**b.** [redacted] Tucker Decl. ¶¶ 11(a), 34, 42, Figure 5B, Figure 6H.

| | |
|---|---|
| **c.** [redacted] Hurst Decl. **Ex. 66** (Loretto 30(b)(6) Dep. Tr.) 95:7-18. | |
| **News Plaintiffs' Response to Microsoft Paragraph 55**: **Denied** because it suggests that the Pioneer Press's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue, and admissible evidence contradicts this.<br><br>The Pioneer Press's revenues have been declining and no evidence in this case isolates the impact of ChatGPT and Copilot on the Pioneer Press's revenues, including total revenues, subscription revenues, and advertising revenues. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | **Microsoft's Reply:** Paragraph 55 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the trends in The Pioneer Press's total revenue, subscription revenue, and advertising revenue.<br><br>News Plaintiffs' denial that these facts "suggest[] The Pioneer Press's revenues have not been impacted by Defendants' use of the Asserted Works to train the LLMs at issue," is not addressed to the fact as stated. Paragraph 55 is therefore **Undisputed**. |

**Paragraph 56**

| |
|---|
| **56. To the extent the Pioneer Press asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: Employing the methodology described in Undisputed Facts ¶¶ 29-32(a), News Plaintiffs' Expert Dr. Goldstein found:** |

a. **Of the Pioneer Press's 47,527 Asserted Works, 326 articles matched in the Copilot [redacted] fields using the 4x4 gram continuity score and 300 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 1, 4; Lafferty Decl. ¶ 408, Table 1 (Sur-reply).

b. **Of the Pioneer Press's 47,527 Asserted Works, 21 articles matched in the Copilot [redacted] fields (i.e., the user-facing responses) using the continuity score and 12 using the 16-gram score.** Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Tables 2, 5; Lafferty Decl. ¶ 409, Table 2.

c. **Goldstein did not report a match to any entire article.** *See* Hurst Decl. **Ex. 235** (Goldstein Supplemental Report) ¶ 37, Table 2 (highest threshold Goldstein reported was a continuity score of 50 or above).

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 56</u>**: **Denied** to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Goldstein's methodology described in Undisputed Facts ¶¶ 29-32(a) is not the only analysis of regurgitation by Dr. Goldstein. Dr. Goldstein also performed analyses that quantified the amount of News Plaintiffs' content appearing in different Copilot conversation data fields including by using a 4-gram analysis (Goldstein Opening Rep. ¶¶ 397-398), looking at News Plaintiffs' domains (Goldstein Opening Rep. ¶¶ 394-397, Goldstein Rebuttal Rep. ¶¶ 106-107), looking at News Plaintiffs' URLs corresponding to an Asserted Work (Goldstein Supplemental Rep. ¶¶ 46-49), looking at "leaks" of News Plaintiff content from internal RAG fields to output (Goldstein Rebuttal Rep. ¶¶ 77-79, 82-85), and looking at | **<u>Microsoft's Reply:</u>** **Undisputed** that Dr. Goldstain performed his analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what he qualified as a "regurgitation" of News Plaintiffs' Asserted Works. News Plaintiffs seek to create a dispute by listing other analyses Dr. Goldstein performed, including as to regurgitation. The fact that Dr. Goldstein performed multiple analyses does not controvert the fact as stated.<br><br>Plaintiffs further attempt to create a dispute of fact by denying this paragraph "to the extent Microsoft asserts that Dr. Goldstein's log analysis is only relevant to harm from regurgitation and suggests that Plaintiff's evidence of harm from LLM training is limited to Dr. Goldstein's Copilot log analysis." That does not contradict the fact as stated, which merely describes Dr. Goldstein's most recent regurgitation analyses from his supplemental report.<br><br>Paragraphs 56(a) and 56(b) are **Undisputed**. News Plaintiffs do not dispute any of the article match figures in |

| | |
|---|---|
| Microsoft's impressions data (Goldstein Opening Rep. ¶¶ 415-418).<br><br>Moreover, Dr. Goldstein's analyses concerned harms to News Plaintiffs beyond regurgitation by looking at how frequently Copilot is used for news purposes. See Goldstein Opening Rep. ¶¶ 419-420; Goldstein Rebuttal Rep. ¶¶ 109-120, 129-158. | these paragraphs. These figures are drawn directly from Dr. Goldstein's Supplemental Expert Report. Hurst Decl. Ex. 235 (Goldstein Suppl. Rep.) ¶ 37, Tables 1, 2, 4, and 5.<br><br>Paragraph 56(c) is **Undisputed.** Plaintiffs cite no contradictory evidence. |

***<u>The Center for Investigative Reporting (CIR)</u>***

**Paragraph 57**

| | |
|---|---|
| 57.**From 2019 to 2024, the vast majority of CIR's revenue from exploitation of its Asserted Works was earned through subscriptions, donations, and licensing (for purposes other than use in LLM training or grounding LLM-based general purpose chatbot (*e.g.*, syndication)).** Hurst Decl. **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. Vol. 2 (dated Dec. 19, 2025)) 311:1-15, 405:25-408:22; **Ex. 17** (Buckingham 30(b)(6) Dep. Tr. (Vol. 1, dated Dec. 18, 2025)) 194:5-7; **Ex. 17A** (Buckingham Dep. Ex. 30 – Building the investigative newsroom of the future); **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 2, dated Jan. 27, 2026)) 378:19-379:3, 385:9-24; **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 293:25-294:22, 297:22-25, 299:13-21; Ex. 13 (Bauerlein Dep. Tr. dated Jan. 27, 2026) 58:16-64:18; **Ex. 12.A** (Bauerlein Dep. Ex. 47); Tucker Decl. ¶ 44. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 57</u>**: **Undisputed** to the extent CIR raises money through the non-exhaustive list of donations, subscriptions and licensing. CIR also raises money through grants and advertising. NP Ex. 1277 [Bauerlein 30(b)(6) 1/27/26 Depo. Tr.] at 319:23-320:5, 322:20-24 (describing grant making programs from foundations or institutional donors); NP Ex. 1277 [Bauerlein 30(b)(6) 1/27/26 Depo. Tr.] at 413:1-4 (describing stronger advertising sales on digital channels). | **<u>Microsoft's Reply:</u> Undisputed** that the vast majority of CIR's revenue from exploitation of its Asserted Works was earned through subscriptions, donations, and licensing, even in light of the additional information in CIR's response that CIR also raises money through grants and advertising. |

**Paragraph 58**

| |
|---|
| **58.** [redacted]<br><br>**a.** [redacted] Tucker Decl. ¶¶ 11(a), 44, 48, Figure 8; *see also* Hurst Decl. **Ex. 17** (Buckingham 30(b)(6) Dep. Tr. (Vol. 1, dated Dec. 18, 2025)) 194:5-7; **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 2, dated Jan. 27, 2026)) 385:9-24.<br><br>**b.** [redacted] Tucker Decl. ¶¶ 11(a), 44-47, Figure 7; *see also* Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 299:13-21. |

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 58</u>**: Subparagraph (a) is **denied** to the extent Microsoft means Mother Jones magazine subscription revenue increased due to the introduction of Copilot and ChatGPT. Evidence cited does not support that contention. **Undisputed** to the extent Microsoft's statement means Madeleine Buckingham, Chief Financial Officer at CIR, testified that overall, "subscription revenue has increased" from 2018-2024. She also testified that "if I look at the trend line, it looks like it's remained relatively flat with a slight bump-up in the last year." NP Ex. 284 [Buckingham 30(b)(6) Depo. Tr. (Vol. 1, dated Dec. 18, 2025)] at 195:14-16. Also **undisputed** that Ms. Bauerlein testified "[t]here has not been a downward trend, but it has become more difficult and more expensive to acquire those subscribers." NP Ex. 1277 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 2, dated Jan. 27, 2026)] at 385:9-24. *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake | **<u>Microsoft's Reply:</u>** Paragraph 58 is not genuinely disputed because News Plaintiffs do not deny the specific facts Microsoft stated regarding the trends in the CIR's magazine subscription revenue and donations revenue.<br><br>Regarding CIR's magazine subscription revenue (subparagraph a), CIR denies that its magazine subscription revenue "increased *due* to the introduction of Copilot and ChatGPT" but that is not the fact; Microsoft's fact states that [redacted]—not because of it. Additionally, the testimony of Ms. Buckingham and Ms. Bauerlein that CIR includes in its response (which both acknowledge that subscription revenue has increased) provide additional support for Microsoft's fact as stated, and thus there is no genuine dispute of fact as to Paragraph 58(a). |

| | |
|---|---|
| to isolate the factors that affect those trends to determine causation).<br><br>Subparagraph (b) is denied to the extent Microsoft treats the absence of direct attribution data as establishing Copilot and ChatGPT were not associated with a decrease in donation revenue. Admissible evidence contradicts Microsoft's statement. Ms. Bauerlein testified that "we don't have data that directly connect these products with individuals who haven't made a donation," not that Copilot and ChatGPT are not associated with a decrease in donation revenue. Hurst Decl. Ex. 11; NP Ex. 1276 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 1, dated Jan. 26, 2026)] at 299:13-21. Further denied to the extent Microsoft treats donation revenue as the only measure of value important to Mother Jones. Cross Rebuttal Rep. at 21 (cultivation of eventual donors begins at the moment a user first discovers an organization exists); Cross Rebuttal Rep. at 6 (nonprofit news organizations build financial support over multiple years); Cross Rebuttal Rep. at 24 (ChatGPT and Copilot interrupt the discovery of news organization, which shrinks the pool of potential donors and undermines the entire business model of nonprofit news organizations). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | Regarding CIR's donation revenue (subparagraph b), CIR also does not dispute or deny the specific fact as stated: that the introduction of Copilot and ChatGPT is not associated with a decrease in the trend of *Mother Jones* donation revenues, [redacted] Instead, CIR in its response denies the fact "to the extent Microsoft treats the absence of direct attribution data as establishing Copilot and ChatGPT were not associated with a decrease in donation revenue." It is not clear what "direct attribution data" is or what bearing this would have on the fact as stated, and it is not clear how the cited Bauerlein testimony contradicts the fact as stated. Nothing in the fact states that people who use ChatGPT or Copilot do not donate to CIR and so the evidence CIR cites does not dispute the fact as stated.<br><br>CIR adds additional information in its response about how CIR cultivates donation revenue, but this also does not engage with the actual donation revenue data that Dr. Tucker analyzed to conclude that [redacted] At most, the cites from the Cross report allege theories of how Copilot and ChatGPT *may* impact CIR's donations, but these theories do not dispute what the actual data shows, and thus there this fact is not genuinely disputed. |

**Paragraph 59**

| **59. To the extent CIR asserts harm from regurgitation as a result of the use of its content for LLM training, Microsoft offers the following facts: CIR's expert Dr. Wenger analyzed the same logs of approximately 8.2 million Copilot conversations described in Undisputed Facts ¶¶ 29-32(a).** Hurst Decl. **Ex. 246** (Wenger Opening Report) at 104-05; **Ex. 247** (Wenger Reply Report) at 113 & n.162; Lafferty Decl. ¶¶27, 28, Table 1 (Rebuttal), 360. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 59**: **Denied** to the extent Microsoft asserts Dr. Wenger's Copilot log analysis is only relevant to harm from regurgitation and suggests that Plaintiffs' evidence of harm from LLM training is limited to Dr. Wenger's Copilot log analysis. Admissible evidence contradicts this.<br><br>Dr. Wenger's Copilot regurgitation analysis is not the only analysis Dr. Wenger performed. Among other things, Dr. Wenger quantified the amount of CIR's content appearing in Microsoft's and OpenAI's output logs and the frequency with which CIR's web domains and keywords appeared in those logs. Wenger Opening Rep. at 87-110.<br><br>Dr. Wenger's analyses concerned harms to CIR beyond regurgitation. For instance, she examined the extent to which training on CIR's and other Plaintiffs' news content furthered OpenAI's models' and downstream products' ability to mimic news-style content and to serve news-related use cases. Wenger Reply Rep. at 80-81 ("OpenAI's models would uniquely benefit from news content in the sense that including news content in the training data would improve the models' ability to produce news-style outputs."). | **Microsoft's Reply:** **Undisputed** that Dr. Wenger performed her analysis of the 8.2 million logs in order to assess whether any of the Copilot outputs contained what she qualified as a "regurgitation" of CIR's Asserted Works. CIR seeks to create a dispute by listing other analyses Dr. Wenger performed. The fact that Dr. Wenger performed multiple analyses does not controvert the fact as stated. Indeed, the fact specifically states that it is limited to Dr. Wenger's findings "[t]o the extent CIR asserts harm from regurgitation." |

**Paragraph 60**

| | |
|---|---|
| **60. Wenger analyzed the Copilot [redacted] and [redacted] fields using a filter built from 16-grams of CIR's Asserted Works.** Hurst Decl. **Ex. 246** (Wenger Opening Report) at 104-05; **Ex. 247** (Wenger Reply Report) at 113 & n.162; Lafferty Decl. ¶¶ 28, Table 1 (Rebuttal), 360.<br><br>**a. Dr. Wenger treated as a "putative regurgitation" any Copilot [redacted] that contained at least five 16-gram matches to an individual *Mother Jones* Asserted Work.** Hurst Decl. **Ex. 246** (Wenger Opening Report) at 74–75, 105–06; Lafferty Decl. ¶ 360.<br><br>**b. Dr. Wenger found 51 articles over the five 16-gram match threshold in the Copilot [redacted] fields, after exclusion of public-domain text (e.g., the Constitution or the Bible).** Hurst Decl. **Ex. 246** (Wenger Opening Report) at 38, 40, 105–07; Lafferty Decl. ¶¶ 360–61.<br><br>**c. In her analysis of the Copilot logs, Wenger did not report a match to any entire article.** Hurst Decl. **Ex. 246** (Wenger Opening Report) at 106–07; Lafferty Decl. ¶ 360. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 60</u>**: The umbrella sentence is **undisputed.**<br><br>Subparagraph (a) is **denied** as unsupported by the cited evidence. The phrase "putative regurgitation" is drawn from Dr. Wenger's inspection of OpenAI's base models, not her analysis of Copilot Text fields.<br><br>For subparagraph (b), **undisputed** that Dr. Wenger reported finding 77 hits associated with copies of Mother Jones Registered Works in 51 different conversations. Denied to the extent Microsoft suggests that these results were meant to be comprehensive as to all CIR's Asserted Works. This aspect of Dr. Wenger's analysis did not include a direct search for any of CIR's unregistered works, which comprise the majority of CIR's Asserted Works. *See id.*; *see* | **<u>Microsoft's Reply:</u> Undisputed** that Dr. Wenger analyzed the Copilot [redacted] and [redacted] fields using a filter built from 16-grams of CIR's Asserted Works.<br><br>Paragraph 60(a) is **Undisputed.** CIR does not assert that the methodology described in this paragraph is incorrect. Instead, CIR attempts to create a dispute of fact by quibbling over the use of the phrase "putative regurgitation." That does not contradict the description of Dr. Wenger's methodology. While Dr. Wenger may not have used the phrase "putative regurgitation" in reference to her Copilot analysis, her Copilot regurgitation analysis used a similar 16-gram approach and apart from the specific "putative regurgitation" term, the cited fact is accurate and undisputed. *See* Hurst Decl. Ex. 246 (Wenger Opening Rep.) at 74-75 (describing 16-gram match methodology used to identify "putative regurgitation"); *id.* at 105-06 |

| | |
|---|---|
| Bauerlein Decl. A. at "Registered Works," "Mother Jones," and "Reveal" Tabs.<br><br>Subparagraph (c) is **undisputed.** | (Copilot chat logs were analyzed "following" the same "methodological approach" as that used to analyze OpenAI's chat logs).<br><br>Paragraph 60(b) is **Undisputed.** CIR does not dispute that Dr. Wenger found purported matches to Mother Jones Registered Works in 51 Copilot conversations. CIR attempts to manufacture a dispute of fact be reciting analyses Dr. Wenger did not perform. That does not controvert the fact as stated.<br><br>Paragraph 60(c) is **Undisputed.** |

***<u>As to all News Plaintiffs</u>***

**Paragraph 61**

| | |
|---|---|
| **61. Microsoft's expert Dr. Lafferty calculated a regurgitation rate in the user-facing output [redacted] for all The New York Times and Daily News Plaintiffs' Asserted Works of 0.004% of all logged Copilot conversations, and for all CIR's Asserted Works of 0.00008% of all logged Copilot conversations.** Lafferty Decl. ¶¶ 28, Table 1 (Rebuttal), 374-77, Table 4 (Rebuttal) (New York Times and Daily News Plaintiffs); *id.* ¶¶ 361–64, 344 Table 2 (Rebuttal) (CIR). | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 61</u>**: **Undisputed** that Microsoft's expert Dr. Lafferty calculated regurgitation rates where messages contained at least six 16-grams of News Plaintiffs Asserted Works, and that Microsoft's statement accurately reports his proffered rates. In particular, Dr. Lafferty calculated how many messages contained at least six 16-grams of News Plaintiffs Asserted Works over the 8.2 million sample, and obtained his 0.004% rate by dividing that amount over the entire | **<u>Microsoft's Reply:</u>** **Undisputed** that Microsoft's expert Dr. Lafferty calculated a regurgitation rate in the user-facing output ([redacted]) for all The New York Times and Daily News Plaintiffs' Asserted Works of 0.004% of all logged Copilot conversations, and for all CIR's Asserted Works of 0.00008% of all logged Copilot conversations.<br><br>The remainder of Plaintiffs' response is legal argument that attacks Dr. Lafferty's findings. None of Dr. Lafferty's |

| | |
|---|---|
| population of 1 billion conversations (assuming that there would not be any matches in the 991,800,000 conversations he did not analyze). Lafferty Decl. ¶ 377, Table 4.<br><br>**Denied** to the extent Microsoft contends that Dr. Lafferty used an appropriate and reliable method for calculating regurgitation rates. Admissible evidence contradicts that contention. For example, News Plaintiffs' expert Dr. Goldstein applied a superior method for identifying instances in which Copilot regurgitated News Plaintiffs' content in the produced Copilot logs. Goldstein Supp'l Rep. ¶¶ 21-41. Dr. Goldstein found 263,348 conversations containing a URL in the user output corresponding to an Asserted Work for all The New York Times and Daily News Plaintiffs' (compared to Lafferty's 35,806). Goldstein Supp'l Rep. ¶ 46, Table 3. These results do not take into account the 25% of conversations that had their key text fields stripped by a privacy program, the truncations and redactions within the output logs Microsoft produced, or conversations outside of the 8.2 million sample (which Microsoft did not produce). Goldstein Rebuttal Rep. ¶¶ 79, 85; Goldstein Reply Rep. ¶ 288. Dr. Goldstein also performed other measures (including counting domain hits, analyzing Microsoft's impressions data, and computing 16-gram and continuity scores), which resulted in more hits than what Dr. Lafferty reported. Goldstein Supp'l Rep. ¶¶ 16-52.<br><br>In addition, Dr. Wenger showed that Dr. Lafferty under-represented the regurgitation rate as to CIR, including because he incorrectly assumed that all regurgitations would include a reference to the plaintiff-related search terms used to construct the sample (which is wrong | opinions or calculation are the subject of Plaintiffs' Rule 702 Motion, and therefore the critiques of Dr. Lafferty's findings and methodology should be disregarded. *See* ECF 2067; ECF 2357. |

| | |
|---|---|
| because OpenAI's removal of CMI prevented those terms from being included in Copilot regurgitations of the training data). The true regurgitation rate for CIR is thus approximately 0.0006% for the Mother Jones Registered Works, 0.0058% for all Mother Jones Asserted Works, and 0.0001% for the Reveal Asserted Works. These rates are confirmed by (because they closely approximate) the regurgitation rate for The Intercept's Asserted Works, which is an appropriate control group because Intercept-related terms were not used to construct the 8.2 million sample. *See* Wenger Opening Rep. at 105-10; Wenger Reply Rep. at 113-17. | |

**Paragraph 62**

| |
|---|
| **62. Between 2019 and 2024, News Plaintiffs did not enter into any agreement to license or sell their Asserted Works for the purpose of use as training data for general purpose LLMs.** ***New York Times:*** Hurst Decl. **Ex. 46** (Grossman-Cohen 30(b)(6) Dep. Tr.) 24:22-29:19, 101:18-102:16; **Ex. 77** (Miller Dep. Tr.) 10:3-11, 14:2-20. ***Daily News:*** Hurst Decl. **Ex. 140** (Daily News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Chicago Tribune:*** Hurst Decl. **Ex. 133** (Chicago Tribune 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Orlando Sentinel:*** Hurst Decl. **Ex. 159** (Orlando Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Sun Sentinel:*** Hurst Decl. **Ex. 166** (Sun Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Mercury News:*** Hurst Decl. Ex. 148 (Mercury News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Denver Post:*** Hurst Decl. **Ex. 144** (Denver Post 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Orange County Register:*** Hurst Decl. **Ex. 156** (OC Register 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown |

Dep. Tr.) 66:10-13, 66:22-69:5. ***Pioneer Press:*** Hurst Decl. **Ex. 163** (Pioneer Press 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***CIR:*** Hurst Decl. **Ex. 12** (Bauerlein Dep. Tr. dated Jan. 27, 2026) 58:16-64:18; **Ex. 12.A** (Bauerlein Dep. Ex. 47 – Bauerlein email with Bloomberg reporter (dated July 25, 2024)); **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 405:25-408:22.

| News Plaintiffs' Response | Microsoft's Reply |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 62**:<br><br>**The Times**: **Undisputed**, but **denied** to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal.<br><br>Admissible evidence contradicts this. *See* NP Ex. 229 [Felix Depo. Ex. 137] [NYT_00468323]; NP Ex. 230 [Felix Depo. Tr.] at 312:17-314:21; NP Ex. 231 [Lightcap 30(b)(1) Depo. Ex. 17]; NP Ex. 232 [Lightcap 30(b)(1) Depo. Ex. 18] [OPCO_MDL_004419803] ([redacted]); NP Ex. 234 [Russell 30(b)(6) Depo. Tr.] at 221:19-228:20 ([redacted]; NP Ex. 1289 [Felix Depo. Ex. 130 – NYT_00941750] at -750-751 (The Times and Amazon engaged in licensing negotiations in 2024 for the GenAI | **Microsoft's Reply: Undisputed** that between 2019 and 2024, News Plaintiffs did not enter into any agreement to license or sell their Asserted Works for the purpose of use as training data for general purpose LLMs.<br><br>News Plaintiffs add additional information in their response that they *would* have entered into an agreement if they would have been approached, but that does not dispute the fact as stated.<br><br>In reply to CIR's response that "[t]he cited evidence also does not support the purported fact," Microsoft notes that it inadvertently cited Hurst Decl. Ex. 12 as including the testimony on pages 58:16-64:18, whereas that testimony appears in Hurst Decl. Ex. 13 that was filed with Microsoft's Motion for Summary Judgment on September 4, 2026. This testimony supports this fact, which CIR does not dispute: [redacted] Hurst Decl. Ex. 13 (M. Bauerlein 30(b)(1) Dep. Tr.) at 62:3-6. |

| | |
|---|---|
| licensing deal that closed in 2025); *see also* NP Ex. 228 [NYT_00890201].<br><br>**Daily News Plaintiffs**: **Undisputed**, but **denied** to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal. Admissible evidence contradicts this.<br><br>For example, outreaches to *Daily News* Plaintiffs regarding licenses for LLM training started around 2023, 2024, and *Daily News* Plaintiffs approached them with a curiosity about what this new category of business could look like, but also sensitive to risks that could come with licensing (such as the potential for cannibalization and the potential negative impacts to the business versus whatever money is being offered). NP Ex. 1300 [Lown 30(b)(1) 1/9/26 Depo Tr.] at 18:23-19:4; NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 161:10-167:4; 206:8-209:6.<br><br>**CIR**: **Undisputed**, but **denied** to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal. The cited evidence also does not support the purported fact.<br><br>Admissible evidence contradicts this. NP Ex. 1276 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 1, dated Jan. 26, 2026)] at 196:11-16 (CIR was not approached by Microsoft regarding licensing its content); NP Ex. 1276 [Bauerlein 30(b)(6) Depo. Tr. (Vol. 1, dated Jan. 26, 2026)] at 196:3- | |

| | |
|---|---|
| 10 (testifying "if [CIR] had been asked [to license its content], we certainly would have considered it."). | |

**Paragraph 63**

| **63. There are substantial impediments to the formation of a market for licensing a training corpus sufficient to train the type of general purpose LLMs at issue in this case. For example:** | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 63 (Introduction): Denied.** News Plaintiffs incorporate by reference their responses to Microsoft Paragraph 63 subparts (a) through (f) below.<br><br>In addition, admissible evidence contradicts Microsoft's assertion. Malackowski Rebuttal Rep. at 36 (opining that the "key building blocks of a market" for Generative AI data licensing already exist: "willing buyers with demand, willing sellers with supply, pricing mechanisms (albeit depressed, at this point), intermediaries and license facilitators, and executed transactions"), 37-40; NP Ex. 128 [Stamm Rebuttal Rep.] at Appendix C, Ex. 1 (summarizing [redacted] Strategic Collaboration and Partnership Agreements between OpenAI and media publishers for use of their data or content in generative AI); NP Ex. 129 [Stamm ZD Rebuttal Rep.] ¶¶ 177-178, Appendix C, Ex. 1; NP Ex. 127 [Rao Rebuttal Report] at Tabs 3-4 (summarizing OpenAI, Microsoft, and Amazon's news-related generative AI licensing agreements); NP Ex. 82 [Tucker Opening Rep.] ¶ 135 (Microsoft's expert Dr. Tucker admitting that "licensing collectives and marketplaces for data for training or grounding LLMs" are "developing" in the United States); NP Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 322; NP Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 17e; | **Microsoft's Reply:** Microsoft incorporates by reference its replies to News Plaintiffs' responses to Microsoft's Statements of Fact Nos. 63(a) through (f) below.<br><br>Additionally, this fact is not genuinely disputed because the evidence cited by Plaintiffs does not specifically controvert the fact as stated. Plaintiffs cite the existence of one-off agreements (News Ex. 128 (Stamm Rebuttal Rep.) at Appendix C, Ex. 1; News Ex. 129 (Stamm ZD Rebuttal Rep.) ¶¶ 177-178, Appendix C, Ex. 1; News Ex. 127 (Rao Rebuttal Report) at Tabs 3-4; News Ex. 467 (Goldfarb NYT Opening Rep.) ¶ 322; ECF 1800 (Malackowski Decl.) Ex. A (NYT-DNP Opening Rep.) Appendix F, Exhibit 4.1 and 5.1, but these agreements do not show either a lack of substantial impediments to the formation of a market or that such impediments are readily overcome. ECF 1733 (Tucker Decl.) ¶¶ 175-201; *see also* Hurst Decl. Ex. 382 (C. Tucker Tr.) at 250:25-251:8 ("[N]one of these agreements appear to solve these considerable economic frictions that I've identified in this hypothesized or hypothetical licensing market to exist, and indeed, when you look at the agreements, they are often covering multiple different other concerns, which again, makes it hard to interpret them as evidence in the way that the opposing experts are."). |

| | |
|---|---|
| Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of OpenAI's licensing agreements with media publishers that provide for OpenAI's "training use" and "display use," where display use typically includes access to current information through an API and/or crawlers for grounding purposes); Malackowski ZD Opening Rep. at p. 59-62, Appendix D, Exhibit 2.2.1 (same); Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1 (chart summarizing Microsoft's data access and content access agreements with at least [redacted] granting Microsoft certain rights to content including non-fiction books, [redacted]). | Further, Plaintiffs' citations to Dr. Stamm's rebuttal report in *Ziff Davis* is inadmissible as to Microsoft, and otherwise not relevant, because Microsoft is not a party to *Ziff Davis, Inc. v. OpenAI, Inc.*<br><br>Lastly, Plaintiffs misstate Dr. Tucker's opinions regarding the status of licensing collectives and marketplaces for data for AI uses. As Dr. Tucker explained: "I did not offer an opinion that a functioning market for licensing data for AI training or grounding exists or is developing. Instead, I explain that these initiatives are experimental, not that they have overcome the considerable challenges of developing into functioning markets for licensing data for AI training or grounding required for general-purpose LLMs." ECF 2231 (Tucker Opp. Decl.) ¶¶ 10(b), 18-19. |

a. **A very large volume and a large variety of textual data is necessary for the training corpus to develop general purpose LLMs like those at issue; as such, no individual work has value by itself as training material nor is it currently technologically possible to isolate the contribution of any particular piece of data to an LLM's output generation.** Lafferty Decl. ¶¶ 16, 34, 94-97, 99, 168, 283, 290, 322, 433; Usdan Decl. ¶¶ 10-11; Hurst Decl. **Ex. 53** (Hoeschele Dep. Tr. (Vol. 1, dated Apr. 2, 2025)) 16:17-22, 17:1-23, 19:12-20:1, 23:24-24:25 25:15-23, 26:6-22, 35:18-36:11; **Ex. 117** (Sutskever Dep. Tr.) 27:4-15, 28:5-29:15, 67:9-15, 255:12-256:2.

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 63(a):</u> Denied.** Admissible evidence contradicts Microsoft's assertion.<br><br>News content is especially valuable for training general purpose LLMs. Etzioni Opening Rep. ¶¶ 72-75, 78-85, 87-93, 95-122 (opining based on academic studies and Defendants' documents that high-quality content, and in particular news content, is especially valuable for training Defendants' accused LLMs, that a relatively small amount | **<u>Microsoft's Reply</u>:** News Plaintiffs do not dispute or offer any evidence to dispute the first part of the fact – that "[a] very large volume and a large variety of textual data is necessary for the training corpus to develop general purpose LLMs like those at issue." Thus, that fact is **Undisputed**.<br><br>The second part of this fact, that "no individual work has value by itself as training material nor is it currently technologically possible to isolate the contribution of any |

| | |
|---|---|
| of high-quality data can have an outsized impact on model performance, and citing studies that successfully isolated certain high-quality data as an independent variable and found observable performance gains); *id.* ¶ 53 (opining that "[i]f one wants to generate 'news-like' outputs from LLMs, they need news content for training."); NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 71 (Defendants' expert admitting that "the ability to generate news-like style or content is what one would expect from a model that has learned recurring statistical patterns of a genre"); Wenger Rebuttal Rep. at 16. In addition, Microsoft executive Jaron Lanier has stated that it is possible to isolate the contribution of any particular piece of data to an LLM's output generation. NP Ex. 1313 [MSFT_AI_MDL_002218935] at -42 (Lanier proposing in March 2023 that Microsoft "trace the most unique and influential contributors of prior examples or data when a big AI model provides a valuable output" in order to "calculate[]" which data contributors were "uniquely essential" so they "would get paid"). | particular piece of data to an LLM's output generation," is not genuinely disputed because the cited evidence does not controvert the fact. Whether a particular *type* of content (*i.e.*, news content, as News Plaintiffs claim in their response), could be valuable for training does not dispute that "*no individual work* has value by itself as training material nor is it currently technology possible to isolate the contribution of *any particular piece of data* to an LLM's output generation."<br><br>While Plaintiffs rely on Etzioni and Wenger to support their proposition that "[n]ews content is especially valuable for training general purpose LLMs," both acknowledge the news content is not needed for training. Dr. Etzioni also repeatedly emphasized that "if you want to provide news-like answers to users," news content isn't necessary, only "news-like" content is. News Ex. 1771 (Etzioni Decl.) Ex. A at ¶¶ 75, 99. Dr. Wenger similarly asserts that "a pretrained model lacking substantial news content in its training corpus would be less capable of producing that type of output," not that it would be incapable of, or "bad" at, doing so. ECF 1858-4 (Wenger Decl.) Ex. D (Rebuttal Rep.) at 16. Additionally, Defendants' pending Rule 702 motion seeks to exclude the opinions of Etzioni and Wenger on which this statement relies. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2). The section of Dr. Lafferty's report cited by News Plaintiffs to support this proposition says nothing about whether training on news content is necessary to generate news-like systems or content. News Ex. 800 (Lafferty Rebuttal Rep.) ¶ 71.<br><br>Finally, Plaintiffs cite to Microsoft employee Jaron Lanier. The quote cited by Plaintiffs is not present in the News |

| | |
|---|---|
| | Plaintiffs' Exhibit 1313. Regardless, Mr. Lanier's testimony does not provide a way to isolate the contribution of any particular piece of data to an LLM's output generation and assign value to it. Pursuant to Federal Rule of Evidence 106, Mr. Lanier testified that there is no way to do it. He explained: "we don't really know" that "if you remove some stuff from training data, how much would it affect the output from time to time." Hurst Decl. Ex. 369 (J. Lanier 30(b)(1) Tr.) at 264:3-9. He also testified that "the way a large language model works is reflections of reflections of reflections, all statistical, and so there isn't a single place where you can say this is the thing and this is how it's used. Like you can -- you can remove it and then it will still reconstruct itself from all the reflections out there and other data." *Id.* at 107:8-17. This supports the fact that there is no way to value any specific data for training or outputs. |
| b. **The Asserted Works were a minuscule share of the training corpus used to train the GPT models.** Lafferty Decl. ¶¶ 94-97, 105-109; Tucker Decl. ¶¶ 13(a), 134, 137-138. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 63(b)</u>: Undisputed** that there were a large volume of other works in the training corpus. **Denied** that the Asserted works were a "miniscule share of the training corpus."<br><br>Admissible evidence indicates that the Asserted Works were a particularly important share of the training corpus. For example, during mid-training OpenAI prioritized using news content, including News Plaintiffs' content, to improve the models' ability to consume and produce news content. See NP Ex. 759 [OPCO_MDL_004740422] at -422 (during "mid-training" OpenAI wanted to improve on "current events / news articles (NYT data, etc.))"; NP Ex. | **<u>Microsoft's Reply:</u>** This fact is not genuinely disputed because News Plaintiffs admit that "there were a large volume of other works in the training corpus" yet only deny the fact to argue that the Asserted Works were a "particularly important" share of the training corpus. This does not dispute Microsoft's fact that the Asserted Works were a *miniscule* share of the training corpus, and News Plaintiffs cite no evidence stating otherwise. News Plaintiffs also claim that the term "miniscule share" is "vague and ambiguous," but there is no genuine dispute here; trillions of tokens are needed and were used to train the LLMs at issue, and trillions of *words* were needed to comprise those tokens. *See* Microsoft's Reply ¶¶ 5-6 *supra*. |

| | |
|---|---|
| 761 [OPCO_MDL_000481870] at -870; (Members of OpenAI's mid-training team had the goal to "crush freshness in the domain of real-world news first" with "~95% accuracy on current events"); NP Ex. 757 [OPCO_MDL_000155738] at 6 (OpenAI identified news datasets, including CC-News, as "natural sources of freshness" and "high quality (and fresh) data relevant for our users"). OpenAI likewise prioritized obtaining news content, including News Plaintiffs' content, for use in pre-training its LLMs. NP Ex. 688 [OPCO_MDL_000113921] at -25 (explaining how OpenAI's president Greg Brockman "scraped" websites including "[redacted]"); NP Ex. 551 [OPCO_MDL_000481178] at -78 (February 2022 conversation noting that "greg [Brockman] has prepped some high quality, small datasets" including "7m urls" from "nytimes", or "about half of NYT").<br><br>News Plaintiffs object to the term "miniscule share" as vague and ambiguous. | Regardless, the evidence cited is not admissible because it is hearsay and lacks foundation as to Microsoft because it relates to testimony, document, and alleged actions of OpenAI employees. *See* News Exs. 759, 761, 757, 688, 551. And these documents do not support Plaintiffs' contention that "the Asserted Works were a particularly important share of the training corpus." The documents News Plaintiffs cite only describe early hypotheses and individual researchers' goals, as opposed to what happened in practice. OpenAI's 30(b)(6) designee on mid-training Chris Koch, acknowledged [redacted] Blanco Decl. Ex. 223 (C. Koch 30(b)(6) Tr.) at 33:21–35:18; *see also id.* 38:6–18. Mr. Koch also testified that [redacted]. *Id.* 21:13–21, 22:5–8, 22:12–17, 23:17–24:336:24–37:1, 37:11–12, 39:10–13, 39:17–21, 40:10–17, 47:2–4, 47:25–48:1. Additionally, News Ex. 688 (OPCO_MDL_000113921) concerns Mr. Brockman's [redacted] It does not show that news content was prioritized over other categories of training data. "High-quality data" in the context of LLM training can refer to data that is "diverse, well-formatted, and representative such that it contains useful examples of actual human language," rather than data that is considered aesthetically or commercially valuable. News Ex. 676 (C. Callison-Burch Rebuttal Rep.) ¶¶ 46-50. Additionally, OpenAI 30(b)(6) designee Nick Ryder testified that [redacted] |

| | |
|---|---|
| | [redacted] Blanco Opp. Decl. Ex. 267 (N. Ryder 30(b)(6) Tr.) at 32:8–33:14; *see also* News Ex. 686 (C. Callison-Burch Rebuttal Rep.) Section V (plaintiffs' experts overstate the value of their clients' content to LLM training). |

c. **For a traditional copyright license, rightsholders monetize the inherent value of specific creative expression contained within their individual works. By contrast, when licensing data for LLM training, value is not attributable to any discrete piece of interchangeable data, but rather emerges from statistical distributions observable only across large-scale datasets. There is no settled or workable means for pricing any given piece of training data.** Tucker Decl. ¶¶ 13(b), 149-153.

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 63(c)</u>**: **Denied.** Admissible evidence contradicts Microsoft's assertion.<br><br>News content is especially valuable for training general purpose LLMs. Etzioni NYT-DN Opening Rep. ¶¶ 72-75, 78-85, 87-93, 95-122 (opining based on academic studies and Defendants' documents that high-quality content, and in particular news content, is especially valuable for training Defendants' accused LLMs, that a relatively small amount of high-quality data can have an outsized impact on model performance, and citing studies that successfully isolated certain high-quality data as an independent variable and found observable performance gains); *id.* ¶ 53 (opining that "[i]f one wants to generate 'news-like' outputs from LLMs, they need news content for training."); NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 71 (Defendants' expert admitting that "the ability to generate news-like style or content is what one would expect from a model that has learned recurring statistical patterns of a genre"); | **<u>Microsoft's Reply:</u>** This fact is not genuinely disputed because News Plaintiffs admit that even though they claim that "[n]ews content is especially valuable for training general purpose LLMs," which is wrong for all the reasons stated in Microsoft's Response to 63(a) and 63(b), that does not dispute the fact that "value is not attributable to any discrete piece of interchangeable data" or that "there is no settled or workable means for pricing any given piece of training data."<br><br>None of Plaintiffs' cited evidence shows a reliable method for tying a price to any one work's contribution to model training. Regarding Plaintiffs' citations to Etzioni, Lafferty, and Wenger, Microsoft incorporates its response to 63(a) above. The additional evidence cited by News Plaintiffs relates to agreements involving GenAI companies, licensing collectives and intermediaries, damages calculations, or internal OpenAI and Microsoft documents that reflect brainstorming for potential ways to acquire data to train |

| | |
|---|---|
| Wenger Rebuttal Rep. at 16; Malackowski Rebuttal Rep. at 36 (opining that the "key building blocks of a market" for Generative AI data licensing already exist: "willing buyers with demand, willing sellers with supply, pricing mechanisms (albeit depressed, at this point), intermediaries and license facilitators, and executed transactions"), 37-42 (opining that the business economic indicia of genuine Generative AI data licensing market emergence are present, including that "[c]ontractual and pricing structures across independent transactions are beginning to converge on recognizable conventions including per-token, per-query, per-scrape, percentage of revenue, and lump sum bundled rights formulations"); NP Ex. 128 [Stamm Rebuttal Rep.] at ¶¶ 366-368 (summarizing OpenAI documents and deposition testimony regarding the internal "benchmarks" for pricing existing and prospective Generative AI licenses on a per-word basis), Appendix C, Ex. 1. (summarizing [redacted] Strategic Collaboration and Partnership Agreements between OpenAI and media publishers for use of their data or content in generative AI); NP Ex. 129 [Stamm ZD Rebuttal Rep.] ¶¶ 177-178, Appendix C, Ex. 1; NP Ex. 127 [Rao Rebuttal Report] at Tabs 3-4 (summarizing OpenAI, Microsoft, and Amazon's news-related generative AI licensing agreements); NP Ex. 82 [Tucker Opening Rep.] ¶ 135 (Microsoft's expert Dr. Tucker admitting that "licensing collectives and marketplaces for data for training or grounding LLMs" are "developing" in the United States); NP Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 322; NP Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 17e; Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of OpenAI's licensing agreements with media publishers that provide for OpenAI's "training use" and "display use," where display | general-purpose LLMs. None of these controvert the fact stated in 63(c).<br><br>Plaintiffs cite to portions of various expert reports that discuss agreements involving GenAI companies, including Malackowski, Stamm, Rao, Tucker, and Goldfarb. These agreements do not controvert the fact stated in Paragraph 63(c) because they contain many provisions other than LLM training, so the value of any one agreement is not directly tied to the value of data to training but could reflect the value of those other provisions. ECF 1733 (Tucker Decl.) ¶¶ 176-186. Thus, those agreements merely show that parties were able to reach agreement on a price for access to certain content (among a myriad of other considerations) in certain circumstances. Just because certain agreements have included a particular price does not mean that there is a "settled or workable means for pricing any given piece of training data." That two parties agreed to a price for a particular transaction does not reveal anything about whether there is agreed-upon value of data for LLM training, and could reflect many other considerations. *Id.* To this point, Jordan Usdan has explained that there is "no accepted or reliable mechanism for valuing how one data input affects AI training." ECF 1707 (Usdan Decl.) ¶ 11. For these same reasons, Mr. Malackowski's citation to the presence of "key building blocks" and "business economic indica" of a licensing market does not controvert the fact stated in Paragraph 63(c). Just like the existence of a few agreements, these merely show that certain parties experimenting with ways to reach agreement in certain circumstances for a myriad of considerations, not that there is "settled or workable means for pricing any given piece of training data." |

| | |
|---|---|
| use typically includes access to current information through an API and/or crawlers for grounding purposes); Malackowski ZD Opening Rep. at p. 59-62, Appendix D, Exhibit 2.2.1 (same); Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1 (chart summarizing Microsoft's data access and content access agreements with at least [redacted] granting Microsoft certain rights to content including non-fiction books, [redacted]); NP Ex. 375 [OPCO_MDL_004589228] (reference document prepared by OpenAI pricing existing and in-progress Generative AI licensing deals in terms of dollar amounts per article and/or word); NP Ex. 1312 [MSFT_AI_MDL_001618003] at -8089 (internal Microsoft presentation regarding pricing models for access to non-public news and other text data for Generative AI training, fine-tuning, and testing by Microsoft and OpenAI).<br><br>Furthermore, rightsholders license their works for a variety of reasons—including those beyond the creative expression contained within their individual works. *See, e.g.*, NP Ex. 1316 [NYT_00759576 at – 77] (Text and Data Mining License Agreement) (NYT licensing its works to Stanford University "to copy and use [The Times's] Licensed Material solely for Text and Data Mining"). | Regarding licensing collectives and intermediaries, the existence of these entities alone does not dispute the fact that there is no settled or workable means for pricing any given piece of training data. As Dr. Tucker has explained, "the emergence of such organizations reflects ongoing experimentation with potential licensing models and other data acquisition arrangements, rather than evidence of either a solution to the collective action problem or a functioning market for the acquisition of data at scale required for training and grounding general-purposes LLMs." ECF 2231 (Tucker Decl.) ¶ 19. Plaintiffs have not cited any evidence that the existence of intermediaries has resulted in a settled or workable means for pricing any given piece of training data.<br><br>Regarding Plaintiffs' citation to Defendants' *damages* experts (Dr. Stamm and Dr. Rao), their reliance on *past* agreements where parties were able to reach agreement on price in individual circumstances for *a damages analysis in litigation* is not evidence that there is a "settled or workable means for pricing any given piece of training data." Indeed, Dr. Rao specifically noted Dr. Tucker's finding that there are "difficulties inherent to pricing or attributing value to any piece of content" for training LLMs." News Ex. 127.1 ¶ 212.<br><br>Regarding the OpenAI document cited by News Plaintiffs as News Ex. 375, that document is not admissible. News Ex. 375 is hearsay and lacks foundation as to Microsoft because it relates to testimony, documents, and alleged actions of OpenAI employees. Regarding the Microsoft presentation cited as News Ex. 1312, that is not evidence that "pricing models" exists. Mr. Usdan testified that presentation was "in the very early stage of trying to get our heads around what would be a fair price to pay for a book" and certain |

| | |
|---|---|
| | pricing ranges were Mr. Usdan "trying to reverse engineer a justification for this huge, ridiculous price we were being quoted." Hurst Decl. Ex. 359 (J. Usdan 30(b)(6) Tr.) at 266:13-267:1. Mr. Usdan further explained that [redacted] *Id.* at 267:23-268:20. [redacted]" *Id.*<br><br>News Plaintiffs' citations to the reports of OAI experts Dr. Stamm and Dr. Goldfarb, as well as Mr. Malackowski's report in the Ziff Davis case, should be disregarded as these are inadmissible evidence against Microsoft.<br><br>Lastly, that "rightsholders license their works for a variety of reasons—including those beyond the creative expression contained within their individual works" does not dispute the fact as written because this type of license would not be considered a "traditional copyright license," as Paragraph 63(c) states. Works that are not being licensed for their expression are not being licensed for something covered by copyright. Additionally, the Text and Data Mining License Agreement (News Ex. 1316) that News Plaintiffs cite is a [redacted] between The Times and an academic institution for [redacted]. Therefore, this agreement is not relevant to any kind of a market that may be relevant to this case. |

| | |
|---|---|
| d. **A developer seeking to license a training corpus would need to obtain rights from millions of dispersed authors and content creators.** Tucker Decl. ¶¶ 13(a)-(b), 130-133, 139-144; Usdan Decl. ¶¶ 10-11, 22, 24.<br><br>e. **Rightsholders for individual works can be difficult and costly to identify and locate, increasing the transaction costs of negotiating any proposed training data licenses.** Tucker Decl. ¶¶ 13(b), 139-144; Usdan Decl. ¶ 24<br><br>f. **Negotiations for the aggregation of the necessary volume and variety of data are susceptible to holdout problems.** Tucker Decl. ¶¶ 13(b), 145-148. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 63(d)-(f):</u> Denied.** Admissible evidence contradicts Microsoft's assertions. The purported difficulties are not especially hard to surmount.<br><br>For example, intermediaries exist to facilitate licensing of content for Generative AI, and licenses for GenAI training, grounding and display have already been entered into. *See, e.g.*, Malackowski NYT-DN Rebuttal Rep. at 77-78 (opining about Microsoft's "Publisher Content Marketplace" designed to "empower publishers with a transparent economic framework for licensing premium content into AI products"), 80-82 (opining on the dozens of intermediaries, technological solutions, and collective licensing solutions that have entered the market to facilitate licensing in the Generative AI data licensing market, including by facilitating content licenses between content providers and AI companies); NP Ex. 128 [Stamm Rebuttal Rep.] at ¶¶ 366-368 (summarizing OpenAI documents and deposition testimony regarding the internal "benchmarks" for pricing existing and prospective Generative AI licenses on a per-word basis), Appendix C, Ex. 1 (summarizing [redacted] Strategic Collaboration and | **<u>Microsoft's Reply</u>:** Paragraph 63(d) is not genuinely disputed. Plaintiffs do not cite any evidence to dispute that rights from millions of dispersed authors and content creators would need to be obtained to license a training corpus. Thus, Paragraph 63(d) is **Undisputed**.<br><br>News Plaintiffs respond to Paragraphs 63(e) and (f) that the "purported difficulties" in obtaining rights from so many authors and content creators "are not especially hard to surmount." But Paragraphs 63(e) and 63(f) are not genuinely disputed because the evidence that News Plaintiffs cite does not dispute the facts as stated. Paragraph 63(e) states that it can be "difficult and costly to identify and locate" rightsholders for individual works, and Paragraph 63(f) states that "negotiations for the...volume and variety of data [necessary to train an LLM] are susceptible to holdout problems." News Plaintiffs' response only cites to the existence of certain intermediaries, agreements, and their Rule 1006 summaries to try and dispute this fact.<br><br>First, the existence of intermediaries alone does not dispute the fact or solve the issue identified in Paragraph 63(e). As Dr. Tucker has explained, "the emergence of such |

| | |
|---|---|
| Partnership Agreements between OpenAI and media publishers for use of their data or content in generative AI); NP Ex. 129 [Stamm ZD Rebuttal Rep.] ¶¶ 177-178, Appendix C, Ex. 1; NP Ex. 127 [Rao Rebuttal Report] at Tabs 3-4 (summarizing OpenAI, Microsoft, and Amazon's news-related generative AI licensing agreements); NP Ex. 82 [Tucker Opening Rep.] ¶ 135 (Microsoft's expert Dr. Tucker admitting that "licensing collectives and marketplaces for data for training or grounding LLMs" are "developing" in the United States); NP Ex. 467 [Goldfarb NYT Opening Rep.] ¶ 322; NP Ex. 474 [Goldfarb ZD Opening Rep.] ¶ 17e; Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 4.1 (chart summarizing the key terms of OpenAI's licensing agreements with media publishers that provide for OpenAI's "training use" and "display use," where display use typically includes access to current information through an API and/or crawlers for grounding purposes); Malackowski ZD Opening Rep. at p. 59-62, Appendix D, Exhibit 2.2.1 (same); Malackowski NYT-DNP Opening Rep. at Appendix F, Exhibit 5.1 (chart summarizing Microsoft's data access and content access agreements with at least [redacted] granting Microsoft certain rights to content including non-fiction books, [redacted]; NP Ex. 309 [Procas 30(b)(6) Depo. Tr.] at 216:20-217:2 (testifying regarding The Times's over ten million copyrighted written works from 1924-2024), 32:13-19 (testifying that "The Times has copyright registrations for all the works it's asserting in this case"); Maisel Decl. Ex. A (Rule 1006 summaries identifying the 964,888 copyrighted works asserted by The Times in its summary judgment motion); NP Ex. 136 [Shetty 30(b)(6) Depo. Tr.] at 14:24-15:23 | organizations reflects ongoing experimentation with potential licensing models and other data acquisition arrangements, rather than evidence of either a solution to the collective action problem or a functioning market for the acquisition of data at scale required for training and grounding general-purposes LLMs." ECF 2231 (Tucker Decl.) ¶ 19. Plaintiffs have not cited any evidence that intermediaries could provide the rights for the volume and variety of data needed to train an LLM.<br><br>The existence of one-off executed agreements may show that transaction costs have been overcome in *some* instances but does not dispute that transaction costs would have to be overcome at the scale large enough to acquire the necessary volume and variety of data needed to train an LLM. Plaintiffs have not identified any evidence of this occurring.<br><br>Additionally, News Plaintiffs cite *one* version of their Rule 1006 summaries in an attempt to dispute Paragraph 63(e), but their response does not address the difficulty they had in determining whether they owned the rights in the Asserted Works. News Plaintiffs continued to revise the Asserted Works lists in this case, including as late as the submission of their opposition summary judgment brief. *See* 10/24/26 FRE 1006 Summaries; ECF 2150 (Maisel Decl.) ¶¶ 2-7. This has made clear that the existence of copyright registrations (News Ex. 309 (Procas 30(b)(6) Depo. Tr.) at 32:13-19) alone does not establish whether a publisher owns the rights in each article it publishes. |

| | |
|---|---|
| (OpenAI's Varun Shetty testifying about how OpenAI enters agreements with media publishers to use that media company's content); Malackowski NYT-DN Reply Rep. at 32-35 (opining about the existing market for Generative AI data licensing deals and the evidence of infrastructure designed to reduce transaction costs and the hundreds of millions of dollars in existing licenses). | |

**Paragraph 64**

| | |
|---|---|
| **64. After the release of the LLMs at issue in this case, News Plaintiffs have continued to write and publish newspapers and magazines.** Hurst Decl. **Ex. 116** (Sulzberger Dep. Tr.) 177:24-178:6; 246:5-17; **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr.) (Vol. 2, dated Jan. 27, 2026) 423:6-16; **Ex. 59** (Julien Dep. Tr.) 33:12-17; Tucker Decl. ¶¶ 14, 30-48, 237-238. | |
| **News Plaintiffs' Response to Microsoft Paragraph 64: Undisputed.** | **Microsoft's Reply: Undisputed.** |

**Paragraph 65**

| | |
|---|---|
| **65. To the extent that News Plaintiffs claim that using the Asserted Works to train the LLMs at issue resulted in loss of conversions or traffic, *see infra* ¶¶ 86-91, 93-97, 99 103, 105-109, 111-115, 117-121, 123-127, 129-133, 135-139, 141-146 which are hereby incorporated by reference.** | |
| **News Plaintiffs' Response to Microsoft Paragraph 65: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft Paragraphs 86-91, 93-97, 99-103, 105-109, 111-115, 117-121, 123-127, 129-133, 135-139, 141-146. | **Microsoft's Reply:** Microsoft disagrees that this is inappropriate and incorporates its Replies to Paragraphs 86-91, 93-97, 99-103, 105-109, 111-115, 117-121, 123-127, 129-133, 135-139, 141-146 as though fully restated herein. |

## II. Count I: COPYRIGHT INFRINGEMENT (17. u.s.C. § 501) – Grounding and Output claims related to Web Grounding

### B. Fair Use (17 U.S.C. § 107)

#### 1. *Purpose and Character of the Use (Factor 1)*

**Paragraph 66**

| | |
|---|---|
| 66. **An LLM is inherently limited by the data included in the training corpus used to create its statistical parameters; accordingly, a standalone, LLM-based chatbot cannot reliably—or usefully—respond to those queries that require information omitted from or first discovered after the data of the training corpus.** Abib Decl. ¶¶ 9-10; Lafferty Decl. ¶¶ 18, 178, 189-91; Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) 155:25-156:20. | |
| **News Plaintiffs' Response to Microsoft Paragraph 66**: **Undisputed,** with the understanding that a "standalone, LLM-based chatbot" means a chatbot that does not have access to any information outside its own parameters. | **Microsoft's Reply:** **Undisputed** as to the fact as stated, and News Plaintiffs' additional assertion does not specifically controvert that fact. Accordingly, the fact as stated in Paragraph 66 remains **Undisputed**. |

**Paragraph 67**

| | |
|---|---|
| 67. **Microsoft added a functionality called "web grounding" to its LLM based chatbot, Copilot. Web grounding enables Copilot to retrieve content that was obtained from the public internet, and to use such content in responding to user queries.** Abib Decl.¶¶ 8-22; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9, **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 71** (Manivannan 30(b)(6) Dep. Tr.) 50:15-51:6, 9:6-9, 11:20-22, 12:5-16, 13:6-9; **Ex. 85** (Parakhin Dep. Tr.) 216:9-217:17. | |
| **News Plaintiffs' Response to Microsoft Paragraph 67**: **Undisputed** that the process Microsoft refers to as "web grounding" enables Copilot to retrieve content that was obtained from the internet and use such content in responding to user queries. Cited evidence does not | **Microsoft's Reply:** **Undisputed** that "Microsoft added a functionality called 'web grounding' to its LLM based chatbot, Copilot" and that "[w]eb grounding enables Copilot to retrieve content that was obtained from the ... internet, and to use such content in responding to user queries." |

| | |
|---|---|
| support the proposition that the content retrieved was from the "public internet." Abib Decl.¶ 8 (Copilot uses a technique commonly referred to as "grounding" or "retrieval-augmented generation" ("RAG"). Grounding refers to the process of providing a large language model ("LLM" or "model") with information from external sources so that the model can generate a response based on that information, rather than relying solely on its predictive language capabilities. One potential external source for such information is the internet").<br><br>**Denied** that web grounding enabled Copilot to retrieve content obtained from the "public internet" to the extent "public" means not behind a paywall or requiring a log-in. Admissible evidence contradicts the purported fact. NP Ex. 410 [Feamster Opening Rep.] ¶¶ 206, 213 (During the RAG process, Defendants' products access webpage content using the Bing API); NP Ex. 513 [Ribas Depo. Tr.] at 160:19-161:7 (The Bing API is an application programming interface that enables one to access and query the Bing Index); NP Ex. 807 [OPCO_MDL_001700392] at -97 (On April 14, 2023, during the public beta of Browse with Bing, an OpenAI employee reported that she "was able to use ChatGPT Browsing to get past a NYT paywall."); NP Ex. 809 [OPCO_MDL_004771719] at -720-21 (On June 27, 2023, OpenAI performed a "paywall test" for GPT-4 with browsing and confirmed that it could bypass paywalls); NP Ex. 1145 [MSFT_AI_MDL_000455566] (On June 27, 2023, a Microsoft employee [redacted]). | News Plaintiffs claim that the cited evidence by Microsoft in support of Paragraph 67 does not support that the content Copilot retrieves through web grounding was obtained from the "public" internet. Plaintiffs' claim is clearly belied by the evidence cited by Microsoft. *See* ECF 1713 (Abib Decl.) ¶ 8 ("One potential external source for such information is the internet."); *see also id.* ("Copilot grounds responses in web content from Bing search results"); *id.* at ¶ 9 ("retrieval" can include information from "web search results"); *id.* at ¶ 10 (defining "web grounding" as "[g]rounding Copilot responses in web search results"); *id.* at ¶ 18(a) (the system employs "paywall filtration mechanisms for web content" retrieved from Bing search results "before they are sent on to Copilot for the LLM to use for grounding").<br><br>Next, News Plaintiffs attempt to create a dispute by claiming that, to the extent Copilot has ever inadvertently retrieved content behind a paywall or requiring a log-in, then Copilot did not retrieve content from the "public internet" for the purposes of web grounding. But News Plaintiffs fail to cite to any evidence that even mentions Copilot (or Bing Chat), much less describes the content Copilot retrieves through its web grounding functionality. Rather, the cited evidence only concerns the web retrieval capabilities of OpenAI's generative AI products, not Microsoft's. *See* News Ex. 410 (Feamster Opening Rep.) ¶¶ 206, 213 (ChatGPT Browse/Search functionality); News Ex. 513 (J. Ribas Tr.) at 160:19-161:7 (ChatGPT Browse and SearchGPT); News Ex. 807 (OPCO_MDL_001700392) at -397 (ChatGPT Browsing); News Ex. 809 (OPCO_MDL_004771719) at -720-21 (GPT-4 testing); News Ex. 1145 (MSFT_AI_MDL_000455566) at -566 (ChatGPT). |

**Paragraph 68**

| | |
|---|---|
| **68. By providing Copilot with an ever-evolving source of information, web grounding greatly expands the usefulness of Copilot for users because Copilot can accurately and more completely respond to a significantly broader range of user queries than a standalone LLM based chatbot limited by its training data.** Abib Decl. ¶ 10; Lafferty Decl. ¶ 178; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 71** (Manivannan 30(b)(6) Dep. Tr.) 50:15-51:6. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 68</u>: Undisputed** that a standalone LLM-based chatbot is limited by its training data, otherwise denied. The extent to which web grounding on "an ever-evolving source of information" can "greatly expand the usefulness of Copilot" because Copilot can "accurately and more completely respond to a significantly broader range of user queries" depends on the sources it relies on for information. The terms "greatly expands," "usefulness," and "more completely" are vague and undefined.<br><br>Admissible evidence contradicts Microsoft's statement. Some web sources can increase the likelihood of Copilot outputting "hallucinations," including for example pink-slime news sites, which are low-quality news sites. Bell Opening Rep. ¶ 128; Cross Rebuttal Rep. at 32. Log records produced in this case confirm that Copilot relies on pink-slime news sites for grounding. Goldstein Rebuttal Rep. ¶ 113. | **<u>Microsoft's Reply:</u> Undisputed** that a standalone LLM based chatbot is limited by its training data.<br><br>News Plaintiffs attempt to dispute the remainder of Paragraph 68 by claiming that "the extent to which" web grounding can "greatly expand[] the usefulness of Copilot" depends on the sources that Copilot relies on for information. That claim is not at odds with Paragraph 68, which states that "web grounding greatly expands the usefulness of Copilot for users because Copilot can accurately and more completely respond to a significantly broader range of user queries *than a standalone LLM based chatbot limited by its training data*." That fact is therefore not genuinely disputed.<br><br>Next, News Plaintiffs claim that where Copilot relies on "pink-slime news sites," it can "increase the likelihood of Copilot outputting 'hallucinations.'" But "hallucinations," by definition, are ungrounded model responses, *i.e.*, responses generated by the LLM using only next token prediction to generate a response containing a factual assertion, without relying on any external sources of information to verify that its generation is supported. ECF 1713 (Abib Decl.) ¶ 10; ECF 1723 (Lafferty Decl.) ¶ 178. This faulty theory does not controvert the stated fact. News Plaintiffs' citations to the Bell and Cross reports merely |

| | |
|---|---|
| | reflect that some users create AI-generated "pink slime" web content of their own accord; neither of these citations refer to Copilot or even suggest that web grounding was used or necessary to generate such outputs. Simpson Decl. Ex. 333 (Bell Opening Rep.) ¶ 128; ECF 1821 (Cross Decl.), Ex. A (Cross Rebuttal Rep.) at 32.<br><br>While News Plaintiffs cite to Goldstein in support of their claim that "Copilot relies on pink-slime news sites for grounding," Goldstein identified merely 842 Copilot conversations out of 45,000 (1.87%) "retrieved a pink-slime domain," but did not include any findings regarding the corresponding outputs, *e.g.*, the relative amount of information from the so-called "pink-slime" source included in the response; the accuracy of the specific statements from that source used for grounding; or the overall accuracy and completeness of the response. ECF 1819 (Goldstein Decl.) Ex. B (Goldstein Rebuttal Rep.) ¶ 113. As News Plaintiffs concede, Goldstein's findings only concern Copilot's alleged "reliance" on such sites for grounding; Goldstein's report does not purport to use these findings to establish that web grounding in general adversely affects the accuracy of Copilot's response. Additionally, none of News Plaintiffs' experts have identified any specific content on the so-called "pink-slime" news sites that allege was generated by Copilot. ECF 1794 (Bell Decl.) Ex. B (Rebuttal Report) ¶¶ 206-11.<br><br>Additionally, Defendants moved to exclude the opinions of Bell, Cross, and Goldstein cited in Plaintiffs' response pursuant to Federal Rule of Evidence 702. ECF 2055 at 33-37, n.7. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them. *See* Fed. R. Civ. P. 56(c)(2). |

| | |
|---|---|
| | Finally, Plaintiffs' vagueness objection is improper legal argument. Plaintiffs identify no ambiguity that prevents a response, and they proceed to dispute the substance of the statement. |

**Paragraph 69**

| |
|---|
| **69. Copilot web grounding also improves LLM performance by reducing the likelihood of so-called "hallucinations"—seemingly plausible but inaccurate outputs—because the chatbot relies on not just next token prediction but also retrieved content in order to provide more reliable responses supported by material synthesized from publicly accessible web sources.** Abib Decl. ¶ 10; Bird Decl. ¶¶ 30, 39; *see also* Hurst Decl.; **Ex. 26** (Cook Dep. Tr.) 111:19-112:9, 116:1-11, 117:1-118:4, 10:12-20, 11:1-6, 16:14-17:12, 20:24-21:1, 22:1-24:18; **Ex. 71** (Manivannan 30(b)(6) Dep. Tr.) 50:18-22; Lafferty Decl. ¶¶ 178, 312. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 69**: **Denied** to the extent that "publicly accessible web sources" means uncopyrighted, free-to-download or use content. Denied to the extent the statement suggests that Copilot does not hallucinate with web grounding.<br><br>Admissible evidence contradicts Microsoft's statement. *See* Bell Opening Rep. ¶ 160 ("In Tow Center studies, chatbots often misattributed the sources of quotes. In the Tow Center's 2025 study, ChatGPT correctly linked the original article in eight out of 200 outputs. It linked the incorrect article in 79 instances, only linked to the homepage instead of the specific article 37 times, did not include any links 42 times, did not identify the article at all on 38 instances, and linked a URL that led to an error page a handful of times. Meanwhile, Microsoft's Copilot hardly ever identified the correct article link, linked the wrong article on 72 instances, and did not identify the article at all | **Microsoft's Reply:** **Undisputed** that Copilot web grounding improves LLM performance by reducing the likelihood of so-called "hallucinations" because the chatbot relies on both next token prediction and the retrieved content in order to provide more reliable responses supported by material synthesized from web sources.<br><br>News Plaintiffs attempt to create a dispute over the meaning of the phrase "publicly accessible web sources" as used in this fact. But News Plaintiffs do not offer any explanation of how their definition controverts or even relates to the fact as stated and do not cite any evidence to support their preferred characterization. Thus, New Plaintiffs' response does not controvert the stated fact.<br><br>Rather than address the fact as stated (web grounding *reduces* the likelihood of "hallucinations"), News Plaintiffs dispute a fact not stated in Paragraph 69—that Copilot |

| | |
|---|---|
| 46 times."); NP Ex. 1207 [Klaudia Jaźwińska & Aisvarya Chandrasekar, AI Search Has a Citation Problem, COLUM. JOURNALISM REV. (Mar. 6, 2025), https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php.] (The Tow Center for Digital Journalism conducted a series of experiments from late 2024 and early 2025 and found that major GenAI tools including ChatGPT and Copilot were routinely bad at declining to answer questions about sources of excerpts of news articles that they could not answer accurately, and were instead "confidently wrong"); NP Ex. 956 [MSFT_AI_MDL_000447446] at -450 (Microsoft knew in February 2023 that [redacted]; NP Ex. 719 [Bilenko Depo. Tr.] at 164:22–165:7 (As of March 30, 2023, Mr. Bilenko noted that [redacted]); NP Ex. 1211 [Adam Tauman Kalai et al., Why Language Models Hallucinate, arXiv (Sept. 4, 2025), https://arxiv.org/abs/2509.04664] (In a study led by three researchers from OpenAI, and one from Georgia Tech, found that "language models hallucinate because the training and evaluation procedures reward guessing over acknowledging uncertainty," further arguing that "guessing when uncertain improves test performance."); NP Ex. 1212 [DNP-00569563] at -564-565 (Computerworld's interpretation of the study was that "large language models will always produce plausible but false outputs, even with perfect data, due to fundamental statistical and computation limits," and that OpenAI's advanced reasoning models actually hallucinated more frequently than simpler models.). Also **denied** because some web sources can increase the likelihood of Copilot outputting | "does not hallucinate with web grounding." The stated fact never makes such a claim, and thus News Plaintiffs' response does not controvert this fact. Indeed, News Plaintiffs' evidence cited as News Exs. 956 and 719 supports it. *See* News Ex. 956 (MSFT_AI_MDL_000447446) at -451 ([redacted]); News Ex. 719 (M. Bilenko Tr.) at 157:7-11 (hallucination rates in Copilot have "been greatly mitigated in the recent years" and "dramatically reduced"). News Plaintiffs then provide various additional citations to support their position, none of which is responsive to the facts stated and accordingly does not controvert Paragraph 69. Additionally, to the extent that News Plaintiffs rely on Bell Opening Rep. ¶ 160, News Ex. 1207, 1211, and 1212, that claim is not supported by admissible evidence. Specifically, the cited support is inadmissible hearsay because each of these citations point to third-party publications that are offered as proof for the truth of their assertions.<br><br>Finally, News Plaintiffs also seek to create a dispute on the grounds that "[s]ome web sources can increase the likelihood of Copilot outputting 'hallucinations,'" but that claim also does not address the fact as stated. The cited evidence also does not specifically controvert that fact or support the assertion for which they are cited. This last sentence and cited evidence should be disregarded for the reasons stated in response to Paragraph 68 above. |

| | |
|---|---|
| "hallucinations", including for example pink-slime news sites, which are low-quality news sites. Bell Opening Rep. ¶ 128; Cross Rebuttal Rep. at 32. | |

**Paragraph 70**

| | |
|---|---|
| 70. **Web grounding enhances a user's experience; for example, by accessing information from Microsoft's Bing search infrastructure, Copilot with web grounding improves knowledge discovery, synthesis, and location by enabling direct and informed responses to user queries in the context of a conversational chatbot.** Abib Decl. ¶¶ 5-7, 23-26; Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 212:17-217:17; **Ex. 85.A** (Parakhin Dep. Ex. 25 - The new Bing: Our approach to Responsible AI documentation); **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9, **Ex. 1.A** (Abib 30(b)(6) Ex. 3). | |
| **News Plaintiffs' Response to Microsoft Paragraph 70**: **Undisputed** to the extent the cited evidence describes retrieval, synthesis, and conversational responses. Denied to the extent the cited evidence establishes the user experience is "enhanced" as an objective or measurable fact. Also denied because some web sources used for grounding can increase the likelihood of Copilot outputting misinformation or "hallucinations", including for example pink-slime news sites, which are low-quality news sites. Bell Opening Rep. ¶ 128; Cross Rebuttal Rep. at 32. | **Microsoft's Reply:** **Undisputed** that, "by accessing information from Microsoft's Bing search infrastructure, Copilot with web grounding improves knowledge discovery, synthesis, and location by enabling direct and informed responses to user queries in the context of a conversational chatbot."<br><br>News Plaintiffs instead seek to create a dispute on the grounds that the cited evidence does not establish that web grounding "objective[ly] or measurabl[y]" enhances a user's experience. But the evidence cited as Hurst Decl. Ex. 1.A does establish metrics demonstrating objective and measurable improvements in the Copilot user experience in connection with web grounding capabilities. *See* Hurst Decl. Ex. 1.A (E. Abib Dep. Ex. 3) at -451-52 (defining Microsoft's chat response quality metrics and including chart reflecting improved metrics correlated with access to grounding data). News Plaintiffs do not provide any evidence to dispute this point, nor do they explain how the |

| | |
|---|---|
| | cited evidence does not support this point. Thus, News Plaintiffs have not controverted the stated fact.<br><br>Finally, News Plaintiffs again seek to create a dispute on the grounds that "[s]ome web sources can increase the likelihood of Copilot outputting misinformation or 'hallucinations'" as they did in Paragraphs 68 and 69. But that claim again does not address the fact as stated, and the cited evidence does not specifically controvert the asserted fact or support the assertion for which they are cited. Microsoft also states that this last sentence and cited evidence should be disregarded for the reasons stated in response to Paragraph 68 above. |

**Paragraph 71**

| |
|---|
| **71. Copilot's web grounding works by connecting the LLM with Microsoft Bing via Retrieval Augmented Generation, or RAG. When the Copilot system recognizes that responding to a user query may benefit from web grounding, the query proceeds down a "grounding pipeline" as follows:**<br><br>a. **First, the user's query is tokenized in order to be interpreted and acted upon by the LLM;** Cook Decl. ¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.<br><br>b. **Second, Copilot sends a search-optimized query to the Bing Index, obtaining the top results: six potentially responsive webpages;** Cook Decl. ¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.<br><br>c. **Third, each webpage—or a truncated portion thereof—is tokenized;** Cook Decl.¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23. |

| | |
|---|---|
| d. **Fourth, all of the tokenized grounding content is placed alongside the tokenized user query into a temporary "context window" and passed along to Copilot's LLM;** Cook Decl. ¶ 5; Hurst Decl. **Ex. 1** (Abib 30(b)(6) Dep. Tr.) 14:22-16:9; **Ex. 1.A** (Abib 30(b)(6) Ex. 3); **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23.<br><br>e. **Fifth, the LLM analyzes this "context window" in order to generate a response using its underlying statistical parameters.** Cook Decl. ¶ 5; Hurst Decl. **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23. | |
| **News Plaintiffs' Response to Microsoft Paragraph 71**: **Denied** to the extent that Microsoft anthropomorphizes Copilot by stating that the system "recognizes" when a query may benefit from grounding. **Undisputed** to the extent the cited evidence describes an automated retrieval trigger and pipeline. | **Microsoft's Reply:** **Undisputed** that "Copilot's web grounding works by connecting the LLM with Microsoft Bing via Retrieval Augmented Generation, or RAG" and that the remainder of Paragraph 71 describes Copilot's "grounding pipeline" when a user query may benefit from web grounding.<br><br>News Plaintiffs seek to create a dispute by characterizing this fact as "anthropomorphizing" Copilot based on the single use of the term "recognizes" in the second sentence. But that recharacterization is not itself a fact, and News Plaintiffs do not otherwise challenge the factual accuracy of the term "recognizes" as used in that sentence. That does not make this fact disputed. |

**Paragraph 72**

| |
|---|
| 72. **Copilot's web-grounded responses are influenced by all tokens in the model's context window; the grounded content tokens alter the LLM's probability distribution (its statistical prediction of the next sequence of tokens), which influences the token sequence generated in response to the user query. Copilot is thereby able to synthesize different pieces of grounding data and the user prompt in generating a response, while also drawing upon the background understanding, insight, and reasoning capacity encoded into its underlying LLM parameters.** Cook Decl. ¶ 6; Lafferty Decl. ¶¶ 189-91; Hurst Decl. **Ex. 101** (Rossett Dep. Tr.) 69:20-72:23. |

| News Plaintiffs' Response to Microsoft Paragraph 72 | Microsoft's Reply |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 72</u>: Denied** to the extent that Microsoft anthropomorphizes Copilot by stating that the system has "understanding, insight, and reasoning capacity."<br><br>**Denied** to the extent Microsoft means "drawing upon the background" does not include leakage in the outputs. Goldstein Rebuttal Report ¶ 82 (Even with the truncation, over 10% of the 45K sample (4,651 conversations out of 45,000 total conversations) contain a 16-gram in the output that leaked through from the internal RAG fields); *id.* (Even with the truncation, approximately 20% of the 8.2M Microsoft output logs (1.66M conversations) contain a 16-gram in the output that leaked through from the internal RAG fields; NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 53 (Microsoft's expert admits that, for Microsoft output logs with RAG fields, "[t]he presence of these fields (and the URLs/domains in these fields) establishes that some content is retrieved and processed by the model in forming its response.") | **<u>Microsoft's Reply:</u> Undisputed** that "Copilot's web-grounded responses are influenced by all tokens in the model's context window; the grounded content tokens alter the LLM's probability distribution (its statistical prediction of the next sequence of tokens), which influences the token sequence generated in response to the user query." Also **undisputed** that "Copilot is thereby able to synthesize different pieces of grounding data and the user prompt in generating a response, while also drawing upon the background … encoded into its underlying LLM parameters." News Plaintiffs' attempt to create a dispute by characterizing this fact as "anthropomorphizing" Copilot. That recharacterization is not itself a fact, and News Plaintiffs do not otherwise challenge the factual accuracy of the phrase "understanding, insight, and reasoning capacity" as used in that fact. News Plaintiffs' response does not make this fact disputed.<br><br>News Plaintiffs attempt to create a dispute around whether Copilot "drawing upon the background" includes "leakage in outputs." That fails to controvert the fact for multiple reasons. *First*, News Plaintiffs' definitional issue does not address the fact as stated. Paragraph 72 describes Copilot's *process* for generating a response; it does not relate to the response ultimately displayed in a user-facing output. Further, the purportedly disputed portion of the fact describes how the LLM "draw[s] upon" the background and reasoning capacity "*encoded in its underlying LLM parameters*," *i.e.*, the standalone LLM's text-generation capabilities "without access to any information outside its own parameters" (*see* News Plaintiffs' Response to Paragraph 66); it does not relate to Copilot's web grounding capabilities. *Second*, News Plaintiffs' cited evidence does not specifically controvert the fact as stated. The Goldstein |

| | |
|---|---|
| | Rebuttal Report at ¶ 82 only discusses so-called "leakage" of web grounding data in the final output displayed to a user, which, as explained, is not responsive to any part of the fact as stated. The Lafferty Rebuttal Report at ¶ 53 explains only the grounding process with respect to web content retrieval, which is unrelated to the purportedly disputed portion of the fact for which this evidence is cited as support. *Third*, to the extent News Plaintiffs rely on Goldstein's opinions, this claim is not supported by admissible evidence. Defendants have moved to exclude certain opinions of Goldstein pursuant to Federal Rule of Evidence 702. ECF 2055 at 9, 13-19. To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them. *See* Fed. R. Civ. P. 56(c)(2). |

**Paragraph 73**

| | |
|---|---|
| 73. **Copilot provides attribution and links to every webpage used as grounding content, helping users navigate directly to those webpages to verify information or learn more.** Abib Decl. ¶¶ 6, 10; Hurst Decl. **Ex. 26** (Cook Dep. Tr.) 111:14-112:17, 147:20-148:1; **Ex. 99** (Ribas Dep. Tr.) 65:7-12. | |
| **News Plaintiffs' Response to Microsoft Paragraph 73**: **Denied** to the extent that Microsoft asserts Copilot provides attribution and links to every webpage used as grounding content *or* that doing so necessarily helps users navigate to webpages or learn more. Admissible evidence contradicts Microsoft's statement. *See* Bell Opening Rep. ¶ 160 ("In Tow Center studies, chatbots often misattributed the sources of quotes. In the Tow Center's 2025 study, ChatGPT correctly linked the original article in eight out of 200 outputs. It linked the incorrect article in 79 instances, only linked to the homepage instead of the specific article 37 times, did not include any links 42 times, did not identify | **Microsoft's Reply:** **Undisputed** that "Copilot provides attribution and links to … webpage[s] used as grounding content, helping users navigate directly to those webpages to verify information or learn more." Microsoft's cited evidence plainly supports that Copilot's responses "include citations and links to each of the web search results used to inform its answer" thereby "enabling users to view and easily access the sources of information that Copilot used to ground its response. Users can click those links to go directly to a source if they want to learn more." ECF 1713 (Abib Decl.) ¶¶ 6, 10. This fact is not only clearly stated, but also demonstrated in the cited evidence: |

<table>
<tr>
<td>the article at all on 38 instances, and linked a URL that led to an error page a handful of times. Meanwhile, Microsoft's Copilot hardly ever identified the correct article link, linked the wrong article on 72 instances, and did not identify the article at all 46 times."); NP Ex. 1207 [Klaudia Jaźwińska & Aisvarya Chandrasekar, AI Search Has a Citation Problem, COLUM. JOURNALISM REV. (Mar. 6, 2025), https://www.cjr.org/tow_center/we-compared-eight-ai-search-engines-theyre-all-bad-at-citing-news.php] (discussing Copilot and ChatGPT citation accuracy). Microsoft's assertion also lacks a time basis and mischaracterizes product descriptions as proof.</td>
<td>

<br><br>
Id. at ¶ 6.
<br><br>
While News Plaintiffs claim admissible evidence contradicts this statement, Plaintiffs' cited evidence is inadmissible hearsay. Each of Plaintiffs' citations point to a third-party publication that Plaintiffs offer for the truth of its assertions. Bell's reliance on the study does not, by itself, render the underlying publication admissible for its truth.
<br><br>
Finally, News Plaintiffs claim that Paragraph 73 is disputed because it "lacks a time basis and mischaracterizes product descriptions as proof." But there is no genuine dispute regarding the applicable "time basis" relevant to this case. The scope of Microsoft products at issue in this matter and</td>
</tr>
</table>

| | |
|---|---|
| | the time period relevant to those products has been extensively litigated by the parties. MSFT News MSJ Br. at 4. News Plaintiffs' contention that this fact "mischaracterizes products description as proof" is a mischaracterization of the fact stated. The fact as stated *is* a description of Copilot's design to "provide[] attribution and links to every webpage used as grounding content" by default. News Plaintiffs' cited evidence reflects that Copilot is designed to include accurate citations to the web sources it uses for grounding, notwithstanding marginal error rates expected with any AI technology (see ECF 1713 (Abib Decl.) ¶ 10), thus does not controvert the fact stated in Paragraph 73. |

**Paragraph 74**

| | |
|---|---|
| **74. Microsoft deployed a multi-layered mitigation system to prevent Copilot from outputting copyrighted content in response to a user query. Microsoft's mitigations include, for example: metaprompt and system prompt instructions; user input classifiers and filters; and an output detection system.** Bird Decl. ¶¶ 34-43; *see also* Hurst Decl. **Ex. 26** (Cook Dep. Tr.) 37:5-10, 52:17-53:20, 61:16-62:25, 65:18-66:3, 67:2-24, 69:5-11, 77:22-78:3, 107:3-6, 137:22-138:14, 144:7-145:13; **Ex. 85** (Parakhin Dep. Tr.) 217:18-218:20; **Ex. 99** (Ribas Dep. Tr.) 132:8-135:12. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 74</u>: Denied** to the extent that "prevent" implies Microsoft's mitigation system eliminates Copilot outputs containing copyrighted content.<br><br>The cited sources do not support the statement. Microsoft mischaracterizes Mr. Parakhin's, Mr. Ribas's and Ms. Cook's deposition testimony. The citations to Mr. Ribas's testimony, Mr. Parakhin's testimony, and most citations to Ms. Cook's testimony concern NOARCHIVE and | **<u>Microsoft's Reply:</u> Undisputed** that "Microsoft deployed a multi-layered mitigation system to prevent Copilot from outputting copyrighted content in response to a user query" and that "Microsoft's mitigations include, for example: metaprompt and system prompt instructions; user input classifiers and filters; and an output detection system."<br><br>News Plaintiffs attempt to create a dispute around whether "prevent Copilot from outputting copyrighted content" |

| | |
|---|---|
| NOCACHE metatags, not copyright mitigations. In her discussion of classifiers, Ms. Cook does not mention any copyright-specific classifier. To the extent Microsoft relies on Ms. Cook's reference to Snippy,<br><br>To the extent Microsoft relies on Snippy, its tool for limiting consecutive verbatim text in Copilot's outputs (Bird Decl. ¶¶ 41-42), the record forecloses the argument. Snippy compares each response Copilot generates against an index of copyrighted text, limiting consecutive spans of matched text to 150 characters. *Id.* The tool therefore protects only what its index contains. Microsoft's corporate designee on these issues, Elbio Abib, testified he knew of no news content in Snippy's index. NP Ex. 657 [Elbio Abib 30(b)(6) Dep. Tr.] at 99:9-18, 107:16-108:6. Dr. Bird's declaration confirms Microsoft's omission of news was deliberate (Bird Decl. ¶¶ 41-42): Microsoft considered adding news content — [redacted] (NP Ex. 1310 [MSFT_AI_MDL_001178782] at 9) — to the index but decided not to after concluding it did not present the "same concern" for regurgitation as other categories of copyrighted content. Bird Decl. ¶ 42.<br><br>*See also* evidence cited in response to Paragraphs 69, 72 & 73. | means "eliminate[] Copilot outputs containing copyrighted content." Paragraph 74 uses "prevent," not "eliminate." Thus, Paragraph 74 is not claiming that Microsoft's multi-layered mitigation system "eliminates" Copilot from outputting copyrighted content and Plaintiffs' response does not controvert the stated fact. Moreover, Plaintiffs have failed to establish how often Copilot actually outputs anything that approaches an infringing copy of their news articles.<br><br>News Plaintiffs next contend that the evidence cited in Paragraph 74 does not support the fact stated on the grounds that Mr. Parakhin's and Mr. Ribas's testimony, along with "most citations" to Ms. Cook's deposition testimony, concern mechanisms to filter web content applying the NOARCHIVE and NOCACHE meta tags, not "copyright mitigations." However, the fact specifically states that the listed mitigations are "example[s]" of the mitigations deployed in Copilot and does not purport to be exhaustive. Further, the cited evidence establishes that such opt-out meta tags are included amongst Microsoft's multi-layered mitigation system. The Bird Declaration explains, "Microsoft addresses verbatim reproduction of news content through robust protections built into the retrieval system itself," such as NOARCHIVE and NOCACHE meta tag recognition. ECF 1710 (Bird Decl.) ¶¶ 40, 42.<br><br>Finally, News Plaintiffs attempt to create a dispute as to Microsoft's "rel[iance]" on the Snippy tool by pointing out that Snippy does not contain "news content." Once again, that response fails to controvert Paragraph 74, which states that Copilot's multi-layered mitigation *system* prevents Copilot from outputting copyrighted content. Paragraph 74 does not state or suggest that every mitigation is directed |

| | |
|---|---|
| | toward preventing outputs containing news content. Microsoft's Snippy tool is designed to address issues related to model regurgitation, and regurgitation is unlikely to result in outputs containing verbatim news content (as that term is ordinarily understood) because "[u]sers requesting news-related content from a model generally seek current information that post-dates model training." ECF 1710 (Bird Decl.) ¶ 42; *see also* Hurst Decl. Ex. 406 (S. Bird (non-retained rebuttal expert witness) Tr. (Aug. 13, 2026)) at 31:12-33:1. Microsoft deploys multiple mechanisms to prevent outputs containing verbatim news content, *e.g.*, mitigations built into the web retrieval pipeline, post-training, meta prompt and system prompt instructions, and user input classifiers and filters. ECF 1710 (Bird Decl.) ¶¶ 34-40.<br><br>As to News Plaintiffs' reliance on the evidence cited in response to Paragraphs 69, 72, and 73, that evidence also does not specifically controvert the fact as stated: Paragraph 69 cites to evidence concerning citation errors, hallucinations, and AI-generated "pink-slime" news content, and Paragraph 73 cites to evidence concerning citation errors—none of which relate to Copilot outputting copyrighted content, let alone the mechanisms Microsoft deploys to prevent this outcome. Paragraph 72 cites to evidence concerning grounding data "leakage" in Copilot outputs without mention of the multi-layered mitigation system described in Paragraph 74 or the measurable impacts of those mitigations on any "output leakage" purportedly observed. Microsoft further incorporates by reference its Replies to each of Paragraphs 69, 72, and 73. |

### 2. *Nature of the Work (Factor 2)*

**Paragraph 75**

| **75. Microsoft incorporates Undisputed Facts ¶¶ 22-26 as though fully restated herein.** | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 75: Denied.** This is not an appropriate undisputed fact. To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 22-26 as though fully restated herein. | **Microsoft's Reply:** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 22-26 as though fully restated herein. |

### 3. *Amount and Substantiality Used (Factor 3)*

**Paragraph 76**

| **76. Copilot web grounding is not designed to display grounding content to a user as part of the LLM's grounded response; that is, the system has no deterministic functionality for passing grounding content through to a user.** Cook Decl. ¶ 7. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 76: Denied** to the extent that Microsoft asserts grounding content cannot be reflected in user-facing outputs. Admissible evidence contradicts Microsoft's statement. Microsoft grounded Copilot on at least 1,820 words of a single News Plaintiff article, and an identified Copilot output included retrieved and paraphrased article text with verbatim sequences. Goldstein Rebuttal Rep. ¶ 107, Table 4; NP Ex. 806 [MSFT_AI_MDL_002882532] at -2889899-902. Dr. Goldstein further found that over 10% of the 45,000 sample conversations, and approximately 20% of the 8.2 million sample conversations had "leaked" | **Microsoft's Reply: Undisputed** that "Copilot web grounding is not designed to display grounding content to a user as part of the LLM's grounded response" or that "the system has no deterministic functionality for passing grounding content through to a user."<br><br>News Plaintiffs seek to create a dispute by denying a fact not stated: that "grounding content *cannot* be reflected in user-facing outputs." Thus, News Plaintiffs' response only contains additional facts that do not controvert the fact stated. Specifically, the citations to the Goldstein report discuss instances in which Copilot outputs contained |

| | |
|---|---|
| at least one 16-gram (i.e., 16 consecutive words) from the grounding content into the response to a user. Goldstein Rebuttal Rep. ¶¶ 77-85 (noting that "[t]his analysis likely significantly undercounts the number of true 16-gram regurgitations because of the number of truncations and redactions in the data.").<br><br>Microsoft mischaracterizes the system's design objective as proof that grounding content cannot appear in a user-facing response. | "verbatim" sequences or "consecutive words" overlapping with the grounding content used to inform Copilot's response. Those citations do not address how Copilot is designed to generate grounded responses. News Plaintiffs' new, stated fact is also not supported by admissible evidence. In addition, Defendants have moved to exclude certain opinions of Goldstein pursuant to Federal Rule of Evidence 702. ECF 2055 at 9, 13-19. To the extent the Court excludes the challenged opinions, which form the sole evidentiary basis News Plaintiffs cite in support of its assertions, News Plaintiffs may not rely on them.<br><br>Finally, News Plaintiffs also fail to create a dispute by stating that "Microsoft mischaracterizes the system's design objective as proof that grounding content cannot appear in a user-facing response." Again, this is not the fact stated, and Microsoft has not relied on Copilot's "design objective" as "proof" of any such assertion. |

**Paragraph 77**

| | |
|---|---|
| 77. **As described in Undisputed Fact ¶ 72, Copilot uses grounding data within the LLM's context window to provide a newly generated string of tokens through next token prediction.** Cook Decl. ¶ 7; Lafferty Decl. ¶¶ 189-91; *see also* Hurst Decl. **Ex. 26** (Cook Dep. Tr.) 73:22-11. | |
| **News Plaintiffs' Response to Microsoft Paragraph 77**: **Denied** that Copilot provides a "newly generated string of tokens" that does not include copyrighted content in the outputs. Admissible evidence contradicts Microsoft's purported fact. *See* evidence cited in response to Paragraph 72. | **Microsoft's Reply:** **Undisputed** that "Copilot uses grounding data within the LLM's context window to provide a newly generated string of tokens through next token prediction."<br><br>News Plaintiffs seek to create a dispute according to a definition of "newly generated string of tokens" that appears nowhere in the fact as stated or evidence cited in Paragraph |

| | |
|---|---|
| | 77. News Plaintiffs' response is thus an additional assertion does not address the fact stated, and News Plaintiffs cite no evidence specifically controverting that fact. To the extent News Plaintiffs rely on the evidence cited in their response to Paragraph 72, that too does not address the fact as stated on the grounds set forth in Microsoft's reply. Accordingly, the fact stated in Paragraph 77 is not genuinely disputed.<br><br>Additionally, News Plaintiffs' assertion concerning "copyrighted content" in Copilot outputs constitutes an improper legal argument and thus should not be considered.<br><br>To the extent Plaintiffs assert that every match in Goldstein's "RAG Leakage" analysis is necessarily copied directly from the grounding content and that no new text can be generated based off of tokenized grounding content fed into the context window of the LLM used in Copilot, Microsoft incorporates its response regarding Goldstein's "RAG Leakage" analysis in Paragraph 78 below. |

**Paragraph 78**

| | |
|---|---|
| **78. Because an LLM's next-token prediction is non-deterministic, an LLM can incidentally predict token strings that match grounding data. It is also possible that the LLM, to satisfy a particular user prompt, could attempt to provide a portion of tokens from grounding data. These behaviors are intermediated by Copilot's multi-layered mitigation system, described at Undisputed Fact ¶ 74, to prevent Copilot responses from containing significant output matching copyrighted content.** Cook Decl. ¶ 8; Lafferty ¶¶ 187, 191, 398. | |
| **News Plaintiffs' Response to Microsoft Paragraph 78**: **Denied** to the extent that Microsoft characterizes matching copyrighted output as "incidental" or as reflective | **Microsoft's Reply:** **Undisputed** that next-token prediction is non-deterministic, that an LLM can predict token strings that match grounding data, that an LLM may |

| | |
|---|---|
| of a user's desires. Admissible evidence contradicts Microsoft's statement. Goldstein and Wenger identified matching text in Copilot conversations, including user-facing outputs and grounded material. Goldstein Rebuttal Rep. ¶ 107; NP Ex. 800 [Lafferty Rebuttal Rep.] ¶¶ 120, 360-64.<br><br>Outputs that substantially overlap with copyrighted text are not merely incidental; these outputs reflect regurgitation of either the model's training data or data retrieved during RAG. *See* Mitchell Rebuttal Rep. ¶¶ 33-34. Contrary to Microsoft's statement, "shared text in the grounding and user output fields is expected as part of the normal output grounding process." NP Ex. 1148 [Lafferty Reply Rep.] ¶ 6. *See also* NP Ex. 1148 [Lafferty Reply Rep.] ¶ 20 (overlap between retrieved text and output is an "expected byproduct of summarizing retrieved material in natural language."); NP Ex. 800 [Lafferty Rebuttal Rep.] ¶ 103 ("The [Copilot] user-facing output predominately summarizes or rewords the retrieved material[.]"); NP Ex. 461 [Berg-Kirkpatrick Opening Rep.] ¶ 196 (using a 25-word threshold for identifying regurgitations because this threshold is "likely to capture language used from another source, rather than language that is similar by chance, thereby capturing instances where ChatGPT may have regurgitated text from Plaintiffs' works."). | also attempt to provide a portion of tokens from grounding data to users in responses, and that these behaviors are intermediated by Copilot's multi-layered mitigation system to prevent Copilot responses from containing significant output matching copyrighted content.<br><br>News Plaintiffs deny Paragraph 78 only to the extent it calls matching outputs "incidental" or tied to what users want. Their response fails to controvert the fact as stated. News Plaintiffs seek to create a dispute by arguing that "matches" identified by Drs. Goldstein and Wenger in Copilot outputs are reproductions of *copyrighted* content from either the model's training data or grounding data. But both Dr. Goldstein and Dr. Wenger disclaim any substantial-similarity or copyrightability analysis. *See* Blanco Opp. Decl. Ex. 206 (T. Goldstein Tr.) at 248:1–255:9; ECF 1858 (Wenger Decl.) at 16.<br><br>Further, Defendants' pending Rule 702 motion seeks to exclude Dr. Goldstein's "RAG Leakage" analyses in his Rebuttal Report. ECF 2055 at 15. To the extent the Court excludes the challenged opinion and findings, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2). Even if the Court does not exclude the analysis, Dr. Goldstein counts any 16-gram match between the grounding field and the user text output as a match. ECF 1819 (Goldstein Decl.) Ex. B (Goldstein Rebuttal Rep.) ¶¶ 77-79. Meaning the content in the shared text is not necessarily content from News Plaintiffs' articles but could be text generated by the model or content from other non-Plaintiff sources retrieved by the model. *See* Hurst Decl. Ex. 407 (T. Goldstein Tr.) at 522:15-524:1. When Dr. Goldstein filtered for matches between *News Plaintiffs' works* and the 8.2 million Copilot matches, he found that only 0.73% |

| | |
|---|---|
| | contain even a mere 16-grams of overlap. ECF 1819 (Goldstein Decl.) Ex. B (Goldstein Rebuttal Rep.) Table 1 (pg. 31).<br><br>*Second*, Microsoft does not deny that some text matching grounding content sometimes appears in Copilot outputs, especially when doing so will best satisfy a user's prompt. That does not controvert the fact as stated. What this fact states is that due to the non-deterministic nature of next-token prediction, at least some "matches" between Copilot outputs and grounding data are not due to the model "copying" the grounding data. Dr. Lafferty's statements that shared text between grounding and output fields is "expected" appear in passages explaining that such overlap "does not establish regurgitation" and is limited to "short factual spans" that arise when a model summarizes retrieved material in natural language. ECF 1723 (Lafferty Decl.) ¶ 398. Dr. Lafferty further explains that LLM outputs cannot reliably be attributed to any particular tokens appearing in the context window that influenced its next-token-prediction, and that a token match "may reflect the distributed statistical associations learned from many related training tokens" and sources of grounding content (excepting instances where Copilot includes citations to the grounding content). *Id.* ¶¶ 32, 175, 191, 398. Dr. Lafferty's complete opinions confirms Microsoft's statement that non-deterministic next-token prediction can "incidentally" produce token strings matching grounding data.<br><br>*Third*, the response states that "Wenger identified matching text in Copilot conversations" yet News Plaintiffs do not cite any evidence in support of this fact, and thus fail to controvert it. |

| | |
|---|---|
| | *Fourth*, the fact says nothing about training data. It relates only to grounding content. News Plaintiffs' response as to training data does not meet the fact as stated. |

**Paragraph 79**

<table>
<tr><td colspan="2">79. News Plaintiffs' experts Goldstein and Wenger identified certain outputs containing matching text in the pool of 8.2 million conversations that hit on keywords associated with News Plaintiffs. Goldstein's analysis finds 59,545 of these conversations contain matching text. Wenger's analysis searched for conversations with at least 5 16-gram matches; she found 51 total out of the 8.2 million conversation sample. See Lafferty Decl. ¶¶ 360-61; 396-401.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 79</u>: Undisputed that Dr. Goldstein found approximately 20% of the 8.2 million sample conversations had "leaked" at least one 16-gram (i.e., 16 consecutive words) from the grounding content into the response to a user, and that included 59,545 conversations Dr. Goldstein could link to a News Plaintiff domain. Disputed to the extent Microsoft is suggesting this analysis fully captures all such leaks. Dr. Goldstein explained that "the ability to identify and link leaked content to individual web domains is extremely limited because the web search blocks in Microsoft logs that include the web grounding data provided to the model are severely shortened [i.e., truncated]." Goldstein Rebuttal Rep. ¶ 82. Dr. Goldstein also explained that "[t]his analysis [i.e., the leak analysis] likely significantly undercounts the number of true 16-gram regurgitations because of the number of truncations and redactions in the data." Goldstein Rebuttal Rep. ¶ 85.<br><br>Denied as misleading as to Dr. Wenger's findings. Within the 74,745 references to CIR-related keywords and 95,882</td><td><u>Microsoft's Reply:</u> Undisputed. News Plaintiffs do not dispute any part of the fact as stated. They seek to create a dispute by adding facts that are not in Microsoft's statement, none of which controvert the fact as stated.<br><br>As to Goldstein, News Plaintiffs do not dispute the 59,545 figure, which comes directly from Dr. Goldstein's report. ECF 1819 (Goldstein Decl.) Ex. B (Goldstein Rebuttal Rep.) ¶ 82 & Table 1 (reporting 16-gram "Leaks in Microsoft's 8.2M Copilot Outputs" by publisher: NYT 41,487; MN 3,523; CT 3,369; DP 3,123; OCR 2,359; NYDN 1,887; SS 1,235; PP 1,173; OS 1,069; Athletic 320, totaling 59,545). To the extent they argue that this figure is conservative or undercounts the total, that simply does not dispute what Goldstein's report actually stated.<br><br>The "approximately 20%" figure News Plaintiffs invoke is not limited to News Plaintiffs' content. ECF 1819 (Goldstein Decl.) Ex. B (Goldstein Rebuttal Rep.) ¶ 82. That count covers grounding material from any web source. Goldstein links only 59,545 of those conversations to any News</td></tr>
</table>

| | |
|---|---|
| references to CIR-associated web domains, Dr. Wenger found 51 hits in 77 conversations pertaining to CIR's Mother Jones Registered Works following keyword exclusion. Wenger Opening Rep. at 104-06. This aspect of Dr. Wenger's analysis did not include a direct search for any of CIR's unregistered works, which comprise the majority of CIR's Asserted Works. *See id.*; *see* Bauerlein Decl. A. at "Registered Works," "Mother Jones," and "Reveal" Tabs. Using her true hit rate calculated for the Mother Jones Registered Works, Dr. Wenger extrapolated hit rates for all CIR's works and concluded that Copilot likely regurgitates CIR's Asserted Works over 160,000 times per year. Wenger Opening Rep. at 108-110; Wenger Reply Rep. at 113-117. | Plaintiff domain. *Id.* & Table 1. Dr. Goldstein confirmed that he "counted every instance in which grounding content appeared in a Copilot output as a leak," requiring only that "[t]he 16-gram needs to be shared." Hurst Decl. Ex. 407 (T. Goldstein Tr.) at 522:23. He likewise confirmed that his analysis "counts any 16-gram leak as identified by the criteria . . . from a browse hit into the model output." *Id.* at 523:23-524:1. The fact is not genuinely disputed because Plaintiffs seek to inject data that does not involve their Asserted works.<br><br>As to Wenger, Plaintiffs misstate Dr. Wenger's findings and their import. News Plaintiffs assert that Dr. Wenger found "51 hits in 77 conversations," but she reported the converse, 77 hits in 51 unique conversations. ECF 1858 (Wenger Decl.) Ex. A at 106. Their point about CIR's unregistered works reflects Dr. Wenger's own methodological choice, not a factual dispute. Dr. Wenger did not manually review the hits for the broader set of Asserted Works because "[m]anual review of these hits to remove instances of public domain text that also appears in Plaintiffs' articles proved unduly burdensome[.]" ECF 1858 (Wenger Decl.) Ex. A (Wenger Opening Rep.) at 108. Dr. Wenger's extrapolation to a purported rate in the population of logs is based on multiple unvalidated assumptions, which is the subject of Defendants' Rule 702 motion to exclude Dr. Wenger's extrapolated analyses. ECF 2055 at 22. |

**Paragraph 80**

| |
|---|
| **80. Meta tag controls are machine readable code on a webpage that operate at the individual HTML page level and communicate to a web crawling robot, such as Microsoft's Bingbot, how to process that webpage. When a website permits crawling by Bingbot, Bingbot retrieves the content found on a** |

| | |
|---|---|
| **particular webpage and stores this content in Microsoft's Bing Index.** Canel Decl. ¶¶ 11-12; Gaggara Decl. ¶ 15; *see also* Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 226:23–227:24; **Ex. 99** (Ribas Dep. Tr.) 178:9–17; **Ex. 64** (Liang Dep. Tr.) 169:7-170:10. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 80</u>**: **Disputed** to the extent the statement characterizes meta tags as controls that determine how Bingbot processes a webpage. News Plaintiffs object to this statement as unsupported by the cited evidence. For example, Microsoft Exhibit 99 (Ribas Depo. Tr. at 178:9–17) does not address meta tags, and Mr. Ribas testified that only "a subset of what's on the website" ends up in the Bing Index. NP Ex. 513 [Ribas Depo Tr.] at 177:24–178:21. Mr. Parakhin, who acknowledged he was "simplify[ing]," testified only generally about, for example, robots.txt, no-cache and no-archive. NP Ex. 647 [Parakhin Depo. Tr.] at 226:23–227:24. Denied to the extent the statement implies that Microsoft honored publishers' meta tag instructions. Bing Chat and Copilot continued to ground on and display NOARCHIVE-tagged content. NP Ex. 453 [MSFT_AI_MDL_000391970] at -970 [redacted]); NP Ex. 454 [Abib 30(b)(1) Tr.] at 61:8-62:10 (Microsoft employee testifying [redacted]; NP Ex. 455 [MSFT_AI_MDL_000642967] at –967.<br><br>**Undisputed** that Microsoft uses Bingbot to crawl webpages, including News Plaintiffs' webpages, and stores the content in the Bing Index. NP Ex. 610 [Sept. 25, 2025 Discovery Hearing Tr.] at 69:20-21 (The Bing Index | **<u>Microsoft's Reply:</u>** Paragraph 80 is not genuinely disputed. **Undisputed** that: (1) Microsoft uses Bingbot to crawl webpages and that, when a website permits crawling by Bingbot, Bingbot retrieves content found on a particular webpage and stores this content in the Bing Index; and (2) meta tags are machine readable code on a webpage that operate at the individual HTML page level and communicate to a web crawling robot how to process that webpage.<br><br>Paragraph 80 cites to evidence specifically addressing the stated fact, such as the testimony (also cited by News Plaintiffs) by Mikhail Parakhin (former CEO of Microsoft's Advertising & Web Services business) which expressly reflects that meta tags "are finer-grained controls at the header level where you can say" to Microsoft's Bingbot that "a specific HTML page can be included or not included ... in the search results, but don't use my text, or exclude me from [Bing] [C]hat[.]" *See* Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 226:23-227:24; News Ex. 647 at 226:23-227:24 (same). Additionally, Paragraph 80 cites Fabrice Canel (former Principal Product Manager of Microsoft Bing) and Padma Gaggara's (VP of Microsoft AI) declarations that describe the technical operation of web crawlers, such as Microsoft's Bingbot that collects data for the Bing Index, and meta tag controls on an individual webpage "for more granular, page-level control over how search engines index and/or display content." *See* ECF 1711 (Canel Decl.) ¶¶ 11-12; ECF 1705 (Gaggara Decl.) ¶ 15. |

| | |
|---|---|
| "supports the Bing search engine by crawling, storing, and organizing the internet."); NP Ex. 613 [Gaggara Jan. 27, 2026 30(b)(6) Depo. Tr.] at 21:17-22:6; NP Ex. 615 [Gaggara Aug. 20, 2025 30(b)(6) Depo. Tr.] at 63:12-64:2 (Microsoft uses a bot ("Bingbot") to crawl the internet and index and collect content from webpages, including News Plaintiffs' webpages, and Microsoft then stores that content in the "Bing Index."). | News Plaintiffs instead seek to add an additional fact to create a dispute. But, that does not make this fact disputed. The evidence cited by News Plaintiffs does not specifically controvert the fact as stated. For example, News Plaintiffs cite internal Microsoft communications (News Exs. 453 and 455)—as well as testimony about same (News Ex. 454 referencing News Ex. 455)—that describe software bugs or errors (so-called "leakage violations"). None of these cited materials bear on the automated operation of meta tag controls that publishers can use on a webpage to provide signals to Bingbot for how to process that website (*i.e.*, the fact as stated), as opposed to occasional software bugs or errors associated with the release of a new product. The allegation that Microsoft does not "honor" such meta tag controls is unsupported for the same reason, and also is not part of the fact as stated. Therefore, the cited testimony and documents do not create a genuine dispute that meta tags are controls that communicate to web crawling robots, including Bingbot, how to process a webpage. |

**Paragraph 81**

| | |
|---|---|
| 81. **After the release of Bing Chat, Microsoft implemented a change to its system whereby the existing NOARCHIVE and NOCACHE meta tags were designed to be used by publishers to signify the degree, if any, to which their content should be excluded from web grounding.** Fabrice Decl. ¶¶ 23-29. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 81</u>: Denied** to the extent it suggests the meta tags would result in content being excluded from web grounding once tagged. Admissible evidence contradicts this.<br><br>In practice, content tagged NOARCHIVE often continues to be grounded on because Microsoft does not (re)index the | **<u>Microsoft's Reply:</u>** Paragraph 81 is not genuinely disputed. News Plaintiffs do not dispute the fact as stated that after the release of Bing Chat, Microsoft implemented a change to its system whereby the existing NOARCHIVE and NOCACHE meta tags were designed to be used by publishers to signify the degree, if any, to which their content should be excluded from web grounding. News |

| | |
|---|---|
| content after it is marked with the meta-tag, and thus, Publishers' attempts to control use are ignored. *See* NP Ex. 1351 [Stricchiola Depo Tr.] at 165:12-166:24 (suggesting that older content is often not reindexed after metatags are applied). | Plaintiffs do not dispute the fact in Paragraph 81 that "*Microsoft implemented* a change to its system whereby the existing NOARCHIVE and NOCACHE meta tags were *designed to be used by publishers[.]*" News Plaintiffs instead seek to add an additional re-indexing step they maintain Microsoft should have undertaken. But that does not make this fact disputed, and this additional requirement runs counter to Paragraph 81 and the record. As Microsoft made clear in its blog announcement to publishers: "[c]ontent tagged NOARCHIVE will not be included in Bing Chat answers, not be linked to in the answers. Going forward, for content in our Bing Index that is labeled NOARCHIVE, we will not use the content for training Microsoft's generative AI foundation models." Hurst Decl. Ex. 21.A at 2. Furthermore, Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was clear that Microsoft was using standard controls that content publishers were already familiar with in the context of search: the tags were "built on standard controls that webmasters use today to control indexing … on Bing in order to empower publishers to make choices about use of their content in Bing Chat[.]" *Id.* Any suggestion in News Plaintiffs' response that News Plaintiffs were not familiar with or know how the NOARCHIVE meta tags functioned in connection with Microsoft's Bing Index or that the tags needed to appear in the Bing Index to be effective is belied by the facts. *See, e.g.*, ECF 1711 (Canel Decl.) ¶¶ 27-30; Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 279:1-22; Hurst Decl. Ex. 99 (J. Ribas Tr.) at 130:1–131:24; Hurst Decl. Ex. 34 (S. Felix Tr.) at 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; Hurst Decl. Ex. 64 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21; Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8; Hurst Decl. Ex. 57 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18, |

| | |
|---|---|
| | 95:23–97:2, 104:3–105:12, 106:3-108:2. The Times, for example, regularly used both NOARCHIVE and Microsoft's IndexNow tool when it wished to signal to the Bing Index that it had updated its news content. *See, e.g.*, Hurst Decl. Ex. 385 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 199:14-202:17; *see also* Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8. There is no dispute, as it has been the case since the advent of Microsoft's use of meta tags for search content, that in order for a tag to take effect it must appear in the Bing Index. Regardless, when content was first published with a NOARCHIVE tag, that NOARCHIVE tag is included in the Bing Index from the start. No re-indexing was required to prevent that website content from being grounded on by Bing Chat. *See* ECF 1711 (Canel Decl.) ¶¶ 27, 29; *see also* Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr.) at 201:2-20, 202:9–11. Pages that are changed or where an NOARCHIVE tag is updated or added after initial publication, are subject to Microsoft's ordinary re-crawling efforts, which do not require any specific re-indexing request. If the publisher would like the meta tag to take effect sooner than may occur with regular crawling activity, Microsoft also offers tools to notify it of changes and request earlier re-indexing (but as noted, notifying Microsoft of the changes and requesting re-indexing is not required for the meta tag to take effect). *See* ECF 1711 (Canel Decl.) at ¶ 19; ECF 2057 (Gaggara Decl.) at ¶ 4.<br><br>Moreover, the evidence cited by News Plaintiffs does not specifically controvert the fact as stated. For example, News Plaintiffs cite to Ms. Stricchiola's testimony describing how older content online is not always reindexed. This testimony does not bear on Microsoft's repurposing of the NOARCHIVE and NOCACHE meta tags (or the automated operation of same) that publishers can use on a webpage to |

| | |
|---|---|
| | provide signals to the Copilot system to determine the amount of content permissible for use in web grounding (*i.e.*, the fact as stated)—as opposed to Bingbot not detecting certain changes to the HTML document of older online content because it has not been reindexed for a period of time.<br><br>Therefore, the cited testimony and documents do not create a genuine dispute that the NOARCHIVE and NOCACHE meta tags are controls that Microsoft expanded for publishers to signal the degree, if any, to which their content should be excluded from web grounding. |

**Paragraph 82**

| | |
|---|---|
| **82. On September 22, 2023, Microsoft announced—via a post published on Microsoft Bing Blogs—that it had repurposed the NOARCHIVE and NOCACHE meta tags for publishers to use as AI-related controls. The blog post stated that content tagged with the repurposed NOARCHIVE meta tag "will not be included in Bing Chat answers, not be linked to in the answers." A webmaster's inclusion of the NOARCHIVE meta tag in the HTML on a webpage stored in the Bing Index signals to the Copilot system that it is supposed to exclude that webpage entirely from the data provided to Copilot for web grounding.** Canel Decl. ¶ 27; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex. 21.A** (Canel Dep. Ex. 35 – Microsoft Bing Blog Announcing Meta Tags); **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 179:2-181:8, 182:17-183:9; **Ex. 64** (Liang Dep. Tr.) 181:8–182:21; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:10-105:12. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 82</u>**: **Denied** to the extent it suggests the meta tags would result in content actually being excluded from web grounding once tagged. Admissible evidence contradicts this. | **<u>Microsoft's Reply:</u>** Paragraph 82 is not genuinely disputed. News Plaintiffs do not dispute the fact as stated that: (1) on September 22, 2023, Microsoft announced—via a post published on Microsoft Bing Blogs—that it had repurposed the NOARCHIVE and NOCACHE meta tags for publishers to use as AI-related controls; (2) the blog post stated that content tagged with the repurposed |

| | |
|---|---|
| In practice, content tagged NOARCHIVE often continues to be grounded on because Microsoft does not (re)index the content after it is marked with the meta-tag, and thus, Publishers' attempts to control use are ignored. *See* NP Ex. 1351 [Stricchiola Depo Tr.] at 165:12-166:24 (suggesting that older content is often not reindexed after metatags are applied); NP Ex. 453 [MSFT_AI_MDL_000391970] at -970 ([redacted]); NP Ex. 454 [Abib 30(b)(1) Tr.] at 61:8-62:10 (Microsoft employee testifying [redacted]); NP Ex. 455 [MSFT_AI_MDL_000642967] at -967 | NOARCHIVE meta tag "will not be included in Bing Chat answers, not be linked to in the answers[;]" and, (3) a webmaster's inclusion of the NOARCHIVE meta tag in the HTML on a webpage stored in the Bing Index signals to the Copilot system that it is supposed to exclude that webpage entirely from the data provided to Copilot for web grounding.<br><br>News Plaintiffs instead seek to add an additional fact to create a dispute. Specifically, News Plaintiffs instead seek to add an additional re-indexing step they maintain Microsoft should have undertaken. But that does not make this fact disputed, and this additional requirement runs counter to Paragraph 82 and the record. As Microsoft made clear in its blog announcement to publishers: "[c]ontent tagged NOARCHIVE will not be included in Bing Chat answers, not be linked to in the answers. Going forward, for content in our Bing Index that is labeled NOARCHIVE, we will not use the content for training Microsoft's generative AI foundation models." Hurst Decl. Ex. 21.A at 2. Furthermore, Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was clear that Microsoft was using standard controls that content publishers were already familiar with in the context of search: the tags were "built on standard controls that webmasters use today to control indexing ... on Bing in order to empower publishers to make choices about use of their content in Bing Chat[.]" *Id.* Any suggestion in News Plaintiffs' response that News Plaintiffs were not familiar with or did not know how the NOARCHIVE meta tags functioned in connection with Microsoft's Bing Index or that the tags needed to appear in the Bing Index to be effective is belied by the facts. *See, e.g.*, ECF 1711 (Canel Decl.) ¶¶ 27-30; Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 279:1-22; Hurst Decl. Ex. 99 (J. Ribas Tr.) |

| | |
|---|---|
| | at 130:1–131:24; Hurst Decl. Ex. 34 (S. Felix Tr.) at 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; Hurst Decl. Ex. 64 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21; Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8; Hurst Decl. Ex. 57 (Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2. The Times, for example, regularly used both NOARCHIVE and Microsoft's IndexNow tool when it wished to signal to the Bing Index that it had updated its news content. *See, e.g.*, Hurst Decl. Ex. 385 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 199:14-202:17; *see also* Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8. There is no dispute, as it has been the case since the advent of Microsoft's use of meta tags for search content, that in order for a tag to take effect it must appear in the Bing Index. Regardless, when content was first published with a NOARCHIVE tag, that NOARCHIVE tag is included in the Bing Index from the start. No re-indexing was required to prevent that website content from being grounded on by Bing Chat. *See* ECF 1711 (Canel Decl.) ¶¶ 27, 29; *see also* Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr.) at 201:2-20, 202:9–11. Pages that are changed or where an NOARCHIVE tag is updated or added after initial publication, are subject to Microsoft's ordinary re-crawling efforts, which do not require any specific re-indexing request. If the publisher would like the meta tag to take effect sooner than may occur with regular crawling activity, Microsoft also offers tools to notify it of changes and request earlier re-indexing (but as noted, notifying Microsoft of the changes and requesting re-indexing is not required for the meta tag to take effect). *See* ECF 1711 (Canel Decl.) at ¶ 19; ECF 2057 (Gaggara Decl.) at ¶ 4. |

| | |
|---|---|
| | Moreover, the evidence cited by News Plaintiffs does not specifically controvert the fact as stated. For example, News Plaintiffs cite to Ms. Stricchiola's testimony describing how older content online is not always reindexed. News Plaintiffs also cite internal Microsoft communications (News Exs. 453 and 455)—as well as testimony about same (News Ex. 454 referencing News Ex. 455)—that describe software bugs or errors (so-called "leakage violations"). None of this cited material bears on Microsoft's blog post announcement, Microsoft's repurposing of the NOARCHIVE and NOCACHE meta tags (or the automated operation of same) that publishers can use on a webpage to provide signals to the Copilot system to determine the amount of content permissible for use in web grounding (*i.e.*, the fact as stated). Instead, the cited materials describe Bingbot not detecting certain changes to the HTML document of older online content because it has not been reindexed for a period of time, and occasional software bugs or errors associated with the release of a new product. Therefore, the cited testimony and documents do not create a genuine dispute that the NOARCHIVE and NOCACHE meta tags are controls that Microsoft publicly announced and expanded for publishers to signal the degree, if any, to which their content should be excluded from web grounding. |

**Paragraph 83**

| |
|---|
| **83. The blog post also stated that portions of content from a web page tagged with the repurposed NOCACHE meta tag "may be included in Bing Chat answers." A webmaster's inclusion of the NOCACHE meta tag in the HTML on a webpage stored in the Bing Index signals to the Copilot system that it is supposed to exclude from grounding data everything on the page other than the page title, URL and a snippet.** Canel Decl. ¶ 27; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex.** |

| | |
|---|---|
| **21.A** (Canel Dep. Ex. 35 – Microsoft Bing Blog Announcing Meta Tags); **Ex. 85** (Parakhin Dep. Tr.) 217:18–218:20, 226:23–227:24; **Ex. 99** (Ribas Dep. Tr.) 132:8–135:12; **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 179:2-181:8; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:10-105:12. | |
| **News Plaintiffs' Response to Microsoft Paragraph 83**: **Denied** to the extent that Microsoft suggests the use of the NOCACHE meta tag always excludes from grounding data everything on the web page other than the title, URL, and a snippet. Admissible evidence contradicts this.<br><br>In practice, content tagged NOCACHE would be treated the same as content not tagged NOCACHE unless Microsoft has reindexed the content after it is marked with the meta-tag. *See* NP Ex. 1351 [Stricchiola Depo Tr. 165-168] (suggesting that older content is often not reindexed after metatags are applied). | **Microsoft's Reply:** Paragraph 83 is not genuinely disputed. News Plaintiffs do not dispute the fact as stated that: (1) the blog post also stated that portions of content from a web page tagged with the repurposed NOCACHE meta tag "may be included in Bing Chat answers[;]" and (2) a webmaster's inclusion of the NOCACHE meta tag in the HTML on a webpage stored in the Bing Index signals to the Copilot system that it is supposed to exclude from grounding data everything on the page other than the page title, URL and a snippet.<br><br>News Plaintiffs instead seek to add an additional fact to create a dispute. News Plaintiffs instead seek to add an additional re-indexing step they maintain Microsoft should have undertaken. But that does not make this fact disputed, and this additional requirement runs counter to Paragraph 83 and the record. As Microsoft made clear in its blog announcement to publishers: "[c]ontent with the NOCACHE tag may be included in Bing Chat answers. We will only display URL/Snippet/Title in the answer; Going forward, for content in our Bing Index that is labeled NOCACHE, only URLs, Titles and Snippets may be used in training Microsoft's generative AI foundation models." Hurst Decl. Ex. 21.A at 2. Furthermore, Microsoft's blog post announcing the repurposed NOCACHE meta tag was clear that Microsoft was using standard controls that content publishers were already familiar with in the context of search: the tags were "built on standard controls that webmasters use today to control indexing ... on Bing in order to empower publishers to make choices about use of |

| | |
|---|---|
| | their content in Bing Chat." *Id.* Any suggestion in News Plaintiffs' response that News Plaintiffs were not familiar with or know how the NOCACHE meta tags functioned in connection with Microsoft's Bing Index or that the tags needed to appear in the Bing Index to be effective is belied by the facts. *See, e.g.*, ECF 1711 (Canel Decl.) ¶¶ 27-30; Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 279:1-22; Hurst Decl. Ex. 99 (J. Ribas Tr.) at 130:1–131:24; Hurst Decl. Ex. 34 (S. Felix Tr.) at 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; Hurst Decl. Ex. 64 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 183:3-9; Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8; Hurst Decl. Ex. 57 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18, 95:23–97:13, 104:3–105:12, 106:3-108:2. The Times, for example, regularly used both NOARCHIVE and Microsoft's IndexNow tool when it wished to signal to the Bing Index that it had updated its news content. *See, e.g.*, Hurst Decl. Ex. 385 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 199:14-202:17; *see also* Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8. There is no dispute, as it has been the case since the advent of Microsoft's use of meta tags for search content, that in order for a tag to take effect it must appear in the Bing Index. Regardless, when content was first published with a NOCACHE tag, that NOCACHE tag is included in the Bing Index from the start. No re-indexing was required to limit grounding by Bing Chat of their website content to the page's title, URL, and a snippet. *See* ECF 1711 (Canel Decl.) ¶¶ 27, 29; *see also* Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr.) at 201:2-20, 202:9–11. Pages that are changed or where an NOCACHE tag is updated or added after initial publication, are subject to Microsoft's ordinary re-crawling efforts, which do not require any specific re-indexing request. If the publisher would like the meta tag to take effect sooner than |

| | |
|---|---|
| | may occur with regular crawling activity, Microsoft also offers tools to notify it of changes and request earlier re-indexing (but as noted, notifying Microsoft of the changes and requesting re-indexing is not required for the meta tag to take effect). *See* ECF 1711 (Canel Decl.) at ¶ 19; ECF 2057 (Gaggara Decl.) at ¶ 4.<br><br>Moreover, the evidence cited by News Plaintiffs does not specifically controvert the fact as stated. For example, News Plaintiffs cite to Ms. Stricchiola's testimony describing how older content online is not always reindexed. This cited testimony does not bear on Microsoft's blog post announcement, Microsoft's repurposing of the NOCACHE meta tag (or the automated operation of same) that publishers can use on a webpage to provide signals to the Copilot system to determine the amount of content permissible for use in web grounding (*i.e.*, the fact as stated)—as opposed to Bingbot not detecting certain changes to the HTML document of older online content because it has not been reindexed for a period of time. Therefore, the cited testimony and documents do not create a genuine dispute that the NOCACHE meta tag is a control that Microsoft publicly announced and expanded for publishers to limit grounding data to the page title, URL, and a snippet. |

**Paragraph 84**

| |
|---|
| **84. The blog post also explained that if a webmaster uses neither meta tag, then the content "may be included in Bing Chat answers." Without a tag, when stored in the Bing Index the web page is used as grounding data by the Copilot system if it is selected as one of the relevant sources of data.** Canel Decl. ¶ 27; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex. 21.A** (Canel Dep. Ex. 35); **Ex. 85** (Parakhin Dep. Tr.) 15:18-21, 16:1-5, 18:7-12, 22:25-23:8, 23:21-25:6, 26:12-27:4, 217:18–218:20; **Ex. 93** (Procas |

| | |
|---|---|
| 30(b)(6) Dep. Tr.) 179:4-181:8, 182:17-183:9; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:9-105:12. | |
| **News Plaintiffs' Response to Microsoft Paragraph 84**: **Denied** to the extent it suggests the use of the NOCACHE or NOARCHIVE meta tags will fully prevent the use of publishers' content by Copilot. Admissible evidence contradicts this.<br><br>In practice, content tagged NOCACHE or NOARCHIVE would be treated the same as content not tagged with those metatags, unless Microsoft has reindexed the content after it is marked with the meta-tag. *See* NP Ex. 1351 [Stricchiola Depo Tr. 165-168] (suggesting that older content is often not reindexed after metatags are applied). | **Microsoft's Reply:** Paragraph 84 is not genuinely disputed. News Plaintiffs do not dispute the fact as stated that: (1) the blog post also explained that if a webmaster uses neither meta tag, then the content "may be included in Bing Chat answers[;]" and, (2) without a tag, when stored in the Bing Index the web page is used as grounding data by the Copilot system if it is selected as one of the relevant sources of data.<br><br>News Plaintiffs instead seek to add an additional fact to create a dispute. News Plaintiffs instead seek to add an additional re-indexing step they maintain Microsoft should have undertaken. But that does not make this fact disputed, and this additional requirement runs counter to Paragraph 84 and the record. As Microsoft made clear in its blog announcement to publishers: "[c]ontent with the NOCACHE tag may be included in Bing Chat answers. We will only display URL/Snippet/Title in the answer; Going forward, for content in our Bing Index that is labeled NOCACHE, only URLs, Titles and Snippets may be used in training Microsoft's generative AI foundation models. Content tagged NOARCHIVE will not be included in Bing Chat answers, not be linked to in the answers. Going forward, for content in our Bing Index that is labeled NOARCHIVE, we will not use the content for training Microsoft's generative AI foundation models." Hurst Decl. Ex. 21.A at 2. Furthermore, Microsoft's blog post announcing the repurposed NOCACHE and NOARCHIVE meta tags was clear that Microsoft was using standard controls that content publishers were already familiar with in the context of search: the tags were "built on standard |

| | |
|---|---|
| | controls that webmasters use today to control indexing … on Bing in order to empower publishers to make choices about use of their content in Bing Chat." *Id.* Any suggestion in News Plaintiffs' response that News Plaintiffs were not familiar with or know how the NOCACHE and NOARCHIVE meta tags functioned in connection with Microsoft's Bing Index or that the tags needed to appear in the Bing Index to be effective is belied by the facts. *See, e.g.*, ECF 1711 (Canel Decl.) ¶¶ 27-30; Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 279:1-22; Hurst Decl. Ex. 99 (J. Ribas Tr.) at 130:1–131:24; Hurst Decl. Ex. 34 (S. Felix Tr.) at 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; Hurst Decl. Ex. 64 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 183:3-9; Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8; Hurst Decl. Ex. 57 (C. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18, 95:23–97:13, 104:3–105:12, 106:3-108:2. The Times, for example, regularly used both NOARCHIVE and Microsoft's IndexNow tool when it wished to signal to the Bing Index that it had updated its news content. *See, e.g.*, Hurst Decl. Ex. 385 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 199:14-202:17; *see also* Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8. There is no dispute, as it has been the case since the advent of Microsoft's use of meta tags for search content, that in order for a tag to take effect it must appear in the Bing Index. Regardless, when content was first published with a NOCACHE and/or NOARCHIVE tag, that NOCACHE and/or NOARCHIVE tag is included in the Bing Index from the start. No re-indexing was required to prevent that website content from being grounded on by Bing Chat (for pages tagged with NOARCHIVE) or to limit grounding by Bing Chat of their website content to the page's title, URL, and a snippet (for pages tagged with NOCACHE). *See* ECF 1711 (Canel Decl.) |

| | |
|---|---|
| | ¶¶ 27, 29; *see also* Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr.) at 201:2-20, 202:9–11. Pages that are changed or where an NOCACHE and/or NOARCHIVE tag is updated or added after initial publication, are subject to Microsoft's ordinary re-crawling efforts, which do not require any specific re-indexing request. If the publisher would like the meta tag to take effect sooner than may occur with regular crawling activity, Microsoft also offers tools to notify it of changes and request earlier re-indexing (but as noted, notifying Microsoft of the changes and requesting re-indexing is not required for the meta tag to take effect). *See* ECF 1711 (Canel Decl.) at ¶ 19; ECF 2057 (Gaggara Decl.) at ¶ 4.<br><br>Moreover, the evidence cited by News Plaintiffs does not specifically controvert the fact as stated. For example, News Plaintiffs cite to Ms. Stricchiola's testimony describing how older content online is not always reindexed. This cited testimony does not bear on Microsoft's blog post announcement, Microsoft's repurposing of the NOARCHIVE and NOCACHE meta tags (or the automated operation of same) that publishers can use (or not use) on a webpage to provide signals to the Copilot system to determine the amount of content permissible for use in web grounding (*i.e.*, the fact as stated)—as opposed to Bingbot not detecting certain changes to the HTML document of older online content because it has not been reindexed for a period of time. Therefore, the cited testimony and documents do not create a genuine dispute that Microsoft's blog post explained that content without either meta tag "may be included in Bing Chat answers," and that untagged webpages stored in the Bing Index are used as grounding data when selected as relevant sources. |

### 4. *Impact Upon the Market (Factor 4)*

***<u>The New York Times Company (The New York Times)</u>***

**Paragraph 85**

| **85. Microsoft incorporates Undisputed Facts ¶¶ 27-32, 61 as though fully restated herein.** | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 85</u>: Denied.** This is not an appropriate undisputed fact. To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 27-32 and 61 as though fully restated herein. | **<u>Microsoft's Reply:</u>** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 27-32, and 61 as though fully restated herein. |

**Paragraph 86**

| **86. Although The New York Times was capable of tracking and in fact collected at least some conversion data (*i.e.*, data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.** Hurst Decl. **Ex. 129** (Yang 30(b)(6) Dep. Tr.) 20:5-22:23, 64:4-65:15, 66:21-67:16; **Ex. 114** (Stricchiola Dep. Tr.) 97:22-98:4, 98:14-99:2, 99:22-24; **Ex. 281** (Bell Dep. Tr.) 144:16-145:3. | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 86</u>: Denied.** Admissible evidence contradicts this assertion. The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates (CTR) from Bing search and Bing Chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389-90. Reduced traffic to The Times's website results in fewer conversions to subscribers. *See* NP Ex. 8 [Bardeen 30(b)(6) Depo. Tr.] at 198:2-11 ("[T]he less traffic we get, the less subscribers | **<u>Microsoft's Reply:</u>** Paragraph 86 is not genuinely disputed. The testimony cited by Plaintiffs regarding The Times's collection of conversion data shows that they did in fact collect "at least some conversion data." *See* Hurst Ex. 129 (H. Yang 30(b)(6) Tr.) at 21:18-22:23,66:21-67:16; News Ex. 1306 (M. Melikadze 30(b)(6) Tr.) at 77:19-80:10. Therefore, the evidence cited by Plaintiffs does not specifically controvert the fact as stated. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that [redacted] |

| | |
|---|---|
| we have, the less advertising we can sell, and, therefore, the less advertising revenue. And so, for the exact same reasons that I've described ... having fewer subscribers than our expectations would lead to less subscriber revenue, the same dynamic would lead to less advertising revenue than we would otherwise have."); NP Ex. 1106 [The New York Times Company's Supplemental Response to Microsoft Interrogatory No. 15] at 10 ("[R]educed traffic to The Times's websites—including the Athletic and Wirecutter—reduce subscriptions, advertising revenue, and affiliate revenue."); NP Ex. 1234 [NYT_00832517]; NP Ex. 1254 [Yang Depo. Ex. 13] at 6 (a Times Oct. 2025 board presentation entitled [redacted] NP Ex. 1254 [Yang Depo. Ex. 13] at 37 [redacted]).<br><br>**Denied** that The Times collected data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content. The cited evidence does not support this assertion.<br><br>Admissible evidence contradicts Microsoft's assertion that The Times collected data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content. *See* Hurst Ex. 129 [Yang 30(b)(6) Depo. Tr.] at 21:18-22:23 (The Times's Chief Growth and Customer Officer, Hannah Yang, testifying that she does not believe The Times typically calculates conversion rates on a daily basis but could calculate it from the raw data on the number of anonymous | [redacted] Hurst Decl. Ex. 114 (J. Stricchiola Dep. Tr.) at 99:3-8. Yet she did not analyze that data. *Id. a*t 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's correct."). Dr. Bell admitted that she did not analyze paywall conversion data from the Times. Hurst Decl. Ex. 281 (E. Bell Tr.) at 144:16-145:3.<br><br>Because they cannot dispute that testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that she (nor any other expert) failed to analyze Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, testimony from Mr. Bardeen and Ms. Yang about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence .... , is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

| | |
|---|---|
| or registered users and subscribers on a given day), 66:21-67:16 (Ms. Yang testifying that although The Times can pull records of conversion rates, she is not sure if it is kept consistently in a place that can be pulled over the entire relevant period); NP Ex. 1306 [Melikadze 30(b)(6) Depo. Tr.] at 77:19-80:10 (The Times's VP of Data and Insight Enterprise Analytics testifying that The Times's conversion data does not indicate the specific sources or rates of conversions). | |

**Paragraph 87**

| | |
|---|---|
| **87. The conversion rate for The New York Times core product (defined internally as its "news" content) increased from November 2022 to November 2025.** Tucker Decl. ¶¶ 11(a), 49-53, Figure 9; Hurst Decl. **Ex. 91** (Poferl 30(b)(6) Dep. Tr.) 15:2-15. | |
| **News Plaintiffs' Response to Microsoft Paragraph 87**: **Undisputed** that the conversion rate for The Times's core news product was higher in November 2025 than it was in November 2022, shortly after The Times acquired The Athletic and during a period of heightened news awareness due to the change in presidential administrations. Insofar as Microsoft intends to mean that the conversion rate has always increased during the entire period from November 2022 to November 2025, that is disputed.<br><br>Admissible evidence contradicts that the paywall conversion rate for The Times's news product increased during the entire period from November 2022 to November 2025. *See* NP Ex. 1317 [NYT_01036107] ([redacted] | **Microsoft's Reply:** Paragraph 87 is not genuinely disputed. **Undisputed** that "the conversion rate for The Times's core news product" was higher in November 2025 than November 2022, which is the substance of Paragraph 87.<br><br>Microsoft's fact does not state that "the paywall conversion rate for The Times's news product increased during the entire period," but rather that the conversion rate "increased from November 2022 to November 2025," as shown by the evidence Microsoft cited. Paragraph 87 is therefore **undisputed**. |

| | |
|---|---|
| [redacted] NP Ex. 1352 [Tucker Rebuttal Rep.] at 50, Figure 6 (analyzing The Times's paywall conversion rates for its news product and demonstrating sharp declines at certain periods between 2022 and 2025). | |

**Paragraph 88**

| | |
|---|---|
| **88. Although The New York Times collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026) 109:9-110:5. | |
| **News Plaintiffs' Response to Microsoft Paragraph 88: Denied.** Admissible evidence contradicts that The Times's experts did not analyze traffic data. The Times's expert Jim Malackowski analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites. For example, Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that although he did analyze the traffic data that was produced, ultimately no | **Microsoft's Reply:** Paragraph 88 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that The New York Times collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. In fact, the testimony from Mr. Malackowski that News Plaintiffs cite in their response acknowledges that he did not base any of his findings on the actual traffic data that Plaintiffs produced. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Microsoft's cited evidence makes clear that The Times collects data regarding the sources of its traffic, and Ms. Stricchiola and Mr. Malackowski all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on data regarding the sources of |

| | |
|---|---|
| conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski testified: "I believe there's quantitative evidence in the record, whether it be the survey evidence [i.e., Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | traffic collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case.").<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a survey and Ms. Stricchiola's click-through rate analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 39-41. |

| | |
|---|---|
| Finally, The Times's expert Jessie Stricchiola analyzed Microsoft's produced impressions and clickthrough data for The Times's domains and concluded that the clickthrough rate for Bing Chat was significantly lower than for traditional Bing Web Search for The Times's domains. *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389-90 ("Based on my analysis of Microsoft's produced impression and click data for News Plaintiffs' websites from Bing Web Search and Bing Chat covering the period December 2, 2023 through September 30, 2024, CTR in Bing Chat is dramatically lower when compared to CTR of Bing Web Search. . . . The overall percentage reduction in CTR for Bing Chat was approximately 87% to 93% for The Times's domains and 83% to 91% for *Daily News* Plaintiffs' domains when compared with Bing Web search."); Stricchiola NYT/DN Opening Rep. ¶ 393 ("Based on my analysis of Microsoft's produced impression and click data for The Times's domains for Search and Chat covering June 2023 and December 2, 2023 to September 30, 2024, it is my opinion that user clickthrough-rate (CTR) (measures as click/impression) is dramatically lower for Bing Chat when compared to CTR of Bing Web Search for The Times's domains."). | |

**Paragraph 89**

| | |
|---|---|
| **89.** [redacted] Tucker Decl. ¶¶ 11(a), 63-64, Figure 12. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 89</u>: Denied.** The cited evidence contradicts Microsoft's assertion. *See* Tucker Decl. ¶ 64, Figure 12 (a chart | **<u>Microsoft's Reply:</u>** Paragraph 89 is not genuinely disputed. The fact states that [redacted] |

| | |
|---|---|
| prepared by Microsoft's expert showing [redacted]). Microsoft's expert Dr. Tucker's conversion rate analysis also fails because it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>Admissible evidence also contradicts Microsoft's assertion to the extent that Microsoft seeks to suggest that Copilot and ChatGPT do not cause a decrease in pageviews to The Times's websites compared to non-GenAI search. The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates from Bing search and Bing chat and found that the [redacted] *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389–90. Defendants' experts also admitted [redacted] *See, e.g.*, NP Ex. 556 [Amir Opening Rep.] at ¶ 60 ([redacted].<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | [redacted]. The evidence cited by Plaintiffs does not contradict the fact as stated. [redacted] Paragraph 89 is therefore not disputed. Additionally, Plaintiffs' discussion of Dr. Tucker's conversion rate analysis is not relevant because Paragraph 89 is about a different metric, pageviews.<br><br>The remaining testimony cited by News Plaintiffs does not specifically controvert the stated fact. Ms. Stricchiola's calculation involved another entirely different metric not at issue in Paragraph 89: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30.<br><br>News Plaintiffs also misstate Dr. Amir's results, which do not controvert Paragraph 89. Dr. Amir reported that [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59. |

**Paragraph 90**

| | |
|---|---|
| **90.** [redacted] Tucker Decl. ¶¶ 11(a), 65-66, Figure 13A, Figure 13B, Figure 14A, Figure 14B. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 90</u>: Denied.** The cited evidence contradicts Microsoft's assertion. *See* Tucker Decl. ¶ 65, Figure 13A (a chart prepared by Microsoft's expert showing [redacted]), Figure 13B (a chart prepared by Microsoft's expert showing [redacted]), ¶ 66, Figure 14A (a chart prepared by Microsoft's expert showing [redacted]), Figure 14B (a chart prepared by Microsoft's expert showing [redacted]. Microsoft's expert Dr. Tucker's conversion rate analysis also fails because it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>Admissible evidence also contradicts Microsoft's assertion to the extent that Microsoft seeks to suggest that Copilot and ChatGPT do not cause a decrease in user visits to The Times's websites compared to non-GenAI search. The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates from Bing search and Bing chat and | **<u>Microsoft's Reply:</u>** Paragraph 90 is not genuinely disputed. The fact states that [redacted]. The evidence cited by Plaintiffs does not specifically controvert the fact as stated. [redacted]. Paragraph 90 is therefore not disputed. Additionally, Plaintiffs' discussion of Dr. Tucker's conversion rate analysis is not relevant because Paragraph 90 is about a different metric, pageviews.<br><br>The remaining testimony cited by News Plaintiffs does not specifically controvert the stated fact. Ms. Stricchiola's calculation involved another entirely different metric not at issue in Paragraph 90: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30.<br><br>News Plaintiffs also misstate Dr. Amir's results, which do not controvert Paragraph 89. Dr. Amir reported that [redacted] |

| | |
|---|---|
| found that the [redacted] *See* Stricchiola NYT/DN Opening Rep. ¶¶ 389-390. Defendants' experts also admitted that [redacted] *See, e.g.*, NP Ex. 556 [Amir Opening Rep.] at ¶ 60 ([redacted].<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59. |

**Paragraph 91**

| | |
|---|---|
| **91.** [redacted] Tucker Decl. ¶¶ 12(b), 112-113, Figure 23. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 91</u>: Denied.** The cited evidence contradicts this asserted fact. *See* Tucker Decl. ¶ 113, Figure 23 (a chart prepared by Microsoft's expert showing [redacted]). Microsoft's expert Dr. Tucker's conversion rate analysis also fails because it looks | **<u>Microsoft's Reply:</u>** Paragraph 91 is not genuinely disputed. News Plaintiffs do not dispute that Figure 23 of the Tucker Declaration shows [redacted] does not controvert the fact as stated. Additionally, Plaintiffs' discussion of Dr. Tucker's |

| | |
|---|---|
| at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>To the extent that Microsoft seeks to suggest that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT, admissible evidence contradicts this assertion. For example, The Times's expert Jessie Stricchiola analyzed the difference in the click-through-rates from Bing search and Bing chat and found that the [redacted] ¶¶ 389-90. [redacted] *See, e.g.*, NP Ex. 556 [Amir Opening Rep.] at ¶ 60 ([redacted]). Moreover, the release of Defendants' accused products sparked other companies like Google to fast-track their own generative AI products, including but not limited to Google AI Overviews, which provides AI-generated summaries in the same way as Defendants' products. *See* NP Ex. 1111 [TONER_000000154] at -183; NP Ex. 1112 ["Ways to Search (AI Overviews)," Google, https://search.google/ways-to-search/ai-overviews/]; NP Ex. 128 [Stamm Rebuttal Rep.] ¶ 148; NP Ex. 1113 ["Find information in faster & easier ways with AI Overviews in Google Search," Google Search Help, https://support.google.com/websearch/answer/14901683 ]; NP Ex. 495 ["Introducing ChatGPT search," OpenAI (Oct. 31, 2024), https://openai.com/index/introducing-chatgpt-search/]. Defendants' own experts agree that Google AI Overviews negatively impacted The Times's traffic. *See* NP | conversion rate analysis is not relevant because Paragraph 91 is about a different metric, pageviews.<br><br>The remaining testimony cited by News Plaintiffs also does not specifically controvert the stated fact. Ms. Stricchiola's calculation involved another entirely different metric not at issue in Paragraph 91: That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding organic search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30.<br><br>News Plaintiffs also misstate Dr. Amir's results, which do not controvert Paragraph 89. Dr. Amir reported that [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>Furthermore, the evidence cited by News Plaintiffs regarding Google AI overviews does not specifically controvert the stated fact. News Ex. 1111 (TONER_000000154) at -183; News Ex. 1112 ("Ways to Search (AI Overviews)," Google, https://search.google/ways-to-search/ai-overviews/); News Ex. 128 (Stamm Rebuttal Rep.) ¶ 148; News Ex. 1113 ("Find information in faster & easier ways with AI Overviews in Google Search," Google Search Help, https://support.google.com/websearch/answer/14901683 |

| | |
|---|---|
| Ex. 467 [Goldfarb Opening Rep.] ¶ 169; NP Ex. 128 [Stamm Rebuttal Rep.] ¶¶ 139-147.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | ); News Ex. 495 (["Introducing ChatGPT search," OpenAI (Oct. 31, 2024), https://openai.com/index/introducing-chatgpt-search/); News Ex. 467 (Goldfarb Opening Rep.) ¶ 169; News Ex. 128 (Stamm Rebuttal Rep.) ¶¶ 139-147. Studies relating to Google AI Overviews does not impact that "[redacted]."<br><br>Rather, as Plaintiffs' documents and testimony (some of which Dr. Tucker relied upon for this opinion) reveal, Google's algorithmic changes to its traditional search engine had significant impacts on Newspaper Plaintiffs' audience metrics by shifting audience search patterns and behavior. *See, e.g.*, Hurst Decl. Ex. 386 (S. Felix Tr.) at 154:2-17; Hurst Decl. Ex. 385 (C. Liang Tr.) at 52:14-20. For example, [redacted] *See, e.g.*, Hurst Decl. Ex. 415 (M. Melikadze Dep. Ex. 8 - Subscription Growth Update, Overall Audience Presentation) at 22; *see also* ECF 1733 (Tucker Decl.) ¶ 77(b) (describing how algorithm changes to referral sites, such as Google, can affect traffic to Newspaper Plaintiffs' websites). This dynamic continued in the year following the introduction of Copilot and ChatGPT: for instance, [redacted] News Ex. 1118 (H. Poferl 30(b)(6) Dep. Ex. 4 - 2024 Data Insights Group Year in Review Presentation) at 50-52.<br><br>That Plaintiffs now try to rely on evidence concerning Google also runs ***directly contrary*** to their position |

| | |
|---|---|
| | during two years of discovery in this case, where they continuously blocked Defendants' efforts to seek discovery into Google and other third-party AI tools because they were "irrelevant." *See, e.g.*, 1:23-cv-11195, ECF 293 at 3 (arguing "discovery into the impact of third-party generative AI on the broader journalism market" as irrelevant "to the harm" caused by Defendants); *id*. ECF 344 (M.J. Wang denying defendants' motion to compel discovery on third party GenAI tools); MDL ECF 82 (Stein upholding M.J. Wang's 344 order). Judicial estoppel bars Plaintiffs from using Google as both a sword and shield. *Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, No. 16-CV-1318 (GBD) (BCM), 2022 WL 2530456, at *18 (S.D.N.Y. Mar. 9, 2022*), report and recommendation adopted*, No. 16 CIV.1318(GBD)(BCM), 2024 WL 5154462 (S.D.N.Y. Dec. 18, 2024). Paragraph 91 is therefore not disputed. |

***<u>Daily News, LP (Daily News)</u>***

**Paragraph 92**

| **92. Microsoft incorporates Undisputed Facts ¶¶ 33-35, 61 as though fully restated herein.** | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 92</u>: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 33-35 and 61 as though fully restated herein. | **<u>Microsoft's Reply:</u>** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 33-35, and 61 as though fully restated herein. |

**Paragraph 93**

| | |
|---|---|
| **93. Although the Daily News was capable of tracking and in fact collected at least some conversion data (*i.e.*, data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14. | |
| <u>**News Plaintiffs' Response to Microsoft Paragraph 93**</u>: **Denied.** Admissible evidence contradicts this.<br><br>The *Daily News* Plaintiffs' experts did analyze conversion data. For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain nydailynews.com the CTR for Bing Chat was 90.60% lower than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, | <u>**Microsoft's Reply:**</u> Paragraph 93 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Daily News collected conversion data, yet its experts did not actually analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. *Id.* at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute that testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely different metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them |

| | |
|---|---|
| paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence .... , is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

**Paragraph 94**

| | |
|---|---|
| **94.** [redacted] Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 94</u>: Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Daily News website compared to non-GenAI search.<br><br>For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the domain nydailynews.com the [redacted] | **<u>Microsoft's Reply:</u>** Paragraph 94 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also |

| | |
|---|---|
| [redacted] *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the | moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that the Daily News conversion data does not "isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

| | |
|---|---|
| impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 95**

| | |
|---|---|
| **95. Although the Daily News collects data regarding the sources of its traffic, its experts did not analyze whether Copilot affected actual traffic volumes to its website.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 95</u>: Denied.** Admissible evidence contradicts this.<br><br>*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze | **<u>Microsoft's Reply:</u>** Paragraph 95 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Daily News collects data regarding the sources of its traffic, yet its experts did not analyze that traffic data to determine whether Copilot affected actual traffic volumes to its website. Microsoft's cited evidence makes clear that the Daily News collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have |

| | |
|---|---|
| whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If | reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case.").<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

| | |
|---|---|
| you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | |

**Paragraph 96**

| | |
|---|---|
| **96.** [redacted] Tucker Decl. ¶¶ 11(a), 67-69, 71, 77-78, 80, Figure 15, Figure 16. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 96</u>**: Denied to the extent it suggests Copilot and ChatGPT do not cause a decrease in pageviews and users to the Daily News website compared to non-GenAI search. Admissible evidence contradicts this.<br><br>Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains, the difference was [redacted] and for nydailynews.com specifically the difference in click-through-rate was [redacted] Stricchiola NYT/DN Opening Rep, ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted] | **<u>Microsoft's Reply:</u>** Paragraph 96 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted] News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 96. Therefore, Paragraph 96 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 96: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the |

| | |
|---|---|
| [redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] would have a negative effect on pageviews and users.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews | challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used the Daily News website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 96. Dr. Amir reported that [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on the Daily News website. |

| | |
|---|---|
| will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 97**

| | |
|---|---|
| **97.** [redacted] Tucker Decl. ¶¶ 12(b), 112-113, Figure 24. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 97</u>**: Denied to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>Daily News Plaintiffs' experts analyzed numerous sources of data supporting the proposition that [redacted] For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for nydailynews.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening | **<u>Microsoft's Reply:</u>** Paragraph 97 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News |

| | |
|---|---|
| Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in | Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to the Daily News website declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted] Ms. Jacobs's testimony only addresses 2022 (ChatGPT was released in late November of that year), 2024, and 2026. Dr. Tucker's analysis examined search-referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) |

| | |
|---|---|
| 2024, it declined to around [redacted] and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted] NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted] *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. Ex. 48) at 1 ([redacted] |

***<u>Chicago Tribune Company, LLC (Chicago Tribune)</u>***

**Paragraph 98**

| | |
|---|---|
| **98. Microsoft incorporates Undisputed Facts ¶¶ 36-38, 61 as though fully restated herein.** | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 98</u>: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 36-38 and 61 as though fully restated herein. | **<u>Microsoft's Reply:</u>** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 36-38, and 61 as though fully restated herein. |

**Paragraph 99**

| |
|---|
| **99. Although the Chicago Tribune was capable of tracking and in fact collected at least some conversion data (*i.e.*, data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that** |

| | |
|---|---|
| **conversion data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 99</u>: Denied.** Admissible evidence contradicts this.<br><br>The *Daily News* Plaintiff experts did analyze conversion data. For example, expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain chicagotribune.com the CTR for Bing Chat was 86.13% lower than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of | **<u>Microsoft's Reply:</u>** Paragraph 99 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Chicago Tribune collected conversion data, yet its experts did not actually analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. *Id.* at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute that testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' |

| | |
|---|---|
| meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

**Paragraph 100**

| | |
|---|---|
| **100.** [redacted] Tucker Decl. ¶¶ 11(a) 49-51, 54-55, Figure 10. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 100</u>: Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Chicago Tribune website compared to non-GenAI search.<br><br>For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the domain chicagotribune.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389.<br><br>Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new | **<u>Microsoft's Reply:</u>** Paragraph 100 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the |

| | |
|---|---|
| subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that the Chicago Tribune conversion data does not "isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

| | |
|---|---|
| News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 101**

| | |
|---|---|
| 101. **Although the Chicago Tribune collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. | |
| <u>**News Plaintiffs' Response to Microsoft Paragraph 101**</u>: **Denied.** Admissible evidence contradicts this.<br><br>*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's | <u>**Microsoft's Reply:**</u> Paragraph 101 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Chicago Tribune collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. Microsoft's cited evidence makes clear the Chicago Tribune collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at |

| | |
|---|---|
| qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period | 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case.").<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

| | |
|---|---|
| of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | |

**Paragraph 102**

| | |
|---|---|
| **102.** [redacted] Tucker Decl. ¶¶ 11(a), 67-70, 77-79, Figure 15, Figure 16. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 102</u>: Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in pageviews and users, including to the Chicago Tribune website, compared to non-GenAI search.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted] and for chicagotribune.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted] An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users. | **<u>Microsoft's Reply:</u>** Paragraph 102 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted]<br><br>News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 102. Therefore, Paragraph 102 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 102: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. |

| | |
|---|---|
| Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] (tab "Metrics"); Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP"). | Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used the Chicago Tribune website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 102. Dr. Amir reported that [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on the Chicago Tribune website. |

| | |
|---|---|
| News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 103**

| | |
|---|---|
| **103.** [redacted] Tucker Decl. ¶¶ 12(b), 112-113, Figure 24. | |
| **__News Plaintiffs' Response to Microsoft Paragraph 103__**: **Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]. For the *Daily News* Plaintiff domains the difference was [redacted], and for chicagotribune.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]. An [redacted] (than non-GenAI search) | **__Microsoft's Reply:__** Paragraph 103 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to the Chicago Tribune website have |

| | |
|---|---|
| combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted] and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted] NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22. | declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted] Ms. Jacobs's testimony only addresses 2022 (the year that ChatGPT was released), 2024, and 2026. Dr. Tucker's analysis examined search-referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted] *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. |

| | |
|---|---|
| News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | Ex. 48) at 1 ([redacted] |

***<u>Sun-Sentinel Company, LLC (Sun Sentinel)</u>***

**Paragraph 104**

| | |
|---|---|
| **104. Microsoft incorporates Undisputed Facts ¶¶ 39-41, 61 as though fully restated herein.** | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 104</u>: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 39-41 and 61 as though fully restated herein. | **<u>Microsoft's Reply:</u>** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 39-41, and 61 as though fully restated herein. |

**Paragraph 105**

| | |
|---|---|
| **105. Although the Sun Sentinel was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 105</u>: Denied.** Admissible evidence contradicts this. | **<u>Microsoft's Reply:</u>** Paragraph 105 is not genuinely disputed because News Plaintiffs do not deny the specific |

| | |
|---|---|
| The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain sun-sentinel.com the CTR for Bing Chat was 89.04% lower than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine 2/4/26 | fact that Microsoft stated: that the Sun Sentinel collected conversion data, yet its experts did not actually analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. *Id.* at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute that testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to |

| | |
|---|---|
| 30(b)(6) Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | create a genuine issue of fact in light of the evidence to the contrary"). |

**Paragraph 106**

| | |
|---|---|
| **106.** [redacted] Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10. | |
| **News Plaintiffs' Response to Microsoft Paragraph 106: Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Sun Sentinel website compared to non-GenAI search.<br><br>For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the domain sun-sentinel.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data | **Microsoft's Reply:** Paragraph 106 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. *See* *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of |

| | |
|---|---|
| and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that the Sun Sentinel conversion data does not "isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

**Paragraph 107**

| |
|---|
| **107. Although the Sun Sentinel collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 107: Denied.** Admissible evidence contradicts this.<br><br>*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical | **Microsoft's Reply:** Paragraph 107 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Sun Sentinel collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. Microsoft's cited evidence makes clear that the Sun Sentinel collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case."). |

| | |
|---|---|
| impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

**Paragraph 108**

| **108.** [redacted] Tucker Decl. ¶¶ 11(a), 67-69, 72, 77-78, 81, Figure 15, Figure 16. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 108: Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in pageviews and users, including to the Sun Sentinel website, compared to non-GenAI search.<br><br>For example, Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for sun-sentinel.com specifically the difference in click-through-rate was [redacted] Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted] An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the | **Microsoft's Reply:** Paragraph 108 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted] News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 108. Therefore, Paragraph 108 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 108: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used the Sun Sentinel website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory |

| | |
|---|---|
| numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to | statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 108. Dr. Amir reported that [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on the Sun Sentinel website. |

| | |
|---|---|
| isolate the factors that affect those trends to determine causation). | |

**Paragraph 109**

| | |
|---|---|
| **109.** [redacted] Tucker Decl. ¶¶ 12(b), 112-113, Figure 24. | |
| **News Plaintiffs' Response to Microsoft Paragraph 109**: **Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>Daily News Plaintiffs' experts analyzed numerous sources of data [redacted] For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for sun-sentinel.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted] An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI | **Microsoft's Reply:** Paragraph 109 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to the Sun Sentinel website have declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a |

| | |
|---|---|
| search [redacted] would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted] and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted] NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their | genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted] Ms. Jacobs's testimony only addresses 2022 (the year that ChatGPT was released), 2024, and 2026. Dr. Tucker's analysis examined search-referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted] *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. Ex. 48) at 1 [redacted]). |

| | |
|---|---|
| *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

***<u>Orlando Sentinel Communications Company, LLC (Orlando Sentinel)</u>***

**Paragraph 110**

| | |
|---|---|
| **110. Microsoft incorporates Undisputed Facts ¶¶ 42-44, 61 as though fully restated herein.** | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 110</u>: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 42-44 and 61 as though fully restated herein. | **<u>Microsoft's Reply:</u>** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 42-44, and 61 as though fully restated herein. |

**Paragraph 111**

| | |
|---|---|
| **111. Although the Orlando Sentinel was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 111</u>: Denied.** Admissible evidence contradicts this. | **<u>Microsoft's Reply:</u>** Paragraph 111 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Orlando Sentinel collected conversion data, yet its experts did not actually |

| | |
|---|---|
| The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain orlandosentinel.com the CTR for Bing Chat was 86.10% lower than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's | analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. *Id.* at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute this testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

| | |
|---|---|
| conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | |

**Paragraph 112**

| | |
|---|---|
| **112.** [redacted] Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 112</u>: Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Orlando Sentinel website compared to non-GenAI search.<br><br>For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the domain orlandosentinel.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting | **<u>Microsoft's Reply:</u>** Paragraph 112 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... |

| | |
|---|---|
| in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | , unsupported by documentary or other concrete evidence …., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that the Orlando Sentinel conversion data does not "isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

**Paragraph 113**

| | |
|---|---|
| **113. Although the Orlando Sentinel collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. | |
| **News Plaintiffs' Response to Microsoft Paragraph 113: Denied.** Admissible evidence contradicts this.<br><br>*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July | **Microsoft's Reply:** Paragraph 113 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Orlando Sentinel collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. Microsoft's cited evidence makes clear that the Orlando Sentinel collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ez. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case."). |

| | |
|---|---|
| 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

**Paragraph 114**

**114.** [redacted] Tucker Decl. ¶¶ 11(a), 67-69, 73, 77-78, 82, Figure 15, Figure 16.

| News Plaintiffs' Response | Microsoft's Reply |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 114</u>: Denied.** Admissible evidence contradicts this.<br><br>Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat [redacted] For the *Daily News* Plaintiff domains the difference was 83-91%, and for orlandosentinel.com specifically the difference in click-through-rate was 86.10%. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without | **<u>Microsoft's Reply:</u>** Paragraph 114 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted]<br><br>News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 114. Therefore, Paragraph 114 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 114: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used the Orlando Sentinel website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self- |

| | |
|---|---|
| the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | serving testimony "consist[ing] largely of conclusory statements …. , unsupported by documentary or other concrete evidence …., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 114. Dr. Amir reported that [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on the Orlando Sentinel website. |

**Paragraph 115**

| | |
|---|---|
| **115.** [redacted] ucker Decl. ¶¶ 12(b), 112-113, Figure 24. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 115</u>: Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for orlandosentinel.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted] An 83-91% lower CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers | **<u>Microsoft's Reply:</u>** Paragraph 115 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to the Orlando Sentinel website have declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact |

| | |
|---|---|
| from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted] and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted] NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted] Ms. Jacobs's testimony only addresses 2022 (the year that ChatGPT was released), 2024, and 2026. Dr. Tucker's analysis examined search-referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted] *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. Ex. 48) at 1 ([redacted] |

***San Jose Mercury-News, LLC (The Mercury News)***

**Paragraph 116**

| | |
|---|---|
| **116. Microsoft incorporates Undisputed Facts ¶¶ 45-47, 61 as though fully restated herein.** | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 116</u>: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 45-47 and 61 as though fully restated herein. | **<u>Microsoft's Reply:</u>** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 45-47, and 61 as though fully restated herein. |

**Paragraph 117**

| | |
|---|---|
| **117. Although The Mercury News was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 117</u>: Denied.** The admissible evidence contradicts this.<br><br>The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain mercurynews.com the CTR for Bing Chat was 82.82% lower than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less | **<u>Microsoft's Reply:</u>** Paragraph 117 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that The Mercury News collected conversion data, yet its experts did not actually analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. *Id.* at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's |

| | |
|---|---|
| traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute this testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

**Paragraph 118**

| | |
|---|---|
| **118.** [redacted] Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 118</u>: Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on The Mercury News website compared to non-GenAI search.<br><br>For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and [redacted] For the domain mercurynews.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' | **<u>Microsoft's Reply:</u>** Paragraph 118 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that The Mercury News conversion data does not "isolate |

| | |
|---|---|
| products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

**Paragraph 119**

| |
|---|
| **119. Although The Mercury News collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. |

| News Plaintiffs' Response | Microsoft's Reply |
| --- | --- |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 119</u>: Denied.** Admissible evidence contradicts this.<br><br>*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 | **<u>Microsoft's Reply:</u>** Paragraph 119 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that The Mercury News collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. Microsoft's cited evidence makes clear that The Mercury News collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case.").<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a |

| | |
|---|---|
| [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

**Paragraph 120**

| | |
|---|---|
| **120.** [redacted] Tucker Decl. ¶¶ 11(a), 67-69, 73, 77-78, 82, Figure 15, Figure 16. | |
| **News Plaintiffs' Response to Microsoft Paragraph 120: Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in | **Microsoft's Reply:** Paragraph 120 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted] |

| | |
|---|---|
| pageviews and users, including to the Mercury News website, compared to non-GenAI search.<br><br>For example, Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was 83-91%, and for mercurynews.com specifically the difference in click-through-rate was 82.82%. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted] An [redacted] CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17. | [redacted] News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 120. Therefore, Paragraph 120 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 120: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used The Mercury News website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 120. Dr. Amir reported that [redacted] |

| | |
|---|---|
| Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on The Mercury News website. |

**Paragraph 121**

| |
|---|
| **121.** [redacted] Tucker Decl. ¶¶ 12(b), 112-113, Figure 24. |

| News Plaintiffs' Response | Microsoft's Reply |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 121</u>: Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for mercurynews.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17. | **<u>Microsoft's Reply:</u>** Paragraph 121 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to The Mercury News website have declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted] Ms. Jacob's testimony only addresses 2022 (the year that ChatGPT was released), 2024, and 2026. Dr. Tucker's analysis examined search- |

| | |
|---|---|
| Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted] and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted] NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted] *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. Ex. 48) at 1 [redacted]. |

***DP Media Network, LLC (The Denver Post)***

**Paragraph 122**

<table>
<tr><td colspan="2">122. Microsoft incorporates Undisputed Facts ¶¶ 48-50, 61 as though fully restated herein.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 122</u>: Denied. This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 48-50 and 61 as though fully restated herein.</td><td><u>Microsoft's Reply:</u> Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 48-50, and 61 as though fully restated herein.</td></tr>
</table>

**Paragraph 123**

<table>
<tr><td colspan="2">123. Although The Denver Post was capable of tracking and in fact collected at least some conversion data (i.e., data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data. Hurst Decl. Ex. 114 (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; Ex. 82 (Owen Dep. Tr.) 107:13-23, 117:4-14.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 123</u>: Denied. Admissible evidence contradicts this.<br><br>The Daily News Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain denverpost.com the CTR for Bing Chat was 86.84% lower than for Bing Web Search. See Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less</td><td><u>Microsoft's Reply:</u> Paragraph 123 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that The Denver Post collected conversion data, yet its experts did not actually analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. Id. at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's</td></tr>
</table>

| | |
|---|---|
| traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute this testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

**Paragraph 124**

| | |
|---|---|
| **124.** [redacted]. Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 124</u>: Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on The Denver Post website compared to non-GenAI search.<br><br>For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the domain denverpost.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting | **<u>Microsoft's Reply:</u>** Paragraph 124 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that The Denver Post conversion data does not "isolate the |

| | |
|---|---|
| conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

**Paragraph 125**

| |
|---|
| **125. Although The Denver Post collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. |

| News Plaintiffs' Response | Microsoft's Reply |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 125</u>: Denied.** Admissible evidence contradicts this.<br><br>*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 | **<u>Microsoft's Reply:</u>** Paragraph 125 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that The Denver Post collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. Microsoft's cited evidence makes clear that The Denver Post collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case.").<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a |

| | |
|---|---|
| [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

**Paragraph 126**

| | |
|---|---|
| **126.** [redacted] Tucker Decl. ¶¶ 11(a), 67-69, 74, 77-78, 83, Figure 15, Figure 16. | |
| **News Plaintiffs' Response to Microsoft Paragraph 126: Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in | **Microsoft's Reply:** Paragraph 126 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted] |

| | |
|---|---|
| pageviews and users, including to the Denver Post website, compared to non-GenAI search.<br><br>Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for denverpost.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted] An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have | [redacted] News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 126. Therefore, Paragraph 126 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 126: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used The Denver Post website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 126. Dr. Amir reported that [redacted] |

| | |
|---|---|
| metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on The Denver Post website. |

**Paragraph 127**

| |
|---|
| **127.** [redacted] Tucker Decl. ¶¶ 12(b), 112-113, Figure 24. |

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 127</u>**: **Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for denverpost.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted] An 83-91% lower CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search 37.2 percent of the time would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17. | **<u>Microsoft's Reply:</u>** Paragraph 127 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to The Denver Post website have declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted] Ms. Jacobs's testimony only addresses 2022 (the year that ChatGPT was released), 2024, and 2026. Dr. Tucker's analysis examined search- |

| | |
|---|---|
| Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted] and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted] NP Ex. 72 [Jacobs 30(b)(6) 2/12/26 Dep Tr] at 23:6-22.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted] *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. Ex. 48) at 1 ([redacted] |

***ORB Publishing, LLC (The Orange County Register)***

**Paragraph 128**

| **128. Microsoft incorporates Undisputed Facts ¶¶ 51-53, 61 as though fully restated herein.** | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 128**: **Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 51-53 and 61 as though fully restated herein. | **Microsoft's Reply:** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 51-53, and 61 as though fully restated herein. |

**Paragraph 129**

| **129. Although The Orange County Register was capable of tracking and in fact collected at least some conversion data (*i.e.*, data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 129**: **Denied.** The admissible evidence contradicts this.<br><br>The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain ocregister.com the CTR for Bing Chat was 87.49% lower than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less | **Microsoft's Reply:** Paragraph 129 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that The Orange County Register collected conversion data, yet its experts did not actually analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. *Id.* at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A |

| | |
|---|---|
| traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | That's correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute that testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

**Paragraph 130**

| | |
|---|---|
| **130.** [redacted] Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 130</u>: Denied.** Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on The Orange County Register website compared to non-GenAI search.<br><br>For example, *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the domain ocregister.com the CTR for Bing Chat was [redacted] than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting | **<u>Microsoft's Reply:</u>** Paragraph 130 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that The Orange County Register conversion data does not |

| | |
|---|---|
| conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | "isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

**Paragraph 131**

| |
|---|
| 131. **Although The Orange County Register collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. |

| News Plaintiffs' Response to Microsoft Paragraph 131 | Microsoft's Reply |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 131</u>: Denied.** *Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One | **<u>Microsoft's Reply:</u>** Paragraph 131 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that The Orange County Register collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. Microsoft's cited evidence makes clear that The Orange County Register collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case.").<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to Plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a |

| | |
|---|---|
| thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

**Paragraph 132**

| | |
|---|---|
| **132.** [redacted] Tucker Decl. ¶¶ 11(a), 67-69, 75, 77-78, 84, Figure 15, Figure 16. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 132</u>: Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in | **<u>Microsoft's Reply:</u>** Paragraph 132 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted] |

| | |
|---|---|
| pageviews and users, including to the Orange County Register website, compared to non-GenAI search.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for ocregister.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on pageviews and users.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have | [redacted] News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 132. Therefore, Paragraph 132 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 132: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used The Orange County Register website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 132. Dr. Amir reported that [redacted] |

| | |
|---|---|
| metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on The Orange County Register website. |

**Paragraph 133**

| |
|---|
| **133.** [redacted]. Tucker Decl. ¶¶ 12(b), 112-113, Figure 24. |

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 133</u>: Denied** to the extent it suggests that declines in search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for ocregister.com specifically, the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 [redacted]). An [redacted] CTR (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17. | **<u>Microsoft's Reply:</u>** Paragraph 133 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to The Orange County Register website have declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted] Ms. Jacobs's testimony only addresses 2022 (the year that ChatGPT was released), 2024, and 2026. Dr. Tucker's analysis examined search- |

| | |
|---|---|
| Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes had [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted]. *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. Ex. 48) at 1 ([redacted]. |

***Northwest Publications, LLC (Pioneer Press)***

**Paragraph 134**

| **134. Microsoft incorporates Undisputed Facts 54-56, 61 as though fully restated herein.** | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 134: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 54-56 and 61 as though fully restated herein. | **Microsoft's Reply:** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 54-56, and 61 as though fully restated herein. |

**Paragraph 135**

| **135. Although the Pioneer Press was capable of tracking and in fact collected at least some conversion data (*i.e.*, data indicating the rate and sources from which online traffic referrals resulted in a reader signing up in order to read paywalled content), its experts performed no analysis of that conversion data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 97:21-98:4, 98:14-99:8, 99:22-24; **Ex. 82** (Owen Dep. Tr.) 107:13-23, 117:4-14. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 135: Denied.** Admissible evidence contradicts this.<br><br>The *Daily News* Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For the domain twincities.com the CTR for Bing Chat was 89.71% lower than for Bing Web Search. *See* Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less | **Microsoft's Reply:** Paragraph 135 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Pioneer Press collected conversion data, yet its experts did not actually analyze that data. The testimony Microsoft cites in support of this fact makes it clear. For example, Ms. Stricchiola testified that the Daily News Plaintiffs "all have the ability to track [conversion] data and use that data." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 99:3-8. Yet she did not analyze that data. *Id.* at 99:22-24 ("And you have not quantified conversion rate for any plaintiff in these actions; true? A That's |

| | |
|---|---|
| traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16. | correct."). Dr. Owen admitted that he "did not review underlying data" produced by the Daily News plaintiffs that showed any missed subscription conversion as a result of generative AI. Hurst Decl. Ex. 82 (T. Owen Tr.) at 107:13-19.<br><br>Because they cannot dispute this testimony, News Plaintiffs instead point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than conversion data and does not dispute that neither she nor any other expert analyzed Plaintiffs' actual conversion data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute that Plaintiffs' experts failed to perform any analysis of actual conversion data. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary"). |

**Paragraph 136**

<table>
<tr><td colspan="2">136. [redacted] Tucker Decl. ¶¶ 11(a), 49-51, 54-55, Figure 10.</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 136</u>: Denied. Admissible evidence demonstrates that the introduction of Copilot and ChatGPT is associated with a decrease in conversion rates on the Pioneer Press website compared to non-GenAI search.<br><br>For example, Daily News Plaintiffs expert Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted]<br>For the domain twincities.com the CTR for Bing Chat was [redacted] than for Bing Web Search. See Stricchiola NYT/DN Opening Rep., ¶ 389. Admissible evidence in the case further demonstrates that when the plaintiffs have less traffic, they convert less new subscribers. NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17 ("[W]hen the plaintiffs have less traffic, we will convert – the plaintiffs will convert less new subscribers, which adds to the impact of the previous trust discussion that continues to deliver fewer and fewer subscribers for our company."). Thus, the CTR analysis combined with this conversion testimony is an analysis of conversion data and demonstrates that Copilot and ChatGPT are resulting in fewer referrals and conversions compared to non-GenAI search platforms.<br><br>The conversion rate data metrics that DNP produced do not show otherwise because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting</td><td><u>Microsoft's Reply:</u> Paragraph 136 is not genuinely disputed because none of News Plaintiffs' cited evidence disputes that [redacted] News Plaintiffs' response does not discuss the actual conversion rate data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to Dr. Tucker's observations in the conversion rate data. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto about website user behavior that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not dispute the observations in the conversion rate data. See Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>For completeness, Microsoft disputes News Plaintiffs' claim that the Pioneer Press conversion data does not "isolate the</td></tr>
</table>

| | |
|---|---|
| conversion rates (e.g., news cycles, introductory offers, paywall settings), to determine the empirical impact of generative AI. As Frank Pine testified, "We're not able to isolate specifically the effect of generative AI because there are many other factors that would affect your conversions, including the – the paywall meter settings, the type of meter settings, the offer that readers are seeing, how much we're asking them, as well as the type of content they're looking at, whether or not there was major news happening, right. So you're going to get a different type of conversion rate during a major news event, hurricane or wildfire, than you would regularly." NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 231:6-232:2. Dr. Tucker's conversion rate analysis fails for this very reason – it looks at the conversion rates generally without isolating the impact of generative AI (or Defendants' products) specifically on the rate. *See* ECF 2067 at 13-16.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates." Plaintiffs' experts did not analyze that data, but Dr. Tucker did. Dr. Tucker found that the trend *after* the introduction of Copilot and ChatGPT was not different from the trend *before* the introduction of Copilot and ChatGPT, and thus no additional analysis to identify potential causes of an impact was necessary. *See* ECF 2357 at 46-53; Malhotra Decl. Ex. 17 (C. Tucker Tr.) at 90:13–91:7. |

**Paragraph 137**

| |
|---|
| 137. **Although the Pioneer Press collects data regarding the sources of its traffic, its experts performed no analysis of that traffic data.** Hurst Decl. **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24; **Ex. 69** (Malackowksi Dep. Tr. (Vol. 1, dated July 15, 2026)) 109:9-110:5; **Ex. 82** (Owen Dep. Tr.) 117:4-6. |

| News Plaintiffs' Response | Microsoft's Reply |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 137: Denied.** Admissible evidence contradicts this.<br><br>*Daily News* Plaintiffs' expert, Jim Malackowski, analyzed numerous sources of data that show that generative AI results in less traffic volumes to its websites.<br><br>Jim Malackowski testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced.").<br><br>Further, Mr. Malackowski testified that he did analyze the traffic data that was produced, and ultimately no conclusions could be drawn because there was no way to isolate the impact caused by generative AI (or specifically Defendants' products) from the numerous other factors affecting conversion rates, to determine the numerical impact of generative AI. NP Ex. 1303 [Malackowski July 16, 2026 Depo. Tr.] at 343:12-345:13 (explaining that while he undertook to quantitatively apportion the harm and lost traffic between the various LLMs and other factors in the marketplace, he was unable to do so because "[t]here are many countervailing facts within the marketplace that mask the ability to parse that out"); NP Ex. 1302 | **Microsoft's Reply:** Paragraph 137 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: that the Pioneer Press collects data regarding the sources of its traffic, yet its experts performed no analysis of that traffic data. Microsoft's cited evidence makes clear that the Pioneer Press collects this data, and Ms. Stricchiola, Mr. Malackowski and Mr. Owen all failed to analyze it. For example, Ms. Stricchiola testified: "I'm not performing an analysis on traffic or quantifying traffic volumes in any way." Hurst Decl. Ex. 114 (J. Stricchiola Tr.) at 83:9-10.<br><br>News Plaintiffs attempt to dispute this fact by pointing to opinions offered by Mr. Malackowski that "defendants have reduced the traffic to plaintiffs' websites." But those opinions are not based on actual traffic data collected by News Plaintiffs, as Mr. Malackowski admitted in the testimony cited by News Plaintiffs in their response. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 101:4-12 (describing his analysis as "qualitative"). Indeed, Mr. Malackowski testified that he was unable to draw conclusions after members of his team reviewed News Plaintiffs' traffic data. *See also* Hurst Decl. Ex. 409 (J. Malackowski Tr. (July 16, 2026)) at 413:22-414:1 ("And I did attempt, through discussions with my team and our economist, to decipher the empirical data. It's just not, in my view, feasible, given the limitations of this case.").<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Further, Microsoft disputes Mr. Malackowski's opinion that defendants have reduced traffic to plaintiffs' websites. Those opinions are based only on two other sources that Defendants have moved to exclude pursuant to Federal Rule of Evidence 702 as unreliable: a |

| | |
|---|---|
| [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI's expert] and Dr. Rao [Microsoft's expert] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way.").<br><br>When asked if there is "any way to conduct a quantitative analysis that establishes that traffic to the asserted works has been negatively affected by the substitution caused by defendants' products," Mr. Malackowski responded: "I believe there's quantitative evidence in the record, whether it be the survey evidence [Generative AI surveys] of the parties or independent market participants or whether it be Ms. Stricchiola's click-through rate analysis or qualitative evidence simply acknowledging that these facts exist. If you're asking me whether there can be some economic regression or difference analysis or others, my conclusion is that the market is sufficiently complex, that for the period of data we have, you can't draw a definitive economic – econometric conclusion of the relative impact of the defendants' action that wasn't offset in ways by mitigation or other market conditions." NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 213:14-214:9. | survey and Ms. Stricchiola's click-through analysis, not web traffic data. *See* News Ex. 1302 (J. Malackowski Tr. (July 15, 2026)) at 213:14-214:9 (acknowledging that News Plaintiffs' experts' analysis of harm only includes "survey evidence [Generative AI surveys] of the parties" as well as "Ms. Stricchiola's click-through rate analysis or qualitative evidence"). To the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. |

**Paragraph 138**

| | |
|---|---|
| **138.** [redacted] Tucker Decl. ¶¶ 11(a), 67-69, 76, 77-78, 85, Figure 15, Figure 16. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 138</u>: Denied.** Admissible evidence in this case shows that Copilot and ChatGPT are associated with a decrease in | **<u>Microsoft's Reply:</u>** Paragraph 138 is not genuinely disputed because News Plaintiffs do not deny the specific fact that Microsoft stated: [redacted] |

| | |
|---|---|
| pageviews and users, including to the Pioneer Press website, compared to non-GenAI search.<br><br>For example, Jessie Stricchiola analyzed the mechanism that is causing this harm. The difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for twincities.com specifically the difference in click-through-rate was [redacted]. Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]) combined with GenAI search substituting for non-GenAI search 37.2 percent of the time would have a negative effect on pageviews and users.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on pageviews and users. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17.<br><br>Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have | [redacted] News Plaintiffs' response does not discuss the actual pageview or user data that News Plaintiffs produced and is at issue in Paragraph 138. Therefore, Paragraph 138 is not disputed.<br><br>The remaining testimony cited by News Plaintiffs does not controvert the stated fact. Ms. Stricchiola's calculation involved an entirely different metric not at issue in Paragraph 138: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what Plaintiffs' actual pageview and user data shows. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that fewer people have actually visited or used the Pioneer Press website since the introduction of Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>News Plaintiffs also omit critical context from Dr. Amir's results, which do not controvert Paragraph 138. Dr. Amir reported that [redacted] |

| | |
|---|---|
| metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>Produced metrics and projections evidence declines, though the factors affecting the declines cannot be isolated. All eight *Daily News* Plaintiffs have experienced declining referrals from search between 2022 and 2024. NP Ex. 1243 [DNP-00366826] tab "Metrics"; Malackowski NYT-DNP Opening Rep., Appendix B, Exhibit 13.1. Moreover, *Daily News* Plaintiffs have forecasted that declines in pageviews will continue into the future. NP Ex. 1244 [DNP-00626843] (tab "ROLLUP").<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | [redacted] But, pursuant to Fed. R. Evid. 106, Dr. Amir found that "0 [zero] respondents indicated they would have gone to News Plaintiffs' websites or another similar news site." ECF 1716 (Amir Decl.) at ¶ 59.<br><br>News Plaintiffs also cite evidence that search-referrals have declined from 2022 to 2024, but that does not dispute the stated fact because it does not establish that any declining search referrals led to a decline in pageviews or users on the Pioneer Press website. |

**Paragraph 139**

| | |
|---|---|
| **139.** [redacted] Tucker Decl. ¶¶ 12(b), 112-113, Figure 24. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 139</u>**: Denied to the extent it suggests that declines in | **<u>Microsoft's Reply:</u>** Paragraph 139 is not genuinely disputed because News Plaintiffs do not deny the specific |

| | |
|---|---|
| search-referred visits after the introduction of Copilot and ChatGPT are not caused in part by Copilot and ChatGPT. Admissible evidence contradicts this.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing search and Bing chat and found that the [redacted] For the *Daily News* Plaintiff domains the difference was [redacted], and for twincities.com specifically, the difference in click-through-rate was [redacted] Stricchiola NYT/DN Opening Rep., ¶ 389. Defendants' experts also admitted that LLMs/GenAI substitutes for non-GenAI search engines. *See, e.g.*, NP Ex. 556 [Amir Opening Rep.], ¶ 60 ([redacted]). An [redacted] (than non-GenAI search) combined with GenAI search substituting for non-GenAI search [redacted] of the time would have a negative effect on search-referred visits.<br><br>Numerous fact witnesses have also testified to the negative effect that Copilot and ChatGPT are having on search-referred visits. For example, Chris Loretto, MediaNews Group's VP of Advertising, testified that "[T]he reason why all the numbers show catastrophic impacts to referrers from OpenAI and gen AI search in general is because of their business model. They are an answer engine, not a search engine. Their main job is to answer the question without the need for the individual to go to the original source of the content." NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 32:3-17. | fact that Microsoft stated. Specifically, News Plaintiffs' response does not discuss the search-referred traffic data that News Plaintiffs produced. Instead, News Plaintiffs point to Ms. Stricchiola's calculation of an entirely different metric: click-through rates. That Ms. Stricchiola calculated click-through rates does not create a dispute as to what News Plaintiffs' actual data shows regarding search-referred visits to its website. Defendants also moved to exclude Ms. Stricchiola's click-through rate "calculation" pursuant to Federal Rule of Evidence 702, so to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30. Additionally, the anecdotal, speculative, layperson testimony from Mr. Loretto and Mr. Anderson that News Plaintiffs cite, which is not supported by the actual data that News Plaintiffs have produced, does not establish that search-referred visits to the Pioneer Press website have declined further due to Copilot and ChatGPT. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (self-serving testimony "consist[ing] largely of conclusory statements .... , unsupported by documentary or other concrete evidence ...., is simply not enough to create a genuine issue of fact in light of the evidence to the contrary").<br><br>CJ Jacobs's testimony also does not dispute the stated fact because it does not dispute that search-referrals were declining before the launch of ChatGPT and Copilot, and [redacted]. Ms. Jacobs's testimony only addresses 2022 (the year that ChatGPT was released), 2024, and 2026. Dr. Tucker's analysis examined search-referred visits from January 2018 through December 2024, which was the full scope of data produced by Plaintiffs in the |

| | |
|---|---|
| Dan Anderson, MediaNews Group's Chief Financial Officer, testified that the *Daily News* Plaintiffs "have metrics that show [its] audience is declining, search referrals are declining, [its] ability to acquire new subscribers are declining" and such declines are correlated with "ChatGPT, Microsoft have put substitutive products in the market utilizing [Daily News Plaintiffs'] copyrighted content." NP Ex. 10 [D. Anderson 30(b)(6) Depo. Tr.] at 65:25-66:8.<br><br>CJ Jacobs testified that in 2022, search was responsible for about [redacted] of DNP's overall inbound sessions; in 2024, it declined to around [redacted]; and as of Ms. Jacobs' deposition in February 2026, they had declined to [redacted]. NP Ex. 72 [Jacobs Feb. 12, 2026 30(b)(6) Depo. Tr.] at 23:6-22.<br><br>News Plaintiffs object to the testimony of Dr. Tucker that Microsoft relies on for the reasons set forth in their *Daubert* motion and briefing. *See* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | case. ECF 1733 (Tucker Decl.) Figure 24. Additionally, it is unclear which "numbers" CJ Jacobs was referring to in her testimony, as she does not specify the source of that data or whether she was looking at data for one of the Daily News Plaintiffs, all of the Daily News Plaintiffs, or other newspapers owned by the Daily News Plaintiffs' parent company but which are not plaintiffs to this suit. *See* News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 23:8-12.<br><br>Microsoft further replies that, in fact, Google's algorithmic changes had [redacted] *See, e.g.*, Hurst Decl. Ex. 56 (A. Ibrahim 30(b)(6) Tr.) at 21:16-24, 119:10-120:7. For example, Google's algorithm changes [redacted] *See* ECF 1733 (Tucker Decl.) ¶ 77(b); *see also* Blanco Opp. Decl. Ex. 61 (C.J. Jacobs 30(b)(1) Dep. Ex. 48) at 1 ([redacted]. |

***The Center for Investigative Reporting (CIR)***

**Paragraph 140**

| **140. Microsoft incorporates Undisputed Facts ¶¶ 57-61 as though fully restated herein.** | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 140: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 57-61 as though fully restated herein. | **Microsoft's Reply:** Microsoft disagrees that this is inappropriate and incorporates its Replies to Undisputed Facts 57-61 as though fully restated herein. |

**Paragraph 141**

| **141. CIR has no paywall on its *Mother Jones* website.** Hurst Decl. **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec 19, 2025)) 295:9-24. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 141: Undisputed.** | **Microsoft's Reply:** Paragraph 141 is **Undisputed**. |

**Paragraph 142**

| **142. CIR uses a window of approximately two months between publication of its *Mother Jones* magazine and inclusion of that content on the *Mother Jones* website.** Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan 26, 2026)) 144:21-145:11. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 142: Undisputed.** | **Microsoft's Reply:** Paragraph 142 is **Undisputed**. |

**Paragraph 143**

| 143. **CIR's expert did not identify any causal relationship between the introduction of Copilot and the traffic to the *Mother Jones* website.** Hurst Decl. **Ex. 27** (Cross Dep. Tr.) 142:15-21; **Ex. 74** (McDonald Dep. Tr.) 92:24-100:5. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 143**: **Denied** to the extent Microsoft characterizes the absence of an identified causal relationship in the cited evidence as proof no relationship exists.<br><br>The cited evidence does not support Microsoft's purported fact, as it pertains to AI and not to Copilot specifically. Hurst Decl. Ex. 74 (McDonald Depo. Tr.) at 93:5-11 ("The report does not attempt to ascribe specific driving causal factors for any harm, in general . . . related to this AI. It does not attempt to quantify the magnitude of the harm that stems from AI."). Dr. McDonald described "it's likely that there's multiple causal factors related to this harm, AI being one of those causal factors, perhaps the principal causal factor" and "you have multiple factors that occur in the same time period, and you don't have an effective proxy variable or effective data to capture this." Hurst Decl. Ex. 74 (McDonald Depo. Tr.) at 93:18-94:24.<br><br>Microsoft mischaracterizes the cited deposition excerpts by taking a lack of an isolated causal finding and converting it into proof that no causal relationship could exist. | **Microsoft's Reply: Undisputed** because News Plaintiffs do not cite any evidence showing that CIR's expert *has* identified a causal relationship between the introduction of Copilot and the traffic to the *Mother Jones* website. Instead, News Plaintiffs acknowledge that the evidence cited by Microsoft shows "a lack of an isolated causal finding" and then argue that this does not mean that "no causal relationship *could* exist." (Emphasis added). But News Plaintiffs do not actually cite to evidence showing that this causal evidence exists. The deposition testimony of Mr. McDonald that News Plaintiffs cite further supports that he did not identify a causal relationship between the introduction of Copilot and the traffic to the Mother Jones website. Thus, this fact is undisputed. |

**Paragraph 144**

| |
|---|
| **144.** [redacted]. Tucker Decl. ¶¶ 11(a), 86-89, Figure 17, Figure 18, Figure 19. |

| | |
|---|---|
| **<u>News Plaintiffs' Response to Microsoft Paragraph 144</u>: Denied.** The cited evidence does not support the proposition. Dr. Tucker does not provide evidence that demonstrates users and visits were declining before the introduction of Copilot and ChatGPT.<br><br>Admissible evidence also contradicts the purported fact. Before the release of ChatGPT and Copilot, the monthly visitor count to CIR's *Mother Jones* website was positive. McDonald Rebuttal Rep. at pp. 20-21 ("Controlling for article output and time trends, Mother Jones lost approximately 43,105 unique visitors per month in the post-ChatGPT period."). Average monthly readership fell from 8.545 million in the 52 months before ChatGPT's release to 3.297 million in the 32 months after, a decline of approximately 5.25 million readers per month. *See id*. Dr. McDonald concluded that Mother Jones experienced "a large, statistically robust, and editorially-independent decline in audience reach" whose timing and magnitude "align with the deployment of AI tools that reduce the need for users to visit original news sources." *See id*. | **<u>Microsoft's Reply:</u>** Paragraph 144 is not genuinely disputed. **Undisputed** that [redacted]. Plaintiffs only dispute that "users and visits" were declining before the introduction of Copilot and ChatGPT. Regardless, News Plaintiffs do not actually cite any evidence to support their claim that that "users and visits" were not declining before the introduction of Copilot and ChatGPT, instead saying Dr. Tucker has not provided evidence of this. But that is not true. *See* ECF 1733 (Tucker Decl.) ¶ 88, Figure 18 [redacted]); ECF 1733 (Tucker Decl.) ¶ 89, Figure 19 ([redacted]. This is consistent with the data that CIR's expert also analyzed. *See* McDonald Rebuttal Report, page 23. Thus, this fact is not genuinely disputed.<br><br>Additionally, News Plaintiffs do not cite evidence that controverts the fact that [redacted] News Plaintiffs' response discusses the number of readers on the Mother Jones website in the "post-ChatGPT period" without comparing it to the number of readers on the Mother Jones website in the "*pre*-ChatGPT period" [redacted] |

| | |
|---|---|
| | Additionally, Mr. McDonald's conclusion about a "statistically robust" decline is based on a flawed regression analysis that he admitted does not identify any causation. *See* Hurst Decl. Ex. 74 (M. McDonald Tr.) at 92:24-100:5; *see also* ECF 1702 (Microsoft 56.1 Statement) ¶ 143. |

***<u>As to All News Plaintiffs</u>***

**Paragraph 145**

| | |
|---|---|
| **145. Using both a survey and an analysis of Copilot conversation logs, Microsoft's experts found that consumers rarely use Copilot to obtain information about current events.** Bail Decl. ¶¶ 97, 124-25; Amir Decl. ¶¶ 9(c), 42, 55, 57, 59-60. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 145</u>: Undisputed** that Microsoft's experts did those analyses; **denied** that their conclusion was that consumers "rarely" use Copilot to obtain information about current events. Denied that consumers "rarely use Copilot to obtain information about current events." Admissible evidence contradicts Microsoft Paragraph 145.<br><br>Microsoft expert Dr. Amir did a survey and concluded that 1.2% of Copilot users use it for "research of news or current events" and Professor Bail's team did an analysis of Copilot conversation logs and concluded that 1.3% of conversations could be classified as "Information Retrieval – Current Events," however both of these studies were flawed and unreliable for numerous reasons as set forth in Plaintiffs' experts reports. Indeed, Dr. Bail at deposition conceded that "news would include some things other than current events" – yet his study only reported on use of Copilot for "current events." NP Ex. 1367 [Bail Depo Tr.] at 56:22- | **<u>Microsoft's Reply:</u>** Paragraph 145 is not genuinely disputed. News Plaintiffs do not dispute that Microsoft's experts performed a survey and a log analysis. They also do not dispute the experts' results: 1.2% of users in Dr. Amir's survey and 1.3% of conversations in Professor Bail's analysis.<br><br>The Goldstein grounding analyses measure something other than consumer use of Copilot, which is what the fact states. Dr. Goldstein measured how often Copilot *retrieved a news domain* to ground its output. That describes the system's retrieval behavior, not why or how consumers use Copilot. His conclusion that Dr. Bail's categories "are not strongly predictive of where news data is used for RAG" makes the same point: grounding and user intent are different questions. Nevertheless, Dr. Bail found that "only 0.4% of all conversations included at least one News Plaintiff website RAG request (potentially as part of many other non-news related RAG requests)." ECF 1719 (Bail |

| | |
|---|---|
| 57:15. *See also, e.g.*, Malackowski NYT-DNP Rebuttal at 55-59 (Defendants' experts rely on an artificially narrow definition of "news" and thereby fail to properly account for the significant overlap between the demand for ChatGPT/Copilot and the demand for Plaintiffs' copyrighted works; news is more than "breaking" stories); Owen Rebuttal at para 34-36 (Bail assumes only one category of his 15 user intent categories overlap with newspaper content ("current events") and fails to account for other queries that ask about information newspapers have reported on); Goldstein Rebuttal Rpt. at 109-120 and 129-158 and 213-216; Goldstein Supplemental Rpt. at 50-52; McDonald Rebuttal Rep. at 63-64 (Dr. Bail's "current events" category is defined to capture only prompts about events occurring within the prior week, so the 1.3% figure reflects only the most temporally constrained slice of news-related usage and understates the relevance of AI substitution for Plaintiffs' investigative and policy journalism, which has a longer shelf life than breaking news). In any event, Dr. Amir's results actually indicate that at least 10.9% of respondents use Copilot to obtain news or product recommendations. NP Ex. 1275 [Amir Depo Tr.] at 98:3-102:9.<br><br>Using a list of news sites provided by Drs. Bell and Owen (News Plaintiffs' journalism experts), Dr. Goldstein found that Copilot retrieved a news domain for grounding its output in 17.94% of RAG conversations in Dr. Lafferty's 45,000 Copilot sample (87,494 total RAG conversations), and 61.75% of RAG conversations in the 8.2M sample (4,956,860 total RAG conversations). Goldstein Rebuttal Rpt. at 109-120 and 129-158; Goldstein Supplemental Rpt. at 50-52. He also concluded that "[t]he categories chosen | Decl.) ¶ 109, Ex. 43. In comparison, Dr. Goldstein counts an entire conversation as a "hit" whenever a single URL from the Bell News List appears anywhere in its grounding field, "even though a single conversation can include many grounding URLs unrelated to those lists." ECF 1723 (Lafferty Decl.) ¶¶ 389–90. Measured properly, as a share of the URLs that Copilot actually retrieved, Bell News List domains account for 10,417 of 248,049 grounding URLs, or about 4.2%. *Id.* ¶¶ 391–93 & Table 1 (Reply). Dr. Goldstein's own underlying counts also contradict News Plaintiffs' characterization. The 17.94% figure is 5,967 conversations out of 33,259 conversations with grounding data. *Id.* ¶ 389 & Table 1 (Reply). News Plaintiffs' assertion that the 45,000-conversation sample contained "87,494 total RAG conversations" cannot be correct, because it exceeds the total number of conversations in the sample. The Goldstein data cited therefore does not controvert Paragraph 145.<br><br>Paragraph 145 asserts what Dr. Bail and Dr. Amir *found*. News Plaintiffs' response disputes the questions asked by Dr. Amir and Dr. Bail's studies, but does not dispute or call into question how the studies were performed or their actual results. Microsoft's experts studied current events as the main proxy for news because, by their own allegations, Plaintiffs were concerned with substitution of their reporting on current events. *See* 1:24-cv-03285, ECF 777 (DNP First Amended Complaint) at 49 ("Unauthorized Retrieval and Dissemination of Hot News"); ECF 1677 (NYT Third Amended Complaint) at 37 ("Unauthorized Retrieval and Dissemination of Current News"). Plaintiffs' experts' arguments that a broader definition of "news" would yield higher figures means they disagree with how the category was defined, not what the experts found within that category. Nor does the volume of total ChatGPT traffic |

| | |
|---|---|
| by Dr. Bail are not strongly predictive of where news data is used for RAG[.]" Goldstein Rebuttal Rpt. at 116.<br><br>Furthermore, the 1.2% and 1.3% percentages – even if correct – do not indicate that consumers' use of generative AI chats to obtain information about current events is "rare." As of December 2024, ChatGPT processed more than 1 billion total queries per day. As of July 2025, ChatGPT processed approximately 2.5 billion queries per day. Even if a minority of outputs or low proportion of users use OpenAI's LLMs to obtain information similar to that of News Plaintiffs, when such use is put into context, it is substantial. For example, 1.2% of 2.5 billion queries per day is 30 million queries per day to obtain information about current events. Malackowski Rebuttal at 57 (citing NP Ex. 1278 ["Believe it or not, ChatGPT gets over 1 billion messages every single day," PCWorld, December 5, 2024, https://www.pcworld.com/article/2546712/believe-it-or-not-chatgpt-gets-over-1-billion-messages-everysingle-day.html]; NP Ex. 1228 [Aaron Chatterji, et. al., "How People Use ChatGPT," OpenAI, et. al., September 15, 2025, https://cdn.openai.com/pdf/a253471f-8260-40c6-a2cc-aa93fe9f142e/economic-research-chatgptusagepaper.pdf, p. 36]). | provide any meaningful information in this context when, as their expert Jessie Stricchiola conceded, Plaintiffs never analyzed their own traffic. The evidence cited by Plaintiffs therefore does not controvert the fact as stated.<br><br>News Plaintiffs' assertion that both studies are "flawed and unreliable for numerous reasons as set forth in Plaintiffs' experts reports" identifies no specific flaw and gives no pin cite. Plaintiffs did not move to exclude either Dr. Amir or Dr. Bail's reports pursuant to Fed. R. Evid. 702. |

**Paragraph 146**

**146. News Plaintiffs' experts produced no analysis quantifying any loss of traffic, subscriptions, or revenue as a result of readers choosing to read a Copilot output with "regurgitated" content (as measured by Goldstein) as a substitute for reading any of their Asserted Works. *New York Times:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 281** (Bell Dep. Tr.) 99:16-22, 144:16-145:3, 168:20-169:15; **Ex. 114**

(Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Daily News:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Chicago Tribune:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Orlando Sentinel:*** Hurst Decl. Ex. 41 (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Sun Sentinel:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr.) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***The Mercury News:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***The Denver Post:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); Ex. 82 (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***The Orange County Register:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 109:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***Pioneer Press:*** Hurst Decl. **Ex. 41** (Goldstein Dep. Tr. (Vol 2, dated July 31, 2026)) 508:1–509:10; **Ex. 69** (Malackowski Dep. Tr. (Vol 1, dated July 15, 2026)) 105:24-108:22, 10 9:9-110:5; **Ex. 70** (Malackowski Dep. Tr. (Vol 2, dated July 16, 2026)) 379:4–20, 381:17–384:4, 386:16-388:13); **Ex. 82** (Owen Dep. Tr.) 63:9-12, 70:8-71:18, 104:12-18, 107:13-23, 117:4-14, 217:10-218:10; **Ex. 114** (Stricchiola Dep. Tr.) 82:16-83:10, 97:22-99:24. ***CIR:*** Hurst Decl. **Ex. 125** (Wenger Dep. Tr.) 249:1–13; **Ex. 74** (McDonald Dep. Tr.) 70:6-15, 92:24-100:5, 228:2-10; **Ex. 27** (Cross Dep. Tr.) 142:15-21.

| News Plaintiffs' Response | Microsoft's Reply |
| --- | --- |
| <u>**News Plaintiffs' Response to Microsoft Paragraph 146**</u>: **Denied** to the extent it suggests there are no opinions about loss of traffic, subscriptions, and revenues as a result of Defendants' infringing conduct. Admissible evidence contradicts this.<br><br>For example, Jessie Stricchiola analyzed the difference in the click-through-rate from Bing Search and Bing Chat and found that the CTR for Bing Chat was substantially lower than for Bing Search. For The Times domains the difference was 87-93%, for DNP domains the difference was 83-91%, and for Ziff Davis's domains the difference was 51-94%. *See* Stricchiola NYT/DNP Rebuttal Rpt. ¶ 29; Stricchiola NYT/DNP Opening Rpt. ¶ 389; Stricchiola ZD Opening Rpt. ¶ 264.<br><br>As another example, James Malackowski analyzed the produced metrics of all eight *Daily News* Plaintiffs and concluded that they all saw declines in organic search referrals between 2022 and 2024 – Denver Post had a [redacted] decrease; Mercury News had a [redacted] decrease; Orange County Register had a [redacted] decrease; Pioneer Press had a [redacted] decrease; Chicago Tribune had a [redacted] decrease; Sun-Sentinel had a [redacted] decrease; Daily News had a [redacted] decrease; and Orlando Sentinel had a [redacted] decrease. *See* Malackowski NYT-DNP Opening Rep. at 70, n. 500 and Appendix B, Exhibit 13.1; NP Ex. 1243 [DNP-00366826] tab "Metrics."<br><br>Jim Malackowski also testified that it is his opinion that defendants have reduced the traffic to plaintiffs' websites. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 90:8-21; 97:5-9 ("I don't think this was an issue that was disputed amongst the executives. I don't think it's disputed | <u>**Microsoft's Reply:**</u> **Undisputed** because News Plaintiffs do not deny that their experts did not analyze and quantify any specific loss of traffic, subscriptions, or revenue as a result of readers choosing to read a Copilot output containing "regurgitated" content instead of the Asserted Works. They admit it in the last paragraph of their response: "<u>That there is no quantification of the aforementioned losses by News Plaintiffs' experts based on the produced empirical data</u> does not mean there is no harm or loss." (Emphasis added).<br><br>Instead, News Plaintiffs cite to other non-quantitative evidence that they claim shows a "loss of traffic, subscriptions, and revenues as a result of Defendants' infringing conduct." For completeness, Microsoft addresses why this evidence does not dispute the fact as stated. First, News Plaintiffs point to Ms. Stricchiola's purported calculation of click-through rates, which is an entirely *different* metric than traffic, subscriptions, or revenue and does not dispute that she (nor any other expert) failed to analyze Plaintiffs' actual traffic, subscription, or revenue data. Defendants also moved to exclude Ms. Stricchiola's click-through rate calculation pursuant to Federal Rule of Evidence 702, and so to the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to dispute this fact. ECF 2055 at 28-30.<br><br>Next, News Plaintiffs cite Mr. Malackowski's discussion of the Daily News Plaintiffs' organic 2022-2024 search referrals. This does not dispute the fact as stated. While Mr. Malackowski opined that a decline occurred between 2022-2024, he did not conclude that this decline was "a result of readers choosing to read a Copilot output with 'regurgitated' content (as measured by Goldstein) as a substitute for |

| | |
|---|---|
| really amongst anyone, that answer engines as a substitute for search will reduce traffic that flows back to the originating source."); 101:4-12 (Q: "Did you analyze whether or not any decline in the traffic to plaintiffs' website was attributable to defendants' conduct specifically as opposed to other market forces?" A: "Yes. But it's qualitative based upon the review of the larger record that you just referenced."). *See also* Malackowski NYT-DNP Opening Rep. at 29-67 (identifying scores of qualitative and quantitative evidence to support that defendants have reduced traffic to plaintiffs' websites in the form of third party reports, testimony and documents from Defendants' executives, click-through-rate data (in connection with Microsoft's estimate that if LLMs caused a 30% reduction in CTR for publishers it would be enough for content creators' business models to be threatened); NP Ex. 854 [MSFT_NEWS_000944196-200] at 197.<br><br>Michael McDonald likewise quantified traffic loss for CIR, finding a statistically significant secular decline of approximately 43,100-69,900 unique visitors per month that cannot be attributed to article output or email subscriber acquisition. McDonald Rebuttal Rep. at p 54 (describing his findings).<br><br>That there is no quantification of the aforementioned losses by News Plaintiffs' experts based on the produced empirical data does not mean there is no harm or loss; rather, it reflects the numerous factors at play and the difficulty in isolating the various causes. NP Ex. 1302 [Malackowski July 15, 2026 Depo. Tr.] at 93:18-24 ("One thing that I and Ms. Stamm [OpenAI] and Mr. Rao [Microsoft] agree on is that there are many factors that make it challenging to isolate the direct harm in a quantitative way"); NP Ex. 88 | reading any of their Asserted Works." Mr. Malackowski just examined data from 2022-2024 (and not any data from before 2022 to put into context that search-referrals had been declining before the introduction of ChatGPT and Copilot) and concluded that ChatGPT and Copilot are the cause. The additional qualitative evidence that Mr. Malackowski reviewed and which News Plaintiffs cite in their response does not show that he analyzed Plaintiffs' actual traffic, subscription, or revenue data. Additionally, his opinions regarding harm that are based on qualitative evidence, including Defendants' documents, Stricchiola's CTR "calculation," and flawed surveys, are subject of Defendants" pending Rule 702 motion. Thus to the extent the Court excludes the challenged opinions, Plaintiffs may not rely on them to dispute this fact. *See* Fed. R. Civ. P. 56(c)(2).<br><br>McDonald's CIR traffic regression does not dispute the fact as stated because it did not conclude that CIR lost any traffic *as a result of* readers choosing to read a Copilot output containing "regurgitated" content instead of the Asserted Works. Hurst Decl. Ex. 74 (M. McDonald Tr.) at 93:5-6 ("The report does not attempt to ascribe specific driving causal factors for any harm[.]").<br><br>Lastly, News Plaintiffs' attempt to explain *why* their experts didn't undertake the quantitative analysis that is the subject of Paragraph 146 does not dispute that their experts did not in fact undertake that quantitative analysis. |

| | |
|---|---|
| [Ibrahim 30(b)(6) Depo. Tr.] at 45:3-47:2 (offsetting measures that have masked full extent of harm); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 241:7-242:16 (offsetting measures that have masked full extent of harm). *See also* ECF 2067 at 13-16 (Dr. Tucker's opinions on "trends" purportedly remaining the same should be stricken because she did not undertake to isolate the factors that affect those trends to determine causation). | |

**Paragraph 147**

| |
|---|
| 147. **Between 2019 and 2024, News Plaintiffs did not enter into any agreement to license their Asserted Works for the purpose of use as grounding data for LLM-based general purpose chatbots. *New York Times:*** Hurst Decl. **Ex. 46** (Grossman-Cohen 30(b)(6) Dep. Tr.) 24:22-29:18, 101:18-102:16; **Ex. 77** (Miller Dep. Tr.) 10:3-11, 14:2-20. ***Daily News:*** Hurst Decl. **Ex. 140** (Daily News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Chicago Tribune:*** Hurst Decl. **Ex. 133** (Chicago Tribune 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Orlando Sentinel:*** Hurst Decl. **Ex. 159** (Orlando Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Sun Sentinel:*** Hurst Decl. **Ex. 166** (Sun Sentinel 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 67** (Lown 30(b)(6) Dep. Tr.) 48:24-49:7; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Mercury News:*** Hurst Decl. **Ex. 148** (Mercury News 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Denver Post:*** Hurst Decl. **Ex. 144** (Denver Post 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***The Orange County Register:*** Hurst Decl. **Ex. 156** (OC Register 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***Pioneer Press:*** Hurst Decl. **Ex. 163** (Pioneer Press 4th Suppl. Resp. to OAI Interrog. No. 3); **Ex. 88** (Pine 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 4, 2026)) 206:6-12, 213:3-18; **Ex. 68** (Lown Dep. Tr.) 66:10-13, 66:22-69:5. ***CIR:*** Hurst Decl. **Ex. 12** (Bauerlein Dep. Tr. Dated Jan. 27, 2026) 58:16-64:18; **Ex. 12.A** (Bauerlein Dep. Ex. 47); **Ex. 18** (Buckingham 30(b)(6) Dep. Tr. (Vol. 2, dated Dec. 19, 2025)) 405:25-408:22. |

| | |
|---|---|
| <u>**News Plaintiffs' Response to Microsoft Paragraph 147**</u>: **The Times**: **Undisputed** that the parties had not executed a final agreement to "license their Asserted Works for the purpose of use as grounding data for LLM-based general purpose chatbots," but **denied** to the extent it is intended to suggest that News Plaintiffs were not in negotiations during that period to license their Asserted Works for that purpose, and would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal.<br><br>Admissible evidence contradicts this. *See* NP Ex. 229 [Felix Depo. Ex. 137] [NYT_00468323]; NP Ex. 230 [Felix Depo. Tr.] at 312:17-314:21; NP Ex. 231 [Lightcap 30(b)(1) Depo. Ex. 17]; NP Ex. 232 [Lightcap 30(b)(1) Depo. Ex. 18] [OPCO_MDL_004419803] ([redacted]); NP Ex. 234 [Russell 30(b)(6) Depo. Tr.] at 221:19-228:20 ([redacted]); NP Ex. 1289 [Felix Depo. Ex. 130 – NYT_00941750] at -750-751 (The Times and Amazon engaged in licensing negotiations in 2024 for the GenAI licensing deal that closed in 2025).<br><br>**Daily News Plaintiffs**: | <u>**Microsoft's Reply:**</u> **Undisputed** that between 2019 and 2024, News Plaintiffs did not enter into any agreement to license their Asserted Works for the purpose of use as grounding data for LLM-based general purpose chatbots.<br><br>News Plaintiffs add additional information in their response that they *would* have entered into an agreement if they would have been approached, but that does not dispute the fact as stated. |

| | |
|---|---|
| **Undisputed**, but **denied** to the extent it suggests that *Daily News* Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal. Admissible evidence contradicts this.<br><br>While *Daily News* Plaintiffs did not enter into such an agreement between 2019 and 2024, outreaches to *Daily News* Plaintiffs regarding licenses for LLM training started around 2023, 2024, and *Daily News* Plaintiffs approached them with a curiosity about what this new category of business could look like, but also sensitive to risks that could come with licensing (such as the potential for cannibalization and the potential negative impacts to the business versus whatever money is being offered). NP Ex. 1300 [Lown 30(b)(1) 1/9/26 Depo Tr.] at 18:23-19:4; NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 161:10-167:4; 206:8-209:6.<br><br>**CIR**: Undisputed, but denied to the extent it is intended to suggest that News Plaintiffs would not have entered into such a license agreement if an LLM-based general purpose chatbot sought to negotiate and pay a fair price rather than steal.<br><br>Admissible evidence contradicts this. NP Ex. 1276 [Bauerlein 30(b)(6) 1/26/26 Depo. Tr.] at 196:11–16 (CIR was not approached by Microsoft regarding licensing its content); NP Ex. 1276 [Bauerlein 30(b)(6) 1/26/26 Depo. Tr.] at 196:3–9 (testifying "if [CIR] had been asked [to license its content], we certainly would have considered it."). | |

**Paragraph 148**

<table>
<tr><td colspan="2">

**148. There are substantial impediments to the formation of a market for licensing data for web grounding LLMs. For example:**

a. **Because developers cannot predict in advance which specific content and sources will be relevant to any given prompt, a large volume and a large variety of textual data is necessary for grounding general purpose LLMs like those at issue.** Tucker Decl. ¶¶ 13(c), 154-156.

b. **No singular piece of data is needed to ground an LLM; any one piece of data used to ground a response can be easily substituted for another.** Tucker Decl. ¶¶ 13(c), 155-157.

c. **LLMs generate outputs probabilistically in response to user prompts (including during web grounding); it is difficult to isolate the marginal contribution of an individual piece of data in an LLM's output generation.** Lafferty Decl. ¶¶ 16, 99, 140, 175, 180, 189, 191, 284, 435; Hurst Decl. **Ex. 80** (Murati Dep. Tr.) 108:12-18, 11:13-16, 13:24-14:4, 18:3-14, 114:11-115:6; Tucker Decl. ¶¶ 13(a), 13(c), 155-156, 160-161.

d. **Rightsholders for individual works can be difficult and costly to identify and locate, increasing the transaction costs of negotiating any proposed web grounding data licenses.** Tucker Decl. ¶¶ 13(c), 161-165.

e. **Negotiations for the necessary volume of data needed for web grounding an LLM are susceptible to holdout problems.** Tucker Decl. ¶¶ 13(c), 161-165.

</td></tr>
<tr><td>

**<u>News Plaintiffs' Response to Microsoft Paragraph 148</u>: Denied.** Admissible evidence contradicts each of these points.

For example, while Dr. Tucker argues that large quantities of data would need to be licensed because "developers cannot predict in advance which specific content and sources will be relevant to any given prompt" this is contradicted by her claims that data is interchangeable

</td><td>

**<u>Microsoft's Reply:</u>** Paragraph 148 is not genuinely disputed because the cited evidence does not controvert the fact as stated.

First, regarding subparagraphs (a) and (b), News Plaintiffs point to a "contradiction" that does not exist. As Dr. Tucker explained: "The ability to substitute one piece of data with another ex-post, however, does not eliminate the need to have access to a large volume or variety of data ex-ante

</td></tr>
</table>

| | |
|---|---|
| (point b). If data were interchangeable, there would be no need to keep getting more of it. Malackowski DNP/NYT Rebuttal Rpt. at 83.<br><br>On the point that it is difficult to isolate the marginal contribution of individual data in the LLM output, this is technically incomplete because the LLM training pipeline has three stages – pre-training, mid-training, and post-training, and news content plays a distinct role in each. *See* Malackowski DNP/NYT Reply Rpt. at 13. In addition, Microsoft executive Jaron Lanier has stated that it is possible to isolate the contribution of any particular piece of data to an LLM's outputs. NP Ex. 1313 [MSFT_AI_MDL_002218935] at -42 (Lanier proposing in March 2023 that Microsoft "trace the most unique and influential contributors of prior examples or data when a big AI model provides a valuable output" in order to "calculate[]" which data contributors were "uniquely essential" so they "would get paid").<br><br>On the point that rightsholders for individual works can be difficult and costly to identify and locate, increasing the transaction costs of negotiating any proposed web grounding data licenses, there is evidence in the record (through Mr. Malackowski) that these types of transaction costs and fragmented ownership "are precisely the kinds of challenges all IP licensing markets face" and they "do not preclude a market; they call for solutions." Malackowski DNP/NYT Reply Rpt. at 33 (providing example that photocopying spurred the formation of the Copyright Clearance Center in the late 1970s and digital music rights were formalized through iTunes after Napster). Mr. Malackowski also identifies at least 29 intermediaries (e.g., Calliope Networks, Tollbit, ProRata.ai, ScalePost) that | when there is uncertainty about the kind of data needed to ground future responses and potential data substitutes." ECF 1733 (Tucker Decl.) ¶ 156.<br><br>On the next point (subparagraph (c)), News Plaintiffs claim that "news content plays a distinct role" in pre-training, mid-training, and post-training, all of which are distinct from grounding. ECF 1723 (Lafferty Decl.) ¶ 179. Thus, this claim does not dispute the stated fact: it is difficult to isolate the marginal contribution of an individual piece of data in grounding. News Plaintiffs' reliance on Microsoft researcher Jaron Lanier is likewise misplaced. Mr. Lanier's testimony does not provide a way to isolate the contribution of any particular piece of data to an LLM's output generation and assign value to it. In fact, Mr. Lanier testified that there is no way to do it. He testified: "we don't really know" that "if you remove some stuff from training data, how much would it affect the output from time to time." Hurst Decl. Ex. 369 (J. Lanier 30(b)(1) Tr.) at 264:3-9. He also testified that "the way a large language model works is reflections of reflections of reflections, all statistical, and so there isn't a single place where you can say this is the thing and this is how it's used. Like you can -- you can remove it and then it will still reconstruct itself from all the reflections out there and other data." *Id.* at 107:8-17. This supports the fact that there is no way to value any specific data for grounding or outputs.<br><br>Regarding subparagraph (d), the evidence that News Plaintiffs cite (examples in photocopying and music, and the existence of intermediaries) does not genuinely dispute that identifying rightsholders of individual works can be difficult and costly to identify and locate, and that this increases the transaction costs for negotiating any proposed |

| | |
|---|---|
| facilitate licensing at scale. Malackowski DNP/NYT Rebuttal Rpt., Appx. 5.2.<br><br>Finally, Dr. Tucker's argument that negotiations for the volume of data needed are susceptible to holdout problems is contradicted by Mr. Malackowski's testimony that the fair use doctrine "expressly rejects that circular logic" and that the relevant inquiry is not whether every piece of web content can be licensed, but whether a market exists for "the plaintiffs' type of work." *See* Malackowski DNP/NYT Reply Rpt. at 33 and 36-37. | web grounding data licenses. That licensing models have emerged in other contexts does not mean that will happen here. As explained by Dr. Tucker: "For grounding, a user of a general-purpose LLM is not choosing to consume a specific article in the way a Spotify user chooses a specific song or a YouTube user chooses a specific video. Instead, the user submits a prompt, and the model may draw from multiple current and archival sources to generate a synthesized response." ECF 1733 (Tucker Decl.) ¶ 228. Second, the existence of intermediaries reflects ongoing experimentation with potential licensing models, not evidence of a solution to the problem in identifying rightsholders or the transaction costs involved in seeking data on the scale needed for grounding LLMs. ECF 2231 (Tucker Decl.) ¶ 19. Plaintiffs have not cited any evidence that intermediaries could provide the rights for the volume and variety of data needed to ground an LLM.<br><br>Additionally, News Plaintiffs' response does not address the difficulty they had in determining whether they owned the rights in the Asserted Works. News Plaintiffs were unable to identify whether they owned the rights in the millions of works they asserted, as evidenced by their continued revision of the Asserted Works lists in this case, including as late as the submission of their opposition summary judgment brief. *See* 10/24/26 FRE 1006 Summaries; ECF 2150 (Maisel Opp. Decl.) ¶¶ 2-7.<br><br>Lastly, regarding subparagraph (e), News Plaintiffs response is an improper legal argument about interpretation of the fair use doctrine and thus should not be considered. Indeed, Mr. Malakowski's statement that the fair use doctrine "expressly rejects that circular logic" is based on his interpretation of case law. *See* ECF 1800 |

| | |
|---|---|
| | (Malackowski Decl.) Ex. C. (Malackowski DNP/NYT Reply Rpt.) at 33, n. 171 (citing to pages 28-30 of Malackowski's Rebuttal Report which is a multi-page discussion of case law). |

**Paragraph 149**

| | |
|---|---|
| **149. News Plaintiffs' incentives to create new works have not been reduced following the use of the Asserted Works for web grounding, as demonstrated by their continued publication.** Tucker Decl. ¶¶ 14, 30-48, 237-238; Hurst Decl. **Ex. 116** (Sulzberger Dep. Tr.) 177:24-178:6; **Ex. 12** (Bauerlein 30(b)(6) Dep. Tr.) (Vol. 2, dated Jan. 27, 2026) 423:6-16; **Ex. 59** (Julien Dep. Tr.) 33:12-17. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 149</u>: Denied.**<br><br>Admissible evidence contradicts Microsoft's assertion. *See* Bell Rebuttal Rep. ¶¶ 161, 163, 200 (opining that The Times's incentive to create new works is driven in part by its ability to create new works, which in turn is driven by its ability to fund the creation of its journalism via subscriptions, advertising, licensing, and affiliate revenue, so any harm to The Times from Defendants' or other third parties' unauthorized uses of their Asserted Works necessarily impacts The Times's incentives and ability to create new works); NP Ex. 5 [Meredith Levien Depo. Ex. 7] at 13; NP Ex. 1 [The New York Times SEC Form 10-K Dec. 31, 2025] at 41 (detailing The Times's increased journalism costs of $48.7 million, which were "largely due to higher compensation and benefits, which was driven by growth in the number of employees who work in [The Times's] newsrooms as well as higher salaries, benefits costs and incentive compensation"); NP Ex. 3 [Sulzberger Depo. Tr.] at 191:16-192:10 (describing The Times's track record of | **<u>Microsoft's Reply:</u>** Paragraph 149 is not genuinely disputed because News Plaintiffs do not deny that they have continued publishing journalism following the use of the Asserted Works for web grounding. In fact, the evidence News Plaintiffs cite actually shows that they have continued to publish journalism and pour more resources into it. *See, e.g.*, News Ex. 1 (The New York Times SEC Form 10-K Dec. 31, 2025) at 41 (noting that The Times had a "growth in the number of employees who work in [The Times's] newsrooms as well as higher salaries"). Plaintiffs attempt to create a dispute by pointing to evidence of how Plaintiffs' incentives to create new works *could be* reduced because of Generative AI. But none of the cited evidence supports that Plaintiffs' incentives to create new works has actually been reduced. *See, e.g.*, News Ex. 90 (C. Loretto 30(b)(6) Tr.) at 36:1-37:6 [redacted]) (emphasis added); News Ex. 1277 (M. Bauerlein Tr. (Jan. 27, 2026)) at 423:6-16 [redacted]) (emphasis added). Additionally, none of the cited evidence mentions or is |

| | |
|---|---|
| "reinvesting deeply into [its] journalistic mission"), 302:8-23 (describing The Times's investment into its journalism, including having "bureaus all over the world" and giving journalists "sometimes years" "to do the most important work"); NP Ex. 90 [Loretto 30(b)(6) Depo. Tr.] at 36:1-37:6 (explaining that as a result of generative AI causing reductions in traffic and revenues, that "will also result in significant reductions of employees, specifically our newsrooms and our advertising departments will no longer be able to continue to fund the same amount of staff and produce the same amount of copyrighted, quality, accurate, and trusted content"); NP Ex. 20 [J. Anderson Depo Tr.] at 138:13-20 ("I don't think people understand what we put into investigations. And it just can't be taken, because if it is, we can't do it anymore because there's so much – so many resources put into it. And if it's just taken and put out there for free, and we can't, you know, monetize it and do it for the community, then there's really no point."); NP Ex. 17 [Pine Feb. 4, 2026 30(b)(6) Depo. Tr.] at 251:1-6 ("I think it has been well documented that generative AI poses a serious, immediate, and existential threat to the economy and the industry for local news, essentially to my business, and I think that has been acknowledged by both Microsoft and OpenAI"); NP Ex. 1277 [Bauerlein 1/27/26 Depo. Tr.] at 423:6-16 (testifying that while CIR maintains its mission-driven desire to create new works, generative AI products "affect the return on [CIR's] efforts" and CIR's "ability to have the impact that [it] seek[s]" and thereby "could impact the incentives by making it more difficult to have the impact."); Cross Rebuttal Rep. at 14 (opining that copyright gives news organizations like CIR the incentive to invest in coverage, helping "newsrooms cover costs and continue their creative work"). | specific to web grounding or any conduct by Microsoft in particular, such that this fact can be genuinely disputed.<br><br>News Plaintiffs' claim that the cited testimony of Andrew Julien (News Ex. 59) does not support the proposition is incorrect. Microsoft agrees that Mr. Julien's testimony shows that the New York Daily News has never missed an issue of publication. That testimony supports Paragraph 159 because it shows that the New York Daily News has not reduced publication frequency following the alleged use of its Asserted Works as web grounding. |

| | |
|---|---|
| News Plaintiffs object to the phrase "incentives to create new works" as vague and ambiguous. It is unclear what an "incentive" is – a personal desire, the actual creation of new work, business strategy for creating new works, etc. News Plaintiffs further object that cited testimony of Andrew Julien (Ex. 59) does not support the proposition – it says only that New York Daily News (one of the eight DNPs) has never missed an issue of publication. | |

## C. Implied License

### Paragraph 150

| **150. Microsoft incorporates Undisputed Facts ¶¶ 80-84 as though fully restated herein.** | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 150**: **Denied.** This is not an appropriate undisputed fact. To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 80-84 as though fully restated herein. | **Microsoft's Reply:** Microsoft disagrees that this is inappropriate and incorporates its Replies to News Plaintiffs' responses to Paragraphs 80-84 as though fully restated herein. |

### Paragraph 151

| **151. Microsoft's blog post announcing the repurposed NOARCHIVE and NOCACHE meta tags further stated that "content with the NOCACHE tag or NOARCHIVE tag will still appear in our search results." Publishers can remain in the Bing Index for use in traditional Bing search, while excluding their content from web grounding.** Canel Decl. ¶¶ 27-28; *see also* Hurst Decl. **Ex. 21** (Canel 30(b)(6) Dep. Tr.) 201:2-20, 202:9-11; **Ex. 21.A** (Canel Dep. Ex. 35 – Microsoft Bing Blog Announcing Meta Tags); **Ex. 85** (Parakhin Dep. Tr.) 226:23–227:24; **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 179:2-181:8, 182:17-183:9; **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 104:9-105:12; **Ex. 34** (Felix Dep. Tr.) 121:23–122:22; **Ex. 64** (Liang Dep. Tr.) 187:10–23; **Ex. 11** (Bauerlein 30(b)(6) Dep. (Vol. 1, dated Jan. 26, 2026)) 171:5–13, 176:25–177:19. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 151**: Disputed. **Denied.** Admissible evidence contradicts Microsoft's assertion that "[p]ublishers can remain in the Bing Index for use in traditional Bing search, while excluding their content from web grounding." *See* NP Ex. 453 [MSFT_AI_MDL_000391970] at -970 ([redacted] | **Microsoft's Reply:** Paragraph 151 is not genuinely disputed. Paragraph 151 cites to evidence specifically addressing the stated fact, such as Microsoft's blog post itself which contains the quoted language (*see* Hurst Decl. Ex. 21.A) as well as testimony from multiple employees of News Plaintiffs specifically addressing the stated fact. For example, Ms. Jacobs (the Daily News Plaintiffs' Head of Product Development) and Ms. Liang (The Times's Sr. Director of Technical SEO) acknowledged and read the |

| | |
|---|---|
| [redacted] NP Ex. 454 [Abib 30(b)(1) Tr.] at 61:8-62:10 (Microsoft employee testifying [redacted]); NP Ex. 455 [MSFT_AI_MDL_000642967] at -967; Stricchiola NYT/DN Opening Rep. at ¶¶ 280-297 (Microsoft's own published data in a tool called Bing Webmaster Tools showing that Copilot is accessing and citing content that The Times and *Daily News* Plaintiffs have marked with NOARCHIVE meta-tags).<br><br>News Plaintiffs object that the evidence cited does not support Microsoft's assertions. The quoted language from the cited blog post does not appear in the attached blog post. *See* Hurst Ex. 21.A. | quoted blog post into the record. *See* Hurst Decl. Ex. 57 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 104:9-105:12; *see also* Hurst Decl. Ex. 64 (C. Liang Tr.) at 187:10-23. Similarly, Ms. Felix (The Times's VP, Head of Platform Strategy & Strategic and AI Partnerships) testified to her understanding that a webmaster or content owner could use the NOCACHE and NOARCHIVE meta tags and they would still appear in the Bing Search results. Hurst Decl. Ex. 34 (S. Felix Tr.) at 121:23-122:22. Additionally, Paragraph 151 cites Mikhail Parakhin (former CEO of Microsoft's Advertising & Web Services business) testimony and Fabrice Canel's declaration (former Principal Product Manager of Microsoft Bing) confirming the technical understanding and operation of same. *See* Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 226:23-227:24; ECF 1711 (Canel Decl.) ¶¶ 27-28.<br><br>News Plaintiffs seek to create a dispute of fact about whether publishers can remain in the Bing Index for use in traditional Bing search, while excluding their content from web grounding—based on the *effectiveness* of the meta tags described in Paragraph 151, but none of this cited evidence disputes the fact as stated. News Plaintiffs cite internal Microsoft communications (News Exs. 453 and 455)—as well as testimony about same (News Ex. 454 referencing News Ex. 455)—that describe software bugs or errors (so-called "leakage violations"). None of this cited material bears on Microsoft's blog post announcement, Microsoft's repurposing of the NOARCHIVE and NOCACHE meta tags (or the automated operation of same) that publishers can use on a webpage to provide signals to the Copilot system for how to process that page to remain in traditional search and in or out of web grounding (*i.e.*, the fact as stated). Instead, the cited materials describe occasional software |

| | |
|---|---|
| | bugs or errors (including reporting errors) associated with the release of a new product. Therefore, the cited testimony and documents do not dispute Paragraph 151.<br><br>Plaintiffs additionally cite to Ms. Stricchiola's opinions that are subject to a pending Rule 702 motion. ECF 2055 at 30-32. To the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Further, the "evidence cited" does support "Microsoft's assertions" in Paragraph 151, and specifically reflects that Microsoft's blog post contains the quoted language. *See* Hurst Decl. Ex. 64 (Liang Dep. Tr.) at 187:10-19 (confirming quoted blog post language); *see also* Hurst Decl. Ex. 57 ( C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 108:3-15 (same). Pursuant to FRE 106 and 1003, Microsoft includes here the duplicate, non-truncated version of this blog post being testified about in News Exs. 57 and 64. *See* Hurst Decl. Ex. 388 (Jacobs Dep. Ex. 24); Hurst Decl. Ex. 410 (Liang Dep. Ex. 15). The Court may also take judicial notice that Microsoft's blog (Hurst Decl. Ex. 21.A) posted online contains the stated language. *See, e.g.*, *Salvatierra v. Connolly*, No. 09-cv-3722, 2010 U.S. Dist. LEXIS 137731, at *11-12, n.5 (S.D.N.Y. Sept. 1, 2010), *report and recommendation adopted*, *Salvatierra v. Connolly*, No. 09-cv-3722, 2011 U.S. Dist. LEXIS 10 (S.D.N.Y. Jan. 3, 2011) (J. Stein). |

**Paragraph 152**

| **152. Each News Plaintiff employs a webmaster, or equivalent personnel, who holds a Bing Webmaster Tools Account for managing content control for digital publications.** Canel Decl. ¶ 15. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 152**: **Denied** to the extent it suggests the person who holds the Bing Webmaster Tools Account can manage content control for digital publications, and that Microsoft abides by those controls. Admissible evidence contradicts this.<br><br>Microsoft does not abide by a NOARCHIVE tag unless content is crawled for the Bing Index *after* the NOARCHIVE tag is added, and in the case of News Plaintiffs' content, this often did not happen even a year following the tagging of content with NOARCHIVE. *See* NP Ex. 1351 [Stricchiola Depo. Tr.] at 165:12-168:9; Stricchiola NYT / DN Opening Rpt. at 103-109.<br><br>News Plaintiffs object that the cited evidence does not support Microsoft's assertion. *See* Canel Decl. ¶ 15 (stating only that "each News Plaintiff holds a Bing Webmaster Tools account"). | **Microsoft's Reply:** Paragraph 152 is not genuinely disputed. The cited evidence supports that each News Plaintiff employs a webmaster or equivalent personnel; a Bing Webmaster Tools account is necessarily held by personnel acting for the publisher. News Plaintiffs do not dispute the fact as stated.<br><br>While News Plaintiffs dispute that "the person who holds the Bing Webmaster Tools Account can manage content control for digital publications," they cite no evidence in support of that dispute, nor do they explain how Microsoft's cited evidence fails to support that statement. Thus, this fact is not disputed.<br><br>News Plaintiffs instead seek to add an additional fact regarding the usage requirements and effectiveness of meta tags as controls. Specifically, News Plaintiffs seek to add an additional re-indexing step they maintain Microsoft should have undertaken. This additional requirement runs counter to Paragraph 152 and the record. As Microsoft made clear in its blog announcement to publishers: "[c]ontent tagged NOARCHIVE will not be included in Bing Chat answers, not be linked to in the answers. Going forward, for content in our Bing Index that is labeled NOARCHIVE, we will not use the content for training Microsoft's generative AI foundation models." Hurst Decl. Ex. 21.A at 2. Furthermore, Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was clear that Microsoft was using standard controls that content publishers were |

| | |
|---|---|
| | already familiar with in the context of search: the tags were "built on standard controls that webmasters use today to control indexing … on Bing in order to empower publishers to make choices about use of their content in Bing Chat." *Id.* Any suggestion in News Plaintiffs' response that News Plaintiffs were not familiar with or know how the NOARCHIVE meta tag functioned in connection with Microsoft's Bing Index or that the tags needed to appear in the Bing Index to be effective is belied by the facts. *See, e.g.*, ECF 1711 (Canel Decl.) ¶¶ 27-30; Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 279:1-22; Hurst Decl. Ex. 99 (J. Ribas Tr.) at 130:1–131:24; Hurst Decl. Ex. 34 (S. Felix Tr.) at 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; Hurst Decl. Ex. 64 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 183:3-9; Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8; Hurst Decl. Ex. 57 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18, 95:23–97:13, 104:3–105:12, 106:3-108:2. The Times, for example, regularly used both NOARCHIVE and Microsoft's IndexNow tool when it wished to signal to the Bing Index that it had updated its news content. *See, e.g.*, Hurst Decl. Ex. 385 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 199:14-202:17; *see also* Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8. There is no dispute, as it has been the case since the advent of Microsoft's use of meta tags for search content, that in order for a tag to take effect it must appear in the Bing Index. Regardless, when content was first published with a NOARCHIVE tag, that NOARCHIVE tag is included in the Bing Index from the start. No re-indexing was required to prevent that website content from being grounded on by Bing Chat for pages tagged with NOARCHIVE. *See* ECF 1711 (Canel Decl.) ¶¶ 27, 29; *see also* Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr. (Jan. 22, 2026)) at 201:2-20, 202:9–11. Pages that are changed |

| | |
|---|---|
| | or where an NOARCHIVE tag is updated or added after initial publication, are subject to Microsoft's ordinary re-crawling efforts, which do not require any specific re-indexing request. If the publisher would like the meta tag to take effect sooner than may occur with regular crawling activity, Microsoft also offers tools to notify it of changes and request earlier re-indexing (but as noted, notifying Microsoft of the changes and requesting re-indexing is not required for the meta tag to take effect). *See* ECF 1711 (Canel Decl.) at ¶ 19; ECF 2057 (Gaggara Decl.) at ¶ 4. And News Plaintiffs' statement does not dispute that each News Plaintiff employs a webmaster who manages these tools.<br><br>Additionally, the only evidence cited by News Plaintiffs, Ms. Stricchiola's opinions and testimony, do not contradict the fact as stated. The citations to Ms. Stricchiola's testimony describe how older content online is not always reindexed while the report citations discuss different topics entirely: the NOCACHE, nosnippet, and max-snippet meta tags. Accordingly, none of those cited materials bear on Bing Webmaster Tools Accounts, or that News Plaintiffs hold these accounts to manage their content controls. Therefore, the cited testimony and report do not create a dispute to the fact stated in Paragraph 152. And Ms. Stricchiola's opinions are subject to a pending Rule 702 motion. ECF 2055 at 30-32. To the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). |

**Paragraph 153**

<table>
<tr><td colspan="2">

**153. Microsoft's announcement via blog post of its repurposing of the NOARCHIVE meta tag for use as an AI-related control was communicated to News Plaintiffs, via for example:**

a. **Microsoft transmitted a mass notification to all Bing Webmaster Tools account holders when Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was published.** Canel Decl. ¶ 30.

b. **Microsoft publicized how it had repurposed the NOARCHIVE meta tag via its post on Microsoft Bing Blogs as well as through industry outreach.** Canel Decl. ¶ 30; *see also* Hurst Decl. **Ex. 85** (Parakhin Dep. Tr.) 279:1-22.

c. **Microsoft publicized its blog post featuring the repurposed NOARCHIVE meta tag at webmaster and search engine optimization conferences.** Canel Decl. ¶ 30; *see also* Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) 130:1–131:24; Ex. 85 (Parakhin Dep. Tr.) 279:1-22.

d. **Microsoft created a chart summarizing the repurposed meta tags, which was presented directly to The New York Times and to other publishers at an event in Mexico.** Hurst Decl. **Ex. 99** (Ribas Dep. Tr.) 130:1–131:24.

</td></tr>
<tr><td>

**<u>News Plaintiffs' Response to Microsoft Paragraph 153</u>: Denied.** Admissible evidence contradicts this.

For example, the expert report and deposition of Ms. Stricchiola make clear that Microsoft's message was *not effectively communicated*. Indeed, News Plaintiffs had marked their content with the NOARCHIVE meta tag and yet Microsoft's own published data in Bing Webmaster Tools reflected that Copilot was still repeatedly accessing and using the content. In Ms. Stricchiola's deposition, Microsoft counsel pointed out this was purportedly because over the course of the year since the NOARCHIVE meta tag was applied Microsoft purportedly failed to re-index that

</td><td>

**<u>Microsoft's Reply:</u>** Paragraph 153 is not genuinely disputed. News Plaintiffs do not dispute that Microsoft announced via blog post its repurposing of the NOARCHIVE meta tag for use as an AI-related control or that this announcement was communicated to News Plaintiffs via four specific communication channels described in Paragraph 153. News Plaintiffs instead seek to add an additional fact regarding the usage requirements and effectiveness of meta tags as controls. Specifically, News Plaintiffs seek to add an additional re-indexing step they maintain Microsoft should have undertaken. This additional requirement runs counter to Paragraph 153 and the record. As Microsoft made clear in its blog

</td></tr>
</table>

| | |
|---|---|
| content. This is a loophole in Microsoft's meta tag instructions. *See* NP Ex. 1351 [Stricchiola Depo. Tr.] at 165:12-168:9; Stricchiola NYT / DN Opening Rpt. at 103-109.<br><br>News Plaintiffs object that Microsoft's cited evidence does not support that News Plaintiffs received Microsoft's purported "transmi[ssion] [of] a mass notification to all Bing Webmaster Tools account holders when Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was published," through "industry outreach," through "webmaster and search engine optimization conferences," *see* Canel Decl. ¶ 30, or through a "chart summarizing the repurposed meta tags, which was presented directly to The New York Times and to other publishers at an event in Mexico," *see* Hurst Ex. 99 (Ribas Dep. Tr.) 130:1–131:24. | announcement to publishers: "[c]ontent tagged NOARCHIVE will not be included in Bing Chat answers, not be linked to in the answers. Going forward, for content in our Bing Index that is labeled NOARCHIVE, we will not use the content for training Microsoft's generative AI foundation models." Hurst Decl. Ex. 21.A at 2. Furthermore, Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was clear that Microsoft was using standard controls that content publishers were already familiar with in the context of search: the tags were "built on standard controls that webmasters use today to control indexing … on Bing in order to empower publishers to make choices about use of their content in Bing Chat." *Id.* Any suggestion in News Plaintiffs' response that News Plaintiffs were not familiar with or know how the NOARCHIVE meta tag functioned in connection with Microsoft's Bing Index or that the tags needed to appear in the Bing Index to be effective is belied by the facts. *See, e.g.*, ECF 1711 (Canel Decl.) ¶¶ 27-30; Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 279:1-22; Hurst Decl. Ex. 99 (J. Ribas Tr.) at 130:1–131:24; Hurst Decl. Ex. 34 (S. Felix Tr.) at 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; Hurst Decl. Ex. 64 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 183:3-9; Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8; Hurst Decl. Ex. 57 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18, 95:23–97:13, 104:3–105:12, 106:3-108:2. The Times, for example, regularly used both NOARCHIVE and Microsoft's IndexNow tool when it wished to signal to the Bing Index that it had updated its news content. *See, e.g.*, Hurst Decl. Ex. 385 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 199:14-202:17; *see also* Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8. There is no dispute, as it has been the case since the advent of Microsoft's use of |

| | |
|---|---|
| | meta tags for search content, that in order for a tag to take effect it must appear in the Bing Index. Regardless, when content was first published with a NOARCHIVE tag, that NOARCHIVE tag is included in the Bing Index from the start. No re-indexing was required to prevent that website content from being grounded on by Bing Chat for pages tagged with NOARCHIVE. *See* ECF 1711 (Canel Decl.) ¶¶ 27, 29; *see also* Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr. (Jan. 22, 2026)) at 201:2-20, 202:9–11. Pages that are changed or where an NOARCHIVE tag is updated or added after initial publication, are subject to Microsoft's ordinary re-crawling efforts, which do not require any specific re-indexing request. If the publisher would like the meta tag to take effect sooner than may occur with regular crawling activity, Microsoft also offers tools to notify it of changes and request earlier re-indexing (but as noted, notifying Microsoft of the changes and requesting re-indexing is not required for the meta tag to take effect). *See* ECF 1711 (Canel Decl.) at ¶ 19; ECF 2057 (Gaggara Decl.) at ¶ 4. And News Plaintiffs' statement does not dispute that Microsoft communicated its repurposed NOARCHIVE meta tag to News Plaintiffs in at least four different ways.<br><br>Additionally, the only evidence cited by News Plaintiffs, Ms. Stricchiola's opinions and testimony, do not contradict the fact as stated. The citations to Ms. Stricchiola's testimony describe how older content online is not always reindexed, while the report citations discuss different topics entirely: the NOCACHE, nosnippet, and max-snippet meta tags. Accordingly, none of those cited materials bear on Microsoft's blog post announcement communicated to News Plaintiffs through multiple channels about Microsoft's repurposing of the NOARCHIVE meta tag. Therefore, the cited testimony and documents do not create |

| | |
|---|---|
| | a dispute to the fact stated in Paragraph 153. Additionally, Ms. Stricchiola's opinions are subject to a pending Rule 702 motion. ECF 2055 at 30-32. To the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Finally, News Plaintiffs' statement that Microsoft's cited evidence does not support that News Plaintiffs "received" these communications does not dispute the stated fact. Paragraph 153 concerns actions taken by Microsoft to communicate these changes; it does not make any representations about News Plaintiffs' receipt of these communications. News Plaintiffs' awareness of the announcement is addressed in Paragraph 154 *infra*. |

**Paragraph 154**

| |
|---|
| **154. After publication of the September 22, 2023 blog post, News Plaintiffs knew about Microsoft's repurposed NOARCHIVE meta tag control, and how to use it on their webpages to signal exclusion from web grounding on News Plaintiffs' content in the Bing Index.** ***The New York Times:*** Hurst Decl. **Ex. 34** (Felix Dep. Tr.) 112:17-114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; **Ex. 34.A** (Times Ex. 105); **Ex. 64** (Liang Dep. Tr.) 172:25–173:12, 176:2–177:16, 181:8–182:21; **Ex. 93** (Procas, 30(b)(6) Dep. Tr.) 179:2–181:8; Canel Decl. ¶ 30. ***Daily News:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Chicago Tribune:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Orlando Sentinel:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Sun Sentinel:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***The Mercury News:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***The Denver Post:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***The Orange County Register:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***Pioneer*** |

| | |
|---|---|
| ***Press:*** Hurst Decl. **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13-18, 95:23–97:2, 104:3–105:12, 106:3-108:2; Canel Decl. ¶ 30. ***CIR:*** Canel Decl. ¶ 30. | |
| **News Plaintiffs' Response to Microsoft Paragraph 154**: **Denied.** The cited evidence does not support the assertion, and admissible evidence shows that News Plaintiffs did not know how to use it on their webpages to signal exclusion from web grounding on News Plaintiffs' content in the Bing Index. The expert report and deposition of Ms. Stricchiola makes clear that Microsoft's message of how to signal exclusion of content from web grounding was misleading. News Plaintiffs *had* marked their content with the NOARCHIVE meta tag and yet Microsoft's own published data in Bing Webmaster Tools reflected that Copilot was still repeatedly accessing and using the content. NYT / DN Stricchiola Opening Rpt. at 103-109. | **Microsoft's Reply:** Paragraph 154 is not genuinely disputed. Paragraph 154 cites to testimony from each News Plaintiff specifically addressing the stated fact. For example, Ms. Liang (The Times's Sr. Director of Technical SEO) testified that she had shared internally with The Times a "blurb" from Microsoft's blog post, and that it was her "understanding [] that there had been an update to the documentation," in reference to the blog post "where Bing was recommending this NOARCHIVE tag as a way to -- to opt out of Bing chat and other GenAI products under Microsoft's umbrella." Hurst Decl. Ex. 64 (C. Liang Tr.) at 176:2–177:16. Similarly, Ms. Felix (The Times's VP, Head of Platform Strategy & Strategic and AI Partnerships) acknowledged that she had seen Microsoft's blog post before, and was "aware of the ability to use this no archive meta tag to disable content for use with Bing Chat or Copilot" "once Microsoft told us." Hurst Decl. Ex. 34 (S. Felix Tr.) at 118:18-23. Daily News Plaintiffs' witness Ms. Jacobs (Head of Product Development) testified that [redacted] Hurst Decl. Ex. 57 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18. Additionally, Fabrice Canel (former Principal Product Manager of Microsoft Bing, responsible for developing and managing Microsoft's Webmaster Tools) stated in his sworn declaration that CIR held a Bing Webmaster Tools Account – and, Microsoft transmitted a mass notification to all Bing Webmaster Tools account holders when Microsoft's blog post announcing the repurposed NOARCHIVE meta tag |

| | |
|---|---|
| | was published. ECF 1711 (Canel Decl.) ¶¶ 15, 30. CIR was therefore on notice of the repurposed NOARCHIVE meta tag.<br><br>Further, News Plaintiffs seek to add an additional fact regarding the effectiveness of this communication and meta tags as controls. But that statement does not dispute that after September 22, 2023, News Plaintiffs knew about the repurposed NOARCHIVE meta tag and how to use it on their webpages.<br><br>Moreover, the evidence cited by News Plaintiffs does not contradict the fact as stated. The citations to Ms. Stricchiola's report discuss different topics entirely: the NOCACHE, nosnippet, and max-snippet meta tags. Accordingly, none of this cited material bears on Microsoft's blog post announcement, Microsoft's repurposing of the NOARCHIVE meta tag that News Plaintiffs knew about for use on a webpage to provide signals to the Copilot system for how to determine the amount of content permissible for use in web grounding. And Ms. Stricchiola's opinions are subject to a pending Rule 702 motion. ECF 2055 at 30-32. To the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2). Therefore, the cited document does not create a dispute to the fact stated in Paragraph 154. |

***The New York Times Company (The New York Times)***

**Paragraph 155**

<table>
<tr><td colspan="2">155. With knowledge of Microsoft's repurposed NOARCHIVE meta tag, The New York Times did not uniformly apply Microsoft's repurposed NOARCHIVE meta tag on a sitewide basis, despite internal recommendations to do so. Hurst Decl. Ex. 64 (Liang Dep. Tr.) 175:23–177:16, 183:3–17, 190:15–195:18; Ex. 64.A (Liang Dep. Ex. 14); Ex. 64.B (Liang Dep. Ex. 16).</td></tr>
<tr><td><u>News Plaintiffs' Response to Microsoft Paragraph 155</u>: Denied. News Plaintiffs object to the term "uniformly apply" as vague and ambiguous. News Plaintiffs also object to the suggestion that there was any obligation for publishers to opt out of having their content used for training or web grounding or that NOARCHIVE was effective to prevent such use of publisher content.<br><br>Admissible evidence shows that, in 2024, The Times reviewed Microsoft's recommendation that the NOARCHIVE tag was "a way to ... opt out of Bing chat and other GenAI products under Microsoft's umbrella," as an alternative to blocking Bingbot entirely from crawling The Times's site, which would have hurt The Times in search. NP Ex. 415 [Liang Tr.] at 192:4-20. The Times maintained the NOARCHIVE tagging it already had in place, which was on all news stories. NP Ex. 415 [Liang Tr.] at 195:6-13.</td><td><u>Microsoft's Reply:</u> Paragraph 155 is not genuinely disputed. The evidence cited by both Microsoft and News Plaintiffs—testimony from Ms. Liang (The Times's Sr. Director of Technical SEO)—clearly shows that The New York Times had knowledge of Microsoft's repurposed NOARCHIVE meta tag and that The New York Times did not uniformly apply Microsoft's repurposed NOARCHIVE meta tag on a sitewide basis, despite internal recommendations to do so. See Hurst Decl. Ex. 64 (C. Liang Tr.) at 195:6-13 ("Q. And so, with respect to your recommendation here of adding NOARCHIVE site-wide, that was ultimately something The Times did not move forward with, correct? A. We did not. Q. But the NOARCHIVE tags remained on -- on the news stories. Correct? A. Correct."); see also News Ex. 415 (C. Liang Tr.) at 195:6-13 (same).<br><br>Further, News Plaintiffs' first response on whether copyright law is an opt-out or opt-in regime constitutes improper attorney argument and / or is conclusory. It thus requires no further response. News Plaintiffs' second response, regarding the "effective[ness]" of the NOARCHIVE meta tag, should be disregarded because it does not bear on the fact as stated (i.e., The Times's</td></tr>
</table>

| | |
|---|---|
| | knowing, selective application of the NOARCHIVE meta tag). |

**Paragraph 156**

| | |
|---|---|
| **156. Until early 2026, The New York Times selectively implemented the NOARCHIVE meta tag control, blocking some webpages but not others (for example the home page, as well as Wirecutter articles).** Hurst Decl. **Ex. 64** (Liang Dep. Tr.) 174:6–175:22; **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 181:20–182:16. | |
| **News Plaintiffs' Response to Microsoft Paragraph 156**: **Undisputed** that before 2026, The Times did not implement the NOARCHIVE metatag on its homepage or on all Wirecutter articles. **Denied** as to the rest of this statement. News Plaintiffs object to the term "selectively implemented" as vague and ambiguous. News Plaintiffs also object to the suggestion that there was any obligation for publishers to opt out of having their content used for training LLMs or that NOARCHIVE was effective to prevent use of publisher content for training.<br><br>Admissible evidence shows that, in 2024, The Times maintained the NOARCHIVE tagging it already had in place, which was on all news stories. Hurst **Ex. 64** (Liang Tr.) at 174:18–23 ("Q: And you said that the tag already existed on the website before you arrived. What pages does The Times use the NOARCHIVE meta tag on? A: The NOARCHIVE tag is present on all article pages."); 188:7–10, 195:6-13 ("Q: And so – and I believe you said that you used the NOARCHIVE tags on – on at least all of the News article pages for The Times, correct? A: Correct. . . . Q: [T]he NOARCHIVE tags remained on the news stories [as of April 18, 2024]. Correct? A: Correct."). | **Microsoft's Reply:** Paragraph 156 is not genuinely disputed. **Undisputed** that The Times did not implement the NOARCHIVE meta tag on its homepage or all of its Wirecutter articles prior to early 2026. And, the evidence cited by both Microsoft and News Plaintiffs—testimony from Ms. Liang (The Times's Sr. Director of Technical SEO)—clearly shows that until early 2026, The New York Times selectively implemented the NOARCHIVE meta tag control (*i.e.*, The Times did not implement the NOARCHIVE metatag on its homepage or on all Wirecutter articles), which blocked some webpages but not others. *See* Hurst Decl. Ex. 64 (C. Liang Tr.) at 195:6-13 ("Q. And so, with respect to your recommendation here of adding NOARCHIVE site-wide, that was ultimately something The Times did not move forward with, correct? A. We did not. Q. But the NOARCHIVE tags remained on -- on the news stories. Correct? A. Correct."); *see also* News Ex. 415 (C. Liang Tr.) at 195:6-13 (same).<br><br>In addition, News Plaintiffs' first response on whether copyright law is an opt-out or opt-in regime constitutes improper attorney argument and / or is conclusory. It thus requires no further response. News Plaintiffs' second response, regarding the "effective[ness]" of the |

| | |
|---|---|
| | NOARCHIVE meta tag, should be disregarded because it does not bear on the fact as stated (*i.e.*, The Times's knowing, selective application of the NOARCHIVE meta tag on news articles but not other Times content such as the homepage, or Wirecutter articles prior to early 2026). |

***All Daily News Plaintiffs***

**Paragraph 157**

| |
|---|
| 157. **With knowledge of Microsoft's repurposed NOARCHIVE meta tag, the Daily News Plaintiffs did not uniformly apply that meta tag to their news articles until March 7, 2025. *Daily News*:** Hurst Decl. **Ex. 139** (Daily News 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***Chicago Tribune***: Hurst Decl. **Ex. 132** (Chicago Tribune 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***Orlando Sentinel***: Hurst Decl. **Ex. 158** (Orlando Sentinel 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***Sun Sentinel***: Hurst Decl. **Ex. 165** (Sun Sentinel 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; Ex. **57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***The Mercury News***: Hurst Decl. **Ex. 147** (Mercury News 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***The Denver Post***: Hurst Decl. **Ex. 143** (Denver Post 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex. 57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***The Orange County Register***: Hurst Decl. **Ex. 155** (OC Register 2d Suppl. Resp. to OAI Interrog. No. 6); Ex. **57** (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; Ex. 57.B (Jacobs Dep. Ex. 31); Ex. **57.B** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. ***Pioneer Press***: Hurst Decl. **Ex. 162** (Pioneer Press 2d Suppl. Resp. to OAI Interrog. No. 6); **Ex.** |

| |
|---|
| 57 (Jacobs 30(b)(6) Dep. Tr. (Vol. 1, dated Feb. 12, 2026)) 95:13–18, 122:19–129:19, 137:21-138:17, 139:24–140:1; **Ex. 57.B** (Jacobs Dep. Ex. 31); **Ex. 58** (Jacobs 30(b)(6) Dep. Tr. (Vol. 2, dated Feb. 13, 2026)) 425:7–18. |

| | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 157**: **Denied** to the extent it suggests that Daily News Plaintiffs did not indicate that their content should not be grounded on before March 7, 2025, and to the extent it suggests Daily News Plaintiffs could have "uniformly implemented" metatags on all content immediately upon Microsoft's issuance of a blog post. Admissible evidence contradicts this.<br><br>After the September 2023 blog post, Daily News Plaintiffs investigated and tested the NOARCHIVE meta-tag, including how it worked (or rather, how they believed it worked). NP Ex. 72 [Jacobs 2/12/26 Depo. Tr.] at 94:23-97:2 (explaining that the "sands keep shifting" on what needs to be done to protect content; they are "difficult to find out about" and "difficult to figure out how to implement and use"; notwithstanding, Daily News Plaintiffs researched the NOARCHIVE meta tag upon seeing the Microsoft blog post and added the tags). In April 2024, *Daily News* Plaintiffs sued Microsoft, thereby providing notice that Microsoft was not permitted to use Daily News Plaintiffs' content for, *inter alia*, grounding. *See* ECF 1 (No. 1:24-cv-3285). Notwithstanding being sued, Microsoft continued to use *Daily News* Plaintiffs' content for grounding. Stricchiola NYT/DN Opening Rpt. at 103-109. In March 2025, Daily News Plaintiffs added the NOARCHIVE metatag to their content, and thereafter, Microsoft still continued to use *Daily News* Plaintiffs' content for grounding. *See* Stricchiola NYT / DN Opening Rpt. at 103-109. | **Microsoft's Reply:** Paragraph 157 is not genuinely disputed. The cited evidence, testimony from Ms. Jacobs (The Daily News Plaintiffs' Head of Product Development) clearly shows that with knowledge of Microsoft's repurposed NOARCHIVE meta tag, the Daily News Plaintiffs did not uniformly apply that meta tag to their news articles until March 7, 2025. For example, Ms. Jacobs testified that: [redacted] Hurst Decl. Ex. 57 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18; *see, e.g.*, Hurst Decl. Ex. 139 (Daily News 2d Suppl. Resp. to OAI Interrog. No. 6) (confirming March 7, 2025 implementation date); Hurst Decl. Ex. 58 (C.J. Jacobs 30(b)(6) Tr. (Feb. 13, 2026)) (confirming same).<br><br>Further, Daily News Plaintiffs' additional cited evidence—further testimony from Ms. Jacobs—does not dispute the stated fact. That testimony merely reflects [redacted] News Ex. 72 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:9-10. But Daily News Plaintiffs concede in their response that they "researched the NOARCHIVE meta tag upon seeing the Microsoft blog post," and that it was not until "March 2025" that "Daily News Plaintiffs added the NOARCHIVE metatag to their content."<br><br>Further, the Court should disregard Daily News Plaintiffs' response because the assertion that the Daily News |

| | |
|---|---|
| Further, as explained in the responses to, for example, Paragraph No. 153 above, Microsoft has not effectively communicated how its NOARCHIVE meta tag works, including that addition of the NOARCHIVE has no effect unless Microsoft re-indexes the content. *See* NP Ex. 1351 [Stricchiola Depo. Tr.] at 165:12-168:9; Stricchiola NYT / DN Opening Rpt. at 103-109.<br><br>News Plaintiffs object to the terms "uniformly" and "their news articles" as vague and ambiguous. | Plaintiffs sued Microsoft, thereby providing notice that Microsoft was not permitted to use Daily News Plaintiffs' content for grounding, constitutes improper attorney argument and/or is conclusory.<br><br>In addition, Daily News Plaintiffs also seek to add an additional fact regarding the effectiveness of Microsoft's communication as well as the usage requirements and effectiveness of meta tags as controls. Specifically, News Plaintiffs seek to add an additional re-indexing step they maintain Microsoft should have undertaken. This additional requirement runs counter to Paragraph 157 and the record. As Microsoft made clear in its blog announcement to publishers: "[c]ontent tagged NOARCHIVE will not be included in Bing Chat answers, not be linked to in the answers. Going forward, for content in our Bing Index that is labeled NOARCHIVE, we will not use the content for training Microsoft's generative AI foundation models." Hurst Decl. Ex. 21.A at 2. Furthermore, Microsoft's blog post announcing the repurposed NOARCHIVE meta tag was clear that Microsoft was using standard controls that content publishers were already familiar with in the context of search: the tags were "built on standard controls that webmasters use today to control indexing ... on Bing in order to empower publishers to make choices about use of their content in Bing Chat." *Id.* Any suggestion in News Plaintiffs' response that News Plaintiffs were not familiar with or know how the NOARCHIVE meta tag functioned in connection with Microsoft's Bing Index or that the tags needed to appear in the Bing Index to be effective is belied by the facts. *See, e.g.*, ECF 1711 (Canel Decl.) ¶¶ 27-30; Hurst Decl. Ex. 85 (M. Parakhin Tr.) at 279:1-22; Hurst Decl. Ex. 99 (J. Ribas Tr.) at 130:1–131:24; Hurst Decl. Ex. 34 (S. Felix Tr.) at 112:17- |

| | |
|---|---|
| | 114:7, 115:6-14, 117:10-119:2, 119:24–120:19, 121:2–19; Hurst Decl. Ex. 64 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 183:3-9; Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8; Hurst Decl. Ex. 57 (C.J. Jacobs 30(b)(6) Tr. (Feb. 12, 2026)) at 95:13-18, 95:23–97:13, 104:3–105:12, 106:3-108:2. The Times, for example, regularly used both NOARCHIVE and Microsoft's IndexNow tool when it wished to signal to the Bing Index that it had updated its news content. *See, e.g.*, Hurst Decl. Ex. 385 (C. Liang Tr.) at 172:25–173:12, 176:2–177:16, 181:8–182:21, 199:14-202:17; *see also* Hurst Decl. Ex. 93 (S. Procas 30(b)(6) Tr.) at 179:2–181:8. There is no dispute, as it has been the case since the advent of Microsoft's use of meta tags for search content, that in order for a tag to take effect it must appear in the Bing Index. Regardless, when content was first published with a NOARCHIVE tag, that NOARCHIVE tag is included in the Bing Index from the start. No re-indexing was required to prevent that website content from being grounded on by Bing Chat for pages tagged with NOARCHIVE. *See* ECF 1711 (Canel Decl.) ¶¶ 27, 29; *see also* Hurst Decl. Ex. 21 (F. Canel 30(b)(6) Tr. (Jan. 22, 2026)) at 201:2-20, 202:9–11. For pages that are changed or where an NOARCHIVE tag is updated or added after initial publication, if the publisher would like the meta tag to take effect sooner than may occur with regular crawling activity, Microsoft also offers tools to notify it of changes and request earlier re-indexing (but as noted, notifying Microsoft of the changes and requesting re-indexing is not required for the meta tag to take effect). *See* ECF 1711 (Canel Decl.) at ¶ 19; ECF 2057 (Gaggara Decl.) at ¶ 4. News Plaintiffs' statement does not dispute that the Daily News Plaintiffs had knowledge of Microsoft's repurposed NOARCHIVE meta tag and did not uniformly |

| | |
|---|---|
| | apply that meta tag to their news articles until March 7, 2025.<br><br>Additionally, the evidence cited by Daily News Plaintiffs in support of this additional fact—Ms. Stricchiola's analysis—does not contradict Paragraph 157 as stated. The citations to Ms. Stricchiola's testimony describe how older content online is not always reindexed, while the report citations discuss different topics entirely: the NOCACHE, nosnippet, and max-snippet meta tags. Accordingly, none of the cited material bears on Daily News Plaintiffs' knowledge of Microsoft's repurposed NOARCHIVE meta tag, which Daily News Plaintiffs selectively used on their webpages until March 2025. Additionally, Ms. Stricchiola's opinions are subject to a pending Rule 702 motion. ECF 2055 at 30-32. To the extent the Court excludes the challenged opinions, News Plaintiffs may not rely on them to support this statement. *See* Fed. R. Civ. P. 56(c)(2).<br><br>Therefore, the cited testimony and report do not create a dispute to the fact stated in Paragraph 157. |

***<u>The Center for Investigative Reporting (CIR)</u>***

**Paragraph 158**

| | |
|---|---|
| **158. With knowledge of Microsoft's repurposed NOARCHIVE meta tag, CIR decided not to implement that meta tag at all on any of CIR's webpages.** Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 176:9–11, 176:14–16. | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 158</u>: Denied.** The cited evidence does not support the purported fact. Ms. Bauerlein was asked if she has "any idea | **<u>Microsoft's Reply:</u>** Paragraph 158 is not genuinely disputed. News Plaintiffs do not dispute that CIR did not apply the NOARCHIVE meta tag to any of its webpages. *See* |

| | |
|---|---|
| what the noarchive meta tag is?" to which she responded "I have heard of it, but I don't really know what it is." Hurst Decl. Ex. 11 (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 176:5-8. She then was asked "Do you know whether CIR applies the noarchive meta tag to any of its websites" to which she responded "I don't believe so." Hurst Decl. Ex. 11 (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 176:9-11. Ms. Bauerlein's full testimony, offered as evidence of this fact, does not represent CIR "decided not to implement that meta tag at all on any of CIR's webpages."<br><br>Further, there is admissible evidence that contradicts Microsoft's purported fact. CIR had no pre-suit knowledge of any Microsoft webmaster control meta-tags that relate to permissions for generative AI training. NP Ex. 1285 [CIR's Supplemental Response to Microsoft Corporation's Interrogatories (Nos. 5, 6, 21)] No. 21 ("Plaintiff states that it had no pre-suit knowledge of any Microsoft webmaster control meta-tags that relate to permissions for generative AI training. Accordingly, there was no decision whether or not to use Microsoft's webmaster control meta-tags to control usage of Plaintiff's content in Microsoft's Generative ***AI*** Products and Services."); Second Bauerlein Decl. ¶ 5. | Hurst Decl. Ex. 11 (M. Bauerlein 30(b)(6) Tr. (Jan. 26, 2026)) at 176:9–11 ("[redacted]); 176:14–16. And CIR was on notice of the NOARCHIVE meta tag: like each News Plaintiff, CIR maintains a Bing Webmaster Tools account, and Microsoft notified account holders of the NOARCHIVE control announced on Microsoft's blog. *See* ECF 1711 (Canel Decl.) ¶¶ 15, 30.<br><br>Further, CIR's position that it had no pre-suit knowledge of the NOARCHIVE meta tag is not supported by the record. The Second Bauerlein Decl. cited states only Ms. Bauerlein's "understanding" (not CIR's). *See* ECF 2158 ("Second" M. Bauerlein Decl.) ¶ 5 ("It is my understanding that prior to the initiation of this lawsuit, CIR was not aware of Microsoft webmaster control meta-tags[.]") (emphasis added). In addition, while Ms. Bauerlein was CIR's Rule 30(b)(6) designee on the topic of webmaster controls such as meta tags (*see* Hurst Decl. Ex. 411 (M. Bauerlein 30(b)(6) Dep. Ex. 1 ¶ 38)), she testified at her deposition that [redacted]. Hurst Decl. Ex. 412 (M. Bauerlein 30(b)(6) Tr. (Jan. 26, 2026)) at 172:3-173:5. And, both the Second Bauerlein Decl. and News Ex. 1285 are specific to CIR's "pre-suit knowledge of any Microsoft webmaster control meta-tags that relate to permissions for generative AI ***training***" as opposed to web grounding (*i.e.*, the NOARCHIVE control use at issue in Paragraph 158). *See* News Ex. 1285 at 3 (emphasis added); *see also* ECF 2158 ("Second" Bauerlein Decl.) ¶ 5 ("It is my understanding that prior to the initiation of this lawsuit, CIR was not aware of Microsoft webmaster control meta-tags, including the |

| | |
|---|---|
| | 'NOARCHIVE' metatag, which relate to permissions for generative AI *training*.") (emphasis added). |

**COUNT II: VICARIOUS COPYRIGHT INFRINGEMENT**

## III. COUNT II: VICARIOUS COPYRIGHT INFRINGEMENT

**Paragraph 159**

| 159. **Microsoft incorporates Undisputed Facts ¶¶ 1-65 as though fully restated herein. Because training an LLM is fair use, there is no direct infringement. Without a direct infringer, there is no vicarious liability**. | |
|---|---|
| **News Plaintiffs' Response to Microsoft Paragraph 159: Denied.** This is not an appropriate undisputed fact.<br><br>To the extent that the Court considers this "fact," News Plaintiffs incorporate by reference their responses to Microsoft's Undisputed Facts ¶¶ 1-65 as though fully restated herein.<br><br>News Plaintiffs object to Microsoft's assertion that "[b]ecause training an LLM is fair use, there is no direct infringement. Without a direct infringer, there is no vicarious liability" as improper use of the 56.1 Statement to make legal arguments. *See Chinese Am. Citizens Alliance Greater New York v. New York City Dep't of Edu.*, 802 F. Supp. 3d 483, 502 (S.D.N.Y. 2025) ("Plaintiffs also improperly use their 56.1 Statement to make legal arguments."); *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022) (disregarding portions of a 56.1 Statement that contained legal arguments); *Wysocki v. Nassau County*, 2026 WL 1965726, at *2 (E.D.N.Y. July 7, 2026) ("[L]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded.") (internal citations omitted). | **Microsoft's Reply:** Microsoft disagrees that this is inappropriate and incorporates its Replies to News Plaintiffs' Responses to Undisputed Facts ¶¶ 1-65 as though fully restated herein.<br><br>Further, where "factual assertions [] have legal meaning and legal consequences" those facts are permissible in a Rule 56.1 statement. *See, e.g.*, *KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 528 (S.D.N.Y. 2020). Here, the fact that there is no underlying direct infringement (from training an LLM, for the facts presented in ¶¶ 1-65) has a legal consequence—that there is no vicarious liability—and thus may permissibly be included. |

## COUNTS I-II

## IV. ALL COUNTS: COMPILATIONS CONSTITUTE ONE WORK FOR PURPOSES OF STATUTORY DAMAGES

### Paragraph 160

| | |
|---|---|
| **160. News Plaintiffs have long registered their newspapers and magazines, including the Asserted Works, as compilations by issue and not as individual articles.** ***<u>The New York Times</u>:*** Hurst Decl. **Ex. 93** (Procas 30(b)(6) Dep. Tr.) 32:13-33:10, 38:21-39:10, 45:2-17; **Ex. 277** (NYT_00146884). ***<u>Daily News</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 273** (DNP-00001769). ***<u>Chicago Tribune</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 271** (DNP-00000945). ***<u>Orlando Sentinel</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 276** (DNP-00348298). ***<u>Sun Sentinel</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 272** (DNP-00001523). ***<u>The Mercury News</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 270** (DNP-00000615). ***<u>The Denver Post</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 269** (DNP-00000279). ***<u>The Orange County Register</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 275** (DNP-00036164). ***<u>Pioneer Press</u>:*** Hurst Decl. **Ex. 15** (Brewer 30(b)(6) Dep. Tr.) 25:5-12, 57:8-59:21; **Ex. 78** (Morris 30(b)(6) Dep. Tr. (dated Dec. 17, 2025)) 14:21-15:4; **Ex. 274** (DNP-00002088). ***<u>CIR</u>:*** Hurst Decl. **Ex. 11** (Bauerlein 30(b)(6) Dep. Tr. (Vol. 1, dated Jan. 26, 2026)) 70:23-71:14, 73:9-18; **Ex. 279** (Buckingham 30(b)(6) Dep. Tr. (Vol. 3, dated Feb. 27, 2026)) 23:2-25:5; **Ex. 267** (CIR0002550). | |
| **<u>News Plaintiffs' Response to Microsoft Paragraph 160</u>: Denied.** Admissible evidence contradicts this.<br><br>News Plaintiffs' copyright registrations for the Asserted Works cover both the **<u>individual</u>** articles as well as the compilations/issues. *See, e.g.,* Maisel Declaration Exhibit A [The Times's SJ Rule 1006 Summaries of its Asserted Works] (the "Times Rule 1006 Summaries") and Exhibit B | **<u>Microsoft's Reply:</u>** This fact is not genuinely disputed because News Plaintiffs do not dispute that their copyright registrations are specifically for collective works, which are compilations by statutory definition, not individual articles. The cited evidence shows that the registrations are for newspapers or magazine issues with the title of the work identified as the name of the newspaper or magazine each News Plaintiff publishes (not a list of individual |

| | |
|---|---|
| [DNP SJ Rule 1006 Summaries of its Asserted Works]; NP Ex. 312 [NYT_00000001 – NYT_00020143; NYT_00146890 – NYT_00147431; NYT_00186429 – NYT_00191175; NYT_00218808 – NYT_00264891; NYT_00420950 – NYT_00420951] (NYT registration certificates); NP Ex. 324 [DNP-00160885-952, DNP-00001672-2002; DNP-00000944 – 1338; DNP-00035848-DNP-00035881, DNP-00263284-DNP-00263464, DNP-00348298-302, DNP-00160953- 1088, DNP-00001604-1671; DNP-00263471-DNP-00263604, DNP-00001343-1603, DNP-00000187-430, DNP-00035985 - DNP-00036038,DNP-00263465-70, DNP-00348303, DNP-00002003-2209, DNP-00036105 - DNP-00036241, DNP-00000451-942, DNP-00036039 - DNP-00036104, DNP-00640861-64, DNP-00640879-964] (DNP registration certificates); Bauerlein Decl. (ECF 1788) ¶ 17; Bauerlein Decl. Ex. A at “Registered Works”; Bauerlein Decl. Ex. B.<br><br>News Plaintiffs object to the statement because it is vague and ambiguous as to whether it is referring to the process News Plaintiffs undertook for registration, or the content that was registered as a result. News Plaintiffs further object that this purported fact is immaterial to the issue of whether statutory damages should be issued per article or per issue. | articles). News Plaintiffs’ argument that the individual articles are covered by the collective work registration is a legal conclusion that does not dispute the fact as stated.<br><br>This fact is material to the determination of statutory damages as it demonstrates that all Asserted Works were part of, and registered as part of, compilations and thus are subject to the one-damages-award-per-compilation rule under 15 U.S.C. § 504(c)(1). *See* Microsoft Reply Brief at 15-16. |

Dated: November 20, 2026

Respectfully submitted,

*/s/ Annette L. Hurst*

ORRICK, HERRINGTON & SUTCLIFFE LLP
Annette L. Hurst (admitted pro hac vice)
Daniel Justice (admitted pro hac vice)
Robert Scott Shwarts
Catherine Lui (admitted pro hac vice)
Amanda H. Schwartz (admitted pro hac vice)
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759
ahurst@orrick.com
djustice@orrick.com
aschwartz@orrick.com

Christopher J. Cariello
Lisa T. Simpson
Marc Shapiro
Vanessa Sorrentino
Hilda Obeng
51 West 52nd Street
New York, NY 10019
Telephone: (212) 506-3778
Facsimile: (212) 506-5151
ccariello@orrick.com
lsimpson@orrick.com
mrshapiro@orrick.com
vsorrentino@orrick.com
hobeng@orrick.com

Sheryl Koval Garko (admitted pro hac vice)
Laura Brooks Najemy (admitted pro hac vice)
222 Berkeley Street
Boston, MA 02116
Telephone: (617) 880-1800
Facsimile: (617) 880-1801
sgarko@orrick.com
lnajemy@orrick.com

Isaac Sawlih Behnawa (admitted pro hac vice)
Johnathan Vaknin (admitted pro hac vice)
355 S. Grand Ave. Suite 2700
Los Angeles, CA 90071
Telephone: (213) 612-2179
Facsimile: (213) 612-2499
ibehnawa@orrick.com
jvaknin@orrick.com

Monica Svetoslavov (admitted pro hac vice)
Louis Andrew Schreiber
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
msvetoslavov@orrick.com
aschreiber@orrick.com

FAEGRE DRINKER BIDDLE & REATH LLP
Jeffrey S. Jacobson
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3191
jeffrey.jacobson@faegredrinker.com

Jared B. Briant (admitted pro hac vice)
Kirstin L. Stoll-DeBell (admitted pro hac vice)
Timothy Scull (admitted pro hac vice)
Shelby Pickar-Dennis (admitted pro hac vice)
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3588
jared.briant@faegredrinker.com
kirstin.stolldebell@faegredrinker.com
timothy.scull@faegredrinker.com
shelby.pickar-dennis@faegredrinker.com

Lora A. Brzezynski (admitted pro hac vice)
Brianna Lynn Silverstein (admitted pro hac vice)
Faith Maggard (admitted pro hac vice)
1500 K Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 230-5000
Facsimile: (202) 842-8465
lora.brzezynski@faegredrinker.com

brianna.silverstein@faegredrinker.com
faith.maggard@faegredrinker.com

Carrie A. Beyer (admitted pro hac vice)
320 South Canal Street, Suite 3300
Chicago, IL 60606-5707
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
carrie.beyer@faegredrinker.com

Elizabeth M.C. Scheibel (admitted pro hac vice)
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
elizabeth.scheibel@faegredrinker.com

Andrew Lawrence Van Houter
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7018
Facsimile: (973) 360-9831
Andrew.vanhouter@faegredrinker.com

*Attorneys for Defendant Microsoft Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, I caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Southern District of New York using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Annette L. Hurst*