**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This Document Relates To:<br><br>1:23-cv-11195-SHS-OTW<br>1:24-cv-01515-SHS-OTW<br>1:24-cv-03285-SHS-OTW<br>1:24-cv-04872-SHS-OTW<br>1:25-cv-04315-SHS-OTW | 1:25-md-03143-SHS-OTW<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang<br><br>ORAL ARGUMENT REQUESTED<br><br>PUBLIC VERSION — REDACTED |

**REPLY BRIEF IN SUPPORT OF OPENAI'S**

**MOTION FOR SUMMARY JUDGMENT IN THE NEWS CASES**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FAIR USE: TRAINING ..... 1

A. Factor One ..... 1

1. OpenAI's use was highly transformative. ..... 1

2. OpenAI's use was justified. ..... 3

3. News Plaintiffs mischaracterize the training process but fail to create a genuine dispute of material fact. ..... 3

4. Copyrightability of outputs does not determine transformativeness. ..... 4

B. Factor Two ..... 4

C. Factor Three ..... 5

D. Factor Four ..... 5

1. Competition from non-infringing outputs is not cognizable harm. ..... 5

2. News Plaintiffs have not been harmed by rare "regurgitations." ..... 6

3. News Plaintiffs have suffered no harm, cognizable or not. ..... 7

4. OpenAI's use did not harm any cognizable licensing market. ..... 8

III. FAIR USE: BROWSE ..... 8

A. Factor One ..... 8

B. Factor Two ..... 10

C. Factor Three ..... 10

D. Factor Four ..... 10

IV. IMPLIED LICENSE ..... 12

V. DMCA ..... 13

A. No Requisite Intent ..... 13

B. No Induced, Enabled, Facilitated, or Concealed Infringement ..... 14

C. Fair Use ..... 14

VI. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994)........................................2

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)........................................2, 3

*Arica Inst., Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992)........................................2, 5

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
931 F.Supp.2d 537 (S.D.N.Y. 2013)........................................6, 11

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)........................................*passim*

*Bartz v. Anthropic PBC*,
787 F.Supp.3d 1007 (N.D. Cal. 2025)........................................*passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)........................................8

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)........................................3

*Fox News Network, LLC v. TVEyes, Inc.*,
124 F.Supp.3d 325 (S.D.N.Y. 2015), *rev'd on other grounds*, 883 F.3d 169 (2d Cir. 2018)........................................9

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)........................................2, 4, 5, 8

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024)........................................*passim*

*Harper & Row, Publ'rs, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)........................................6

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 1786418 (N.D. Cal. June 27, 2025)........................................15

*Kadrey v. Meta Platforms, Inc.*,
788 F.Supp.3d 1026 (N.D. Cal. 2025)........................................1, 2, 5, 8

*Keane Dealer Servs., Inc. v. Harts*,
968 F.Supp. 944 (S.D.N.Y. 1997) ....................12

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)....................14

*McGucken v. Shutterstock*,
166 F.4th 361 (2d Cir. 2026) ....................13

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
189 F.4th 1150 (D.C. Cir. 2026)....................5

*N.Y. Times Co. v. Microsoft Corp.*,
777 F.Supp.3d 283 (S.D.N.Y. 2025)....................7

*Nautical Sols. Mktg., Inc. v. Boats.com*,
2004 WL 783121 (M.D. Fla. Apr. 1, 2004)....................4

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999)....................6, 7, 9

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025) ....................2, 3, 9

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ....................2, 3, 4

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ....................2, 3, 4

*Stevens v. CoreLogic, Inc.*,
899 F.3d 666 (9th Cir. 2018) ....................14

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014)....................8, 9

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025)....................4

*Thomson Reuters Enter. Centre GmbH v. ROSS Intel. Inc.*,
193 F.4th 271 (3d Cir. 2026) ....................3, 5, 8

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
2003 WL 21406289 (C.D. Cal. Mar. 7, 2003)....................4

*Whyte Monkee Prods., LLC v. Netflix, Inc.*,
174 F.4th 761 (10th Cir. 2026) ....................3

*Wright v. Warner Books, Inc.*,
953 F.2d 731 (2d Cir. 1991)....................5

**STATUTES**

17 U.S.C.
§ 101....................7
§ 107(1)....................8
§ 1202(b)....................1, 13, 14

# TABLE OF CITATION CONVENTIONS

| Document | Citation Abbreviation |
|---|---|
| OpenAI's Motion for Summary Judgment | Mot. |
| News Plaintiffs' Omnibus Opposition to Summary Judgment | Opp. |
| OpenAI's Rule 56.1 Statement | OAI-SOF |
| Class and News Plaintiffs' Response to OpenAI's Rule 56.1 Statement | Pls-OAI-SOF-Resp. |
| News Plaintiffs' Counterstatement of Material Facts | NP-CSOF |
| News Plaintiffs' Motion for Summary Judgment | NP-Mot. |
| News Plaintiffs' Corrected Rule 56.1 Statement | NP-SOF |
| OpenAI's Opposition to News Plaintiffs' Motion for Summary Judgment | OAI-NP-Opp. |
| Defendants' Response to News Plaintiffs' Rule 56.1 Statement | Defs-NP-SOF-Resp. |
| OpenAI's Opposition to Class Plaintiffs' Motion for Summary Judgment | OAI-Class-Opp. |
| News Plaintiffs' Opposition to Defendants' Rule 702 Motion | NP-702-Opp. |

# I. INTRODUCTION

News Plaintiffs' opposition only confirms that OpenAI's use of news articles for training LLMs and Browse was fair use as a matter of law. They raise no genuine dispute of material fact as to whether OpenAI's use was transformative. They concede that their own experts' analysis of ChatGPT logs showed alleged "regurgitation" rates of less than one thousandth of a percent. Pls-OAI-SOF-Resp. ¶¶ 220–222. They offer no empirical rebuttal to OpenAI's expert's analysis showing no harm, cognizable or not, insisting instead that "no empirical evidence [is] needed." Opp. 20–21. And their own expert opines that there are too "many countervailing facts within the marketplace" to attribute particular harm to OpenAI's use. Pls-OAI-SOF-Resp. ¶ 246.

News Plaintiffs also misstate the law. Their primary argument is that OpenAI's LLMs are capable of generating new, non-infringing "news" content that might "substitute" for content News Plaintiffs create. But under controlling law, the creation of new, non-infringing works or the provision of unprotected facts is not "substitution."

News Plaintiffs' implied license and DMCA arguments fare no better. They concede that they knew of OpenAI's Browse tool and how to disallow it, but chose not to. And the undisputed facts establish that OpenAI did not single out CMI for removal in violation of the DMCA.

# II. FAIR USE: TRAINING

## A. Factor One

### 1. OpenAI's use was highly transformative.

There is no "serious question" that using news articles to train general-purpose LLMs is "spectacularly" transformative. *Kadrey v. Meta Platforms, Inc.*, 788 F.Supp.3d 1026, 1044 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F.Supp.3d 1007, 1021 (N.D. Cal. 2025).

News Plaintiffs' argument that OpenAI's use cannot be transformative because its LLMs are capable of generating non-infringing "news" that might compete with News Plaintiffs is

irreconcilable with Second Circuit law.[1] *See Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077–78 (2d Cir. 1992) ("Defendant . . . is perfectly entitled to create a competing work."); *Romanova v. Amilus Inc.*, 138 F.4th 104, 115 (2d Cir. 2025) (use that does not "allow[] public access to the copy . . . assure[s] that the copied work [does not] serve as a substitute for the original in the marketplace."). Other circuits are in accord. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) (use that "facilitat[ed] the entry of a new competitor" favored fair use); *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 606–07 (9th Cir. 2000) (new work that did not contain plaintiff's protected expression was a "legitimate competitor in the market"). *Bartz*, 787 F.Supp.3d at 1021–22; *Kadrey*, 788 F.Supp.3d at 1044–45 & nn.5–6.

News Plaintiffs do not address *Arica*, and they attempt to distinguish *Sega* and *Connectix*—both of which were cited approvingly by the Supreme Court in *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22 (2021)—on the grounds that the works there were computer code. Opp. 10 n.3; *see also id.* 23. But while *Sega* and *Connectix* discuss the use of reverse-engineering techniques to study "functional requirements" in computer code, both opinions separately address the question of non-infringing competition and find it to favor fair use. *See Sega*, 977 F.2d at 1522–23, 1524; *Connectix*, 203 F.3d at 603–04, 607–08; *see also* Opp. 11–13.

No controlling authority holds that competition from new, non-infringing works renders a use "substitutive." In *Warhol*, the Court found that a Warholized photo of Prince was substitutive not solely because it "competed" with the original but because it republished protected expression from the original for the same purpose. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 535–38 (2023). *Texaco* and *Hachette* involved distributing complete copyrighted works to be read, the same purpose as the originals. *Am. Geophysical Union v.*

[1] It also wrongly conflates training with Browse. Mot. 12–13; OAI-NP-Opp. 6.

*Texaco Inc.*, 60 F.3d 913, 919–20, 923–24 (2d Cir. 1994); *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 181–82 (2d Cir. 2024).

News Plaintiffs' reliance on *Thomson Reuters Enter. Centre GmbH v. ROSS Intel. Inc.*, 193 F.4th 271, 278 (3d Cir. 2026), is unavailing. ROSS used Westlaw headnotes for "a highly similar" purpose as Thomson Reuters–to "create and optimize a legal-research platform." *Id.* at 283–84. OpenAI's use of news articles as a small part of an enormous corpus of text to pretrain a general-purpose LLM is significantly different from the purpose for which News Plaintiffs wrote their articles. Mot. 7–8. Indeed, *ROSS* expressly distinguished this, stating: "Unlike the AI models in *Bartz* and *In re: OpenAI*, ROSS's AI platform cannot generate original expression." *Id.* at 284 n.7. *ROSS* does not hold that any use that results in competition is non-transformative, and any attempt to read it that way would conflict with Second Circuit law, as discussed above.

**2. OpenAI's use was justified.**

OpenAI's use served an entirely distinct purpose from the originals and is therefore justified in the broad sense. *Warhol*, 598 U.S. at 510–11. No further justification is needed. *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 174 F.4th 761, 786 (10th Cir. 2026) (analyzing *Warhol* and holding that where a use is "transformative in this broad sense, then no independent justification is likely to be necessary"). Even if it were, OpenAI's use readily satisfies the standard because its LLMs provide a "valuable service to the public . . . without allowing public access to the copy." *Romanova*, 138 F.4th at 115; *see also* Mot. 7–8; OAI-SOF ¶¶ 22–23, 65–66.

**3. News Plaintiffs mischaracterize the training process but fail to create a genuine dispute of material fact.**

Training enables LLMs to generate factual information, and News Plaintiffs have no copyright over facts. *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Their argument that copying "to obtain facts is not a transformative purpose" fails to address *Sega*, *Sony*, and numerous other

cases holding otherwise. *See Sega*, 977 F.2d at 1522–23, 1527–28; *Connectix*, 203 F.3d at 602–04, 606–07; *Nautical Sols. Mktg., Inc. v. Boats.com*, 2004 WL 783121, at *2 (M.D. Fla. Apr. 1, 2004) (copying of "public web pages in order to extract . . . facts unprotected by copyright law constitutes a fair use"); *Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 21406289, at *4 (C.D. Cal. Mar. 7, 2003) (similar). Indeed, News Plaintiffs themselves routinely copy content from the Internet to identify and report on factual information. NYT ECF 52 at 3 n.13; OAI-SOF ¶ 172.

News Plaintiffs' characterization of training as "encoding" copyrighted expression, Opp. 4, is both inaccurate and legally immaterial. NP-Mot. 11–12. Their own expert concedes that training encodes the "general structure of language" and "general world knowledge." NP-CSOF ¶ 40. But even accepting their new characterization, it does not undermine the transformative purpose of training. *See* Books Reply at Section II.B.1.a.

**4. Copyrightability of outputs does not determine transformativeness.**

Copyright protection for AI-generated outputs is not a prerequisite to finding that OpenAI's use advances copyright's purposes. *Contra* Opp. 14–16. General-purpose LLMs facilitate human creativity. *See Google*, 593 U.S. at 30 (use that created new, utility expanding tools is "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself"). Moreover, "[t]he human authorship requirement does not prohibit copyrighting work that was made by or with the assistance of [AI]." *Thaler v. Perlmutter*, 130 F.4th 1039, 1049 (D.C. Cir. 2025). News Plaintiffs themselves use OpenAI's LLMs for brainstorming, editing, and summarization, while maintaining that their articles are entitled to copyright protection. *See* OAI-SOF ¶ 304; Pls-OAI-SOF-Resp. ¶ 304.

**B. Factor Two**

Because the Asserted Works are published and primarily factual, factor two favors fair use. Mot. 8–9; OAI-NP-Opp. 10–11. Regardless, this factor rarely plays a significant role.

*Hachette*, 115 F.4th at 187.

**C. Factor Three**

OpenAI's LLMs do not make the Asserted Works available to the public as competing substitutes. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 222 (2d Cir. 2015) ("*Google Books*"). And even focusing on the amount copied, using entire works was reasonable in light of training's transformative purpose. As *Bartz* explained, "'reasonably necessary' does not mean 'strictly necessary'" and "using any one work for actually training LLMs was about as reasonable as the next." 787 F.Supp.3d at 1030.

**D. Factor Four**

OpenAI has shown that its transformative use did not cause any cognizable harm.

**1. Competition from non-infringing outputs is not cognizable harm.**

Harm from works that do not republish protected expression from the original is not cognizable. *Arica*, 970 F.2d at 1078; *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991); *Google Books*, 804 F.3d at 224; Mot. 10; *Med. Imaging & Tech. All. v. Libr. of Cong.*, 189 F.4th 1150, 1162 (D.C. Cir. 2026); OAI-NP-Opp. 13–14.

News Plaintiffs identify no controlling authority holding otherwise. Their attempt to distinguish *Google Books* on the ground that Snippet View did not "replace demand for plaintiff's books," Opp. 24, misreads the decision, which acknowledged that there are "surely instances" in which Snippet View could satisfy demand for factual information and lead to "some loss of sales." 804 F.3d at 224; *see also Google*, 593 U.S. at 33 (harm unrelated to "the expressive qualities" of the work is not cognizable).

*ROSS* is distinguishable for the reasons explained above. *Supra* Section II.A.1. Neither *ROSS* nor *dicta* from *Kadrey* displaces the controlling Second Circuit law discussed above.

The other cases that News Plaintiffs rely on have nothing to do with harm from works

that do not republish protected expression. *Meltwater, Nihon,* and *Harper & Row* all involved dissemination of protected expression: *Meltwater* republished article text, *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F.Supp.2d 537, 554–55, 560–61 (S.D.N.Y. 2013); *Nihon* involved republication of "direct, if not word-for-word translations" of articles, *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999); and *Harper & Row* involved publication of the memoir's "most expressive elements," which impaired first-serialization rights, *Harper & Row, Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 563–64, 566–69 (1985).

**2. News Plaintiffs have not been harmed by rare "regurgitations."**

News Plaintiffs do not dispute that the rate of alleged regurgitation in actual user conversations is extremely low. OAI-SOF ¶¶ 220–222; Pls-OAI-SOF-Resp. ¶¶ 220–222. Instead, they rely on their experts' contrived experiments designed to force regurgitation through millions of repeated API probes using article-specific prompts, manipulated settings, and models unavailable through ChatGPT. Opp. 25–27; Mot. 5; Pls-OAI-SOF-Resp. ¶¶ 231–232, 235–237. Those experiments do not approximate real-world behavior and still resulted in extremely low regurgitation rates. *See* Pls-OAI-SOF-Resp. ¶ 238; Mot. 4–5; OAI-SOF ¶¶ 233, 238–239.

News Plaintiffs cannot dismiss the rarity of regurgitation by invoking speculative harm from "unrestricted and widespread conduct." Opp. 26–27. That inquiry considers the harm if the challenged conduct became widespread; it does not presume that rare instances of reproduction would become routine and turn an otherwise transformative use into a market substitute. Indeed, *Google Books* rejected precisely that reasoning, recognizing that even determined efforts to obtain protected expression through repeated searches did not render Snippet View an effective substitute. 804 F.3d at 223–24. Moreover, the type of regurgitation News Plaintiffs allege would not become "widespread" in any commercially relevant sense because eliciting it would require

technical knowledge, atypical and unnatural use of ChatGPT, and costs exceeding the purchase price of the Asserted Works. MDL ECF 1750 ¶¶ 56–57; T. Berg-Kirkpatrick Decl. (Nov. 20, 2026) Ex. A ¶ 358.

News Plaintiffs' reliance on unidentified "summaries" or "derivatives" of the Asserted Works, Opp. 27, is irrelevant. This Court has already dismissed their claim based on factual summaries. *N.Y. Times Co. v. Microsoft Corp.*, 777 F.Supp.3d 283, 328 (S.D.N.Y. 2025); *see also Nihon*, 166 F.3d at 70. And new, non-infringing outputs are not "derivative works" under 17 U.S.C. § 101. *See Google Books*, 804 F.3d at 225 (derivative works "re-present[] the protected aspects of the original work, *i.e.*, its expressive content, converted into an altered form").

**3. News Plaintiffs have suffered no harm, cognizable or not.**

OpenAI's expert's empirical analysis found no harm to any News Plaintiff attributable to ChatGPT. OAI-SOF ¶¶ 241–246; Mot. 5–6, 10. Extensive user-level analysis shows that there was no statistically significant decrease in traffic to The Times, the Daily News Plaintiffs, or Ziff Davis websites after users adopted ChatGPT, and analysis of page-level data for CIR and Intercept likewise shows no impact on web traffic. OAI-SOF ¶¶ 241–245; Defs-NP-SOF-Resp. ¶ 1609. News Plaintiffs offer no empirical rebuttal. Their own expert acknowledged that overall traffic trends have remained unchanged since ChatGPT was released, Pls-OAI-SOF-Resp. ¶ 240, and that "[t]here were too many countervailing facts within the marketplace" to isolate alleged harm attributable to OpenAI, NP-702-Opp. 38 (MDL ECF 2352); *see also id.* 28 (expert "reached no conclusion because so many factors affect traffic"). News Plaintiffs' attempts to explain away increasing revenues by observing that revenues could increase despite harm, Opp. 21, proves nothing and does not address OpenAI's empirical analysis.

*Hachette* does not excuse News Plaintiffs' failure of proof. There, the court inferred market harm because the defendant republished complete copies of the plaintiffs' books for free,

directly substituting for the originals. *Hachette*, 115 F.4th at 190, 193.

#### 4. OpenAI's use did not harm any cognizable licensing market.

News Plaintiffs' attempt to claim harm in a highly transformative market, Opp. 22, is foreclosed by *Bill Graham*, 448 F.3d at 614–15. Further, both *Bartz* and *Kadrey* rejected similar theories. *Bartz*, 787 F.Supp.3d at 1032; *Kadrey*, 788 F.Supp.3d at 1052.

The existence of OpenAI's partnerships does not establish a cognizable licensing market for pretraining. Opp. 29–30. As the Second Circuit explained, a "publisher's willingness to pay license fees for reproduction of images does not establish that the publisher may not, in the alternative, make fair use of those images." *Bill Graham*, 448 F.3d at 615; *see also Google*, 593 U.S. at 38 (finding fair use notwithstanding prior licensing negotiations). *ROSS* involved licensing headnotes for a non-generative legal research tool whose use was "minimally transformative at best," not the highly transformative use of training general-purpose LLMs on billions of works. *See* OAI-NP-Opp. 9, 16–17. Neither the existence of partnership arrangements nor the possibility of negotiating them defeats an otherwise fair use.

## III. FAIR USE: BROWSE

### A. Factor One

News Plaintiffs do not dispute that Browse is an interactive research tool that is designed to retrieve and synthesize factual information in response to queries—ranging from MoMA's opening hours to today's weather. Mot. 12–14; 17 U.S.C. § 107(1). It serves a transformative purpose distinct from the original articles. Nor do they dispute that Browse was intentionally designed to synthesize factual information from multiple sources but avoid displaying substantial amounts of protected expression from these sources to users. Mot. 15–18; OAI-SOF ¶¶ 149, 154.

On those undisputed facts, factor one strongly favors fair use. In *Swatch*, the Second Circuit held that even disseminating full copies of copyrighted recordings favored fair use under

factor one because it made important financial information available to the public. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 82 (2d Cir. 2014). As the Circuit subsequently explained, that was because the "value of the copied recording lay not in its copyright-protected manner of expression but in the unprotected information it supplied." *Romanova*, 138 F.4th at 116. Browse serves the same information purpose without being designed to disseminate substantial protected expression—which makes the use's justification even more compelling. *Id.* at 115 (stressing whether defendant "allow[ed] public access to the copy"); *see also Google Books*, 804 F.3d at 224 (provision of factual information is fair even if accomplished through delivery of short snippets of expression).

News Plaintiffs attack strawman arguments. OpenAI does not claim fair use merely because Browse is "innovat[ive]," *contra* Opp. 32, or makes otherwise inaccessible information available, *contra id.* 33 (discussing *Google Books* and *TVEyes*). Rather, Browse finds and analyzes publicly available online content, extracts facts, and generates original, tailored answers providing those facts and citations to relevant resources. Mot. 15–18; *Romanova*, 138 F.4th at 116.

Finally, the fact that one OpenAI employee used the word "substitutive" in a "brainstorming thread," Opp. 34, does not resolve the relevant legal question, *i.e.*, whether Browse "replicat[es] protected expression in a manner that provides a meaningful substitute" for the Asserted Works. *Google Books*, 804 F.3d at 220. It does not.

The irony of News Plaintiffs' position is that they themselves often report facts originally uncovered by other journalists. NYT ECF 52 at 3 n.13. Copyright does not prohibit such competition so long as the subsequent use does not appropriate protected expression. *See Nihon*, 166 F.3d at 70 (recognizing that a competitor "had every right to republish the facts" in news

articles); *see also* NYT ECF 514 at 40–42.

**B. Factor Two**

News Plaintiffs devote only a single sentence to Factor Two, incorporating their training arguments. Opp. 34. Those arguments fail for at least the reasons addressed above.

**C. Factor Three**

News Plaintiffs focus on how much text Browse ***retrieves***, Opp. 35, but the relevant question is how much protected expression from the Asserted Works is ***shown*** to users. *Google Books*, 804 F.3d at 222. The undisputed evidence shows that this amount is insignificant. Mot. 17–18; OAI-SOF ¶¶ 153–156. In any event, News Plaintiffs' contention that Browse copies "entire articles," Opp. 35, 43, mischaracterizes how it operates. In over 96% of the Browse conversations identified by their experts, the only content obtained from a News Plaintiff domain was a short snippet returned by Bing—not the underlying article. Mot. 17 n.13. Those snippets averaged approximately [redacted] comparable to snippets displayed in ordinary search results. MDL ECF 1756 ¶ 24. And even where Browse retrieves additional content, it uses that content to synthesize factual answers, not republish the articles. Mot. 15–18.

**D. Factor Four**

OpenAI has shown that its limited use in Browse did not cause any cognizable harm. Mot. 18–19. Browse uses short snippets of web content as factual references to inform responses, without displaying those snippets to users. Because Browse does not reveal significant protected expression from the underlying websites, any alleged "harm" News Plaintiffs claim arises from ChatGPT's provision of factual information to users and is not cognizable as a matter of law.

News Plaintiffs do not deny that their own experts' reported regurgitation counts yield rates below one thousandth of a percent in the analyzed logs. OAI-SOF ¶¶ 220–222; Pls-OAI-SOF-Resp. ¶¶ 220–222. Instead, they cite factual summaries, quotations in requested

commentary, articles that are not Asserted Works, and retrieval through third-party tools rather than Browse directly. Defs-NP-SOF-Resp. ¶¶ 1015–1018, 1066–1068, 1080–1084.[2] Their purported evidence of outputs with "verbatim expression," Opp. 42, includes boilerplate, third-party material, user-supplied text, and internal retrieval records that are never displayed to users. Defs-NP-SOF-Resp. ¶¶ 1010–1011, 1059; NP-CSOF ¶ 202.

Relying on *Meltwater*, News Plaintiffs contend that lower click-through rates ("CTRs") from chatbots compared with traditional, link-based web search establish substitution. Opp. 43–44. But *Meltwater* involved a service ***designed*** to republish protected expression. 931 F.Supp.2d at 554–55. Any alleged reduction in CTR caused by satisfying user demand for factual information is not cognizable harm. *Google Books*, 804 F.3d at 223–24.

Nor does News Plaintiffs' CTR evidence establish harm, cognizable or not. They admit that their cited CTR reduction (1) does not measure lost web traffic, and (2) only measures the alleged difference in CTR between two Microsoft products rather than between ChatGPT and "traditional search." NP-SOF ¶ 1536. None of this rebuts OpenAI's expert Prof. Goldfarb's user-level analysis demonstrating no statistically significant decrease in visits to News Plaintiffs' websites following ChatGPT adoption. OAI-SOF ¶¶ 241–243; *supra* Section II.D.3.

Finally, News Plaintiffs' licensing arguments fail because they claim harm to a highly transformative market, *see supra* Section II.D.4, and their predictions of harm from widespread use fail because (1) the harm they claim is not cognizable, (2) OpenAI's use permits News Plaintiffs to disallow the use via robots.txt, and (3) alleged harm from Google's AI Overviews cannot be attributed to OpenAI. OAI-NP-Opp. 17–18; Defs-NP-SOF-Resp. ¶¶ 1780–1788.

---

[2] They also cite outputs from Microsoft's Copilot, not OpenAI's Browse. Opp. 42–43.

## IV. IMPLIED LICENSE

News Plaintiffs do not dispute they were aware of OpenAI's March 2023 announcement, in which it explained that (1) it had "created a web browsing plugin" which "retrieves recent information" from the Internet to inform ChatGPT responses and (2) had implemented a mechanism for publishers to opt out of this service via robots.txt. OAI-SOF ¶183; J. Gratz Decl. Ex. 44. Nor do they dispute that, upon learning of OpenAI's new service, they "chose not to act." Mot. 20; *see generally* Opp. 46–47. For good reason: internal emails show that News Plaintiffs were well aware of this opt-out mechanism and [redacted]. OAI-SOF ¶¶ 190–194. That is "consent given in the form of . . . lack of objection," which is "equivalent to a nonexclusive license." *Keane Dealer Servs., Inc. v. Harts*, 968 F.Supp. 944, 947 (S.D.N.Y. 1997).

Instead, News Plaintiffs offer an excuse: that they "needed time to learn" about the service and "figure out what to do." Opp. 46. This is immaterial. Implied license does not require knowledge of every technical detail of a disclosed use. News Plaintiffs knew that OpenAI was using their articles for Browse, understood how to prevent that use, and deliberately chose not to—instead preferring to "keep[] an eye on it." OAI-SOF ¶¶ 186–194.

News Plaintiffs offer two other arguments. First, they suggest that they told OpenAI not to "use their content" for Browse. Opp. 47. But none of the pre-lawsuit evidence identified actually references Browse, despite the fact that News Plaintiffs indisputably were aware of it. OpenAI also implemented additional measures to restrict Browse access to News Plaintiffs' content following the filing of their lawsuits. NP-SOF ¶ 1019; News Ex. 410 ¶¶ 250–257.

Second, they claim the robots.txt protocol is unworkable on an Internet-wide scale, and express concern about their ability to deal with bots not at issue in this litigation. Opp. 50. OpenAI's motion does not ask the Court to endorse any particular standard or to dictate a rule to

govern the entire Internet. It seeks a straightforward application of a basic principle of law: that a publisher who, by act or omission, licenses a particular use cannot later claim ignorance and sue the licensee for damages. Mot. 19–20. That is exactly what happened here.

## V. DMCA

The undisputed facts establish that OpenAI did not intentionally remove copyright management information ("CMI") knowing, or having reasonable grounds to know, that removal would "induce, enable, facilitate, or conceal" copyright infringement. 17 U.S.C. § 1202(b).

### A. No Requisite Intent

News Plaintiffs concede "intentional removal" requires "singling out" CMI for removal. Opp. 52. That OpenAI ***extracted*** some text and not other content—including alleged CMI—is legally insufficient: Section 1202(b)(1) only applies if the defendant's "intent" was to remove CMI for its own sake. *McGucken v. Shutterstock*, 166 F.4th 361, 370 (2d Cir. 2026) (rejecting CMI claim based on evidence that removal was "to avoid computer viruses and the dissemination of [PII]"). It is insufficient that OpenAI excluded a broader category of content, such as website boilerplate, that incidentally contains CMI. *See* Mot. 23–24. The undisputed facts show that OpenAI performed generalized text extraction, not targeted CMI removal: its text extractors retained desirable training content—human-written language data—and not raw HTML that contained "illegible, non-language data," including repetitive or machine-generated boilerplate. OAI-SOF ¶ 341; Defs-NP-SOF-Resp. ¶¶ 1303–1304.

News Plaintiffs' remaining evidence confirms the point. The Dragnet, Newspaper, and Gutentag text extractors applied heuristics designed to extract human-language text. *See* Defs-NP-SOF-Resp. ¶¶ 1310–1331. OpenAI's witnesses likewise explained that it sought human-language text. *See* Defs-NP-SOF-Resp. ¶¶ 1303–1304. Isolated snippets of source code that identified and did not extract HTML fields containing non-useful boilerplate text—even if, as

News Plaintiffs assert, some fields may contain CMI, Opp. 51—cannot prevent summary judgment that OpenAI did not ***single out*** CMI for removal.

### B. No Induced, Enabled, Facilitated, or Concealed Infringement

News Plaintiffs' speculation about several types of infringement that the alleged CMI removal might conceal or facilitate, Opp. 53–57, is legally deficient. Section 1202(b) requires ***evidence*** that removal is likely to aid infringement. *Stevens v. CoreLogic, Inc.*, 899 F.3d 666, 673–75 (9th Cir. 2018). News Plaintiffs supply none, which dooms their claims. Their output and user-sharing theories require a tortuous chain of unsupported assumptions: that retaining bylines and copyright notices in training text would cause ChatGPT to output CMI alongside a regurgitated article, that such article would even be regurgitated, that such reproduced CMI would be accurate, and that seeing such CMI would deter a user from sharing the output. Opp. 54–56. Because each assumption finds zero factual support, OAI-SOF ¶ 349, News Plaintiffs resort to their experts' speculative say-so, but that cannot defeat summary judgment as a matter of law. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

News Plaintiffs fare no better in their training theories, which speculate that ChatGPT might reveal training sources if CMI were extracted. Opp. 56–57. They offer no evidence any extracted CMI would enable ChatGPT to accurately identify its training inputs if so prompted. Their assertion that alleged CMI removal simplified tokenization or reduced processing costs, Opp. 57, is similarly unfounded. MDL ECF 1750, Ex. H ¶¶ 198–200 (adding CMI would require under $4 monthly, total).

### C. Fair Use

News Plaintiffs' assertion that no standalone "fair use" defense applies to DMCA claims misses the point. Opp. 57–58. Their output and user-sharing theories are baseless speculation, and any CMI removal that facilitates training could not facilitate infringement because training is

fair use as a matter of law. *Kadrey v. Meta Platforms, Inc.*, 2025 WL 1786418, at *1 (N.D. Cal. June 27, 2025); Mot. 22–23.

## VI. CONCLUSION

For the foregoing reasons, the Court should grant OpenAI's motion.

Dated: November 20, 2026

Respectfully submitted,

**LATHAM & WATKINS LLP**
Andrew M. Gass (*pro hac vice*)
*andrew.gass@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415.391.0600

Sarang V. Damle
*sy.damle@lw.com*
Luke A. Budiardjo
*luke.budiardjo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200

Elana Nightingale Dawson (*pro hac vice*)
*elana.nightingaledawson@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

**MORRISON & FOERSTER LLP**
Joseph C. Gratz (*pro hac vice*)
*jgratz@mofo.com*
Tiffany Cheung (*pro hac vice*)
*tcheung@mofo.com*
Caitlin Sinclaire Blythe (*pro hac vice*)
*cblythe@mofo.com*
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000

Lily Li (*pro hac vice*)
*YLi@mofo.com*
755 Page Mill Road
Palo Alto, CA 94304
Telephone: 650.813.5600

**KEKER, VAN NEST & PETERS LLP**
Robert A. Van Nest (*pro hac vice*)
*rvannest@keker.com*
R. James Slaughter (*pro hac vice*)
*rslaughter@keker.com*
Paven Malhotra
*pmalhotra@keker.com*
Michelle S. Ybarra (*pro hac vice*)
*mybarra@keker.com*
Reid P. Mullen (*pro hac vice*)
*rmullen@keker.com*
Nicholas S. Goldberg (*pro hac vice*)
*ngoldberg@keker.com*
633 Battery St.
San Francisco, CA 94111
Telephone: 415.391.5400

*Attorneys for OpenAI*

**CERTIFICATE OF COMPLIANCE**

In accordance with Local Civil Rule 7.1(c), I hereby certify that the foregoing REPLY BRIEF IN SUPPORT OF OPENAI'S MOTION FOR SUMMARY JUDGMENT IN THE NEWS CASES is 4,374 words, exclusive of the caption page, table of contents, table of authorities, and signature block. The basis of my knowledge is the word count feature of the word-processing system used to prepare this memorandum.

Dated: November 20, 2026 By: ______________________